**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAITIAN BRIDGE ALLIANCE,<br>c/o INNOVATION LAW LAB<br>333 SW Fifth Avenue #200<br>Portland, OR 97204<br>Telephone: +1 503 922-3042<br>Facsimile: +1 503-882-0281;<br><br>MIRARD JOSEPH and MADELEINE<br>PROSPERE, citizens of Haiti,<br>c/o INNOVATION LAW LAB<br>333 SW Fifth Avenue #200<br>Portland, OR 97204<br>Telephone: +1 503 922-3042<br>Facsimile: +1 503-882-0281;<br><br>MAYCO CELON and VERONIQUE<br>CASSONELL, citizens of Haiti,<br>c/o INNOVATION LAW LAB<br>333 SW Fifth Avenue #200<br>Portland, OR 97204<br>Telephone: +1 503 922-3042<br>Facsimile: +1 503-882-0281;<br><br>WILSON DOE, citizen of Haiti,<br>c/o INNOVATION LAW LAB<br>333 SW Fifth Avenue #200<br>Portland, OR 97204<br>Telephone: +1 503 922-3042<br>Facsimile: +1 503-882-0281;<br><br>JACQUES DOE, citizen of Haiti,<br>c/o INNOVATION LAW LAB<br>333 SW Fifth Avenue #200<br>Portland, OR 97204<br>Telephone: +1 503 922-3042<br>Facsimile: +1 503-882-0281;<br><br>ESTHER and EMMANUEL DOE, citizens of<br>Haiti<br>c/o INNOVATION LAW LAB<br>333 SW Fifth Avenue #200<br>Portland, OR 97204 | Civil Action No. |

Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281;

SAMUEL and SAMENTHA DOE, citizens of
Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281;

PAUL DOE, citizen of Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

*Plaintiffs*,

v.

JOSEPH R. BIDEN, PRESIDENT OF THE
UNITED STATES, *in his official capacity*;
1600 Pennsylvania Avenue NW
Washington, DC 20500;

ALEJANDRO N. MAYORKAS, SECRETARY
OF HOMELAND SECURITY*, in his official
capacity*;
Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND
SECURITY
245 Murray Lane SW
Washington, DC 20528;

CHRIS MAGNUS, COMMISSIONER FOR U.S.
CUSTOMS AND BORDER PROTECTION, *in
his official capacity*;
U.S. Customs and Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20229;

WILLIAM A. FERRARA, EXECUTIVE
ASSISTANT COMMISSIONER OF U.S.
CUSTOMS AND BORDER PROTECTION'S
OFFICE OF FIELD OPERATIONS, *in his
official capacity*;
CBP Office of Field Operations
1300 Pennsylvania Ave. NW
Washington, DC 20229;

RAUL L. ORTIZ, CHIEF OF U.S. BORDER
PATROL, *in his official capacity*;
U.S. Border Patrol
1300 Pennsylvania Ave. NW
Washington, DC 20229;

U.S. CUSTOMS AND BORDER PROTECTION,
Office of Chief Counsel
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, D.C. 20229;

TAE D. JOHNSON, ACTING DIRECTOR OF
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *in his official capacity*;
U.S. Immigration and Customs Enforcement,
500 12th Street SW
Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street SW
Washington, DC 20536;

XAVIER BECERRA, SECRETARY OF
HEALTH AND HUMAN SERVICES, *in his
official capacity*;
U.S. Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Ave. SW
Washington, DC 20201;

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
Hubert H. Humphrey Building
200 Independence Ave. SW
Washington, DC 20201;

ROCHELLE P. WALENSKY, DIRECTOR OF
CENTERS FOR DISEASE CONTROL AND
PREVENTION, *in her official capacity*;
Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329;

CENTERS FOR DISEASE CONTROL AND
PREVENTION,
Centers for Disease Control and Prevention
1600 Clifton Road
Atlanta, GA 30329;

*Defendants*.

## CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................ 3

PARTIES ............................................................................................................... 4

I.      Plaintiffs ...................................................................................................... 4

II.     Defendants .................................................................................................. 8

FACTUAL ALLEGATIONS ............................................................................. 12

I.      The United States' history of anti-Haitian immigration policies ..................... 12

        A.      The United States has long supported the economic and political
                subjugation of Haitians ................................................................... 12

        B.      The United States uses its immigration policy to discriminate against
                Haitians .......................................................................................... 14

        C.      The United States' recent Title 42 Process has been brutally deployed
                against Haitians. ............................................................................. 16

II.     DHS Defendants violate the rights of thousands of Haitian asylum seekers in Del
        Rio ............................................................................................................. 18

        A.      DHS Defendants take no steps to prepare for the anticipated arrival of
                large groups of Haitian asylum seekers in Del Rio .............................. 20

        B.      Thousands of Haitian asylum seekers arrive in Del Rio in September 2021 ...... 22

        C.      CBP personnel abuse Haitian asylum seekers in Del Rio pursuant to the
                Haitian Deterrence Policy. .............................................................. 24

                1.      CBP personnel deprive thousands of asylum seekers in their
                        custody of basic human needs .............................................. 25

                        (a)     CBP personnel provide inadequate food and water. ................... 26

                        (b)     CBP personnel deny asylum seekers any shelter. ...................... 28

                2.      CBP personnel refuse to provide effective medical care. ...................... 28

                3.      CBP personnel physically and verbally abuse asylum seekers in
                        Del Rio ............................................................................... 30

        D.      DHS Defendants summarily expel thousands of Haitian asylum seekers
                from Del Rio in unprecedented fashion ............................................ 33

                1.      DHS Defendants expel thousands of asylum seekers from Del Rio
                        to Haiti ............................................................................... 35

                2.      DHS Defendants expel thousands of asylum seekers from Del Rio
                        to Mexico ............................................................................ 39

        E.      Asylum seekers expelled from Del Rio face danger in Haiti and Mexico .......... 40

# TABLE OF CONTENTS

Page

III. President Biden and DHS Defendants' Haitian Deterrence Policy applied in Del Rio diverges from standard practices and is driven by discriminatory purpose. ................... 42

    A. The treatment of Haitian migrants in Del Rio diverged from standard practices Defendants applied to other asylum seekers ......................................... 43

    B. Discriminatory intent drove the treatment of Haitian asylum seekers in Del Rio. ........................................................................................................................... 45

IV. Defendants' Title 42 Process applied in Del Rio is unlawful. ........................................ 46

    A. The federal government's public health powers provide no support for the mass, summary expulsion of asylum seekers ..................................................... 46

    B. Defendants' Title 42 Process deprives asylum seekers of protections guaranteed under U.S. law ............................................................................... 47

    C. Defendants' Title 42 Process does not advance public health ........................... 49

V. Defendants' Title 42 Process and Haitian Deterrence Policy continue, even as tens of thousands of Haitians again head to the U.S. border .................................................. 51

VI. Individual Plaintiffs were harmed by Defendants' policies implemented in Del Rio. ......................................................................................................................................... 52

    A. Plaintiffs Mirard Joseph and Madeleine Prospere ................................................ 52

    B. Plaintiffs Mayco ("Michael") Celon and Veronique Cassonell .......................... 54

    C. Plaintiff Wilson Doe .............................................................................................. 55

    D. Plaintiff Jacques Doe ............................................................................................. 56

    E. Plaintiffs Esther and Emmanuel Doe ..................................................................... 58

    F. Plaintiffs Samuel and Samentha Doe ..................................................................... 60

    G. Plaintiff Paul Doe ................................................................................................... 62

VII. Haitian Bridge is harmed by the application of the Title 42 Process and Haitian Deterrence Policy in Del Rio. ......................................................................................... 64

CLASS ALLEGATIONS ............................................................................................................ 66

CAUSES OF ACTION ............................................................................................................... 69

PRAYER FOR RELIEF ............................................................................................................. 83

## INTRODUCTION

1.     On a hot day in mid-September, Mirard Joseph crossed the Rio Grande with his wife Madeleine and their one-year-old daughter. As they stepped onto the riverbank in Del Rio, Texas, Mirard and Madeleine were greeted by countless others who, like them, had fled danger and instability in Haiti and traveled thousands of miles to the United States to save their own and their families' lives.

2.     For days, Mirard and Madeleine waited patiently for an opportunity to seek asylum, a process they are entitled to access under U.S. law. They and at least 15,000 Haitian asylum seekers were kept in a makeshift encampment set up by U.S. Customs and Border Protection near the Del Rio International Bridge (the "CBP Encampment"). During the day, Mirard sweltered in triple-digit temperatures. At night, the family kept close as they slept on the ground, hopeful that they could soon request protection and begin new lives in the safety of the United States.

3.     With each passing day, Mirard's situation became more dire. U.S. officials in the encampment distributed only bottled water and bread to his family, and not enough to sustain anyone. He watched as Madeleine and their daughter suffered from hunger and dehydration. On September 18, 2021, Mirard crossed to Mexico to buy the food and water that his family desperately needed, but which U.S. officers had repeatedly denied. While in Mexico, Mirard made a note to return the next day for a treat for his daughter's second birthday.

4.     What Mirard met as he returned to Del Rio was captured in heartrending photos and video that stirred the national conscience and placed a spotlight on the treatment of Haitians in the CBP Encampment. After Mirard stepped out of the river, holding two bags of food for Madeleine and his daughter, he encountered a mounted officer. As other officers looked on—some on foot, others on horseback or in official vehicles—the mounted officer shouted at Mirard, lashed at him with split reins, grabbed his neck, and held his collar. For several minutes, the officer attempted to drag Mirard back to the river, destroying Mirard's shirt and causing his shoes to fall off in the process. The officer released Mirard only when the horse was about to trample him. Two days later, Mirard and his family were taken to a detention facility. From there, Mirard and

Madeleine were shackled, placed on a plane with their young daughter, and expelled to Haiti.

5.    Mirard now reflects that when he was grabbed and dragged by the horse-mounted officer, it "was the most humiliating experience of my life. The second most humiliating moment was when they handcuffed and chained me to go back to Haiti."

\*    \*    \*

6.    What happened to Mirard and many others was neither bad luck nor an isolated experience. It was the expected result of two policies applied by U.S. officials in Del Rio.

7.    Acting pursuant to purported public health authority under Title 42 of the U.S. Code, immigration officials detained Haitian asylum seekers for field processing in the CBP Encampment and summarily expelled them—either on flights to Haiti or by forcing them back into Mexico—from the United States. When this "Title 42 Process" was introduced by former President Donald Trump in March 2020, his own Centers for Disease Control and Prevention experts objected that there was no sound public health rationale for an order expelling asylum seekers to the countries they fled. Since President Biden's inauguration, his administration has embraced Title 42. Indeed, consistent with the United States' long history of anti-Haitian and anti-Black immigration policies, the Biden Administration has used the Title 42 Process as a cudgel to deny thousands of Haitians an opportunity to access the U.S. asylum process. After witnessing Department of Homeland Security officials' mass expulsions of asylum seekers from the CBP Encampment, a senior advisor in the Biden Administration decried the Title 42 Process as "violat[ing] our legal obligation not to expel or return [ ] individuals who fear persecution, death, or torture, especially [for] migrants fleeing from Haiti."

8.    But U.S. officials' abuse of Haitians in Del Rio did not stop with the Title 42 Process. Despite President Biden's promises to restore dignity and compassion to the U.S. asylum system, senior White House and Department of Homeland Security officials developed a "Haitian Deterrence Policy" to apply the Title 42 Process in a way that subjected Haitian asylum seekers in Del Rio to deplorable conditions while in government custody, was deliberately indifferent to humanitarian concerns, and focused on expelling Haitian asylum seekers as quickly as possible.

-2-

Pursuant to this policy, U.S. officials refused to prepare sufficient infrastructure, personnel, and resources in Del Rio to provide for migrants' basic necessities. They also directed the expedited, mass expulsions of migrants to deter other Haitians from seeking asylum in the United States.

9.      Unfortunately, Mirard is not alone in the suffering he experienced in Del Rio from the Title 42 Process and the Haitian Deterrence Policy. Thousands of other Haitian asylum seekers in the CBP Encampment were similarly impacted by U.S. officials' calculated indifference. They were denied food, water, and medical care. They were physically and verbally abused. And they were summarily expelled without an opportunity to request asylum and without consideration of the danger they would face in Haiti or Mexico.

10.      When the world witnessed the events unfold in Del Rio, President Biden said he "takes responsibility" for the "horrible" treatment of Haitians and promised a swift investigation. In the ensuing three months, however, there has been no accountability for these acts. Instead, U.S. officials have reaffirmed their commitment to the Title 42 Process and continue to use it to expel asylum seekers to Haiti at alarming levels—at least 99 expulsion flights to Haiti carrying more than 10,000 asylum seekers have occurred since the government began to clear the CBP Encampment in September. And the Biden Administration has shown no evidence that it has abandoned its cruel Haitian Deterrence Policy.

11.      Plaintiffs—eleven Haitian asylum seekers who were victims of U.S. officials' abusive treatment in the CBP Encampment and expelled without an opportunity to access the U.S. asylum system, and Haitian Bridge Alliance, a community-based organization that has led the legal and humanitarian response to that conduct—bring this lawsuit to ensure accountability and an end to the Biden Administration's harmful, discriminatory, and unlawful policies.

## JURISDICTION AND VENUE

12.      This case arises under the Fifth Amendment of the U.S. Constitution; the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"); the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*. ("INA"), and its implementing regulations; the Convention Against Torture, 8 U.S.C. § 1231 note ("CAT"), *see also* Foreign Affairs Reform and Restructuring Act of

1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-82 (1998) ("FARRA"); and the Public Health Service Act of 1944, 42 U.S.C. § 201, *et seq*.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The United States has waived sovereign immunity with respect to the claims alleged in this case. *See* 5 U.S.C. § 702. This Court has jurisdiction to enter declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (e)(1) because defendants are agencies of the United States and federal officers of the United States acting in their official capacities and are headquartered or reside in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### I.     Plaintiffs

15.     Plaintiff **Haitian Bridge Alliance** ("Haitian Bridge") is a grassroots and community-based nonprofit organization incorporated in California. Its mission is to advocate for fair and humane immigration policies and to provide humanitarian, legal, and social services to migrants—particularly Black migrants, the Haitian community, and other vulnerable populations. Since 2015, Haitian Bridge has provided services to asylum seekers and other migrants at the border and throughout their U.S. immigration proceedings. As a Haitian-led, Haitian Creole-speaking organization, Haitian Bridge also provides social and humanitarian assistance to and advocacy alongside Black migrant communities at the border, across the United States, and in Mexico, and educates the public about anti-Black racism in the U.S. immigration system. Haitian Bridge provided aid and legal services to asylum seekers in the CBP Encampment in September 2021. Since the encampment was cleared, Haitian Bridge has continued to provide humanitarian assistance and legal services to Haitian asylum seekers expelled from Del Rio.

16.     Plaintiffs **Mirard Joseph and Madeleine Prospere** are citizens of Haiti. They fled to Chile in 2017 because they felt unsafe in Haiti and feared they could be kidnapped every time

they left their home. Due to their lack of stability in Chile, the couple decided to travel to the United States with their one-year-old daughter to seek asylum.[1] On or around September 11, 2021, Mirard, Madeleine, and their baby arrived in Del Rio, Texas, and were given a numbered ticket by U.S. officials. While waiting to seek asylum, they experienced extreme hunger because U.S. officials provided insufficient food to meet their basic needs. Mirard was thus forced to cross the Rio Grande into Mexico several times to buy food for his wife and their daughter. On September 18, 2021, as Mirard was returning to the CBP Encampment with food, U.S. officials on horseback chased and lashed Mirard, and tried to force him back to Mexico. Two days later, after Mirard and Madeleine had been in the CBP Encampment for approximately nine days, officials called their ticket number and transported the family to a detention center. After being detained there for several days, Mirard and Madeleine were shackled and—without being told where they were going—expelled with their young child to Haiti. They never received an opportunity to seek asylum or explain why they feared returning to Haiti. Mirard is currently in Haiti, where he remains in hiding out of fear of being attacked or kidnapped if he ventures outside. Madeleine has been forced to separate from their family to take their young daughter to Chile for medical care that was unavailable in Haiti for the illnesses she developed in the CBP Encampment. They plan to return to the United States to seek asylum.

17.     Plaintiffs **Mayco ("Michael") Celon and Veronique Cassonell** are citizens of Haiti. Michael fled Haiti after his mother was murdered when he was fifteen years old. Because it was not safe to return to Haiti, his family remained in the Dominican Republic and Chile for over two decades. During that time he married Veronique and they had two children. After suffering discrimination in Chile and seeing multiple Haitians murdered there, Michael and Veronique traveled to the United States with their children, intending to seek asylum. In mid-September 2021,

---

[1] As used in this Complaint, references to "asylum" or the "U.S. asylum process" are understood to encompass the statutory and regulatory processes by which any noncitizen may seek all relevant forms of non-refoulement relief available under U.S. immigration laws, including asylum, withholding of removal, and relief under the Convention Against Torture. *See* 8 U.S.C. §§ 1158, 1231 & note.

Michael, Veronique, and their children crossed into Del Rio and presented themselves at the CBP Encampment. They experienced terrible conditions, received very little food and water, slept on the ground, and saw officers on horseback using reins as whips against people in the river. After approximately ten days, U.S. officials sent Michael and Veronique to a detention center, where they were detained separately, each with one of their children. After approximately nine days separated in detention, Michael, Veronique, and their children were expelled in shackles to Haiti, having never been given an opportunity to seek asylum. Conditions in Haiti were so bad that the family has since returned to Chile. Although they face discrimination and threats in Chile because of their race and Haitian nationality, they are marginally safer there than in Haiti. They plan to return to the United States to seek asylum.

18.     Plaintiff **Wilson Doe** and his wife Wideline are Haitian nationals who fled Haiti after Wideline was kidnapped and held for ransom. They eventually made their way to the United States with their two children to seek asylum. On or around September 11, 2021, Wilson, Wideline, and their children crossed the U.S.-Mexico border near Del Rio. They remained in the CBP Encampment for approximately four days hoping they would be given the opportunity to seek asylum. While in the encampment, Wilson, Wideline, and their children received only water, and no food. On or around September 14, 2021, U.S. officials removed Wilson and his family from the CBP Encampment and held them in a detention center for about four or five days, where they separated Wilson and his older child from each other and from the rest of the family. On or around September 19, 2021, U.S. officials expelled Wilson, Wideline, and their two children to Haiti, without giving them an opportunity to seek asylum. Wilson, Wideline, and their children are currently in Haiti, where they remain in constant fear that Wideline or others in their family will again be kidnapped. Wilson and Wideline plan to return to the United States with their children to seek asylum.

19.     Plaintiff **Jacques Doe,** a citizen of Haiti, fled Haiti because a gang had targeted him for death, even following him into the countryside when he tried to escape their reach. He fled to Brazil and then made an arduous journey to the United States to seek asylum. In mid-September

2021, Jacques came to the CBP Encampment, where U.S. officials gave him a numbered ticket. Jacques understood that he would need to identify himself when officials called the number, which they did around eight days later. Instead of receiving the chance to seek asylum, Jacques was taken to two different detention centers for approximately one week, after which he was expelled Haiti. On the expulsion flight, Jacques tried to tell officials that he could not return to Haiti because he faced danger there. But the officials responded only that "there were too many Haitians in the United States" and that they had to send Jacques and others back to Haiti. Jacques is currently in hiding in Haiti, hoping the gang that previously threatened his life will not learn that he is back in the country. Jacques plans to return to the United States to seek asylum.

20.     Plaintiffs **Esther and Emmanuel Doe** are citizens of Haiti. They fled Haiti after receiving numerous threats of violence from a gang affiliated with the majority political party. On or around September 18, 2021, Esther, Emmanuel, and their baby son arrived in Del Rio to seek asylum in the United States. In the CBP Encampment, their baby became very sick. When Esther tried to cross the river to find food for him, she was terrorized by officers on horseback. U.S. officials attempted to expel Esther and Emmanuel back to Haiti without giving them an opportunity to seek asylum. Because they were afraid of being expelled to Haiti, Esther and Emmanuel were forced to cross with their son back into Mexico. They are currently living in precarious conditions in Mexico and intend to return to the United States to seek asylum.

21.     Plaintiffs **Samuel and Samentha Doe** are Haitian nationals who fled Haiti after Samuel was attacked by a rival political party and threatened at the school where he worked by men armed with machetes. They originally escaped to Chile but struggled to survive there, eventually deciding to seek asylum in the United States. On or around September 16, 2021, Samuel, Samentha, and their two children crossed into the United States near Del Rio, where they were given a numbered ticket and told to wait until their number was called. While in the CBP Encampment, Samuel developed stomach ulcers, their daughter became very sick, and their son contracted an eye infection and a rash after falling on the ground and injuring his eye while running away from U.S. officers on horseback. Everyone in the family went hungry because there was not

enough food in the encampment. Eventually, Samuel and Samentha decided they could not keep their children in such conditions and felt compelled to cross back into Mexico. They are currently in Mexico because they cannot return to Haiti and plan on returning to the United States to seek asylum.

22.    Plaintiff **Paul Doe** is a citizen of Haiti.[2] A gang affiliated with the dominant political party in Haiti killed his uncle after he failed to pay back money he owed, then targeted Paul for recruitment. Paul fled because he had only two options in Haiti: join the gang or die. He first escaped to Chile and then made his way to the United States, hoping he would be granted asylum. On or around September 17, 2021, Paul arrived in Del Rio. U.S. officials gave him a numbered ticket and told him to wait until his number was called. While waiting in the CBP Encampment, Paul was provided no shelter and very little food or water. He slept on the ground in the dust and went hungry for several days. He knew he could not survive much longer without adequate food and water. Eventually, Paul saw people being taken from the encampment and heard they had been sent back to Haiti. As more and more people were taken away, he realized that he had no option but to cross back to Mexico because he was weak from lack of food and knew that if he were sent back to Haiti, he was a dead man. Paul was never given an opportunity to speak with U.S. officials to seek asylum. Paul is currently in Mexico and plans to return to the United States to seek asylum.

## II.    Defendants

23.    Defendant Joseph R. Biden, Jr., is President of the United States. He is sued in his official capacity. In that capacity, President Biden is the Chair of the National Security Council ("NSC"), a forum of the President's senior advisors, and the Domestic Policy Council ("DPC"), which is tasked with driving and implementing the President's domestic policy agenda in the White House and across the Federal Government. Under President Biden's authority, the NSC and

---

[2] A motion for leave of the Court for Wilson and Wideline Doe, Jacques Doe, Esther and Emmanuel Doe, Samuel and Samentha Doe, and Paul Doe to proceed under pseudonyms will be filed separately.

DPC each contributed to devising, developing, and implementing the Haitian Deterrence Policy applied to Individual Plaintiffs and others seeking asylum in Del Rio. In his official capacity, President Biden also delegated authority to the Secretary of the U.S. Department of Health and Human Services ("HHS"), the Director of the U.S. Centers for Disease Control and Prevention ("CDC"), and the Secretary of the U.S. Department of Homeland Security ("DHS") to review, determine, and implement the Title 42 Process that was used to expel Individual Plaintiffs and thousands of others from Del Rio. Pursuant to that delegation of authority and the Haitian Deterrence Policy devised by his White House senior staff, President Biden enabled DHS to prioritize the rapid expulsion of approximately 15,000 Haitian asylum seekers from Del Rio, Texas, to Haiti and Mexico without giving them access to the asylum process or screening them for a fear of return to their home country.

24.     Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security. He is sued in his official capacity. In that capacity, Secretary Mayorkas is responsible for the administration of U.S. immigration laws. *See* 8 U.S.C. § 1103. Secretary Mayorkas directs each of DHS's components, including the components responsible for the processing, apprehension, detention, and removal of noncitizens present at or between U.S. ports of entry and the components charged with implementing and applying the Title 42 Process and the Haitian Deterrence Policy to Individual Plaintiffs and others seeking asylum in Del Rio.

25.     Defendant U.S. Department of Homeland Security is a federal cabinet-level department of the U.S. government. DHS is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1). It is responsible for administering U.S. immigration laws, including those relating to the processing, apprehension, detention, and removal of noncitizens present at or between U.S. ports of entry. *See* 8 U.S.C. § 1103. DHS, in coordination with HHS and CDC, is responsible for implementing the Title 42 Process. Its components include U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), which are responsible for implementing and applying the Title 42 Process and the Haitian Deterrence Policy.

26.     Defendant Chris Magnus is the Commissioner for CBP. He is sued in his official

capacity. In that capacity, Mr. Magnus is a supervisory official responsible for overseeing the processing, apprehension, and detention of noncitizens arriving at or between U.S. ports of entry. Mr. Magnus is also responsible for implementing the Title 42 Process and the Haitian Deterrence Policy and for conducting expulsions of noncitizens subject to the Title 42 Process and the Haitian Deterrence Policy.

27.     Defendant William A. Ferrara is the Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). He is sued in his official capacity. OFO is responsible for border security, including immigration and facilitating travel through U.S. ports of entry. As Executive Assistant Commissioner, Mr. Ferrara oversees OFO personnel and the operation of 20 major field offices and 328 ports of entry along the U.S. border. He is a supervisory official responsible for implementing the Title 42 Process at U.S. ports of entry and applying the Haitian Deterrence Policy.

28.     Defendant Raul L. Ortiz is the Chief of U.S. Border Patrol ("Border Patrol"), which is a sub-office of CBP. He is sued in his official capacity. Border Patrol is the mobile, uniformed law-enforcement arm of CBP and is the primary federal law enforcement agency responsible for border security and enforcement of U.S. immigration laws between U.S. ports of entry. As Chief of Border Patrol, Mr. Ortiz oversees all Border Patrol personnel and is a supervisory official responsible for implementing the Title 42 Process between U.S. ports of entry and applying the Haitian Deterrence Policy.

29.     Defendant U.S. Customs and Border Protection is a sub-agency of DHS and an "agency" within the meaning of the APA. *See* 6 U.S.C. § 271; *see also* 5 U.S.C. § 551(1). It is responsible for the processing, apprehension, and detention of noncitizens present at or between U.S. ports of entry. CBP has primary responsibility for implementing the Title 42 Process and the Haitian Deterrence Policy and conducting expulsions of noncitizens subject to the Title 42 Process and the Haitian Deterrence Policy.

30.     Defendant Tae D. Johnson is the Acting Director of ICE. He is sued in his official capacity. In that capacity, Mr. Johnson oversees all ICE personnel and is a supervisory official

responsible for overseeing immigration detention, including the detention of noncitizens subject to the Title 42 Process and the Haitian Deterrence Policy, and carrying out expulsion flights of noncitizens subject to the Title 42 Process and the Haitian Deterrence Policy.

31.     Defendant U.S. Immigration and Customs Enforcement is a sub-agency of DHS and an "agency" within the meaning of the APA. *See* 6 U.S.C. § 271; *see also* 5 U.S.C. § 551(1). It is responsible for executing removal orders and overseeing immigration detention, including the detention of noncitizens subject to the Title 42 Process and the Haitian Deterrence Policy. It also conducts air operations to expel or remove noncitizens from the United States through its Office of Enforcement and Removal Operations. ICE is responsible for scheduling and coordinating expulsion flights of noncitizens subject to the Title 42 Process and the Haitian Deterrence Policy who cannot be expelled directly to Mexico through a U.S. port of entry.[3]

32.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity. In that capacity, Secretary Becerra directs each component of HHS, including CDC.

33.     Defendant U.S. Department of Health and Human Services is a federal cabinet-level department of the U.S. government. HHS is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1). It is responsible for administering health and human services aimed at promoting public health. Its components include CDC. HHS, through CDC, is responsible for issuing the public health orders and regulations underlying the Title 42 Process.

34.     Defendant Rochelle P. Walensky, M.D., M.P.H., is the Director of CDC. She is sued in her official capacity. In that capacity, Dr. Walensky issued the public health orders underlying the Title 42 Process in this case.

35.     Defendant Centers for Disease Control and Prevention is a sub-agency of HHS and an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1). CDC is charged with fighting

---

[3] Defendants Magnus, Ferrara, Ortiz, and CBP are referred to collectively as "CBP Defendants." Defendants Johnson and ICE are referred to collectively as "ICE Defendants." CBP Defendants, ICE Defendants, and Defendants Mayorkas and DHS are referred to collectively as "DHS Defendants."

public health threats, including communicable diseases. It is responsible for issuing the public health orders and regulations underlying the Title 42 Process.[4]

## FACTUAL ALLEGATIONS

### I.     The United States' history of anti-Haitian immigration policies.

36.     Anti-Black racism and white supremacy motivated the earliest U.S. immigration policies and have continued to shape immigration laws through the present.[5] Haitians have been one of the most common targets of the United States' racist, exclusionary policies.[6]

37.     Haiti's history as an independent country begins in the early 1800s, when Black Africans liberated themselves from slavery and colonial rule. The Haitian Revolution in 1804 marked not only the end of nearly two centuries of French control, but also the creation of the first free Black nation in the Western Hemisphere, and the only one to gain independence through the uprising of enslaved people. With this revolution, Haiti abolished slavery almost sixty years before President Abraham Lincoln's Emancipation Proclamation. Today, Haiti is at least 95% Black and has one of the highest percentages of Black nationals in the Western Hemisphere. With its independence, Haiti inspired enslaved Black people across the world and offered freedom and citizenship to all Black and indigenous people of the Americas.

### A.     The United States has long supported the economic and political subjugation of Haitians.

38.     Following the Haitian Revolution, the United States viewed the new nation as an

---

[4] Defendants Becerra, HHS, Walensky, and CDC are referred to collectively as "HHS Defendants."

[5] *See, e.g.*, Kat Murdza and Walter Ewing, Ph.D., The Legacy of Racism within the U.S. Border Patrol, American Immigration Council (2021), https://www.americanimmigrationcouncil.org/research/legacy-racism-within-us-border-patrol.

[6] *See, e.g.*, Fabiola Cineas, *Why America Keeps Turning Its Back on Haitian Migrants*, Vox (Sept. 24, 2021, 2:40 PM), https://www.vox.com/22689472/haitian-migrants-asylum-history-violence ("[E]very presidential administration since the 1970s has treated Haitians differently than other migrant groups, rejecting asylum claims, holding them longer in detention, and making it harder for them to settle down in safety.").

existential threat of Black uprising and liberation and did not diplomatically recognize Haiti for more than half a century. Throughout the subsequent 200 years, the United States has actively oppressed and discriminated against Haitians.

39.     In 1825, when France demanded that Haiti pay the present-day equivalent of billions of dollars for the so-called loss of enslaved human labor, American banks lent to Haiti at usurious interest rates so the nation could avoid French reoccupation.[7]

40.     In part to ensure continued payment of this debt, the United States forcibly occupied Haiti from 1915 to 1934. During that period, U.S. officials engaged in violent and deadly repression of Haitians while restructuring the nation's economy and constitution to benefit American interests.[8] The United States ultimately withdrew, following mass, organized resistance by the Haitian people.

41.     Following this occupation, the United States continued to promote its financial and political interests in Haiti to the detriment of the Haitian people. It supported the brutal dictatorships of Francois and Jean-Claude Duvalier, which, over a thirty-year-period, contributed to inequality, impunity, destabilization, and mass poverty in Haiti and resulted in the deaths of tens of thousands of Haitians and a diaspora of thousands of others fleeing violence.

42.     In more recent years, the United States has intervened to prop up corrupt leaders in Haiti, further undermining the rule of law and human rights. The United States was instrumental in the election of Michel Martelly and his hand-picked successor Jovenel Moïse, despite Martelly's increasing slide toward authoritarianism and Moïse's fraudulent election and subsequent dissolution of parliament.

---

[7] *See* Marlene Daut, *France Pulled Off One of the Greatest Heists Ever. It Left Haiti Perpetually Impoverished*, Miami Herald (July 15, 2021), https://www.miamiherald.com/opinion/op-ed/article252809873.html.

[8] *See* Emmanuela Douyon and Alyssa Sepinwall, *Earthquakes and Storms Are Natural, but Haiti's Disasters Are Man-Made, Too*, Wash. Post (Aug. 20, 2021, 6:00 AM), https://www.washingtonpost.com/outlook/2021/08/20/earthquakes-storms-are-natural-haitis-disasters-are-man-made-too/.

43.     In the face of this long history of political and economic instability, Haitians have remained steadfast in their struggle for autonomy against external and internal forces seeking to exploit them. It was this resolute spirit that U.S. Special Envoy to Haiti Daniel Foote referenced in his September 22, 2021 letter resigning his post in protest of the Biden Administration's actions in Del Rio that month. Citing the United States' long history of intervention and the inhumane treatment of Haitians, Ambassador Foote remarked: "[W]hat our Haitian friends really want, and need, is the opportunity to chart their own course, without international puppeteering and favored candidates."

**B.     The United States uses its immigration policy to discriminate against Haitians.**

44.     As the United States was interfering with Haitian affairs and contributing to burgeoning political and economic unrest, it was also crafting immigration policies that specifically targeted Haitians for disparate treatment to keep them off U.S. soil.[9]

45.     In 1978, the United States created a policy dubbed the "Haitian Program," which jailed arriving Haitians and universally denied their asylum claims despite the known atrocities being committed by the Duvalier regime at the time.[10]

46.     The Haitian Program was struck down in *Haitian Refugee Center v. Civiletti*, which held the government systematically discriminated against Haitian asylum seekers. 503 F. Supp. 442, 450 (S.D. Fla. 1980) ("This case involves thousands of [B]lack Haitian nationals, the brutality of their government, and the prejudice of ours."). The United States quickly implemented a new policy requiring them to be detained without an opportunity to post bail. The policy appeared

---

[9] "It is instructive to note that, despite the ideological differences between the Carter, Reagan, Bush I, Clinton, and Bush II administrations, each has persistently discriminated against Haitian entrants . . . ." Roger Daniels, *Guarding the Golden Door: American Immigration Policy and Immigrants Since 1882*, at 213-14 (2004).

[10] *See* Carl Lindskoog, *Violence and Racism Against Haitian Migrants Was Never Limited to Agents on Horseback*, Wash. Post (Sept. 30, 2021, 6:00 AM), https://www.washingtonpost.com/outlook/2021/10/02/violence-racism-against-haitian-migrants-was-never-limited-horseback-riders/.

neutral on its face, but statistics showed selective application to Haitians and discovery sought in a legal challenge to the policy in *Jean v. Nelson* showed that the government was using this policy to continue its "Haitian Program." 711 F.2d 1455, 1493 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). U.S. officials adopted this policy to deter Haitian asylum seekers, even as the then-Deputy Attorney General acknowledged it could create an appearance of "concentration camps" filled with Black people. An Eleventh Circuit panel in *Jean v. Nelson* held that the selective application of the policy to Haitians violated equal protection, particularly in light of the government's history of discriminatory policies against Haitians. *Id.*

47.     During the 1980s and 1990s, the United States began an aggressive interdiction policy to intercept Haitians at sea and return them to Haiti.[11] The policy was designed to prevent Haitian migrants from reaching U.S. soil, where they could request access to the U.S. asylum process and to evade its non-refoulement obligations under international law not to return asylum seekers to a country in which they would be likely to face persecution. Under this policy, U.S. authorities intercepted tens of thousands of Haitian asylum seekers at sea and prevented them from seeking relief in the United States. Indeed, from 1981 to 1991, only *twenty-eight* out of over 25,000 interdicted Haitians were allowed to enter the United States.

48.     While the Haitian interdiction policy was in place, the United States singled out Haitian migrants for detention at Guantanamo Bay. At the height of this policy, at least 12,000 Haitians were held at the U.S. military prison.

49.     This disproportionate use of detention continues today. Not only are Black migrants in general more likely to be held in immigration detention, but Haitians are particularly targeted. In 2020, Haitians constituted the largest nationality group in family detention. While accounting for only 1 percent of asylum decisions adjudicated in 2020, Haitians represented more than 44

---

[11] *See Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum*, National Immigrant Justice Center and FWD.us, 6 (2021), https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2021-09/Offshoring%20Asylum%20Report_Chapter4.pdf.

percent of all families locked in ICE detention during summer 2020. Throughout 2020, the U.S. consistently detained more Haitian families than any other nationality.

50.     Contemporary immigration schemes have also aimed to prevent Haitian migrants from reaching the United States to seek asylum. Under a policy known as "metering," first implemented under President Barack Obama in 2016 in response to an increase in Haitian migrants seeking asylum, U.S. officials limited the number of migrants permitted to request asylum at ports of entry and turned back most asylum seekers to wait in dangerous Mexican border cities for an opportunity to request protection. The policy has since been held unlawful by a federal court, but not before it prevented thousands of Haitians from exercising their rights under U.S. law.

51.     In January 2018, DHS announced the termination of Temporary Protected Status for Haitians, despite dire conditions in Haiti. The policy was enjoined after a district court found that the policy was likely "based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians in particular." *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018); *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) ("Based on the facts on this record, and under the factors prescribed by *Arlington Heights*, there is both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti.").

**C.     The United States' recent Title 42 Process has been brutally deployed against Haitians.**

52.     The most recent example of the United States' discriminatory immigration policies is the implementation of a purported public health order under the Public Health Service Act, 42 U.S.C. § 265.

53.     While the use of Title 42 began under former President Trump, President Biden has continued its use—with alarming increases against Haitians. During 2018 and 2019, former Trump Administration official Stephen Miller advocated using the government's public health powers to restrict immigration and end migrants' access to asylum. This proposal followed a history of bigoted and xenophobic policies advanced by the Trump Administration to scapegoat immigrants,

particularly those from predominantly Black countries like Haiti that then-President Trump referred to as "shithole countries."

54.    In early 2020, the Trump Administration seized upon the global COVID-19 pandemic as an opportunity to execute Miller's proposal. Despite objections from CDC public health experts that "there was no valid public health reason" for an order under Section 265, then-President Trump announced on March 20, 2020, that Defendant CDC would issue an order "to suspend the introduction of all individuals seeking to enter the U.S. without proper travel documentation" along the U.S. border. Any migrant subject to the order would be "immediately return[ed]" "without delay."

55.    To implement this immigration authority consistent with then-President Trump's direction, Defendant CDC issued a regulation, without advance notice and comment, permitting the agency to prohibit the "introduction into the United States of persons" from foreign countries. *See* 42 C.F.R. § 71.40 (the "Title 42 Regulation").

56.    Pursuant to this purported regulatory authority, Defendant CDC issued an order directing the "immediate suspension of the introduction of" certain noncitizens seeking entry at ports of entry or between ports of entry without proper travel documents. Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020) (eff. date Mar. 20, 2020). Defendant CDC has since reissued similar orders, most recently in August 2021, that continue to prohibit covered noncitizens from entering the United States purportedly to "protect" the public "during the COVID-19 public health emergency." Public Health Assessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828, 42,828 (Aug. 5, 2021). In December 2021, Defendant CDC announced that it would keep the Title 42 order in place.

57.    Shortly after Defendant CDC's issuance of the Title 42 Regulation and the March 2020 public health order, Defendant CBP began developing standards implementing the order.

*Cf.* 42 C.F.R. § 71.40(d)(2). By April 2020, Defendant CBP issued an internal memorandum establishing procedures for applying Defendant CDC's order under "Operation Capio" (the "CBP Capio Memo" or the "Memo").[12] The CBP Capio Memo provides that "all processing [of covered noncitizens] will be done in the field" "[t]o the maximum extent possible." It also directs that covered noncitizens should be "immediately returned to Mexico or Canada" at the nearest port of entry or transported to "a dedicated facility for limited holding prior to expulsion" to their home country. The CBP Capio Memo provides no process for covered noncitizens to seek access to the U.S. asylum process and indicates that U.S. immigration officials are purportedly "not operating pursuant to [their] authorities" under U.S. immigration laws when processing and summarily expelling covered noncitizens.

58.     Since January 2021, DHS Defendants have increased the rate of expulsions for Haitians under the Title 42 Process. During the first weeks of the Biden Administration, DHS Defendants effectuated the expulsion of more Haitians under the Title 42 Process than during the entire prior fiscal year under the former Trump Administration. In the past eleven months, Defendant ICE has conducted nearly 130 expulsion flights to Haiti.

## II.    DHS Defendants violate the rights of thousands of Haitian asylum seekers in Del Rio.

59.     DHS Defendants' enforcement of the Title 42 Process against Haitians has always had devastating effects, but it has taken on additional dimensions since September 2021, when thousands of Haitian migrants began to arrive near the Del Rio Port of Entry in Del Rio, Texas.

60.     President Biden, through the NSC and DPC, and DHS Defendants began receiving intelligence reports in August 2021 indicating that they could soon anticipate an increase in the number of Haitians seeking asylum in Del Rio. Since that time, their response has been to adopt a series of decisions and policies designed to suppress the growing number of Haitians arriving at the border and to deter Haitians from seeking asylum in the United States in the future

---

[12] https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html.

(collectively, the "Haitian Deterrence Policy").

61.     The Haitian Deterrence Policy resulted from a series of discrete decisions made by President Biden's senior advisors on the NSC and DPC in September 2021, under authority delegated by President Biden. From approximately September 9 to 24, 2021, at least 15,000 Haitians were held in a makeshift CBP field encampment for field processing pursuant to the CBP Capio Memo near the Del Rio International Bridge (the "CBP Encampment"). As directed by the White House and Defendant Mayorkas pursuant to the Haitian Deterrence Policy, DHS Defendants and personnel took no steps to prepare to receive thousands of asylum seekers in Del Rio—in contrast to DHS's approach to similar circumstances involving non-Haitians. As a result, CBP officers deprived individuals in the CBP Encampment of basic human necessities like sufficient food and water, ignored their medical needs, and provided no shelter to protect them from the blazing sun, triple-digit heat, and copious dust. When asylum seekers attempted to provide for such needs themselves, they were often physically or verbally assaulted by CBP officers. Upon information and belief, after allowing Haitian asylum seekers to suffer for days, DHS officers did not screen these individuals for fear of return to their home country or process them for asylum, instead acting to expel them as quickly as possible under the Haitian Deterrence Policy, either on expulsion flights to Haiti or by forcing individuals to Mexico. In the resulting series of expulsion flights to Haiti, ICE officials expelled at least one mother with a days-old-baby *born in the United States*. Some expelled individuals did not even realize they had been sent to Haiti until they got off the plane, because officers had lied about where the asylum seekers were being taken. Many individuals were expelled in shackles; upon information and belief, none were given an opportunity to request asylum or screening for fear or risk of torture and death upon return to Haiti or Mexico.

62.     This brutal and rapid expulsion of asylum seekers was intentional. Under the Haitian Deterrence Policy devised by White House senior officials, DHS Defendants applied the Title 42 Process in Del Rio in a manner indifferent to humanitarian concerns and focused on removing Haitian asylum seekers as quickly as possible to discourage other Haitians from

exercising their right to seek asylum. DHS Defendants implemented the policy while taking steps to shield their actions from accountability, including by preventing media access to the CBP Encampment, restricting the air space over the encampment, and expelling thousands of individuals before any human rights abuses could be documented, investigated, or pursued. On information and belief, the adoption and implementation of the Haitian Deterrence Policy was informed by a perception that Haitian asylum seekers are dangerous, violent and criminal; a discriminatory purpose toward Black and Haitian migrants; a desire to keep Black and Haitian migrants out of the country; and a plan to send a message to other Haitian asylum seekers not to come to the United States. For example, a senior DHS official told White House and other DHS officials, including Secretary Mayorkas, that the Haitian migrants in Del Rio were more likely to be violent—with no facts to support this statement. On information and belief, this view was adopted by the White House and DHS and resulted in their Haitian Deterrence Policy.

### A. DHS Defendants take no steps to prepare for the anticipated arrival of large groups of Haitian asylum seekers in Del Rio.

63.     By early 2021, President Biden's staff and DHS Defendants were aware that instability and desperate conditions in Haiti had forced numerous Haitians to flee to various Latin American countries and that many Haitians were traveling toward the U.S. border to seek asylum.

64.     One month before thousands of Haitians arrived at the CBP Encampment, Defendant Secretary Mayorkas redesignated Haiti for Temporary Protected Status. *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863, 41,863-71 (Aug. 3, 2021). In the notice, Secretary Mayorkas concluded that protected status was appropriate because of extraordinary conditions in Haiti, including "a deteriorating political crisis, violence, and a staggering increase in human rights abuses," as well as "rising food insecurity and malnutrition, [. . .] waterborne disease epidemics, and high vulnerability of natural hazards, all of which have been further exacerbated by the [COVID-19] pandemic." 86 Fed. Reg. 41,864 (citation omitted).

65.     Meanwhile, local officials in Del Rio began alerting the Biden Administration that they expected increasing arrivals of asylum seekers and lacked the resources necessary to manage

those arrivals. As early as February 2021, Del Rio Mayor Bruno Lozano publicly warned President Biden and DHS Defendants that Del Rio needed federal support to assist with growing numbers of border crossings; at least President Biden's senior advisors on the NSC and DPC, as well as DHS Defendants, were informed of the mayor's concerns.

66.     In April 2021, President Biden's staff and DHS Defendants received data indicating that Haitian migrants disproportionately arrived and crossed into the United States in the CBP Del Rio Sector. In the following months, they continued to receive intelligence reports that migrant border crossings, particularly of single, male Haitian asylum seekers, continued to increase and that Del Rio lacked resources to meet the needs of arriving Haitians.

67.     President Biden and his senior staff and DHS Defendants received regular intelligence in July and August 2021 reflecting the movement of Haitians from South and Central America toward the United States. Western Hemisphere immigration experts warned the Biden Administration of the impending arrival of thousands of Haitians. This information was corroborated by internal intelligence reports and information received from Latin American and local government officials.

68.     Despite these warnings, the White House and DHS Defendants decided to take no action to plan for the arrival of these asylum seekers. Senior White House officials dismissed reports from immigration experts and local officials and prevented staff from taking steps to prepare for thousands of arriving Haitians given the known resource shortages in Del Rio.

69.     The Haitian Deterrence Policy grew out of and encompassed these decisions. Neither President Biden's senior staff nor DHS Defendants attempted to arrange appropriate infrastructure, personnel, and resources to support the legal processing of the anticipated Haitian asylum seekers and the provision of necessary and appropriate food, water, shelter, and medical care. Instead, as part of the Haitian Deterrence Policy, senior White House and DHS officials blocked internal efforts to prepare humanitarian infrastructure in Del Rio. President Biden's senior staff also stopped efforts to prepare public health resources, including COVID-19 testing and vaccinations, for arriving Haitians.

70.     Moreover, while CBP Defendants had, in months prior, coordinated with local officials to create a respite center at a local Del Rio church for arriving migrants, they refused to leverage this additional resource as thousands of Haitians approached the border.

71.     President Biden, his senior advisors, and DHS Defendants also refused to take steps to ensure appropriate infrastructure and resources to facilitate screenings for asylum or withholding of removal and protection under the INA or CAT. Senior White House and DHS officials did not make such preparations despite receiving an August 2021 memorandum from DHS's Office for Civil Rights and Civil Liberties advising against expulsions of migrants to Haiti and emphasizing a "strong risk" that such expulsions would violate DHS Defendants' non-refoulement obligations under U.S. and international law. In addition, senior White House staff and DHS Defendants declined to take any steps to arrange for CAT screenings for the Haitians approaching Del Rio, even though they had ordered and implemented the adoption of such CAT screenings for Mexicans in San Diego in July 2021.

72.     Pursuant to the Haitian Deterrence Policy, senior White House officials and DHS Defendants blocked efforts to prepare for the arrival of thousands of Haitian asylum seekers in Del Rio, including ensuring the presence of sufficient infrastructure, personnel, and resources to meet Haitians' basic needs and provide adequate screenings for relief required by law. On information and belief, senior NSC, DPC, and DHS officials believed that refusing to make appropriate preparations for arriving asylum seekers would not only deter approaching Haitians from coming to the border to seek asylum, but also deter asylum seekers already in Del Rio from attempting to return if they were expelled.

**B.      Thousands of Haitian asylum seekers arrive in Del Rio in September 2021.**

73.     As President Biden, his senior staff, and DHS Defendants received reports of large groups of Haitian asylum seekers traveling to the U.S. border through the late summer, border personnel in the Del Rio Sector began to observe an increase in crossings by Haitians. Daily encounters with arriving asylum seekers grew to hundreds and eventually thousands. As the processing of migrants under the Title 42 Policy slowed, in late August 2021 CBP officials set up

a "temporary intake site" near the Del Rio International Bridge, the primary port of entry in Del Rio. The site was located under the bridge to facilitate the field processing of migrants under the CBP Capio Memo.

74.     The intake site, however, lacked sufficient resources to meet the basic needs of the arriving Haitian asylum seekers and to provide them adequate screenings for relief under U.S. law. The under-resourced intake station reflected the White House and DHS's steadfast refusal to organize any appropriate infrastructure to address the anticipated arrival of thousands of Haitian migrants, even as Del Rio Sector personnel continued to report a lack of processing capacity.

75.     Beginning in September 2021, thousands of people began crossing the Rio Grande near the Del Rio Port of Entry to seek relief in the United States. Most of the individuals were Haitian and had come to Del Rio to request asylum.

76.     According to DHS Defendants, at least 15,000 individuals crossed near the Del Rio Port of Entry by mid-September 2021. Many of the asylum seekers arriving in Del Rio at this time were part of family units. Public reports estimate that approximately 40 percent of those who arrived near the Del Rio Port of Entry in September 2021 were children.

77.     As Haitian asylum seekers entered the United States in early to mid-September, the temporary intake site under the Del Rio International Bridge turned into the CBP Encampment as U.S. officials required asylum seekers to remain at the site for longer periods of time to be processed. CBP officers adopted a ticketing system to process arriving migrants, separating them into four groups that were identifiable by a numbered, color-coded ticket: families with children, pregnant women, single men, and single women. When officers called out numbers, the corresponding ticket holders were expected to identify themselves for processing. Migrants were also directed to different sections of the CBP Encampment based on the color of their tickets.

78.     As the number of asylum seekers in the CBP Encampment grew, CBP increased the number of personnel monitoring and patrolling the encampment to congregate and secure arriving Haitians. These personnel prohibited asylum seekers from moving freely throughout the CBP Encampment and informed Individual Plaintiffs and other asylum seekers that they were to

wait until their number was called for processing. Upon information and belief, at no point during the existence of the CBP Encampment were arriving migrants given a reasonable opportunity to present themselves to a U.S. immigration officer and request access to the asylum process. They also were not screened for a fear of return to their home country or vulnerability to persecution or torture upon return, as required under U.S. law.

C.    **CBP personnel abuse Haitian asylum seekers in Del Rio pursuant to the Haitian Deterrence Policy.**

79.    The lack of amenities near the CBP Encampment meant that any food, water, shelter, and medical care provided to Haitians would need to be provided by CBP personnel. As part of their Haitian Deterrence Policy, however, DHS Defendants made decisions that deprived Haitians in the encampment of such basic human necessities despite knowing for months that thousands of Haitian asylum seekers were approaching Del Rio.

80.    Due to the DHS Defendants' deliberate lack of preparation, there was insufficient food, water, and shelter in the CBP Encampment for the thousands of Haitians arriving there in mid-September. At the same time, CBP personnel monitoring the encampment generally prevented Individual Plaintiffs and other migrants from leaving to provide for their own needs. Plaintiff Jacques Doe, for example, was in the CBP Encampment for approximately one week and suffered from severe hunger and thirst. He never tried to leave to find food in Mexico, however, because he saw that personnel patrolling the encampment would not allow it. Defendants also blocked non-governmental and legal organizations, including Plaintiff Haitian Bridge, from entering the CBP Encampment to assist the Haitian asylum seekers or to hand out know-your-rights materials.

81.    Plaintiff Samuel Doe reflects that "no human being should have been" in the CBP Encampment. The conditions in the encampment, however, were a direct result of decisions made pursuant to the Haitian Deterrence Policy by President Biden's closest advisors and DHS Defendants to deter other Haitian and Black migrants from seeking asylum in the United States.

82.    For example, in a September 2021 meeting addressing how to respond to conditions at the CBP Encampment, senior DHS officials described the Haitian migrants in Del Rio as

"particularly difficult" to deal with when implying that little could be done for the asylum seekers and discussing the need for swift and universal removal of Haitians in the encampment.

83.     In a meeting including White House senior advisors to President Biden, Secretary Mayorkas, and DHS leadership, a senior DHS official made a comment implying that the Haitian migrants had engaged in criminal conduct in Mexico, without any evidence.

84.     A CBP official in the Del Rio Sector leadership expressed a fear that Haitian asylum seekers would "tear through the walls" if put in detention.

85.     Additionally, in internal discussions around the time of the increase in crossings in Del Rio, top DHS officials repeatedly evinced the belief that arriving Haitian asylum seekers in the CBP Encampment were uncivilized, unclean, and like animals—reflecting language and attitudes that, upon information and belief, were not used to describe non-Black migrants arriving at the U.S. border.

86.     The result of President Biden and DHS Defendants' Haitian Deterrence Policy was rampant abuse in the CBP Encampment. Thousands of Haitians who fled violence and persecution were met with insufficient food, water, shelter, and medical care, and physical and verbal abuse, conditions described by one Congressman as "unacceptable by any human standard." After images of a White CBP officer on horseback assaulting a Black Haitian man went viral, President Biden said he "takes responsibility" for the "horrible" treatment of Haitians in Del Rio.[13]

### 1.     CBP personnel deprive thousands of asylum seekers in their custody of basic human needs.

87.     As asylum seekers arrived in Del Rio and were given tickets for processing, they lost the ability to provide for themselves and their families. They were forced instead to rely on the CBP personnel supervising the encampment for food, water, and shelter. As a result of the Haitian Deterrence Policy, however, President Biden and DHS Defendants decided not to prepare

---

[13] Marissa Dellatto, "Biden 'Takes Responsibility' for Mishandling of Haitian Migrant Crisis," Forbes (Sept. 24, 2021, 11:21 AM), https://www.forbes.com/sites/marisadellatto/2021/09/24/biden-takes-responsibility-for-mishandling-of-haitian-migrant-crisis/?sh=5fc379fc319b.

or provide sufficient resources to meet these most basic needs until there was a serious humanitarian crisis in the encampment.

**(a)    CBP personnel provide inadequate food and water.**

88.    Consistent with the Haitian Deterrence Policy, the distribution of food and water to migrants in the CBP Encampment was woefully inadequate.

89.    CBP personnel arranged a minimal number of service stations in the CBP Encampment to distribute food and water. Anyone wishing to receive water or food was required to wait in line, often for extended periods of time. And because CBP's service stations were set up in only one section of the CBP Encampment, not all migrants could access the stations while food and water were being distributed. Many who could not receive food or water fainted from lack of nutrition or dehydration.

90.    Plaintiff Paul Doe and others describe receiving only one or two pieces of bread or an equivalent and one or two bottles of water each day in the CBP Encampment. Appropriate food was not available in reasonable quantities until World Central Kitchen, a non-governmental organization, was able to negotiate access to the encampment and set up operations to begin providing meals the week of September 19, 2021. But by the time World Central Kitchen had scaled its operations, DHS Defendants had already started clearing out the CBP Encampment. For much of the period between September 9 and 24, CBP personnel denied most individuals in the encampment food and water beyond some bread and water each day.

91.    The bottles of water distributed by CBP personnel were often undrinkable when hydration was most needed. They were left on containers covered in plastic with no protection from the sun. With daily temperatures hovering near triple digits, the water in the bottles became so hot that it could not be consumed when it was handed out. Some Individual Plaintiffs and other asylum seekers in the CBP Encampment were forced to drink from the Rio Grande, which is not potable. This lack of clean drinking water caused many Haitians in Del Rio to get sick, including the common development of gastrointestinal illness, particularly among babies and children.

92.    CBP Defendants also failed to provide formula or age-appropriate food to migrants

with young children. Plaintiff Esther Doe repeatedly requested age-appropriate food for her one-year-old son, but was told there was only the food and water being provided to adults. When Esther pleaded for something that her baby could eat, CBP personnel refused. Esther was only able to feed her son some rice pudding, which was distributed occasionally at the CBP Encampment. Esther's baby went hungry for days because Esther could not find enough food for him.

93.     As starving and dehydrated asylum seekers pleaded without success for additional food and water, many looked to the city across the river in Mexico, Ciudad Acuña, for the resources needed to save themselves, their family members, and other vulnerable people in the CBP Encampment. Pursuant to the Haitian Deterrence Policy, CBP personnel often blocked individuals from leaving the encampment to obtain their own food and water in Ciudad Acuña. This meant that individuals seeking to buy food in Mexico often had to cross the river outside the view of CBP personnel.

94.     Asylum seekers wishing to cross to Mexico in search of food and water faced a variety of risks: being stopped by CBP personnel while attempting to leave the CBP Encampment, drowning in the river, and being prevented from returning to the encampment by Mexico or U.S. border officials, which could lead to separation from their families.

95.     Despite these risks, many individuals risked the river crossing to secure basic necessities. Plaintiff Mirard left the encampment to find food for his family after he and his wife, Plaintiff Madeleine, received insufficient food and water and were denied age-appropriate food for their one-year-old daughter. Plaintiff Paul Doe also crossed to Mexico to get food for himself and others in the CBP Encampment after surviving several days on only a bottle of water and a tortilla per day. Plaintiff Esther Doe was in the CBP Encampment with her husband Plaintiff Emmanuel Doe and one-year-old son for at least two days during which CBP personnel provided no baby-appropriate food. Esther's son, in desperate need of nourishment, was sick with a fever and diarrhea. Watching her child suffer from sickness and hunger, Esther decided she had no other choice but to cross the river in search of food for her baby.

96.     Individuals returning to the CBP Encampment often encountered resistance from

CBP personnel. U.S. border officials, including some on horseback, regularly patrolled the riverbank and physically tried to prevent asylum seekers from crossing the river. Moreover, CBP personnel frequently confiscated and deliberately disposed of the food that starving individuals had brought from Mexico.

> **(b)     CBP personnel deny asylum seekers any shelter.**

97.     Pursuant to the Haitian Deterrence Policy, CBP personnel also failed to meet the basic shelter needs of the migrants in the CBP Encampment. As Haitian asylum seekers first entered the United States and were processed into the encampment, CBP personnel refused to provide beds, cots, blankets, tents, or shelters of any kind.

98.     With no shelter, migrants in Del Rio were left fully exposed to the elements. The CBP Encampment was extremely dusty, and the wind—as well as the arrival and departure of helicopters near the bridge—kicked up dirt that gave many individuals, including children, respiratory problems, eye infections, and rashes. Most migrants in the CBP Encampment were held adjacent to the Del Rio International Bridge rather than under it, meaning they were left with no protection from the sun as daily high temperatures reached from 90 to over 100 degrees Fahrenheit. Although some migrants were fortunate to have their own tents, others made makeshift shelters from reeds pulled from the nearby riverbank to offer shade. Plaintiff Samuel Doe recalls seeing pregnant women suffering in the heat and the dirt under the bridge because they had nowhere else to go: "I have never seen anything more horrible in my life."

99.     Asylum seekers with their own tents became targets of CBP searches, with officers regularly opening, or demanding that individuals open, their tents, in the middle of the night. These searches were alarming and disorienting for asylum seekers.

100.     Having been denied bedding, most individuals in the CBP Encampment were forced to sleep directly on the ground, often in the dirt or on cardboard. Plaintiffs Esther and Emmanuel Doe and their sick baby, for example, were forced to sleep in the dirt each night.

> **2.     CBP personnel refuse to provide effective medical care.**

101.     CBP personnel also refused to provide effective medical care to the thousands of

individuals in the CBP Encampment.

102.     Pursuant to the Haitian Deterrence Policy, President Biden and DHS Defendants refused to take the steps needed to secure necessary resources and personnel to meet the anticipated and reasonable medical needs of migrants, including the large number of babies, children, and pregnant and otherwise vulnerable people in the CBP Encampment.

103.     For individuals able to seek out medical attention, the care offered to sick and injured Haitians was shamefully inadequate, to the extent any was provided.

104.     In some cases, CBP personnel flatly denied migrants' requests for medical care, telling migrants to go back to Mexico instead. Plaintiff Samuel Doe's one-year-old daughter was severely ill while held in the CBP Encampment. As his daughter experienced severe coughing, diarrhea, and vomiting, Samuel begged officers for help. Each time, CBP personnel denied Samuel's pleas, just telling him he should give his daughter water. It was only after Samuel and his family were forced to return to Mexico that his daughter was able to obtain medical treatment.

105.     At other times, CBP personnel ignored pleas for assistance, often from pregnant people and children, only acting when the condition became an obvious medical emergency. In one situation, a pregnant Haitian asylum seeker went into labor while sitting in the dirt. CBP eventually took the woman out of the CBP Encampment, but returned her to the encampment mere hours after delivery. Plaintiff Mirard also observed a pregnant woman complain of pain. On information and belief, she went into labor in the CBP Encampment, but was not taken to another facility to deliver her child until she had suffered for hours.

106.     Ms. Jozef, Founder and Executive Director of Plaintiff Haitian Bridge, encountered several infants who had been transported to hospitals after suffering dehydration in the CBP Encampment. One baby nearly died; he survived only after Haitian Bridge intervened and advocated for his admission to a hospital in Del Rio. The newborn's condition had grown so precarious that, after he was finally removed from the CBP Encampment, he had to be airlifted to a hospital in San Antonio where specialists were able to save his life.

107.     The medical care others received often had no effect. Plaintiff Esther Doe's baby

-29-

developed a fever and diarrhea while they were being held in the CBP Encampment. When Esther took him to the medical tent to seek help, the medical personnel appeared more focused on taunting her about being deported and going to jail than on treating her baby. They gave Esther some liquid medication and an ice pack, which did nothing to alleviate her baby's illness.

108.    Similarly, Plaintiff Paul Doe suffered from bloating and diarrhea because of the inadequate food and water provided in the CBP Encampment. When Paul sought treatment, an on-site doctor provided him a single pill without explaining what the pill was. The pill did not improve Paul's symptoms, and he soon learned that others seeking medical treatment were provided the same unidentified pill, regardless of their symptoms.

109.    Many asylum seekers were unaware that medical personnel were even available. After his baby daughter developed a severe cough and diarrhea in the CBP Encampment, Plaintiff Mirard was unaware that any medical treatment was potentially available for her, and CBP personnel in the encampment did not offer any assistance to Mirard as his daughter suffered. His daughter is still ailing from health conditions that developed during their time in Del Rio.

110.    CBP Defendants' refusal to provide adequate medical care resulted in prolonged illness and lasting suffering for many Haitians in the CBP Encampment. Even today, months after DHS Defendants unlawfully expelled thousands of asylum seekers from the encampment, Individual Plaintiffs, their families, and others continue to experience persistent illness from their ordeal in Del Rio. On information and belief, at least one Haitian who was in the CBP Encampment died after the encampment was cleared, due in part to the poor conditions and lack of medical care.

### 3.    CBP personnel physically and verbally abuse asylum seekers in Del Rio.

111.    The Haitian Deterrence Policy did not merely result in the willful deprivation of life-sustaining necessities in the CBP Encampment. Haitian asylum seekers also found themselves to be victims of physical and verbal assaults by CBP personnel who were enabled by the policy.

112.    CBP personnel frequently targeted migrants for abuse when they were returning to the CBP Encampment from Mexico with desperately needed food and water. One of the most well-

known examples of the Haitian Deterrence Policy occurred on or about September 18, 2021, and involved CBP personnel, supported by mounted Border Patrol officers, driving Haitian asylum seekers back into the river as they returned to the CBP Encampment.

113.    Plaintiff Mirard was one of those asylum seekers. While crossing back to the CBP Encampment with food for his wife and their daughter, Mirard encountered a mounted officer who lashed at him with split reins and attempted to drag Mirard back to the river. All Mirard could think about through the ordeal was his duty to hold onto the food at all costs, and his need to return to the CBP Encampment so he could feed his sick and hungry baby. The officer released him only when his horse was about to trample Mirard.

114.    Plaintiff Esther Doe was also assaulted by mounted officers after going to Mexico to get food for her sick baby. As Esther attempted to return to the CBP Encampment, she was chased back into the river by mounted officers who attempted to force her back to Mexico. As Esther pleaded in English that she was attempting to return to reach her baby in the encampment, the officers ignored her. They continued to force her deeper into the river, nearly running her down with their horses. Esther needed to get back to her husband and baby, so she tried to reach the shore in Del Rio again, slightly away from the officers on horses. When the officers turned their horses to chase other people crossing the river, she was able to pass by them and reunite with her family.

115.    Officers did not merely target Haitians returning from Mexico with food. They also chased individuals who even gathered near the river, which was commonly used for bathing, washing clothes, and cooling off. For example, when Plaintiff Samuel Doe brought his eight-year-old son to the river to clean themselves, mounted officers appeared and began running after migrants. As his terrified son tried to run away from the horses, he fell and hurt himself.

116.    Through this ordeal, CBP personnel spewed racist and demeaning invective at Haitian asylum seekers in the CBP Encampment. One example captured on video includes a mounted officer shouting at a group of migrants: "This is why your country's shit, because you use your women for this." The officer then reared his horse, directing it at a group of children.

117.    CBP officers also deliberately imperiled the safety of migrants crossing in the river in an attempt to keep them from entering the CBP Encampment.

118.    As Plaintiff Paul Doe was attempting to return to the United States with food for himself and others, an officer deliberately cut a rope that had been set up to help migrants maintain balance as they traversed the river. Paul was in the middle of the Rio Grande when the officer threw the cut rope into the water and shouted to the crossing Haitians that they could not return. As the officer cut the rope, Paul watched in terror as numerous other Haitians crossing in front of him who were deeper in the water went under the water and struggled not to drown. He also saw other migrants closer to the Del Rio side of the river, including one of Paul's friends, who were hit and shoved back into the river by CBP personnel. While the CBP personnel were busy knocking Haitians into the water, Paul walked and swam downstream to find a place to cross that was not blocked by officers.

119.    Haitians crossing the river observed that the water level of the river would also change throughout the day. At most times, the water level was below migrants' waists, permitting individuals to safely wade across with the assistance of a guide rope. Sometimes when individuals would cross from Mexico, the water level would inexplicably rise, often to an unsafe shoulder-high level that risked causing drownings. On information and belief, authorities could and did manipulate the flow of water in the Rio Grande to prevent Haitian asylum seekers from crossing. On information and belief, at least three Black migrants believed to be Haitian asylum seekers drowned while attempting to cross the river and reach the CBP Encampment.

120.    CBP personnel also used helicopters, motorcycles, and other official vehicles to stir up dust in areas of the CBP Encampment where Haitians were congregating and sleeping. On information and belief, this conduct created respiratory problems that persist today.

121.    While these abuses occurred, DHS personnel deliberately restricted the press and humanitarian aid and legal service organizations from entering the CBP Encampment or documenting the conduct of DHS personnel therein. For example, when Haitian Bridge attempted to enter the CBP Encampment to provide Know Your Rights information and humanitarian

assistance, CBP officials told Haitian Bridge staff they were not permitted to enter and denied their entry. The only press DHS personnel permitted to access the encampment was Fox News. DHS personnel also restricted the air space over the CBP Encampment to prevent aircraft from taking aerial footage of the encampment. On information and belief, DHS personnel prevented press and neutral observers from entering the CBP Encampment in an attempt to conceal the concerted and deliberate misconduct that occurred pursuant to the Haitian Deterrence Policy.

**D.     DHS Defendants summarily expel thousands of Haitian asylum seekers from Del Rio in unprecedented fashion.**

122.    After refusing for weeks to take action to prevent or mitigate the growing humanitarian crisis in the CBP Encampment, senior advisors in the White House and DHS Defendants suddenly switched into swift and unprecedented action in mid-September to expel thousands of Haitian asylum seekers to Haiti and Mexico. Indeed, in the final days of the CBP Encampment, DHS officials rushed to clear the camp as quickly as possible and began to force groups of people onto buses for expulsion, often by tying their hands with plastic zip ties, rather than reading their ticket numbers one by one. Many people did not want to get on the buses as they feared deportation to Haiti, but were nevertheless forced on by DHS personnel.

123.    The move to rapidly expel Haitians from the CBP Encampment was likely prompted by a district court decision issued on September 16, 2021, which found that the Title 42 Process was likely unlawful and enjoined the process from being enforced against families with minor children, but temporarily stayed the injunction until September 30. *See Huisha-Huisha v. Mayorkas*, ---F. Supp. 3d---, 2021 WL 4206688 (D.D.C. Sept. 16, 2021), *appeal docketed*, No. 21-5200 (D.C. Cir. Sept. 17, 2021). If the preliminary injunction went into effect, it would take away DHS Defendants' authority to expel Haitian families.

124.    On September 15, 2021—the day *before* the district court's decision—Defendant Border Patrol stated that it would take between ten and fourteen days to set up infrastructure necessary to complete the processing of the Haitian migrants in the CBP Encampment. But within days after the day the district court issued its injunction, Defendant Ortiz, Chief of the U.S. Border

Patrol, stated that the CBP Encampment would be cleared within *seven days*. On information and belief, it was around this same time that senior White House and DHS officials met and expanded the Haitian Deterrence Policy to include a rapid mass expulsion strategy, and directed DHS Defendants to expel the Haitian asylum seekers in Del Rio as quickly as possible.

125.    The number of daily expulsion flights to Haiti rose swiftly after September 16. After a single expulsion flight on September 15, daily flights began on September 19, increasing from three flights per day on September 19 to five flights per day on September 23, and then seven flights per day on September 30. Each flight carried at least 100 people. The number of Haitian asylum seekers in the CBP Encampment dwindled as migrants were processed and sent to detention centers to be staged for expulsion flights. Other migrants, already suffering from the conditions in the CBP Encampment, learned that fellow asylum seekers were being deported to Haiti and felt compelled to flee the CBP Encampment back to Mexico to avoid being returned to Haiti.

126.    In authorizing and carrying out expulsions pursuant to the Haitian Deterrence Policy and the Title 42 Process, President Biden and DHS Defendants ignored the high risk of unlawful refoulement that their own attorneys had warned would arise from expulsions of Haitians. Upon information and belief, President Biden or DHS Defendants did not take steps to ensure that migrants were allowed to request asylum or were screened for fear or vulnerability.

127.    President Biden's advisors and DHS Defendants were aware that some of the asylum seekers in the CBP Encampment either were not Haitian nationals, were adult nationals of other countries, or otherwise had no ties to Haiti, such as children of Haitian nationals who had been born and grew up in countries other than Haiti. Upon information and belief, President Biden's advisors and DHS Defendants affirmatively decided not to adopt any processes or protections to ensure that such individuals were not expelled to Haiti, a country that these individuals may have never visited in their lives. This decision was consistent with the Haitian Deterrence Policy and the desire to send a message to future Haitian and Black asylum seekers that they are not welcome in the United States.

128.    When crafting and implementing the rapid mass expulsion strategy under the Haitian Deterrence Policy, a senior CBP official also stated that personnel should prioritize expelling single Haitian men because they were likely to be dangerous and violent, despite offering no evidence for the assertion.

129.    In mid-September, DHS personnel expelled nearly 4,000 people to Haiti, including hundreds of families with children. By the end of the month, DHS Defendants had effectuated the expulsion of thousands of asylum seekers of Haitian descent to Haiti and Mexico. ICE had chartered close to 40 expulsion flights to Haiti in one of the largest mass expulsions in recent American history, and some 8,000 Haitian asylum seekers had fled to Mexico to avoid being returned to Haiti. The expulsion flights continued after the CBP Encampment was empty: between September 19 and October 19, 2021, DHS personnel expelled approximately 10,831 migrants to Haiti, including nearly 2,500 women and 1,800 children.

### 1.    DHS Defendants expel thousands of asylum seekers from Del Rio to Haiti.

130.    As DHS Defendants began implementing their unprecedented expulsion plan, CBP officers were charged with summoning asylum seekers in the CBP Encampment at all hours of the day and night for expulsion. CBP personnel would make loud announcements on speakers throughout the CBP Encampment, broadcasting numbers on the color-coded tickets that each migrant had received after arriving in the encampment.

131.    Individuals whose numbers were announced were placed onto buses. Once the buses were full, DHS personnel transported the asylum seekers to formal detention facilities to await expulsion.

132.    At DHS detention facilities, guards continued to harass and abuse migrants. Some guards taunted the migrants, calling them "pigs" and saying they would "trash this place like they trashed their country." Migrants were denied adequate food, medical care and sanitation, and sleeping provisions. Plaintiff Jacques Doe, for example, was only given two small pieces of bread

and two bottles of water per day and was forced to sleep on the ground in a holding cell with approximately 30 other men before he was eventually expelled.

133.    DHS personnel also separated some family units and prevented family members from contacting each other. For example, on or about September 14, 2021, officers took Plaintiff Wilson Doe, and his wife Wideline, and their family to a detention facility, where they remained for four or five days. Wilson and his sixteen-year-old son were separated from each other and from the rest of the family. U.S. authorities did not allow Wilson to speak to anyone. When he asked a guard what they were planning to do to the detained migrants, the guard answered that Wilson had to wait to be called upon to speak. Every time Wilson tried to see anyone in his family, the guards would yell at him and prevent him from doing so. At one point, an officer screamed at Wilson, yelling that "no one told you to come to the U.S." Wilson and his family were unable to shower, wash their faces, or brush their teeth at this facility. When Wilson asked for a painkiller for a toothache, an official laughed, responded that he, too, had a toothache, and provided no medication.

134.    Plaintiff Michael and his family experienced similarly abusive conditions. When his family arrived, officers told Michael and others that they smelled because they were Haitian. Michael and his wife Veronique were detained separately, with each keeping one of their two children with them. When Michael requested milk for his child, he was handcuffed, told to "shut up," and separated from his child for an hour. The experience brought Michael and his family to tears. No one in Michael's family was provided an opportunity to bathe while detained.

135.    After spending at least a few days in more formal detention settings, Haitian asylum seekers subject to expulsion were transported to airports in large groups, made to board airplanes, and returned to Haiti. Upon information and belief, they were given no opportunity to access the U.S. asylum process, request the assistance of counsel, or receive any legal information. If asylum seekers asked where they were being transported, DHS officers not only withheld information but sometimes lied, stating that they were being transferred to another detention facility and were not

going to be deported. Compounding the trauma and abuse they inflicted, DHS personnel indiscriminately handcuffed and shackled nearly all adults during the long flights to Haiti.

136.    For example, on or about September 19, 2021, officers woke Plaintiff Wilson Doe and his family in their detention cells in the middle of the night and placed them on a bus with other migrants. When Wilson asked where they were going, officers lied and said they were transferring Wilson and his family to another "prison" in Florida. After the bus drove for approximately two hours, Wilson realized that they were arriving at an airport.

137.    When the bus parked at the airport, none of the migrants wanted to get off the bus because it was clear they were going to board a plane. Wilson and others tried to stay on the bus, stating that they did not want to leave the United States and get on the plane without knowing where they were going. In response, officers boarded the bus and beat Wilson and several others. In front of Wideline and their children, the officers beat Wilson so savagely that they ripped his clothes off and he lost his shoes. Eventually the officers forced Wilson off the bus. Wilson saw officers strike at least four other migrants.

138.    When Wilson got to the steps to board the plane, he said he would not board the plane without knowing where it was going. The officers beat Wilson again, and at one point, an officer placed a foot on Wilson's neck, while pinning his arms against his back. As the officer continued to apply pressure, Wilson tried to say, "I can't breathe."

139.    After beating Wilson, officers handcuffed him. The restraints were placed so tightly that they cut into his wrists and drew blood. Officers forced Wilson on the plane. They also threatened a sobbing Wideline that they would arrest Wilson if she did not get on the plane. Wilson sat through the entire flight without a shirt or shoes. Wilson and Wideline's family, and everyone else on the plane, were expelled to Haiti.

140.    Now in Haiti, Wilson has scars on his wrists from the handcuffs. His oldest child, who once dreamed of living in the United States and joining the U.S. Army, cries every day. His younger child keeps repeating "they hurt you, they hurt you." The entire family is devastated to be back in Haiti after all that they endured to seek asylum in the United States.

141.    Similarly, after approximately nine days at a detention facility, Plaintiffs Michael and Veronique's names were called. Michael asked an officer if they were being sent back to Haiti. The officer replied that Michael, Veronique, and the others were being transferred to a different detention facility. U.S. officials then handcuffed the adults on waists, legs, and hands before loading them onto a bus. Seeing Michael being handcuffed made his daughter cry. The bus left the detention facility with a police escort.

142.    On the bus, Michael again asked another officer if they were being returned to Haiti. He told the officer that sending them to Haiti would be the equivalent of a death sentence—"You might as well just kill us." The officer replied that they were not being returned to Haiti, but instead being transferred to another detention facility.

143.    Veronique had the couple's two-year old daughter on her lap during the bus trip. At one point, their daughter fell off her lap and became stuck under the seat. Veronique was unable to pick up her child because she was handcuffed. In tears, Michael and Veronique pleaded with the officers for help, saying: "Our baby is under there, we need to get the baby out. Please help us." The officers did not respond until other migrants also began shouting that there was a baby stuck under the seat. An officer eventually released one of Veronique's hands so she was able to reach down and pull her child back into her lap.

144.    It was not until they arrived at the airport that Michael and Veronique realized they were being expelled to Haiti. They remained handcuffed on the waist, legs, and hands during the duration of the flight to Haiti. Although Michael asked for his handcuffs to be removed so he could use the restroom, officers refused to remove them for the entire trip from the detention facility to Haiti, preventing him from using the restroom.

145.    Michael saw a woman on the bus who had given birth to a baby a few days earlier while in the CBP Encampment. That woman was also handcuffed, and she and her newborn were expelled to Haiti on the same flight as Michael and Veronique's family.

146.    Similarly, when Plaintiffs Mirard and Madeleine and their two-year-old daughter were expelled, all the adults on their flight were shackled at the waist and legs. Any adult who did

not have to hold a small child was also handcuffed, including Mirard. The humiliation alone caused Mirard, a proud father and man of faith, to break down in tears. At no time did Defendants inform Mirard or Madeleine that they were being returned to Haiti. Only when they landed in Port-au-Prince did Mirard realize that they were being sent back to the country that he and Madeleine had fled and his daughter had never known.

147.    Upon information and belief, at no time during the entire expulsion process—from processing at the CBP Encampment to holding at the detention facility to being transported to the airport and expelled to Haiti—did U.S. officials ever ask if Individual Plaintiffs or any other asylum seeker had a fear of returning to Haiti or wished to seek asylum.

148.    Officers' refusal to screen for fear or vulnerability to refoulement was not a mistake. In authorizing and enabling mass expulsions under the Haitian Deterrence Policy, President Biden and DHS Defendants understood that asylum seekers would be expelled without further access to the statutory or procedural protections required under U.S. law.

149.    DHS Defendants' failure to abide by their statutory obligations resulted in erroneous expulsions. In at least one case, a Black migrant from Angola was expelled to Haiti on the presumption that he was Haitian, despite repeatedly explaining to officers that he was not Haitian and had never been to Haiti. On information and belief, such errors were reported to senior DHS officials and President Biden and DHS Defendants took no action to prevent similar erroneous expulsions from occurring.

**2.    DHS Defendants expel thousands of asylum seekers from Del Rio to Mexico.**

150.    Through their conduct taken pursuant to the Haitian Deterrence Policy, DHS Defendants also effectuated the expulsion of approximately 8,000 asylum seekers to Mexico. These asylum seekers were compelled to cross back to Mexico because despite the dangerous conditions they would face there, many believed that being summarily expelled to Haiti posed an even graver threat.

151.    For example, Plaintiffs Samuel and Samentha Doe were unwilling to risk being sent back to Haiti because they knew if they went back, they would die there. In addition, their children were sick, their son had been injured after running away from a mounted CBP officer chasing Haitians in the river, and they were starving from lack of food. Samuel describes the CBP Encampment as "the worst thing in my life that I can describe." Because Samuel feared the family would be returned to Haiti, they took their children back to Mexico.

152.    Similarly, after Plaintiffs Esther and Emmanuel Doe had spent about one week suffering in the CBP Encampment waiting to seek asylum, they were awoken early in the morning by U.S. officials and told to get on the "last" bus. Because they were afraid of being sent back to Haiti if they got on the bus, Esther and Emmanuel crossed into Mexico with their son. Although Esther and her family had come to the CBP Encampment to request asylum, they were never asked if they wanted to seek asylum and were not given the chance to express a fear of return to Mexico or Haiti. "They never asked me that. Even if you wanted to, they didn't give you the chance to talk to them."

**E.    Asylum seekers expelled from Del Rio face danger in Haiti and Mexico.**

153.    The common consequence of Defendants' implementation of the Title 42 Process and Haitian Deterrence Policy is that thousands of Haitian asylum seekers now live under constant threat in Haiti and Mexico. The danger faced by these asylum seekers is the predictable result of deliberate choices by President Biden's senior staff and DHS Defendants to expel Individual Plaintiffs and other vulnerable individuals without first affording them any access to the U.S. asylum process or required non-refoulement screenings.

154.    Individuals expelled to Haiti face constant threats to their safety due to that country's political instability, violent crime by gangs and cartels, and acute food insecurity. Years of devastating natural disasters have crippled critical infrastructure and local economies, while progressively brutal feuds among cartels and political factions have left the government unable to provide basic services or to prevent violence and kidnappings.

155.     This situation has deteriorated in recent months following the assassination of President Jovenel Moïse and the 7.2 magnitude earthquake that debilitated the country's south. Aid groups in Haiti believe that the insecurity is the worst they have seen in decades. The State Department has issued a "Level 4" Travel Advisory for Haiti, advising U.S. citizens not to travel there because "kidnapping is widespread" and "violent crime, such as armed robbery and carjacking, is common." U.S. government employees are encouraged not to walk in the capital city of Port-au-Prince at any time and must receive approval to visit certain parts of the city.

156.     Fearing the escalating violence, many expelled migrants in Haiti have gone into hiding. Plaintiff Jacques Doe is currently in hiding from the gangs that forced him to flee Haiti originally. Plaintiff Wilson Doe and Wideline likewise do not venture far beyond their front porch, fearful that Wideline or others in their family could be kidnapped again. Other individuals have no choice but to live on the street or sleep in temporary shelters. Most migrants struggle to find food, housing, and jobs in a country they had fled and no longer recognize. They spend their days trying to survive amidst rampant robberies, murders, and kidnappings.

157.     President Biden and DHS Defendants were aware of these circumstances and the danger that awaited Individual Plaintiffs and asylum seekers in Haiti when they were expelled.

158.     One month before thousands of Haitians arrived at the CBP Encampment, around the same time Secretary Mayorkas redesignated Haiti for TPS because of the extraordinary conditions there, DHS's civil rights office confirmed that there would be a strong risk of unlawful refoulement if DHS were to expel asylum seekers to Haiti.

159.     President Biden and DHS Defendants nonetheless ignored these warnings and authorized and effectuated the expulsion of thousands to Haiti where there is no infrastructure in place to receive and provide resources to expelled individuals. Many individuals had not been to Haiti for years and have no network, family members, or place to call home. In fact, the head of Haiti's National Migration Office protested in mid-September that Haiti was unable to receive expelled migrants. As DHS personnel were expelling Haitians from the CBP Encampment, U.S. Special Envoy for Haiti Daniel Foote resigned, declaring that he refused "to be associated with the

United States['] inhumane, counterproductive decision to deport thousands of Haitian refugees"

to Haiti. Ambassador Foote noted that the "collapsed state is unable to provide security or basic

services" and "simply cannot support the forced infusion of thousands of returned migrants lacking

food, shelter, and money without additional, avoidable human tragedy."

160.    Individual Plaintiffs and other Haitian asylum seekers expelled from Del Rio to

Mexico also face insecurity and experience harm. Black migrants encounter increased challenges

in Mexico due to pervasive anti-Black racism from Mexican immigration authorities, the police,

and the local community. For example, after fleeing to Mexico to avoid being expelled to Haiti,

Plaintiff Paul Doe had difficulty finding a room to rent and still has not been able to find a job,

despite making multiple applications. He has also been stopped multiple times by the police, who

question him about who he is and where he is going. To avoid being targeted this way, he now

remains at home as much as possible.

161.    These migrants are regularly denied adequate medical care, housing, and

employment in Mexico. Vendors frequently refuse to serve Haitians and other Black migrants food

or water and Mexican police officials are known to extort these migrants, threatening to deport

them to their country of persecution. Scores of Haitian migrants have been kidnapped and held for

ransom as they traveled to the United States and after being expelled by U.S. officials. Because of

these dangers, many migrants are in hiding in Mexico.

### III.    President Biden and DHS Defendants' Haitian Deterrence Policy applied in Del Rio diverges from standard practices and is driven by discriminatory purpose.

162.    The suffering and harm experienced by Individual Plaintiffs and thousands of

others in the CBP Encampment and during their subsequent detention and expulsions are a direct

result of President Biden and DHS Defendants' Haitian Deterrence Policy. This overarching

policy, which aimed to remove Haitians from the United States and prevent others from coming

to seek protection under the U.S. asylum system, resulted from a series of discrete decisions that

departed from standard practices and were made by senior White House and DHS officials as the

situation in the CBP Encampment evolved.

**A.    The treatment of Haitian migrants in Del Rio diverged from standard practices Defendants applied to other asylum seekers.**

163.    The decision to deprive Haitian asylum seekers of necessities like food, water, shelter, and medical care departed from DHS Defendants' typical procedures for processing asylum seekers pursuant to the Title 42 Process and for providing humanitarian aid to large groups of arriving migrants in several ways.

164.    First, the high level of involvement by top White House and agency officials in decision-making relating to the treatment of asylum seekers in Del Rio was unusual. On information and belief, senior and Cabinet-level officials do not generally take an active role deciding how aid and necessities are provided at field processing centers like the CBP Encampment.

165.    Second, President Biden, his senior advisors in the NSC and DPC, and DHS Defendants disregarded months of intelligence indicating that thousands of Haitian asylum seekers were traveling to the U.S. border and stopped internal efforts to discuss and organize necessary infrastructure, personnel, and resources to prepare for their arrival. It is uncommon for an agency to ignore its own intelligence and the recommendations of its experts, particularly where, as here, the intelligence is corroborated by reports from sources and partners with first-hand knowledge.

166.    Third, despite the insufficient resources available at the CBP Encampment to meet the needs of Haitian asylum seekers, DHS Defendants did not seek out assistance from non-governmental organizations ("NGOs"). In similar situations, agencies like DHS and CBP generally engage with humanitarian aid organizations when circumstances prevent the agency from meeting reasonably anticipated needs.

167.    Fourth, Defendants diverged from their typical practice of accounting for people in CBP custody and tracking important information about them, including the existence of fear-based claims. On information and belief, DHS Defendants lacked information regarding the number of fear-based claims Haitians in the CBP Encampment had raised, did not know how many people were in their custody, and lost at least one child for hours. On information and belief, this lack of

information represented a marked departure from DHS Defendants' protocols and processing of other large groups of asylum seekers at the border.

168.     The decision to expel Haitians in the CBP Encampment as quickly as possible was also inconsistent with DHS Defendants' standard practice in similar situations.

169.     First, DHS Defendants departed from how they typically addressed the needs of groups of asylum seekers arriving at the border, including other large and fast-growing groups. For example, when thousands of people were severely overcrowded without food or other necessities in a temporary outdoor processing site under the Anzalduas International Bridge in Mission, Texas, in spring 2021, DHS personnel relocated individuals to other sites for processing to alleviate the humanitarian crisis near the port of entry. They also engaged local NGOs and provided greater resources to asylum seekers, including food, cots, benches, and water misters.

170.     Second, despite being informed in advance that expulsions of Haitian asylum seekers would create a "high risk of refoulement" in violation of U.S. and international law, President Biden and DHS Defendants did not take this risk into account and failed to ensure that any non-refoulement screenings or interviews were offered to asylum seekers prior to expulsion. This lack of screenings is a departure from general practice, mandated by law, to ensure adequate safeguards against unlawful refoulement of asylum seekers.

171.     Third, DHS Defendants expelled asylum seekers to Haiti despite knowing that there was no infrastructure set up to receive and process them. Only days after the expulsion flights began, on or about September 20, 2021, did White House officials and DHS Defendants discuss the lack of infrastructure and any steps to be taken to remedy it. These actions are inconsistent with standard procedures, which call for reception infrastructure prior to expulsions on the scale that DHS Defendants were conducting.

172.     Fourth, DHS Defendants and personnel did not discuss or take any steps to mitigate the health risks of expulsion, including COVID-19, to vulnerable asylum seekers who were sick, tender-aged, or pregnant, even though Defendants generally consider health vulnerabilities of

migrants when making expulsion decisions under the Title 42 Process. At least one woman went into labor while on the tarmac awaiting expulsion.

173.    Fifth, DHS Defendants had a default policy not to subject families from Central America and Mexico to the Title 42 Process. This policy included screening families for vulnerability and providing family units with minor children with humanitarian exemptions to the Title 42 Process. DHS Defendants departed from this default policy specifically for Haitian families in Del Rio, expelling large numbers of families, including those with infants, and including at least one family with a days-old U.S. citizen child born in the CBP Encampment, without screening them for vulnerability or exemptions.

**B.    Discriminatory intent drove the treatment of Haitian asylum seekers in Del Rio.**

174.    The Haitian Deterrence Policy also arose from discriminatory intent based on race and national origin.

175.    At the direction of the White House and DHS Defendants, CBP personnel treated all asylum seekers in the CBP Encampment as presumed Haitian nationals, regardless of whether they were in fact Haitian. DHS personnel also initially miscounted the number of Haitians in the encampment because they assumed that non-Haitian Black asylum seekers were Haitian. On information and belief, DHS Defendants took no action to prevent errors in reporting the nationality of individuals in Del Rio.

176.    On information and belief, DHS officials tasked with addressing the developing humanitarian crisis in Del Rio viewed Haitian and Black asylum seekers as dangerous, barbaric, and criminal. On one occasion, a CBP official in senior leadership for the Del Rio Sector remarked to DHS officials that Haitians would "tear through the walls" of a detention facility. In a meeting relating to the CBP Encampment, top DHS officials described Haitians as "particularly difficult," and a senior DHS official reported to Secretary Mayorkas, without evidence, that Haitian asylum seekers had engaged in criminal conduct in Mexico.

177.     On information and belief, DHS Defendants believed that Haitians were more likely to break the law, be embedded with smugglers, or move through irregular channels than other groups. On September 16, 2021, when preparing the mass expulsion strategy, a senior CBP official stated that removing single Haitian men must be a priority because they were likely to be dangerous and violent. DHS personnel also refused to allow the inclusion of toothbrushes or combs in some hygiene kits that were distributed at the CBP Encampment, out of concern that the Haitian asylum seekers might use them as weapons.

178.     On information and belief, perspectives such as these shaped the decisions that senior White House and DHS officials made in adopting and implementing the Haitian Deterrence Policy. These decisions included, among others, the decision not to prepare adequate food, water, medical care, or shelter for asylum seekers arriving in the CBP Encampment; the decision that DHS personnel effectuating the expulsions of Haitians should lie about where such Haitians were being transported; the decision that DHS personnel should shackle Haitians, including mothers with children, on expulsion flights; and the decision to expel Haitians swiftly, without access to non-refoulement screenings, in one of the largest mass expulsions in U.S. history.

IV.     **Defendants' Title 42 Process applied in Del Rio is unlawful.**

179.     Beyond the abuses described above, the procedures ostensibly being applied to Individual Plaintiffs and Haitians in Del Rio in connection with the Haitian Deterrence Policy— the Title 42 Process—are themselves unlawful. The Title 42 Process deprives asylum seekers of their statutory and procedural protections under U.S. law despite lacking any authority to do so. Moreover, although Defendants pretextually portray the Title 42 Process as a public health measure, it instead undermines public health.

A.     **The federal government's public health powers provide no support for the mass, summary expulsion of asylum seekers.**

180.     The Title 42 Process that was used to expel thousands of Haitian asylum seekers in Del Rio is grounded in the federal government's purported public health authority.

181.     These statutory public health powers have their origins in an 1893 statute

authorizing the Executive Branch to undertake certain acts to address the spread of contagious diseases originating outside of the United States. *See* Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452. Now codified at 42 U.S.C. § 265, the statute authorizes the CDC Director to address "a serious danger of the introduction of" a "communicable disease" from a foreign country "into the United States" by "prohibit[ing], in whole or in part, the introduction of persons or property."

182.    Over the 128 years that the statute and its predecessors have been in force, this provision has never been used to expel noncitizens from the United States. Indeed, despite several infectious disease outbreaks during that period, no regulation has ever before been promulgated purporting to authorize the immigration powers asserted through the Title 42 Process.

183.    This historical context fits with the framework of the Public Health Service Act, which confirms that these public health powers do not include the broad powers claimed by Defendants. Among other reasons, the statutory language expressly provides the power to prohibit "the introduction of persons and property," but makes no reference to an authority to expel individuals under the act. That Section 265 applies to U.S. citizens and noncitizens further supports the plain language interpretation that "introduction" does not mean "expulsion." Finally, the act references Section 265 as a "quarantine" provision, and provides specific penalties for its violation, none of which include expulsion. *See* 42 U.S.C. § 271(a) (violation of Section 265 "shall be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both").

184.    In short, the sole statutory authority underlying the Title 42 Process and relied on in applying the process to Individual Plaintiffs and Haitian asylum seekers in Del Rio does not authorize the expulsion of noncitizens from the United States.

**B.    Defendants' Title 42 Process deprives asylum seekers of protections guaranteed under U.S. law.**

185.    Defendants' Title 42 Process relies not only on a novel, atextual construction of Section 265, but also on the unprecedented and extraordinary claim that Defendants may ignore clear protections for asylum seekers mandated under U.S. immigration laws.

-47-

186.     The United States' modern asylum system has its roots in the aftermath of World War II, when U.S. lawmakers created the nation's first formal asylum protections to prevent a recurrence of the United States closing its borders to individuals seeking safety from Nazi persecution.

187.     Currently, three primary statutory frameworks operate to protect individuals fleeing persecution and torture. Together, they provide individuals coming to the United States with a right to seek immigration relief through the specific procedures set forth in those laws.

188.     First, the INA provides that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States"—regardless of their place of entry, interdiction, or status—"may apply for asylum[.]" 8 U.S.C. § 1158(a)(1).

189.     Second, the INA sets forth the duty of non-refoulement, an international law principle providing that a country may not expel or return an individual to a country where they have a well-founded fear of persecution or serious harm. Consistent with the United States' obligations under the 1951 Convention on the Rights of Refugees and the 1967 Protocol, the INA's withholding of removal provision prohibits the United States from removing any individual to a country where it is more likely than not that the individual's "life or freedom would be threatened in that country because of [their] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

190.     Third, FARRA implements the United States' non-refoulement duties set forth in Article 3 of the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. In relevant part, FARRA prohibits the United States from expelling an individual to a country where it is more likely than not that they will be tortured. *See* 8 U.S.C. § 1231 note.

191.     DHS Defendants and personnel have applied the Title 42 Process in a manner that violates each of these fundamental protections of the U.S. asylum system.

192.     When applying the Title 42 Process to persons in the CBP Encampment, DHS personnel refused to allow Individual Plaintiffs and thousands of others to "apply for asylum" as

required under the INA. 8 U.S.C. § 1158(a)(1). Rather than inspect all people in the encampment to determine whether they would "indicate[] either an intention to apply for asylum . . . or a fear of persecution," 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i)-(ii), DHS personnel actively refused to engage with Individual Plaintiffs or other asylum seekers.

193.    DHS Defendants also effectuated the expulsion of Individual Plaintiffs and others to Mexico and Haiti without considering whether they would likely be persecuted or tortured upon their return. DHS Defendants' refusal to provide adequate safeguards against refoulement, including screenings for withholding of removal and protection under CAT, is inconsistent with their mandatory duties under the INA and FARRA.

194.    Indeed, in a memorandum dated shortly after DHS cleared the CBP Encampment, entitled "Ending Title 42 return flights to countries of origin, particularly Haiti," senior State Department advisor Harold Koh concluded that Defendants' "current implementation of the Title 42 authority continues to violate our legal obligation not to expel or return ('refouler') individuals who fear persecution, death, or torture, especially migrants fleeing from Haiti." Koh explained that the Title 42 Process, particularly as it was applied to asylum seekers in Del Rio, was inconsistent with DHS Defendants' duties under the INA and FARRA and created "an unacceptably high risk that a great many people deserving of asylum" will be unlawfully returned to countries where they fear persecution, death, or torture.

195.    Finally, DHS Defendants' expulsions of Haitian asylum seekers under the Title 42 Process also conflicts with the INA's provisions governing the removal of noncitizens. With few exceptions, removal proceedings before an immigration judge are the "sole and exclusive procedure" for determining whether an individual may be removed from the United States. 8 U.S.C. §§ 1229a(a)(3); 1225(b)(1). Summary expulsions under the Title 42 Process offer none of the procedural protections mandated by the INA for noncitizens who fear removal.

C.    Defendants' Title 42 Process does not advance public health.

196.    Although Defendants' purported goal in implementing the Title 42 Process is to promote public health, scientific experts and legal scholars have denounced the process as

undermining public health and welfare.

197.    Defendants' Title 42 Process has never been about public health. Instead, the government's public health powers were used to serve former President Trump's political ends of restricting immigration and circumventing critical protections for asylum seekers.

198.    When HHS Defendants' own public health experts initially refused to sign onto the first Title 42 health order, top Trump Administration officials ordered them to fall in line. It is widely reported that former Vice President Mike Pence directed former CDC Director Dr. Robert Redfield to issue the Title 42 order and Title 42 Regulation after Redfield expressed that there was no valid public health reason to issue such an order. In her testimony to Congress shortly after Defendants' use of the Title 42 Process at the CBP Encampment, Anne Schuchat, the former Deputy Director of CDC, testified that the issuance of the first Title 42 order "wasn't based on a public health assessment at the time."

199.    The public health justifications for the Title 42 Process are no more compelling now than they were twenty months ago. Indeed, any public health justifications are weaker now due to the wide availability in the U.S. of vaccines that are highly effective in combatting the transmission and spread of COVID-19.

200.    Shortly after Defendants applied the Title 42 Process to thousands of Haitians in Del Rio, Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases and the Chief Medical Advisor to the President, stated that "expelling" immigrants "is not the solution to an outbreak." He affirmed: "Certainly immigrants can get infected, but they're not the driving force of this, let's face reality here." Dr. Raul Gutierrez, co-chair of the American Academy of Pediatrics' Council on Immigrant Child and Family Health, echoed this sentiment, stating: "I don't think that there's a defensible public health reason to keep Title 42 in place."

201.    After observing the expulsion of Individual Plaintiffs and thousands of Haitians "without any assessment of their safety," hundreds of Defendant Walensky's former colleagues signed a letter to oppose Defendants' Title 42 Process, calling it "a political measure to prevent legal immigration under the rhetoric of public health."

202.   A principal justification for Defendants' continued extension and application of the Title 42 Process is the "congregate nature" of CBP and Border Patrol stations along the U.S. border, which purportedly risks the introduction, transmission, and spread of COVID-19 from arriving migrants.

203.   Although HHS Defendants "recognize[] the availability of testing, vaccines, and other mitigation protocols [that] can minimize risk in this area," and "anticipate[] additional lifting of restrictions" as DHS facilities employ these protocols, DHS Defendants have continued to enforce the Title 42 Process for months without taking advantage of any widely available mitigation measures. For example, the CBP Capio Memo provides no policies or procedures related to COVID-19 testing or the provision of COVID-19 vaccinations. And, although President Biden and DHS Defendants were aware for months that thousands of Haitian asylum seekers were traveling towards Del Rio, they refused to make any preparations for offering testing or vaccination to asylum seekers as they waited days or weeks in the CBP Encampment.

## V.   Defendants' Title 42 Process and Haitian Deterrence Policy continue, even as tens of thousands of Haitians again head to the U.S. border.

204.   The abuses that occurred in the CBP Encampment and in connection with the expulsion of thousands of Haitians are likely to continue under DHS Defendants' enforcement of the Title 42 Process and the Haitian Deterrence Policy.

205.   Public reporting indicates that thousands of individuals, many of whom are Haitian, are traveling to the United States to seek asylum at this time. Each Individual Plaintiff has likewise expressed an intent to return to the United States to seek asylum.

206.   No Defendant, however, has taken any appropriate corrective steps to ensure that the abuses and mass expulsions that happened in Del Rio are not repeated and to discontinue either the Title 42 Process or the Haitian Deterrence Policy.

207.   In December 2021, CDC conducted its periodic reassessment of the circumstances underlying CDC's August 2021 order and announced that the Title 42 Process would remain in place for at least another sixty days. In addition, President Biden and DHS Defendants have

blocked the efforts of internal staff to engage in an after-action review of the events at the encampment and DHS Defendants' treatment of Haitian asylum seekers. On information and belief, President Biden and DHS Defendants have not taken appropriate corrective action to end the Haitian Deterrence Policy.

208.    With Defendants' Title 42 Process and Haitian Deterrence Policy still in place, there are no safeguards to ensure that the abuses that occurred in Del Rio will not reoccur if and when Individual Plaintiffs and other Haitians arrive at the border to seek access to the U.S. asylum process. As the local sheriff stated shortly after the CBP Encampment was cleared, "I've never seen anything like [the Del Rio Encampment], but it's going to happen again."

## VI.    Individual Plaintiffs were harmed by Defendants' policies implemented in Del Rio

209.    Defendants' adoption and implementation of the Title 42 Process and the Haitian Deterrence Policy has caused Individual Plaintiffs and all other similarly situated individuals substantial, concrete, particularized, and irreparable injury.[14]

210.    As Defendants' relevant policies are ongoing, so too is the harm these policies cause. As detailed below, Individual Plaintiffs suffer ongoing harm from their treatment at the CBP Encampment and their unlawful expulsions to Haiti or Mexico. Because Individual Plaintiffs intend to return to the United States to seek asylum and Defendants' policies are ongoing, the harms detailed herein are likely to continue and recur.

### A.    Plaintiffs Mirard Joseph and Madeleine Prospere

211.    Mirard and Madeleine fled Haiti around 2017 in fear for their lives, escaping to Chile. They had a baby in Chile, but Mirard could not secure residency or work authorization there. After months of instability in Chile, the family decided to travel to the United States to seek asylum. The arduous journey to Mexico took the family almost a month with their young child.

---

[14] In addition to the claims asserted in this Complaint, each Individual Plaintiff is exploring individual claims based on the Federal Tort Claims Act and reserves the right to amend this Complaint to add such claims after satisfying the necessary administrative exhaustion requirements.

While traveling, bandits robbed Mirard and Madeleine and took all their money and belongings.

212.   On or around September 11, 2021, Mirard, Madeleine, and their young daughter finally arrived in Del Rio. U.S. officials gave Mirard a blue ticket. He understood that the blue ticket was being assigned to families and meant he should wait until his number was called.

213.   In the CBP Encampment, the family was forced to sleep on cardboard. Temperatures soared during the day and there was no shade. As a result, Mirard was severely sunburnt and dehydrated. The encampment was so dirty and dusty that their daughter developed respiratory and gastrointestinal issues that persist to this day. Mirard never saw or was aware of a doctor in the encampment who might assist his daughter.

214.   Mirard, Madeleine, and their daughter were given only water and bread, plus a single diaper each day. There was so little food available in the CBP Encampment that Mirard and others were forced to cross the river to Mexico to purchase food and water for their families.

215.   On or about September 18, 2021, when crossing back from Mexico with food for his family, Mirard was assaulted by a horse-mounted officer who lashed at him with reins, attempted to drag him back into the water, and nearly trampled him. This abuse has left him traumatized.

216.   Approximately two days after this trauma, officials transported Mirard, Madeleine, and their daughter to a detention facility. After being held there in conditions unfit for human life, U.S. immigration authorities called Mirard and his family, along with other detained Haitians, and handcuffed them and put shackles on their feet and waist. Madeleine, though shackled, was not handcuffed so that she could hold the baby. No authorities informed Mirard and Madeline where they were being taken when they were forced onto a plane and expelled to Haiti. Neither Mirard nor Madeline had ever been given an opportunity to seek asylum or otherwise explain why they feared being sent back to Haiti.

217.   Mirard is now in hiding in Haiti. Madeleine and their daughter were forced to travel to Chile to access medical treatment for the illnesses their daughter developed in the CBP Encampment. If they had the means, they would come back to the United States "right this second"

to seek asylum. They plan to save any money they can so that they can make another journey to the U.S. border to seek asylum.

### B.      Plaintiffs Mayco ("Michael") Celon and Veronique Cassonell

218.    Michael's family fled Haiti when he was only fifteen years old after the murder of his mother and lived in the Dominican Republic and then in Chile for over two decades. During that time, Michael and Veronique married and had two children. Michael, Veronique, and their children—now ages two and eight—fled Chile after conditions became extremely difficult for Haitians, who were being targeted there for violence and discrimination.

219.    After crossing the river in mid-September 2021 to seek asylum near Del Rio, Michael and his family experienced deplorable conditions at the CBP Encampment. U.S. officials provided very little food and water to Michael's family. Michael and Veronique often gave what little they received to their children. Michael saw fellow migrants pass out from thirst, heat, and hunger. "After days of being outside like that I realized I couldn't stay there anymore and thought about returning back to Mexico."

220.    In the CBP Encampment, migrants were using their own clothes to shade themselves from the sun and to sleep on the ground. In the morning, officers would yell "wake up, wake up" and kick migrants to awaken them. When people complained about the sun, asked about the availability of food and water, or asked when they would be processed, officers would yell and tell them to "sit down and shut up." Michael saw U.S. officials handcuff other migrants, seemingly because they had been asking questions. He also saw mounted officers using reins as whips against people in the river. He felt like the officers did not treat the Haitians in the encampment as people.

221.    After about three days in the CBP Encampment, Michael was given a numbered ticket. Other Haitians in the CBP Encampment had explained to Michael that he had to wait to receive a ticket, and then wait for his ticket number to be called in order to be interviewed about his case and either remain in the United States or be deported.

222.    About a week later, Michael, Veronique, and their two children had their number called and they were taken to a detention facility. After being separated and detained for over one

week, Michael and Veronique were shackled and expelled to Haiti with their children.

223.    After being expelled to Haiti, Michael and his wife did not have enough money to feed their family. One of their daughters became ill from drinking Haiti's contaminated water, and the family was unable to obtain medical care for her due to the country's instability. While back in Haiti, Michael expressed extreme fear for his and his family's safety. "Ever since I've been here I've been fearing for my life. I'm in hiding. I'm at risk every day."

224.    Michael and his family have since returned to Chile, where they face discrimination and threats because of their race and Haitian nationality. They plan to seek asylum in the United States again.

### C.    Plaintiff Wilson Doe

225.    Plaintiff Wilson Doe and his wife Wideline fled Haiti in 2016 after Wideline was kidnapped and held for ransom. Wilson's family had to collect a great deal of money to secure her release, and they still do not know exactly who kidnapped her. After receiving more kidnapping threats, Wilson, Wideline, and their young son fled Haiti to seek safety in Chile.

226.    Wilson and Wideline lived in Chile for almost five years, and their daughter was born there. As the family faced instability and Wilson and Wideline could not obtain employment documents or seek asylum, the couple decided to seek asylum in the United States.

227.    On or about September 11, 2021, Wilson and Wideline arrived in Del Rio with their sixteen-year-old son and their four-year-old daughter. They spent around four days in the CBP Encampment. During this time, U.S. officials gave them only water, but no food. The family had nothing to eat for a full day and was eventually able to eat only after a friend gave them some money, which allowed Wilson to cross into Mexico to purchase food and water.

228.    On or about September 14, 2021, U.S. officials took Wilson and his family to what Wilson described as a "prison," where they separated Wilson from his children and held them for what he thinks was four or five days. While in detention, Wilson was never given an opportunity to state that he had a fear of returning to Haiti. When Wilson tried to speak to a U.S. official, the official told Wilson that he had to wait to be called to speak to someone.

229.    On or about September 19, 2021, U.S. officials woke Wilson and his family in the middle of the night and placed them on a bus with other detained migrants. When Wilson asked where they were going, U.S. officials lied and said they were transferring Wilson and his family to another "prison" in Florida. After seeing they were brought to an airport, Wilson and others tried to stay on the bus, stating that they did not want to leave the United States and get on the plane without knowing where they were going. In response, U.S. officials boarded the bus and physically beat Wilson and several others. In front of Wideline and their children, the U.S. officials beat Wilson so savagely that they ripped his clothes off and he lost his shoes. Eventually the officials forced them off the bus and beat them further on the tarmac. Wilson tried to run on the tarmac, but an officer stopped him, threw him on the ground, and placed a foot on his neck while pinning his arms against his back, temporarily cutting off Wilson's ability to breathe.

230.    U.S. officials then handcuffed Wilson so tightly that the handcuffs cut into Wilson's wrists and drew blood. Officers forcibly placed Wilson on the plane and threatened a sobbing Wideline that they would arrest Wilson if she did not get on the plane. Wilson sat through the flight without a shirt or shoes and with the handcuffs cutting into his wrists. Wilson and Wideline's family, and everyone else on the plane, was expelled to Haiti. The entire family is traumatized.

231.    With nowhere else to go, Wilson, Wideline, and their family are staying with a relative, never leaving the house out of fear of being attacked or kidnapped. Haitians who have recently been deported back to Haiti are often targeted by gangs because the gangs believe that such people have money. Although Wilson and his family have no financial resources, they live in constant fear that someone will learn where they are and target them. Their plan is to save money so that they can travel back to the United States to seek asylum again. "We didn't want to go back to Haiti," Wilson has said. "My wife especially didn't want to return because of what happened to her. There was nothing left in Haiti for us. There is insecurity, kidnappings, and no money. Haiti is in a very difficult situation right now and that's why I resisted getting on the plane."

### D.    Plaintiff Jacques Doe

Jacques used to be a trade student and worked in construction before he was forced to flee

Haiti in 2019. A gang threatened his life after he refused their recruitment efforts and reported them to the police. Although the police arrested several gang members based on Jacques's tip, a neighbor told the gang what Jacques had done, and the gang started threatening his life. The death threats continued even when he tried to escape by moving out of the city, into the countryside.

232.    Fearing for his life, Jacques fled Haiti for Brazil. He then decided to seek asylum in the United States. The journey was difficult and took many days, including some days when Jacques walked up to 40 miles at a stretch.

233.    When he finally arrived in Del Rio on or about September 17, 2021, U.S. officials gave Jacques a numbered ticket. Other asylum seekers in the CBP Encampment told him that if officials called his number, he would need to identify himself to them. Although Jacques knew that people whose numbers were called were taken to prison, he thought that in prison he would be able to ask for a lawyer and get an interview with an immigration official, who would hear why he left Haiti and decide whether he could stay in the United States. He spent approximately one week in the CBP Encampment, waiting for his number to be called. Because officers called ticket numbers at all hours of the night and day, he often stayed awake at night so that he would not miss his number being called.

234.    While in the CBP Encampment, Jacques and other asylum seekers had no choice but to sleep on the ground. Some resorted to cleaning themselves in the river because there was no other option, but he saw people get sick from the river water. "A lot of people were sick. That's what shocked me the most." Apart from the riverbank, U.S. officials typically did not allow Jacques or others to go anywhere else. But there was not enough food in the encampment: "People were starving there." During the week Jacques spent in Del Rio, U.S. officials gave him only two small sandwiches and two bottles of water per day. The bottles of water were left out in the hot sun, so whenever he got one, the water was so hot it burned his mouth. When Jacques asked for more food, U.S. officials turned him away.

After approximately one week in the CBP Encampment, U.S. officials called Jacques's ticket number in the middle of the night. He was relieved to have his number called, because he

thought his chance to ask for asylum had finally come.

235.    Instead, Jacques was sent to two detention facilities. U.S. officials conducted a short interview and took his biometrics, but at no point did they ask him if he was afraid to return to Haiti or if he intended to seek asylum in the United States; nor was he allowed to ask questions or say anything other than answer the officials' questions. At the second detention facility, the officials did not provide Jacques with bedding, a change of clothing, or an opportunity to shower or brush his teeth. Jacques slept on the floor with around thirty other individuals. Generally, he was given only two pieces of bread and two water bottles each day.

236.    After Jacques had been detained for approximately four days at the second facility, U.S. officials woke him up at midnight and placed him on a bus. They refused to tell Jacques where they were being taken. When Jacques asked whether he was being taken back to Haiti, U.S. officials said no. "They lied to us." Jacques did not realize he was being expelled to Haiti until he was shackled with chains across his ankles, thighs, and hands and put on the airplane. "It was absolutely terrible; I couldn't do anything. The situation made me cry. I felt helpless." When he realized that he was being deported, Jacques tried to tell officials on the plane that he could not return to Haiti because he faced danger there. But the officials said there were too many Haitians in the United States, so he had to go back.

237.    When Jacques landed in Haiti, he was terrified that the gang would find out he was back and carry out their death threats. He immediately went into hiding, where he has been ever since, because he does not currently have enough money to leave Haiti. As a result, even though he got sick with a bad flu he contracted after being expelled, he has not been able to get any medical treatment. Because his life is in danger, Jacques plans to travel to the United States to seek asylum again.

### E.    Plaintiffs Esther and Emmanuel Doe

238.    Esther fled Haiti in 2017 due to threats to her life because of her family's political connections. After Esther's family suffered home invasions and threats of violence from a gang supporting a rival political party, Esther's father decided to send her to Chile for her own safety.

Emmanuel joined her there in 2018.

239.    Esther and Emmanuel lived in Chile and had a baby there. They struggled to survive in Chile, where they were unable to obtain permanent residence, and also faced repeated threats and extortion from drug dealers who targeted them because they were Haitian. Esther and Emmanuel decided to seek asylum in the United States, where they hoped that they could build a new life with their child.

240.    On or about September 18, 2021, Esther, Emmanuel, and their then-fifteen month-old son crossed the U.S. border near Del Rio. When they arrived at the CBP Encampment, a U.S. immigration official gave them a numbered ticket. They observed that U.S. officials would call out numbers, and people with those numbers on their tickets would identify themselves and be taken away from the camp. Esther and Emmanuel believed that when their number was called, they could request the opportunity to remain in the United States.

241.    In the CBP Encampment, the family slept on the ground and their son became sick with diarrhea and fever. U.S. officials distributed almost no baby-appropriate food, and Esther's son went hungry. Despite her fear of Mexican immigration officials, Esther crossed the river alone because she was desperate to find food for her sick and hungry son.

242.    Esther bought what she could on the Mexico side of the river and tried to hurry back to the encampment. But when she was in the middle of crossing the river, she was charged by CBP officers on horseback yelling, "Go back to Mexico!" Although she shouted in English that she had a baby who was in the CBP Encampment, they told her "no, go back to Mexico." She had to run backwards towards Mexico to avoid being trampled by the horses. It was only because the officers then turned their horses to chase other migrants in the river that Esther was able to pass by them and reunite with her family.

243.    For several more days in the encampment, Esther, Emmanuel, and her family slept on the ground and went hungry. Her son had constant diarrhea and developed a high fever. Eventually Esther's son was so ill that she twice sought help at a medical tent where there were personnel who appeared to be doctors. Visiting the doctors was an incredibly hurtful experience

for Esther, because the medical personnel treated her baby "like he was nothing." Instead of paying attention to and treating her son, they kept taunting her by asking Esther when her number would be called so that she would be put in jail and then deported. Eventually they gave her some liquid drops and some ice gel packs for his fever, but they did not appear to help.

244.     Esther and Emmanuel saw the numbers in the encampment dwindle as people's numbers were called and they were taken away. Finally, Esther and Emmanuel were awoken early in the morning by officials calling for people to get on the "last" bus. It was clear that officials were trying to clear the encampment. But they were afraid of being sent back to Haiti because of the threats of violence made against their family, and knew it was safer for them to cross the river back to Mexico than to get on the bus and be expelled.

245.     Esther, Emmanuel, and their son are currently living in precarious conditions in Mexico. Emmanuel has already been attacked a knifepoint, and Esther feels very visible, and vulnerable, as a Haitian in the Mexican town where they are renting a room. They plan on waiting until conditions are safer before returning to the United States to seek asylum.

### F.     Plaintiffs Samuel and Samentha Doe

246.     Samuel is a primary school teacher and credit union employee who fled Haiti in 2016 after being attacked by a rival political party and receiving death threats by armed men at his workplace. After seeking safety in Chile, he saved enough money for his wife Samentha and their son to join him. Samuel, Samentha, and their family struggled in Chile, where they faced discrimination. Around July 2021, Samuel, Samentha, their eight-year-old son, and their one-year-old daughter, who was born in Chile, began their journey to the United States to seek asylum.

247.     On or about September 16, 2021, the family arrived at the CBP Encampment. U.S. officials gave Samuel a numbered ticket and told him to go with the officials when his number was called. He believed that would be his opportunity to speak with U.S. immigration officials.

248.     While in the CBP Encampment, Samuel, and his family struggled. Because there was no shelter from the extreme sun, wind, and large amounts of dirt in the air, people had to search for branches to create shade for themselves. His family slept on the ground.

249.    The family also suffered from the lack of food at the encampment. When Samuel and his family first arrived, there was no food available for them to eat. As U.S. officials began handing out food and water, Samuel waited in line with hundreds of others to receive a bottle of water and a piece of bread or tortilla. As he waited for food, Samuel observed that the officials distributing the food taunted the asylum seekers by throwing water bottles at them. Samuel recalls, "It was humiliating. It felt like at home how you would throw food for chickens on the floor. That's how they treated us." The food that his family received in the CBP Encampment was not enough to sustain them. "It felt like they did enough so we wouldn't die but no more than that. It felt like a nightmare."

250.    Because of the wind and large amounts of dirt in the air, Samuel and Samentha's young daughter became very sick with diarrhea, vomiting, and coughing. She became so ill that Samuel pleaded for help from a U.S. official at the encampment. The official said they could not help them and suggested Samuel give his daughter water.

251.    As Samuel and his family waited longer in the CBP Encampment, they began to fear what would happen when their number was called. Samuel and Samentha had heard that people who had their numbers called went to be processed by immigration officials thinking that they were going to be released, but instead were sent back to Haiti. Samuel knew that if his family was returned to Haiti, they would die there.

252.    Samuel took their eight-year-old son to the river to clean himself. Officers on horseback showed up and chased after the migrants by the river. Terrified, Samuel's son ran from the horses, fell, and injured his eye, which then became painfully inflamed. After seeing mounted officers charge at migrants returning from Mexico with food, Samuel knew that his family had to leave the CBP Encampment as quickly as possible to protect his children.

253.    Given how ill their children were, the lack of food in the CBP Encampment, their encounter with mounted officers, and the possibility of being expelled to danger in Haiti, Samuel and Samentha felt their only choice was to cross the river back into Mexico. At no point while they were in the CBP Encampment did Samuel or Samentha have an opportunity to tell U.S.

immigration officials that they were afraid to return to Haiti and wished to seek asylum.

254.    After initially staying at a shelter in Mexico, Samuel, Samentha, and their children were expelled from the shelter. They continue to live in precarious conditions in Mexico. Samuel's son suffers from the painful eye condition he developed in the CBP Encampment. Samuel and Samentha fear that if their family returns to Haiti, they will be killed. "If we were to go back to Haiti, we are 99.9 percent dead. So there was no way I would take that risk." They hope to seek asylum in the United States and plan to return to the border when they can safely do so.

### G.    Plaintiff Paul Doe

255.    Paul was pursuing a degree in economics in Haiti but was forced to flee the country in 2017 after a gang associated with a dominant political party threatened his life because Paul refused to work for them to pay off an uncle's debt. The gang had killed Paul's uncle when he could not repay money he owed. Opposed to the gang's activities and unwilling to engage in their violence, Paul fled Haiti to seek safety in Chile. "I had to leave Haiti because I either had to be involved with the gang, or die. Those were my only two options."

256.    Paul traveled from Chile to the United States to seek asylum because it remains his hope that he can live without constant fear that he or his family might be attacked or killed. On or about September 17, 2021, Paul arrived at the CBP Encampment and was directed to a tent with officers who gave him a ticket with a number on it. They told him to wait under the bridge until his number was called. Other asylum seekers explained that Paul would be taken on a bus to a detention center when his number was called.

257.    For approximately the next week, Paul waited in the CBP Encampment for his number to be called. The conditions in the encampment were some of the hardest he has ever endured. Paul was forced to sleep on the ground in the dust without even a blanket. For the first several days Paul was at the CBP Encampment, officials gave him no more than a bottle of water and a tortilla each day. Often the water was undrinkable because it had been left sitting out in the sun. Around the fifth day, the officials began giving out a portion of rice and beans with the tortilla, and sometimes a box of juice. The food, however, gave him diarrhea, and when he sought medical

treatment, a doctor only gave him a pill that had no effect. Paul soon noticed it appeared to be the same pill that the doctors gave to anyone seeking care. Although he continued to feel ill, Paul did not seek medical care because everyone was given the same pill, regardless of symptoms.

258.    Paul eventually became so hungry that he decided to cross the river to get food in Mexico. He also hoped to get medicine for a friend's sick baby. As Paul reached the river, he observed U.S. officers beating asylum seekers returning to the CBP Encampment and pushing them back into the river. When Paul attempted to cross using a rope that had been set up to aid migrants through the river, officers deliberately cut the rope, threw it back into the river, and told Paul and others that they could not cross. Paul was forced to walk and swim downstream until he could cross safely.

259.    Paul was never asked by U.S. immigration officials if he had a fear of return to Haiti or provided an opportunity to request asylum while in the CBP Encampment. As Paul started seeing people leave the encampment, he understood that they were being deported. A U.S. official told him that "the U.S. is not a money tree – you can't just come here and get money."

260.    Paul knew that if he were to be sent back to Haiti, the gang would kill him. He felt that he had no choice but to go back to Mexico and wait there for another opportunity to seek asylum in the United States. What troubles Paul most about his experience in the CBP Encampment is that a country he has dreamed about since he was child had humiliated him and so many others from his country, rather than providing them refuge.

261.    In Mexico, Paul regularly encounters discrimination. It was incredibly difficult for him to find a room to rent—after being denied by approximately ten people advertising rooms for rent, he finally found someone willing to rent to him. Paul has also been unable to find work. He has applied to approximately six workplaces that advertised they were hiring, but when Paul applied, he was told they were no longer hiring. Without a job, Paul worries about how he will survive. He has been stopped by the police multiple times and questioned about who he is and where he is going. He now avoids going outside as much as possible.

**VII.   Haitian Bridge is harmed by the application of the Title 42 Process and Haitian Deterrence Policy in Del Rio.**

262.   The application of the Title 42 Process and Haitian Deterrence Policy to Haitian asylum seekers in the CBP Encampment has impaired Haitian Bridge's normal programming and resulted in a diversion of organizational and programmatic resources.

263.   The abuse of Haitians in Del Rio has put severe strain on Haitian Bridge's ability to carry out its work and mission. Haitian Bridge is one of the primary organizations at the center of the massive humanitarian and legal response to the detention, inhumane treatment, and unlawful expulsion of thousands of Haitian and other Black migrants in the CBP Encampment pursuant to the Title 42 Process and Haitian Deterrence Policy. Haitian Bridge diverted six of its nine full-time staff and one full-time contractor to respond to the crisis. A majority of these staff continue to devote significant time to issues flowing from Defendants' application of these policies in Del Rio and have not been able to resume normal work on Haitian Bridge's existing projects.

264.   Following media reporting that thousands of Haitians were coming to Del Rio to seek immigration relief, Haitian Bridge's Executive Director Guerline Jozef arrived in Del Rio on September 18, 2021. She was the first responder to the crisis; no other humanitarian organization was present on the ground at that time.

265.   As the first responder, and as a Haitian Creole-speaking organization with Haitian staff, Haitian Bridge was compelled to devote substantial resources to provide and coordinate assistance to the thousands of migrants in Del Rio. Haitian Bridge quickly sent staff to Del Rio. Although Defendants did not allow any of these staff to enter the CBP Encampment to directly assist asylum seekers, Haitian Bridge's staff worked quickly to organize an on-the-ground emergency response. Haitian Bridge coordinated culturally sensitive humanitarian services and transportation for individuals permitted to leave Del Rio and arranged support in Haiti to receive the thousands of asylum seekers being expelled there. It also coordinated communications inquiries with the media and received members of Congress, Haitian-American elected officials, and members of Haitian consulates seeking to protect the interests of Haitian nationals. Haitian Bridge staff organized and led advocacy efforts with the federal government in an unsuccessful

attempt to slow or stop expulsion flights and to develop a more humane response that safeguarded the rights of Haitians in the CBP Encampment and in detention facilities.

266.    On September 24, 2021, Secretary Mayorkas announced that there were no longer any migrants in the CBP Encampment. But DHS Defendants' mass expulsion of thousands of asylum seekers did not end Haitian Bridge's response work. Even after the camp was cleared, Haitian Bridge staff continued to receive delegations of Haitians and other Black leaders in Del Rio. The numerous human rights violations that Haitian Bridge staff observed at and around the CBP Encampment, including physical assaults and the denial of basic necessities to Haitian asylum seekers, compelled Haitian Bridge staff to travel to Ciudad Acuña and elsewhere in Mexico to interview individuals and gather evidence of these human rights violations.

267.    Haitian Bridge continues to divert resources in response to the government's abusive actions. Haitian Bridge continues to provide legal and humanitarian support to affected individuals and respond to media inquiries and speaking requests related to Del Rio.

268.    This response effort continues to take a toll on Haitian Bridge, its staff, and their ability to advance Haitian Bridge's mission. Several Haitian Bridge staff members worked in excess of 80–100 hours a week for several weeks, and lost several nights of sleep because of additional work from the crisis in Del Rio. Many of Haitian Bridge's core projects have been delayed since the government began detaining and expelling asylum seekers from the CBP Encampment in min-September. To date, Haitian Bridge staff members responding to the abuses in Del Rio, particularly Black staff members, have suffered and continue to suffer trauma from the brutal anti-Black racist treatment and injustice they witnessed in Del Rio.

269.    The need to respond on an emergency basis to the treatment of Haitian migrants at Del Rio has impaired Haitian Bridge's ability to keep up with existing demands for its services. For example, a key program component of Haitian Bridge's work involves assisting Haitians in the United States with their applications for Temporary Protected Status, which protects individuals from deportation and enables them to receive work authorization and permission to travel. But this work has largely stalled since September 2021. Haitian Bridge has had to postpone

several clinics and has not been able to move forward work in preparing a manual and trainings to enable lawyers and law school clinics to provide this assistance around the country. Haitian Bridge has also not been able to complete dozens of TPS applications, with serious adverse consequences for their clients, who consequently have been unable to receive work authorization.

270.    The events at the CBP Encampment and aftermath also strained Haitian Bridge's legal support and case management capacity. Haitian Bridge was forced to organize a national hotline to coordinate efforts and respond to hundreds of calls from Haitian asylum seekers in detention centers across the country and who had just been released from the Del Rio Encampment. In order to scale and staff this hotline, Haitian Bridge had to stall several ongoing projects.

## CLASS ALLEGATIONS

271.    Individual Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and a class of all other persons similarly situated. The proposed class is defined as all Haitian, or presumed Haitian, individuals who (1) sought access to the U.S. asylum process[15] in or around the CBP Encampment near the Del Rio Port of Entry between September 9 and 24, 2021, and (2) were denied access to the U.S. asylum process.

272.    Individual Plaintiffs seek to represent the class for all claims.

273.    This action meets all Rule 23(a) prerequisites for maintaining a class action.

274.    The class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Between approximately September 9 to 24, 2021, at least 15,000 migrants, the vast majority of whom were Haitian or Black and seeking asylum in the United States, arrived at the U.S. border and were detained in the CBP Encampment near the Del Rio Port of Entry. DHS Defendants used the Title 42 Process to expel at least 10,000 asylum seekers in the encampment

---

[15] As used in the proposed class definition, "asylum" and "asylum process" are understood to encompass the statutory and regulatory processes by which any noncitizen may seek all relevant forms of non-refoulement relief available under U.S. immigration laws, including asylum, withholding of removal, and relief under the Convention Against Torture. *See* 8 U.S.C. §§ 1158, 1231, 1231 note.

to Haiti or Mexico. Each of these individuals was deprived of access to the U.S. asylum process by Defendants' Title 42 Process and the Haitian Deterrence Policy. Joinder is made further impracticable because class members expelled to Haiti or Mexico generally do not have stable living conditions.

275.    There are questions of law and fact that are common to the class. *See* Fed. R. Civ. P. 23(a)(2). Class members allege common harms resulting from adoption and application of Defendants' Title 42 Process and the Haitian Deterrence Policy: all class members were seeking access to the U.S. asylum process, processed in the field pursuant to the CBP Capio Memo, deprived of basic necessities in the CBP Encampment, expelled to Haiti or Mexico, and denied legal rights, including their right to access the U.S. asylum process.

276.    All class members assert the same legal claims. These claims raise numerous questions of fact and law common to all class members, including: whether Defendants are engaged in the conduct alleged herein; whether class members are treated differently from similarly situated asylum seekers based on class members' race or nationality in violation of the Fifth Amendment; whether the application of the Title 42 Process and Haitian Deterrence Policy to class members is motivated by discriminatory intent on the basis of race or national origin, in violation of the Fifth Amendment; whether class members are deprived of their substantive and procedural due process rights under the Fifth Amendment by Defendants' Title 42 Process and Haitian Deterrence Policy; whether Defendants fail to consider important issues, including the right to non-refoulement and the danger to human life and welfare resulting from field processing asylum seekers, when issuing and implementing the Title 42 Process and Haitian Deterrence Policy; whether Defendants fail to consider important issues or consider improper factors when applying the Title 42 Process and Haitian Deterrence Policy to class members; whether 42 U.S.C. § 265 authorizes the summary expulsion of asylum seekers; whether the Title 42 Process applied to class members conflicts with the INA; whether the Title 42 Process applied to class members conflicts with FARRA; whether the summary expulsion of class members pursuant to the Title 42 Process violates the United States' non-refoulement obligations under the INA; whether class

members suffer harm as a result of Defendants' conduct; and whether class members are entitled to equitable and declaratory relief. These shared common facts will ensure that judicial findings regarding the legality of the challenged practices will be the same for all class members.

277.   Individual Plaintiffs' claims are typical of the class's claims. *See* Fed. R. Civ. P. 23(a)(3). Individual Plaintiffs and class members raise common legal claims and are united in their interest and injury. All Individual Plaintiffs, like class members, are Haitians who crossed the U.S. border at Del Rio to seek asylum and were deprived of access to the U.S. asylum process by Defendants' actions. Like class members, Individual Plaintiffs were subjected to Defendants' Title 42 Process and the Haitian Deterrence Policy: they were processed in the field pursuant to the CBP Capio Memo, subjected to dire conditions and abuse in the CBP Encampment, and expelled to Haiti or Mexico without the opportunity to apply for asylum.

278.   Individual Plaintiffs are also adequate representatives of the class. *See* Fed. R. Civ. P. 23(a)(4). Individual Plaintiffs and all class members share a common interest in ensuring that they are permitted to seek asylum under U.S. immigration laws without having their constitutional or statutory rights violated by Defendants. Individual Plaintiffs also seek the same relief as the members of the class they represent. Individual Plaintiffs and class members seek, among other things, an order: (1) declaring that the application of Defendants' Title 42 Process and Haitian Deterrence Policy to detain, process, and expel class members is unlawful and violates class members' constitutional and statutory rights, (2) enjoining the continued application of these policies to class members, and (3) enjoining Defendants to return unlawfully expelled class members to the United States so they can meaningfully access the U.S. asylum process. Individual Plaintiffs have no interest that is now or may be antagonistic to the interests of the class and they will fairly and adequately protect the interests of class members as they defend their own rights.

279.   Individual Plaintiffs are represented by attorneys from Justice Action Center, Innovation Law Lab, and Haitian Bridge Alliance. Counsel have demonstrated a commitment to protecting the rights and interests of noncitizens and, together, have considerable experience representing immigrants in complex and class action litigation in federal court aimed at systemic

government misconduct.

280.    The class likewise meets the requirements to be certified under Rule 23(b).

281.    The class may be certified under Rule 23(b)(1) because prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications and would create incompatible standards of conduct for Defendants.

282.    The class may also be certified under Rule 23(b)(2). Defendants have acted, have threatened to act, and will act on grounds generally applicable to the class by subjecting them to the unlawful application of the Title 42 Process and the Haitian Deterrence Policy, including field processing under the CBP Capio Memo, expulsion to Haiti and Mexico, and obstruction of access to the U.S. asylum process. Given Defendants' common treatment of class members, final injunctive and declaratory relief is appropriate as to the class as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Violation of the Due Process Clause of the Fifth Amendment (Equal Protection)**
***All Plaintiffs Against President Biden and DHS Defendants***

283.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

284.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from denying to any person equal protection of the laws. U.S. Const. Amend. V.

285.    The Due Process Clause applies to all "persons" on United States soil and thus applied to Individual Plaintiffs and similarly situated individuals during the period they were subjected to the Title 42 Process in the United States, including field processing pursuant to the CBP Capio Memo, as well as Defendants' Haitian Deterrence Policy.

286.    Defendants' Title 42 Process and Haitian Deterrence Policy were implemented against Individual Plaintiffs and similarly situated individuals without regard for their health, welfare, humanitarian needs, or statutory rights. The implementation of these policies resulted in

their deprivation of basic necessities such as food, water, shelter, and medical care; the imposition of physical and psychological abuse; and the use of threats, violence, and racial slurs.

287.    The adoption and implementation of the Title 42 Process and Haitian Deterrence Policy against Individual Plaintiffs and similarly situated individuals by President Biden, his staff, DHS Defendants, and DHS personnel departed from standard procedures and was motivated at least in part by discriminatory purpose based on race and presumed national origin.

288.    Discrimination on the basis of race or presumed national origin in the treatment of migrants in the United States is not necessary to fulfill a compelling government interest.

289.    There is a substantial risk that Individual Plaintiffs will again be subject to discriminatory treatment based on race and presumed national origin as a result of President Biden and DHS Defendants' adoption and implementation of the Title 42 Process and Haitian Deterrence Policy.

290.    Defendants' conduct has impaired Haitian Bridge's programming and forced Haitian Bridge to divert resources to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

291.    Defendants' violations of the Due Process Clause cause ongoing harm to Plaintiffs.

**SECOND CLAIM FOR RELIEF**
**Violation of the Due Process Clause of the Fifth Amendment (Substantive Due Process)**
*All Plaintiffs Against President Biden and DHS Defendants*

292.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

293.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty. *See* U.S. Const. Amend. V.

294.    The Due Process Clause applies to all "persons" on United States soil and thus applied to Individual Plaintiffs during the period in which they were subject to the Title 42 Process in the United States, including field processing pursuant to the CBP Capio Memo, as well as

Defendants' Haitian Deterrence Policy.

295.     The conduct of President Biden, his staff, DHS Defendants, and DHS personnel staff in adopting and enforcing the Haitian Deterrence Policy against Individual Plaintiffs, including enforcing the Title 42 Process in Del Rio in a manner indifferent to humanitarian concerns, expelling thousands of Haitian asylum seekers as quickly as possible, and taking steps to shield such actions from accountability, was gravely unfair and so egregious and outrageous that it may fairly be said to shock the conscience.

296.     DHS Defendants and President Biden therefore have violated Individual Plaintiffs' substantive due process rights.

297.     There is a substantial risk that Individual Plaintiffs and similarly situated individuals will again be subject to abusive and unconscionable treatment enabled by DHS Defendants and President Biden, including in connection with Defendants' ongoing Title 42 Process and Haitian Deterrence Policy.

298.     Defendants' conduct has impaired Haitian Bridge's programming and forced Haitian Bridge to divert resources to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

299.     Defendants' violations of the Due Process Clause cause ongoing harm to Plaintiffs.

**THIRD CLAIM FOR RELIEF**
**Violation of the Due Process Clause of the Fifth Amendment (Special Relationship)**
*All Plaintiffs Against DHS Defendants*

300.     Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

301.     Under the Fifth Amendment to the U.S. Constitution, Defendants have an affirmative duty to provide for an individual's basic human needs when they "take[] that person into [their] custody and hold[] him there against his will," thereby creating a "special relationship" with that individual. *DeShaney v. Winnebago Cnty. Svcs.*, 489 U.S. 189, 199-200 (1989). When

the government "so restrains an individual's liberty that it renders him unable to care for himself," it assumes responsibility for that individual's safety and well-being. *Id.*

302.    When the government has a special relationship with an individual, "'governmental "deliberate indifference" will shock the conscience sufficiently' to establish a substantive due process violation." *Harvey v. D.C.*, 798 F.3d 1042, 1050 (D.C. Cir. 2015).

303.    Through their processing of Individual Plaintiffs at the CBP Encampment pursuant to the CBP Capio Memo and the Haitian Deterrence Policy, DHS Defendants and DHS personnel created a "special relationship" with Individual Plaintiffs by restraining their liberty, keeping them in DHS Defendants' custody, and rendering them unable to care for themselves. DHS Defendants therefore owed Individual Plaintiffs a heightened duty of care and protection.

304.    By depriving Individual Plaintiffs in their custody of basic human needs such as adequate food, water, shelter, and medical care, as well as of the ability to act on their own behalf to meet these needs themselves, DHS Defendants and DHS personnel have acted with deliberate indifference to Plaintiffs' basic human needs and engaged in "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). The conditions in the CBP Encampment were not reasonably related to a legitimate goal and therefore unconstitutional.

305.    DHS Defendants therefore have violated Individual Plaintiffs' substantive due process rights.

306.    There is a substantial risk that Individual Plaintiffs will again be subject to abusive and unconscionable treatment in DHS Defendants' custody, including in connection with DHS Defendants' ongoing enforcement of the Title 42 Process and Haitian Deterrence Policy.

307.    DHS Defendants' conduct has impaired Haitian Bridge's programming and forced Haitian Bridge to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

308.    DHS Defendants' violations of the Due Process Clause cause ongoing harm to

Plaintiffs.

## FOURTH CLAIM FOR RELIEF
### Violation of the Due Process Clause of the Fifth Amendment (Procedural Due Process)
#### *All Plaintiffs Against All Defendants*

309.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

310.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. Amend. V.

311.    Congress has guaranteed asylum seekers, including Individual Plaintiffs, a protected interest in applying for asylum, withholding of removal, and relief under the Convention Against Torture, and in not being removed to countries where they face danger, persecution, and potential loss of life. *See* 8 U.S.C. §§ 1158, 1231.

312.    Individual Plaintiffs are thus entitled under the Due Process Clause of the Fifth Amendment to a meaningful opportunity to establish their potential eligibility for asylum and access other forms of relief from removal.

313.    By denying Individual Plaintiffs access to the asylum process and access to other relief from removal, Defendants' conduct violates procedural due process.

314.    Further, Defendants have adopted and implemented the Title 42 Process and Haitian Deterrence Policy without adequate safeguards against expulsions of asylum seekers to countries where it is more likely than not that the asylum seeker will face persecution.

315.    As a result of Defendants' conduct, Individual Plaintiffs have been harmed by the denial of their access to the asylum process. Individual Plaintiffs have also been harmed by being expelled to Haiti or Mexico where they face danger.

316.    Defendants' conduct has impaired Haitian Bridge's programming and forced Haitian Bridge to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

317.    Defendants' violations of the Due Process Clause cause ongoing harm to Plaintiffs.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act 5 U.S.C. § 706(2)**
**Not in Accordance with Law and in Excess of Statutory Authority 42 U.S.C. § 265, 8 U.S.C.**
**§§ 1158, 1231 (Title 42 Process)**
*All Plaintiffs Against All Defendants Other Than President Biden*

318.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

319.    Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law;" "contrary to constitutional right;" "in excess of statutory jurisdiction, authority, or limitations;" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

320.    The Title 42 Process must be set aside because Defendants' issuance, administration, and application of the Title 42 Process is "not in accordance with law," "contrary to constitutional right," "in excess of statutory . . . authority," and "without observance of procedure required by law" in at least the following ways:

**Contrary to the Public Health Service Act, 42 U.S.C. § 265.**

321.    Defendants have relied on Title 42 of the U.S. Code, specifically Section 265, for the purported authority to issue, administer, and apply the public health orders, regulations, and memoranda underlying the Title 42 Process.

322.    Title 42 of the U.S. Code and Section 265 are public health statutes and do not authorize Defendants to deny asylum seekers an opportunity to access statutory and procedural protections afforded under U.S. law, including the INA. *See* 8 U.S.C. §§ 1158, 1231.

323.    Title 42 of the U.S. Code and Section 265 likewise do not authorize Defendants to expel asylum seekers from the United States or to deny asylum seekers an opportunity to access statutory and procedural protections to non-refoulement under U.S. law, including the INA.

324.    Defendants have applied the Title 42 Process to expel Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from the United States without affording them an

opportunity to access statutory and procedural protections under U.S. law.

**Contrary to the Immigration and Nationality Act, 8 U.S.C. § 1158 (Asylum).**

325.　The INA provides that any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such [noncitizen's] status, may apply for asylum . . . ." 8 U.S.C. § 1158(a)(1).

326.　Defendants have applied the Title 42 Process to prevent Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from applying for asylum or otherwise accessing the statutory and procedural protections for asylum seekers under the INA and applicable U.S. law.

**Contrary to the Immigration and Nationality Act, 8 U.S.C. § 1231 (Withholding of Removal).**

327.　The international law principle of non-refoulement provides that a country has an obligation to not expel or return an individual to a country where they have a well-founded fear of persecution or serious harm.

328.　The INA's withholding of removal provision codifies the United States' duty of non-refoulement. Under the INA, the United States may not remove an individual to a country where it is more likely than not that the individual's "life or freedom would be threatened in that country because of [their] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

329.　Defendants have applied the Title 42 Process to prevent Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from accessing their substantive rights and any process for requesting withholding of removal under the INA and applicable U.S. law, and to expel Individual Plaintiffs without access to this mandatory safeguard. Further, Defendants have adopted and implemented the Title 42 Process without adequate safeguards against expulsions of asylum seekers to countries where it is more likely than not that they will face persecution.

**Contrary to the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 Note (Convention Against Torture).**

330.　The Foreign Affairs Reform and Restructuring Act of 1998 implements the United States' non-refoulement duties set forth in Article 3 of the Convention Against Torture. In relevant

part, FARRA prohibits the United States from expelling an individual to a country where it is more likely than not that they will be in danger of being tortured. *See* 8 U.S.C. § 1231 note.

331.    Defendants have applied the Title 42 Process to prevent Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from meaningfully accessing withholding of removal under FARRA. Further, Defendants have adopted and implemented the Title 42 Process without adequate safeguards against expulsions of asylum seekers to countries where it is more likely than not that the asylum seeker will face torture. Defendants have applied the Title 42 Process to expel asylum seekers, including Individual Plaintiffs, without access to this mandatory safeguard.

***Ultra Vires* and Contrary to the Immigration and Nationality Act, 8 U.S.C. §§ 1225, 1229a (Removal of Noncitizens).**

332.    Congress created the exclusive means for removing a noncitizen from the United States in the INA.

333.    As a general matter, removal proceedings before an immigration judge are the "sole and exclusive procedure" for determining whether an individual may be removed from the United States. 8 U.S.C. §§ 1229a(a)(3). These proceedings include mandatory safeguards for noncitizens who fear removal. *Id.*

334.    Defendants have implemented the Title 42 Process as a means of removing noncitizens that is not set forth in or subject to the INA. Defendants purport to apply the Title 42 Process outside of U.S. immigration laws and the sole Congressionally authorized procedures for removal set forth in the INA.

335.    Defendants have applied the Title 42 Process to expel Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from the United States without allowing them to access the statutory and procedural protections relating to the removal of noncitizens under the INA and applicable U.S. law.

*         *         *

336.    For each of these reasons, Defendants' application of the Title 42 Process to Individual Plaintiffs is *ultra vires* and contrary to law.

337.    Defendants' issuance, administration, and application of the Title 42 Process constitute final agency action within the meaning of the APA.

338.    Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs. Among other things, Defendants' application of the Title 42 Process to Individual Plaintiffs has harmed them by denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law and to access procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law.

339.    Defendants' application of the Title 42 Process to Haitian and presumed Haitian asylum seekers, including Individual Plaintiffs, also harms Haitian Bridge by impairing its programming and forcing it to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

340.    Plaintiffs, who have no adequate remedy at law, seek immediate review under the APA and declaratory and injunctive relief restraining Defendants from continuing to implement the Title 42 Process against Individual Plaintiffs and similarly situated Haitian asylum seekers.

## SIXTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious Agency Action (Title 42 Process)
### *All Plaintiffs Against All Defendants Other than President Biden*

341.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

342.    Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

343.    Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

344.    Defendants' issuance, administration, and application of the Title 42 Process to Individual Plaintiffs and similarly situated asylum seekers is arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), in at least the following ways.

345.    Defendants have not provided a reasoned explanation for their decision to apply the Title 42 Process to Haitian asylum seekers in Del Rio, including Individual Plaintiffs, and to expel such asylum seekers from the United States.

346.    Defendants relied on improper considerations and factors Congress did not intend to be considered, including the use of a purported public health measure to deter immigration and restrict access to statutory and procedural protections guaranteed under U.S. immigration laws.

347.    Defendants have entirely failed to consider important aspects of the problem when applying the Title 42 Process to Individual Plaintiffs. Among other factors, Defendants have failed to consider asylum seekers' fear of persecution or torture in the country to which they will be expelled; humanitarian exceptions to the Title 42 Process as provided for in the CDC Order; that their implementation of the Title 42 Process continues to place asylum seekers in congregate settings, contradicting its stated purpose; and the opinions of scientific experts that the Title 42 Process does not advance public health and in fact actually undermines public health.

348.    Defendants also have failed to consider reasonable, less restrictive alternatives to applying the Title 42 Process to Individual Plaintiffs and Haitian asylum seekers in Del Rio. Among other alternatives, Defendants did not consider providing widely available COVID-19 testing or vaccinations to asylum seekers.

349.    Defendants have also offered an explanation—public health— that runs counter to the evidence before the agency, as Defendants' own experts have warned that the Title 42 Process undermines public health.

350.    Defendants' public health rationale is a pretextual means of restricting immigration and therefore is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

351.    Defendants' issuance, administration, and application of the Title 42 Process

constitute final agency action within the meaning of the APA.

352.   Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs. Among other things, Defendants' application of the Title 42 Process to Individual Plaintiffs has harmed them by denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law and to access procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law.

353.   Defendants' application of the Title 42 Process to Haitian and presumed Haitian asylum seekers, including Individual Plaintiffs, also harms Haitian Bridge by impairing its programming and forcing it to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

354.   Plaintiffs, who have no adequate remedy at law, seek immediate review under the APA and declaratory and injunctive relief restraining Defendants from continuing to implement the Title 42 Process against Individual Plaintiffs and similarly situated Haitian asylum seekers.

## SEVENTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1)
### Unlawfully Withheld or Unreasonably Delayed Agency Action
### *All Plaintiffs Against Defendants CBP and ICE*

355.   Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

356.   The APA provides that a court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

357.   CBP officers have failed to take numerous discrete agency actions in connection with Defendant CBP's issuance, administration, and application of the Title 42 Process and implementation of the Haitian Deterrence Policy. Defendant CBP has unlawfully withheld or unreasonably delayed required agency action in at least the following ways:

**Inspection and Asylum Referral Process**

358.   CBP officers have a discrete, mandatory duty to inspect all noncitizens and if "the

[noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer." 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i)-(ii); 8 C.F.R. § 235.3(b)(4).

359.    CBP officers have failed to inspect Individual Plaintiffs and similarly situated Haitian and presumed Haitian asylum seekers in Del Rio. CBP and ICE personnel have also failed to refer Individual Plaintiffs and similarly situated asylum seekers in Del Rio for asylum interviews.

360.    By refusing to allow asylum seekers, including Individual Plaintiffs, a meaningful opportunity to apply for asylum or to access any statutory and procedural protections afforded under the INA and applicable U.S. law to which they are entitled, Defendant CBP has unlawfully withheld and unreasonably delayed discrete agency actions mandated by statute.

**Withholding of Removal**

361.    The INA and FARRA prohibit the United States from removing an individual to a country where it is more likely than not that they will face persecution or torture. *See* 8 U.S.C. § 1231(b)(3), note.

362.    CBP officers have a discrete, mandatory duty to follow the procedures required by 8 U.S.C. § 1231(b)(3) and FARRA, *see* 8 U.S.C. § 1231 note, to determine whether a noncitizen faces a risk of persecution or torture and is therefore entitled to withholding of removal after full removal proceedings.

363.    By refusing to follow those procedures, and thus refusing to allow asylum seekers, including Individual Plaintiffs, meaningful access to procedural protections mandated under the INA and FARRA withholding of removal provisions to which they are entitled, Defendant CBP has unlawfully withheld and unreasonably delayed discrete agency actions mandated by statute.

**Removal under the INA**

364.    The INA sets forth the only processes established by Congress to remove noncitizens from the United States. *See* 8 U.S.C. §§ 1225(b)(1); 1229a; *see generally* 8 U.S.C. § 1101, *et seq*.

365.    To the extent Defendants seek to remove asylum seekers, including Individual Plaintiffs, from the United States, CBP and ICE officers have a discrete, mandatory obligation to follow the statutory and procedural protections relating to the removal of noncitizens under the INA and applicable U.S. law.

366.    By refusing to follow the removal procedures set forth in the INA, *see* 8 U.S.C. §§ 1225(b)(1); 1229, and therefore refusing to allow asylum seekers, including Individual Plaintiffs, meaningful access to statutory and procedural protections relating to the removal of noncitizens mandated by the INA to which they are entitled, Defendants CBP and ICE have unlawfully withheld and unreasonably delayed discrete agency actions mandated by statute.

*        *        *

367.    CBP and ICE's failure to act as required by law, including the INA, FARRA, and other applicable U.S. law, is final agency action within the meaning of the APA.

368.    CBP and ICE's failure to act as required by law has caused, and will continue to cause, ongoing harm to Plaintiffs. Among other things, Defendants CBP and ICE's failure to act as required by law has harmed Individual Plaintiffs by denying them a meaningful opportunity to apply for asylum and other relief as required under U.S. law and an opportunity to access procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law.

369.    CBP and ICE's failure to act also harms Haitian Bridge, which must divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by CBP and ICE's conduct.

370.    Plaintiffs have no adequate alternative to review under the APA and thus seek review and an order compelling Defendants to take actions required by the INA, FARRA, and other applicable U.S. law pursuant to 5 U.S.C. § 706(1).

## EIGHTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious, An Abuse of Discretion, Not in Accordance with Law and In Excess of Statutory Authority 8 U.S.C. §§ 1158, 1231 (Haitian Deterrence Policy)
### *All Plaintiffs Against DHS Defendants*

371.   Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

372.   DHS Defendants' Haitian Deterrence Policy subjects Individual Plaintiffs and similarly situated individuals to gross abuses, including the denial of basic human needs, dignity in government detention, access to counsel and to the asylum process, and the right to non-refoulement, in an effort to deter Haitian asylum seekers from coming to the United States.

373.   DHS Defendants' issuance, administration, and application of the Haitian Deterrence Policy is arbitrary and capricious because DHS Defendants have failed to consider or factor in Plaintiffs' humanitarian needs or right to access the U.S. asylum process and to access counsel when seeking asylum in the United States; failed to articulate a reasoned explanation for the decision to deny Individual Plaintiffs and similarly situated individuals these rights; and provided an explanation so implausible that it could not be ascribed to agency expertise.

374.   The Haitian Deterrence Policy is further arbitrary and capricious because in its adoption and implementation, DHS Defendants considered factors that Congress did not intend for them to consider when engaging with and intercepting asylum seekers.

375.   Additionally, by adopting and implementing the Haitian Deterrence Policy, DHS Defendants have acted in a manner not in accordance with law, contrary to constitutional right, in excess of their statutorily prescribed authority, and without observance of procedure required by law in violation of section 706(2) of the APA. *See* 5 U.S.C. §§ 706(2)(A)-(D).

376.   By adopting and implementing a policy that contravenes the right to apply for asylum and the right to non-refoulement enshrined in the INA, DHS Defendants act not in accordance with law. *See* 8 U.S.C. §§ 1158, 1231.

377.   By adopting and implementing a policy that departs from standard procedures and was motivated at least in part by discriminatory purpose based on race and presumed national

origin, DHS Defendants also act contrary to constitutional right. *See* U.S. Const. Amend. V.

378.    DHS Defendants' adoption and implementation of the Haitian Deterrence Policy constitute final agency action within the meaning of the APA.

379.    DHS Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs. Among other things, DHS Defendants' application of the Haitian Deterrence Policy to Individual Plaintiffs has harmed them by denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law and to access procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law.

380.    DHS Defendants' application of the Haitian Deterrence Policy to Haitian and presumed Haitian asylum seekers, including Individual Plaintiffs, also harms Haitian Bridge by impairing its programming and forcing it to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by DHS Defendants' conduct.

381.    Plaintiffs, who have no adequate remedy at law, seek immediate review under the APA and declaratory and injunctive relief restraining DHS Defendants from continuing to implement the Haitian Deterrence Policy against Individual Plaintiffs and similarly situated Haitian asylum seekers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a.      An order certifying a class, pursuant to Federal Rules of Civil Procedure 23(b)(1) and (b)(2),), of all Haitian, or presumed Haitian, individuals who (1) sought access to the U.S. asylum process in or around the CBP Encampment near the Del Rio Port of Entry between September 9 and 24, 2021 and (2) were denied access to the U.S. asylum process;

b.      An order appointing the undersigned as class counsel;

c.      An order declaring unlawful the Title 42 Process as applied to Individual Plaintiffs and class members;

d.      An order declaring unlawful the Haitian Deterrence Policy as applied to Individual

Plaintiffs and class members;

e.       An order declaring that Defendants' application of the Title 42 Process and the Haitian Deterrence Policy alleged herein deprives Plaintiffs and class members of their Fifth Amendment rights;

f.       An order enjoining Defendants from applying the Title 42 Process to Individual Plaintiffs and class members;

g.       An order enjoining Defendants from applying the Haitian Deterrence Policy to Plaintiffs and class members;

h.       An order staying further expulsions of Individual Plaintiffs and class members under the Title 42 Process, removing them from the Title 42 Process, and affording them the statutory and procedural protections to which they are eligible under the U.S. asylum process and applicable laws, including access to asylum and withholding of removal under the INA and CAT withholding of removal under FARRA;

i.       An order allowing each of the Individual Plaintiffs and class members to return to the United States and requiring Defendants to facilitate return, with appropriate precautionary health measures, so that Individual Plaintiffs may pursue their asylum claims in the United States;

j.       An order awarding Plaintiffs their costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable statute or regulation; and

k.       An order granting such further relief as the Court deems just, equitable, and proper.

DATED: December 20, 2021

Respectfully submitted,

*/s/ Karen C. Tumlin*

**Stephen Manning** (application for admission forthcoming)
stephen@innovationlawlab.org
**Tess Hellgren** (OR0023)
tess@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503 882-0281


**Nicole Phillips** (*pro hac vice* forthcoming)
nphillips@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4265 Fairmount Avenue, Suite 280
San Diego, CA 92105
Telephone: +1 949 603-5751

**Karen C. Tumlin** (CA00129*)*
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
**Daniel J. Tully** (CA00130)
daniel.tully@justiceactioncenter.org
**Jane Bentrott** (DC Bar No. 1029681)
jane.bentrott@justiceactioncenter.org
**Lauren M. Wilfong** (application for admission pending)*
lauren.wilfong@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7276

*Not admitted to practice in California