UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HAITIAN BRIDGE ALLIANCE *et al.*,

Plaintiffs,

v.

JOSEPH R. BIDEN *et al.*,

Defendants.

Civil Action No. 21-3317 (EGS)

## MOTION TO DISMISS

Defendants in the above-captioned action, by and through undersigned counsel, respectfully move, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6), to dismiss the above-captioned action for the reasons stated in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss.

Dated:  June 10, 2022

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar. #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:    */s/ Sean M. Tepe*
SEAN M. TEPE, DC Bar #1001323
DIANA V. VALDIVIA, DC Bar #1006628
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-2533; (202) 252-2545
sean.tepe@usdoj.gov
diana.valdivia@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAITIAN BRIDGE ALLIANCE *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 21-3317 (EGS) |
| JOSEPH R. BIDEN *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

BACKGROUND....................................................................................................1

    A.    Arrival of Individual Plaintiffs and Thousands of Haitian Migrants at Del Rio, Texas..............................................................................................1

    B.    "Haitian Deterrence Policy".........................................................................3

    C.    Title 42's Public Health Authority................................................................3

    D.    Plaintiffs' Class Action Lawsuit...................................................................6

LEGAL STANDARDS.........................................................................................7

ARGUMENT........................................................................................................8

    I.    Plaintiffs Lack Standing to Bring Their Claims..........................................8

        A.    The Individual Plaintiffs Fail to Allege a Present or Imminent Injury......9

        B.    Haitian Bridge Alliance Cannot Establish Organizational Standing.......11

    II.    Plaintiffs' Claims Based on the Due Process Clause Should Be Dismissed.......14

        A.    Substantive Due Process................................................................14

        B.    Procedural Due Process.................................................................19

        C.    Equal Protection...........................................................................21

    III.    Certain APA Claims Should Be Dismissed........................................25

        A.    Plaintiffs Fail to Allege a Plausible Claim of Withheld or Delayed Agency Action..............................................................................25

        B.    Plaintiffs' Challenge to "Haitian Deterrence Policy" Fails to State a Claim ........................................................................................27

    IV.    President Biden is Not a Proper Defendant........................................30

CONCLUSION...................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdelfattah v. Dep't of Homeland Sec.,*
787 F.3d 524 (D.C. Cir. 2015) ................................................................. 16

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach,*
469 F.3d 129 (D.C. Cir. 2006) ........................................................... 12, 13

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ................................................................................ 21

*Al-Owhali v. Ashcroft,*
279 F. Supp. 2d 13 (D.D.C. 2003) ............................................................ 7

*Alshawy v. U.S. Citizenship & Immigr. Servs.,*
Civ. A. No. 21-2206 (FYP), 2022 WL 970883 (D.D.C. Mar. 30, 2022) ................................. 19

*Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros.,*
317 F.3d 334 (D.C. Cir. 2003) .................................................................. 9

*Anderson v. Obama,*
Civ. A. No. 10-0017, 2010 WL 3000765 (D. Md. July 28, 2010) ............................................ 32

*Arpaio v. Obama,*
797 F.3d 11 (D.C. Cir. 2015) .................................................................. 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .............................................................................. 7, 8

*Atherton v. D.C. Off. of Mayor,*
567 F.3d 672 (D.C. Cir. 2009) ................................................................ 19

*Bark v. United States Forest Serv.,*
37 F. Supp. 3d 41 (D.D.C. 2014) ............................................................ 29

*Beatty v. Wash. Metro. Area Transit Auth.,*
860 F.2d 1117 (D.C. Cir. 1988) .............................................................. 32

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................. 7

*Bennett v. Spear*,
    520 U.S. 154 (1997)..................................................................................... 28

*Bolling v. Sharpe*,
    347 U.S. 497 (1954)..................................................................................... 21

*Butera v. District of Columbia*,
    235 F.3d 637 (D.C. Cir. 2001) .......................................................... 15, 17

*Carlson v. Bush*,
    Civ. A. No. 07-1129, 2007 WL 3047138 (M.D. Fla. Oct. 18, 2007) ...................... 32

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) .................................................................. 34

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)..................................................................................... 22

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................. 10, 11

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) .................................................................. 30

*Collins v. City of Harker Heights*,
    503 U.S. 115 (1992)..................................................................................... 15

*Comm. to Establish the Gold Standard v. United States*,
    392 F. Supp. 504 (S.D.N.Y. 1975) .......................................................... 32

*Council v. Pena,*
    147 F.3d 1012 (D.C. Cir. 1998) ................................................................... 9

*County of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................... 32

*Ctr. for Biological Diversity v. Zinke,*
    260 F. Supp. 3d 11 (D.D.C. 2017) .......................................................... 26

*Ctr. for Responsible Sci. v. Gottlieb,*
    346 F. Supp. 3d 29 (D.D.C. 2018)..................................................... 12, 22

*Day v. Obama,*
    Civ. A. No. 15-0671, 2015 WL 2122289 (D.D.C. May 1, 2015)............................ 32

*Department of Homeland Security v. Thuraissigiam*,
  140 S. Ct. 1959 (2020) ........................................................................... 16, 19

*Dep't of Homeland Sec.*,
  387 F. Supp. 3d 33 (D.D.C. 2019) .................................................................. 30

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) ............................................................................... 17, 18

*Doe v. Trump*,
  319 F. Supp. 3d 539 (2018) ............................................................................. 32

*Dominguez v. UAL Corp.*,
  666 F.3d 1359 (D.C. Cir. 2012) ........................................................................ 9

*Equal Rts. Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) .................................................................... 11, 12

*Erby v. United States*,
  424 F. Supp. 2d 180 (D.D.C. 2006) ................................................................... 7

*Fernandors v. District of Columbia*,
  382 F. Supp. 2d 63 (D.D.C. 2005) ................................................................... 24

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) .............................................................. 9, 11, 12

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................. passim

*Fund for Animals, Inc. v. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ......................................................................... 27

*George Wash. Univ. v. District of Columbia*,
  318 F.3d 203 (D.C. Cir. 2003) ........................................................................ 15

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) ................................................................. 21

*Gustave-Schmidt v. Chao*,
  226 F. Supp. 2d 191 (D.D.C. 2002) .................................................................. 8

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) .................................................................................. 34

*Harris v. District of Columbia,*
　932 F.2d 10 (D.C. Cir. 1991) ............................................................................ 17, 18

*Havens Realty Corp. v. Coleman,*
　455 U.S. 363 (1982) ................................................................................................ 12

*Hawaii v. Trump,*
　859 F.3d 741 (9th Cir.) .......................................................................................... 32

*Hoffman v. Jeffords,*
　175 F. Supp. 2d 49 (D.D.C. 2001) .......................................................................... 9

*Huisha-Huisha v. Mayorkas,*
　27 F.4th 718 (D.C. Cir. 2022) .................................................................... 20, 25, 26

*Indep. Equip. Dealers Ass'n v. EPA,*
　372 F.3d 420 (D.C. Cir. 2004) ............................................................................... 27

*INS v. Cardoza-Fonseca,*
　480 U.S. 421 (1987) ................................................................................................ 20

*Int'l Refugee Assistance Project v. Trump,*
　265 F. Supp. 3d 570 (D. Md. 2017) ....................................................................... 32

*Int'l Refugee Assistance Project v. Trump,*
　857 F.3d 557 (4th Cir.) ........................................................................................... 32

*Jerome Stevens Pharmacy, Inc. v. FDA,*
　402 F.3d 1249 (D.C. Cir. 2005) ............................................................................... 7

*Kim v. Brownlee,*
　344 F. Supp. 2d 758 (D.D.C. 2004) ....................................................................... 21

*Kingman Park Civic Ass'n v. Gray,*
　27 F. Supp. 3d 142 (D.D.C. 2014) ......................................................................... 23

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular,*
　*Affs.*, 104 F.3d 1349 (D.C. Cir. 1997) ..................................................................... 21

*Lincoln v. Vigil,*
　508 U.S. 182 (1993) ................................................................................................ 22

*Lujan v. Defenders of Wildlife,*
　504 U.S. 555 (1992) .................................................................................................. 9

*M.M.V. v. Garland,*
   1 F.4th 1100 (D.C. Cir. 2021) ............................................................. 19

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) ......................................................................... 24

*McMeans v. Obama,*
   Civ. A. No. 11-0891, 2011 WL 6046634 (D. Del. Dec. 1, 2011) ........................... 32

*Mississippi v. Johnson,*
   71 U.S. 475 (1866) .................................................................... 31, 32, 34

*Narenji v. Civiletti,*
   617 F.2d 745 (D.C. Cir. 1979) ............................................................. 23

*Nat'l Ass'n of Internal Revenue Emps. v. Nixon,*
   349 F. Supp. 18 (D.D.C. 1972) ............................................................ 32

*Nat'l Taxpayers Union, Inc. v. United States,*
   68 F.3d 1428 (D.C. Cir. 1995) ............................................................. 14

*Nat. Res. Def. Council, Inc. v. EPA,*
   383 F. Supp. 3d 1 (D.D.C. 2019) ............................................................ 9

*Newdow v. Bush,*
   355 F. Supp. 2d 265 (D.D.C. 2005) ....................................................... 33

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ........................................................... 33

*Norton v. Southern Utah Wilderness Alliance,*
   542 U.S. 55 (2004) .................................................................. 25, 27, 30

*People for the Ethical Treatment of Animals v. Dep't of Agric.,*
   797 F.3d 1087 (D.C. Cir. 2015) ......................................................... 11, 12

*Plyler v. Doe,*
   457 U.S. 202 (1982) ......................................................................... 22

*Psychas v. Dist. Dep't of Transp.,*
   Civ. A. No. 18-0081 (ABJ), 2019 WL 4644503 (D.D.C. Sept. 24, 2019) ............... 16

*R.J. Reynolds Tobacco Co. v. FDA,*
   810 F.3d 827 (D.C. Cir. 2016) ............................................................. 10

*RCM Techs., Inc. v. Dep't of Homeland Sec.,*
  614 F. Supp. 2d 39 (D.D.C. 2009) ........................................................ 30

*Reese v. Nixon,*
  347 F. Supp. 314 (C.D. Cal. 1972) ....................................................... 32

*S.F. Redevelopment Agency v. Nixon,*
  329 F. Supp. 672 (N.D. Cal. 1971) ...................................................... 32

*Sacramento v. Lewis,*
  523 U.S. 833 (1998) ............................................................................ 15

*Scahill v. District of Columbia,*
  271 F. Supp. 3d 216 (D.D.C. 2017) ..................................................... 16

*Settle v. Obama,*
  Civ. A. No. 15-0365, 2015 WL 7283105 (E.D. Tenn. Nov. 17, 2015) ................... 32

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953) ............................................................................ 16

*Shreeve v. Obama,*
  Civ. A. No. 10-0071, 2010 WL 4628177 (E.D. Tenn. Nov. 4, 2010) ..................... 32

*Skaggs v. Carle,*
  110 F.3d 831 (D.C. Cir. 1997) ................................................................ 9

*Suskin v. Nixon,*
  304 F. Supp. 71 (N.D. Ill. 1969) ..................................................... 32, 34

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ........................................... 31, 32, 33, 34

*Sykes v. Dudas,*
  573 F. Supp. 2d 191 (D.D.C. 2008) ........................................................ 8

*U.S. Off. of Special Counsel,*
  480 F. Supp. 3d 118 (D.D.C. 2020) ................................................ 11, 12

*United States v. Verdugo–Urquidez,*
  494 U.S. 259 (1990) ............................................................................ 21

*United Transp. Union v. ICC,*
  891 F.2d 908 (D.C. Cir. 1989) .............................................................. 10

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ................................................................. 30

*Washington v. Davis*,
   426 U.S. 229 (1976) .......................................................................... 22

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) .......................................................................... 14

*Willis v. Dep't of Health & Human Servs.*,
   38 F. Supp. 3d 1274 (W.D. Okla. 2014) ..................................................... 32

*Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*,
   93 F.3d 910 (D.C. Cir. 1996) ................................................................ 22

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) .......................................................................... 16

**Statutes**

5 U.S.C. § 551(13) ........................................................................ 27, 29

5 U.S.C. § 553(b) ............................................................................. 6

5 U.S.C. § 701(a)(2) ......................................................................... 22

5 U.S.C. § 704 ............................................................................... 27

5 U.S.C. § 706(1) ........................................................................ 25, 26

5 U.S.C. § 706(2) ............................................................................ 27

8 U.S.C. § 1158 .............................................................................. 20

8 U.S.C. § 1231(b)(3) ................................................................. 20, 21, 26

42 U.S.C. § 265 ........................................................................ 3, 19, 25

Pub. L. No. 105-277 .......................................................................... 26

**Rules**

Fed. R. Civ. Pro. 12(b)(1) ................................................................. 1, 7

Fed. R. Civ. Pro. 12(b)(6) .................................................................................. 7

**Regulations**

31 Fed. Reg. 8855 ......................................................................................... 4

85 Fed. Reg. 16,559 ....................................................................................... 4

85 Fed. Reg. 16,560 ....................................................................................... 4

85 Fed. Reg. 16,563 ....................................................................................... 4

85 Fed. Reg. 17,060 ....................................................................................... 4

85 Fed. Reg. 17,061 ....................................................................................... 4

85 Fed. Reg. 56,424 ....................................................................................... 5

86 Fed. Reg. 42,828 ....................................................................................... 5

86 Fed. Reg. 42,836 ..................................................................................... 22

87 Fed. Reg. 19,941 ....................................................................................... 6

By and through undersigned counsel, Defendants[1] respectfully submit this memorandum in support of their motion to dismiss Plaintiffs' Complaint (ECF No. 1). For the reasons stated below, both Individual Plaintiffs and Organizational Plaintiff Haitian Bridge Alliance ("HBA") (collectively, "Plaintiffs") lack standing to bring their claims and many of the claims alleged suffer from fatal pleading infirmities. And even if any claims remain, President Biden should be dismissed because he is not a proper defendant.

## BACKGROUND

Although Plaintiffs' Complaint is not a "short and plain statement" of claims—running 90 pages and 381 paragraphs (plus prayer for relief) in length—the claims and underlying allegations may be summarized succinctly as follows.

### A.    Arrival of Individual Plaintiffs and Thousands of Haitian Migrants at Del Rio, Texas

"From approximately September 9 to 24, 2021, at least 15,000 Haitians" crossed the Rio Grande River "near the Del Rio International Bridge" and the Del Rio Port of Entry in Del Rio, Texas. Compl. ¶¶ 59, 61, 75. Among them were Individual Plaintiffs, comprising single adults and family units. *See id.* ¶¶ 15-22. They all allege that they crossed into the United States in order to "seek asylum." *Id.*

---

[1]    Defendants are President Joseph R. Biden, Jr.; U.S. Department of Homeland Security ("DHS"), Alejandro N. Mayorkas as Secretary of Homeland Security; U.S. Customs and Border and Protection ("CBP"), Chris Magnus as Commissioner for CBP, Pete Flores as Executive Assistant Commission of CBP's Office of Field Operations, Raul L. Ortiz as Chief of U.S. Border Patrol (collectively "CBP Defendants"); U.S. Immigration and Customs Enforcement ("ICE"), Tae D. Johnson as Acting Director of ICE (collectively "ICE Defendants"); U.S. Department of Health and Human Services ("HHS"), Xavier Becerra as Secretary of HHS; Centers for Disease Control and Prevention ("CDC"), Rochelle P. Walensky as Director of CDC. Compl. ¶¶ 23-35. CBP Defendants, ICE Defendants, and Defendants Mayorkas and DHS are referred to collectively as "DHS Defendants." *Id.* ¶ 31 n.3. Becerra, HHS, Walensky, and CDC are referred to collectively as HHS Defendants. *Id.* ¶ 35 n.4

Much of Plaintiffs' Complaint is focused on the conditions Individual Plaintiffs encountered in and around Del Rio, which Plaintiffs refer to as the "CBP Encampment." *Id*. ¶ 61. When thousands of Haitian migrants arrived at Del Rio, CBP established a "ticketing system" where arriving migrants were called by "numbered, color-coded ticket" to present themselves for processing by CBP. *Id*. ¶ 77. While Haitian migrants waited to be processed, CBP set up "service stations" where it provided for "distribution of food and water" to the migrants but Plaintiffs allege the food and water was "inadequate." *Id*. ¶¶ 88-92. Plaintiffs note that World Central Kitchen was able to set up additional meal distribution and that Individual Plaintiffs were able to procure additional food and water by crossing back into Mexico. *Id*. ¶¶ 90, 95. Plaintiffs also allege that there was medical care at Del Rio but that it too was inadequate, although Plaintiffs acknowledge that some ill migrants were taken to hospitals in the United States. *Id*. ¶¶ 101-10. Plaintiffs further allege that many migrants lacked shelter, beds, or cots. *Id*. ¶¶ 97-100. Plaintiffs complain of verbal abuse, and in certain instances, physical assaults by CBP personnel.[2] *Id*. ¶¶ 111-21. Plaintiffs assert that the DHS Defendants were unprepared for the arrival of the thousands of Haitian migrants despite having advance warning of their movement towards the southwest border. *Id*. ¶¶ 63-69.

The Complaint also alleges that many, but not all, Individual Plaintiffs were quickly expelled from the United States pursuant to the authority granted in Title 42 of the U.S. Code without being able to make claims for asylum or other protections like withholding of removal. Individual Plaintiffs Esther and Emmanuel Doe, Samuel and Samantha Doe, and Paul Doe were not expelled because they decided to return to Mexico. *Id*. ¶¶ 20-22.

---

[2]    In a footnote, Plaintiffs state "each Individual Plaintiff is exploring claims based on the Federal Tort Claims Act." Compl. at 52 n.14.

B.    "**Haitian Deterrence Policy**"

The Complaint also seeks to enjoin the application of something Plaintiffs themselves label the "Haitian Deterrence Policy." The Complaint alleges that the "Haitian Deterrence Policy" was developed "to apply the Title 42 Process in a way that subjected Haitian asylum seekers in Del Rio to deplorable conditions while in government custody, was deliberately indifferent to humanitarian concerns, and focused on expelling Haitian asylum seekers as quickly as possible." Compl. ¶¶ 8, 72, 79. The purported "Haitian Deterrence Policy" is not alleged to be a concrete, discrete government policy but rather something that Plaintiffs allege "resulted" from or "grew out of" a "series" of other unspecified "decisions and policies" that led to the expulsion of Haitian migrants who crossed into the United States near the Del Rio Bridge in September 2021. *Id.* ¶¶ 60-62, 69. According to the Complaint, the "Haitian Deterrence Policy" refers to the "way" or "manner" in which Title 42 was applied to this group of Haitian migrants that Plaintiffs allege was indifferent to humanitarian concerns. *Id.* ¶¶ 8, 62, 295. The Complaint alleges that "the Haitian Deterrence Policy [was] devised by White House senior officials[.]" *Id.* ¶¶ 23, 61, 62. DHS, and in particular CBP and ICE, were allegedly "responsible for implementing and applying" this so-called policy. *Id.* ¶ 25

C.    **Title 42's Public Health Authority**

The Complaint makes a variety of allegations concerning the authority granted in Title 42 of the U.S. Code and specifically 42 U.S.C. § 265. Compl. ¶¶ 52-58; 179-208. In Section 265, Congress gave the Executive the power to exclude individuals from the United States during public health emergencies. It states:

Whenever Surgeon General[3] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the

---

[3]    In 1966, acting pursuant to the Reorganization Act of 1949, President Johnson transferred the Surgeon General's authority to what is now the Department of Health and Human Services.

introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [Secretary], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

In response to the COVID-19 pandemic that began in 2020, HHS issued an interim final rule to implement authority granted in Section 265 and "enable the CDC Director to suspend the introduction of persons into the United States." *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020). This interim rule defined the "introduction into the United States of persons from a foreign country" as "the movement of a person from a foreign country . . . so as to bring the person into contact with persons in the United States . . . in a manner that the Director determines to present a risk of transmission of a communicable disease." *Id*. at 16,566. That definition covered "those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease." *Id*. at 16,563. The CDC promptly applied that interim final rule by issuing an order prohibiting the introduction into the United States of "covered aliens" from Canada or Mexico. *See* Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020). "Covered aliens" are noncitizens "who are traveling from Canada or

31 Fed. Reg. 8855 (June 25, 1966). Today, the Centers for Disease Control and Prevention, which is part of HHS, exercises the authority that § 265 gave the Surgeon General. 85 Fed. Reg. 16,559, 16,560, 16,563 (Mar. 24, 2020).

Mexico (regardless of their country of origin), and who must be held longer in congregate settings in [Ports of Entry] or Border Patrol stations to facilitate immigration processing." *Id*. As a general matter, that means noncitizens who "lack valid travel documents." *Id*. In September 2020, HHS and the CDC issued a final rule implementing the authority granted in Section 265. *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020).

As relevant for this case, as of September 2021, the applicable CDC Order was the one issued on August 5, 2021. *See* Centers for Disease Control and Prevention, Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021) ("August 2021 Order"). The August 2021 Order continued the suspension of the right to introduce into the United States "covered noncitizens" who would otherwise be introduced into a congregate setting in a Port of Entry or U.S. Border Patrol station, such as "noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States[.]" *Id*. at 42,841. The Order allowed for certain exceptions from its scope, including "[p]ersons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."

More recently, and subsequent to the D.C. Circuit's affirmation of the Executive's power to expel with certain limitations covered noncitizens pursuant to the authority granted in Section 265, the CDC Director exercised her authority to issue a new public health order that terminated the August 2021 Order and all prior orders, which would enable the return of normal immigration

processing under Title 8 of the U.S. Code.  *See* Centers for Disease Control and Prevention, Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 Fed. Reg. 19,941 (Apr. 6, 2022) ("Termination Order").  The termination was scheduled to be implemented on May 23, 2022, so that DHS had "time to implement appropriate COVID-19 protocols, such as scaling up a program to offer COVID-19 vaccinations to migrants, and prepare for full resumption of regular migration under Title 8 authorities."  *Id.* at 19,942.

The Termination Order would have been implemented on May 23, 2022, but for a challenge to that order by two-dozen States in the District Court for the Western District of Louisiana in *Louisiana v. CDC*, Civ. A. No. 22-885 (W.D. La.).  On May 20, 2022, that Court preliminarily enjoined defendants from enforcing the Termination Order.  Prelim. Inj. Order (May 20, 2022), ECF No. 91.  That court found, among other things, that the States are likely to succeed on their claim that the CDC failed to comply with the notice-and-comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b), in issuing the Termination Order.  *See* Mem. Op. at 34-41, ECF No. 90.  An appeal of the preliminary injunction is now pending before the Fifth Circuit.  *See Louisiana v. CDC*, No. 22-30303 (5th Cir.).

### D.    Plaintiffs' Class Action Lawsuit

On December 20, 2021, Plaintiffs filed a putative class action based on their alleged experience in Del Rio in September 2021.  The putative class is defined as "all Haitian, or presumed Haitian, individuals who (1) sought access to the U.S. asylum process in or around the CBP Encampment near the Del Rio Port of Entry between September 9 and 24, 2021, and (2) were denied access to the U.S. asylum process."  Compl. ¶ 271.  The Complaint asserts four claims purportedly based on the Due Process Clause of the Fifth Amendment, two claims pursuant to the

Administrative Procedure Act ("APA") challenging the Title 42 Process,[4] and two additional claims pursuant to the APA, one of which challenges the purported "Haitian Deterrence Policy." *Id*. at 69-83.  Plaintiffs seek declaratory and injunctive relief.  *Id*. at 83-84.

## LEGAL STANDARDS

A Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be presented as a facial or a factual challenge.  "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint."  *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotations and citations omitted).  When a defendant makes a facial challenge, the district court must accept the allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party.  *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).  With respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims.  *Jerome Stevens Pharmacy, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The plaintiff bears the responsibility of establishing the factual predicates of jurisdiction by a preponderance of evidence.  *Erby*, 424 F. Supp. 2d at 182.

Pursuant to a motion made under Rule 12(b)(6), the Court may dismiss a case or claim for failure to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When resolving a motion to dismiss pursuant to

---

[4]    Defendants are not moving to dismiss Counts Five and Six at this time as a consequence of the preliminary injunction issued in the Western District of Louisiana.  Nevertheless, Defendants reserve the right to move under Rule 12 in the future.

Rule 12(b)(6), the pleadings are construed broadly so that all facts pleaded therein are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff. *Sykes v. Dudas*, 573 F. Supp. 2d 191, 198 (D.D.C. 2008). However, a district court is not required to accept conclusory allegations or unwarranted factual deductions as true. *Id*. at 198-99. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (internal citations omitted).

## ARGUMENT

It is clear that the influx of 15,000 Haitian migrants concentrated near the Del Rio International Bridge in September 2021 presented a humanitarian challenge. And CBP's Office of Professional Responsibility is currently examining certain aspects of the response. But those issues are not appropriately before for the court. The questions before this Court, rather, are: (1) whether Plaintiffs have standing to bring the claims alleged in their Complaint; (2) whether the allegations in the Complaint, taken as true, state plausible constitutional and APA claims; and (3) whether President Biden is an appropriate defendant. Because the answer to all of the foregoing questions is "no," the Court should grant the government's motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim.

## I.    Plaintiffs Lack Standing to Bring Their Claims

The Court should dismiss Plaintiffs' claims—which arise from events that allegedly took place in September 2021—for lack of subject matter jurisdiction because Plaintiffs lack standing. Individual Plaintiffs have not demonstrated injury-in-fact, specifically an "actual or imminent, not

conjectural or hypothetical" injury.  Individual Plaintiffs are not presently subject to any of the alleged unlawful conduct that they seek to enjoin, nor will they imminently be subject to this conduct.  Additionally, HBA failed to allege facts sufficient to establish that it used its resources to counteract any alleged harm.  As such, Plaintiffs lack standing to bring their claims.

### A.    The Individual Plaintiffs Fail to Allege a Present or Imminent Injury

"In order to establish standing to sue under Article III of the Constitution, plaintiffs must demonstrate that: (1) they have suffered an injury that is both (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the conduct of which they complain; and (3) the injury is likely to be redressed by a court decision in their favor." *Hoffman v. Jeffords*, 175 F. Supp. 2d 49, 55 (D.D.C. 2001) (finding citizens lacked standing to challenge senator's decision to leave political party and caucus with a different party) (citing *Skaggs v. Carle*, 110 F.3d 831, 834 (D.C. Cir. 1997), and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Plaintiffs "bear[] the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting *Lujan*, 504 U.S. at 560).

Where, as here, a party seeks injunctive relief, "past harm will not suffice" to demonstrate injury-in-fact. *Nat. Res. Def. Council, Inc. v. EPA*, 383 F. Supp. 3d 1, 8 (D.D.C. 2019) (citing *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros.*, 317 F.3d 334, 336 (D.C. Cir. 2003)).  Rather, the party seeking injunctive relief "must demonstrate 'some present or imminent injury' to establish their standing to seek injunctive relief." *Id.*  The likelihood of future injury, moreover, cannot be merely speculative or hypothetical. *See Nat'l Res. Def. Council v. Pena,* 147 F.3d 1012, 1022 (D.C. Cir. 1998).  It must be real, palpable, and imminent. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015).

The Supreme Court and D.C. Circuit have rejected assertions of imminent injury where the prospective injury depends on a "speculative chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *United Transp. Union v. ICC,* 891 F.2d 908, 912 (D.C. Cir. 1989) ("[W]hen considering any chain of allegations for standing purposes," the Court "may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions[.]"); *see also R.J. Reynolds Tobacco Co. v. FDA*, 810 F.3d 827, 831 (D.C. Cir. 2016) (noting that the Circuit "ha[s] rejected assertions of imminent injury where the prospective injury depends on future illegal activity, finding, for example, that a sheriff lacked standing to challenge President Obama's immigration policy partly because the plaintiff's theory depended on immigrants' committing crimes in the future.") (citing *Arpaio v. Obama,* 797 F.3d 11, 22 (D.C. Cir. 2015)).

Under this standard, Individual Plaintiffs cannot establish injury-in-fact that is present or imminent. Individual Plaintiffs' past injuries, which they allege occurred in September 2021, are of no moment for purposes of the injunctive relief they now seek, and their claims of future injury are too speculative. The only allegations in the Complaint that even arguably allege a future injury are three paragraphs in which Plaintiffs allege that there is a "substantial risk" that Individual Plaintiffs "will again be subject to discriminatory treatment based on race and presumed national origin" and "abusive and unconscionable treatment" at the hands of DHS. *See* Compl. ¶¶ 289, 297, 306. Plaintiffs support these conclusory assertions with vague allegations that certain Individual Plaintiffs "plan" or "intend" to return to the United States at some unspecified future date. Compl. ¶¶ 16-19, 22 ("plan[] to return to the United States"), ¶ 20 (Plaintiffs Esther and Emmanuel Doe "intend to return to the United States"), ¶ 21 (Plaintiffs Samuel and Samantha Doe

"plan on returning to the United States"). But Plaintiffs do not allege that any Individual Plaintiff has returned to the United States in the past eight months. Nor do they allege facts indicating that any such "planned" or "intended" return is now imminent. And even if Individual Plaintiffs returned to the U.S. border, their being subject to the same alleged harms, including being expelled under Title 42, is speculative. Plaintiffs' allegations rest on a "speculative chain of possibilities," *Clapper*, 568 U.S. at 133, that does not establish that their potential injury is certainly impending and these allegations are thus insufficient under the law of this Circuit. For these reasons alone, Individual Plaintiffs have failed to demonstrate that they have standing to bring their claims.

## B.    Haitian Bridge Alliance Cannot Establish Organizational Standing

An organization seeking to establish standing may "sue either on their own behalf ('organizational standing') or on behalf of their members ('representational standing')." *Citizens for Resp. & Ethics in Wash. ("CREW") v. U.S. Off. of Special Counsel*, 480 F. Supp. 3d 118, 126-27 (D.D.C. 2020). By claiming that Defendants' conduct "impaired [its] programming and forced [it] to divert resources[,]" *see e.g.*, Compl. ¶ 290, Plaintiff Haitian Bridge Alliance appears to allege that it qualifies for organizational standing, though the Complaint is far from clear on this point.

"[L]ike an individual plaintiff," an organization must "show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch*, 808 F.3d at 919 (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)). In this case (as in many cases), "the key issue is whether [the organization] has suffered a 'concrete and demonstrable injury to [its] activities.'" *People for the Ethical Treatment of Animals v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*") (second alteration in original) (quoting *Equal Rts. Ctr.*, 633 F.3d at 1138).

For organizational standing injury-in-fact, an organization must allege a "concrete and demonstrable injury to [its] activities." *CREW*, 480 F. Supp. 3d at 127. The organization cannot establish standing by seeking to "vindicate [its] own value preferences through the judicial process." *Id*. Courts in this Circuit use a "two-part inquiry" for assessing whether an organization has sufficiently alleged injury-in-fact, asking first "whether the agency's action or omission to act 'injured the [organization's] interest'"; then, if satisfied, it inquires whether "the organization 'used its resources to counteract the harm.'" *PETA*, 797 F.3d at 1099; (alteration in original) (quoting *Equal Rights Ctr.*, 633 F.3d at 1140); *accord Food & Water Watch*, 808 F.3d 905, 919 (D.C. Cir. 2015) (employing same test); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding organizational injury based on an "injury to the organization's activities" followed by "the consequent drain on the organization's resources"). Both prongs must be satisfied—if an organization fails one part of the inquiry, a court need not address the other. *See id*.

In reviewing the injury analysis, the government activity must "perceptively impair [] the organization's ability to provide services." *CREW*, 480 F. Supp. 3d at 127. It is not enough that the organization's mission has been compromised. *Id*. at 128 (citing *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006)). And not all use of resources will meet the second part of the test. *CREW*, 480 F. Supp. 3d at 128. "[T]he devotion of resources to advocacy for the organization's preferred policy—whether that advocacy is directed at Congress, the courts, or an administrative agency—falls short of the line." *Id*. at 128 (citing, among others, *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 37 (D.D.C. 2018)). These are considered "self-inflicted" injuries. *Id*. (citing *Abigail All.*, 469 F.3d at 133).

Here, Plaintiff HBA fails both prongs of the test.  Nothing alleged in the Complaint supports the conclusion that the government's actions have perceptively impaired HBA's ability to provide services except a conclusory (and therefore insufficient) allegation that "Defendants' conduct has impaired Haitian Bridge's programming."  *See* Compl. ¶¶ 290, 298, 307, 316.  Plaintiff HBA does nothing to explain in what way its programming has been impaired, and how that is fairly traceable to government conduct.  *See generally* Compl.  Rather, if anything, HBA appears to allege that its mission is being compromised, *see* Compl. ¶ 15 ("[Plaintiff HBA's] mission is to advocate for fair and humane immigration policies and to provide humanitarian, legal, and social services to migrants—particularly Black Migrants, the Haitian community, and other vulnerable populations"), which is insufficient under this Circuit's case law.  *See Abigail All.*, 469 F.3d at 133.

HBA also fails to allege that it has invested resources that are not "self-inflicted" to counteract any alleged harm.  *See generally* Compl.  While Plaintiffs allege that Defendants' conduct has "forced Haitian Bridge to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct," providing assistance to Haitian asylum seekers is, by Plaintiffs' own admission, part of its normal activities.  As detailed in the Complaint, "[s]ince 2015, Haitian Bridge has provided services to asylum seekers and other migrants at the border and throughout their U.S. immigration proceedings."  Compl. ¶ 15.  It is thus to be expected that HBA would have expended greater-than-usual amounts of its resources in providing services to the unprecedented number of Haitian migrants—over 15,000—that crossed the border from Mexico to the United States in September 2021.  HBA does not explain how its expenditure of resources "to provide aid and legal services to asylum seekers in the CBP Encampment in September 2021," Compl. ¶ 15, was any greater than it normally would have been

to aid that number of migrants in the absence of the other government conduct alleged in the Complaint.

Finally, to the extent HBA contends that it has redirected some of its resources into litigation of this matter, *see, e.g.*, Compl. ¶ 15 (alleging that since the encampment was cleared, HBA has provided "legal services to Haitian asylum seekers expelled from Del Rio"), this injury is self-inflicted as a result of the organization's own budgetary choices and insufficient to support standing. *Nat'l Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (quoted in parenthetical, quoted citation omitted)). HBA has thus failed to allege facts sufficient to meet either prong of this Circuit's test to establish injury-in-fact for organizational standing.

**II.      Plaintiffs' Claims Based on the Due Process Clause Should Be Dismissed**

The first four claims of the Complaint rely on the Fifth Amendment's Due Process Clause even though due process protections do not necessarily extend to noncitizens seeking admission to the United States at the border. For this reason and a variety of pleading deficiencies detailed below, the Court should dismiss Counts One through Four.

**A.      Substantive Due Process**

In Count Two, Plaintiffs assert against President Biden and DHS Defendants a claim for violation of substantive due process rights under the Fifth Amendment. Compl. ¶¶ 292-99. The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty[.]" *Washington v. Glucksberg*, 521 U.S. 702, 720-21

(1997) (cleaned up).  Because the scope of substantive process is limited to recognized fundamental rights, the Supreme Court has cautioned that the substantive due process analysis must begin with a "careful description" of the asserted right, for "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Id*. at 721; *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("failing to provide a reasonably safe work environment" is not a right protected by the substantive component of the Due Process Clause).  This analysis requires a "focus on the allegations in the complaint to determine how [plaintiff] describes the constitutional right at stake and what the [government] did to deprive [plaintiff]." *Id*.  In addition to identifying the liberty or property interest at stake, a plaintiff must also plausibly allege with respect to the fundamental liberty or property interest that the government's "conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  "This stringent requirement exists to differentiate substantive due process . . . from local tort law." *Id*. (citations omitted).

Here, the Complaint does not allege a recognized fundamental liberty or property right or interest to which Individual Plaintiffs were entitled and deprived.  For example, in Paragraph 296, Plaintiffs assert the President and DHS Defendants violated Individual Plaintiffs' substantive due process rights but fail, in that paragraph or any other, to identify those "rights."  Sufficiently identifying and alleging a liberty or property interest at stake is a necessary predicate for stating a plausible substantive due process claim.  *See George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003) (holding that substantive due process imposes no burden on the government "in the absence of a liberty or property interest").  The Complaint's failure to identify,

much less provide a "careful description" of, a fundamental liberty or property interest is fatal, because "[w]ithout some indication from plaintiffs which liberty interests they are relying on, the Court cannot accept their claim." *See, e.g., Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 239 (D.D.C. 2017) (dismissing claim for failing to identify "any specific fundamental liberty interest" implicated), *aff'd*, 909 F.3d 1177 (D.C. Cir. 2018); *Psychas v. Dist. Dep't of Transp.*, Civ. A. No. 18-0081 (ABJ), 2019 WL 4644503, at *16 (D.D.C. Sept. 24, 2019) ("Because this Court already found that plaintiffs have not asserted a valid property interest, plaintiffs' substantive due process claim can be dismissed on that basis as well.").

Although Plaintiffs contend that the "Due Process Clause applies to all 'persons' on United States soil and thus applied to Individual Plaintiffs," Compl. ¶ 294, this allegation still does not identify a cognizable fundamental liberty or property interest protected by substantive due process. *See Abdelfattah v. Dep't of Homeland Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015) (affirming dismissal of substantive due process claim because "Abdelfattah has not alleged facts suggesting he has been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest."). It is also incorrect as a matter of law. The Supreme Court in *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959 (2020), reiterated that noncitizens attempting to enter the United States unlawfully "are 'treated' for due process purposes 'as if stopped at the border.'" *Id*. at 1982 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). And individuals, "who [are] detained shortly after unlawful entry cannot be said to have 'effected an entry.'" *Id*. (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). Noncitizens do not obtain due process protections simply by virtue of unlawfully crossing onto physical U.S. soil in their quest for entry. Likewise here, the fact that Plaintiffs set foot on U.S. soil after crossing the Rio Grande does not automatically afford them due process protections under the Fifth Amendment. They were

effectively "stopped at the border." Given the foregoing precedent and the fatal pleading failure, Count Two should be dismissed.

Plaintiffs make a second, but no more successful, attempt at pleading a substantive due process claim in Count Three. In Count Three, Plaintiffs predicate a substantive due process claim against DHS Defendants on a "special relationship" that they assert was created at the alleged "CBP Encampment" at Del Rio. Compl. ¶¶ 300-08. Specifically, Plaintiffs allege "[t]hrough their processing of Individual Plaintiffs at the CBP Encampment pursuant to the CBP Capio Memo and the Haitian Deterrence Policy, DHS Defendants and DHS personnel created a 'special relationship' with Individual Plaintiffs by restraining their liberty, keeping them in DHS Defendants' custody, and rendering them unable to care for themselves." *Id*. ¶ 303. As a result of the "special relationship," DHS Defendants allegedly owed Individual Plaintiffs a "heightened duty of care and protection" that was violated by the conditions at the "CBP encampment." *Id*. ¶¶ 300-04.

Plaintiffs fail to note that the special relationship or "custody exception is narrowly construed" by courts. *Butera*, 235 F.3d at 648. As explained by the Supreme Court, "it is the [government's] affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause[.]" *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189, 200 (1989). When the government "by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself," "the Constitution imposes upon the [government] affirmative duties of care and protection with respect to" that individual. *Id*. at 198, 200. In other words, when the government "enter[s] into 'certain special relationships' with the person," the government has a "due process obligation." *Harris v. District of Columbia*, 932 F.2d 10, 13-14 (D.C. Cir. 1991) (quoting

*DeShaney*, 489 U.S. at 197).  Importantly, "[t]he affirmative duty to protect arises not from the [government's] knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200.  Further, "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual."  *Id*. at 196.

Here, Plaintiffs have not alleged facts—rather than conclusory assertions—plausibly establishing that Plaintiffs at the "CBP Encampment" were in any form of government custody.  On the contrary, the Complaint presents numerous, specific instances demonstrating that Plaintiffs were *not* in government custody or restrained against their will at the Del Rio bridge.  The Complaint alleges repeatedly that Plaintiffs were able to and did leave Del Rio and "cross[ed] the river to Mexico," a "freedom to act" that detained individuals would not enjoy.  Compl. ¶¶ 214, 227, 241-42, 258.  Similarly, Plaintiffs were not restrained in their ability to "care for" themselves, as the Complaint alleges that Plaintiffs crossed over to Mexico "to purchase food and water" and other provisions.  *Id*.  Some Plaintiffs returned to and remained in Mexico, thereby avoiding detention and expulsion.  *Id*. ¶¶ 244-45, 253, 260.  Given these allegations of freedom of movement and ability to seek provisions and care, Plaintiffs have not plausibly alleged that a "special relationship" arose at the "CBP Encampment."  *See Harris*, 932 F.2d at 14 (holding police officers did not enter into a special relationship with victim of drug overdose even when handcuffed and placed in a police van).

Thus, Counts Two and Three should be dismissed because the Complaint fails to state plausible substantive due process claims.

**B.      Procedural Due Process**

In Count Four, Plaintiffs allege a claim against all Defendants for a violation of Individual Plaintiffs' procedural due process rights under the Fifth Amendment.  Compl. ¶¶ 309-17.   "A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections."  *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009).  Yet again, the Complaint does not explicitly identify the protected liberty or property interest that Plaintiffs allegedly were deprived without procedural protections.  As established above, Plaintiffs' failure to plead a recognized liberty or property interest is fatal to their claim.  *See, e.g., Alshawy v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 21-2206 (FYP), 2022 WL 970883, at *8 (D.D.C. Mar. 30, 2022) ("Because Alshawy does not assert 'a liberty interest protected by the Constitution,' her procedural due process claim must be dismissed.") (citations omitted).

Furthermore, the Supreme Court in *Thuraissigiam* emphasized that a non-citizen "has only those rights regarding admission that Congress has provided by statute" and "the Due Process Clause provides nothing more" with respect to the rights available to non-citizens.  140 S. Ct. at 1983 (noncitizen detained 25 yards inside the United States did not have right to judicial review of allegedly flawed credible fear proceeding); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021) ("Just last term, the Supreme Court confirmed that aliens apprehended while trying to enter the country have no due process rights beyond what Congress has provided by statute[.]").

To the extent that Plaintiffs claim that Individual Plaintiffs had in September 2021 a protected liberty or property interest in "access to the asylum process" or the "opportunity to establish their potential eligibility for asylum and access other forms of relief from removal" (Compl. ¶¶ 312-13), Plaintiffs are mistaken.  The authority granted by Congress in 42 U.S.C. § 265

gives the Executive the power to "prohibit . . . the introduction of persons" from the United States during public health emergencies.   In response to the COVID-19 pandemic, the Executive exercised that statutory authority in the CDC's August 2021 Order through which "covered noncitizens" were prohibited from entering the country.   Individual Plaintiffs, as "covered noncitizens" under the August 2021 Order, "[were] here illegally" and the Executive had the lawful authority to expel them. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022).   The D.C. Circuit recently disagreed with Plaintiffs' position that it is unlawful to expel noncitizens "here illegally" pursuant to Section 265 before allowing them an opportunity to apply for asylum pursuant to 8 U.S.C. § 1158.   *Id*. at 729-31.   Granting asylum is a matter of Executive discretion. *Id*. at 730-31 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (§ 1158 "authorizes the Attorney General, in his discretion, to grant asylum to an alien")).   Here, "[t]he Executive has shown an intent to exercise that 'discretion' by foreclosing asylum for the specific subset of border crossers covered by its § 265 Order" to protect public health.   *Id*. at 731.   The August 2021 Order under Section 265 forecloses both the grant of asylum and the "statutorily mandated procedures" for asylum applications.   *Id*.   Therefore, under the statutory framework in place in September 2021, no further due process with regard to asylum was due Plaintiffs.[5]

While the D.C. Circuit did rule that noncitizens cannot be expelled to countries where they will likely be persecuted, as set forth in 8 U.S.C. § 1231(b)(3), the Complaint does not allege that any Individual Plaintiff claimed their "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political

---

[5]     Some Plaintiffs returned to Mexico prior to processing by CBP and accordingly would not have been harmed by alleged infirmities in procedural due process, and therefore would not have standing.   The Complaint alleges that most Haitian migrants who had arrived at Del Rio in September 2021 returned to Mexico.   Compl. ¶ 129.

opinion." Nor does the Complaint allege that any Individual Plaintiff claimed a fear of torture in being expelled to Haiti. Thus, the Complaint does not plausibly allege that any Individual Plaintiff was denied protections under 8 U.S.C. §§ 1231(b)(3) or 1231 note. In fact, Plaintiffs allege that CBP personnel were guided by an internal memorandum called the "Capio Memo" that included guidance on identifying and processing noncitizens who claimed a fear of torture. Compl. ¶ 57.

Thus, Count Four should be dismissed because the Complaint fails to allege a liberty or property interest to which Individual Plaintiffs were entitled in September 2021 and denied without procedural due process.

### C.    Equal Protection

Plaintiffs also rely on the Due Process Clause of the Fifth Amendment to allege a claim in Count One against the President and DHS Defendants for a violation of equal protection.[6] Compl. ¶¶ 283-91. But the equal protection claim fails because "the Fifth Amendment's equal protection clause does not protect any Plaintiff outside the United States, so they have no constitutional claim." *Gomez v. Trump*, 485 F. Supp. 3d 145, 188 (D.D.C. 2020); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs*., 104 F.3d 1349, 1353 (D.C. Cir. 1997) (rejecting claim that State Department's consular venue policy violates Fifth Amendment equal protection because "the migrants, as aliens, may not assert a Fifth Amendment right in challenging the procedures for granting immigrant visas") (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 269 (1990)). And as established above, Individual Plaintiffs,

---

[6]    Although the Fifth Amendment does not contain an equal protection clause, its due process clause "makes the Fourteenth Amendment's guarantee of equal protection applicable to federal entities." *Kim v. Brownlee*, 344 F. Supp. 2d 758, 760-61 (D.D.C. 2004) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 204 (1995), and *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

as noncitizens attempting to enter the United States, are "for due process purposes 'as if stopped at the border.'"  *See supra*.

Yet even if Plaintiffs could claim the protections of the Fifth Amendment, the Complaint does not allege a plausible equal protection violation.  "Equal Protection . . . commands that no [government] shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  On the other hand, "dissimilar treatment of dissimilarly situated persons does not violate equal protection."  *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996).  And where, as here, facially neutral laws or policies are at issue, proof of racially discriminatory intent or purpose is required to state a violation of the Equal Protection Clause.  *Washington v. Davis*, 426 U.S. 229, 238-39 (1976).

The Complaint fails to identify noncitizens (i) of a different race or national origin (ii) who were "similarly situated" to Individual Plaintiffs and (iii) were treated differently under the law (*e.g.*, not expelled and granted access to asylum procedures).[7]  Instead of identifying a group of

---

[7]     The closest Plaintiffs come to alleging disparate treatment is where they allege that DHS Defendants had a "default policy not to subject families from Central America and Mexico to the Title 42 Process" and that DHS Defendants "departed from this default policy" by "expelling large numbers of [Haitian] families."  Compl. ¶ 173.  What Plaintiffs call a "default policy" seemingly refers to the public fact that "a significant percentage of [family units] were unable to be expelled pursuant to the order, given a range of factors, including, most notably, restrictions imposed by foreign governments" on receiving expelled families.  *See* 86 Fed. Reg. at 42,836.  In addition, the August 2021 Order, as well as previous orders, permit DHS to exercise its discretion to exempt covered noncitizens from the Title 42 Process for law enforcement or other purposes based on the totality of the circumstances.  *See id.* at 42,841.  Such decisions under Section 265 are "committed to the agency['s] discretion by law" and therefore are not reviewable under the APA.  5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) ("[W]e held an agency's decision not to institute enforcement proceedings to be presumptively unreviewable under § 701(a)(2).") (citations omitted).

similarly situated noncitizens seeking entry, Plaintiffs allege that Defendants "departed from standard procedures" or practices for processing noncitizens crossing the border. Compl. ¶¶ 162-73, 287. For example, the Complaint alleges that the White House had relatively more involvement, that Defendants "disregarded months of intelligence" about the Haitian migrants' arrival, and that DHS Defendants did not sufficiently engage non-government organizations. *Id*. ¶¶ 164-67. Such allegations about Defendants' planning activity, assuming their truth, does not plead anything about the treatment of Individual Plaintiffs or plead disparate or discriminatory treatment of Individual Plaintiffs as compared to other noncitizens crossing the border among a group of 15,000 migrants. Similarly, the Complaint alleges that there was a "lack of screenings" for non-refoulment, there was "no infrastructure" in Haiti to receive expelled migrants, and DHS Defendants did not "mitigate the health risks of expulsion." *Id*. ¶¶ 170-72. But again, these allegations do not speak to the treatment of Individual Plaintiffs or identify migrants of another race or national origin that were treated differently.

The failure to provide factual allegations identifying similarly situated noncitizens who were treated differently dooms Plaintiffs' equal protection claim.[8] *See, e.g., Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 159 (D.D.C. 2014) (dismissing claim because African-American "Plaintiff fails to identify any neighborhood, much less one that is a similarly situated non-African-American neighborhood—that has been treated more favorably than Kingman Park"), *aff'd*, 815 F.3d 36 (D.C. Cir. 2016); *Colindres v. Dep't of State*, Civ. A. No. 21-348 (GMH), 2021 WL 5906041, at *10 (D.D.C. Dec. 14, 2021) (granting dismissal where "complaint

---

[8]     Note that "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive. So long as such distinctions are not wholly irrational they must be sustained." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (internal citations omitted).

fails to allege that 'similarly situated persons were intentionally treated differently' and contains no facts—let alone specific facts—that would support such an inference.").

Plaintiffs' allegations of discriminatory intent fare no better. To state an equal protection claim, Plaintiffs must establish that the "decisionmakers" in Individual Plaintiffs' cases "acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). But the section of the Complaint devoted to alleging discriminatory intent offers no factual allegations of the decision-makers determining Individual Plaintiffs' treatment or responsible for Defendants' actions at Del Rio. For example, the Complaint alleges that the supposed "Haitian Deterrence Policy"—which the Complaint alleges was "devised by White House senior officials" (Compl. ¶ 62)—"arose from discriminatory intent based on race and national origin" but offers no factual allegations suggesting discriminatory intent of these unidentified White House decision-makers. Compl. ¶ 174. Rather, the Complaint attempts to rely on short ambiguous quotes from a few unnamed DHS officials, *see id*. ¶¶ 176-77, and then alleges "on information and belief" that "perspectives such as these shaped the decisions that senior White House and DHS officials made[.]" *Id*. ¶ 178. Such allegations are insufficient to plausibly allege discriminatory purpose to state an equal protection claims. *See Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 69 (D.D.C. 2005) ("[P]laintiff has not presented any direct evidence that would support an inference that racial considerations motivated the police officers who searched and arrested him. The only evidence presented by plaintiff is his own beliefs and experiences with the police.").

Plaintiffs' equal protection claim should be dismissed because Plaintiffs cannot claim protections under the Fifth Amendment and, even if they could, have failed to allege plausible disparate treatment arising from discriminatory intent.

III.    **Certain APA Claims Should Be Dismissed**

A.    **Plaintiffs Fail to Allege a Plausible Claim of Withheld or Delayed Agency Action**

In Count Seven, Plaintiffs bring a claim under 5 U.S.C. § 706(1) against Defendants CBP and ICE alleging that these Defendants failed to take a variety of actions.   Section 706(1) empowers a court to "compel agency action unlawfully withheld or unreasonably delayed."  The Supreme Court in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), explained the contours of Section 706(1).  The Court stated that "the only agency action that can be compelled under the APA is action legally required," that is where "an agency failed to take a *discrete* agency action that it is *required to take*."  *Id*. at 63-64.  The limitation that the agency action be "required" means there must be a "ministerial or non-discretionary" duty "demanded by law" or amounting to a "specific, unequivocal command."  *Id*. at 63.

Plaintiffs assert that Defendant CBP withheld or unreasonably delayed mandatory action by "refusing to allow . . . a meaningful opportunity to apply for asylum."   Compl. ¶¶ 359-60.  However, as the D.C. Circuit concluded, the CDC's August 2021 Order under 42 U.S.C. § 265 foreclosed grants of asylum and the statutory "procedures that aliens use to apply for asylum."  *Huisha-Huisha*, 27 F.4th at 731.  CBP or ICE could not "withhold" something which was not legally available.[9]   Likewise, Plaintiffs complain that Defendants CBP and ICE did not use "removal procedures set forth in the INA," (*see* Compl. ¶¶ 364-66) but Individual Plaintiffs were not "removed" under Title 8; those Individual Plaintiffs who did not return to Mexico were expelled pursuant to the public health authority granted in Section 265.  And in *Huisha-Huisha*, the D.C. Circuit ruled that expulsions pursuant to that Section 265 authority are likely lawful.

---

[9]    In any event, the Complaint does not allege that Plaintiffs who were expelled indicated to CBP an intention to apply for asylum.  Compl. ¶¶ 216, 222, 228, 235.

*Huisha-Huisha*, 27 F.4th at 733 ("It is likely that § 265 grants the Executive sweeping authority to prohibit aliens from entering the United States during a public-health emergency; that the Executive may expel aliens who violate such a prohibition[.]").

Plaintiffs also assert that the Government has a "mandatory duty to follow the procedures required by 8 U.S.C. 1231(b)(3) and [1231 note] to determine whether a noncitizen faces a risk of persecution or torture." Compl. ¶ 362. Neither provision, however, sets forth any such required "procedures." For example, Section 1231(b)(3)(A) states that "the [Secretary of Homeland Security] may not remove an alien to a country if the [Secretary] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." It does not establish a "ministerial or non-discretionary" duty "demanded by law" that can be compelled pursuant to 5 U.S.C. § 706(1). It states what the Government "may not" do "if the Secretary decides" in the exercise of his discretion that a "noncitizen's life or freedom would be threatened" but does not mandate any "procedures" that Plaintiffs identify as being withheld. "The mandatoriness requirement means that courts cannot compel agencies to take action *beyond* what is legally required of them." *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (emphasis in original).

Further, in contrast to the conclusory allegations that Defendants acted inconsistent with Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, as implemented through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note), the Complaint alleges facts establishing the opposite. Plaintiffs allege that CBP issued an internal memorandum called the "Capio Memo" to provide "procedures for applying Defendant CDC's order" at the border, including at the "CBP Encampment." Compl. ¶¶ 57 & n.12, 61, 73, 277. The

Complaint provides a web link to the Capio Memo, which has a section on processing Convention Against Torture claims. *Id.* ¶ 57 n.12. The memo states on page four: "Aliens that make an affirmative, spontaneous and reasonably believable claim that they fear being tortured in the country they are being sent back to, will be taken to the designated station and referred to USCIS." No Plaintiff alleges that they made a claim that they feared torture if expelled to Haiti. *See generally* Compl.

### B.    Plaintiffs' Challenge to "Haitian Deterrence Policy" Fails to State a Claim

Count Eight alleges a claim under 5 U.S.C. § 706(2) against the DHS Defendants challenging the purported "Haitian Deterrence Policy." Section 706(2) of the APA authorizes a court to "hold unlawful and set aside agency action" under certain enumerated circumstances. The APA does not, however, "authorize [courts] to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (citations omitted). The APA permits judicial review of only "final agency action." 5 U.S.C. § 704. Thus, Plaintiffs must allege facts establishing the existence of "agency action" that is "final." *See Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Whether there has been 'agency action' or 'final agency action' within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable.").

The Supreme Court has stressed that an agency action for APA purposes is limited to the set of "circumscribed, discrete agency actions" delineated in 5 U.S.C. § 551(13), which defines "action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *See Norton*, 542 U.S. at 62. The agency action must also be "final," and to be considered final the action must "mark the 'consummation' of the agency's decisionmaking process" (not "merely tentative or interlocutory") and be one by which "rights or obligations have

been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

With respect to the purported "Haitian Deterrence Policy," the Complaint clearly fails to allege a discrete final agency action reviewable under the APA. For one, the purported policy is not even alleged to be a policy of any *agency* subject to the APA. Plaintiffs allege that the policy was "devised by White House senior officials" and "resulted from a series of discrete decisions made by President Biden's senior advisors on the [National Security Council] and [Domestic Policy Council]." Compl. ¶¶ 23, 61, 62. However, it is well-settled that actions of the Executive Office of the President are not subject to review under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992). Presumably this is why Count Eight is alleged against DHS Defendants only. But the APA only authorizes review of agency action, and by the allegations in their own Complaint, any challenge to the White House's purported "Haitian Deterrence Policy" may not stand.

To the extent Plaintiffs contend that DHS Defendants' "adoption and implementation" of the purported "Haitian Deterrence Policy" is final agency action (Compl. ¶ 378), there are no factual allegations to support the existence of a final discrete agency action by DHS Defendants to "adopt" or to "implement" this policy supposedly "devised by [the] White House." Absent from the Complaint are basic factual allegations regarding how the policy was adopted by DHS Defendants (which consists of multiple agencies and officials) and in what form; when the policy was adopted; who at the agencies were involved; or that it was the "consummation" of agency decision-making that itself determined "rights or obligations." (Indeed, the lack of factual allegations demonstrates that there is no such policy.)

Therefore, as alleged in the Complaint, the purported "Haitian Deterrence Policy" (or any adoption or implementation thereof) is not a "circumscribed, discrete agency action[]" as delineated in 5 U.S.C. § 551(13). The Complaint does not identify any "agency rule, order, license, sanction, relief, or the equivalent or denial thereof" or any facts from which one can infer the existence of such. *Id*. And the Complaint offers no allegations indicating the "policy" was the consummation of an agency's decision-making that itself determined any rights or obligations of Plaintiffs. Rather, the policy allegedly "resulted" from or "grew out of" a "series" of other unidentified "decisions and policies" that led to the expulsion of Haitian migrants who crossed into the United States near the Del Rio Bridge in September 2021. *Id*. ¶¶ 60-62, 69. It is evident from the pleading that the purported "Haitian Deterrence Policy" is the name Plaintiffs assign to the "way" or "manner" in which Title 42 was applied to these Haitian migrants in September 2021. Compl. ¶¶ 8 ("officials developed a 'Haitian Deterrence Policy' to apply the Title 42 Process in a way that subjected Haitian asylum seekers in Del Rio to deplorable conditions"), 62 ("Under the Haitian Deterrence Policy devised by White House senior officials, DHS Defendants applied the Title 42 Process in Del Rio in a manner indifferent to humanitarian concerns and focused on removing Haitian asylum seekers as quickly as possible to discourage other Haitians from exercising their right to seek asylum."). Thus, based on the pleading in the Complaint, the purported "Haitian Deterrence Policy" is not an actual final "circumscribed, discrete agency action" but rather a label created and used by Plaintiffs to describe the application or implementation of an actual final agency action—the CDC's August 2021 Order—to a large group of Haitian migrants. *See Bark v. United States Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (finding no final agency action because "Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices" under challenge).

Challenges to how an agency implements a policy are generally unreviewable under the APA.  As the Supreme Court stated in *Norton*, "[g]eneral deficiencies in compliance" with or implementation of broad statutory or regulatory mandates—like perhaps the Section 265 public health authority—"lack the specificity requisite for agency action" review.  542 U.S. at 66-67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA."); *see also Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Because an on-going program or policy is not, in itself, a final agency action under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior."); *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (an agency's "approval, not [its] subsequent activities in carrying it out, [i]s the final agency action"); *CREW v. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019) ("[A] plaintiff must challenge a 'discrete agency action' and cannot make 'a broad programmatic attack' on an agency's compliance with a statutory scheme."); *RCM Techs., Inc. v. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009) ("Courts stand ready to entertain appeals from specific, concrete agency adjudications. But absent that, courts have neither the resources nor the expertise to superintend agency policy-making.").  Plaintiffs may be concerned with how expulsions pursuant to the August 2021 Order occurred, but how DHS implemented the Order at Del Rio in September 2021 is simply not a reviewable final agency action.

Because Plaintiffs have not alleged in Count Eight a challenge to a final concrete, discrete agency action, the claim should be dismissed.

## IV.    <u>President Biden is Not a Proper Defendant</u>

Although Plaintiffs allege claims against the President, he is not a proper defendant in this case.  Plaintiffs may not obtain—and the Court may not order—injunctive or declaratory relief

directly against the President for his official conduct. Therefore, the Court should dismiss all of Plaintiffs' claims against President Biden.

To maintain the constitutional separation of powers, courts have long recognized that the non-ministerial conduct of the President when he acts in his official capacity cannot be enjoined. In *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), the Supreme Court held that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Id.* In that case, the State of Mississippi sought to enjoin President Andrew Johnson from executing the Reconstruction Acts, which Mississippi claimed were unconstitutional. *See id.* at 497. In barring injunctive relief against the President, the Court reasoned that when presidential action requires "the exercise of judgment," "general principles . . . forbid judicial interference with the exercise of Executive discretion." *Id.* at 499. Just as courts cannot enjoin Congress in exercising its legislative function, they cannot enjoin the President in exercising the executive function. *Id.* at 500 ("Neither can be restrained in its action by the judicial department[.]"). To do so, the Court observed, would be "without a precedent." *Id.*

A "majority of the Justices" in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), reaffirmed these fundamental principles. *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996). In *Franklin*, a district court issued an injunction requiring the President to take certain actions related to the census. *See* 505 U.S. at 791. Writing for a four-Justice plurality, Justice O'Connor explained that "the District Court's grant of injunctive relief against the President himself [was] extraordinary, and should have raised judicial eyebrows." *Id.* at 802 (citation omitted). The plurality reiterated that "in general, '[the] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" *Id.* at 802–03 (quoting *Mississippi*, 71 U.S. at 501).

In line with *Mississippi* and *Franklin*, courts in this and other circuits have rejected plaintiffs' demands to enjoin the President in the performance of his official duties, regardless of the claim.[10]  For example, in *Swan v. Clinton*, a former member of the National Credit Union Administration ("NCUA") Board sued the President and two subordinates after the President removed him from his position.  100 F.3d at 975.  The court recognized that the Supreme Court in *Franklin* had "'left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely ministerial duty.'"[11]  *Id.* at 977 (quoting *Franklin*, 505 U.S. at 802).  Although the Court found that the President's duty to comply with the removal restrictions in the NCUA statute was "ministerial and not discretionary," it nonetheless determined that

---

[10]     *See, e.g.*, *Doe v. Trump*, 319 F. Supp. 3d 539, 542 (2018); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated & remanded on other grounds*, 138 S. Ct. 377 (2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir.), *vacated & remanded on other grounds sub. nom.*, 138 S. Ct. 353 (2017); *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 632 (D. Md. 2017); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539–40 (N.D. Cal. 2017), *appeal docketed* No. 17-16886 (9th Cir. Sept. 18, 2017); *Settle v. Obama*, Civ. A. No. 15-0365, 2015 WL 7283105, at *6 (E.D. Tenn. Nov. 17, 2015); *Day v. Obama*, Civ. A. No. 15-0671, 2015 WL 2122289, at *1 (D.D.C. May 1, 2015); *Willis v. Dep't of Health & Human Servs.*, 38 F. Supp. 3d 1274, 1277 (W.D. Okla. 2014); *McMeans v. Obama*, Civ. A. No. 11-0891, 2011 WL 6046634, at *3 (D. Del. Dec. 1, 2011); *Shreeve v. Obama*, Civ. A. No. 10-0071, 2010 WL 4628177, at *5 (E.D. Tenn. Nov. 4, 2010); *Anderson v. Obama*, Civ. A. No. 10-0017, 2010 WL 3000765, at *2 (D. Md. July 28, 2010); *Carlson v. Bush*, Civ. A. No. 07-1129, 2007 WL 3047138, at *3 (M.D. Fla. Oct. 18, 2007); *Comm. to Establish the Gold Standard v. United States*, 392 F. Supp. 504, 506 (S.D.N.Y. 1975); *Nat'l Ass'n of Internal Revenue Emps. v. Nixon*, 349 F. Supp. 18, 21–22 (D.D.C. 1972); *Reese v. Nixon*, 347 F. Supp. 314, 316–17 (C.D. Cal. 1972); *S.F. Redevelopment Agency v. Nixon*, 329 F. Supp. 672, 672 (N.D. Cal. 1971); *Suskin v. Nixon*, 304 F. Supp. 71, 72 (N.D. Ill. 1969).

[11]     A ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion."  *Mississippi*, 71 U.S. at 498; *see also Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) ("A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." (citing *Mississippi*, 71 U.S. at 498)).  In contrast, "a duty is discretionary if it involves judgment, planning, or policy decisions."  *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (citation omitted).  There can be no question here that Plaintiffs seek to enjoin the President from performing a discretionary duty—the formation and implementation of immigration and public health policies—that goes to the heart of his authority as Chief Executive overseeing Executive branch agencies.

injunctive relief against the President was not appropriate.  *Id.*  The Court reiterated the Supreme

Court's "stern admonition" from *Franklin* that "injunctive relief against the President personally

is an extraordinary measure not lightly to be undertaken." *Id.* at 978.  The rationale behind this

doctrine, the Court found, was "painfully obvious":

> the President, like Congress, is a coequal branch of government, and for the
> President to 'be ordered to perform particular executive . . . acts at the behest of the
> Judiciary,' at best creates an unseemly appearance of constitutional tension and at
> worst risks a violation of the constitutional separation of powers.

*Id.* (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part & concurring in the

judgment)).

The district court expressed similar concerns regarding the separation of powers in

*Newdow v. Bush*, 355 F. Supp. 2d 265 (D.D.C. 2005).  In that case, the plaintiff moved for a

preliminary injunction against all defendants, including the President, to prevent the use of

clergymen to engage in any religious act at the presidential inauguration. *Id.* at 270–71.  Although

the plaintiff argued that the Court should "read an exception into the immunity of the President

from injunctive relief for instances where he is claimed to have violated the Constitution," the

Court found that "there is no support at all for such an exception." *Id.* at 282.  In a similar case

challenging prayers at a subsequent presidential inauguration, the D.C. Circuit affirmed the

dismissal of the plaintiff's case, finding that "[t]he only apparent avenue of redress for plaintiffs'

claims would be injunctive or declaratory relief" against the President, but "such relief is

unavailable." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).  The Court concluded

that "[w]ith regard to the President, courts do not have jurisdiction to enjoin him and have never

submitted the President to declaratory relief."[12]  *Id.* (citing *Mississippi*, 71 U.S. at 501; *Franklin*, 505 U.S. at 827–29).

The foregoing cases underscore that the President is not a proper defendant in this case.  It is undisputed that Plaintiffs brought suit against the President in his official capacity, challenging actions his administration took concerning public health policy at the U.S. borders during a pandemic in his role as Chief Executive overseeing the U.S. Department of Health and Human Services and U.S. Department of Homeland Security.  *See* Compl. ¶23; *see also* Compl. ¶¶ 283-91 (First Claim), ¶¶ 292-99 (Second Claim), ¶¶ 309-17 (Fourth Claim).  It is also undisputed that Plaintiffs seek declaratory and injunctive relief against the President.  *Id.*; *see also id.* at 89-90 (Prayer for Relief).  It is further undisputed that Plaintiffs brought suit against DHS, the Secretary of DHS, CBP, the Commissioner for CBP, the Executive Assistant Commissioner of CBP's Office of Field Operations, Chief of U.S. Border Patrol, ICE, the Acting Director of ICE, HHS, the Secretary of HHS, the CDC, and the Director of the CDC, *id.* ¶¶ 24–35, and Plaintiffs could obtain full relief for their alleged injuries through injunctive relief against those other Defendants.  Accordingly, because this Court cannot issue a declaratory judgment or an order enjoining the President for his official, discretionary action, the Court should dismiss President Biden from the case.

---

[12]    This is not to say that Plaintiffs may not bring their claims against the other Defendants in this case or that the Court may not enjoin the actions of subordinate officials in the Executive Branch.  To the contrary, "[i]n most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."  *Swan*, 100 F.3d at 978–79 (citing *Franklin*, 505 U.S. at 803; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982)).  Thus, in cases involving the President and other defendants, courts avoid granting relief against the President and instead grant relief only against subordinate officials in the Executive Branch.  *See, e.g., id.* at 976–80.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs'

Complaint in its entirety.

Dated:  June 10, 2022                    Respectfully submitted,

                                         MATTHEW M. GRAVES, D.C. Bar. #481052
                                         United States Attorney

                                         BRIAN P. HUDAK
                                         Chief, Civil Division

                        By:     /s/ Sean M. Tepe
                                SEAN M. TEPE, DC Bar #1001323
                                DIANA V. VALDIVIA, DC Bar #1006628
                                Assistant United States Attorney
                                601 D Street, N.W.
                                Washington, D.C. 20530
                                Phone: (202) 252-2533; (202) 252-2545
                                sean.tepe@usdoj.gov
                                diana.valdivia@usdoj.gov