## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAITIAN BRIDGE ALLIANCE *et al.*,

          *Plaintiffs*,

    v.

JOSEPH R. BIDEN, President of the United States, *et al.*,

          *Defendants.*

Case No. 1:21-cv-03317  (JMC)

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.      INTRODUCTION.......................................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................ 1

        A.      The Haitian Deterrence Policy ......................................................................... 2

        B.      The Title 42 Process........................................................................................ 3

        C.      The Abusive Treatment and Mass Expulsion of Haitian Migrants in Del Rio....... 4

III.    LEGAL STANDARDS ................................................................................................. 7

IV.     ARGUMENT................................................................................................................ 8

        A.      Plaintiffs Have Standing ................................................................................. 8

                1.      Individual Plaintiffs allege sufficient facts to establish standing ................... 8

                2.      Haitian   Bridge   Alliance   alleges   sufficient   facts   to   establish
                        organizational standing .................................................................................11

        B.      Plaintiffs Adequately State Constitutional Claims ...........................................14

                1.      Plaintiffs' constitutional claims are not foreclosed by the recency of
                        their entry to the United States ..................................................................14

                2.      Plaintiffs adequately state an equal protection claim ....................................17

                3.      Plaintiffs adequately state a substantive due process claim under the
                        "shock the conscience" standard ................................................................23

                4.      Plaintiffs adequately state a substantive due process claim under the
                        "special relationship" standard...................................................................26

                5.      Plaintiffs adequately state a procedural due process claim ...........................30

        C.      Plaintiffs Adequately State APA Claims .........................................................34

                1.      Plaintiffs adequately state a claim under section 706(1) of the APA ............34

                2.      Plaintiffs adequately state a claim under section 706(2) of the APA
                        regarding the Haitian Deterrence Policy .....................................................38

        D.      President Biden Is a Proper Defendant .............................................................43

V.      CONCLUSION.............................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967)...................................................................................40

*Abigail All. for Better Access to Dev. Drugs v. Eschenbach*,
  469 F.3d 129 (D.C. Cir. 2006) ...................................................................12

*Al Otro Lado, Inc. v. Mayorkas*,
  2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) ..................................... 17, 44

*Alshawy v. U.S. Citizenship & Immigration Services*,
  2022 WL 970883 (D.D.C. Mar. 30, 2022).................................................31

*Am. Wildlands v. Kempthorne*,
  2008 WL 2651091 (D.C. Cir. July 8, 2008) ....................................... 19, 24

*Arpaio v. Obama*,
  797 F. 3d 11 (D.C. Cir. 2015) ....................................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................7

*Ass'n of Admin. L. Judges v. U.S. Off. of Pers. Mgmt.*,
  640 F. Supp. 2d 66 (D.D.C. 2009) .............................................................40

*Barnes v. D.C.*,
  793 F. Supp. 2d 260 (D.D.C. 2011) .................................................... 23, 24

*Bennett v. Spear*,
  520 U.S. 154 (1997).....................................................................................40

*Butera v. District of Columbia*,
  235 F.3d 637 (D.C. Cir. 2001) ......................................................24, 28, 30

*Cal. Cmtys. Against Toxics v. EPA*,
  934 F.3d 627 (D.C. Cir. 2019) ...................................................................41

*CASA de Maryland, Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018) .................................................... 43, 44

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
  332 F. Supp. 3d 393 (D. Mass. 2018)........................................................44

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985)................................................................................18

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)................................................................................10

*Clinton v. Jones*,
  520 U.S. 681 (1997)................................................................................42

*Colbert v. D.C.*,
  5 F. Supp. 3d 44 (D.D.C. 2013)..............................................................29

*Colindres v. U.S. Dep't of State*,
  2021 WL 5906041 (D.D.C. Dec. 14, 2021) ...........................................22

*Collins v. City of Harker Heights*,
  503 U.S. 115 (1992)................................................................................24

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
  2022 WL 424966 (D.D.C. Feb. 11, 2022) ..............................................10

*D.A.M. v. Barr*,
  474 F. Supp. 3d 45 (D.D.C. 2020) .........................................................16

*D.C. v. Trump*,
  291 F. Supp. 3d 725 (D. Md. 2018) .......................................................44

*D.J.C.V. v. United States*,
  2022 WL 1912254 (S.D.N.Y. June 3, 2022)...........................................16

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989)..............................................................26, 27, 29, 30

*DHS v. Thuraissigiam*,
  140 S. Ct. 1959 (2020) .............................................15, 16, 17, 31

*Edwards v. United States*,
  2020 WL 2800605 (D.D.C. May 29, 2020) ...............................................7

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) .........................................................31, 32, 35

*Est. of Sinthasomphone v. City of Milwaukee*,
  785 F. Supp. 1343 (E.D. Wis. 1992) ......................................................29

*Farrell v. Blinken*,
  4 F.4th 124 (D.C. Cir. 2021)......................................................................8

*Fernandors v. District of Columbia*,
  382 F. Supp. 2d 63 (D.D.C. 2005) .......................................................................... 22

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) .............................................................................................. 43

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) .............................................................................................. 11

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) .......................................................................... 38, 40

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) ..................................................................... 16

*Grace v. Whitaker*,
  344 F. Supp. 3d 96 (D.D.C. 2018) .......................................................................... 9

*Gutierrez-Rogue v. I.N.S.*,
  954 F.2d 769 (D.C. Cir. 1992) .............................................................................. 30

*Haitian Refugee Ctr. v. Civiletti*,
  503 F. Supp. 442 (S.D. Fla. 1980) ....................................................................... 18

*Harris v. D.C.*,
  932 F.2d 10 (D.C. Cir. 1991) ................................................................................ 30

*Harvey v. D.C.*,
  798 F.3d 1042 (D.C. Cir. 2015) ...................................................................... 28, 29

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .............................................................................................. 12

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) ......................................................................*passim*

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
  372 F.3d 420 (D.C. Cir. 2004) .............................................................................. 38

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
  319 F. Supp. 3d 491 (D.D.C. 2018) ...................................................23, 24, 25, 26

*Jones v. Mukasey*,
  565 F. Supp. 2d 68 (D.D.C. 2008) .................................................................. 19, 24

*Jordan ex rel. Jordan v. Jackson*,
  15 F.3d 333 (4th Cir. 1994) .................................................................................. 25

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................9

*Kingman Park Civic Ass'n v. Gray*,
    27 F. Supp. 3d 142 (D.D.C. 2014) ......................................................19, 20, 22

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018) ..............................................................41

*Las Americas Immigr. Advoc. Ctr. v. Wolf*,
    507 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................30

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
    104 F.3d 1349 (D.C. Cir. 1997) ......................................................................16

*Lucas R. v. Azar*,
    2018 WL 7200716 (C.D. Cal. Dec. 27, 2018) ...................................................41

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................8

*Lynch v. Cannatella*,
    810 F.2d 1363 (5th Cir. 1987) ........................................................................16

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021)................................................................15, 16, 17

*Mayor & City Council of Balt. v. Trump*,
    416 F. Supp. 3d 452 (D. Md. 2019) .................................................................44

*McBride v. Merrell Dow & Pharm., Inc.*,
    800 F.2d 1208 (D.C. Cir. 1986) ......................................................................19

*McCleskey v. Kemp*,
    481 U.S. 279 (1987)..........................................................................................21

*McCray v. Biden*,
    2021 WL 5823801 (D.D.C. Dec. 7, 2021) ......................................................43

*Ms. L. v. U.S. Immigr. & Customs Enf't*,
    302 F. Supp. 3d 1149 (S.D. Cal. 2018) ...........................................................25

*N.A.A.C.P. v. U.S. Dep't of Homeland Sec.*,
    364 F. Supp. 3d 568 (D. Md. 2019) .................................................................18

*N.A.A.C.P. v. U.S.P.S.*,
    496 F. Supp. 3d 1 (D.D.C. 2020) .............................................10, 12, 13, 19

*Nat'l Treasury Employees Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ........................................................................ 42, 43

*Nat. Res. Def. Council, Inc. v. E.P.A.*,
    383 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................ 9

*Nat. Res. Def. Council v. Pena*,
    147 F.3d 1012 (D.C. Cir. 1998) .............................................................................. 9

*National Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ............................................................................. 14

*Natural Law Party of U.S. v. Fed. Elec. Comm'n*,
    111 F. Supp. 2d 33 (D.D.C. 2000) .......................................................................... 7

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ........................................................................... 43

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) ............................................................................. 42

*Norris v. D.C.*,
    737 F.2d 1148 (D.C. Cir. 1984) ........................................................................... 25

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................... 34, 38, 40

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.C. Cir. 2019) .............................................................. 12, 13

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ......................................................................................... 10

*Overseas Partners, Inc. v. PROGEN Musavirlik*,
    15 F. Supp. 2d 47 (D.D.C. 1998) ......................................................................... 29

*Plyler v. Doe*,
    457 U.S. 202 (1982) ......................................................................................... 15

*R.J. Reynolds Tobacco Co. v. FDA*,
    810 F.3d 827 (D.C. Cir. 2016) ............................................................................. 11

*Rochin v. California*,
    342 U.S. 165 (1952) ......................................................................................... 25

*Ross v. United States*,
    910 F.2d 1422 (7th Cir. 1990) ............................................................................. 29

*S.F. Herring Ass'n v. Dep't of the Interior*,
  946 F.3d 564 (9th Cir. 2019) ............................................................................40

*Saget v. Trump*,
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) .......................................................*passim*

*Smith v. D.C.*,
  413 F.3d 86 (D.C. Cir. 2005) ...................................................................27, 28, 29

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000) .........................................................................27

*Stone v. Trump*,
  400 F. Supp. 3d 317 (D. Md. Aug. 2019) .........................................................44

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ...........................................................................43

*Troxel v. Granville*,
  530 U.S. 57 (2000) ..............................................................................................25

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) ............................................................................................18

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019) ..............................................................................7

*United Transp. Union v. ICC*,
  891 F.2d 908 (D.C. Cir. 1989) ...........................................................................10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ...........................................................................18, 19, 20, 21

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ......................................................................................24, 25

*Whitman v. Am. Trucking Ass'ns, Inc.*,
  531 U.S. 457 (2001) ............................................................................................42

*Wolff v. McDonnell*,
  418 U.S. 539 (1974) ............................................................................................17

*Women Prisoners of the D.C. Dep't of Corr. v. D.C.*,
  93 F.3d 910 (D.C. Cir. 1996) .............................................................................23

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ............................................................................................15

*Youngberg v. Romeo*,
    457 U.S. 307 (1982) .............................................................................................25

**Statutes**

5 U.S.C. § 551 ...........................................................................................38, 39, 40

5 U.S.C. § 706 ...........................................................................................34, 38, 42

8 U.S.C. § 1158 ................................................................................................ 30, 31

8 U.S.C. § 1225 ...........................................................................................35, 36, 37

8 U.S.C. § 1231 ...........................................................................................30, 31, 33

8 U.S.C. § 1252 .......................................................................................................15

8 U.S.C. § 1254a .....................................................................................................44

42 U.S.C. § 265 ...............................................................................................*passim*

**Regulations**

8 C.F.R. § 235.3 ..........................................................................................35, 36, 37

85 Fed. Reg. 65,806 (Oct. 16, 2020) .......................................................................3

86 Fed. Reg. 42,828 (Aug. 5, 2021) ................................................................ 35, 36

**Secondary Sources**

Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for
    Control of Presidential Information*, 90 Geo. L.J. 737 (2002) ............................43

## I.     INTRODUCTION

As their Complaint sets forth in painstaking detail, Plaintiffs came to the United States seeking safety—attempting to access the processes Congress enshrined to protect people who have been forced to flee persecution and torture. United States officials greeted them not with the protections they were due under law, but instead with racism, cruelty, starvation, and forced return to the very dangers they risked everything to escape. Exceeding the "short and plain statement" required at the pleading stage, Plaintiffs' Complaint lays bare the abuse inflicted upon them because of Defendants' policies, decisions, and conduct. It makes clear the ways in which Defendants' actions violated Plaintiffs' constitutional and statutory rights. And it shows how a favorable decision from this Court will redress the harms Plaintiffs suffered, continue to suffer, and imminently risk suffering again.

Despite publicly professing outrage and promising accountability for the unconscionable abuse inflicted in Del Rio, Defendants now seek to avoid judicial review of that very conduct. In asking this Court to shut its doors to Plaintiffs, Defendants' Motion relies on a distorted and unduly narrow reading of the Complaint, demands that this Court view the allegations in the light most favorable to Defendants rather than Plaintiffs, and misconstrues the applicable legal standards and governing law. Defendants' baseless attempt to avoid review must be rejected.

## II.    STATEMENT OF FACTS

In late summer 2021, hundreds and eventually thousands of people seeking asylum began crossing the Rio Grande near Del Rio, Texas and arriving in the United States. Complaint (Dkt. 1) ("Compl.") ¶¶ 73, 76. Many of these asylum-seekers were Haitian nationals, fleeing persecution, violence, and instability in Haiti that only increased after the assassination of the Haitian president, Jovenel Moïse, on July 7, 2021, followed by a 7.2 magnitude earthquake that devastated the country's southern region on August 14, 2021. *See id.* ¶¶ 64, 73, 155 & n.8.

The Biden administration's response to the arrival of these primarily Haitian asylum-seekers was driven by two policies: the Haitian Deterrence Policy and the Title 42 Process.

### A.  The Haitian Deterrence Policy

The Haitian Deterrence Policy resulted from a series of discrete decisions made by senior White House and Department of Homeland Security (DHS) officials in the late summer and early fall of 2021, under authority delegated by President Biden. *Id.* ¶¶ 8, 61-72. Because of these decisions, and pursuant to the Haitian Deterrence Policy, DHS personnel did not prepare to receive or process thousands of asylum-seekers they knew would be arriving in the Customs and Border Protection (CBP) Del Rio Sector in the late summer and early fall of 2021, intentionally and foreseeably creating a humanitarian crisis that resulted in immense human suffering. *Id.* ¶¶ 61-62.

Defendants were forewarned of the increased number of Haitian asylum-seekers coming to the Del Rio Sector. As early as February 2021, Del Rio Mayor Bruno Lozano warned President Biden and DHS that his city needed federal support to assist with growing numbers of border crossings. *Id.* ¶ 65. As early as spring 2021, DHS and the President's staff learned in intelligence briefings that Haitian migrants disproportionately arrived and crossed into the United States in the Del Rio Sector. *Id.* ¶ 66. Throughout summer 2021, intelligence reports documented the movement of thousands of Haitians towards the United States; briefings also informed White House and DHS decision-makers of the lack of local resources to process them. *Id.* ¶¶ 66, 67, 73. Against this backdrop, an August 2021 memorandum from the DHS Office of Civil Rights and Civil Liberties advised that expelling Haitian nationals under the Title 42 Process (described below) created a "strong risk" of violating the U.S. government's non-refoulement obligations under U.S. and international law. *Id.* ¶ 71. In sum, over months, the Biden administration received many warnings about the impending arrival of thousands of Haitian asylum-seekers to the Del Rio Sector and the federal government's statutory non-refoulement obligations.

Notwithstanding these warnings, the Biden administration decided *not* to prepare for a significant increase in arrivals in the Del Rio Sector—thereby choosing not to prepare for a situation that could foreseeably turn into a humanitarian crisis. *Id.* ¶¶ 71-72, 74. The administration took no steps to muster either the necessary resources for the legal processing of the anticipated Haitian asylum-seekers or sufficient food, water, shelter, and medical care to meet their basic

human needs. *Id.* ¶¶ 69, 71. It did not attempt to coordinate with a local church, despite having done so in prior months, to create a respite center for arriving migrants. *Id.* ¶ 70. Nor did it allocate any resources to set up a screening process to identify asylum-seekers with claims for humanitarian and immigration relief under the Convention Against Torture (CAT) or the Immigration and Nationality Act (INA), even though it had ordered and implemented the adoption of such screenings for Mexican nationals arriving in San Diego in July 2021. *Id.* ¶ 71.

White House and DHS officials made and implemented these decisions pursuant to, and in support of, a consciously adopted policy to suppress the growing number of Haitians arriving at the border and to deter Haitians from seeking asylum in the United States in the future. *Id.* ¶ 60. As alleged in the Complaint, this Haitian Deterrence Policy was fueled by a racist perception, shared among senior White House and DHS officials, that Haitian asylum-seekers are dangerous, violent, and criminal; by discriminatory views directed at Black and Haitian migrants; by a desire to keep Black and Haitian migrants out of the country; and by a desire to deter other Haitian asylum-seekers from coming to the United States. *Id.* ¶¶ 62, 174-78.

**B. The Title 42 Process**

In March 2020, through a series of regulations, orders, and guidance documents, the federal government adopted a policy to summarily expel noncitizens arriving at the border, including individuals seeking asylum, who lack immigration documentation (the "Title 42 Process"). Compl. ¶¶ 54-58. The Centers for Disease Control and Prevention (CDC), invoking its statutory authority pursuant to 42 U.S.C. § 265, which allows the Surgeon General to "prohibit . . . the introduction of persons and property" based on the danger posed by a communicable disease, *id.*, issued an order "suspending the right to introduce and prohibiting the introduction" of certain noncitizens "covered" by the order, 85 Fed. Reg. 65,806, 65,812 (Oct. 16, 2020); *see* Compl. ¶ 56. Covered noncitizens included, with limited exceptions, "persons traveling from Canada or Mexico" "seeking to enter the United States at [ports of entries without] proper travel documents, . . . whose entry is otherwise contrary to law, [or] . . . who are apprehended at or near the border seeking to unlawfully enter the United States." 85 Fed. Reg. at 65,808.

CBP issued an internal memorandum in April 2020 establishing procedures for implementing the Title 42 Process (the "Capio Memo"), which states that "all processing [of covered noncitizens under the Title 42 Process] will be done in the field" "[t]o the maximum extent possible." Compl. ¶ 57. The Capio Memo provides for the expulsion of covered noncitizens as quickly as possible, providing for their "immediate[] return to Mexico or Canada" or to their home country after a limited period of detention. *Id*. The stated purpose of the Title 42 Process, as implemented in part by the Capio Memo, is to protect the country against COVID-19. *Id*. ¶ 58.

### C.  The Abusive Treatment and Mass Expulsion of Haitian Migrants in Del Rio

Because of the Haitian Deterrence Policy, senior White House and DHS officials blocked internal efforts to prepare humanitarian infrastructure for the impending arrival of thousands of Haitian asylum-seekers, despite having done so earlier in response to other anticipated increases in the numbers of non-Haitian and non-Black asylum-seekers arriving elsewhere along the U.S.-Mexico border. *Id*. ¶¶ 61, 69. Senior White House and DHS officials similarly blocked efforts to prepare public health resources, including COVID-19 testing and vaccination, for the thousands of Haitians they knew would be coming to the Del Rio Sector. *Id*. ¶ 69. As a result, the treatment of the primarily Haitian migrants in Del Rio was drastically different from—and far less humane than—the treatment of other non-Haitian and non-Black migrants who came to the U.S. in prior large-scale arrivals. *Id*. ¶¶ 162-73. And in one of the largest mass expulsions in U.S. history, these officials moved swiftly to expel as many Haitian asylum-seekers as possible under the Title 42 Process after a district court issued a September 16, 2021 injunction (the "*Huisha-Huisha* injunction") that, if it took effect after a two-week stay period, would have prevented the federal government from expelling Haitian families with minor children. *See id*. ¶¶ 122-23, 129.

Instead of preparing appropriate facilities and resources to process the anticipated large numbers of Haitians arriving to seek asylum, CBP erected a temporary intake site near the Del Rio International Bridge in late August. *Id*. ¶ 73. This site eventually became an encampment (the "CBP Encampment") for U.S. officials to contain the hundreds and then thousands of asylum-seekers whom they required to wait for multiple days to be processed by immigration officials "in

the field" under the Capio Memo. *Id.* ¶ 77. Although CBP adopted a ticketing system, handing out numbered tickets to arriving migrants and ordering them to report to officials when their number was called, there was no process to screen individuals for non-refoulement relief. *Id.* ¶¶ 77-78. Instead, many people who reported to immigration officials after their ticket number was called were summarily expelled without ever being given a chance to state that they feared returning to Haiti or wished to seek protection. *Id.* ¶¶ 71, 122-29, 135, 147-48.

The CBP Encampment did not have enough water or food, leaving many people dehydrated and starving as they waited for days to hear their ticket numbers called for what they thought was a chance to seek protection in the United States. *Id.* ¶¶ 80, 88-96, 234. Most people sleeping in the CBP Encampment did not have shelter or bedding apart from what they were able to cobble together on their own, which left many people exposed to the elements—including temperatures that soared over 100 degrees and dust and dirt that caused respiratory problems, eye infections, and rashes, particularly for young children. *Id.* ¶¶ 80, 97-100, 213. Medical care at the site was, at best, inadequate, and at worst, nonexistent. *See id.* ¶¶ 101-10, 213, 243, 257. And multiple Plaintiffs reported incidences of physical and verbal abuse by the federal officials staffing the CBP Encampment, including by (1) CBP horse patrol who assaulted and harassed, among others, Plaintiffs Mirard and Esther, *id.* ¶¶ 4-5, 113-15, 215, 242; (2) CBP officers who distributed water bottles by throwing them at migrants like "how you would throw food for chickens on the floor," *id.* ¶ 249; (3) medical personnel who taunted migrants about being deported when they sought medical assistance, *id.* ¶ 107; (4) CBP officers who used motorcycles and helicopters to kick up dust, causing respiratory problems among the migrants, *id.* ¶ 120; and (5) CBP officers who used horses to drive migrants into the Rio Grande River, away from the U.S. side of the border, and who cut ropes intended to prevent drowning that had been strung across the river *while people were using them*, *id.* ¶¶ 117-18. Plaintiff Samuel, whose entire family was starving from lack of food, and whose children were sick and received no medical care in the CBP Encampment, described the CBP Encampment as a "nightmare" that "no human being should have to endure." *Id.* ¶ 249; *see* Declaration of Samuel Doe (Dkt. 8-8) ¶¶ 7-14.

Daily flights to Haiti began in mid-September 2021 and increased in number rapidly. Compl. ¶ 129. In total, nearly 11,000 people, including thousands with babies and children, were expelled to Haiti between September 19 and October 19, 2021. *Id*. Other asylum-seekers fled to Mexico to avoid being returned to Haiti. *Id*. The CBP Encampment was empty by September 24, 2021—six days before the *Huisha-Huisha* injunction was set to go into effect. *Id*. ¶ 266.

The rapid and mass expulsion of thousands of Haitians under the Title 42 Process represented another manifestation of the Haitian Deterrence Policy. *Id*. ¶¶ 124-29. The treatment of migrants during the expulsion process was as inhumane as the treatment they had endured while awaiting processing in the CBP Encampment: migrants detained prior to expulsion flights were in many cases (1) denied adequate food, water, medical care, sanitation, and sleeping provisions, *id*. ¶¶ 132-33; (2) subjected to verbal abuse and harassment, *id*. ¶¶ 132, 134; (3) separated from their husbands, wives, parents, or children, *id*. ¶¶ 133-34; and (4) put on expulsion flights without being given a chance to seek asylum, and without being told what was happening to them or where they might be going, *id*. ¶ 135. Several expelled individuals did not even realize they had been sent to Haiti, a country they feared, until they got off the plane, because officers lied to them about where they were being taken. *Id*. ¶ 61. When Plaintiff Wilson refused to get on a plane without being informed where it was going, officers beat him so savagely that they ripped his clothes off and he lost his shoes. *Id*. ¶¶ 138-39. And, virtually all adult migrants—even mothers holding babies—were **shackled** on the flights. *Id*. ¶¶ 139, 143-46. Because they were unable to access the U.S. asylum process, including statutorily required non-refoulement screenings, both the migrants expelled on flights to Haiti, and those forced to flee to Mexico (due to the egregious conditions in the CBP Encampment and the threat of being returned to danger in Haiti under the Title 42 Process), were made to face danger and instability.[1] *Id*. ¶ 153.

---

[1] As used throughout the Complaint, Plaintiffs' references to "asylum" and the "asylum process" include all forms of non-refoulement relief, in addition to the discretionary grant of asylum. Compl. ¶ 16 n.1. In this Opposition, Plaintiffs also use "non-refoulement protections" or "non-refoulement relief" to specifically refer, within the broader asylum process, to statutory withholding of removal and relief under the CAT.

The abuses perpetrated in the CBP Encampment and during the expulsion of thousands of Haitians continue under the Title 42 Process and the Haitian Deterrence Policy, both of which remain in place. *Id.* ¶ 204, 207-08. Despite public outcry, no official or agency in the Biden administration has taken any corrective steps to ensure that the abuses and unlawful expulsions are not repeated. *Id.* ¶¶ 206-07.

## III.   LEGAL STANDARDS

When reviewing a motion to dismiss under Rule 12(b)(6), courts evaluate whether the plaintiff's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must "accept as true all of the plaintiff's allegations of fact, and must also 'grant plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Edwards v. United States*, 2020 WL 2800605, at *5 (D.D.C. May 29, 2020) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)).

To establish Article III standing, a plaintiff must allege (1) "an injury in fact" that is "concrete and particularized and actual or imminent"; (2) that the "claimed injury is 'fairly traceable to the challenged conduct of the defendant'"; and (3) that it is "likely, as opposed to merely speculative, that the[] injury will be redressed by a favorable decision." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); and *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court will] presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* at 61 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Standing (in contrast to mootness) is assessed "upon the facts as they exist at the time the complaint is filed." *Natural Law Party of U.S. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 40 (D.D.C. 2000).

IV.     **ARGUMENT**

    **A.  Plaintiffs Have Standing**

        1.      **Individual Plaintiffs allege sufficient facts to establish standing**

Individual Plaintiffs sufficiently allege injury in fact fairly traceable to Defendants' actions that can by redressed by this Court. *See Lujan*, 504 U.S. at 560-61. Indeed, Individual Plaintiffs plead three independent bases for standing based on past, ongoing, and future injury. While summarily asserting otherwise, *see* Motion to Dismiss (Dkt. 28) ("Mot.") at 9-11, Defendants fail to establish how the facts alleged fall short on any of these three separate bases.

*First*, Individual Plaintiffs have standing based on the "past injuries" that Defendants concede they suffered. Mot. at 10. As alleged in the Complaint, Defendants denied Plaintiffs access to legal protections that guarantee individuals will not be returned to a country where it is more likely than not that their life or freedom will be threatened or they will be tortured.[2] Defendants also denied Individual Plaintiffs access to basic necessities and fundamental rights, including the rights to bodily and family integrity, while they were in government custody in the CBP Encampment, detention sites, and on expulsion flights. *See* Compl. ¶¶ 79-121. Defendants then (1) expelled Individual Plaintiffs back to harm in Haiti, or (2) forced them to return to unsafe conditions in Mexico by depriving them of basic needs and threating to return them to Haiti.[3] These injuries are "concrete consequences" of Defendants' unlawful conduct that are "unquestionably particular" to each Individual Plaintiff's circumstances. *Farrell v. Blinken*, 4 F.4th 124, 129, 132 (D.C. Cir. 2021); *see id.* (finding injury in fact where government's failure to acknowledge plaintiff's expatriation resulted in concrete consequences, including extradition to the United States).

---

[2] *See* Compl. ¶¶ 61, 71, 78, 126, 147, 147, 170, 192-95; *see also id.* ¶¶ 216 (Mirard and Madeleine), 221 (Mayco ("Michael") and Veronique), 228 (Wilson), 234-35 (Jacques), 240 (Esther and Emmanuel), 246-47, 253 (Samuel and Samentha), 259 (Paul).

[3] *See generally* Compl. ¶¶ 122-29, 168, 130-49 (expulsions to Haiti), 150-52 (expulsions to Mexico); *see also id.* ¶¶ 216 (Mirard and Madeleine), 222 (Michael and Veronique); 229-30 (Wilson), 236 (Jacques), 244 (Esther and Emmanuel), 253 (Samuel and Samentha), 260 (Paul).

These past harms are sufficient to establish standing to seek, at least, declaratory relief (and Defendants' Motion does not contend otherwise). *See Nat. Res. Def. Council, Inc. v. E.P.A.*, 383 F. Supp. 3d 1, 15 (D.D.C. 2019) (where plaintiff pled past harm, plaintiff could rely "on its APA claim and its request for declaratory relief"). In addition, denial of access to the asylum process is a procedural injury that can be redressed by an order requiring Defendants to afford Individual Plaintiffs access to these procedures. *See Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 27 (D.D.C. 2020) (Plaintiffs had standing when asylum requests were evaluated pursuant to unlawful guidance, leading to expedited removal, and this procedural injury "would be fully redressed by a court order that requires new credible fear interviews"); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 119 (D.D.C. 2018) (similar), *aff'd in relevant part sub nom.*, *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020).

*Second*, Individual Plaintiffs independently have standing because they are experiencing ongoing harms. Past unlawful conduct provides a basis for standing to seek injunctive relief where, as here, there are "continuing, present adverse effects." *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). The Complaint alleges that Individual Plaintiffs experience ongoing harm resulting from their expulsion back to Haiti or their forced return to Mexico. *See* Compl. ¶¶ 153-61. Individual Plaintiffs expelled to Haiti have experienced continuing adverse effects directly resulting from their expulsion (including dangerous and life-threatening situations),[4] as have Individual Plaintiffs constructively expelled to Mexico.[5] Such injuries are ongoing and redressable by this Court. Moreover, Defendants' ongoing policies—the Title 42 Process and the Haitian Deterrence

---

[4] *See* Compl. ¶¶ 217 (Mirard and Madeleine having to hide for their safety and travel to Chile to get medical treatment for their daughter for an illness she developed in the CBP Encampment), 223-24 (Michael, Veronique, and their children having to hide and live in fear for their lives), 231 (Wilson and his family having to hide and never leaving the house for fear of being kidnapped), 237 (Jacques hiding for fear a gang would carry out death threats).

[5] *See* Compl. ¶¶ 245 (Esther and Emmanuel living in precarious conditions in Mexico; Emmanuel being attacked at knifepoint), 254 (Samuel and Samentha living in precarious conditions after their family was kicked out of a shelter), 261 (Paul regularly encountering discrimination, struggling to find work, and avoiding going outside for fear of the police).

Policy—continue to deprive Individual Plaintiffs of access to the U.S. asylum process. *Id.* ¶ 210. These current, ongoing injuries independently confer standing.

*Third*, and finally, Individual Plaintiffs also have standing based on the risk of imminent future injury. Expelled back to danger, all Individual Plaintiffs feel compelled to again attempt to access the U.S. asylum process for themselves and their families. *See* Compl. ¶¶ 16-22. [6] Defendants' assertions that these plans to return are "unspecified," and that any intention to ask for protection is "speculative," Mot. at 10-11, fundamentally misunderstand the reason Individual Plaintiffs sought asylum in the United States in the first place. [7] Moreover, the policies that Defendants admit suffice to establish past injury, *see* Mot. at 10, remain in effect. Compl. ¶ 210. As such, Plaintiffs face an imminent risk that their attempts to return to the United States will directly result, again, in Defendants' denial of their rights through the ongoing Title 42 Process and/or the Haitian Deterrence Policy. *See N.A.A.C.P. v. U.S.P.S.*, 496 F. Supp. 3d 1, 9-10 (D.D.C. 2020) (plaintiffs established standing to obtain injunctive relief based on future injury where plaintiffs described persisting government conduct). Moreover, Plaintiffs' past harms, which Defendants acknowledge, are "evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496. [8] Here, Defendants' history of systematically

---

[6] Since the filing of the Complaint, Michael and Veronique, Esther and Emmanuel, Samuel and Samentha, and Paul, have returned to the United States through individualized, case-by-case exceptions to the ongoing Title 42 Process. They are in the United States through temporary, discretionary grants of parole under INA § 212(d)(5). Mirard and Madeleine, Jacques, and Wilson are taking concrete steps to return to the United States to seek asylum. *See* Decl. of Nicole Phillips ISO Pls.' Opp. to Defs.' MTD (Ex. A) ¶¶ 3-8; *see also Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 2022 WL 424966, at *4 (D.D.C. Feb. 11, 2022) ("[I]t is well established that the Court may look to materials beyond the pleadings when considering a 12(b)(1) motion to assure itself of jurisdiction, including additional declarations or affidavits provided by a plaintiff to support standing.").

[7] *See* Compl. ¶¶ 211 (Mirard and Madeleine), 218 (Michael and Veronique), 225-26 (Wilson), 232 (Jacques), 238-39 (Esther and Emmanuel), 246 (Samuel and Samentha), 255-56 (Paul).

[8] The cases that Defendants rely on regarding future harms are readily distinguishable because no past harms were alleged. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *United*

targeting Haitian migrants, coupled with Defendants' past infliction of harm against Plaintiffs, demonstrates a substantial risk that Individual Plaintiffs will once again be injured by Defendants' unlawful conduct. *See* Compl. ¶¶ 36-58; *supra* Part II.C. *Contra* Mot. at 10 (citing none of the alleged facts substantiating these allegations before asserting that any future injury risks are "conclusory"). Far from a "speculative chain of possibilities," Mot. at 10, Individual Plaintiffs' imminent harms stem directly from Defendants' own continued unlawful actions.[9] Finally, to the extent Defendants suggest any future injury to Individual Plaintiffs is speculative because the Haitian Deterrence Policy successfully deterred Plaintiffs from returning, that argument is unavailing. *See Friends of the Earth*, 528 U.S. at 184 (finding injury in fact if plaintiffs would take future action but-for defendants' unlawful conduct).

### 2. Haitian Bridge Alliance alleges sufficient facts to establish organizational standing

Plaintiffs have also alleged facts establishing organizational standing on the part of Plaintiff Haitian Bridge Alliance ("Haitian Bridge"). On September 18, 2021, Haitian Bridge staff dropped their regular work and instead rapidly deployed their resources to address the emergency facing their community in the CBP Encampment in Del Rio. Compl. ¶¶ 262-65, 267-69. While Defendants deprived thousands of Haitians of food, water, medical aid, shelter, legal counsel, and access to information and the asylum process, Haitian Bridge acted as first responder. *Id.* ¶¶ 263-65. As the only Haitian Creole-speaking, Haitian-led organization working at the U.S.-Mexico border, Haitian Bridge felt compelled to respond immediately. *Id.* ¶¶ 15, 265. Haitian Bridge's

---

*Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989) ("any petitioner alleging *only* future injuries confronts a significantly more rigorous burden" (emphasis added)).

[9] Defendants' reliance on *R.J. Reynolds Tobacco Co. v. FDA*, 810 F.3d 827 (D.C. Cir. 2016) and *Arpaio v. Obama*, 797 F. 3d 11 (D.C. Cir. 2015) is misplaced—these cases found standing too speculative to the extent it was based on the future activity of unnamed *third parties*. *See, e.g.*, *R.J. Reynolds*, 810 F.3d at 831 ("[W]e are relatively hesitant to find standing when the asserted injury 'depends on the unfettered choices made by independent actors not before the courts.'" (quoting *Lujan,* 504 U.S. at 562)). This principle has no application here, as Plaintiffs' imminent future injury turns on the conduct and policies of *Defendants*, not third parties.

staff attempted to gain access to the CBP Encampment to provide information and coordinate aid and document the abuses that were rampant. *See id*. And they worked tirelessly to coordinate resources for individuals released as well as those further detained by CBP or ICE, expelled, or forced back to Mexico: setting up a hotline to respond to hundreds of calls from Haitian asylum seekers, coordinating legal services, providing legal information and humanitarian aid, and organizing medical assistance. *See id*. ¶¶ 106, 263-65, 267-70. For example, Haitian Bridge helped a family whose newborn almost died due to Defendants' conduct. *Id*. ¶ 106. To respond to the emergency Defendants created, Haitian Bridge had to re-assign several staff members to Del Rio, ask staff to work over 80-100 hours per week for several weeks, and stall several core projects. *Id*. ¶ 268. These facts, and the many more set forth in the Complaint, establish organizational standing.

At bottom, Defendants fundamentally misconstrue the standard required to establish organizational standing, which Haitian Bridge has met. An organization may establish standing on its own behalf if Defendants' conduct "injured the [organization's] interest" and the organization "used its resources to counteract that harm." *Citizens for Resp. & Ethics in Wash.* ("*CREW*") *v. U.S. Office of Special Couns.*, 480 F. Supp. 3d 118, 127 (D.D.C. 2020) (quotations omitted). Here, Haitian Bridge pleads both. Haitian Bridge establishes Article III standing because Defendants' conduct has injured its legally protected interest in using its organizational resources to achieve its mission and because Haitian Bridge has used its resources to counteract that harm.

It is undisputed that organizations' interests in their own missions and resources are judicially cognizable. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.20 (1982). Thus, organizational plaintiffs have standing when they allege that defendants impaired their missions to serve clients and caused organizational resources to be diverted. *See O.A. v. Trump*, 404 F. Supp. 3d 109, 142-43 (D.C. Cir. 2019) (training and re-assigning staff to new project and forcing organization to raise more funds for its programs to support asylum-seekers sufficient for standing); *Nw. Immigr. Rights Project* ("*NWIRP*") *v. U.S.C.I.S.*, 496 F. Supp. 3d 31, 45-47 (D.D.C. 2020) (increased time spent to support asylum-seekers and diversion of staff from existing core programs meets threshold for standing); *Abigail All. for Better Access to Dev. Drugs v.*

*Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (increased time and resources to help clients comply with regulation meets standing requirements).

As detailed above, Plaintiffs sufficiently allege that Defendants' unlawful application of the Title 42 Process and Haitian Deterrence Policy to Haitian asylum-seekers in the CBP Encampment impaired Haitian Bridge's programming and daily operations and imposed new costs on the organization. Further, "staff members responding to the abuses in Del Rio, particularly Black staff members, have suffered and continue to suffer trauma from the brutal anti-Black racist treatment and injustice they witnessed in Del Rio." Compl. ¶ 268. Here, just as in *NWIRP*, Defendants' actions directly conflict with Haitian Bridge's organizational "mission of providing a broad array of legal services to . . . immigrants and will impose new burdens and costs on the organization." 496 F. Supp. 3d at 46. This conflict has resulted in a continued toll on Haitian Bridge, its staff, and its ability to advance its mission. Compl. ¶ 268. The events at the CBP Encampment and its aftermath have strained Haitian Bridge's capacity to provide legal support, humanitarian aid, and case management services. *Id.* ¶ 270.

As detailed in the Complaint, Defendants' conduct also caused Haitian Bridge to "divert scarce resources away from other important programs." *O.A.*, 404 F. Supp. 3d at 143 (quotations omitted). Haitian Bridge was forced to postpone many crucial programs, such as its Temporary Protected Status (TPS) casework and the creation of practice advisories for lawyers and law school clinics. *Id.* ¶ 269. Because of the events in Del Rio, Haitian Bridge was compelled to delay the filing of dozens of TPS applications, with serious adverse consequences for its ability to timely secure its clients' work authorization. *Id.* Haitian Bridge's response to events in Del Rio caused the delay of "[m]any of [the organization's] core projects," *id.* ¶ 268, and impaired HBA's ability to meet existing demands for its services, *id.* ¶ 269.

Contradicting the Complaint, Defendants erroneously assert that Haitian Bridge seeks standing on the basis of its activities as a plaintiff in this case. Mot. at 14. In fact, Haitian Bridge undertook significant and extraordinary expenditures that are not part of its core programming or normal budgeting to directly counteract Defendants' unlawful actions in Del Rio. Compl. ¶¶ 262-

70. These included sending staff members to Del Rio, diverting human resources and funding from existing casework, and creating a national hotline to coordinate efforts, none of which relate to its participation in this litigation.[10] *Id*. ¶¶ 106, 263-65, 267-69, 270. Defendants also misunderstand the definition of self-inflicted injures in incorrectly claiming that HBA lacks standing for that reason. *See* Mot. at 13. Defendants' unlawful implementation of Title 42 and the Haitian Deterrence Policy harmed Haitian Bridge by frustrating its *existing* mission and forcing it to divert its organizational resources when, as the only Haitian Creole-speaking organization working at the border, it became a "first responder" to the massive humanitarian crisis Defendants created. Compl. ¶ 265. Defendants ignore that an injury is not "self-inflicted . . . merely by having been made willfully or voluntarily." *CREW*, 480 F. Supp. 3d at 128 (quotations omitted). Rather, if the organization's expended resources are "beyond those normally carried out to advance [the organization's] mission" and are used "to counteract the effects of the defendant's challenged conduct, that diversion can suffice for Article III purposes." *Id*. (alteration and quotation omitted). That is precisely what happened here. Accordingly, Haitian Bridge has organizational standing.

### B.  Plaintiffs Adequately State Constitutional Claims

#### 1.  Plaintiffs' constitutional claims are not foreclosed by the recency of their entry to the United States

As a threshold matter, Defendants are wrong that Plaintiffs have no due process rights under the Fifth Amendment because they entered government custody shortly after crossing the border. *See* Mot. at 14. First, the legal fiction that noncitizens taken into government custody near the border have not effected an entry into the United States does not apply to substantive due process and equal protection claims and thus has no effect on Plaintiffs' First, Second, or Third Claims. Second, Plaintiffs' procedural due process claim (Claim Four) is not undermined, let alone

---

[10] Defendants cite *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995), where the court found that an organization's expended resources to educate its members on the regulation in question did not support standing. *Id*. at 1434. But here, Haitian Bridge's expenses are not "ordinary program costs." *Id*. Instead, Haitian Bridge's expended resources are directly in response to Defendant's unlawful actions and are beyond its core programming.

foreclosed, by this legal fiction because Plaintiffs do not challenge the constitutionality of the INA—they merely seek compliance with it.

> **a.** **Equal protection and substantive due process rights extend to all people on U.S. soil**

Defendants rely principally on *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), for their erroneous claim that Plaintiffs have no equal protection or substantive due process rights under the Constitution, but *Thuraissigiam* holds no such thing. *Thuraissigiam*, which concerned a challenge to the constitutionality of 8 U.S.C. § 1252(e)(2) (expedited removal), holds at most that the procedural due process rights of noncitizens seeking entry at the border through an application for admission are coextensive with the statutory processes provided by Congress. 140 S. Ct. at 1983 ("[T]he Due Process Clause provides nothing more" than what "Congress has provided by statute."); *id.* at 1964 ("Respondent . . . was apprehended just 25 yards from the border. He therefore has no entitlement to procedural rights *other than those afforded by statute*." (emphasis added)). The discussion in *Thuraissigiam* makes clear that its holding is limited to the context of immigrants challenging denial of admission on procedural due process grounds. *See, e.g.*, *id.* at 1982 (holding rests on the "fundamental proposition[]" that "the Constitution gives the political department of the government plenary authority . . . to set the procedures to be followed in determining whether [a noncitizen] should be admitted" (quotations omitted)); *id.* (limiting the reach of the entry fiction to "the purposes of this rule"). Defendants' reliance on *M.M.V. v. Garland*, 1 F.4th 1100 (D.C. Cir. 2021) is unavailing for the same reasons; *M.M.V.* merely affirms *Thuraissigiam*'s holding that arriving noncitizens subjected to expedited removal do not have procedural due process rights beyond those provided by statute. *See M.M.V.*, 1 F.4th at 1104.

The Supreme Court has repeatedly made clear that noncitizens on U.S. soil have due process rights under the Constitution. *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens"; its "provisions are universal in their application, to all persons within the territorial jurisdiction[.]"); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("[Noncitizens], even [noncitizens] whose presence in

this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); *see also Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987) ("The 'entry fiction' that excludable [noncitizens] are to be treated as if detained at the border despite their physical presence in the United States . . . does not limit the[ir] right . . . to humane treatment."). *Thuraissigiam* does not undermine—and indeed is irrelevant to—this promise. *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 63 (D.D.C. 2020) (*Thuraissigiam* did not bar claims of noncitizen petitioners seeking entry at the border as "they are seeking to enforce substantive due process rights based on what amounts to unconstitutional conditions of confinement during the removal process" rather than "procedural due process rights related to their asylum applications"); *see also D.J.C.V. v. United States*, 2022 WL 1912254, at *14 (S.D.N.Y. June 3, 2022) (holding post-*Thuraissigiam* that noncitizens apprehended at or near the border "assert[ed] a plausible claim of a violation of substantive due process" by government officials there). Because the legal fiction regarding entry is limited to the procedural due process context regarding applications for admission, Defendants' other case cites—addressing plaintiffs who were physically outside the United States challenging visa processes and decisions[11]—do not apply to limit the constitutional claims of the Plaintiffs here, who suffered abuse *on U.S. soil.*

> **b.      Plaintiffs' procedural due process claim is not foreclosed because Plaintiffs merely seek compliance with the process owed to them under the INA**

*Thuraissigiam* and *M.M.V.* are equally inapplicable to Plaintiffs' procedural due process claim. As set forth above, those cases only limit certain procedural due process claims by recently arriving noncitizens to rights provided by statute. *See Thuraissigiam*, 140 S. Ct. at 1983; *M.M.V.*, 1 F.4th at 1104. But Plaintiffs do not seek due process rights "regarding admission" beyond those "that Congress has provided by statute," *Thuraissigiam*, 140 S. Ct. at 1983, and thus these cases

---

[11] *See Gomez v. Trump*, 485 F. Supp. 3d 145, 188 (D.D.C. 2020) (regarding claims of noncitizens *in foreign countries*); *Legal Assistance for Vietnamese Asylum-seekers v. Dep't of State*, 104 F.3d 1349, 1354 (D.C. Cir. 1997) (same).

offer no relevant limitation here. Put otherwise, Mr. Thuraissigiam challenged the constitutional adequacy of the INA, whereas Plaintiffs merely seek compliance with it.[12] Because Plaintiffs have procedural due process rights at least coextensive with the process owed under the INA,[13] with which Plaintiffs seek compliance, *Thuraissigiam* and *M.M.V.* in no way undermine, let alone foreclose, Plaintiffs' procedural due process claim. In fact, *Thuraissigiam* and *M.M.V.* affirmed—while the CDC's Title 42 order was in effect—that a noncitizen at the border seeking entry has "the right to a determination whether he had a significant possibility of establishing eligibility for asylum," *Thuraissigiam*, 140 S. Ct. at 1983 (alterations and quotations omitted), and that "[noncitizens] subject to expedited removal may either claim a fear of persecution or seek to apply for asylum. . . . If [a noncitizen] does either, an asylum officer *must* interview the [noncitizen] and determine whether he has a 'credible fear of persecution,'" *M.M.V.*, 1 F.4th at 1104 (emphasis added) (citation omitted) (quoting 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(ii)).

### 2.   Plaintiffs adequately state an equal protection claim

Individual Plaintiffs endured egregious and conscience-shocking treatment at the hands of Defendants that violated constitutional and statutory requirements and diverged from Defendants' treatment of other similarly situated groups. Defendants' conduct was motivated at least in part by the fact that Plaintiffs are Black and Haitian. Rather than engage with Plaintiffs' ample factual allegations in support of their equal protection claim, Defendants misstate the applicable legal standard. There are two tests for equal protection violations, either of which is sufficient to state a claim. Defendants ignore the first legal standard altogether, then ignore Plaintiffs' allegations

---

[12] Indeed, Mr. Thuraissigiam *received* the legal process Plaintiffs seek in this case: he was given a credible fear interview by an asylum officer; had an opportunity to present his fear of return; the officer evaluated his individual claim; a supervising officer reviewed that determination; and he accessed *de novo* review before an immigration judge. *Thuraissigiam*, 140 S. Ct. at 1967-68.

[13] *See Thuraissigiam*, 140 S. Ct. at 1983; *see also Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (liberty interest created by statute protected by due process); *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at *20 (S.D. Cal. Sept. 2, 2021) (affirming post-*Thuraissigam* that procedural due process protections extend to noncitizens seeking entry, coextensive with statutory rights).

under the other. However, as explained in detail below, Plaintiffs state a claim under either standard.

### a.    Strict scrutiny applies to Defendants' conduct

When federal officials are motivated at least in part by discrimination on the basis of race or national origin, their actions violate the Fifth Amendment's equal protection component unless the government can prove the discrimination was necessary to achieve a compelling government interest. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (discrimination based on race and national origin subject to strict scrutiny); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (heightened scrutiny required where "a discriminatory purpose has been a motivating factor in the decision"). Defendants do not contest that strict scrutiny is the appropriate legal standard for Plaintiffs' racial discrimination allegations, nor could they. Instead, Defendants include a single citation for the premise that when it comes to immigration, *nationality* distinctions are subject only to rational basis review. Mot. at 23 n.8 (citing *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979)). But *Narenji* is inapposite; the court there did not address allegations that the government's action—promulgating a regulation that drew only nationality distinctions in the context of the Iranian hostage crisis—were racially motivated. *See* 617 F.2d at 746-48. In contrast, multiple courts have found that discrimination against Haitians in the immigration context is in fact discrimination motivated by race and subject to strict scrutiny.[14]

---

[14] *See, e.g.*, *N.A.A.C.P. v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 576 n.4 (D. Md. 2019) (applying strict scrutiny to adverse immigration policy that disproportionately affected Haitians; "[i]t is true that some courts have applied rational basis review to immigration classifications; however, this case does not concern an immigration classification decision. Rather, this case concerns a constitutional challenge to an alleged racially discriminatory decision by the government"); *Saget*, 345 F. Supp. 3d at 303 (anti-Haitian sentiments were evidence of racial animus; plaintiffs plausibly alleged equal protection claim); *cf. also Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 532 (S.D. Fla. 1980) ("The decision was made among high INS officials to expel Haitians, despite whatever claims to asylum individual Haitians might have. A Program was set up to accomplish this goal. . . . This Program, in its planning and executing, is offensive to every notion of constitutional due process and equal protection."), *aff'd as modified*, 676 F.2d 1023 (5th Cir. Unit B 1982).

In any event, because animus toward a marginalized group, such as Haitian and other Black migrants, is never a legitimate government interest, actions motivated by such animus fail even rational basis review. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (a "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").

> **b.** **Plaintiffs state an equal protection claim under *Arlington Heights***

Defendants incorrectly insist that any equal protection claim is "doom[ed]" absent "allegations identifying similarly situated noncitizens who were treated differently." Mot. at 23. This argument neglects that "[P]laintiffs may allege [either of] two types of equal protection violations: (1) that the plaintiff was subject to differential treatment *because of* membership in a protected class, such as one based on race; or (2) that the plaintiff was arbitrarily and intentionally treated differently from others who are similarly situated." *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 158 (D.D.C. 2014) (quotation omitted);[15] *see also N.A.A.C.P.*, 364 F. Supp. 3d at 577 ("Defendants contend that Plaintiffs' claim must fail . . . because they have not identified any similarly situated individuals who were treated differently. [But u]nder the analysis provided in *Arlington Heights*, no comparator evidence is needed." (citation omitted)); *Saget v. Trump*, 345 F. Supp. 3d 287, 301 (E.D.N.Y. 2018) ("Under *Arlington Heights* . . . Plaintiffs need not plead or show the disparate treatment of other similarly situated individuals[.]" (quotation omitted)).

Here, Plaintiffs adequately allege the first type of equal protection claim—but Defendants ignore that type of claim altogether, failing even to cite *Arlington Heights* in their Motion. Defendants have thus waived any argument that the Complaint fails to plead an equal protection

---

[15] Defendants misstate the holding of *Kingman Park*. The court did not "dismiss[] [the] claim." Mot. at 23. Although the court found that plaintiffs did not meet the similarly situated test, it still analyzed the case under the *Arlington Heights* test, holding in abeyance plaintiffs' equal protection claim to allow for additional discovery. *See Kingman Park*, 27 F. Supp. 3d at 159-61.

claim under the *Arlington Heights* standard.[16] Nor could Defendants successfully argue for such dismissal. *Arlington Heights* establishes that plaintiffs may state an equal protection claim by alleging that a "discriminatory purpose" was "a motivating factor" in the government's conduct and provides a non-exhaustive list of factors that can establish such a claim. 429 U.S. at 270.[17] Plaintiffs state a claim under this standard and these factors.

*First*, Individual Plaintiffs allege that the horrific, conscience-shocking conduct they endured at the hands of Defendants had a stark, disproportionate impact on Haitian and Black people. Compl. ¶¶ 60, 274. *Second*, the "historical background" demonstrates longstanding animus toward Haitians by the U.S. government, motivated at least in part by Haiti's historic character as the first nation of free Black people in the Western Hemisphere, *id.* ¶¶ 36-43, which has resulted in multiple U.S. immigration policies that single out Haitians for adverse treatment, *id.* ¶¶ 44-51. *Third*, the "specific sequence of events" leading up to the challenged decision supports a finding of discriminatory motive. *See id.* ¶¶ 60-67, 71, 158-59 (Defendants had significant advance notice that thousands of Haitians would arrive in the Del Rio Sector; that the Sector had insufficient resources to process arrivals; and that expulsions to Haiti carried a "strong risk" of violating non-refoulement obligations), 69-72, 122, 129, 132-49 (Defendants ignored warnings and blocked internal efforts to prepare a humanitarian response, deliberately held Haitians in unlivable conditions for days, then expelled thousands of Haitian asylum-seekers without any procedural protections within a matter of days using mass shackling, lying to people about where they were

---

[16] *See, e.g.*, *Am. Wildlands v. Kempthorne*, 2008 WL 2651091, at *8 (D.C. Cir. July 8, 2008) (arguments made for the first time on reply are waived); *McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) (same); *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) (same).

[17] These factors include "(1) whether the impact of the official action 'bears more heavily on one race than another'; (2) '[t]he historical background of the decision'; (3) '[t]he specific sequence of events leading up to the challenged decision,' including whether the defendant departed from the 'normal procedural sequence'; (4) '[s]ubstantive departures' from factors normally considered in reaching a decision; and (5) the administrative history of a decision.'" *Kingman Park*, 27 F. Supp. 3d at 160 (quoting *Arlington Heights*, 429 U.S. at 266-268). Especially relevant are "contemporary statements by members of the decision-making body." *Arlington Heights*, 429 U.S. at 268.

being taken, beating them, separating families, and keeping them in overcrowded cells without beds, basic hygiene products, food or water). *Fourth*, Defendants departed from "normal procedur[e]" for processing large groups of arriving noncitizens in numerous ways. *See id.* ¶¶ 61, 71, 135-46, 163-73, 177. *Fifth*, the "contemporary statements" of decision-makers evince animus toward Plaintiffs. *See id.* ¶¶ 62, 82-85, 128 (statements by high level decision-makers at DHS and the White House),[18] 116, 132 (racist statements by DHS officers to Haitians in the CBP Encampment and during expulsion process).

Ignoring the *Arlington Heights* factors entirely, and most of Plaintiffs' allegations, Defendants appear to assert (erroneously) that Plaintiffs are required to show discriminatory intent by decision-makers on a plaintiff-by-plaintiff basis, and cherry-pick a few allegations to suggest that the Complaint fails to do so. Mot. at 23-24. But *McCleskey v. Kemp*, 481 U.S. 279 (1987), which Defendants appear to rely on for this argument, does not support it. *McCleskey* held that evidence of disparate impact on a systemic level, using a single statistical study, was not sufficient in that case to state an equal protection claim without evidence that the decision-makers who enacted the death penalty policy at issue, or the decision-makers who applied the policy to McCleskey, were motivated by a discriminatory purpose. *See id.* at 292-93, 297-98. Here, in contrast, Plaintiffs plead that Defendants were motivated at least in part by race and/or national

---

[18] Senior DHS officials made statements in decision-making meetings that Haitian migrants in the CBP Encampment were more likely to be violent, that they were more difficult to deal with, and that they had committed criminal conduct—all without evidence. Compl. ¶¶ 62, 82-83, 128. In addition, senior DHS officials made repeated statements evincing a belief that Haitians in the CBP Encampment were uncivilized and like animals. *Id.* ¶ 85. A senior CBP official in the Del Rio Sector said that Haitian asylum-seekers would "tear through the walls" if put in detention, underscoring the need to swiftly and universally expel them. *Id.* ¶ 84. These statements, made by senior DHS and CBP officials at the time of, and often in connection with, decision-making regarding the application of the Haitian Deterrence Policy to Plaintiffs, are far from "ambiguous" as Defendants suggest. Mot. at 24. Rather, they are manifestations of longstanding, racist tropes that Black people are inherently dangerous, violent, and subhuman. To the extent these statements are ambiguous—a claim that defies credulity—that *still* weighs in favor of denying Defendants' Motion, as all reasonable inferences are to be drawn in favor of Plaintiffs. *See supra* Part III.

origin in developing the Haitian Deterrence Policy and applying it to Plaintiffs seeking asylum in Del Rio, and that Plaintiffs were subjected to numerous harms as a result.

### c.       Plaintiffs also state a claim under the similarly situated standard

Plaintiffs also state a claim under the second type of equal protection claim because they identify a similarly situated group—a large-scale arrival of non-Haitian asylum-seekers at the Anzalduas International Bridge—that received different and better treatment by Defendants. Compl. ¶ 169. This group was similarly situated because: (1) they were noncitizens seeking asylum at the border around the same time as Plaintiffs; (2) they were held under another international bridge in Texas; and (3) they were "severely overcrowded" lacking adequate resources like food. *Id.* But DHS mobilized to provide greater resources to those in Anzalduas, "including food, cots, benches, and water misters." *Id.* And rather than expelling people in Anzalduas as quickly as possible in shackles, Defendants "relocated individuals to other sites for processing to alleviate the humanitarian crisis near the port of entry." *Id.* Defendants completely ignore these alleged facts while inappropriately attempting to dispute the veracity of Plaintiffs' factual allegations. *See* Mot. at 22 n.7.[19] The Complaint identifies, and alleges specific facts regarding, at least one similarly situated group of noncitizens who received different and better treatment than Plaintiffs. As detailed above, Plaintiffs also allege that discriminatory motives drove this disparate treatment.[20]

---

[19] Defendants go on to imply that evidence of disparate racial treatment in expulsions is unreviewable because any decision regarding whether to expel or grant an exemption is a "discretionary" one. This is wrong for at least three reasons. First, Plaintiffs do not argue that non-Black migrants received exemptions at higher rates; they argue that Plaintiffs were denied access to the vulnerability and exemption screening process altogether. Second, as detailed *infra* Parts IV.B.5. & IV.C.1, Defendants' non-refoulement obligations and access to the asylum process are mandatory, not discretionary. Third, discretion does not confer permission to racially discriminate.

[20] Defendants rely on *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63 (D.D.C. 2005), to argue that Plaintiffs have not adequately alleged discriminatory intent, *see* Mot. at 24, but that case is inapposite. In *Fernandors*, the plaintiff did not allege *any* evidence of discriminatory intent; rather, "plaintiff's only evidence of racial animus is the fact that plaintiff is an African-American and plaintiff believes that he was searched and arrested because of his race." *Id.* at 70. Unlike

Moreover, Defendants cite no case that requires dismissal of Plaintiffs' claim under the similarly situated test. Unlike in *Kingman Park* and *Colindres v. U.S. Dep't of State*, Plaintiffs identify another group of noncitizens seeking entry who were treated differently. *Cf. Kingman Park*, 27 F. Supp. 3d 142, 159 (D.D.C. 2014); *Colindres v. U.S. Dep't of State*, 2021 WL 5906041, at \*9 (D.D.C. Dec. 14, 2021) (failing to identify plaintiff's membership in a protected class or another person who received better treatment). Nor are there "striking disparities" in the two groups that explain the difference in treatment. *Compare* Compl. ¶ 169, *with Women Prisoners of the D.C. Dep't of Corr. v. D.C.*, 93 F.3d 910, 925 (D.C. Cir. 1996) (vacating injunction requiring government to provide same variety of programming to women and men prisoners because "[e]ven if the women at the Annex had access to a third or half the number of work and religious programs as the men at Minimum, because of the six-to-one difference in their respective populations, on a per inmate basis, the women had access to two or three times the number of programs").[21]

The Complaint states an equal protection claim under either of the two applicable standards. Defendants' motion to dismiss Claim One should be denied.

### 3. Plaintiffs adequately state a substantive due process claim under the "shock the conscience" standard

The Fifth Amendment's guarantee of substantive due process provides "two strands" of protection: "[t]he first strand protects rights that are 'fundamental,' whereas the second 'protects against the exercise of governmental power that shocks the conscience.'" *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (quotations omitted) (collecting cases). Plaintiffs bring their claims under the "second strand," which applies

---

*Fernandors*, Plaintiffs have alleged numerous, specific facts that together "permit an inference of discriminatory motives." *Id.*; *see, e.g.*, Compl. ¶¶ 163-78.

[21] The court in *Women Prisoners* makes clear that similarly situated does not mean exactly the same, noting that an 800-bed facility is "arguably comparable in size" to a facility more than twice its size for purposes of the similarly situated test. *Women Prisoners*, 93 F.3d at 925.

to conduct "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Barnes v. D.C.*, 793 F. Supp. 2d 260, 275 n.11 (D.D.C. 2011) (quotations omitted).[22]

Defendants do not contest the adequacy of Plaintiffs' allegations that Defendants' conduct, as alleged in the Complaint, was sufficiently outrageous that "it may fairly be said to shock the contemporary conscience." *Id.* Instead, Defendants seek dismissal of this claim on the erroneous basis that "the Complaint does not allege a recognized fundamental liberty or property right or interest to which Individual Plaintiffs were entitled and deprived." Mot. at 15. Defendants incorrectly contend that the deprivation of a fundamental liberty or property interest is a requirement of the "shock the conscience" standard, *see id.*, while relying on inapposite cases that articulate the standard for identifying new fundamental rights, which requires "the utmost care whenever [the Court is] asked to break new ground in this field." *Washington v. Glucksberg*, 521 U.S. 702, 721-24 (1997); *see id.* (considering whether the Due Process Clause includes a "right to commit suicide with another's assistance"); *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (considering whether the Constitution mandates minimal workplace safety).[23]

Defendants' argument fails for two reasons. *First*, Defendants ignore that a complaint states a substantive due process claim if it alleges that defendants' "conduct *either* interferes with rights implicit in the concept of ordered liberty, *or* was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Barnes*, 793 F. Supp. 2d at 276-77 (emphases added); *see also Jacinto-Castanon*, 319 F. Supp. 3d at 499 (recognizing "two strands" of substantive due process protection). Defendants fail to challenge Plaintiffs' latter, independent

---

[22] As explained *supra* Part IV.B.1, the recency of Individual Plaintiffs' entry into the United States does not require dismissal of this claim.

[23] Defendants also rely heavily on an inapplicable case, *Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001). *See* Mot. at 15. *Butera* analyzed claims under the "State endangerment concept." But *Butera* is inapplicable to Plaintiffs' Claim Two because Plaintiffs do not advance a State endangerment claim and make no allegations of private or third-party violence. Even if they did, *Butera* is further inapposite because the purportedly relevant holdings concerned a claim for damages under Section 1983 and a defense of qualified immunity, neither of which are at issue here. 235 F.3d at 647.

basis entirely, and thus waive the argument that Plaintiffs fail to state a claim under this separate standard.[24]

*Second*, even if Plaintiffs were required to allege that Defendants' conduct violated Plaintiffs' fundamental rights, the Complaint does so: it alleges that the DHS Defendants egregiously and outrageously violated Plaintiffs' rights to bodily integrity, freedom from bodily restraint, and family integrity.

Plaintiffs' Complaint alleges that DHS Defendants physically and violently abused Plaintiffs in violation of their right to bodily integrity as well as their right to "freedom from bodily restraint," which "always has been recognized as the core of the liberty protected by the Due Process Clause." *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982); *see also Glucksberg*, 521 U.S. at 720 (Due Process Clause protects right to bodily integrity) (citing *Rochin v. California*, 342 U.S. 165 (1952)). The Complaint alleges that Haitian asylum-seekers were "victims of physical and verbal assaults by CBP personnel," Compl. ¶ 111; that CBP officers deliberately cut a rope set up to help migrants traverse a river without drowning *while* people were using it to cross the river, *id.* ¶ 118; that migrants were "hit and shoved back into the river by CBP personnel," *id.*, among numerous other instances of physical assault and abuse by government actors, *see, e.g.*, *id.* ¶¶ 61, 113-14, 135, 137, 139, 143-45; *supra* Part II.C. Again, this alleged conduct shocks the conscience, and Defendants do not (and could not) contend otherwise. *See, e.g.*, *Rochin*, 342 U.S. at 172-73 (1952) (tackling plaintiff and pumping stomach against his will shocked the conscience); *Norris v. D.C.*, 737 F.2d 1148, 1151 (D.C. Cir. 1984) (brutal beatings of prisoner shocked the conscience).

Plaintiffs also allege that the DHS Defendants committed violations of the Plaintiffs' fundamental rights to family integrity by separating family members, including parents and children. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) (recognizing the fundamental right of parents to make decisions concerning the care, custody, and control of their children). The Complaint details how multiple Plaintiffs were separated from their children, including Plaintiffs

---

[24] *See, e.g.*, *Kempthorne,* 2008 WL 2651091, at *8 (rejecting argument raised for the first time in a reply brief); *Jones*, 565 F. Supp. 2d at 81 (similar).

Michael and Veronique, Compl. ¶ 17, and Plaintiff Wilson, *id.* ¶ 18. *See also id.* ¶ 133 ("DHS personnel also separated some family units and prevented family members from contacting each other."). This forced separation and interference with the integrity of the family unit is a violation of these Plaintiffs' fundamental rights. *See Jacinto-Castanon*, 319 F. Supp. 3d at 501 (finding "no question that defendants have directly and substantially burdened plaintiffs' right to family integrity" by detaining mother and sons in separate facilities); *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994) ("The forced separation of parent from child, even for a short time, represents a serious impingement on [parental] rights."). As before, Defendants do not (and could not) contend that the alleged family separation fails to shock the conscience. Indeed, federal courts have explicitly recognized in the immigration context that the government's separation of parents and children for the purpose of deterring future immigration "shocks the conscience." *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018); *see also Jacinto-Castanon*, 319 F. Supp. 3d at 499-502 & n.4 (finding same policy to violate substantive due process because government action burdened the fundamental right to family integrity, and that the claim would also satisfy the "shock the conscience" standard).

Defendants' motion to dismiss Claim Two should be denied.

### 4. Plaintiffs adequately state a substantive due process claim under the "special relationship" standard

Plaintiffs sufficiently plead that DHS Defendants violated their substantive due process rights when they restrained Plaintiffs' liberty in the CBP Encampment while failing to provide for their safety and well-being. Critically, Defendants do not dispute the sufficiency of Plaintiffs' allegations that Defendants failed to meet Plaintiffs' basic needs for food, water, medical care, or shelter. Rather, Defendants' sole challenge specific to Claim Three is a baseless argument that Plaintiffs have not alleged custodial circumstances sufficient to establish a "special relationship." [25] Mot. at 18. Defendants thus stake their opposition to this claim on the flimsy observation that *some*

---

[25] As explained *supra* in Part IV.B.1, the recency of Individual Plaintiffs' entry into the United States does not require dismissal of this claim.

Plaintiffs, during *some* instances over two weeks, were able to risk crossing the Rio Grande into Mexico for *some* food or water. *See id*. Based on this observation, Defendants argue Plaintiffs were at liberty to meet their own basic needs and, therefore, Defendants had no duty to provide any food or water (let alone medical aid or shelter) to the thousands of people they processed and confined in the CBP Encampment. *See id.*

This disturbing argument is both factually and legally unsound. It ignores the numerous allegations establishing that most persons in the CBP Encampment could not leave, disregards the dangers and risks faced by those who did leave or attempt to leave, rests on an erroneous legal interpretation of the applicable standard, and relies on inapposite case law. Ultimately, the relevant question is—did Plaintiffs plead sufficient facts to show that Defendants restrained their liberty to an extent that impeded their ability to meet their own basic human needs? *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *see also Smith v. D.C.*, 413 F.3d 86, 94 (D.C. Cir. 2005) (same). The answer here is, unequivocally, yes.

*First*, while the facts in *DeShaney* are not analogous, that case articulates the standard applicable to the case at bar: "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action set by . . . the Due Process Clause." *DeShaney*, 489 U.S. at 200. Applying this standard, the Complaint establishes a custodial relationship. The Complaint alleges that as more Haitians arrived, "CBP personnel monitoring the encampment generally prevented Individual Plaintiffs and other migrants from leaving to provide for their own needs." Compl. ¶ 80. Plaintiff Jacques, for example, "never tried to leave to find food in Mexico . . . because he saw that personnel patrolling the encampment would not allow it." *Id.*; *see also id.* ¶ 93 ("CBP personnel often blocked individuals from leaving the encampment to obtain their own food and water in Ciudad Acuña."). Indeed, Defendants' assertion that Plaintiffs were free to get provisions in Mexico is erroneous and cruel in light of Plaintiffs' express allegations demonstrating the myriad ways in which Defendants both prevented individuals from freely getting life-saving supplies, and then confiscated such supplies that

individuals risked their lives to obtain. *See id.* ¶ 96 (alleging that "U.S. border officials . . . regularly patrolled the riverbank and physically tried to prevent asylum-seekers from crossing the river" and "frequently confiscated and deliberately disposed of the food that starving individuals had brought from Mexico."). In ignoring the well-pled facts establishing Defendants' restrictions on Plaintiffs' movement and ability to care for themselves, and focusing entirely on the few exceptions, Defendants distort the legal standard applicable to a Rule 12(b)(6) motion to dismiss—under which courts "must grant *plaintiff[s]* the benefit of all inferences that can be derived from the facts alleged." *Sparrow*, 216 F.3d at 1113 (emphasis added) (quotations omitted).

*Second*, in seeking to raise the bar for Plaintiffs higher than the jurisprudence permits, Defendants misinterpret the standard to establish a special relationship. *See* Mot. at 18. Contrary to Defendants' arguments, courts do not require total restraint to establish a special relationship or duty of care—instead assessing whether the government has imposed sufficient limitations on plaintiffs' freedom to protect or provide for themselves. *See Harvey v. D.C.*, 798 F.3d 1042, 1051 (D.C. Cir. 2015) (holding that some flexibility in movement does not equate to freedom from governmental restraints that would negate a special relationship); *Butera v. D.C.*, 235 F.3d 637, 651 (D.C. Cir. 2001) (recognizing that "something less than physical custody may suffice to present a substantive due process claim"). Thus, in *Smith*, a custodial relationship was established even though the plaintiff-in-interest "could come and go" from the "independent living" apartment he resided in as part of a D.C. program for "delinquent youth[]." 413 F.3d at 90-91, 94. The court reasoned that such "flexibility hardly amounts to freedom from state restraints," because the plaintiff-in-interest "risked punishment" for breaking certain of the government's rules. *Id*. at 94.

The allegations here likewise establish that the government restrained Plaintiffs' "freedom to act on [their] own behalf and held [them] subject to its control" to a degree sufficient to establish a special relationship. *Smith*, 413 F.3d at 94 (quotation omitted). Plaintiffs allege that federal officials (1) formally processed Plaintiffs and instructed them to remain in the CBP Encampment, including a CBP-established intake site, Compl. ¶¶ 73, 77; (2) implemented a color-coded and numbered ticketing system, *id*. ¶ 77; (3) issued express directions to wait in specific locations in

the CBP Encampment, *id*. ¶¶ 77-78; and (4) summoned Plaintiffs by their assigned numbers for transportation to other detention sites, *id*. ¶¶ 78, 122, 130-49. Plaintiffs further plead that their freedom of movement was significantly restricted and—for many—entirely cut off by the following factors, any one of which establishes custody: official patrols, including on foot, horseback, helicopters, motorcycles, and other vehicles, *id*. ¶¶ 78, 80, 96, 120; physical and verbal threats and abuse preventing or deterring escape, *id*. ¶¶ 61, 96, 115-16; affirmative conduct to prevent safe crossing of the river, *id*. ¶¶ 118-19; and other devastating risks for those who could or did attempt to depart, *id*. ¶¶ 94, 117-19. Finally, Plaintiffs plead that Defendants actively prevented third parties from intervening or accessing the CBP Encampment to provide aid to Plaintiffs. *Id*. ¶¶ 80, 121. Indeed, Defendants themselves acknowledge that Plaintiffs were "detained shortly after unlawful entry." Mot. at 16. Defendants' arguments seeking to rebut the special relationship they admit creating simply cannot be credited.

Any of these factors alone—and certainly their combination—supports the existence of a custodial relationship. *See Smith*, 413 F.3d at 94 (finding a custodial relationship based on state-imposed restraints, not complete restriction); *Harvey*, 798 F.3d at 1051 (finding a custodial relationship even though the victim experienced "least restrictive conditions" available to him); *see also Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990) (pleadings established a special relationship where "plaintiff alleges that the county had a policy of arbitrarily cutting off private sources of rescue without providing a meaningful alternative"); *Est. of Sinthasomphone v. City of Milwaukee*, 785 F. Supp. 1343, 1349 (E.D. Wis. 1992) (finding plaintiff adequately pled a special relationship because "officers actively prevented private citizens from helping" plaintiff).

Defendants' callous assertion that some unspecified fraction of Plaintiffs may have had the "choice" to occasionally risk life-threatening circumstances to obtain life-saving necessities in Mexico, Mot. at 18, does nothing to obviate a special relationship. This purported "choice" is legally irrelevant; a choice "only between a greater restraint and a lesser one" does not negate

custody. *Smith*, 413 F.3d at 94.[26] And, to the extent Defendants seek to argue that, for 15,000 people sweltering in the Texas sun over a two-week period, a few outside meals and water bottles carried across the river would be sufficient to meet basic needs—including, for example, those of infants and small children who require age-appropriate provisions, *see* Compl. ¶¶ 2, 61, 92—they at best raise a factual dispute that "must be resolved in favor of plaintiff" under the case's current posture. *Overseas Partners, Inc. v. PROGEN Musavirlik*, 15 F. Supp. 2d 47, 51 n.5 (D.D.C. 1998).

*Finally*, Defendants' cited cases are inapposite, as they address the government's duty to protect individuals from *private* violence, which is irrelevant here. *See DeShaney*, 489 U.S. at 201 ("[T]he harms [plaintiff] suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father[.]"); *Butera*, 235 F.3d 637 (addressing due process rights of individual murdered by third parties); *see also Harris v. D.C.*, 932 F.2d 10, 14 (D.C. Cir. 1991) (addressing distinct sovereign immunity question in case where state officers failed to medically intervene following individual's drug overdose in a nightclub). The Supreme Court has expressly distinguished between harm inflicted by third parties and harm inflicted by the government—and this is hardly a case in which "the State . . . played no part in the[] creation" of the dangers faced by Plaintiffs in the CBP Encampment. *DeShaney*, 489 U.S. at 201.

Defendants' motion to dismiss Claim Three should be denied.

### 5.     Plaintiffs adequately state a procedural due process claim

The Complaint states a procedural due process claim. Plaintiffs adequately allege a protected interest in their right to seek protection and non-refoulement relief—a right that is not undermined by any grant of authority in 42 U.S.C. § 265. The D.C. Circuit's recent decision in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)—a preliminary injunction decision

---

[26] To the extent Defendants argue that Plaintiffs initially arrived voluntarily, not only is that a factual dispute inappropriate for resolution here, but the jurisprudence is clear that a custodial relationship that was initially voluntary "may, over time, take on the character of an involuntary one." *Colbert v. D.C.*, 5 F. Supp. 3d 44, 58 (D.D.C. 2013) (quotation omitted).

which did not consider a constitutional due process claim but did strongly affirm the right to non-refoulement—does not hold otherwise.

Defendants' assertions notwithstanding, *see* Mot. at 19, the Complaint *does* explicitly identify protected interests underlying the Individual Plaintiffs' procedural due process claim: their right to apply for asylum, withholding of removal, and relief under the CAT, and to avoid removal to countries where they face danger, persecution, and death. Compl. ¶ 311. These rights are clearly established and well-defined. *See* 8 U.S.C. §§ 1158, 1231. "It is clearly established in this circuit that although '[t]here is no constitutional right to [asylum] itself . . . a [noncitizen] who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for [asylum]." *Gutierrez-Rogue v. I.N.S.*, 954 F.2d 769, 773 (D.C. Cir. 1992) (quotation omitted); *see also Las Americas Immigr. Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 38-39 (D.D.C. 2020) (recognizing protected interest in right to apply for asylum, withholding, and CAT protection).[27] Individual Plaintiffs are thus entitled under the Due Process Clause of the Fifth Amendment to a meaningful opportunity to establish their potential eligibility for asylum relief.[28]

No power delegated by 42 U.S.C. § 265 undermines Individual Plaintiffs' protected interest in accessing the U.S. asylum system and avoiding refoulement to a country where they will likely be persecuted or tortured.[29] *Contra* Mot. at 19-20. Section 265 makes no reference to Title 8—let

---

[27] Defendants rely on *Alshawy v. U.S. Citizenship & Immigration Services*, 2022 WL 970883 (D.D.C. Mar. 30, 2022), but *Alshawy* is inapposite—it merely concluded that "adult citizen children do not have a constitutionally protected liberty interest in bringing their noncitizen parents into the United States." *Id.* at *8.

[28] As explained *supra* Part IV.B.1, *Thuraissigiam* does not hold otherwise. Even if Plaintiffs' due process rights are limited to the procedural rights explicitly codified in the INA, *see* 8 U.S.C. §§ 1158, 1231, Plaintiffs claim Defendants violated these statutory rights. *See infra* Part IV.C.1.

[29] Defendants are wrong that any Plaintiffs forced back to Mexico by Defendants' conduct have no procedural due process claim. *See* Mot. at 20 n.5. Like Plaintiffs expelled to Haiti, Plaintiffs forced back to Mexico were deprived of their right to seek asylum. *See, e.g.*, Compl. ¶ 152 (describing how Esther and Emmanuel were never given a chance to express fear). Indeed, many individuals were compelled to return to Mexico as a direct result of Defendants' non-refoulement violations, as "many believed that being summarily expelled to Haiti posed an even graver threat" than return to Mexico. Compl. ¶ 150; *see also id.* ¶ 151 ("Because Samuel feared the family would be returned to Haiti, they took their children back to Mexico.").

alone the specific non-refoulement protections that are implemented through the statute's procedures, *see* 8 U.S.C. §§ 1158, 1231—and therefore should not be read to displace Title 8. As the Supreme Court has explained, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [courts are] not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both," and a "party seeking to suggest that two statutes cannot be harmonized . . . bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quotations omitted); *see also Huisha-Huisha*, 27 F.4th at 730 (similar).

Defendants correctly note that *granting* asylum is a matter of executive discretion, *see* Mot. at 20—but providing access to the asylum *process*, including all relevant forms of non-refoulement relief such as withholding of removal and CAT relief, is not. *See* Compl. ¶ 16 n.1; *supra* p.6 n.1. These forms of relief are accessible through a single process, beginning with Defendants' affirmative duty to screen noncitizens for fear of return, *see infra* Part IV.C.1, and continuing through a uniform application process, *see* U.S.C.I.S. Form I-589, Application for Asylum and For Withholding of Removal.[30] Even assuming that Section 265 provides separate statutory authority for Defendants to expel individuals such as Plaintiffs,[31] nothing in the statute suggests, let alone expresses a "clear and manifest" intention, *Epic Sys.*, 138 S. Ct. at 1624, that Title 42 displace Title 8, the international law obligations it enshrines, or procedural due process rights guaranteed by the Constitution. Notably, the Capio Memo establishes an exception to Title 42 processing for

---

[30] *Available at* https://www.uscis.gov/i-589 (last accessed July 15, 2022).

[31] Under Plaintiffs' Fifth Claim, which Defendants do not seek to dismiss, Plaintiffs maintain that 42 U.S.C. § 265 does not authorize Defendants to expel asylum-seekers from the United States. *See* Compl. ¶ 323. The quarantine power delegated by 42 U.S.C. § 265 refers to the power "to prohibit . . . the introduction of persons and property"; it does not delegate any authority to *remove* noncitizens already physically present in the United States and detained by Defendants in the CBP Encampment. While Defendants point out that the D.C. Circuit recently found otherwise, *see* Mot. at 25-26, the D.C. Circuit's decision explicitly disclaimed that "[n]o one should read our opinion to bind the District Court or future circuit panels," *Huisha-Huisha*, 27 F.4th at 733 (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits")).

individuals expressing an "affirmative, spontaneous" fear of torture. Compl. ¶ 57; Mot. at 27. While such affirmative expressions of fear are not required for individuals to access their non-refoulement rights, *see infra* Part IV.C.1, the Capio Memo evinces that Defendants have at least some recognition of the ongoing force of Title 8's codification of the CAT's protections.

Defendants acknowledge, as they must, that the D.C. Circuit's preliminary injunction ruling in *Huisha-Huisha* did not hold that Title 42 displaces Title 8. *See* Mot. at 20 ("[T]he D.C. Circuit did rule that noncitizens cannot be expelled to countries where they will likely be persecuted."). To the extent that the D.C. Circuit found that the CDC's August 2021 Order forecloses the "procedure that [noncitizens] use to apply for asylum," this conclusion was based on the court's analysis that the Order itself manifested a decision to deny asylum—an ultimately *discretionary* form of relief—to individuals covered by the Order, rendering the asylum application process "futile" under those circumstances. *Huisha-Huisha*, 27 F.4th at 731. Importantly, however, the D.C. Circuit left open whether the Title 42 Process violates the INA by allowing asylum-seekers to be expelled before they can apply for asylum—noting that "may be the closest question in this case" and advising the district court to address it on the merits. *Id.* at 730. Moreover, as the D.C. Circuit affirmed in the same decision, no discretion exists for determining eligibility for withholding of removal or CAT protection. *See id.* at 731-33 (concluding that the Executive may not expel noncitizens in violation of § 1231(b)(3)(A) or the CAT). As noted above, these forms of non-refoulement are assessed through the same "asylum process." In short, and as the government recognizes, *Huisha-Huisha* makes clear that Title 42 does not override withholding of removal and CAT protections. Further, the D.C. Circuit made clear that, when the district court reaches the merits and further facts are developed, it may find that asylum is also available. Consequently, at this early stage, this Court should not accept Defendants' invitation to dismiss the claim based on the right to apply for asylum, foreclosing the very development contemplated by the D.C. Circuit.

Contrary to Defendants' conclusory assertions, *see* Mot. at 20-21, Individual Plaintiffs adequately allege that their rights to the non-refoulement process under 8 U.S.C. §§ 1231(b)(3)

and 1231 were violated. The Complaint details how Defendants failed to screen Individual Plaintiffs for fear of persecution or torture or give them the opportunity to request asylum, Compl. ¶¶ 61, 71, 78, 126, 135, 147, 167, and further alleges that Defendants actively prevented Individual Plaintiffs from expressing fear (which would trigger further non-refoulement protections), *see id.* ¶ 153; *see also, e.g., id.* ¶¶ 136, 146 (describing how Wilson, Mirard, and Madeleine were never informed that they were being returned to Haiti), 228 (describing how Wilson was prevented from speaking with a U.S. official), 235 (describing how in Jacques's eventual interview with U.S. officials he was not allowed "to ask questions or say anything other than answer the officials' questions," which did not pertain to fear of return). The Complaint also details how the few Individual Plaintiffs who eventually managed to make affirmative statements of fear were categorically ignored. *See, e.g., id.* ¶¶ 142 (Michael told officer that sending him back to Haiti would be equivalent to a death sentence; the officer lied, telling him that he was being transferred to another detention facility rather than returned to Haiti), 236 (Jacques told officials on plane that he could not return to Haiti because he faced danger there). These violations support and establish Plaintiffs' procedural due process claim.

Defendants' motion to dismiss Claim Four should be denied.

### C.  Plaintiffs Adequately State APA Claims

Defendants do not challenge the sufficiency of Plaintiffs' Fifth and Sixth Claims for Relief alleging that the Title 42 Process violated the APA. Plaintiffs also sufficiently plead their Seventh and Eighth Claims under the APA.

### 1.     Plaintiffs adequately state a claim under section 706(1) of the APA

Under the APA, this Court has the authority to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). To successfully state a claim under § 706(1), plaintiffs must show that (1) the agency failed to take "discrete agency action," and (2) the agency was "required to take" such action. *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004). Here, Plaintiffs sufficiently allege that several discrete agency actions were unlawfully

withheld: (1) inspecting and referring noncitizens to the asylum process, which encompasses all relevant forms of non-refoulement relief, *see supra* p.6 n.1; (2) complying with withholding of removal and CAT procedures; and (3) complying with removal procedures under the INA.

Defendants limit their challenge to the second prong of the inquiry, arguing that the discrete agency actions Plaintiffs alleged were not legally required. Mot. at 25-27. Defendants are incorrect. An agency is required to take a discrete agency action where it is "compelled by law." *SUWA*, 542 U.S. at 65. Because each of the discrete agency actions that Plaintiffs identify is legally mandated under specific provisions of the INA, and Plaintiffs adequately allege that Defendants failed to take these actions, Plaintiffs state a claim under 5 U.S.C. § 706(1).

### a. Defendants' duties under the INA are not displaced by any public health authority granted in 42 U.S.C. § 265

Defendants CBP and Immigration and Customs Enforcement (ICE) are required by statute to inspect noncitizens arriving in the United States and to refer such individuals for further screening where they indicate "either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i)-(ii); 8 C.F.R. § 235.3(b)(4). Defendants' statutory authority to remove noncitizens derives exclusively from 8 U.S.C. §§ 1225(b)(1) and 1229(a).

Defendants argue that these statutory duties and limits under Title 8 are foreclosed by the CDC's August 2021 Order or eclipsed by Defendants' powers "pursuant to the public health authority granted in Section 265." Mot. at 25. However, as explained *supra* Part IV.B.5, 42 U.S.C. § 265 makes no reference to Title 8. Nor does it reference CBP or ICE's duties delegated under that statute. This omission is not surprising; as the D.C. Circuit has observed, it is the CDC—not any component agency of DHS—that administers Section 265. *See Huisha-Huisha*, 27 F.4th at 730 n.8. On the face of the statutes, there is thus no reason why DHS's responsibilities under Section 265 cannot be harmonized with their duties of inspection, withholding of removal, and removal under the INA.[32] *See id.* at 732 (a court "must" give effect to both statutes whenever it is

---

[32] Neither does 42 U.S.C. § 265 authorize Defendants to expel asylum-seekers from the United States. *See supra* Part IV.B.5.

possible to do so). Defendants offer no compelling arguments to the contrary and so fail to meet their "heavy burden" to show that Section 265 displaces those duties under 8 U.S.C. §§ 1225(a)(3), (b)(1), and 1229(a). *See Epic Sys.*, 138 S. Ct. at 1624.

Nor does the CDC's August 2021 Order make non-refoulement screening processes under Title 8 "not legally available." Mot. at 25; *see* 86 Fed. Reg. 42,828 (Aug. 5, 2021). The August 2021 Order, which is necessarily limited to the scope of powers delegated by § 265, notably makes no reference to 8 U.S.C. §§ 1225 or 1229, or to non-refoulement processes and protections more generally. It does, however, explicitly direct that the Order "does *not* apply to . . . [p]ersons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant . . . humanitarian . . . interests." 86 Fed. Reg. at 42,841. Fear of persecution or torture constitute significant humanitarian interests. The D.C. Circuit did not find otherwise in *Huisha-Huisha*. *Contra* Mot. at 25. Instead, the court's characterization of the Order as foreclosing "procedures that [noncitizens] use to apply for asylum" hinged on the discretionary nature of asylum, *Huisha-Huisha*, 27 F.4th at 731, not the mandatory nature of withholding and CAT determinations.[33] *See supra* Part IV.B.5.

### b. Defendants' duty to inspect includes affirmative screening for fear of persecution or torture

"[U]nder § 1231(b)(3)(A) and CAT, the Executive cannot expel [noncitizens] to countries where their life or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or political opinion or where they will likely face torture." *Huisha-Huisha*, 27 F.4th at 733 (quotations omitted). In challenging Claim Seven, Defendants do not contest that these non-refoulement responsibilities remain, notwithstanding § 265. Instead,

---

[33] The D.C. Circuit's analysis on this point also referenced § 1158, *see Huisha-Huisha*, 27 F.4th at 731, a completely different section of Title 8 at issue in Plaintiffs' Seventh Claim.

Defendants argue that there are no mandatory procedures for implementing these protections. Defendants are wrong.[34]

The non-refoulement protections enshrined in § 1231 and the § 1231 note specify a mandatory result: no return of individuals to a country where they are more likely than not to be tortured or killed. This mandatory result requires Defendants to take mandatory action, without which the non-refoulement obligation would be meaningless. Such action is taken in part through Defendants' INA-mandated inspection procedures. *See* 8 U.S.C. § 1225(a)(3) ("All [noncitizens] . . . who are applicants for admissions . . . *shall* be inspected by immigration officers." (emphasis added)). These inspection procedures include a non-discretionary duty to provide Individual Plaintiffs with an opportunity to express fear of persecution or torture. *See* 8 C.F.R. § 235.3(b). Defendants are required to ask, record, and verify an arriving noncitizen's response to four specific questions contained on Form I-867B designed to actively solicit information about fear of return. *See* 8 C.F.R. § 235.3(b)(2)(i) ("[T]he examining immigration officer *shall* record the [noncitizen's] response to the questions contained on Form I-867B" (emphasis added)). It is thus through this mandatory inspection process that noncitizens have the opportunity to "indicate[ either] an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i)-(ii); 8 C.F.R. § 235.3(b)(4). Because Defendants failed to perform these non-discretionary acts, Individual Plaintiffs—all of whom were seeking protection—were given no opportunity to request protection or to receive a credible fear screening. *See* Compl. ¶¶ 11, 61.

Far from undermining Plaintiffs' claim, the Complaint's references to the Capio Memo further evince Defendants' failure to take the discrete agency actions required of them. *See* Mot. at 26-27. The Capio Memo "provides no process for covered noncitizens to seek access to the U.S. asylum process." Compl. ¶ 57. To the extent the Capio Memo purports to shift the burden to

---

[34] To the extent Defendants purport to argue that the Capio Memo was sufficient to comply with any responsibilities under the CAT as codified in the § 1231 note, that argument is unavailing for the reasons set forth *supra* Part IV.B.5.

immigrants to make "affirmative" and "spontaneous" claims that they fear torture, *see* Mot. at 28, such requirements hardly uphold Defendants' duties. Instead, they are textually and practically inconsistent with Defendants' mandatory statutory and regulatory responsibilities, which place the responsibility for screening for fear of persecution or torture on Defendants.[35] Moreover, even if Defendants were right that the process laid out in the Capio Memo is sufficient (it is not), that is irrelevant here, as Plaintiffs adequately allege that Defendants failed to comply with that process, too. As set forth in detail, Defendants actively *prevented* Individual Plaintiffs from affirmatively communicating their fear or intent to seek asylum, and ignored them when they did manage to overcome Defendants' barriers to communication. *See supra* Part IV.B.5.

Defendants' argument that no Individual Plaintiffs expressed fear of torture is not only factually incorrect, as explained *supra* Part IV.B.5, but the lack of formal channels for Individual Plaintiffs to do so is further evidence that Defendants failed to uphold their non-discretionary duties to screen for fear of return. *See* Mot. at 20-21, 25, 27. As described above, Defendants had an affirmative, non-discretionary obligation to follow inspection procedures, which included providing Individual Plaintiffs an opportunity to express fear. That Individual Plaintiffs did not have that opportunity establishes that Defendants unlawfully withheld discrete, non-discretionary agency actions. *See SUWA*, 542 U.S. at 65.

Defendants' motion to dismiss Claim Seven should be denied.

### 2.   Plaintiffs adequately state a claim under section 706(2) of the APA regarding the Haitian Deterrence Policy

Section 706(2) of the APA authorizes a court to "hold unlawful and set aside agency action" where the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.

---

[35] That the statute and regulations place the responsibility on Defendants to formally conduct this screening recognizes that Defendants are best placed to do so. Logic confirms this choice: immigrants are likely to lack knowledge of the U.S. legal system and English language proficiency.

§ 706(2). Defendants seek to dismiss Plaintiffs' Eighth claim, arguing that the Haitian Deterrence Policy is not reviewable as final agency action as required by APA section 706(2). Mot. at 38-41. Defendants further assert that no APA claim can be stated where a policy was planned at the White House level. Mot. at 39. Defendants are wrong on both counts. The Haitian Deterrence Policy is a final agency action that appropriately forms the predicate for an APA claim.

### a.     The Haitian Deterrence Policy qualifies as "agency action"

5 U.S.C. § 551(13) defines "agency action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." However, "[t]his list is expansive [as i]t is 'meant to cover comprehensively every manner in which an agency may exercise its power.'" *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001)). Indeed, "the term 'agency action' undoubtedly has a broad sweep." *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004). Here, the Haitian Deterrence Policy is an "agency action" in one of at least three independent ways: (1) it is a "rule" as defined by the APA; (2) it is a "sanction"; or (3) it is an "Order," a "denial" of "relief," or a "failure to act."

*First*, the Haitian Deterrence Policy is a "rule." The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). Plaintiffs' allegations as to the Haitian Deterrence Policy sufficiently allege the existence of a "rule." The Complaint—based on Plaintiffs' current knowledge of the underlying facts—describes with particularity how the DHS Defendants ultimately adopted and then implemented the Haitian Deterrence Policy. Compl. ¶¶ 59-62. Defendants' mischaracterization and improper narrowing of the allegations notwithstanding, *see* Mot. at 40, the Haitian Deterrence Policy is alleged to be a policy that is distinct from the Title 42 process. Although the Complaint does contain allegations that the Haitian Deterrence Policy was utilized in a way that led to the application of the Title 42 process in a

discriminatory manner, Compl. ¶¶ 8, 62, the overarching allegations make clear that the Haitian Deterrence Policy is a distinct policy that the DHS Defendants implemented. Plaintiffs' allegations are thus sufficient to show that the Haitian Deterrence Policy is an agency action in the form of a "rule" under the plain terms of the APA.

*Second*, even if the Haitian Deterrence Policy were not a rule, it qualifies as a "sanction." 5 U.S.C. § 551(13). The APA defines a "sanction" to include "the whole or a part of an agency . . . prohibition, requirement, limitation, or other condition affecting the freedom of a person; . . . withholding of relief; . . . imposition of penalty or fine; . . . destruction, taking, seizure, or withholding of property." *Id.* § 551(10). The Complaint is replete with allegations describing how the Haitian Deterrence Policy adversely affects the freedom and relief afforded to Haitian immigrants. Compl. ¶¶ 62-121. For example, pursuant to the Haitian Deterrence Policy, Individual Plaintiffs were confined in the CBP Encampment; deprived of basic needs including water, food, medical care and shelter; subjected to abuse, family separation, and shackling; and denied their ability to seek asylum based on their race and/or national origin. *See supra* Part II.A, C. Such allegations sufficiently show that the Haitian Deterrence Policy is a "sanction" and thus agency action under the APA.

*Third*, the Haitian Deterrence Policy can, if not a rule or sanction, alternatively be viewed as an "order," a "denial" of "relief," or a "failure to act" to allow Individual Plaintiffs to seek the legal protections to which they are entitled—all of which are "agency actions" under 5 U.S.C. § 551(13). *See SUWA*, 542 U.S. at 62 (broadly defining "order" as "a final disposition . . . in a matter other than rule making" (quotation omitted)).

### b.    The Haitian Deterrence Policy is "final" agency action

Defendants' argument that the action is not "final" is also without merit. The Haitian Deterrence Policy is the specific, ultimate means adopted and implemented by the DHS Defendants to achieve the deterrence of Haitian immigrants from coming to the United States by

subjecting them to inhumane conditions and to quick expulsions from the United States while denying them the rights and processes afforded to them under law.

To be "final," an action must "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotations omitted); *see also Ass'n of Admin. L. Judges v. U.S. Off. of Pers. Mgmt.*, 640 F. Supp. 2d 66, 72 (D.D.C. 2009) (to be "final," the agency action "must not be of a merely tentative or interlocutory nature" (quoting *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 246 (D.C. Cir. 2003)). Using this two-prong test, courts evaluate "the 'finality' element in a pragmatic way," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), with the goal of not "meddl[ing] in [an] agency's ongoing deliberations," *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 578 (9th Cir. 2019).

Plaintiffs satisfy the first prong of the test. As pled, the Haitian Deterrence Policy is not in flux or interlocutory; the decision-making is complete. Plaintiffs are not challenging activity that is conducted "in anticipation of an agency action" such as "prepar[ing] proposals, conduct[ing] studies, [or] meet[ing] with members of Congress and interested groups," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006), but rather challenge completed decision-making and corresponding action. Indeed, multiple agencies undertook actions that were perpetrated against Plaintiffs and the proposed class members in furtherance of the Haitian Deterrence Policy, who all suffered harm as a result. And, courts have found that that the implementation of a policy that denied rights to certain immigrants "mark[s] the 'consummation' of an agency's decisionmaking process." *Lucas R. v. Azar*, 2018 WL 7200716, at *8 (C.D. Cal. Dec. 27, 2018).

Plaintiffs also satisfy the second prong of the finality test. The Haitian Deterrence Policy, which aims in part to deny Haitian immigrants' statutory and procedural rights, is undoubtedly a decision from which "legal consequences flow," *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612 n.7 (S.D.N.Y. 2018); indeed, Plaintiffs suffered those intended consequences during the application of the Haitian Deterrence Policy in the Del Rio Sector. As alleged in the Complaint, and discussed

above, Plaintiffs were subjected to inhumane conditions and hastily expelled from the United States without statutory rights or due process afforded to them. These forced removals have had a significant and concrete impact on the Plaintiffs, including in some instances sending them back to the unsafe and dangerous conditions from which they initially fled. These consequences clearly satisfy the second prong for determining finality.[36] *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (second prong of finality is based on the action's "concrete consequences"); *see also L.V.M.*, 318 F. Supp. 3d at 612 (finding final agency action where challenged conduct caused a delay in the process by which U.S. Department of Health and Human Services, Office of Refugee Resettlement released unaccompanied children). The Haitian Deterrence Policy thus constitutes a "final" agency action under the APA.

### c.   The Haitian Deterrence Policy is subject to APA review notwithstanding the White House's involvement in devising it

Finally, the Haitian Deterrence Policy is subject to review under the APA. Defendants observe that, as alleged, the Haitian Deterrence Policy was devised at the White House level, and that actions of the Executive Office of the President are not subject to APA review. Mot. at 28 (citing Compl. ¶¶ 23, 61, 62; *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992)). While both observations are true, dismissal on these grounds does not follow. As Defendants recognize, Claim "Eight is alleged against DHS Defendants only." *Id.* The case law is clear that a directive from the White House that is later adopted and implemented by an agency may still appropriately form the basis for a claim under section 706(2) against the adopting and implementing agency or agencies (here, the agencies represented by the DHS Defendants). *See Whitman*, 531 U.S. at 479 (finding agency action reviewable where agency adopted rule in conjunction with White House directive). To hold otherwise would senselessly shield agencies from administrative review merely because some plan, policy, or directive was initially devised by the White House.

Defendants' motion to dismiss Claim Eight should be denied.

---

[36] To the extent Defendants dispute the existence of the Haitian Deterrence Policy, that factual dispute is not permitted at this stage, and Plaintiffs' allegations must be accepted as true.

### D. President Biden Is a Proper Defendant

The Supreme Court has explained that "the doctrine of separation of powers . . . can[not] sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Clinton v. Jones*, 520 U.S. 681, 704 (1997) (quotations omitted). The D.C. Circuit has similarly recognized that if "the President himself" violates the law, then at least in some circumstances "the court's order must run directly to the President." *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973). Accordingly, courts in the D.C. Circuit and beyond have, in appropriate cases, issued declarations and injunctions running against the President. *See Nat'l Treasury Employees Union ("NTEU") v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (issuing declaratory judgment against the President); *Saget v. Trump*, 375 F. Supp. 3d 280, 334-35 (E.D.N.Y. 2019) (issuing preliminary injunction against the President).

Ignoring this authority, Defendants make the absolutist assertion that courts "may not order[] injunctive or declaratory relief directly against the President for his official conduct," Mot. at 30, and seek dismissal of all claims against President Biden on that basis, *id*. at 30-34. In other words, Defendants posit that, upon finding that Plaintiffs plead plausible constitutional and statutory violations based in part on the invidious "series of decisions and policies" developed by the White House that were "designed to suppress the growing number of Haitians arriving at the border and to deter Haitians from seeking asylum," Compl. ¶ 60, the Court should then dismiss President Biden from the suit. Defendants' request is illogical and unsupported.

Defendants in making this argument rely primarily on three cases: *Franklin v. Massachusetts*, 505 U.S. 788 (1992); *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996); and *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). *See* Mot. at 30-34. But these decisions do not "expressly h[o]ld" that courts may "*never* enjoin the President with regard to his official behavior." Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for Control of Presidential Information*, 90 Geo. L.J. 737, 758 (2002). To the contrary, the *Franklin* and *Swan* decisions both "leave[] open the possibility that an injunction against the President might be appropriate where a ministerial duty is at issue or as a last resort in situations where relief is not

available against any other executive official." *McCray v. Biden*, 2021 WL 5823801, at *6-7 (D.D.C. Dec. 7, 2021). And, "*Newdow*'s passing observations concerning the judicial power to enjoin the President were made in dicta, since the President was not a defendant in that case." *McCray*, 2021 WL 5823801 at *7. Directly contradicting Defendants' argument, courts have in fact issued injunctive or declaratory relief against the President in cases that concern the official duties of that Office. *See NTEU*, 492 F.2d at 616; *Saget*, 375 F. Supp. 3d at 334-35.

Critically, moreover, "none of the authority cited by Defendants requires that the President be dismissed at this early stage" of the case. *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 329 (D. Md. 2018) (discussing similar reliance by the government on *Franklin* and *Swan*). Indeed, numerous "district courts, when faced with this delicate question at the motion to dismiss stage, have declined the government's invitation to dismiss the President as a party." *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 516 (D. Md. 2019) (collecting cases).[37] That is the correct disposition here. While Plaintiffs *might* ultimately receive complete relief through injunctions or declarations against subordinate officials alone, the Court should not address that issue now, as the "record in this case has not been fully developed regarding 'what relief would be appropriate if Plaintiffs prevailed on their claim[s] or whether an injunction against lower officials or declaratory relief would be sufficient.'" *Saget*, 345 F. Supp. 3d at 297 (quoting *Centro Presente*, 332 F. Supp. 3d at 419). Equally, the question of whether the relief ultimately afforded Plaintiffs rises above the level of ministerial duties is best addressed when the Court undertakes to fashion such relief. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 335 (determining that "enjoining the President and other executive officials from violating [8 U.S.C. § 1254a, the Temporary Protected Status] statute is akin to performing a ministerial duty and ensuring executive officials follow the laws enacted

[37] *See, e.g.*, *Stone v. Trump*, 400 F. Supp. 3d 317, 359-60 (D. Md. Aug. 2019) (declining to dismiss President from suit on a motion to dismiss); *D.C. v. Trump*, 291 F. Supp. 3d 725, 751-52 (D. Md. 2018) (same), *rev'd on other grounds*, *In re Trump*, 928 F.3d 360 (4th Cir. 2019); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 418-19 (D. Mass. 2018) (finding it "premature" to decide this question on a motion to dismiss); *CASA de Maryland*, 355 F. Supp. 3d at 329 (denying motion to dismiss; even if "relief against the President is extraordinarily unlikely" dismissal "at this early stage" would be "premature"); *Saget*, 345 F. Supp. 3d at 297 (similar).

by the Congress"); *Al Otro Lado*, 2021 WL 3931890, at *14 ("[T]he duties to inspect and refer [arriving asylum applicants] contained in [8 U.S.C.] § 1158(a)(1) and § 1225 are mandatory ministerial duties.").

Defendants' motion to dismiss all claims against President Biden should be denied.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

DATED: July 15, 2022

Respectfully submitted,

/s/ Lauren M. Wilfong

**Stephen Manning** (OR0024)
stephen@innovationlawlab.org
**Tess Hellgren** (OR0023)
tess@innovationlawlab.org
**Trillium Chang** (NY0483)
trillium@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

**Lauren M. Wilfong** (NJ0014)*
lauren.wilfong@justiceactioncenter.org
**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
**Jane Bentrott** (DC Bar No. 1029681)
jane.bentrott@justiceactioncenter.org
**Karen C. Tumlin** (CA00129)
karen.tumlin@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7276
*Not admitted to practice law in California*

**Nicole Phillips** (*pro hac vice* forthcoming)
nphillips@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4265 Fairmount Avenue, Suite 280
San Diego, CA 92105
Telephone: +1 949 603-5751

**Stanley Young** (CA00146)
syoung@cov.com
**Matthew E. Delgado** (CA Bar No. 306999) (*pro hac vice* forthcoming)
mdelgado@cov.com
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: +1 650 632-4704

**Alexander L. Schultz** (DC Bar No. 1618410)
aschultz@cov.com
COVINGTON & BURLING, LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: +1 424 332-4788