# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAITIAN BRIDGE ALLIANCE *et al.*,

    Plaintiffs,

v.

JOSEPH R. BIDEN *et al.*,

      Defendants,

Case No. 1:21-cv-03317-JMC

**BRIEF OF THE DISTRICT OF COLUMBIA AND THE STATES OF ILLINOIS, CONNECTICUT, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI STATES .....................................1

SUMMARY OF ARGUMENT ..................................................................................2

ARGUMENT .............................................................................................................3

    I.    Haitian Migrants Must Be Given An Opportunity To Demonstrate Their Fears Of Persecution Or Torture...........................3

        A.    The U.S. government cannot expel non-citizens to a country where they might face persecution or torture.........................................3

        B.    Haiti's widespread gang violence underscores the critical importance of the United States' non-refoulement obligations ...........6

    II.    Haitian Migrants Offer Substantial Contributions To Amici States, And Summarily Expelling Them Needlessly Deprives Amici States Of Those Benefits ...........................................................7

        A.    Immigrants, including Haitian immigrants, boost states' economies and communities .................................................................8

        B.    The federal government should not further traumatize Haitian asylum seekers, many of whom may settle in Amici States' communities ......................................................................................11

CONCLUSION ........................................................................................................14

# TABLE OF AUTHORITIES

## *Cases*

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ...............................3, 5

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ......................................................3, 4

*Knezevic v. Ashcroft*, 367 F.3d 1206 (9th Cir. 2014) ................................................6

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................6

*Omar v. McHugh*, 646 F.3d 13 (D.C. Cir. 2011)........................................................4

*Sowe v. Mukasey*, 538 F.3d 1281 (9th Cir. 2008).......................................................6

*Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941 (1982)................................11

## *Statutes and International Agreements*

8 U.S.C. § 1101 ...........................................................................................................6

8 U.S.C. § 1158 ...........................................................................................................4

8 U.S.C. § 1231 ........................................................................................................4, 5

42 U.S.C. § 265 ...........................................................................................................5

Act of Oct. 21, 1998, Pub. L. No. 105-277, 112 Stat. 2681 ......................................4

Convention Against Torture and Other Cruel, Inhuman or Degrading
    Treatment or Punishment, art.3, 108 Stat. 382, 1465 U.N.T.S. 85 ......................4

Protocol Relating to the Status of Refugees, January 31, 1967,
    19 U.S.T. 6223, 606 U.N.T.S. 267 .......................................................................3

United Nations Convention Relating to the Status of Refugees, art. 33,
    July 28, 1951, 189 U.N.T.S. 150 ..........................................................................3

## Regulations

136 Cong. Rec. 36198 (1990) ......................................................................4

8 C.F.R. § 208.16 (2022) ...........................................................................4

28 C.F.R. § 200.1 (2022) ...........................................................................4

## Government Authorities

Ryan Baugh, U.S. Dep't of Homeland Sec., Off. of Immigr. Stats., *Fiscal Year 2020 Refugees and Asylees Annual Flow Report* (Mar. 8, 2022) ........................8

U.N. High Comm'r for Refugees, *The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum*, No. 30 (XXXIV), U.N. Doc. A/38/12/Add.1 (Oct. 20, 1983, rev. 2009) ....................................................5

U.S. Census, *People Reporting Ancestry* ................................................................8

U.S. Census, *Selected Population Profile in the United States: Haiti* .....................7

U.S. Dep't of Homeland Sec., Off.  of Immigr. Stats., *2020 Yearbook of Immigration Statistics* (Apr. 2022) .......................................................................8

U.S. Dep't of Homeland Sec., Off. of Prof. Responsibility, *Report of Investigation – Incident Near Del Rio, TX Port of Entry* (Apr. 2022). ...............1

U.S. Dep't of Veterans Affs., *Effects of PTSD* .........................................................12

U.S. State Dep't, *Haiti 2021 Human Rights Report* ...................................................6

*Journal and Newspaper Articles*

Sean D. Cleary et al., *Immigrant Trauma and Mental Health Outcomes Among Latino Youth*, 20 J. Immigr. & Minority Health 1053 (2018)................12

Patricia L. East et al., *The Impact of Refugee Mothers' Trauma, Posttraumatic Stress, and Depression on Their Children's Adjustment*, 20 J. Immigr. & Minority Health 271 (2018) ...............................................................12

Dany Fanfan et al., *Stress and Depression in the Context of Migration Among Haitians in the United States*, 28 Health & Soc. Care Cmty. 1795 (2020)........13

Amelie A. Hecht et al., *Using a Trauma-Informed Policy Approach to Create a Resilient Urban Food System*, 21 Pub. Health Nutrition 1961 (2018)............12

Zainab Iqbal, *Flatbush Is Finally Designated As "Little Haiti" Business and Cultural District*, Bklyner (July 3, 2018) ...........................................................10

Miriam Jordan, *Thousands of Haitians Are Being Allowed Into the U.S. But What Comes Next?*, N.Y. Times (Sept. 30, 2021) ........................................ 9, 10

Julie M. Linton et al., *Unaccompanied Children Seeking Safe Haven: Providing Care and Supporting Well-Being of a Vulnerable Population*, 92 Children & Youth Servs. Rev. 122 (2018) ....................................................12

Jared McCallister, *CARIBBEAT: Zanmi Forges Friendships and Wins Patrons with Haitian Cuisine*, N.Y. Daily News (June 18, 2022) ....................10

Krista M. Perreira & India Ornelas, *Painful Passages: Traumatic Experiences and Post-Traumatic Stress Among Latino Adolescents and Their Primary Caregivers*, 47 Int'l Migration Rev. 976 (2013) ................................................12

Anna Quinn, *Haitian Culture Celebration Brings Parade, Street Fair to Brooklyn*, Patch (May 12, 2022).........................................................................10

Brett Sokol, *Miami's Art World Sets Sights on Little Haiti Neighborhood*, N.Y. Times (Nov. 23, 2015) ...............................................................................10

*Other Authorities*

Am. Immigr. Council, *Immigrants in the United States* (Sept. 21, 2021)................9

Ctr. for Substance Abuse Treatment, Substance Abuse & Mental Health
    Servs. Admin., *Understanding the Impact of Trauma*, *in* Trauma-Informed
    Care in Behavioral Health Services, Treatment Improvement Protocol
    Series, No. 57 (2014) ...........................................................................................12

D.C. Dep't of Behav. Health, *Emergency Psychiatric Services* .............................11

D.C. Dep't of Human Servs., *Refugee Assistance* ...................................................11

Greater Mia. Convention & Visitors Bureau, *Little Haiti* .......................................10

Ill. Dep't of Human Servs., *Refugee & Immigrant Services* ...................................11

N.Y. Off. of Temp. & Disability Assistance,
    *Refugee Services (RS) Programs* ........................................................................11

Kira Olsen-Medina & Jeanne Batalova, *Haitian Immigrants in the United
    States*, Migration Pol'y Inst. (Aug. 12, 2020) ............................................. 9, 10

Substance Abuse & Mental Health Servs. Admin., *Trauma and Violence* .............12

UNICEF, *Migration Profiles: Haiti*..........................................................................7

Caitlyn Yates, *Haitian Migration Through the Americas: A Decade in the
    Making*, Migration Pol'y Inst. (Sept. 30, 2021)..................................................13

**INTRODUCTION AND INTEREST OF AMICI STATES**

The District of Columbia and the States of Illinois, Connecticut, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington ("Amici States") file this brief as amici curiae in support of plaintiffs.  Amici States, who together are home to a large proportion of this country's successful asylum grantees, have an interest in ensuring that individuals fleeing persecution are treated humanely and have access to humanitarian protections.  Such protections are crucial—not only to the vulnerable populations involved, but also to maintaining the substantial contributions these individuals make to Amici States' communities.

Amici States are thus deeply concerned about the allegations regarding the federal government's treatment of Haitian migrants at the border.  Images of mounted U.S. Customs and Border Protection agents forcibly attempting to prevent migrants from crossing the Rio Grande River have been widely circulated, and the agency's Office of Professional Responsibility ("OPR") recently acknowledged that the agents engaged in the "unnecessary use of force against migrants who were attempting to reenter the United States with food."  U.S. Dep't of Homeland Sec., Off. of Prof. Responsibility, *Report of Investigation – Incident Near Del Rio, TX Port of Entry* 5 (Apr. 2022), https://bit.ly/3uFzBga.

Given the government's admissions—and taking the complaint's allegations as true, as a court must at this stage—Amici States ask that plaintiffs be given the opportunity to advance their claims. Migrants from Haiti must have the chance to demonstrate their fears of persecution or torture before being expelled or refouled to another country, as required by law. *See* Pls.' Opp'n 33-34.

## SUMMARY OF ARGUMENT

The United States has an obligation to protect those fleeing persecution in their homelands. As part of that obligation, the government cannot expel someone to a country where they are likely to face persecution or torture. Assessing that likelihood typically involves an individualized, fact-based inquiry. But as the complaint alleges, the federal government summarily deprived thousands of Haitian migrants of that individualized inquiry when it expelled them en masse under its Title 42 public health authority. In doing so, the federal government deprives Amici States of the valuable contributions that immigrants make to our communities. Moreover, by subjecting individuals with strong asylum claims to additional harm, including physical and verbal abuse, the government makes it more difficult for Amici States to provide for these individuals' health, education, and well-being if and when they ultimately settle in our communities.

# ARGUMENT

## I.    Haitian Migrants Must Be Given An Opportunity To Demonstrate Their Fears Of Persecution Or Torture.

Well-established precedents prohibit the mass removal of Haitian migrants under Title 42 "to places where they will be persecuted or tortured." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 722 (D.C. Cir. 2022).  Conditions in Haiti arguably meet such criteria, and Haitian migrants should thus have an individualized opportunity to demonstrate a fear of persecution or torture before being returned to their home country or sent elsewhere.

### A.    The U.S. government cannot expel non-citizens to a country where they might face persecution or torture.

The duty of non-refoulement prohibits a nation from expelling or returning an individual to a country where they have a well-founded fear of persecution or serious harm.  *See* United Nations Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150 ("1951 Convention").  The United States has committed itself to this international principle several times.  For example, in 1980, Congress expressly amended the Immigration and Nationality Act ("INA") to "bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987) (citation omitted), which prohibits states from "expel[ling] or return[ing]" a refugee to a place where his life or freedom would be threatened.  1951 Convention, art. 33; *see* Protocol Relating to the Status of Refugees, January 31, 1967, 19 U.S.T.

6223, 606 U.N.T.S. 267.  In 1990, Congress ratified Article 3 of the Convention Against Torture, which similarly prohibits refoulement if there are "substantial grounds for believing that [a person] would be in danger of being subjected to torture."  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art.3, 108 Stat. 382, 1465 U.N.T.S. 85; *see* 136 Cong. Rec. 36198 (1990).  And in 1998, Congress incorporated Article 3 into domestic law, declaring it "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."  Act of Oct. 21, 1998, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 2681-822 (codified at 8 U.S.C. § 1231 note); *see Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011); 8 C.F.R. § 208.16(c) (2022); 28 C.F.R. § 200.1 (2022).

Today, the INA prohibits the United States from removing an individual to a country where her "life or freedom would be threatened" because of her "membership in a particular social group," a form of relief called withholding of removal.  8 U.S.C. § 1231(b)(3)(A); *see Cardoza-Fonseca*, 480 U.S. at 423, 444 (explaining that such relief is mandatory).  Congress also entitles immigrants—even those who enter the country illegally—to apply for asylum before they are expelled if they have a "well-founded fear of persecution."  8 U.S.C. § 1158(a)(1); *see* Pls.' Opp'n 31-32.

Vindicating these rights—and the international principle of non-refoulement underlying them—requires a meaningful, individualized assessment of the facts and circumstances of each asylum-seeker's case. *See* U.N. High Comm'r for Refugees, *The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum*, No. 30 (XXXIV), U.N. Doc. A/38/12/Add.1 (Oct. 20, 1983), https://bit.ly/3RKkA6C. Yet, as plaintiffs allege, the federal government summarily expelled thousands of Haitian migrants from the border under Title 42 without considering their individual asylum claims or conducting adequate screenings for withholding of removal and Convention Against Torture protection. *See, e.g.*, Compl. ¶ 61 (alleging that "DHS officers did not screen these individuals for fear of return to their home country or process them for asylum"), ¶ 152 (describing a family who intended to apply for asylum and were not afforded the opportunity).

That summary expulsion is inconsistent with the United States' longstanding commitment not to send individuals to countries where they might be persecuted or tortured. *See Huisha-Huisha*, 27 F.4th at 732 ("For the same reasons that [42 U.S.C.] § 265 does not allow the Executive to contravene [8 U.S.C.] § 1231(b)(3)(A), the Executive cannot contravene the Convention Against Torture."); Pls.' Opp'n 33-34. This commitment applies in the case of Haitian migrants, many of whom may face persecution or torture at home.

**B.     Haiti's widespread gang violence underscores the critical importance of the United States' non-refoulement obligations.**

Asylum applicants fleeing gang-related violence often claim a well-founded fear of persecution on account of their "membership in a particular social group." 8 U.S.C. § 1101(a)(42).  Though persecution must typically come from the state, federal courts have recognized that applicants persecuted by non-state actors may still merit relief if they establish that the persecution was "committed by . . . forces the government is either unable or unwilling to control."  *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2014); *see Nken v. Holder*, 556 U.S. 418, 436 (2009) (recognizing the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm").

Haiti suffers from gang violence that is beyond the control of the government. The U.S. State Department has recognized as much, reporting widespread and arbitrary gang-related killings and human rights violations.  *See* U.S. State Dep't, *Haiti 2021 Human Rights Report* 2, https://bit.ly/3bN3XGL (last visited July 22, 2022); s*ee also Sowe v. Mukasey*, 538 F.3d 1281, 1285 (9th Cir. 2008) (describing State Department country reports as "the most appropriate and perhaps the best resource for information on political situations in foreign nations").  In 2021 alone, armed gangs reportedly displaced 20,000 people in Haiti and captured up to 10 police stations.  U.S. State Dep't at 2.  These gangs operate outside the control of the Haitian government, due in part to corruption, "poor training," "a lack of

professionalism," and "rogue elements within the police force allegedly maintaining gang connections." *Id.* at 2, 5.  Overall, this has contributed to a widespread "perception of impunity for abusers." *Id.* at 20.

The context and endemic nature of gang-related violence in Haiti underscores the critical importance of giving asylum seekers a fair opportunity to establish that they are targeted because of their membership in a particular social group.  To be sure, not all applicants who seek asylum based on gang-related activity will succeed on their claims.  But making that determination requires an individualized analysis.  The summary expulsion of thousands of Haitian migrants ignores the necessity of such an individualized approach and deprives migrants of any meaningful opportunity to seek humanitarian protections under federal law—all to the detriment of Amici States, who benefit tremendously from immigration and are responsible for the well-being of any migrants who eventually settle in our communities.

## II.    Haitian Migrants Offer Substantial Contributions To Amici States, And Summarily Expelling Them Needlessly Deprives Amici States Of Those Benefits.

The United States is home to the largest Haitian migrant population in the world.  *See* UNICEF, *Migration Profiles: Haiti* 2, https://bit.ly/3OjNgk8 (last visited July 22, 2022).  There are nearly 702,000 first-generation Haitian immigrants living here and about 1 million people of Haitian ancestry in total.  U.S. Census, *Selected Population Profile in the United States: Haiti*, https://bit.ly/3IL662q (last visited

July 22, 2022); U.S. Census, *People Reporting Ancestry*, https://bit.ly/3APVUn5 (last visited July 22, 2022).  Over the years, Haitian migration numbers have steadily increased.  *See* U.S. Dep't of Homeland Sec., Off.  of Immigr. Stats., *2020 Yearbook of Immigration Statistics* 6, 8, 10 (Apr. 2022), https://bit.ly/3uRaeZ0.

Many Haitian migrants enter through the asylum process.  In 2020, for example, the United States granted over 5,000 affirmative asylum applications from Haiti.  Ryan Baugh, U.S. Dep't of Homeland Sec., Off. of Immigr. Stats., *Fiscal Year 2020 Refugees and Asylees Annual Flow Report* 17 (Mar. 8, 2022), https://bit.ly/3z0K0FK.  These asylum seekers eventually settle into Amici States and become valuable members of our communities.  The troubling allegations regarding the federal government's treatment of Haitian migrants jeopardizes that relationship.

## A.  Immigrants, including Haitian immigrants, boost states' economies and communities.

Amici States and their constituents flourish when the United States fulfills its commitment to welcoming immigrants and refugees.  As Amici States know from experience, these benefits are reciprocal: not only do immigrants gain from the opportunities associated with living in the United States, but states and the country as a whole benefit from the presence of immigrants.

As a general matter, immigrants enhance the nation's prosperity by contributing to their local economies.  Nearly one in six workers is an immigrant,

and immigrants pursue entrepreneurship at disproportionately high levels, making up 20 percent of business owners. *See* Am. Immigr. Council, *Immigrants in the United States* 3, 5 (Sept. 21, 2021), https://bit.ly/3c61yqY. Haitian immigrants in particular play a vital role, outperforming U.S.-born workers in certain key sectors. For example, 71 percent of Haitian immigrants ages 16 or older are engaged in the civilian labor force, compared to 62 percent of the U.S.-born population in the same age group. Kira Olsen-Medina & Jeanne Batalova, *Haitian Immigrants in the United States*, Migration Pol'y Inst. (Aug. 12, 2020), https://bit.ly/3uJ8Ibc.

Moreover, immigrants, including Haitian immigrants, are essential members of many communities and are embedded in the fabric of American society. Residents rely on their Haitian family members and neighbors for care, friendship, community cohesion, and economic vitality. *See, e.g.*, Miriam Jordan, *Thousands of Haitians Are Being Allowed Into the U.S. But What Comes Next?*, N.Y. Times (Sept. 30, 2021), https://bit.ly/3za9Gjv. Many Haitian individuals have built their lives in the United States, earning degrees and starting families in this country. Indeed, nearly 80 percent of Haitian immigrants who are at least 25 years old have a high school degree, and about 19 percent have a bachelor's degree. Olsen-Medina & Batalova, *supra*.

Finally, Haitian immigrants enrich the cultural diversity and vibrancy of their local communities. Haitian immigrants have established "Little Haiti"

neighborhoods in Miami and Brooklyn as well as similarly thriving communities across Massachusetts, Pennsylvania, New Jersey, Georgia, and Connecticut. Olsen-Medina & Batalova, *supra*. These communities have flourished as sites of art, music, food, and commerce, and they promote a robust civil society. *See* Greater Mia. Convention & Visitors Bureau, *Little Haiti*, https://bit.ly/3IzUJdt; Brett Sokol, *Miami's Art World Sets Sights on Little Haiti Neighborhood*, N.Y. Times (Nov. 23, 2015), https://bit.ly/3uIuQlY; Zainab Iqbal, *Flatbush Is Finally Designated As "Little Haiti" Business and Cultural District*, Bklyner (July 3, 2018), https://bit.ly/3yvbTEq. For example, in May 2022, Haitian immigrants in Brooklyn's "Little Haiti" neighborhood celebrated Haitian Heritage Month with a day-long festival, featuring a parade, musical performances, dancing, and food from local vendors. Anna Quinn, *Haitian Culture Celebration Brings Parade, Street Fair to Brooklyn*, Patch (May 12, 2022), https://bit.ly/3z0v4HF. These types of events are supported by community organizations and local churches. *See, e.g.*, Jared McCallister, *CARIBBEAT: Zanmi Forges Friendships and Wins Patrons with Haitian Cuisine*, N.Y. Daily News (June 18, 2022), https://bit.ly/3AMx4oo; Jordan, *supra*.

Haitian immigrants have thus established self-sustaining communities across the country that enhance the overall quality of civic life in many cities and states. The federal government's alleged conduct threatens to diminish those benefits by

summarily excluding and unnecessarily harming thousands of potential immigrants and community members—including those who may have family in the United States.

**B.    The federal government should not further traumatize Haitian asylum seekers, many of whom may settle in Amici States' communities.**

Every year, Amici States welcome thousands of immigrants into their communities. Consistent with their fundamental duty to "protect[] the health of [their] citizens," *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 956 (1982), Amici States provide numerous services to help these vulnerable individuals as they integrate into their new communities.[1] Amici States thus bear the cost of any trauma inflicted on asylum seekers who ultimately reside in their state. As a result, they have a critical interest in ensuring that the federal government refrains from conduct that would further harm asylum seekers.

---

[1]    For example, Illinois offers a variety of social services specifically for immigrant, refugee, and asylee populations. *See* Ill. Dep't of Human Servs., *Refugee & Immigrant Services*, https://bit.ly/3O35Ywc (last visited July 22, 2022). New York provides similar services for recently arriving refugees. N.Y. Off. of Temp. & Disability Assistance, *Refugee Services (RS) Programs*, https://on.ny.gov/3uKsdjB (last visited July 22, 2022). The District of Columbia also provides medical assistance and screenings for eligible populations, including emergency psychiatric services. *See* D.C. Dep't of Human Servs., *Refugee Assistance*, https://bit.ly/3P5fLTP (last visited July 22, 2022); D.C. Dep't of Behav. Health, *Emergency Psychiatric Services*, https://bit.ly/3IB5r3m (last visited July 22, 2022).

The complaint alleges various instances of mistreatment, including malnourishment, inadequate medical care, and threats and physical assault from mounted Border Patrol officers on horseback. *See* Compl. ¶ 79-121. These allegations are deeply concerning. *First*, extensive research indicates that inadequate food and medical treatment, as well as physical or verbal abuse, can have long-lasting physical and mental effects.[2] These effects impair a person's ability to work and participate as a full member of the community. Ctr. for Substance Abuse Treatment, Substance Abuse & Mental Health Servs. Admin., *Understanding the Impact of Trauma*, *in* Trauma-Informed Care in Behavioral Health Services, Treatment Improvement Protocol Series, No. 57 (2014), https://bit.ly/3RwtYdO. Moreover, trauma can burden families and fray existing social structures. *See* U.S. Dep't of Veterans Affs., *Effects of PTSD*, https://bit.ly/3o1faXi; Patricia L. East et al., *The Impact of Refugee Mothers' Trauma, Posttraumatic Stress, and Depression*

---

[2]    *See, e.g.*, Krista M. Perreira & India Ornelas, *Painful Passages: Traumatic Experiences and Post-Traumatic Stress Among Latino Adolescents and Their Primary Caregivers*, 47 Int'l Migration Rev. 976, 996-97 (2013); Amelie A. Hecht et al., *Using a Trauma-Informed Policy Approach to Create a Resilient Urban Food System*, 21 Pub. Health Nutrition 1961, 1961-62 (2018); Substance Abuse & Mental Health Servs. Admin., *Trauma and Violence*, https://bit.ly/3O9DHnr (last visited July 22, 2022); *see also* Sean D. Cleary et al., *Immigrant Trauma and Mental Health Outcomes Among Latino Youth*, 20 J. Immigr. & Minority Health 1053, 1053-54 (2018); Julie M. Linton et al., *Unaccompanied Children Seeking Safe Haven: Providing Care and Supporting Well-Being of a Vulnerable Population*, 92 Children & Youth Servs. Rev. 122 (2018).

*on Their Children's Adjustment*, 20 J. Immigr. & Minority Health 271, 271 (2018). The challenged conduct here thus threatens the vitality of immigrant communities, undermining their potential contributions to Amici States' labor force and civic life. It may also force Amici States to allocate additional resources to trauma care to treat migrants harmed by the federal government's conduct—a decision that would necessarily divert funding away from other important state services.

*Second*, Haitian immigrants already experience extensive migration-related stress. The harms inflicted by the federal government may worsen that stress and increase their risk for depression. A 2020 study found that migration-related stress is the primary predictor of depression among first-generation Haitian immigrants, especially for survivors of the 2010 earthquake. Dany Fanfan et al., *Stress and Depression in the Context of Migration Among Haitians in the United States*, 28 Health & Soc. Care Cmty. 1795, 1796 (2020). And before arriving at the U.S. border, many Haitian migrants have already survived a series of traumatic events, from gang-related violence and natural disasters in their home country; to discrimination and hostility in transition countries like Brazil and Chile; to treacherous conditions during the journey from South or Central America to the United States. Caitlyn Yates, *Haitian Migration Through the Americas: A Decade in the Making*, Migration Pol'y Inst. (Sept. 30, 2021), https://bit.ly/3IwLnPA. Subjecting Haitian migrants to additional harm and inadequate care aggravates these

existing injuries—and, for those who ultimately gain entry into the United States, hinders their adjustment to life in this country.

To prevent these harms and unlock the benefits of immigration, it is critical that the federal government treat migrants humanely as they seek refuge in the United States.   This includes ensuring they have a fair and individualized opportunity to pursue their humanitarian claims free from physical or verbal abuse. Failing to meet these bare requirements would undermine the vital benefits that immigrants, including Haitian immigrants, provide to Amici States, and it would needlessly strain Amici States' resources.

## CONCLUSION

This Court should deny defendants' motion to dismiss.

Respectfully submitted,

KWAME RAOUL
Attorney General for the
State of Illinois

KARL A. RACINE
Attorney General for the
District of Columbia

KATHRYN HUNT MUSE
Deputy Chief
Public Interest Division

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

/s/ Aaron P. Wenzloff
AARON P. WENZLOFF
Senior Assistant Attorney General

/s/ Caroline W. Tan
CAROLINE W. TAN*†
Assistant Attorney General

Office of the Attorney General for
the State of Illinois
100 West Randolph Street
Chicago, Illinois 60601
(773) 590-6964
aaron.wenzloff@ilag.gov

Office of the Solicitor General
Office of the Attorney General
for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 735-7579
caroline.tan@dc.gov

July 2022

---

\*       Admitted to practice only in California. Practicing in the District of Columbia under the direct supervision of Solicitor General Caroline S. Van Zile, a member of the D.C. Bar, pursuant to D.C. Court of Appeals Rule 49(c).

†       The undersigned would like to thank summer law clerk Brianna Yang for her invaluable research and writing assistance on this brief.

On behalf of:

WILLIAM TONG
*Attorney General*
State of Connecticut

MAURA HEALEY
*Attorney General*
Commonwealth of
Massachusetts

KEITH ELLISON
*Attorney General*
State of Minnesota

MATTHEW J. PLATKIN
*Acting Attorney General*
State of New Jersey

LETITIA JAMES
*Attorney General*
State of New York

PETER F. NERONHA
*Attorney General*
State of Rhode Island

ROBERT W. FERGUSON
*Attorney General*
State of Washington

BRIAN E. FROSH
*Attorney General*
State of Maryland

DANA NESSEL
*Attorney General*
State of Michigan

AARON D. FORD
*Attorney General*
State of Nevada

HECTOR BALDERAS
*Attorney General*
State of New Mexico

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

SUSANNE R. YOUNG
*Attorney General*
State of Vermont

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2022, a true and accurate copy of the foregoing brief was filed electronically with the Court using the CM/ECF system.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

/s/ Caroline W. Tan
CAROLINE W. TAN