UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HAITIAN BRIDGE ALLIANCE *et al.*,

Plaintiffs,

v.

JOSEPH R. BIDEN,
President of the Unites States, *et al.*,

Defendants.

Civil Action No. 21-3317 (JMC)

**REPLY MEMORANDUM
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………...1

ARGUMENT…………………………………………………………………………………...3

    I.    Plaintiffs Lack Standing to Bring Their Claims…………………………………..3

        A.    Individual Plaintiffs Fail to Allege a Present or Imminent Injury………...3

        B.    Haitian Bridge Alliance Cannot Establish Organizational Standing……...9

    II.    Plaintiffs' Claims Based on the Due Process Clause Should Be Dismissed...…..12

        A.    Substantive Due Process……………………………………………….12

        B.    Procedural Due Process…………………………………………………19

        C.    Equal Protection………………………………………………………..22

    III.    Certain APA Claims Should be Dismissed…………………………………….27

        A.    Plaintiffs Fail to Allege a Credible Claim of Withheld Agency Action…27

        B.    Plaintiffs' Challenge to "Haitian deterrence Policy" Fails to State a Claim……………………………………………………………………..29

    IV.    President Biden is Not a Proper Defendant……………………………………...32

CONCLUSION………………………………………………………………………………..33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdelfattah v. DHS*,
  787 F.3d 524 (D.C. Cir. 2015) ......................................................................................... 13, 14

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006) ............................................................................................................... 9

*Ashcroft v. Iqbal*,
  556 U.S. 662, (2009) ....................................................................................................... 24, 27

*Ass'n v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998) ....................................................................................... 20

*Atherton v. D.C. Off. of Mayor*,
  567 F.3d 672 (D.C. Cir. 2009) ........................................................................................... 27

*Bark v. U.S. Forest Serv.*,
  37 F. Supp. 3d 41 (D.D.C. 2014) ....................................................................................... 31

*Barnes v. District of Columbia*,
  793 F. Supp. 2d 260 (D.D.C. 2011) ................................................................................... 18

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................................. 31

*Brown v. Califano*,
  627 F.2d 1221 (D.C. Cir. 1980) ......................................................................................... 24

*Butera v. District of Columbia*,
  235 F.3d 637 (D.C. Cir. 2001) ........................................................................................... 16
y
*CASA de Md., Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018) ............................................................................... 32, 33

*Chavez v. Martinez*,
  538 U.S. 760 (2003) ............................................................................................................. 18

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ............................................................................................................. 23

*Clinton v. Jones*,
  117 S. Ct. 1636 (1997) ......................................................................................................... 32

*Colbert v. District of Columbia*,
   5 F. Supp. 3d 44 (D.D.C. 2013) ............................................................... 19

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ................................................................... 1, 18, 19

*Cruzan v. Dir., Mo. Dep't of Health*,
   497 U.S. 261 (1990) ................................................................... 14

*Ctr. for Biological Diversity v. Zinke*,
   260 F. Supp. 3d 11 (D.D.C. 2017) ............................................... 29, 30

*D.A.M. v. Barr*,
   474 F. Supp. 3d 45 (D.D.C. 2020) ............................................... 13

*D.A.M. v. Barr*,
   486 F. Supp. 3d 404 (D.D.C. 2020) ............................................. 21

*D.J.C.V. v. United States*,
   Civ. A. No. 20-5747, 2022 WL 1912254 (S.D.N.Y. June 3, 2022) ......................... 13

*Department of Homeland Security v. Thuraissigiam*,
   140 S. Ct. 1959 (2020) ............................................................... 13, 20

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ......................................................... 15, 16, 17, 19

*Gomez v. Trump*,
   485 F. Supp. 3d 145 (D.D.C. 2020) ............................................. 22

*Harvey v. District of Columbia*,
   798 F.3d 1042 (2015) ................................................................... 17

*Hoffman v. Jeffords*,
   175 F. Supp. 2d 49 (D.D.C. 2001) ............................................... 6

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) ............................................. passim

*Hurd v. District of Columbia*,
   864 F.3d 671 (D.C. Cir. 2017) ................................................... 15

*Jacinto-Castanon de Nolasco v. Immigration & Customs Enforcement*,
   ("ICE"), 319 F. Supp. 3d 491 (D.D.C. 2018) .................................... 18

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ........................................................................ 27

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
    104 F.3d 1349 (D.C. Cir. 1997) ........................................................ 22

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021) .......................................................... 20

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) .......................................................................... 25

*Moses v. District of Columbia*,
    741 F. Supp. 2d 123 (D.D.C. 2010) ................................................. 17

*Nat. Res. Def. Council v. Pena*,
    147 F.3d 1021 (D.C. Cir. 1998) .......................................................... 5

*Nat. Res. Def. Council, Inc. v. EPA*,
    383 F. Supp. 3d 1 (D.D.C. 2019) ............................................. 4, 20, 24

*Nixon v. Sirica*,
    487 F.2d 700 (D.C. Cir. 1973) .......................................................... 32

*Norris v. District of Columbia*,
    737 F.2d  (D.C. Cir. 1984) ................................................................ 18

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ............................................................................ 28

*Orton Motor, Inc. v. Dep't of Health & Human Servs.*,
    884 F.3d 1205 (D.C. Cir. 2018) ........................................................ 21

*Patriot, Inc. v. Dep't of Hous. & Urban Dev.*,
    963 F. Supp. 1 (D.D.C. 1997) ........................................................... 30

*People for the Ethical Treatment of Animals ("PETA") v. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ........................................................ 10

*Plyler v. Doe*,
    457 U.S. 202 (1982) ................................................................... 12, 23

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ............................................................ 26

*Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ............................................................................................. 26

*Richards v. Gelsomino*,
  Civ. A. No. 16-1002 (JDB), 2019 WL 1535466 (D.D.C. Apr. 8, 2019) ................................ 24

*Rochin v. California*,
  342 U.S. 165 (1952) .......................................................................................... 14, 18

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999) ............................................................................................... 9

*Rust v. Sullivan*,
  500 U.S. 173 (1991) .......................................................................................... 17, 18

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................................ 32

*Smith v. District of Columbia*,
  413 F.3d 86 (2005) ........................................................................................... 16, 17

*Statewide Bonding, Inc. v. DHS*,
  980 F.3d 109 (D.C. Cir. 2020) .................................................................................... 14

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ................................................................................... 33

*U.S. Off. of Special Counsel*,
  480 F. Supp. 3d 118 (D.D.C. 2020) ............................................................................... 10

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ............................................................................................. 12

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ......................................................................................... 23, 25

*Washington v. Davis*,
  426 U.S. 229 (1976) ............................................................................................. 23

*Weber v. Dep't of State*,
  885 F. Supp. 2d 46 (D.D.C. 2012) ................................................................................ 29

*Wilkins v. Jackson*,
  750 F. Supp. 2d 160 (D.D.C. 2010) ................................................................................ 4

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
  93 F.3d 910 (D.C. Cir. 1996) ................................................................................ 23

*Woytowicz v. George Wash. Univ.*,
  327 F. Supp. 3d 105 (D.D.C. 2018) ........................................................................ 9

*Wright v. District of Columbia*,
  799 F. Supp. 2d 1 (D.D.C. 2011) ........................................................................... 17

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) .............................................................................................. 12

**Statutes**

5 U.S.C. § 551(13) ................................................................................................. 30

5 U.S.C. § 706(1) ................................................................................................... 28

8 U.S.C. § 1225 ..................................................................................................... 28

8 U.S.C. § 1225(a) ................................................................................................. 27

8 U.S.C. § 1225(a)(1) ............................................................................................. 27

8 U.S.C. § 1225(a)(3) ............................................................................................. 27

8 U.S.C. § 1231 ................................................................................................. 21, 28

8 U.S.C. § 1231(b)(3) .......................................................................................... 21, 28

8 U.S.C. §§ 1158 ................................................................................................... 20

42 U.S.C. § 265 ..................................................................................................... 20

**Regulations**

8 C.F.R. § 235.3(b)(4) ............................................................................................ 28

86 Fed. Reg. 42,828 ........................................................................................... 22, 26

## INTRODUCTION

By and through undersigned counsel, Defendants respectfully submit this reply in further support of their Motion to Dismiss ("Motion"; ECF No. 28) Plaintiffs' Complaint (ECF No. 1).

As a threshold matter, Plaintiffs lack standing to pursue their various claims.  Individual Plaintiffs are not presently subject to any of the alleged unlawful conduct that they seek to enjoin, nor will they imminently be subject to this conduct—a fatal flaw in a case, such as this one, seeking injunctive relief.  Additionally, Plaintiff Haitian Bridge Alliance ("HBA") failed to allege facts sufficient to establish that it used its resources to counteract any alleged harm.  As such, Plaintiffs lack constitutional standing, and the Court lacks subject-matter jurisdiction.

Even if Plaintiffs possess standing to maintain this lawsuit, the simple fact is that the Complaint fails to state plausible claims for relief on Counts One to Four and Seven to Eight.  Plaintiffs' claims predicated on the Fifth Amendment Due Process Clause fail, in part, because such Fifth Amendment protections do not apply to Individual Plaintiffs based on the circumstances alleged in the Complaint (*e.g.*, when they waited in Del Rio, Texas to be processed by U.S. Customs and Border Protection ("CBP")).  They also fail because the factual allegations, accepted as true for the purposes of this Motion only, simply do not state plausible constitutional claims based on binding legal precedent.  The Supreme Court "ha[s] made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."  *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).  And Plaintiffs' Opposition brief (ECF No. 38) cannot fix the Complaint's failure to plausibly state a deprivation or restraint on judicially recognized fundamental liberty interests of Individual Plaintiffs or that they were subject to discriminatory treatment, particularly when they were subject to the same public health order issued under Title 42 of the U.S. Code as other

migrants unlawfully crossing the U.S.-Mexico border.  The law requires more than conclusory allegations that Defendants' actions "shock the conscience" or speculation that Defendants' actions were motivated by animus towards Haitian migrants.

Likewise, Plaintiffs cannot re-package Defendants' implementation of an actual final agency action, the Centers for Disease Control and Prevention's ("CDC") August 2021 public health order, as some distinct "Haitian Deterrence Policy" subject to challenge under the Administrative Procedure Act ("APA").  As demonstrated by the Opposition, the Complaint fails to plausibly allege that the so-called "Haitian Deterrence Policy" is a discrete, "final agency action" reviewable by this Court.

The August 2021 Order, the operative policy in September 2021, allowed Department of Homeland Security ("DHS") Defendants, as the D.C. Circuit recently concluded, to "immediately expel" certain noncitizens and "foreclose[e] asylum" and the procedures "use[d] to apply for asylum" for noncitizens subject to the Order.  *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 727 (D.C. Cir. 2022).  In the Opposition, Plaintiffs fail to show that the D.C. Circuit's harmonization of Title 42 with the immigration laws under Title 8 was incorrect, which would be necessary to plausibly allege that asylum rights were "unlawfully withheld."  Similarly, Plaintiffs cannot plausibly allege that Defendant "unlawfully withheld" rights to withholding of removal and protections under the Convention Against Torture ("CAT") when alternative processes were in place and no Individual Plaintiff alleges that he or she did seek or would qualify for such protections.

Therefore, and as further explained below, the Court should dismiss the instant Complaint, or at the very least dismiss those claims that lack factual and legal foundations to proceed.

**ARGUMENT**

I.   <u>**Plaintiffs Lack Standing to Bring Their Claims**</u>

A.   **Individual Plaintiffs Fail to Allege a Present or Imminent Injury**

Individual Plaintiffs, who seek injunctive relief, lack standing to bring their claims because they have failed to establish injury-in-fact that is present or imminent, a requirement to establish standing.  Mot. at 20-22.[1]  Plaintiffs advance three arguments in their Opposition: (1) that alleged past harm is sufficient to confer Individual Plaintiffs with standing, Opp. at 17-18; (2) that Plaintiffs have adequately alleged "ongoing" harms, Opp. at 18-19; and (3) that Plaintiffs have adequately alleged a risk of imminent future injury, Opp. at 19-20.  Each argument, addressed in turn below, is unavailing.

*First*, Plaintiffs argue that Individual Plaintiffs "have standing based on [] 'past injuries.'"  Opp. at 17.  In support of this assertion, and citing to page 10 of Defendants' Motion, Plaintiffs repeatedly assert that Defendants have "conceded," "admitted," or "acknowledge[d]" that Plaintiffs suffered past injuries.  *See, e.g.*, Opp. at 17 ("based on the 'past injuries' that Defendants concede they suffered"); 19 ("the policies that Defendants admit suffice to establish past injury"); 19 ("Plaintiffs' past harms, which Defendants acknowledge").  But Defendants have not—and do not—make any such concession.  Defendants merely pointed out the fact that almost all of Plaintiffs' 90-page Complaint focuses on supposed past harm that Plaintiffs allege they suffered in September 2021.  Mot. at 21.  Defendants argued this alleged past harm was "of no moment" for purposes of the standing analysis in a case such as this in which injunctive relief is sought.  *Id.*

---

[1]   All citations to documents filed on this Court's docket refer to the pagination in the ECF-generated headers, not the pagination (if any) at the bottom center of documents' pages.

Plaintiffs cite a single Freedom of Information Act ("FOIA") case from another court in this District that Plaintiffs contend stands for the proposition that "where a plaintiff pled past harm, plaintiff could rely 'on its APA claim and its request for declaratory relief.'" *Id.* at 18 (citing *Nat. Res. Def. Council, Inc. v. EPA*, 383 F. Supp. 3d 1, 15 (D.D.C. 2019)). But the case stands for no such proposition. Rather, the court in *Natural Resources* reiterated the general rule cited by Defendants in their Motion that "because the [plaintiff] seeks injunctive relief . . . past harm will not suffice. Rather, the [plaintiff] must demonstrate some present or imminent injury to establish their standing to seek injunctive relief. The likelihood of future injury, moreover, cannot be merely speculative or hypothetical. It must be real, palpable, and imminent." *Natural Resources*, 383 F. Supp. at 8 (internal citations and quotations omitted). Because the *Natural Resources* court had a variety of "concerns," it denied both parties cross-motions for summary judgment in order to provide the parties' with an "opportunity to address these questions." *Id.* at 15. In dicta at the end of the opinion, the *Natural Resources* court proceeded to wonder aloud whether the plaintiff in that case "may decide to rely instead on its APA claim and its request for declaratory relief, neither of which it has pressed to date." *Id.* The *Natural Resources* court did not, however, reach the issue of whether the plaintiff's allegations of past harm were sufficient in that case to confer it with standing for purposes of its seemingly abandoned claim for declaratory relief. *Id.* To the extent Plaintiffs suggest otherwise, they have misunderstood the case.

Moreover, Plaintiffs do not appear to dispute, and thus concede, one of the main points of Defendants' standing arguments: that allegations of past harm are insufficient to establish standing for proposes of *injunctive*, as opposed to declaratory relief. *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded.").

Plaintiffs appear to be aware that there is no caselaw to support their sweeping assertion that past harm alone is sufficient to establish the Individual Plaintiffs' standing for all their claims, because just one page after making this bald assertion, they soft-pedal it with the caveat that past harms should be sufficient to establish standing to seek "at least" declaratory relief.  Opp. at 18.  But the bulk of the relief sought in Plaintiffs' Complaint is injunctive, not declaratory.  *See* Compl. at Prayer for Relief ¶¶ f-i (seeking orders: enjoining Defendants from applying the so-called Haitian Deterrence Policy and Title 42 Process to Individual Plaintiffs; staying further expulsions under the Title 42 Process and affording Individual Plaintiffs with certain statutory and procedural protections; allowing Individual Plaintiffs to return to the United States; requiring Defendants to facilitate Individual Plaintiffs' return and provide unspecified "appropriate precautionary health measures.").  Plaintiffs do not contend otherwise.  *See generally* Opp.  Thus, as Defendants' Motion established, Plaintiffs' allegations of past harm are insufficient to establish standing for the injunctive relief Plaintiffs seek.

*Second*, Plaintiffs argue that they have adequately alleged "ongoing" harms that are independently sufficient to confer Individual Plaintiffs with standing.  Opp. at 18-19.  Again, Plaintiffs' argument is without merit.  The relevant standard does not require Plaintiffs to merely allege that some harm was ongoing for a time, but rather that the injury is "present."  *Nat. Res. Def. Council v. Pena*, 147 F.3d 1021, 1022 (D.C. Cir. 1998).  Plaintiffs first point to paragraphs 153-161 of their Complaint for the proposition that they have alleged sufficient ongoing harm, but these paragraphs merely contain generalized allegations that Individual Plaintiffs currently in Haiti have faced at some unknown point in time since their return "threats to their safety" due to generalized political instability, the existence of gangs, food insecurity, and a general rise in violent crime.  Opp. at 18.  But these are far from the concrete and "particularized" injuries required to

establish standing, *see Hoffman v. Jeffords*, 175 F. Supp. 2d 49, 55 (D.D.C. 2001), let alone showing traceability.

Plaintiffs' reliance on paragraphs 217, 223-24, 231, and 237 of the Complaint, Opp. at 18 n.4, fare no better in terms of establishing that Plaintiffs have adequately alleged present injury for Individual Plaintiffs returned to Haiti.  These paragraphs either fail to allege that any harm is "presently" being felt or else make allegations of generalized rather than particularized harm.  The allegations also either relate to illnesses that are not redressable by this Court and/or actions (including those of third parties) that are not traceable to Defendants' alleged conduct.

Paragraph 217, for example, merely alleges that at some point in time in the past, Individual Plaintiff Madeline traveled to Chile with her daughter for treatment for an illness allegedly developed in the Del Rio encampment.  But the allegation provides no information as to when this travel allegedly occurred and does not allege that the illness is ongoing or a present injury at the time of the Complaint's filing.  Similarly, paragraphs 223-24 allege that Individual Plaintiff Michael's daughter became ill at some unspecified date in the past after drinking contaminated water, but the Complaint does not allege that this illness was an ongoing or present injury at the time of the Complaint's filing.  So too with respect to paragraph 237, which alleges that Individual Plaintiff Jacques "got sick with a bad flu" on some unspecified date and was unable to obtain medical treatment.  Compl. ¶ 237.  Again, there is no allegation that this past illness was a present and ongoing injury at the time of the Complaint's filing.  Moreover, to the extent Plaintiffs now point to allegations of illnesses as their "present" injury, they do nothing to explain how these are traceable to Defendants' alleged conduct or how they are redressable by this Court.  *See generally* Opp.

With respect to paragraph 231, which alleges that Individual Plaintiffs Wilson, Wideline, and their family are staying with a relative, the alleged harm is a general fear of increased violence in the country, Compl. ¶ 231 ("Haitians who have recently been deported back to Haiti are often targeted by gangs because the gangs believe such people have money"), that is not a particularized injury specific to Individual Plaintiffs Wilson and Wideline that they have been targeted by such gangs.  These generalized and often non-presently alleged injuries are insufficient to confer standing.

Finally, Plaintiffs point to three paragraphs of the Complaint—paragraphs 245, 254, and 261—for the proposition that Individual Plaintiffs who returned to Mexico "have experienced continuing and adverse effects" sufficient to establish a present injury.  Opp. at 18 n. 5.  These allegations, however, are also woefully insufficient.  Paragraph 245 alleges that Individual Plaintiff Emmanuel was, at some unspecified time in the past "attacked a[t] knifepoint," in Mexico, but does not allege when this apparently isolated attack occurred or that such violent attacks were ongoing or presently occurring at the time of the Complaint's filing.  Nor do Plaintiffs explain how this third-party conduct is fairly traceable to Defendants'.  Similarly, paragraph 254 alleges that Individual Plaintiffs Samuel, Samentha, and their children are living "in precarious conditions" in Mexico because at some unspecified time in the past, they were "expelled from [a] shelter."  The Complaint, however, makes no allegations regarding why Plaintiffs were allegedly expelled from their first shelter, where these Individual Plaintiffs are currently living, nor is it alleged that Plaintiffs were unable to find adequate alternative shelter at the time the Complaint was filed.  And again, this expulsion was at the hands of a third party, not Defendants.  Thus, this past expulsion from one shelter does not sufficiently allege a particularized present injury that is traceable to Defendants' alleged conduct.  Paragraph 261 alleges that although Individual Plaintiff Paul

initially found it "difficult" to find a room to rent, he "finally found someone willing to rent to him," but that he has not yet found work and has been "questioned [by the police] about who he is and where he is going."  Individual Plaintiff Paul's alleged present inability to find work is not an injury that is "fairly traceable" to the conduct about which Plaintiffs complain, nor is Mexican law enforcement's non-threatening and non-violent questioning an injury sufficient to establish standing.  Because Plaintiffs fail to identify a single paragraph in their Complaint that alleges a concrete, particularized, *present* injury that is fairly tracible to the conduct about which Plaintiffs complain, Individual Plaintiffs lack standing.

*Third*, Plaintiffs argue that they have adequately alleged a risk of imminent future injury to Individual Plaintiffs sufficient to establish standing.  Opp. at 19-20.  Yet again, Plaintiffs' argument misses the mark.  Plaintiffs first allege in a conclusory fashion that "all Individual Plaintiffs feel compelled to again attempt" to travel to the United States.  Opp. at 19.  But, as Defendants demonstrated in their Motion, such conclusory assertions regarding alleged planned or intended future travel is insufficient to establish that any alleged future harm is real, palpable, and imminent.  Mot. at 20-22.  Plaintiffs' counsel's vague and conclusory assertion that Individual Plaintiffs Mirard Joseph, Madeline Prospere, Jacque Doe, and Wilson Doe "are taking concrete steps to return to the United States," ECF No. 38-1 at ¶ 8, again does nothing to support the notion that any such travel is imminent.

Further, as Defendants have demonstrated, even if Individual Plaintiffs returned to the U.S. border, their being subject to the same alleged harms, including being expelled under Title 42, is entirely speculative.  Mot. at 22.  Perfectly demonstrating this point are Plaintiffs' own admissions regarding the only seven Individual Plaintiffs that Plaintiffs allege have actually traveled back to the U.S. since September 2021.  Opp. at 19 n.6.  Plaintiffs allege that Individual Plaintiffs Michael,

Veronique, Esther, Emmanuel, Samuel, Samentha, and Paul, have all recently traveled back to the U.S. border and, rather than being subject to Title 42, each was instead excepted from Title 42 and granted parole into the United States under Immigration and Nationality Act ("INA") § 212(d)(5). *Id.*[2]

Finally, Plaintiffs suggest that Individual Plaintiffs have established injury in fact because Individual Plaintiffs would have taken future action (i.e. traveled to the United States) except that the so-called Haitian Deterrence Policy "successfully deterred Plaintiffs from returning."  Opp. at 20.  Plaintiffs, however, point to no such allegation made in their Complaint, and it is well established that Plaintiffs may not amend their Complaint through arguments made for the first time in their opposition filing.  *See, e.g., Woytowicz v. George Wash. Univ.*, 327 F. Supp. 3d 105, 119 n.4 (D.D.C. 2018).

For all these reasons, and all those articulated in Defendants' opening motion, Individual Plaintiffs have failed to demonstrate that they have standing to bring their claims.

### B.    Haitian Bridge Alliance Cannot Establish Organizational Standing

HBA fails to allege facts sufficient to meet either prong of this Circuit's test to establish injury-in-fact for organizational standing, namely "whether the agency's action or omission to act 'injured the [organization's] interest'"; then, if so, whether "the organization 'used its resources to

---

[2]    Given Plaintiffs' recent representations regarding the humanitarian parole of numerous Individual Plaintiffs into the United States and the Court's "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)), Defendants respectfully submit that it would be appropriate for the Court to issue a show cause order directing Plaintiffs to explain why these Individual Plaintiffs' claims are not moot given their current status as parolees.  Defendants have requested the A-numbers for these Individual Plaintiffs to review the terms of their respective paroles, but to date, Plaintiffs' counsel has not provided this information to Defendants' counsel.

counteract the harm.'"  Mot. at 22-25 (quoting *People for the Ethical Treatment of Animals ("PETA") v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

As to the first prong, in their Opposition Plaintiffs argue in a conclusory fashion that facts alleged in the Complaint are sufficient to establish injury to the organization's interest because Defendant's actions "impaired Haitian Bridge's programming and daily operations."  Opp. at 22. In support, Plaintiffs cite to only two paragraphs of the Complaint, Paragraphs 268, and 270.  *Id*. Whether considered separately or together, these allegations are inadequate.

Paragraph 268 alleges that "several" HBA staff members worked overtime and lost sleep "because of additional work from the crisis in Del Rio," that staff members feel "trauma[tized]" from what they perceived to be an "injustice they witnessed in Del Rio" and that "core projects have been delayed."  Compl. ¶ 268.  Plaintiffs offer no caselaw to support the proposition that staff feelings of trauma, sleeplessness, and some overtime constitute "a concrete and demonstrable injury to [an organization's] activities," as required to meet the first prong of the injury-in-fact test. *See Citizens for Resp. & Ethics in Wash. ("CREW") v. U.S. Off. of Special Counsel*, 480 F. Supp. 3d 118, 127 (D.D.C. 2020).   And indeed, Defendants are aware of none.   Nor is Plaintiffs' conclusory assertion that "core projects have been delayed" sufficient.  As Defendants' Motion demonstrated, a core part of HBA's mission has always been "provi[sion of] services to asylum seekers and other migrants at the border."  Mot. at 24 (quoting Compl. ¶ 15).  It was thus to be expected that HBA would have delayed some other projects in order to provide services to the unprecedented number of Haitian migrants—over 15,000—that crossed the border from Mexico to the United States in September 2021.  HBA does not explain how the alleged "delay" of unspecified duration to some unspecified other "core projects" was traceable to Defendants' conduct rather than the sudden influx of migrants.

The allegations in Paragraph 270 fare no better.  There, Plaintiffs alleged that "[t]he events at the CBP Encampment and aftermath also strained Haitian Bridge's legal support and case management capacity" because HBA "was forced to organize a national hotline to coordinate efforts and respond to hundreds of calls from Haitian asylum seekers in detention centers across the country and who had just been released from the Del Rio Encampment."  Compl. ¶ 270.  Again, Plaintiffs do not appear to dispute that this type of work—direct services to asylum seekers and migrants—has always been a core part of HBA's work.  *See* Compl. ¶ 15.  And again, Plaintiffs fail to allege that this work—setting up the hotline for migrant services—which they claim "stall[ed]" several ongoing (but again, unspecified) "projects," constituted a concrete injury to their activities attributable to alleged actions of Defendants, as opposed to work they would have done regardless in response to the influx of an unprecedented number of migrants.  Plaintiffs thus fail to meet the first prong of the test.

Plaintiffs' failure to meet the first prong of the test alone is fatal to HBA's attempt to demonstrate organizational standing.  But Plaintiffs also fail to allege facts sufficient to meet the second prong—use of resources to counteract the harm—for largely the same reasons they fail to meet the first.

In their opposition, Plaintiffs argue that HBA "postpone[d] many crucial programs, such as its Temporary Protected Status (TPS) casework and the creation of practice advisories for lawyers and law school clinics."  Opp. at 22 (citing Compl. ¶ 269).  But, again, "HBA does not explain how its expenditure of resources 'to provide aid and legal services to asylum seekers in the CBP Encampment in September 2021,' Compl. ¶ 15, was any greater than it normally would have been to aid that number of migrants in the absence of the other government conduct alleged in the Complaint."  Mot. at 24-25.  Nor does HBA explain how its decision to divert allegedly

scarce resources away from one program and to another is attributable to Defendants' conduct, as opposed to the unprecedented number of Haitian migrants crossing the border at that time. Plaintiffs' counsel's conclusory assertion in a footnote in Plaintiffs' opposition papers that HBA's expenses were not "normal program costs," Opp. at 23 n.10, is unsupported by a citation to any allegation in the Complaint and should thus be ignored.  The burden to establish organizational standing is on Plaintiffs, and here Plaintiffs fail to meet that burden.  HBA should therefore be dismissed.

## II.     Plaintiffs' Claims Based on the Due Process Clause Should Be Dismissed

### A.     Substantive Due Process

Plaintiffs' due process claims fail at the outset because they do not cite in the Opposition and cannot cite any binding legal authority holding that noncitizens who unlawfully cross the border onto U.S. soil and are not in government custody—which was the status of Individual Plaintiffs in Del Rio—possess substantive due process rights under the Fifth Amendment. Plaintiffs cite *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), and *Plyler v. Doe*, 457 U.S. 202 (1982), to argue that "noncitizens on U.S. soil have [substantive] due process rights."  Opp. at 24.  But Plaintiffs ignore the actual holding of those factually distinct cases.  As the Supreme Court subsequently summarized, those cases "establish only that [noncitizens] receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).  Here, Individual Plaintiffs do not and could not allege that they developed "substantial

connections" with the United States. And, per *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), they did not as a matter of law "come within the territory of the United States."[3]

While Plaintiffs argue that *Thuraissigiam* is "irrelevant" to the instant matter because the issue before it concerned the scope of procedural due process, Plaintiffs do not explain on what basis "substantive" protections of the Fifth Amendment Due Process Clause would apply to noncitizens effectively "stopped at the border" when constitutional "procedural" protections would not. As explained in Defendants' Motion, the Supreme Court stated plainly that a noncitizen "who tries to enter the country illegally is treated as an 'applicant for admission'" and is "'treated' for due process purposes 'as if stopped at the border.'" *Id.* at 1982. This would be true regardless of whether a plaintiff was alleging a violation of procedural due process or substantive due process. What *Thuraissigiam* teaches is that simply being on U.S. soil, by itself, is not sufficient for constitutional due process protections to apply. *See also id.* ("When an alien arrives at a port of entry—for example, an international airport—the alien is on U.S. soil, but the alien is not considered to have entered the country[.]"). Therefore, the Due Process Clause did not cover Individual Plaintiffs waiting at the Del Rio encampment to be processed by CBP.

Yet even if Individual Plaintiffs were eligible for the protections of the Fifth Amendment, Plaintiffs' substantive due process claims fail because the Complaint does not allege the deprivation of a fundamental liberty or property interest, which is required for stating a plausible substantive due process claim. Mot. at 25-27; *see, e.g., Abdelfattah v. DHS*, 787 F.3d 524, 540

---

[3]     The other cases cited by Plaintiff are inapposite. In *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 63 (D.D.C. 2020), plaintiffs were in ICE detention and were "seeking to enforce substantive due process rights based on what amounts to unconstitutional conditions of confinement during the removal process." *D.J.C.V. v. United States*, Civ. A. No. 20-5747, 2022 WL 1912254, at *14 (S.D.N.Y. June 3, 2022), concerned a challenge to the five-month separation of a minor child from his father under the Trump Administration "Zero Tolerance" policy.

(D.C. Cir. 2015) (affirming dismissal of substantive due process claim because plaintiff "has not alleged facts suggesting he has been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest").  After arguing that pleading the deprivation of a fundamental liberty interest is not necessary (a contention addressed below), Plaintiffs assert that the Complaint does allege violations of "[Individual] Plaintiffs' rights to bodily integrity, freedom from bodily restraint, and family integrity."  Opp. at 34.  First, none of those words appears in the Complaint, belying the assertion that infringement of these rights was alleged.  Plaintiffs may not amend their Complaint through the Opposition brief.  *See Statewide Bonding, Inc. v. DHS*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020) ("And it 'is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (citations omitted).  Second, the allegations that Plaintiffs now identify to belatedly support their pleading, *see* Opp. at 34, do not plausibly allege deprivations of recognized liberty interests.  Those allegations primarily plead "physical and verbal assaults by CBP personnel" directed at some migrants, but constitutional due process is not a "font of tort law," and the need to protect the "constitutional proportions of constitutional claims" is particularly acute "in a due process challenge to executive action."  *Abdelfattah*, 787 F.3d at 540 (citations and quotations omitted).

Plaintiffs do not identify any relevant legal authority demonstrating that their allegations state a substantive due process claim.  Specifically, an assault or battery does not violate the right to "bodily integrity" which, as construed by the Supreme Court, refers to the right to control one's own body.  *See Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269 (1990) ("This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment."); *Rochin v. California*, 342 U.S. 165, 172 (1952) ("Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was

there, the forcible extraction of his stomach's contents" to obtain evidence against petitioner.).

Nor does an assault or battery violate one's right to "freedom from bodily restraint," which is

understood to refer to incarceration, involuntary commitment, and similar government-imposed

confinement. *See, e.g., Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017).

Plaintiffs also now argue that the Complaint alleges a violation of the fundamental right to

family integrity. Opp. at 34-35. Again, the Complaint does not assert a violation of such a right.

*See generally* Compl. Further, the Complaint does not allege facts establishing that this right, if it

were pleaded, was violated. In their Opposition, Plaintiffs rely on cases that involve the alleged

intentional, forced separation of children from their parents under the previous Administration's

"zero tolerance" immigration policy. Opp. at 34-35. Yet intentional separation of children from

parents is not at all what is alleged here. For example, Plaintiff cites paragraph 17 as an example

of separating children from parents, but that paragraph actually alleges that the children were kept

with a parent. *See* Compl. ¶ 17 ("U.S. officials sent Michael and Veronique to a detention center,

where they were detained separately, each with one of their children" for a number of days prior

to expulsion). Plaintiff also relies on paragraph 18, yet that paragraph alleges that Wilson Doe,

the father, was detained separately for some unspecified period from his wife and two children

before being reunited days later for expulsion, and there is no allegation that the children were

separated from the mother. *See id*. ¶¶ 18, 227-28. Plaintiffs' belated efforts to shoehorn their

Complaint into this unalleged liberty interest falls short.

The Complaint also does not plausibly allege a "special relationship" between Individual

Plaintiffs and DHS Defendants arising from conduct in Del Rio, which could potentially provide

the basis for a substantive due process claim. Plaintiffs agree that the standard for a "special

relationship" is articulated in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs*., 489 U.S. 189,

200 (1989), Opp. at 36, but they do not allege any "affirmative act[s]" plausibly showing DHS Defendants "restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause[.]"  *DeShaney*, 489 U.S. at 200.

Plaintiffs respond by pointing to allegations that CBP had established an intake system for processing migrants, *see* Opp. at 37-38, but that does not plausibly allege an "affirmative exercise of [Defendants'] power [to] so restrain[] an individual's liberty."  *DeShaney*, 489 U.S. at 200.  Nor do allegations that CBP "patrolled the riverbank" at the U.S.-Mexico border to impede unlawful entry or "monitor[ed] the encampment," Opp. at 36, 38, plausibly state the creation of a custodial relationship.  Again, the Complaint alleges that Individual Plaintiffs were able to leave and did leave Del Rio.  Plaintiffs Esther and Emmanuel Doe, Samuel and Samantha Doe, and Paul Doe, like thousands of other Haitian migrants, returned to Mexico and were not expelled under Title 42.  Compl. ¶¶ 20-22.  Individual Plaintiffs, like Mirard Jospeh and Wilson Doe "cross[ed] the river to Mexico to purchase food and water."  *Id*. ¶¶ 214; 227; *see also id.* ¶¶ 241-42, 258.  Individual Plaintiffs would not have been able to do any of the foregoing if they were in custody, which is "narrowly construed" in this Circuit.  *Butera v. District of Columbia*, 235 F.3d 637, 648 (D.C. Cir. 2001).

Plaintiffs argue that Defendants were mistaken to argue that courts "require total restraint" to establish a special relationship, Opp. at 37, except Defendants never made such an argument.  *See* Mot. at 28-29.  Defendants simply demonstrated that the Complaint very clearly alleged that Individual Plaintiffs had the freedom to leave, and did leave, the Del Rio encampment and that the Complaint failed to allege the necessary "affirmative act[s]" of government-imposed restraints on personal liberty.  Regardless, Plaintiffs' reliance on *Smith v. District of Columbia*, 413 F.3d 86

(2005), to argue that there could be a "custodial relationship" despite the ability to "come and go" from a location is misplaced. *Smith* involved "an adjudicated delinquent whom the District had, by affirmative use of its police powers, placed with its agent, [delinquent youth facility], through a court order[.]" *Id*. at 94. "[T]he District's legal custody over [the youth] is a good indicator that it . . . had legal responsibility for his daily care." *Id*. Similarly, in *Harvey v. District of Columbia*, 798 F.3d 1042, 1050 (2015), the D.C. Circuit found a duty to care for an involuntarily committed mental patient in a District of Columbia group home. These cases provide no aid to Plaintiffs because they involved affirmative acts of government power restraining personal liberty in contrast to what is alleged in the Complaint.

Because Plaintiffs' factual allegations, taken as true at this time, fail to establish that Individual Plaintiffs were in any form of custody in Del Rio, Texas, their allegations of a failure to provide greater amounts of food, water, and shelter at the encampment do not state a due process claim. There is "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196. This is a "long-recognized principle" of constitutional law. *Rust v. Sullivan*, 500 U.S. 173, 201 (1991). And this principle has been applied repeatedly in this District to find that there is no substantive due process claim where a government has not affirmatively restrained the liberty of an individual (*i.e.*, in custody) or endangered the individual.[4] *See Moses v. District of Columbia*, 741 F. Supp. 2d 123, 125-28 (D.D.C. 2010) (dismissing due process claim based on EMT failure to render medical aid to heart attack victim who came to fire station but was directed to wait in car for ambulance because he was not in government custody); *Wright v. District of Columbia*, 799 F. Supp. 2d 1, 8 (D.D.C. 2011) (while providing competent

---

[4]    Plaintiffs confirm that they "do not advance a State endangerment claim." Opp. at 33 n.23.

medical treatment "may have conceivably saved [person's] life," EMT's failure to competently aid gunshot victim "did not increase or create the danger").

Finally, Plaintiffs argue that even if they have not plausibly alleged the deprivation of a recognized liberty interest, they have alleged conduct that "shocks the conscience" and that merely pleading supposedly shocking conduct is sufficient to state a claim for substantive due process. Opp. at 32-33. But this misapprehends the nature of constitutional due process. The Supreme Court has "recognized in *County of Sacramento v. Lewis*, . . . that deprivations of liberty caused by 'the most egregious official conduct'. . . may violate the Due Process Clause." *Chavez v. Martinez*, 538 U.S. 760, 774 (2003). In contrast, "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. As the cases cited by Plaintiffs make clear, an analysis of conscience-shocking conduct occurs where there is a restraint on a recognized fundamental liberty interest. For example, in *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 275 (D.D.C. 2011), the court found "overdetentions" by the Department of Corrections were "infringing upon an individual's basic liberty interest in being free from incarceration absent a criminal conviction." In *Rochin v. California*, 342 U.S., 165, 166 (1952), a handcuffed, hospitalized arrestee's stomach was involuntarily pumped in order to find evidence to support prosecution. Obtaining a criminal conviction by violating an individual's bodily integrity was characterized as conduct that shocks the conscience. *Id*. at 209-10. In *Norris v. District of Columbia*, 737 F.2d 114 (D.C. Cir. 1984), plaintiff was in prison, and thus there was a restraint on liberty and the creation of a "special relationship." And *Jacinto-Castanon de Nolasco v. Immigration & Customs Enforcement ("ICE")*, 319 F. Supp. 3d 491 (D.D.C. 2018), involved an alleged violation of the right to family integrity. Thus, none of the cases relied on by Plaintiffs hold that a substantive due process claim

can be stated by simply alleging conduct that purportedly "shocks the conscience" without regard to whether a deprivation or restraint on a fundamental liberty interest has been plausibly alleged.

Further, the factual pleading in the body of Complaint never alleges specific conduct that Plaintiffs identify as "shock[ing] the conscience," which one would expect if Defendants' conduct was in fact "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *See generally* Compl.; *Lewis*, 523 U.S. at 847 n.8.   Rather, the "shocks the conscience" concept is mentioned only in the recitation of claims, *see* Compl. ¶¶ 293, 295, 302, 304, and primarily in Count Three.  Count Three alleges the existence of a special relationship, where the "shocks the conscience" concept is employed to differentiate constitutional torts from common law torts committed while a person is in government custody.  *See, e.g., Colbert v. District of Columbia*, 5 F. Supp. 3d 44, 58 n.6 (D.D.C. 2013) (noting it is a "stringent requirement" that "exists to differentiate substantive due process . . . from local tort law").  But as established above, the Complaint's allegations do not sufficiently plead a "special relationship" and any alleged deficiency in humanitarian assistance, *see* Compl. ¶ 304, would not "shock the conscience" as a matter of constitutional law.[5]  *DeShaney*, 489 U.S. at 196.

In sum, even if the Fifth Amendment applied to Individual Plaintiffs while they were in Del Rio—and it does not—the allegations in the Complaint simply fail to state plausible claims for violations of substantive due process.  Counts Two and Three should be dismissed.

**B.    Procedural Due Process**

Plaintiffs clarify that they "do not seek [procedural] due process rights 'regarding admission' beyond those" provided by statute.  Opp. at 25.  Nor could they given the Supreme

---

[5]    Plaintiffs' due process claims are based on Individual Plaintiffs' experience in De Rio, and not in detention awaiting expulsion.  *See* Compl. ¶¶ 294-95, 303-04.

Court's ruling in *Thuraissigiam* that a non-citizen "has only those rights regarding admission that Congress has provided by statute" and "the Due Process Clause provides nothing more" with respect to the rights available to non-citizens. 140 S. Ct. at 1983; *see also M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021) ("Just last term, the Supreme Court confirmed that aliens apprehended while trying to enter the country have no due process rights beyond what Congress has provided by statute[.]"); *Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 60 (D.D.C. 1998) (citing "the overwhelming case law, including that of this circuit, holding that initial entrants have no due process rights with respect to their admission").

In their Opposition, Plaintiffs confirm that they seek alleged statutory rights to apply for asylum, withholding of removal, and relief under CAT. Opp. at 40 (citing 8 U.S.C. §§ 1158, 1231). With respect to asylum, Plaintiffs argue that 42 U.S.C. § 265 does not explicitly displace the provisions of Title 8 (recall that the INA was enacted after Section 265) and therefore the two statutes must be harmonized so that courts can "give effect to both" statutory schemes. *Id*. at 41. Plaintiffs, though, ignore the D.C. Circuit's harmonization of both statutes in *Huisha-Huisha*. Plaintiffs contend that the D.C. Circuit "left open" the question of whether the Government violates a right to apply for asylum in 8 U.S.C. § 1158 when it expels noncitizens prior to allowing them an opportunity to apply for asylum. Opp. at 42. On the contrary, the D.C. Circuit proceeded to answer the question by explaining how to reconcile the statutory regimes, and Plaintiffs here forgo the opportunity to explain in the Opposition how the D.C. Circuit's harmonization was incorrect.

The D.C. Circuit explained that "[i]n normal times" those who enter the country unlawfully may seek asylum. *Huisha-Huisha*, 27 F.4th at 730. The court, however, recognized that these were not normal times and that the two statutory schemes could be harmonized "based on the

discretionary nature of asylum." *Id*.  The Government decided "for public health reasons" to exercise its discretion "by foreclosing asylum for the specific set of border crossers covered by its § 265 Order." *Id*. at 731.  The D.C. Circuit also concluded that the Order also "forecloses the statutorily mandated procedures that aliens use to apply for asylum[,]" explaining that "those procedures would be futile" given that "the asylum decision has already been made." *Id*.  The court reasoned that suspending those procedures could be consistent with Section 265's reference to the "suspension of the right to introduce" persons during periods when the public health dangers are sufficiently pronounced.  *Id*.  Plaintiffs make no attempt to argue that this harmonization is wrong as a matter of law.

With respect to withholding of removal, it is not disputed that no Individual Plaintiff alleged facts showing that his or her "life or freedom would be threatened in [Haiti] because of the [Plaintiff]'s race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).  Plaintiffs cite to allegations that Individual Plaintiffs were never informed that they were being returned to Haiti and that two Plaintiffs expressed fears of being in danger if returned to Haiti, *see* Opp. at 43, but such allegations do not plausibly allege that any Individual Plaintiff did claim or could claim persecution on account of these statutory classifications.  Likewise, it is not disputed that no Individual Plaintiff alleged facts showing that the person would be "in danger of being subjected to torture" if returned to Haiti.  8 U.S.C. § 1231 note.  Accordingly, Plaintiffs have not alleged a denial of due process based on the alleged absence of withholding of removal and CAT protections.  *See D.A.M. v. Barr*, 486 F. Supp. 3d 404, 416 (D.D.C. 2020) ("*All* procedural due process claims target an alleged failure to provide adequate process, but they do so in order to prevent the wrongful deprivation of some substantive interest in life, liberty, or property."); s*ee also Orton Motor, Inc. v. Dep't of Health & Human Servs.*,

884 F.3d 1205, 1215 (D.C. Cir. 2018) ("[D]ue process is required only where government action threatens a deprivation of life, liberty, or property.").

Further, Individual Plaintiffs' procedural due process claims are undercut by their recognition that the August 2021 Order allowed for certain exceptions from its scope, including "[p]ersons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant . . . humanitarian, and public health interests." 86 Fed. Reg. 42,828, 42,841. Plaintiffs also acknowledge that Individual Plaintiffs were processed under guidance that "establishes an exception to Title 42 processing for individuals expressing an 'affirmative, spontaneous' fear of torture." Opp. at 41-42 (citing "Capio Memo"). And most Individual Plaintiffs have subsequently "been granted temporary humanitarian parole in the United States." *See* Declaration of Nicole Phillips (ECF No 38-1).

### C.    Equal Protection

As noted above, Plaintiffs have failed to cite any binding authority holding that Individual Plaintiffs may premise a Fifth Amendment Equal Protection claim on their experience in Del Rio, Texas. Again, because Individual Plaintiffs never effected entry, "the Fifth Amendment's equal protection clause does not protect any Plaintiff outside the United States[.]" *Gomez v. Trump*, 485 F. Supp. 3d 145, 188 (D.D.C. 2020); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997).

But even if Individual Plaintiffs could invoke the equal protection clause, the Complaint fails to state a plausible claim. *See* Mot. at 32-35. Plaintiffs' principal argument is that they do not need to allege facts establishing that they, as Haitian migrants, were treated differently than other similarly situated non-Haitian migrants or that they suffered a disparate impact from

Defendants' conduct.  Opp. at 28-29.  Yet guarding against unequal treatment is the very purpose

of the Equal Protection Clause.  "Equal Protection . . . commands that no [government] shall 'deny

to any person within its jurisdiction the equal protection of the laws,' which is essentially a

direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne

Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).[6]  And

contrary to Plaintiffs' assertions, *Village of Arlington Heights v. Metropolitan Housing

Development Corp.*, 429 U.S. 252 (1977), does not hold or even suggest that an Equal Protection

claim can be stated without pleading disparate treatment or impact.  The Supreme Court in

*Arlington Heights* was building off the Court's previous decision in *Washington v. Davis*, 426 U.S.

229 (1976), which "made it clear that official action will not be held unconstitutional solely

because it results in a racially disproportionate impact."  429 U.S. at 264-65.  "Proof of racially

discriminatory intent or purpose" is also required to state an Equal Protection Claim.  *Id*. at 265.

In *Arlington Heights*, the lower court found a zoning decision "would have a disproportionate

impact on blacks," but because impact alone was not sufficient, the Court looked to other

"evidentiary sources" to determine "whether invidious discriminatory purpose was a motivating

factor" for the decision that led to the disparate impact.  *Id*. at 259.

Evidence of discriminatory treatment or impact is necessarily the starting place, as it was

in *Arlington Heights*,[7] as it is in other Equal Protection cases,[8] and as Plaintiffs concede in their

---

[6]    Again, Individual Plaintiffs were not "within [U.S.] jurisdiction" for purposes of
constitutional due process while they were waiting on the U.S. side of the Rio Grande River.  *See
supra* Part II.A.

[7]    The "important starting point" for assessing discriminatory intent under *Arlington Heights*
is "the impact of the official action whether it 'bears more heavily on one race than another.'"  429
U.S. at 266.

[8]    *See, e.g., Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910
(D.C. Cir. 1996) ("The threshold inquiry in evaluating an equal protection claim is, therefore, 'to

own analysis.  Plaintiffs first argue that Defendants' conduct had a "disproportionate impact on Haitian and Black people," but the two cited paragraphs plainly contain no such allegations of disparate impact.  *See* Opp. at 29 (citing Compl. ¶¶ 60 (defining the "Haitian Deterrence Policy"), 274 (arguing numerosity for class certification)).  Plaintiffs also argue that a group of some unspecified size of migrants (whose race and nationality is not alleged) who encamped under the Anzalduas International Bridge in Mission, Texas, in spring 2021, were treated "better," but that is a subjective conclusion the Court should not accept.  *Id.* at 31 (citing Compl. ¶ 169); *Ashcroft v. Iqbal*, 556 U.S. 662, 679, (2009) ("because they are no more than conclusions, they are not entitled to the assumption of truth").  The Complaint offers few factual allegations about Anzalduas, but what is alleged indicates that in both situations, the Government established temporary outdoor processing, provided humanitarian support directly (*e.g.*, CBP "service stations" for distribution of food and water and "medical tent") and through non-government organizations (*e.g.*, World Central Kitchen), and relocated processed individuals to other sites prior to expulsion.  *See, e.g.*, Compl. ¶¶ 73, 77, 89, 90, 169.  Thus, the two sentences in the Complaint about Anzalduas do not plead plausible disparate treatment.  Further, and most critically, Individual Plaintiffs were subject to the same Government policy under Title 42, and the Complaint does not plausibly allege otherwise.

---

determine whether a person is similarly situated to those persons who allegedly received favorable treatment.'") (citation omitted); *Brown v. Califano*, 627 F.2d 1221, 1234 n.78 (D.C. Cir. 1980) ("Absent proof of disproportionate impact, we refrain from further investigation into the historical background and legislative history to unearth illegitimate intent."); *Richards v. Gelsomino*, Civ. A. No. 16-1002 (JDB), 2019 WL 1535466, at *10 (D.D.C. Apr. 8, 2019) ("The threshold inquiry in evaluating an equal protection claim is . . . to determine whether a person is similarly situated to those persons who allegedly received favorable treatment. . . .  Proof of disparate treatment is an absolute requirement.") (citations and quotations omitted).

In addition, Plaintiffs have not plausibly alleged the Government's conduct was motivated by discriminatory intent or purpose even under the other *Arlington Heights* criteria.[9]  Plaintiffs allege a "history of anti-Haitian immigration policies" (Compl. ¶¶ 36-51) from previous Administrations (and previous decades) but "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987); *see Arlington Heights*, 429 U.S. at 267 ("historical background *of the decision*" being challenged) (emphasis added).

Plaintiffs also argue that the "sequence of events" leading up to September 2021 supports a finding of discriminatory motive, yet one event was the DHS Secretary and Biden Administration "redesignat[ing] Haiti for Temporary Protected Status" in August 2021.  Opp. at 29; Compl. ¶ 64. This strongly suggests that the current Administration did not harbor racial animus towards the Haitian community.[10]  Plaintiffs allege that the sequence of events leading up to September 2021 consisted of Defendants "disregard[ing] months of intelligence" about and failing to sufficiently prepare for the Haitian migrants' arrival and that this "departed from normal procedures."  Opp. at 29.  But as argued in the Motion, these allegations—which are vague and conclusory as to what was "disregarded" and what are "normal procedures" for the influx of 15,000 migrants to Del Rio, Texas—do not plausibly support that Haitian migrants were purposefully treated differently in the

---

[9]     Plaintiffs argue that Defendants "waived" the right to argue that Plaintiffs have not stated a claim under *Arlington Heights*, Opp. at 28-29, but the Complaint never provided notice that Plaintiffs were attempting to plead a claim based solely on *Arlington Heights*.  Regardless, Defendants argued that Plaintiffs did not plausibly allege discriminatory purpose, Mot. at 35, which is the subject of *Arlington Heights*.

[10]     Although Temporary Protected Status decisions do not directly relate to the challenged September 2021 processing and expulsion of Haitian migrants from Del Rio, obviously Plaintiffs cannot use the previous Administration's termination of Temporary Protected Status for Haitians as evidence of discriminatory animus when Defendant Mayorkas and the Biden Administration "redesignated Haiti for Temporary Protected Status."  *Id.* ¶ 51, 64.

Government's approach based on race or national origin.  Mot. at 33-34; *Ramos v. Wolf*, 975 F.3d 872, 899 (9th Cir. 2020) (concluding that the fact that events leading up to temporary protected status determinations were "'irregular and suggestive of a predetermined outcome'" was "[insufficient] support for the conclusion that this overarching goal was motivated by racial animus").

Finally, the Complaint does not allege any "contemporary statement" by any decision-maker for the challenged decisions or actions, which Count I identifies as the "adoption and implementation of the Title 42 Process and Haitian Deterrence Policy."  Compl. ¶ 287.  There are no allegations that CDC Director Walensky, responsible for the August 2021 Order,[11] made statements suggestive of racial animus.  Nor does the Complaint allege such statements by President Biden, Secretary Mayorkas, other named DHS Defendants, or any person identified as a decision-maker for the challenged decisions.  The purported statements of unidentified "senior DHS officials" and line-level CBP officers are "unilluminating" because Plaintiffs have not alleged that they were the "relevant actors" for the policies being challenged by Plaintiffs.  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020) (finding statements of President Trump "d[id] not qualify as "contemporary statements" probative of the decision at issue," which was the recission of Deferred Action for Childhood Arrivals).

Thus, as argued in Defendants' Motion, the Complaint fails to state a plausible Equal Protection violation as a consequence of the lack of factual pleading that Haitian migrants in September 2021 were treated or impacted differently than similarly-situated migrants of different races or nationalities subject to Title 42 and the lack of factual pleading plausibly suggesting a

---

[11]    *See* Centers for Disease Control and Prevention, Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021) ("August 2021 Order").

discriminatory purpose in the application of Title 42 to the Haitian migrants at Del Rio. Plaintiffs must allege more than the "mere possibility" of discriminatory purpose to state an equal protection claim. *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1950). And they have not done so here.

## III. <u>Certain APA Claims Should Be Dismissed</u>

### A. Plaintiffs Fail to Allege a Plausible Claim of Withheld Agency Action

Plaintiffs contend that Defendants "unlawfully withheld" the duty to inspect arriving noncitizens pursuant to 8 U.S.C. § 1225(a)(3). Opp. at 44; Compl. ¶¶ 356-60. Although Plaintiffs treat inspection as a mechanism for seeking asylum or withholding of removal, Opp. at 44, the purpose of 8 U.S.C. § 1225(a) is to "determine whether an alien seeking to enter the country is admissible." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). A noncitizen who "arrives in the United States" is treated as "an applicant for admission," and applicants for admission are "inspected by immigration officers" to ensure that they may be admitted into the country consistent with U.S. immigration law. *Id*. at 836-37; 8 U.S.C. § 1225(a)(1), (3). However, pursuant to the August 2021 Order, "covered noncitizens" "have no right to be in the United States." *Huisha-Huisha*, 27 F.4th at 721. That Order, issued pursuant to Section 265, "eliminated [the] path" to admission, *id*. at 722, for covered noncitizens. And the August 2021 Order "foreclose[d] more than just the grant of asylum; it also foreclose[d] the statutorily mandated procedures that [noncitizens] use to apply for asylum." *Id*. at 731. Because the admission decision had already been made, inspection procedures to determine admissibility "would be futile." *Id*. Thus, under the D.C. Circuit's reasoning, inspection procedures to determine admissibility were not "unlawfully withheld." Rather, they were legally "foreclosed" because of the August 2021 Order.

Plaintiffs also have not plausibly alleged that Defendants CBP and ICE have "unlawfully withheld" "procedures required by 8 U.S.C. § 1231(b)(3) and [1231 note.]"  Compl. ¶¶ 362-63. In their Motion, Defendants demonstrated that 8 U.S.C. §§ 1231 and 1231 note do not set forth any "ministerial or non-discretionary" procedures "demanded by law" that can be compelled pursuant to 5 U.S.C. § 706(1).  Mot. at 37-38; *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 64-65 (2004).  Plaintiffs do not directly dispute this, arguing now that "§ 1231 and the § 1231 note specify a mandatory result."  Opp. at 46.

Consequently, Plaintiffs cite other statutory and regulatory provisions to argue that CBP and ICE withheld duties required by law.  For example, Plaintiffs rely on a regulation that pertains to the expedited removal process, but Individual Plaintiffs were not in expedited removal proceedings.[12]  Plaintiffs also rely on the inspection provision at 8 U.S.C. § 1225.  Opp. at 46.  As explained above, inspection was not "unlawfully withheld," but in any event Section 1225 does not set forth a "ministerial or non-discretionary" command concerning withholding of removal and CAT relief that a court can compel.  Rather, the statute states in relevant part that an immigration officer shall order the removal of an inadmissible noncitizen "unless the [noncitizen] indicates . . . a fear of persecution."  8 U.S.C. § 1225(b)(1)(A)(i).  Statutory withholding of removal and CAT relief are contingent on the indications of the noncitizen, which the noncitizen may or may not make.  Plaintiffs criticize the Capio Memo, but it similarly relies on indications from noncitizens.  If a noncitizen makes an affirmative claim of "fear of being tortured," immigration

---

[12]     Plaintiffs cite 8 C.F.R. § 235.3(b)(4), Opp. at 37, but it pertains to noncitizens who are in expedited removal proceedings.  8 C.F.R. § 235.3(b)(4) ("If an alien subject to the expedited removal provisions . . . expresses a fear of persecution or torture[.]").  Individual Plaintiffs do not claim to have been in expedited removal proceedings.

officers are directed to refer the person to U.S. Citizenship and Immigration Services for further screening.  *See* Compl. ¶ 57 n.12.

Likewise, Section 1231(b)(3)(A) states that DHS "may not remove" a noncitizen "if [DHS] decides that the alien's life or freedom would be threatened" because of certain criteria.  "'If' is a 'conditional term' . . . and its use clearly implies that the 'agency' has some discretion" in its decision-making.  *Weber v. Dep't of State*, 885 F. Supp. 2d 46, 52 (D.D.C. 2012) (concluding that, because State Department has discretion in deciding the validity of a renunciation of citizenship, a claim under Section 706(1) fails).  Plaintiffs, though, do not cite any legal authority whereby any similar provision (*e.g.*, a negative command directing the government may not take an action if certain contingencies exist) formed the basis for a viable Section 706(1) claim.  *Cf. Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) ("The mandatoriness requirement means that courts cannot compel agencies to take action beyond what is legally required of them.").  Indeed, rather than being non-discretionary, the decision not to remove a noncitizen under either provision involves the exercise of discretion. Moreover, as explained previously, Individual Plaintiffs have not alleged facts plausibly establishing that they would have benefited from these two provisions.

Therefore, for all the foregoing reasons, Plaintiffs have failed to plead a plausible claim pursuant to APA Section 706(1).

**B.     Plaintiffs' Challenge to "Haitian Deterrence Policy" Fails to State a Claim**

Plaintiffs' Opposition effectively confirms that Count Eight should be dismissed.  First, Plaintiffs concede that "as alleged, the Haitian Deterrence Policy was devised at the White House level" and such Executive Office policies "are not subject to APA review."  Opp. at 51.  Plaintiffs contend that the "Haitian Deterrence Policy" can nonetheless be reviewed because agency action

adopting and implementing a White House directive is reviewable. *Id*. Plaintiffs, though, do not identify any allegations in the Complaint alleging facts plausibly showing DHS Defendants adopted or implemented a so-called White House "Haitian Deterrence Policy." *See id*.

Second, Defendants previously explained how the Complaint is devoid of any factual allegations plausibly establishing the purported "Haitian Deterrence Policy" as a "circumscribed, discrete agency action[]" in accordance with 5 U.S.C. § 551(13). *See* Mot. at 38-40. Tellingly, in response, Plaintiffs argue that this "policy" is a "rule," or maybe a "sanction," or perhaps an "Order," or a "denial of relief," or a "failure to act." Opp. at 48. But after trying on these agency action "clothes," Plaintiffs cannot find one that fits. Also telling is that Plaintiffs never quote from their own Complaint, in contrast to Defendants, who quoted the allegations demonstrating that the alleged "Haitian Deterrence Policy" is not an actual, existing discrete "agency action" under the APA. *See* Mot. at 14, 40. And Plaintiffs' Opposition is similarly devoid of case law indicating that their allegations plead an "agency action."

More specifically, Plaintiffs argue the "Haitian Deterrence Policy" is a "rule" but do not point to any "agency statement of general or particular applicability and future effect" for the treatment of Haitian migrants. *Patriot, Inc. v. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 4 (D.D.C. 1997) ("[A]n action is not a rule if it genuinely leaves the agency and its decision-makers free to exercise discretion.") (citations omitted). Indeed, in the Opposition, Plaintiffs do not point to any specific allegation in the Complaint supportive of Plaintiffs' "Haitian Deterrence Policy" being a "rule." Likewise, Plaintiffs fail to explain how the Complaint establishes it as a "sanction." Citing to roughly 60 paragraphs in the Complaint and assuring the Court that it is "replete with allegations" qualifying the "Haitian Deterrence Policy" as a sanction is not persuasive. In fact, the

Opposition is devoid of any binding or persuasive case law showing the Plaintiffs have plausibly alleged an "agency action."

Plaintiffs also argue that the "Haitian Deterrence Policy" is a "final" agency action. But in this argument, Plaintiffs not only fail to quote their Complaint, they fail to even cite it. Instead, Plaintiffs argue in conclusory terms that the alleged policy "is not in flux" but is "complete." Opp. at 50. Plaintiffs also argue that through this "policy" Haitian migrants were "hastily expelled," *id*. at 51, but do not explain how "legal consequences" of expulsion "flow[ed]" from the so-called "Haitian Deterrence Policy" and not the CDC's August 2021 Order. Accordingly, Plaintiffs have failed to establish that the Complaint satisfies the requirements of final agency action as articulated in *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (to be considered final the action must "mark the 'consummation' of the agency's decisionmaking process" (not "merely tentative or interlocutory") and be one by which "rights or obligations have been determined," or from which "legal consequences will flow.").

Again, as established in Defendants' Motion and not credibly disputed in the Opposition, the "Haitian Deterrence Policy" is a label Plaintiffs created to describe the "way" or "manner" in which an actual final agency action—the CDC's August 2021 Order—was applied to a large group of Haitian migrants in September 2021. Mot. at 14, 40 (citing Compl. ¶¶ 8, 62). Calling a series of administrative actions a "policy" does not make it so. *See Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (finding no final agency action because "Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices" under challenge). Further, challenges to how an agency implements a policy are generally unreviewable under the APA, and Plaintiffs do not argue to the contrary. *See* Mot. at 41; *see also generally* Opp.

IV.     **President Biden is Not a Proper Defendant**

As Defendants established in their Motion, President Biden is not a proper Defendant in this case because courts have long recognized that the non-ministerial conduct of the President, when he acts in his official capacity, cannot be enjoined.  Mot. at 41-45.  The Court should not struggle to set aside either of the two arguments Plaintiffs advance in their Opposition.

First, Plaintiffs point to cases against then-Presidents Nixon, Clinton, and Trump for the proposition that, at least in some circumstances where "the President himself" violates the law, "the court's order must run directly to the President."  Opp. at 52 (quoting *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973).  Plaintiffs, however, miss the critical distinction between the cases they cite and the case at issue here.  In all three cited cases, there were allegations that "the President himself" had taken an action or made a statement that violated the law.[13]  Here, Plaintiffs cannot point to a single paragraph in their 90-page Complaint that alleges any statement made by or action taken by President Biden.  *See generally* Opp., Compl.  The cases they cite are thus inapposite.

Second, Plaintiffs argue in the alternative that the case law does not support dismissal of President Biden "at this early stage."  Opp. at 53.  Not so.  While some courts may have "declined the government's invitation to dismiss the President as a party" at the motion to dismiss stage, Opp. at 53 (quoting *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 329 (D. Md. 2018)), the

---

[13]     *Clinton v. Jones*, 117 S. Ct. 1636, 1637 (1997), included an allegation that then-President Clinton personally "made 'abhorrent' sexual advances" against Paula Jones when he was Governor of Arkansas.  *Id*.  *Nixon v. Sirica*, 487 F.2d 700, 705 (D.C. Cir. 1973), included an allegation that then-President Nixon had personally "declined to produce" and thus withheld from a grand jury tape recordings of certain identified meetings and telephone conversations in response to a subpoena from Special Prosecutor Archibald Cox.  *Id*.  And in *Saget v. Trump,* 375 F. Supp. 3d 280, 335 (E.D.N.Y. 2019), the Court found that plaintiffs in that case "cite numerous statements made by the President himself" regarding the decision to revoke Temporary Protected Status for Haiti—the claims at issue in the action.

Court should not struggle to do so here.  In the instant case, there is *no* allegation (well-pled or not) that President Biden took any action or made any statement that violated the law; it is undisputed that the President is sued in his official capacity, challenging actions his administration took concerning public health policy at the U.S. borders during a pandemic in his role as Chief Executive overseeing the Departments of Health and Human Services and Homeland Security. Mot. at 45.  It is also undisputed that Plaintiffs brought suit against DHS, the DHS Secretary, CBP, CBP Commissioner, the Executive Assistant Commissioner of CBP's Office of Field Operations, Chief of U.S. Border Patrol, ICE, the Acting Director of ICE, HHS, the Secretary of HHS, the CDC, and the Director of the CDC.  *Id.*  Plaintiffs fail to explain what relief they could not obtain though injunctive relief against those subordinate Executive Branch agencies and officers.[14]  *See generally* Opp.  In such a case, the Court should not delay in promptly dismissing the President as a Defendant, thus ending the "unseemly appearance of constitutional tension" and possible "violation of the constitutional separation of powers" that his inclusion as a Defendant in this lawsuit creates.  *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).

## CONCLUSION

For the foregoing reasons, and all those articulated in Defendants' opening motion, Defendants respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety.

---

[14]   Plaintiffs concede in one breath that they "'*might*" ultimately receive complete relief though injunctions or declarations against subordinate officials alone," but argue in the next breath that the "record in this case has not been fully developed" regarding what relief would be appropriate or whether "an injunction against lower officials" would be sufficient. Opp. at 53. But Plaintiffs fail to explain what information is missing from the record that could possibly suggest that the relief they seek is available only from the President himself, who is not alleged to have personally taken any action or made any statement relevant to Plaintiffs' claims.  Their argument is thus unavailing.

Dated:  September 2, 2022                    Respectfully submitted,

                                            MATTHEW M. GRAVES, D.C. Bar. #481052
                                            United States Attorney

                                            BRIAN P. HUDAK
                                            Chief, Civil Division

                              By:    */s/ Sean M. Tepe*
                                            SEAN M. TEPE, DC Bar #1001323
                                            DIANA V. VALDIVIA, DC Bar #1006628
                                            Assistant United States Attorney
                                            601 D Street, N.W.
                                            Washington, D.C. 20530
                                            Phone: (202) 252-2533; (202) 252-2545
                                            sean.tepe@usdoj.gov
                                            diana.valdivia@usdoj.gov