**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

HAITIAN BRIDGE ALLIANCE *et al.*,

*Plaintiffs*,

v.

JOSEPH R. BIDEN, President of the United
States, *et al.*,

*Defendants*.

Civil Action No. 1:21-cv-03317

---

**PLAINTIFFS' SUPPLEMENTAL PLEADING**
**PURSUANT TO FED. R. CIV. P. 15(d)**

Plaintiffs, by and through their undersigned counsel, hereby supplement their Amended

Complaint pursuant to Federal Rule of Civil Procedure 15(d). Plaintiffs allege the following:

1.     Plaintiffs incorporate by reference every allegation in Plaintiffs' Complaint (ECF

No. 1).

**I.     Defendant CBP's Internal Investigation of Del Rio Extended Impunity for the
Abuses Suffered by Plaintiffs and Class Members.**

2.     Defendants promised a swift, impartial, and thorough investigation "in days, [] not

weeks" after photos of Plaintiff Mirard being assaulted by an agent on horseback went viral.[1]

Instead, nearly ten months after Defendants cleared the CBP Encampment[2], expelling class

---

[1] Joel Rose, *The inquiry into border agents on horseback continues. Critics see a 'broken' system.*, NPR (Nov. 6, 2021), https://www.npr.org/2021/11/06/1052786254/border-patrol-agents-horseback-investigation-haitian-immigrants.

[2] Capitalized terms not otherwise defined herein, have the meaning ascribed to them in Plaintiffs' Complaint. ECF No. 1.

members at unprecedented rates, Defendant CBP released its findings that there was "no evidence" that migrants were struck or prevented from seeking safety on U.S. soil.[3] CBP did not interview a single Haitian held in the CBP Encampment before releasing its conclusions and only reviewed a single 30-minute period during which the viral photograph of a CBP officer grabbing Plaintiff Mirard was captured. This one-sided and woefully incomplete investigation provides further support for Plaintiffs' assertion that Defendants will continue their unlawful actions toward Plaintiffs and class members.

3.      In conducting their investigation, Defendant CBP only spoke with law enforcement officials and one reporter who declined to provide a full account of what he saw because "he didn't want to get anyone in trouble."[4] Then-CBP Commissioner Magnus told the press that CBP did not interview migrants because they could not locate them, despite the fact that many were in immigration custody during the pendency of the investigation and that Individual Plaintiffs had offered to provide testimony. At the press conference announcing the report's conclusions, Commissioner Magnus lauded the "incredible humanitarian . . . efforts" of CBP agents in Del Rio.

4.      The CBP Report (hereinafter, "Report") provides further evidence of Defendants' animus toward Haitians. In interviews, CBP officers repeatedly invoke their fear of a "riot," despite no evidence of any such danger—indeed, CBP admits in the Report that there was no threat from any of the Haitians at the river. This unfounded and racist fear of riots is also reflected in statements by leadership and motivated CBP's decisions that led to the assault and terrorizing of Mirard and

---

[3] The Department of Homeland Security U.S. Customs and Border Protection, Office of Professional Responsibility, Report of Investigation, 202112280, https://www.cbp.gov/sites/default/files/assets/documents/2022-Jul/202112280-cbp-closing-report-public-redacted-final.pdf (hereinafter, "Report").

[4] Report at 73.

others.[5] CBP likewise whitewashed racist comments by a CBP officer, which were caught on camera and widely circulated, as merely "act[ing] in an unprofessional manner," minimizing and eliding the nature of these comments.[6] Indeed, even in drafting the Report, CBP engaged in further dehumanizing language regarding Haitians in the Encampment.[7]

5.      Despite the significant deficiencies of CBP's investigation and the animus reflected in the Report itself, the Report confirms key allegations from Plaintiffs' Complaint, including that conditions in the CBP Encampment were "dire" and that CBP officers understood class members to be in custody yet did not provide them with adequate food, water, or other basic needs.[8]

6.      The Report also admits that officers were instructed to prevent class members from reaching the CBP Encampment and did in fact attempt to turn back people on U.S. soil in contravention of asylum law, "us[ing] force, or threats of force, to coerce or compel individuals to return to Mexico."[9] CBP further states that they did so *knowing* that individuals were attempting to return to their starving families in the CBP Encampment and were in no way threatening. The Report admits that these attempted turn backs were an unnecessary and unsafe show of force intended to achieve an unlawful goal of pushing Haitians back to Mexico, acknowledging that officers on horseback almost trampled multiple people, including children, while swinging reins

---

[5] *See, e.g.*, Report at 28; 413 ("Chief Ortiz was worried the migrants under the Del Rio POE would find out about the flights, causing an uprising.").

[6] Report at 5.

[7] For example, in describing the Encampment CBP referred to the "migrant feeding area," using language that is typically associated with animals, not people. Report at 15.

[8] *See* Report at 16, 18, 23, 36, 37, 39, 45.

[9] Report at 3.

and driving people into the water, and that officers grabbed Plaintiff Mirard while on horseback.[10]

The Report further reveals that CBP Chief Ortiz spoke to involved officers just before the incident

occurred and that he accepted responsibility for officers' actions in the CBP Encampment.[11]

## II.    The Haitian Deterrence Policy Has Persisted Even as Purported Public Health Grounds for Title 42 Have Expired.

7.      On April 1, 2022, well over a year after the Biden Administration took office,

Defendant Rochelle Walensky announced the CDC's intention to end the Title 42 Process,

effective May 23, 2022.[12] The stated reason for the CDC Director's order ("April Termination

Order") was the CDC's changing assessment of the COVID-19 risk posed by the arrival of

"covered noncitizens" in the United States.[13]

8.      The Termination Order explicitly affirmed the CDC's authority to reimplement the

Title 42 Process, noting that if "there is a substantial change in the public health situation with

respect to the pandemic, such as due to new and particularly concerning SARS-CoV-2 variants,

CDC could determine a new order under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 is

necessary."

9.      Despite the issuance of the April Termination Order, the Title 42 Process did not

lift on May 23, 2022. Two days after Defendant Walensky's announcement, multiple states filed

---

[10] Report at 5; Report at 3 (acknowledging that class members have due process rights and that forcing a migrant who has arrived on US soil back to Mexico violates these rights).

[11] Report at 45.

[12] CDC, Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exist (April 1, 2022).

[13] 87 Fed. Reg. 19941, 19941-956 (Apr. 6, 2022), https://www.federalregister.gov/documents/2022/04/06/2022-07306/public-health-determination-and-order-regarding-suspending-the-right-to-introduce-certain-persons

a lawsuit that successfully enjoined the April Termination Order from taking effect. *Louisiana v. CDC*, 603 F. Supp. 3d 406 (W.D. La. 2022). The Title 42 Process thus remained in place.

10.    On January 30, 2023, the Biden administration announced that it would allow the COVID-19 public health emergency declaration to expire at the end of the day on May 11, 2023. Upon the expiration of the declaration – the purported public health basis for the Title 42 Process – the federal government ceased enforcing the Title 42 Process.

11.    Despite the current cessation of the Title 42 Process, Defendants have made no indication that they have terminated the Haitian Deterrence Policy. To the contrary, in the months leading up to the May 11, 2023, sunset of the COVID-19 public health emergency declaration and the Title 42 Process, the Biden administration announced multiple policies and initiatives that, while ostensibly intended to address what the administration deemed an "unprecedented surge in migration across the hemisphere," have a practical effect of continuing to deter Haitians from arriving in the United States to seek protection—notwithstanding the fact that the INA expressly allows any individual "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .)" to "apply for asylum." 8 U.S.C. § 1158(a)(1).

12.    By extending limited and oversubscribed parole pathways while harshly restricting other pathways to humanitarian protection, Defendants persist in their implementation of the Haitian Deterrence Policy and show that they would likely repeat the cruel and illegal actions that they took in September 2021, as described in the Complaint, if similar circumstances were to arise again in the future.

13.    *Haitian Parole.* On January 6, 2023, the U.S. government began offering a new parole pathway to Haitian nationals as part of the Processes for Cubans, Haitians, Nicaraguans,

and Venezuelans (hereafter, "Haitian Parole"). On information and belief, it was through extensive advocacy that Haiti was included in these parole programs at all.

14.     Under the Haitian Parole process, Haitians and other eligible nationals can apply for advance authorization to travel to the United States with a qualifying financial supporter in the United States if they meet eligibility criteria, including passing a "robust security vetting," and "warrant[ing] a favorable exercise of discretion."[14] Haitians who seek asylum between ports of entry at the U.S. border after the date the process was announced are barred from this program. Moreover, Haitians who attempt to journey to the United States to seek asylum and in so doing enter Mexico or Panama without required travel documents for those countries are likewise banned from the program.

15.     The U.S. government subsequently amended the Haitian Parole program to also exclude Haitian asylum seekers interdicted at sea after April 27, 2023.[15]

16.     The government's explicit purpose for implementing the Haitian Parole program was to "disincentivize Haitians in northern Mexico from seeking to enter along the [Southwest Border] of the United States without authorization."[16] In announcing the program, the government explicitly referenced the events in Del Rio in 2021, stating that "[g]iven the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted."[17]

---

[14] U.S. Citizenship and Immigration Services, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV

[15] 88 Fed. Reg. 26327, 26327-329 (Apr. 28, 2023),
https://www.federalregister.gov/documents/2023/04/28/2023-09014/implementation-of-a-change-to-the-parole-process-for-haitians

[16] 88 Fed. Reg. 1243, 1243-55 (Jan. 9, 2023),
https://www.federalregister.gov/documents/2023/01/09/2023-00255/implementation-of-a-parole-process-for-haitians

[17] *See id.* at 1249.

17.     Indeed, the government has met its objective to deter Haitians from applying for asylum at the border by announcing ineligibility for the Haitian Parole program for individuals who exercise their lawful right to seek asylum at the border, as demonstrated by CBP border encounters. In December 2022, before the announcement of the Haitian Parole program and its eligibility criteria, border encounters of Haitian nationals totaled just over 3,900. In January 2023, the month the program was announced, approximately 2,200 Haitians were encountered at the border. During the February, March, and April, border encounters with Haitians ranged from 168 to just over 300 individuals per month.[18]

18.     On May 18, 2023, the U.S. government announced a new review process for Haitian Parole applicants because applications for these processes were "significantly higher than the monthly travel authorizations available."[19] Under the new review process, approximately half of monthly recipients will be randomly selected through a lottery system from the applicant pool, irrespective of their filing date. On information and belief, this lottery system was adopted to stoke hope among applicants--who otherwise face months or years of waiting for their applications to be processed, often in extremely dangerous and difficult conditions—that they might win the lottery and have their application plucked from the burgeoning backlog. On information and belief, the Biden administration feared that Haitians would otherwise become discouraged with the process upon realizing the lengthy delay in processing time and once again try to exercise their right to seek asylum at the U.S. border, as they did in September 2021.

---

[18] U.S. Customs and Border Protection, *CBP Releases April 2023 Monthly Operational Update*, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-april-2023-monthly-operational-update#

[19] U.S. Citizenship and Immigration Services, *USCIS Updates Review Process for the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, (May 18, 2023), https://www.uscis.gov/newsroom/alerts/uscis-updates-review-process-for-the-processes-for-cubans-haitians-nicaraguans-and-venezuelans

19.     Since the announcement of the Haitian Parole program, more than 1.5 million applicants have applied from Haiti as well as the three other nations who had parole processes announced at the same time. Under the parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans, however, the programs' monthly cap is limited to no more than 30,000 travel authorization approvals across all four countries. As a result of this discrepancy, DHS documents have noted that fewer than three days' worth of applications per month have been processed.[20]

20.     On information and belief, the development of the Haitian Parole program, its limitations, and the new lottery process, have been designed to disincentivize Haitian nationals from seeking protection in the United States, consistent with and in furtherance of the Haitian Deterrence Policy.

21.     *Asylum Ban.* On February 23, 2023, the Biden administration published a Notice of Proposed Rulemaking that proposed a presumptive bar on asylum eligibility for most people arriving at the southern land border.[21] The proposed rule aimed to address the "concern about the possibility of a surge in irregular migration upon, or in anticipation of" the end of Title 42 and the potential for increased migration from Haiti, among other countries.[22]

22.     After a limited 30-day comment period, and despite public outcry from over 40,000 commentators, the final rule "Circumvention of Lawful Pathways" (hereinafter, "Asylum Ban"),

---

[20] Camilo Montoya-Galvez, *1.5 Million Apply for U.S. Migrant Sponsorship Program with 30,000 Monthly Cap*, (May 22, 2023, 9:56 PM), https://www.cbsnews.com/news/us-migrant-sponsorship-program-cuba-haiti-nicaragua-venezuela-applications/

[21] 88 Fed. Reg. 11,704 (Feb. 23, 2023), *"Circumvention of Lawful Pathways,"* https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways

[22] *See id.* at 11705–06.

went into effect upon the sunset of the Title 42 Process on May 11, 2023.[23] The Asylum Ban imposes a "rebuttable presumption of asylum ineligibility" on noncitizens who enter the United States without authorization at the southwest border and adjacent coastal borders after the termination of Title 42, subject to only narrow exceptions.

23.    Although Congress allows any individual to "apply for asylum" if that person "is physically present in the United States" or "arrives in the United States (whether or not at a designated port of arrival . . .)," the practical effect of the Asylum Ban is that it requires the *automatic* denial of an applicant's asylum claim, without consideration, unless the person satisfies one of three burdensome conditions: (1) presenting only at a port of entry after securing one of a very limited number of appointments through CBP One, a complicated mobile application that requires an up-to-date smart phone and stable internet connection; (2) applying for and being denied asylum in a country through which the individual travelled en route to the United States (hereinafter the "Transit Ban"); or (3) obtaining advance permission to travel to the United States through an approved parole program, such as the Haitian Parole process.

24.    None of the narrow exceptions to the Asylum Ban provide an adequate pathway for asylum seekers. First, it is now well documented that the CBP One application—one of the primary means through which asylum-seekers may avoid the presumption of ineligibility for asylum— suffers from numerous flaws, including excessively limited daily appointments. Importantly, several of these flaws disproportionately or uniquely affect Haitian asylum seekers, including the

---

[23] 88 Fed. Reg. 31314, 31314-452 (May 16, 2023),
https://www.federalregister.gov/documents/2023/05/16/2023-10146/circumvention-of-lawful-pathways; https://immigrantjustice.org/sites/default/files/content-type/commentary-item/documents/2023-03/Biden%20Asylum%20Ban%20-%20Extension%20letter%20to%2030-days%20comment%20period%20FINAL.pdf

use of technology that disproportionately rejects applicants with darker skin tones and the provision of at times of information that is incorrect and unintelligible in Haitian Creole, but not in other languages offered on CBP One.[24] In addition, some Haitians are sporadically and inexplicably being turned back to Mexico, even when they have properly gone through the CBP One appointment process and have no prior deportation or criminal record. Organizational Plaintiff HBA has raised this issue to Defendant CBP but has been unable to receive information about why this is happening. On information and belief, Haitians are experiencing these turnbacks at a disproportionately high rate compared to individuals of other nationalities using CBP One.

25.    Second, the Transit Ban requires Haitians to first apply for, and be denied, asylum in a country they traveled through on their way to seek asylum in the United States. As Individual Plaintiffs' stories make amply clear, Plaintiffs experienced and continue to experience rampant violence and discrimination in the very countries where the Transit Ban would require them to seek asylum, making this exception untenable. *See, e.g., infra* ¶ 37; Compl. ¶¶ 211; 218; 224; 239; 245; 246; 261. Moreover, because of this widespread discrimination against Haitians as well as language barriers that Haitians face in transit countries, Haitians experience additional barriers to accessing the asylum system in transit countries, and thus are disproportionately harmed by the Transit Ban.

26.    Third, the Haitian Parole program does not provide an adequate pathway for asylum seekers for the reasons described above. In addition to its limited nature and burgeoning backlog of applications, the Haitian Parole program requires applicants to have a qualifying sponsor in the

---

[24] Raul Pinto, *CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers*, Immigration Impact, (Feb. 28, 2023), https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/

United States who commits to financially supporting them for two years—a prerequisite that renders the program inaccessible to many asylum seekers. Haitians who entered Panama, Mexico, or the United States without travel authorization are also barred from eligibility.[25]

27.     Notably, the final version of the Asylum Ban was expanded from the initial proposed rulemaking to also deter migrants who enter the United States through "adjacent coastal borders"—an expansion that will have a disproportionate impact on Haitians who, along with Cubans, constitute the largest population of asylum-seekers attempting to reach the United States by sea.

28.     In addition, the Biden administration announced that asylum-seekers barred by the Asylum Ban "will generally be processed under Title 8 expedited removal authority" and removed "in a matter of days."[26] This practice will effectively continue Defendants' practice of "expelling" Haitian and other non-Mexican asylum-seekers to Mexico under Title 42, with the additional punitive consequence of the five-year bar to re-entry to the United States that accompanies an expedited removal order.

29.     On information and belief, the Asylum Ban is further evidence that Defendants continue to use available policy mechanisms to implement the Haitian Deterrence Policy, irrespective of the sunset of the current Title 42 Process.

30.     The Asylum Ban's "rebuttable presumption of asylum ineligibility" unlawfully disincentivizes Haitians from seeking asylum, violating the uniform right to seek asylum and contravening the plain language of the Immigration and Nationality Act. *See* INA § 208(a)(1); 8

---

[25] Additionally, the Haitian Parole program is the subject of litigation in *Texas v. DHS*, Case No. 6:23-cv-00007 (S.D.Tx. 2023), where 21 states seek to enjoin the program. If successful, this limited pathway for Haitian asylum seekers will disappear.

[26] 88 Fed. Reg. at 63,511, https://cl.usembassy.gov/u-s-government-announces-sweeping-new-actions-to-manage-regional-migration/.

U.S.C. § 1158(a)(1) (stating that noncitizens who arrive to the U.S., regardless of whether they arrive at a designated port of entry or are brought to the U.S. after being interdicted at sea, may apply for asylum). Indeed, the Asylum Ban's restrictions on asylum mirror similar bans under the Trump administration that were vacated and enjoined by federal courts for violating U.S. law, and the new Asylum Ban is already being challenged in court.[27]

31.     In addition to the Haitian Parole process, which channels desperate Haitian asylum seekers into a narrow and protracted process to come to this country and seek asylum, and the Asylum Ban, which prevents individuals from presenting at the border to seek asylum as the INA permits, the Biden administration has adopted other policies that make it still harder to seek asylum in the United States. The administration has, for example, made it even more difficult for an asylum-seeker to claim a "credible fear" of persecution or torture, by reviving the Trump administration's practice of extremely expedited timelines for credible fear screening interviews while detained in CBP custody, rather than after being transferred to ICE custody. DHS also announced on May 11 a related policy change: the waiting period before a credible fear interview would be reduced to 24 hours. Both policies make adequate preparation for the interview even more difficult by preventing asylum seekers from consulting adequately with counsel and subjecting them to deplorable confinement conditions, both of which demonstrably have a negative impact on credible fear passage rates.

---

[27] *See E. Bay Sanctuary Covenant v. Barr,* 519 F. Supp. 3d 663 (N.D. Cal. 2021); *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020); *O.A. v. Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019); National Immigrant Justice Center, *Immigrant Rights Advocates Sue Biden Administration Over New Asylum Ban*, (May 11, 2023), https://immigrantjustice.org/press-releases/immigrant-rights-advocates-sue-biden-administration-over-new-asylum-ban

32.     On information and belief, these changes to the credible fear interview screening process have been designed at least in part to reduce the number of Haitian nationals who are able to successfully seek asylum in the United States, thus disincentivizing Haitian nationals from seeking protection in the United States, consistent with and in furtherance of the Haitian Deterrence Policy.

33.     On information and belief, the Biden administration continues to fear the arrival of Haitian asylum seekers and is aggressively adopting policies to continue the work of the Title 42 Process: preventing Haitians from entering the United States and exercising their right to seek asylum in this country.

## III.    Individual Plaintiffs and Class Members Suffer Ongoing Harms from the Title 42 Process and the Haitian Deterrence Policy.

34.     Irrespective of the sunset of Title 42, the harms inflicted by the Title 42 Process at Del Rio and the continuing Haitian Deterrence Policy persist for Plaintiffs and class members.[28]

35.     Since the filing of Plaintiffs' original Complaint, humanitarian crises in Haiti have persisted and gangs have continued to expand their power, taking control of nearly sixty percent of the country.[29] As a result, gang-related violence in Haiti, including rampant kidnappings, has escalated to new levels of severity, reaching nearly all segments of Haitian society.[30] Such violence

---

[28] In addition to the claims asserted in the Complaint and this Supplemental Complaint, Individual Plaintiffs now also intend to assert individual claims based on the Federal Tort Claims Act and may request further leave to add such claims to this case after satisfying the necessary administrative exhaustion requirements.

[29] *See* Megan Janetsky & Pierre-Richard Luxama, *Gangs take control in Haiti as democracy withers*, PBS, (Jan. 31, 2023), https://www.pbs.org/newshour/world/gangs-take-control-in-haiti-as-democracy-withers; *see also* Widlore Mérancourt & Amanda Coletta, *Haiti's gangs use TikTok, Instagram, Twitter to recruit and terrorize*, The Washington Post, (June 11, 2022), https://www.washingtonpost.com/world/2022/06/11/haiti-gangs-social-media-cherizier-izo/.

[30] *See id.* supra note 23.

is one factor of many that has deepened the level of insecurity in Haiti, "fueling an exodus of Haitians . . . bound for the United States and elsewhere."[31] Haiti also continues to face political, economic, and food insecurities.[32] The humanitarian conditions in Haiti have become so fraught that the U.N. Secretary General has "called on governments to consider halting deportations as the country's situation spirals."[33]

36.     Of the five Individual Plaintiffs expelled to Haiti by Defendants, three still remain outside the United States in precarious conditions as a direct result of Defendants' application of the Title 42 Process and the Haitian Deterrence Policy in September 2021.

37.     Plaintiffs Mirard Joseph and Madeleine Prospere are currently in Chile with their youngest child. After they were expelled back to Haiti from Del Rio in September 2021, life in Haiti was incredibly difficult for them. Their child was very sick and they feared she would die, but they could not seek medical treatment for her because there were no hospitals or medical clinics operating in their neighborhood. The couple was forced to ask for money from extended relatives in the United States so that Madeleine and their daughter could travel in December 2021 to Chile,

---

31 Widlore Mérancourt & Amanda Coletta, *Haiti's gangs use TikTok, Instagram, Twitter to recruit and terrorize*, The Washington Post, (June 11, 2022), https://www.washingtonpost.com/world/2022/06/11/haiti-gangs-social-media-cherizier-izo/.

32 *See* Becky Sullivan, *As its only remaining elected officials depart, Haiti reaches a breaking point*, NPR, (Jan. 18, 2023), https://www.npr.org/2023/01/18/1149556481/haiti-last-elected-official-political-crisis ("Haiti, a country long beset by catastrophe and political turmoil, is facing perhaps its steepest challenge in recent decades as its piecemeal government, now lacking any democratically elected officials, struggles to chart a path forward amid gang violence and a cholera outbreak."); *see also* Dánica Coleto, *UN chief insists on deploying special armed forces as crises in Haiti worsen*, PBS, (Jan. 23, 2023), https://www.pbs.org/newshour/world/un-chief-insists-on-deploying-special-armed-forces-as-crises-in-haiti-worsen

33 Dánica Coto, *UN chief insists on deploying special armed forces as crises in Haiti worsen*, PBS, (Jan. 23, 2023), https://www.pbs.org/newshour/world/un-chief-insists-on-deploying-special-armed-forces-as-crises-in-haiti-worsen

where Madeleine was able to take their daughter to a hospital for treatment. Their daughter is better now, but Mirard believes that if they had stayed in Haiti, she would have died.

38.     Mirard remained in Haiti after Madeleine and their child left for Chile, but he was soon compelled to search for ways to leave Haiti himself. In the spring of 2022, a photojournalist came to Port-au-Prince to interview Mirard and take photographs of him for an article, eventually published in TIME magazine, about Del Rio and the photograph of Mirard that went viral during media coverage of Del Rio. After the photojournalist's visit, members of the gang operating in Mirard's neighborhood visited him multiple times and tried to extort money from him, on the assumption that a white visitor with fancy camera equipment had brought him money. When he said he had no money, they began demanding that he join the gang and threatened violence against him. Because of these threats, Mirard was forced to flee to a different, more remote neighborhood and eventually wrote a friend in Chile begging for help. The friend agreed to buy Mirard a plane ticket to Chile, but only if Mirard promised to pay him back. After flying to Chile in May 2022, Mirard was only recently able to finish repaying his friend.

39.     Life in Chile remains challenging for Mirard's family. Mirard does not have legal status in Chile, so he is not able to work legally and secure a regular job to help support the family. Madeleine has permanent residence in Chile and is therefore able to work, but her income is often not enough for the family. Mirard is occasionally able to find night jobs where he can work without papers, but these are risky because he has been accosted multiple times at night on his way home by Chileans who have assaulted him and attempted to rob him because he is Haitian. His experience is not unique; Haitians suffer widespread discrimination in Chile, and many Haitians have been killed or assaulted for the color of their skin, with no legal repercussions for the perpetrators. Mirard constantly tries to avoid encounters with Chileans because if you're Haitian,

"you'll always be the one who's wrong." He has considered traveling back to the United States to seek asylum, but his first attempt to do so—which led him to Del Rio in September 2021—caused him so much suffering that he has decided not to take the risk of traveling to the U.S. Southern Border again. As explained *infra*, Mirard has applied for Haitian parole through a U.S.-citizen sponsor in order to seek asylum in the United States.

40.    If Mirard and Madeleine had not been expelled back to Haiti in September 2021 pursuant to Title 42 and the Haitian Deterrence Policy, and instead been allowed to access the U.S. asylum process as the INA allows, they could have sought humanitarian parole into the United States under a Title 42 exemption and filed asylum applications. If they had been paroled into the United States during the pendency of their asylum application, they would have been eligible for Temporary Protected Status ("TPS"), as explained *infra at* ¶ 49, which Defendant Secretary Alejandro Mayorkas redesignated on December 2, 2022, for Haitians who entered the United States on or before November 6, 2022. Even if they enter at a future date, they would not be eligible for TPS unless Haiti is re-designated. With TPS, they would have received work authorization and could have found jobs to support themselves and their family.

41.    Plaintiff Jacques Doe is currently in Haiti, where he was expelled under Title 42 and the Haitian Deterrence Policy. Because he is afraid that people will be able to identify him and alert the gang that had previously threatened his life, this young, bright man has been forced to remain in hiding. It is common knowledge in Haiti that gangs kill with impunity, so instead of returning to his old neighborhood in Port-au-Prince, he spends his time primarily in a remote town in the countryside, limits his movement, and tries to stay indoors. When he goes to Port-au-Prince to visit his ailing mother, he does so at night and in secret. He lives in constant fear of being recognized by someone and being targeted again by the gang.

42.     Jacques Doe is unable to lead a normal life in Haiti. His expulsion from the United States left him traumatized. He struggled to resist the urge to engage in self-harm after his experience in Del Rio. Since then, he has not been able to find consistent work, partly because he must remain in hiding due to the threats against his life, but also because there are very few job opportunities in Haiti. When he is unable to find or pay for food, he simply does not eat. He cannot provide for himself or for his sick mother, which further affects his mental health. He rarely sees any friends because sharing his location could put not only himself but also his friends at risk from the gang. Though he does not have the means to do so, he would like to leave Haiti and come to the United States again to seek asylum, as the reasons he initially left Haiti have continued or even worsened since his return.

43.     Like Mirard and Madeleine, if Jacques Doe had not been expelled back to Haiti in September 2021 pursuant to Title 42 and the Haitian Deterrence Policy, and instead been allowed to access the U.S. asylum process as the INA allows, he could have sought humanitarian parole under a Title 42 exemption and he could have sought asylum. If he had been paroled into the United States, he would have been eligible for TPS; and with TPS, he would have received work authorization and could have found a job to help support his sick mother back in Haiti.

44.     The experiences of Mirard, Madeleine, and Jacques reflect the harmful results of the recent policies adopted by the Biden administration. Through U.S.-based sponsors, Mirard, Madeleine, and Jacques submitted applications for Haitian Parole in January 2023. Although the U.S. government reports that it normally adjudicates parole requests within 90 days of receipt,[34] none of these Individual Plaintiffs have received an update on their applications beyond the initial

---

[34] U.S. Citizenship and Immigration Services, *Parole Processing*, https://www.uscis.gov/humanitarian/humanitarian-parole/parole-processing

notice of receipt. But the Asylum Ban now prevents them from coming to the border to seek asylum, as the INA allows and as they previously tried to do in September 2021. If these Individual Plaintiffs are not able to secure one of the tightly restricted appointments available through the CBP One application, and cannot show that they have sought and been denied asylum in any country through which they travel to reach the United States, they will be presumptively ineligible for asylum.

45.     Other Individual Plaintiffs remain in legal limbo. Plaintiffs Esther and Emmanuel Doe, Samuel and Samentha Doe, and Paul Doe received temporary, discretionary grants of humanitarian parole into the United States between April and May 2022. They continue to seek permanent protection in the United States and have filed their Form I-589 Applications for Asylum and for Withholding of Removal. Because their asylum applications have not yet been pending for 180 days, they are currently ineligible for work authorization based on those applications. If they had not been pushed back into Mexico as a result of Defendants' use of the Haitian Deterrence Policy, and instead been allowed to access the U.S. asylum process, they would already be eligible for and likely have received work authorization based on their pending asylum applications.

46.     Plaintiffs Mayco Celon and Veronique Cassonell received temporary, discretionary grants of humanitarian parole into the United States in July 2022. Their one-year grants of parole expire in July 2023. They also continue to seek protection in the United States and are preparing to file their Form I-589 Applications for Asylum and for Withholding of Removal. Because their one-year grants of parole expire imminently and their asylum applications have not yet been pending for 180 days, they will soon be ineligible for work authorization. If Mayco and Veronique had not been expelled back to Haiti in September 2021 pursuant to Title 42 and the Haitian Deterrence Policy, and instead been allowed to access the U.S. asylum process, they would

already be eligible for and likely have received work authorization based on their pending asylum applications.

47.      In March 2023, Plaintiff Wilson Doe and his wife Wideline received temporary, discretionary grants of humanitarian parole into the United States. Like other Individual Plaintiffs, they continue to seek permanent protection in the United States. If Wilson and his wife had not been expelled back to Haiti in September 2021 pursuant to Title 42 and the Haitian Deterrence Policy, and instead been allowed to access the U.S. asylum process, they would have been eligible for Haitian TPS and accompanying work authorization. They would also already be eligible for and likely have received work authorization based on their pending asylum applications.

48.      On information and belief, class members' circumstances mirror those of Individual Plaintiffs. Individuals who were subjected to the Title 42 Process and Haitian Deterrence Policy at Del Rio either continue to be stranded in dangerous circumstances outside the United States or have been severely delayed in exercising their lawful right to seek asylum in the United States. Class members who were expelled to Haiti through the Title 42 Process—like Plaintiffs Mirard Joseph, Madeleine Prospere, Jacques Doe, Wilson Doe, Mayco Celon, and Veronique Cassonell—have suffered continued harm from conditions in Haiti that Defendant DHS has recognized as "extraordinary," "including a prolonged political crisis; grave insecurity and gang crime that worsened a dire economic situation; a lack of access to food, water, fuel and health care during a resurgence of cholera; and the recent catastrophic earthquakes."[35] The harms experienced by class members expelled to Haiti have only increased as the conditions in Haiti have

---

[35] Homeland Security, *Secretary Mayorkas Extends and Redesignates Temporary Protected Status for Haiti for 18 Months*, (Dec. 5, 2022), https://www.dhs.gov/news/2022/12/05/secretary-mayorkas-extends-and-redesignates-temporary-protected-status-haiti-18

further deteriorated. Class members are particularly vulnerable as they are more likely to be targets

of kidnappings and other gang violence, as expelled and deported individuals face stigma in Haiti.

49.     For class members who remain outside the United States or entered on temporary,

discretionary grants of humanitarian parole after November 6, 2022—including Plaintiffs Mirard

Joseph, Madeleine Prospere, Jacques Doe, and Wilson Doe—Defendants' conduct at Del Rio has

also harmed them by making them ineligible to apply for TPS for Haiti. On December 2, 2022,

Defendant Secretary Alejandro Mayorkas announced the redesignation of Haiti for TPS, on the

basis that "[t]he conditions in Haiti, including socioeconomic challenges, political instability, and

gang violence and crime – aggravated by environmental disaster – compelled the humanitarian

relief we are providing today."[36] Under the redesignation, Haitians who have continuously resided

in the United States since November 6, 2022, and have remained continuously physically present

in the United States since February 4, 2023, were eligible to apply for TPS and accompanying

work authorization in the United States through August 3, 2024.[37]

50.     More broadly, the mass abuse and expulsion of Haitians from Del Rio in 2021,

including the deportations in shackles that began at that time, continue to have a chilling effect on

class members and other Haitians who would like to exercise their right to seek asylum in the

United States. For example, the number of Haitian asylum seekers apprehended at the border since

October 2021 is markedly lower than the number of apprehensions in the months leading up to

September 2021. On information and belief, the specter of Del Rio remains for class members and

other Haitians who would otherwise exercise their right to seek protection.

---

[36] *Id.*

[37] 88 Fed. Reg. 5022, 5022-32, (Jan. 26, 2023),
https://www.federalregister.gov/documents/2023/01/26/2023-01586/extension-and-redesignation-of-haiti-for-temporary-protected-status

**IV.     Organizational Plaintiff Haitian Bridge Alliance Suffers Ongoing Harms from the Title 42 Process and the Haitian Deterrence Policy.**

51.     Organizational Plaintiff HBA continues to divert resources as a result of Defendants' unlawful conduct at issue in this case, which remains the biggest drain on HBA's staff and finances.

52.     As a result of Defendants' conduct, the demand on HBA's resources has increased in Mexico and along the southern border. If class members had been allowed to exercise their legal right to seek asylum when they first entered the United States in 2021, they would either have (1) remained in the US while pursuing their asylum claims, resulting in many cases in a grant of asylum or a grant of TPS when Haiti was redesignated for TPS on December 2, 2022, or (2) been removed to Haiti after receiving an adjudication of their asylum application. Instead, many thousands of class members were expelled to Haiti and Mexico with no opportunity to access the asylum system.

53.     HBA continues to regularly encounter class members who were expelled to Mexico, or expelled to Haiti and have since returned to Mexico, hoping to finally exercise the right to seek asylum denied to them in September 2021. HBA must effectively serve the same population twice—once leading up to, during, and in the immediate aftermath of Del Rio; and again in the ensuing months and years, now that expelled individuals languish in Mexico or have left Haiti again to seek safety and stability elsewhere, including in the United States.

54.     Fielding inquiries from, and providing services to, this population takes a substantial amount of HBA's resources, both because of the overall increase in demand for HBA's services resulting from the mass expulsion and denial of rights to class members, and because class members often have more complicated cases as a result of their prior expulsion, and increased trauma as a result of their treatment by Defendants in Del Rio. These cases thus require additional

21

time and effort. Many of these class members would likely not be once again in HBA's service area if their rights had been respected at Del Rio, as they would either have been able to remain in the United States, receiving parole, asylum or TPS, or they would have received their due process and be subject to a five-year bar on entry to the U.S.

55.     The increased demand for services at the border and in Mexico created by Defendants' unlawful conduct has diverted significant resources from HBA's existing work. The core of HBA's funding and staffing for its legal and humanitarian programs center on service provision in California. However, because of the urgency created by Defendants' mass expulsion of Haitians to Mexico and Haiti, HBA has had to focus more time and resources, including of its leadership, on fielding inquiries from class members expelled to Haiti and Mexico and addressing egregious and urgent humanitarian and other conditions created by the unprecedented mass expulsion of Haitians. These efforts have drawn resources away from HBA's normal fundraising and administrative operations and has created delay in several key areas of HBA's existing work. For example, HBA experienced over a year delay in launching a long-planned community center in California for Haitian migrants. Similarly, HBA has not met its benchmarks for legal service provision in California as it continues to address the increased and urgent need for humanitarian and legal services of class members and other Haitians in Mexico. In addition, prior to Del Rio, HBA had a normal practice of undertaking several human rights investigations each year and publishing white papers to bring attention to the plight of Haitian migrants in the Americas. Since Del Rio, however, HBA has not had the available staffing or resources to publish a single white paper.

56.     HBA also experiences ongoing harm because of the primary and secondary trauma that HBA staff experienced at the CBP Encampment and in its aftermath. As the first NGO to

arrive in Del Rio, and with many staff who are themselves Haitian, staff experienced trauma from what they witnessed in the CBP Encampment and its clearing. That trauma was compounded by the urgent demand for HBA's resources in the weeks and months following the CBP Encampment. HBA staff were unable to take the time to address their own direct and vicarious trauma because they were continuing to work around the clock to attempt to prevent unlawful expulsions, locate individuals and connect them with their loved ones, and bear witness to the manifold human rights abuses that Haitians had experienced and continued to experience in detention facilities and upon expulsion to Haiti and Mexico. HBA staff continue to experience the effects of burnout and trauma which undermine their ability in turn to most effectively do their work.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby incorporate and reassert the prayer for relief from Plaintiffs' original Complaint and also set forth the additional requests for relief:

    a.  Declaring that Plaintiffs and Class members, for the purposes of seeking Temporary Protected Status only, were continuously residing and continuously physically present in the U.S. since September 2021;

    b.  Declaring that Plaintiffs and Class Members are not subject to the Asylum Ban Regulations because their entry to the United States at Del Rio was before May 11, 2023;

    c.  Declaring that Plaintiffs and Class Members are immediately eligible to apply for (c)(8) work authorization upon submission of their asylum applications;

    d.  Declaring that Plaintiffs and Class Members outside the United States are immediately eligible to be considered for a grant of humanitarian parole, separate from the Haitian Parole program announced on January 6, 2023;

    e.  Declaring unlawful the Haitian Deterrence Policy;

    f.  Enjoining Defendants from applying the Haitian Deterrence Policy.

DATED:  June 16, 2023

Respectfully submitted,

/s/ *Tess Hellgren*
Tess Hellgren

**Stanley Young** (CA00146)
syoung@cov.com
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: +1 650 632-4704

**Alexander L. Schultz** (DC Bar No. 1618410)
aschultz@cov.com
COVINGTON & BURLING, LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: +1 424 332-4788

**Maura A. Sokol** (DC Bar No. 1672674)
msokol@cov.com
COVINGTON & BURLING, LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: +1 202 662-5528

**Tess Hellgren** (OR0023)
tess@innovationlawlab.org
**Stephen Manning** (OR0024)
stephen@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

**Nicole Phillips** (*pro hac vice*)
nphillips@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4265 Fairmount Avenue, Suite 280
San Diego, CA 92105
Telephone: +1 949 603-5751

**Lauren M. Wilfong** (NJ0014)*
lauren.wilfong@justiceactioncenter.org
**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
**Jane Bentrott** (DC Bar No. 1029681)
jane.bentrott@justiceactioncenter.org
**Karen C. Tumlin** (CA00129*)*
karen.tumlin@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7206

*Not admitted to practice law in California*

*Counsel for Plaintiffs*