# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAITIAN BRIDGE ALLIANCE *et al.*,

*Plaintiffs*,

v.

JOSEPH R. BIDEN, President of the United States, *et al.*,

*Defendants.*

Civil Action No. 1:21-cv-03317 (JMC)

## PLAINTIFFS' COMBINED REPLY TO DEFENDANTS' COMBINED RESPONSE

# TABLE OF CONTENTS

I. ARGUMENT.................................................................................................................. 1

    A.    Plaintiffs' Case Is Not Moot. ................................................................................ 1

        1.    This Case Is Not Moot Because This Court Can Still Grant Effectual Relief to Plaintiffs. ...................................................................................................... 1

        2.    The Expiration of Title 42 Does Not Automatically Moot Plaintiffs' Claims Seeking to Remedy Continuing Harms from the Application of Title 42 to Them. .............................................................................................................. 5

    B.    Even if Plaintiffs' Title 42 Claims Were Moot, Exceptions to Mootness Apply. .. 7

        1.    The Voluntary Cessation Exception to Mootness Applies............................. 7

        2.    Plaintiffs' Claims are Capable of Repetition Yet Evading Review. .............. 12

    C.    Even if Plaintiffs' Title 42 Claims Were Moot Without an Applicable Exception, Plaintiffs' Claims Challenging the Haitian Deterrence Policy Remain Live. ...... 14

    D.    This Court Should Grant Plaintiffs Leave to Supplement the Complaint. ........... 15

        1.    Plaintiffs' Proposed Supplemental Complaint Substantiates the Continued Application of the Haitian Deterrence Policy. ............................................... 16

            a.    Supplementation of the Complaint Is Appropriate and Not Futile. ....... 16
            b.    The Haitian Deterrence Policy Is Reviewable Final Agency Action..... 17

        2.    Plaintiffs' Proposed Supplemental Complaint Substantiates the Continued Harms from Defendants' Conduct at Del Rio................................................ 22

        3.    Plaintiffs' Proposed Supplemental Complaint Will Not Prejudice Defendants and Will Promote Judicial Economy............................................................ 24

CONCLUSION.............................................................................................................. 25

This case is not moot. In contending that this case is moot, Defendants continue their attempt to avoid accountability for the conscience-shocking abuses inflicted on thousands of Haitian asylum-seekers in Del Rio in September 2021. This Court should reject the attempt, as Defendants' arguments misconstrue mootness law and mischaracterize the record.

To be clear, three Individual Plaintiffs expelled from Del Rio in September 2021 remain outside of the United States, still live in fear for their lives, and the United States asylum process remains unavailable to them. *See* Pls.' Proposed Suppl. Compl. (Dkt. 55-1) ("Suppl. Compl.") ¶¶ 39–43. This Court can still grant effectual relief to these and other Plaintiffs—including but not limited to ordering Defendants to facilitate the return of these Plaintiffs and numerous putative class members to the United States so that they may pursue asylum. The possibility of effectual relief means that Plaintiffs' Title 42 claims are not moot, and in any event, two exceptions to mootness apply. Further, even if Plaintiffs' Title 42 claims were moot (they are not), Plaintiffs' claims challenging the Haitian Deterrence Policy remain justiciable. The Haitian Deterrence Policy is *not* merely a challenge to "how the Government applies Title 42," Defendants' Response (Dkt. 58) ("DR") 8; it is a challenge to an "overarching policy" "designed to suppress the growing number of Haitians arriving at the border and to deter Haitians from seeking asylum in the United States in the future," Complaint (Dkt. 1) ("Compl.") ¶¶ 60, 162. The overarching Haitian Deterrence Policy persists independent of Title 42, as both the original Complaint and Supplemental Complaint reflect. *See, e.g.*, Compl. ¶¶ 6; 60–62, 162; Suppl. Compl. ¶¶ 11, 12.

This Court should also grant Plaintiffs leave to file the Supplemental Complaint, which provides important updates to the original Complaint, including information about Plaintiffs' continuing harms and the ongoing nature of the Haitian Deterrence Policy.

## I. ARGUMENT

### A. Plaintiffs' Case Is Not Moot.

#### 1. This Case Is Not Moot Because This Court Can Still Grant Effectual Relief to Plaintiffs.

A case "becomes moot *only* when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin,* 568 U.S. 165, 172 (2013) (emphasis added)

(quoting *Knox v. Serv. Emps.*, 132 S. Ct. 2277, 2287 (2012)). As the party contending that this case is moot, Defendants carry the "'heavy' burden to demonstrate mootness." *WildEarth Guardians v. Env't. Prot. Agency*, 830 F.3d 529, 538 (D.C. Cir. 2016).

Defendants fail to demonstrate—or even argue—that it would be "impossible" for this Court to grant Plaintiffs "any effectual relief whatever." *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (quoting *Chafin*, 568 U.S. at 172); *see* Plaintiffs' Response to the Order to Show Cause (Dkt. 53) ("PR") 1–8. Defendants instead quibble about whether *some* requested relief might benefit Plaintiffs. *See* DR 7–9 (insisting certain "declaratory" relief would "accomplish nothing"). Defendants' quibbles are incorrect,[1] and in any event irrelevant, as this case is not moot unless Plaintiffs cannot benefit from *any* relief. *See, e.g.*, *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 121–22 (1974) (case not moot as plaintiffs could still benefit from certain "declaratory relief" "even though the case for an injunction [had] dissolved").

Critically, Defendants nowhere "dispute[]"—and "therefore concede[]," *Andrews v. I.R.S.*, 2002 WL 31689408, at *2 (D.D.C. Oct. 10, 2002)—that Plaintiffs could benefit from: (1) an "order allowing each of the Individual Plaintiffs and [proposed] class members to return to the United States and requiring Defendants to facilitate return, . . . so that Individual Plaintiffs may pursue their asylum claims," PR 3 (quoting Compl. (prayer) 84 ¶ i); *see Igiebor v. Barr*, 981 F.3d 1123, 1130 (10th Cir. 2020); *Asai v. Castillo*, 593 F.2d at 1224 n.2; and (2) an order affording Plaintiffs "the statutory and procedural protections to which they are eligible under the U.S. asylum process," PR 7 (quoting Compl. (prayer) 84 ¶ h); *see Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442 (S.D. Fla. 1980). Defendants' only response is to assert, incorrectly, that the named "Plaintiffs have already received access to the procedural protections they sought in the original Complaint."

---

[1] For example, far from "accomplish[ing] nothing," DR 7, an order declaring unlawful the manner in which Plaintiffs were expelled and/or deported from the United States, Compl. (prayer) 83–84 ¶¶ c–d, is a precondition to Plaintiffs' requested relief of an order facilitating their return to the United States and affording them the statutory and procedural protections to which they are due. *See Asai v. Castillo*, 593 F.2d 1222, 1224 n.2 (D.C. Cir. 1978) (case not moot as requested relief "might affect [immigrants'] future status with respect to re-entry into the United States").

DR 19. In reality, three Individual Plaintiffs (and numerous class members) **remain outside the United States and have not had any opportunity to seek asylum**. *See infra* Part I.D.2. Whether this Court looks to the original Complaint alone or as supplemented,[2] it is clear that these Plaintiffs, at the very least, have *not* received complete relief. *See Doe v. Harris*, 696 F.2d 109, 114 n.7 (D.C. Cir. 1982) ("mootness must be determined solely by reference to the allegations of the complaining party" (cleaned up)). Defendants' related argument that Plaintiffs "failed to demonstrate that [the named] Plaintiffs retain a personal stake in the outcome" of this case, DR 10, is not only improper burden shifting, *see Doe*, 696 F.2d at 1134 n.7, but is factually incorrect—Plaintiffs *would* continue to benefit from their requested relief.

This Court need go no further to conclude that this case is not moot. That this Court "could in principle grant [at least some Plaintiffs] concrete, tangible relief" means this case remains alive and justiciable. *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 444 (D.C. Cir. 2020) (cleaned up). Defendants, however, do go further (at DR 7), parsing a single statement in *Chafin*—that "a suit becomes moot[] when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," 568 U.S. at 172 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982))—notwithstanding that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute," *Reiter v. Sonotone Corp.*, 442 U. S. 330, 341 (1979). Defendants theorize that *even if* it were "[]possible for [the] court to grant [the plaintiffs] effectual relief," *Chafin*, 568 U.S. at 172 (quoting *Knox*, 132 S. Ct. at 2287), this case is *independently* moot if the "issues presented are no longer 'live,'" *id.* (cleaned up). Defendants then purport to fault Plaintiffs for "fail[ing] to demonstrate that there remains a live controversy." DR 7.

---

[2] A court may permissibly consider allegations in a "supplemental complaint" to determine whether a plaintiff's "injury persists and can be relieved by an appropriate court order." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 444 (D.C. Cir. 2020). Further, a court may award plaintiffs relief even though it is not specifically requested in the complaint. *See Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 66 (1978) ("[O]missions [in a prayer for relief] are not in and of themselves a barrier to redress of a meritorious claim"); 10 Wright & Miller, Fed. Prac. & Proc. Civ. § 2662 (4th ed. Apr. 2023 Update) (a party can "secur[e] a remedy other than that demanded in the pleadings") ("Wright & Miller"); PR 9 n.6.

Defendants' argument misapprehends mootness law and the meaning of the word "live." To begin with, the "heavy burden" of demonstrating mootness *is on Defendants* (as the party asserting mootness), not Plaintiffs. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020). To the extent a wholly independent "live controversy" prong of mootness doctrine even exists, it does not apply if the named Plaintiffs can still benefit from requested relief.[3] Instead, both the Supreme Court and D.C. Circuit have indicated that the possibility of effectual relief makes a case "live"; thus, "[a] case becomes moot *only* when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox*, 567 U.S. at 307 (2012) (cleaned up)); *accord Almaqrami*, 933 F.3d at 779 (same); PR 1–3. Regardless, there is a "live controversy" because the parties remain "self-interested parties vigorously advocating opposing positions." *Lucero v. Bureau of Collection Recovery, Inc*., 639 F.3d 1239, 1242 (10th Cir. 2011) (quoting *Geraghty*, 445 U.S. at 403). Unless and until Defendants concede the merits of Plaintiffs' claims

---

[3] The "live controversy" line the government seizes upon appears to have relevance only in the inapposite context where named plaintiffs *cannot* benefit from any relief but unnamed class members *can* still benefit. The Supreme Court in *Chafin* borrowed the quote in question from *Murphy v. Hunt*, which in turn borrowed it from *U.S. Parole Commission v. Geraghty*, 445 U.S. 388 (1980). In *Geraghty*, the court was "summariz[ing]" the "[m]ootness principles applicable to class actions *in which the claims of all the named plaintiffs but not all members of the class have become moot*" in the traditional sense of not being able to benefit from any relief. *Davis v. Ball Mem'l Hosp. Ass'n*, 753 F.2d 1410, 1416 (7th Cir. 1985) (emphasis added) (citing *Geraghty*, 445 U.S. 388). In that distinct context, some courts have engaged in a two-pronged mootness inquiry. They first ask "(1) whether the issues presented are still 'live,'" *id.*— and they will hold that they remain "live" so long as "putative members of the class [have] moved to be substituted or to intervene" as named plaintiffs, *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1269 (9th Cir. 2010) (citing *Geraghty*, 445 U.S. 396); *see also, e.g.*, *Grant ex rel. Fam. Eldercare v. Gilbert*, 324 F.3d 383, 389 (5th Cir. 2003) ("Despite the mootness of the representative plaintiff's claims . . . a live controversy existed" because other class members "moved to substitute, or intervene, as class representatives." (citing same)). As long as new class representatives are in place, such courts proceed to ask the traditional mootness question: "(2) whether the parties have a legally cognizable interest in the outcome" of the dispute. *Davis*, 753 F.2d at 1416 (quoting *Geraghty*, 445 U.S. at 396). Thus, where, as here, *named plaintiffs* might still benefit from the requested relief, engaging in the first prong of this analysis makes no sense; in other words, there is no basis for the government to insist that *additional* class members must "be substituted or . . . intervene" as representative plaintiffs in order for this case to remain live. *Narouz*, 591 F.3d at 1269.

and afford Plaintiffs all their requested relief, this "dispute is still very much alive." *Chafin*, 568 U.S. at 173.

> **2.    The Expiration of Title 42 Does Not Automatically Moot Plaintiffs' Claims Seeking to Remedy Continuing Harms from the Application of Title 42 to Them.**

Defendants incorrectly declare that whenever a "Government policy being challenged . . . has expired" that represents "an insurmountable barrier to justiciability." DR 1. No such automatic bar to justiciability exists. Both the Supreme Court and the D.C. Circuit have repeatedly held that the mere expiration of a regulation does not necessarily moot a dispute relating to it. *See, e.g.*, *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796–99 (2021); *Decker v. Nw. Env't Def. Ctr.*, 133 S. Ct. 1326, 1335–1336 (2013); *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1101 (D.C. Cir. 2005); *Hedgepeth ex rel. Hedgepeth v. W.M.A.T.A.*, 386 F.3d 1148, 1152 (D.C. Cir. 2004). In other words, it is well established that "[i]f relief remains useful . . . mootness can be avoided" notwithstanding a change in "administrative regulation[s]." Wright & Miller § 3533.6. "[O]bvious reasons for denying mootness occur when the former provisions continue to control the consequences of past transactions," or when a plaintiff requests "retroactive remedies" "on account of the former provisions." *Id.*

The cases cited by Defendants do not suggest otherwise; they instead involve situations where Plaintiffs were *not* seeking to remediate "the consequences of past transactions." *Id.* In many of these cases, the plaintiffs sought nothing more than a declaration that a withdrawn policy was unlawful or an injunction against its reimplementation. *See Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (plaintiff sought *only* "a declaration that the [then-expired] Policy was unconstitutional, [its enforcement] unlawful, and that an injunction be granted preventing its reimplementation"); *Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (plaintiff merely challenged "old regulations [as] unconstitutionally vague" and as containing insufficient "procedural safeguards," but new regulations remedied the defects). Similarly inapposite are the proceedings in (1) *Louisiana v. CDC*, where the plaintiffs sought a forward-looking injunction to keep the Title 42 process on the books, 603 F. Supp. 3d 406, 415

(W.D. La. 2022) (cited at DR 4–5); and (2) *Huisha-Huisha v. Mayorkas*, where the plaintiffs were "detained and in the custody of DHS" and "subject to expulsion"—and sought a forward-looking injunction to prevent DHS from actually "ex[pelling] them," 560 F. Supp. 3d 146, 159 (D.D.C. 2021); *see also Huisha-Huisha v. Mayorkas*, No. 22-5325, Opp. to Mot. to Vacate at 1 (D.C. Cir. June 26, 2023) (taking the position that the case became moot because the government "halt[ed] the expulsions challenged in this case") (cited at DR 3–4). Even further afield is the Supreme Court's decision in *Arizona v. Mayorkas*, 143 S. Ct. 1312 (2023) (cited at DR 3), which addressed only a motion to intervene in the *Huisha-Huisha* litigation and concluded—in a summary order— only that this "*motion* [w]as moot." *Id.* at 1313–14 (statement of Gorsuch, J.) (describing the Court's decision) (emphasis added).

Here, in stark contrast, Plaintiffs *were actually expelled*; they continue to suffer adverse effects from those unlawful expulsions; and, critically, they seek remedies intended to "place Plaintiffs in the same position had [Defendants' unlawful conduct] not occurred." *Lightfoot v. D.C.*, 355 F. Supp. 2d 414, 439 (D.D.C. 2005). The Defendants' theory of mootness in this case implies that the federal government could adopt a policy of deporting persons in the United States on racially discriminatory grounds, actually deport such persons, let the policy expire, and then prevent the deportees from suing to return to the United States—simply by asserting that any dispute related to the expired policy is moot. That is *not* the law, and this case is *not* moot. *See* Wright & Miller § 3533.3.1 (courts "reject assertions of mootness" when the requested injunctive or declaratory relief could "undo the effects of conduct that was not prevented by the time of decision"); *Hedgepeth*, 386 F.3d at 1152 (case was not moot following "policy change," as plaintiff sought "not only declaratory and injunctive relief with respect to the . . . policies, but also" relief that would return her to the position she was in before the challenged policy harmed her).

Defendants' emphasis on litigation challenging the Trump Administration's travel ban, *see* DR 5 (discussing Executive Order 13,780), only serves to *highlight* that claims seeking to remedy ongoing harms are not mooted by the termination of the policy that wrought them. It is true, as the government points out, that courts dismissed as moot claims seeking a "preliminary

injunction . . . prohibiting [the executive order's] enforcement" after the challenged order expired. *Hawaii v. Trump*, 859 F.3d 741, 760 (9th Cir. 2017), *vacated and remanded*, *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353, 353 (2017). But it is equally true, as the government fails to mention, that courts *rejected* suggestions of mootness where plaintiffs "sufficiently alleged that they still ha[d] redressable claims." *Emami v. Mayorkas*, 2022 WL 3031213, at *2 (N.D. Cal. Aug. 1, 2022); *see id*. at *1 (where plaintiffs continued to suffer "genuine injuries that continue to exist independent of the revocation [of the travel ban], and which plaintiffs seek to remedy," plaintiffs' claims were "not moot."). Other courts have similarly recognized that even if a challenged policy "no longer exists," that hardly moots plaintiffs' "claims [that] seek redress for the *continuing adverse effects* of Defendants' unlawful conduct." *Immigrant Defs. L. Ctr. v. Mayorkas*, 2023 WL 3149243, at *9–10 (C.D. Cal. Mar. 15, 2023) (emphasis in original). The same reasoning applies here, and none of Plaintiffs' claims are moot.

**B.    Even if Plaintiffs' Title 42 Claims Were Moot, Exceptions to Mootness Apply.**

Even if Plaintiffs' Title 42 claims were technically moot (they are not), two mootness exceptions apply: (1) voluntary cessation and (2) claims capable of repetition yet evading review. Plaintiffs' expectation that the Title 42 Process would be re-implemented if the public health landscape changes is not "bald speculation," DR 12; it is a reasonable expectation based on Defendants' *own statements*. *See* PR 14. This expectation is bolstered by the plain meaning of the statute under which Defendants assert the Title 42 Process was issued, which unambiguously places voluntariness and discretion within Defendants' authority. *See* DR 2; 42 U.S.C. § 265.

**1.    The Voluntary Cessation Exception to Mootness Applies.**

Defendants, as the party asserting mootness, bear "the heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (cleaned up) (voluntary cessation); *see also Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (burden of showing non-recurrence lies with party asserting mootness).

Defendants assert that the voluntary cessation exception does not apply because the "rationale for this doctrine is to prevent a defendant from 'manipulating the judicial process by voluntarily ceasing the complained of activity, and then seeking dismissal of the case, thus securing freedom to 'return to his old ways.'" DR 12 (quoting *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990) (en banc)). But Defendants have made no representation that they would *not* return to the Title 42 Process if public health conditions change. To the contrary, Defendants have vigorously defended their position that they have the legal authority to implement the Title 42 Process. *See, e.g.*, *Huisha-Huisha*, No. 22-5325, Defs.' Opp. to Proposed Intervenors' Mot. to Intervene at 17 (D.C. Cir. Dec. 14, 2022). Because Defendants' position on the legality of the challenged policy has not changed, the Title 42 Process is likely to be resurrected if the COVID-19 pandemic worsens or other serious pandemics emerge; indeed, Defendants admit as much. *See* DR 14. Moreover, Defendants neglect another important rationale for the voluntary cessation doctrine—the "public interest in having the legality of the practices settled." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). Here, there is a public interest in settling the legality of Defendants' conduct pursuant to the Title 42 Process, as Defendants maintain their authority to issue public-health emergency orders like Title 42 in the future.

Contrary to Defendants' arguments (at DR 12–13), it is not determinative that the August 2021 CDC order enumerated conditions for its expiration. Plaintiffs challenge the Title 42 Process—a policy that was established through a series of CDC orders, beginning in March 2020, whose terms of expirations were set, expired, and re-established several times throughout the COVID-19 pandemic. The terms of these orders have always depended on an ongoing assessment of public health conditions in the U.S.—an assessment which could be voluntarily terminated and re-instated by Defendants whenever they choose to do so.[4]

---

[4] Such voluntary termination is, in fact, exactly what occurred with the CDC Termination Order issued in April 2022, after the events at issue took place and this litigation began. It was in this April 2022 order that "the CDC Director announced her decision to terminate the August 2021 Order suspending the right to introduce certain persons into the United States." Ctrs. for Disease

Defendants' reliance on various cases where policies "expired by [their] own terms," DR 12–13, is misplaced as the policies there had specific expiration *dates*—unlike the present case where the expiration terms set by the August 2021 CDC order were limited to the occurrence of one of two events, both of which were subject to Defendants' ongoing discretion.[5] By contrast, in *Trump v. Hawaii*, the Supreme Court dealt with orders that had fixed expiration dates that passed,[6] and summarily found the case moot because the challenged provisions had "expired by [their] own terms," 138 S. Ct. 377, 377 (2017). That determination has no bearing here, where the order contains expiration *conditions* subject to the discretion of Defendants as opposed to rigid expiration dates.

Defendants further argue that the CDC order expired on May 11, 2023 "ultimately because of a change in public health conditions, which is beyond the unilateral authority of Defendants." DR 13. For purposes of the Title 42 Process, however, the interpretation of what constitutes a public health emergency and the decision to allow the CDC order to expire was and remains wholly within Defendants' interpretation and decision. *See* 42 U.S.C. § 265 ("Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States…the Surgeon General . . . *shall* have the power to prohibit…the introduction of persons . . . from such

---

Control & Prevention, No Longer in Effect – Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, https://tinyurl.com/5xdrch9s (last updated May 12, 2023). This "Court may take judicial notice of information posted on official public websites of government agencies." *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022) (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013)).

[5] August 2021 CDC Order at 42,829 ("This Order will remain in place until either the expiration of the Secretary of HHS' declaration that COVID–19 constitutes a public health emergency, or the CDC Director determines that the danger of . . . COVID-19 . . . has declined such that continuation of the Order is no longer necessary to protect public health[.]").

[6] *See* Federal Register, "Protecting the Nation from Foreign Terrorist Entry into the United States," 82 Fed. Reg. 13,209, 13,213, 13,216 (Mar. 6, 2017) (providing for expiration "90 days from the effective date of this order" and "120 days after the effective date of this order").

countries or places as he shall designate in order to avert such danger, and for such period of time *as he may deem necessary* for such purpose." (emphasis added)). In fact, while there was proposed legislation to end the public health and national emergency declarations pending since January 2023,[7] Defendants, acting within their discretion, did not decide to end these declarations until May 11 for reasons outlined in their Statement of Administration Policy.[8]

Once again, Defendants misconstrue the burden of proof in arguing that the voluntary cessation exception does not apply because Plaintiffs have not established a reasonable expectation that the challenged action will recur. *See* DR 14. It is *Defendants'* burden, as the party advocating that this case is moot, to show that "it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Porup v. Cent. Intel. Agency*, 997 F.3d 1224, 1231 (D.C. Cir. 2021) (cleaned up). If a defendant fails to meet this stringent standard, courts may grant relief to prevent the defendant "from return[ing] to his old ways." *Friends of the Earth*, 528 U.S. at 189. Moreover, several courts, including the D.C. Circuit, have rejected mootness arguments when the defendant failed to offer assurance that the challenged policy would not be resumed. *See Am. Iron & Steel Inst. v. Env't Prot. Agency*, 115 F.3d 979, 1006–07 (D.C. Cir. 1997); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 874–75 (5th Cir. 2000); *Norman-Bloodsaw v. Lawrence Berkeley Labs.*, 135 F.3d 1260, 1274–75 (9th Cir. 1998). Here, Defendants fail to establish that it is "absolutely clear" that their conduct under the Title 42 Process and the Haitian Deterrence Policy will not recur. Nor could Defendants make the requisite showing—because Defendants themselves have asserted that they have authority to re-implement the Title 42 Process following "a change in public health conditions." DR 13.

Defendants' argument that voluntary cessation does not apply because "a change in public health conditions . . . is beyond the unilateral authority of Defendants," DR 13, does not directly

---

[7] *See* Pandemic is Over Act, H.R. 382, 118th Cong. (2023); Relating to a national emergency declared by the President on March 13, 2020, H.R.J. Res. 7, 118th Cong. (2023).

[8] *See* Off. of Mgmt. & Budget, Exec. Off. of the President, Statement of Administration Policy regarding H.R. 382 & H.J. Res. 7 (2023), https://tinyurl.com/mpvmhmpf.

address Plaintiffs' argument. Plaintiffs do not assert that Defendants have control over changes in the public health conditions themselves. Rather, the Title 42 Process can be voluntarily reinstated by Defendants at any moment based on their authority and discretion to impose a similar order upon the impending occurrence of a communicable disease. Because Defendants retain their authority to impose a new public health emergency order at any moment; because public health experts have stated that another pandemic is not only possible, but impending;[9] and because Defendants' authority is not limited to not only the emergence of a new variant or an upswing in COVID-19 spread (events which Defendants themselves have admitted could transpire)[10]—but rather *any* quarantinable communicable disease (including cholera, diphtheria, infectious tuberculosis, plague, smallpox, yellow fever, viral hemorrhagic fevers, severe acute respiratory syndromes such as COVID-19, and novel or re-emergent influenza viruses that have the potential to cause a pandemic), August 2021 CDC Order at 42,830 n.6—Defendants cannot establish that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Porup*, 997 F.3d at 1231.

Finally, even if Defendants "demonstrated that (1) there is no reasonable expectation that the conduct will recur," Defendants have not *also* shown that "(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *True The Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551, 563 (D.C. Cir. 2016) (cleaned up). To the contrary, Plaintiffs continue to suffer adverse effects because of the government's unlawful implementation of Title

---

[9] *See, e.g.*, WHO Chief, United Nations News, World Must Be Ready to Respond to Next Pandemic (May 22, 2023), https://tinyurl.com/m4rsr8sz ("The threat of another variant emerging that causes new surges of disease and death remains, and the threat of another pathogen emerging with even deadlier potential remains. . . . When the next pandemic comes knocking – and it will – we must be ready to answer decisively, collectively, and equitably."). This information from a government's website is subject to judicial notice. *See Arab*, 600 F. Supp. 3d at 63 n.1.

[10] As the CDC has admitted, the virus that causes COVID-19 is "constantly changing" and "new variants of the virus are expected to occur." Ctrs. for Disease Control & Prevention, Summary of Variant Surveillance (last updated July 28, 2023), https://covid.cdc.gov/covid-data-tracker/#variant-summary. As the virus spreads and changes, the CDC advises that "it may become more difficult to stop." *Id.*; *see also Arab*, 600 F. Supp. 3d at 63 n.1 (court may take judicial notice of information on government websites).

42, which this Court can remedy—most notably by facilitating Plaintiffs' return to the United States so that they may pursue their asylum claims. *See supra* Part I.A.1; *cf. also True The Vote*, 831 F.2d at 563 (it is "absurd [for the government] to suggest that the effect of the IRS's unlawful conduct, which delayed the processing of appellant-plaintiffs' applications, has been eradicated when two of the appellant-plaintiffs' applications remain pending").

### 2. Plaintiffs' Claims are Capable of Repetition Yet Evading Review.

Plaintiffs' claims also remain live under the mootness exception for claims which are capable of repetition yet evading review. To determine whether a claim is inherently transitory, a court must determine "whether it is 'by no means certain' that an individual claim will persist long enough" to be adjudicated. *J.D. v. Azar*, 925 F.3d 1291, 1310 (D.C. Cir. 2019) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)). Here, the Title 42 Process challenged by Plaintiffs has always been inherently transitory by its own terms, and there is also a "reasonable expectation" that the policy will recur. *Reid v. Hurwitz*, 920 F.3d 828, 833–43 (D.C. Cir. 2019).

Since its inception in March 2020, the Title 42 Process has been inherently transitory because its duration and modification are explicitly temporary and dependent on fluctuating public health circumstances. *See* March 2020 CDC Order at 17 (conditioning policy's length and modifications on the CDC Director's assessment of whether "further introduction of COVID-19 into the United States has ceased to be a serious danger to the public") (available at https://tinyurl.com/ukrzp4es); May 2020 CDC Order at 1 (extending the duration of the Title 42 Process until the CDC Director determines that "continuation of the Order is no longer necessary to protect the public health") (available at https://tinyurl.com/522f5yn9); *see also* Federal Register, "Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists," 86 Fed. Reg. 42,828, 42,830 (Aug. 5, 2021) ("August 2021 CDC Order") (tying policy's continuation to the extent of the COVID-19 public health emergency, including "the current, highly dynamic conditions regarding COVID-19, including variants of concern and levels of vaccination, as well as evolving circumstances specific to the U.S. borders"). By their own terms, these orders were subject to

reassessment at 30- or 60-day intervals. *See* March 2020 CDC Order at 17 (establishing initial Title 42 Process for only 30 days); May 2020 CDC Order at 1 (requiring assessment of Title 42 Process every 30 days); August 2021 CDC Order at 42,829 (mandating reassessment of circumstances underlying the policy "at least every 60 days").

There is a reasonable expectation that the Title 42 Process will recur if public health conditions worsen.[11] *See also supra* Part I.B.1. Indeed, the termination order for Title 42 explicitly affirmed the CDC's authority to re-implement the Title 42 Process with a "substantial change" in the public health situation, such as "new and particularly concerning SARS-CoV-2 variants," Supp Compl. ¶ 8, and the CDC has warned that new COVID variants "will continue to occur," Ctrs. for Disease Control & Prevention, *Variants of the Virus*, https://tinyurl.com/f3xucxzd (last updated Feb. 6, 2023); *see also supra* p.11 n.10 (CDC admits that the virus that causes COVID-19 is "constantly changing" and may become "more difficult to stop"). And just last month, then-CDC Director and Defendant Rochelle Walensky stated that in the past two-and-a-half years "the world has faced an unrivaled density of public health challenges . . . The question is not if there will be another public health threat, but when."[12] This admission reflects a "reasonable expectation" that another public health threat, and thus Defendants' conduct under the Title 42 Process, will recur. Then-Director Walensky described a "fixed, knowable in advance, and thus predictably repeatable" event, *Reid*, 920 F.3d at 840 (Katsas, J., dissenting), by opting for the word "when"; and rejected a mere "theoretical possibility" of recurrence, *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 951 (D.C. Cir. 2005), by affirmatively rejecting the word "if." There is thus a reasonable expectation that COVID-19 or a similarly devastating pandemic could recur and

---

[11] Indeed, the history of the Title 42 Process itself demonstrates that it is capable of repetition, as Defendants manifested the policy through "a series of public health orders." *See Huisha-Huisha*, Defs' Opp to Proposed Motion to Intervene at 2-3.

[12] Rochelle P. Walendsky, *What I Need to Tell America Before I Leave the C.D.C.*, N.Y. Times (June 27, 2023), https://tinyurl.com/4p63tvuf. The statements are subject to judicial notice as they are "not subject to reasonable dispute." Fed. R. Evid. 201(b); *see DoorDash, Inc. v. City & Cnty. of San Francisco*, 2022 WL 867254, at *5 (N.D. Cal. Mar. 23, 2022) ("courts have judicially noticed documents with a party's own statements" (collecting cases)).

that Defendants will reinstate the Title 42 Process in the future. *See Senate Permanent Subcomm. On Investigations v. Ferrer*, 856 F.3d 1080, 1088 (D.C. Cir. 2017).

Plaintiffs also have a reasonable expectation of being subjected to the Title 42 Process again. *See supra* Part I.B.1. For Individual Plaintiffs still outside the United States, currently living in tenuous conditions in Haiti and Chile, *see* Suppl. Compl. ¶¶ 36–42, returning to the United States would be a long and arduous undertaking. Given the active uncertainty around the trajectory of the COVID-19 pandemic (and threat of future pandemics), these Plaintiffs have a reasonable expectation that the Title 42 Process could be applied against them in the future if they again attempt to travel to the United States. Even if named Plaintiffs were all in the United States and thus unlikely to be subjected to the Title 42 Process again, a live controversy would continue to exist for putative class members still outside the United States. *See Gerstein*, 420 U.S. at 110 n.11 (applying mootness exception where "the constant existence of a class of persons suffering the deprivation is certain."); *J.D. v. Azar*, 925 F.3d 1291, 1310 (D.C. Cir. 2019) (applying exception where "some class members will retain a live claim throughout the proceedings).

**C.    Even if Plaintiffs' Title 42 Claims Were Moot Without an Applicable Exception, Plaintiffs' Claims Challenging the Haitian Deterrence Policy Remain Live.**

Even if Plaintiffs' Title 42 claims were moot (they are not), Plaintiffs' claims challenging the Haitian Deterrence Policy remain justiciable. *Cf. Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021) (a case may remain live "even if a party receives relief on a particular claim").

Defendants do not meaningfully dispute that Plaintiffs would benefit from an order enjoining the Haitian Deterrence Policy and declaring it unlawful. *See* PR 3 (citing Compl. (prayer) at 84 ¶ g; Suppl. Compl. (prayer) at d–f); *see also Int'l Union of Bricklayers*, 761 F.2d at 806 (litigation was not moot where the challenged policy "has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on [plaintiffs'] interests" (quotation omitted)). Defendants instead mount a straw man argument, reductively recasting Plaintiffs' claims challenging the Haitian Deterrence Policy as claims

challenging "how the Government applies Title 42 to Haitian noncitizens," and insisting that the same mootness arguments apply equally to both sets of claims. DR 8.

But that straw man is *not* the Haitian Deterrence Policy that Plaintiffs plead in the Complaint. Rather, the Complaint defines the Haitian Deterrence Policy as "an overarching policy" "designed to suppress the growing number of Haitians arriving at the border and to deter Haitians from seeking asylum in the United States in the future." Compl. ¶¶ 60, 162. Plaintiffs *do* argue that the application of the Title 42 Process at Del Rio was a manifestation of the overarching Haitian Deterrence Policy—but, as both the Complaint and the Supplemental Complaint make clear, it is by no means the Haitian Deterrence Policy's *only* manifestation. *See infra* Part I.D.2; *see also Haitian Refugee Center*, 503 F. Supp. at 466 (declining to find case moot where defendants amended regulations at issue, and plaintiffs' challenge relied only "in part on those regulations to challenge the [overarching] practices of the defendants"); PR 4–5. The Haitian Deterrence Policy has an existence independent of Title 42. *See* Compl. ¶¶ 6, 60–62, 162; *see also* Suppl. Compl. ¶¶ 11, 12. Thus, the termination of Title 42, without more, "does not conclusively put an end to all of [the government's] challenged conduct," *N. Am. Butterfly*, 977 F.3d at 1258—and there is no basis for declaring Plaintiffs' claims against the Haitian Deterrence Policy moot regardless of whether this Court deems Plaintiffs' Title 42 claims moot.

### D.    This Court Should Grant Plaintiffs Leave to Supplement the Complaint.

This Court should grant Plaintiffs leave to supplement their complaint so that Plaintiffs may "set forth new facts that update the original pleading [and] provide the basis for additional relief." *Thorp v. D.C.*, 325 F.R.D. 510, 513 (D.D.C. 2018). Plaintiffs' Supplemental Complaint both (1) explains the actions Defendants have continued to undertake in furtherance of the Haitian Deterrence Policy, and (2) updates the information in the original pleading about Plaintiffs' ongoing harms. Leave to supplement a complaint is entirely appropriate in such circumstances, and Defendants fail to establish prejudice from the supplementation.

1.    **Plaintiffs' Proposed Supplemental Complaint Substantiates the Continued Application of the Haitian Deterrence Policy.**

Plaintiffs seek leave to supplement their complaint in part to "set forth new facts" regarding Defendants' continuation of the Haitian Deterrence Policy. *Thorp*, 325 F.R.D. at 513; *see* Suppl. Compl. ¶¶ 34–56. Defendants' arguments against supplementation, which misconstrue the nature of Plaintiffs' pleadings and recycle failed arguments from their pending Motion to Dismiss, *see* DR 17, fail to establish that leave to supplement should be denied.

a.    <u>Supplementation of the Complaint Is Appropriate and Not Futile.</u>

Contrary to Defendants' assertions, Plaintiffs' original Complaint alleges that the Haitian Deterrence Policy is a stand-alone policy, independent of the Title 42 process, that was designed to suppress the growing number of Haitians arriving at the border and to deter Haitians from seeking asylum in the future.[13] Plaintiffs allege, *inter alia*, that pursuant to the Haitian Deterrence Policy, Defendants departed from their standard practice by depriving Plaintiffs of access to basic necessities like food, water, shelter, and medical care, *see* Compl. ¶¶ 163–174, and expelling them as quickly as possible without due process, despite knowing there was a high risk of *refoulement* and no infrastructure in Haiti to receive them, *see id.* ¶¶ 168–173. Plaintiffs further allege that this treatment differed from the treatment of non-Black asylum seekers who were not subject to the Haitian Deterrence Policy. *See id.* ¶¶ 169, 173–178. All these allegations regard the treatment of Plaintiffs in Defendants' custody pursuant to the Haitian Deterrence Policy, and do not turn on whether Plaintiffs were or will be subjected to Title 42.

Just as Defendants misread the plain language of Plaintiffs' Complaint, they likewise mischaracterize the nature of Plaintiffs' Supplemental Complaint. Plaintiffs do not seek to "transform[] the litigation" to "challenge wholly distinct government policies." DR 2, 19. Indeed,

---

[13] *See, e.g.*, Compl. ¶¶ 6 ("What happened to Mirard and many others . . . was the expected result of two policies applied by U.S. officials in Del Rio"); 8 ("U.S. officials' abuse of Haitians in Del Rio did not stop with the Title 42 Process"); 60 (the Haitian Deterrence Policy is "a series of decisions and policies designed to suppress the growing number of Haitians arriving at the border and to deter Haitians from seeking asylum in the United States"); 69 ("as part of the Haitian Deterrence Policy, senior White House and DHS officials blocked internal efforts to prepare humanitarian infrastructure in Del Rio"); 79 (similar).

the causes of action pled by Plaintiffs remain *exactly the same* and have not expanded in number or in substance. Instead, Plaintiffs allege that Defendants' actions subsequent to the filing of this lawsuit—including their one-sided and woefully incomplete investigation of the abuses that occurred in Del Rio, as well as subsequent restrictions on Haitian access to asylum—provide additional evidence of the ongoing nature of the Haitian Deterrence Policy.[14]

Likewise, Plaintiffs do not "seek[] new relief from new Government policies," as Defendants claim. DR 2. Rather, Plaintiffs are appropriately supplementing their requests for relief to account for continuing harm from Defendants' conduct in Del Rio and the ongoing Haitian Deterrence Policy *See, e.g.*, Suppl. Compl. ¶¶ 34, 40, 43, 47, 49, 50.[15] Such relief is appropriate and within this Court's authority to grant. *See, e.g.*, *Al Otro Lado, Inc. v. McAleenan*, 423 F. Supp. 3d 848, 872 (S.D. Cal. 2019) (ordering that individuals who were subject to the allegedly unlawful policy of metering be exempt from the subsequently implemented asylum ban policy).

b.    The Haitian Deterrence Policy Is Reviewable Final Agency Action.

Defendants contend that the Supplemental Complaint is futile because the Haitian Deterrence Policy does not constitute final agency action. *See* DR 17. This recycled argument from Defendants' Motion to Dismiss remains unpersuasive here. As an initial matter, Defendants' futility argument is a non-starter because Plaintiffs' have stated equal protection and due process claims based on the Haitian Deterrence Policy, neither of which requires final agency action *see*

---

[14] *See, e.g.,* Suppl. Compl. ¶¶ 12 ("By extending limited and oversubscribed parole pathways while harshly restricting other pathways to humanitarian protections, Defendants persist in their implementation of the Haitian Deterrence Policy and show that they would likely repeat the cruel and illegal actions that they took in September 2021, as described in the Complaint, if similar circumstances were to arise again in the future."); 17 (describing the chilling effect on would-be Haitian asylum seekers of Defendants' actions to deter Haitian migration); 24-26 (describing the disproportionate impact of the Government's actions on Haitian migrants); 29 ("the Asylum Ban is further evidence that Defendants continue to use available policy mechanisms to implement the Haitian Deterrence Policy, irrespective of the sunset of the current Title 42 Process."); 33 ("the Biden administration continues to fear the arrival of Haitian asylum seekers and is aggressively adopting policies to continue the work of the Title 42 Process: preventing Haitians from entering the United States and exercising their right to seek asylum in this country.")

[15] Plaintiffs are not limited to the exact relief specified in the original Complaint. *See* PR 9 n.6; Compl. (Prayer) 84 ¶ k.

Plaintiffs' Opposition to Motion to Dismiss (Dkt. 38) ("MTD Opp'n") at 14–34; Compl. ¶¶ 283–317, and supplementation of allegations bearing on those claims is not futile.

In any event, the Haitian Deterrence Policy, as alleged in both the original Complaint and Supplemental Complaint, marks "the consummation of the agency's decisionmaking process" and constitutes an action "by which rights and obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also* MTD Opp'n 40–42. The Haitian Deterrence Policy is therefore final agency action reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 551–559 ("APA").

*First*, the Haitian Deterrence Policy and actions taken pursuant to it are "not [] of a merely tentative or interlocutory nature," *Bennett*, 520 U.S. at 178, but instead reflect Defendants' "definitive legal position," *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 480 (D.C. Cir. 2011). As the Complaint alleges, "President Biden and DHS Defendants were aware for months that thousands of Haitian asylum seekers were traveling towards Del Rio," yet "refused . . . to provide for migrants' basic necessities" upon their arrival and "directed the expedited, mass expulsions of migrants to deter other Haitians from seeking asylum in the United States," thereby "denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law." Compl. ¶¶ 8, 203, 338. Following the abuses in Del Rio, the Biden administration has "announced multiple policies and initiatives" with "a practical effect of continuing to deter Haitians from arriving in the United States to seek protection." Suppl. Compl. ¶¶ 11, 12.

Defendants do not—and cannot—point to any allegations reflecting that these actions were "informal, or only the ruling of a subordinate official, or tentative." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Labs v. Gardener*, 387 U.S. 136, 151 (1967)). To the contrary, the "Haitian Deterrence Policy resulted from a series of discrete decisions made by President Biden's senior advisors on the NSC and DPC in September 2021, under authority delegated by President Biden" and "informed by a perception that Haitian asylum seekers are dangerous, violent, and criminal," to "remove Haitians from the United States and prevent others from coming to seek protection under the U.S. asylum system." Compl. ¶¶ 61, 62,

162. "[T]aken together," Defendants' actions "amount to a definitive statement of [Defendants']
legal position," *CSI Aviation*, 637 F.3d at 480—*i.e.*, that Haitian migrants need not be afforded the
protections expressly granted by the INA, and that Defendants need not fear legal consequences if
they take steps to deter Haitian migrants from coming to the United States in the future to try to
vindicate such rights. There is no indication that Defendants' "thinking about the [policy] is not
final" or that any agency "has yet to make up its mind" about the Haitian Deterrence Policy.
*Nasdaq Stock Market LLC v. Securities & Exchange Comm'n*, 1 F.4th 34, 38–39 (D.C. Cir. 2021);
*see also* Compl. ¶ 10 ("[T]he Biden Administration has shown no evidence that it has abandoned
its cruel Haitian Deterrence Policy.").

 *Second*, as both the original Complaint and the Supplemental Complaint demonstrate, the
"definitiveness" of the Haitian Deterrence Policy and the actions taken pursuant to it "also leads
inexorably to the conclusion that" the Plaintiffs' and putative class members' "rights have been
determined" and concretely affected. *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir.
2016) (cleaned up). As a result of Defendants' actions, all members of the proposed class were
"denied legal rights, including their right to access the U.S. asylum process," in September 2021.
Compl. ¶¶ 271, 275, 372. And Plaintiffs and members of the proposed class continue to suffer the
harmful legal consequences of the Defendants' actions taken to enforce the Haitian Deterrence
Policy both in September 2021 and since.

 For example, due to their summary expulsion under the Title 42 Process and pursuant to
the Haitian Deterrence Policy, Plaintiffs Mirard Joseph, Madeleine Prospere, and Jacques Doe
remain unable to return to the United States to seek asylum. *See id.* ¶¶ 36, 40, 41, 43. If they and
putative class members who remain outside the United States are ever able to come back to the
country to seek asylum, they will be subject to recently adopted policies severely limiting access
to the asylum system, such as the "Circumvention of Lawful Pathways" regulations. Federal
Register, "Circumvention of Lawful Pathways," 88 Fed. Reg. 31,314 (May 16, 2023) (the "Asylum

Ban").[16] Under the Asylum Ban, if these Plaintiffs are unable such that "to secure one of the tightly restricted appointments available through the CBP One application, and cannot show that they have sought and been denied asylum in any country through which they travel to reach the United States, they will be presumptively ineligible for asylum," and potentially subject to swift removal and "the additional punitive consequence of the five-year bar to re-entry to the United States that accompanies an expedited removal order." Suppl. Compl. ¶¶ 28, 44. Moreover, because they were denied the opportunity to seek asylum in September 2021, Plaintiffs Mirard, Madeleine, and Jacques Doe, and other similarly situated putative class members are not eligible for Temporary Protected Status ("TPS"), which Defendant Secretary Alejandro Mayorkas redesignated on December 2, 2022 for Haitians who entered the United States on or before November 6, 2022. *See id.* ¶¶ 40, 43, 49.

Additional Individual Plaintiffs remain in legal limbo, despite having been able to seek asylum in the United States following their expulsions from Del Rio. Their temporary grants of parole have expired or will expire imminently, and none of them have work authorization to support themselves in the United States, for which they would have been eligible and likely would have already received if they had been allowed to seek asylum in September 2021. *See id.* ¶¶ 45–47. And organizational Plaintiff HBA continues to divert resources due to Defendants' unlawful conduct in this case, which impairs HBA's ability to further its mission. *See id.* ¶¶ 51–56. In short, Plaintiffs and the putative class members are suffering harm from the legal consequences of the Haitian Deterrence Policy and its continued implementation. Defendants' claim that "there are no factual allegations pleading the existence of a final agency action" in the Complaint, DR 18, is plainly wrong.[17] For this reason, too, Plaintiffs' Motion for Leave to supplement the Complaint is

---

[16] The Asylum Ban was recently vacated and remanded by a district court in the Northern District of California, which has stayed that decision pending appeal. *See* Order Granting Pls.' Mot. for Summary Judgment, *East Bay Sanctuary Covenant et al. v. Joseph R. Biden et al.*, Case No. 18-cv-06810-JST (N.D. Cal. July 25, 2023), ECF No. 187 at 35.

[17] In addition to the allegations outlined above, the Complaint plainly alleges that "DHS Defendants' adoption and implementation of the Haitian Deterrence Policy constitute final agency

not futile. *Contra* DR 17, 18.[18] The fact that Defendants have enforced the Haitian Deterrence Policy in different ways since September 2021—ranging from the denial of basic human necessities in Del Rio, to the mass summary expulsion of Haitians from Del Rio, to an extension of the Asylum Ban specifically to noncitizens who attempt to enter the United States via adjacent coastal borders, among other actions—does not deprive the Haitian Deterrence Policy of finality. *See, e.g.*, *Safari Club*, 842 F.3d at 1289 ("The possibility that the [agency] may revise its decision based on new information is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." (cleaned up)). Nor can Defendants evade judicial review by keeping the Haitian Deterrence Policy secret and refusing to publish or otherwise publicly acknowledge such a shameful policy. Secret agency action can still be reviewed and enjoined by a court. *See, e.g.*, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action . . . need not be in writing to be final and judicially reviewable."); *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 385–86 (D.C. Cir. 2018) (holding that, based on extrinsic evidence, plaintiffs had sufficiently alleged "a pattern and apparent policy" of improperly automatically extending "temporary" work visas for multiple years "in violation of the APA and the Immigration and Nationality Act"); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001) (an agency cannot evade APA review by "avoiding written statements or other 'official' interpretations"); *Grand Canyon Trust v. Public Serv. Co. of NM*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) ("Unwritten agency actions have been subjected to judicial review under the [APA]").

---

action within the meaning of the APA," and have harmed Plaintiffs "by denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law." Compl. ¶¶ 378–79.

[18] Defendants cite *Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012) to claim the Supplemental Complaint is futile because Plaintiffs' claims cannot survive a motion to dismiss. *See* DR 17. That is incorrect; moreover, unlike in *Hettinga*, Plaintiffs' supplemental allegations "support [Plaintiffs' claims" in the original Complaint and demonstrate that the lawsuit is not moot, as the Haitian Deterrence Policy and the harms of the Title 42 process are on ongoing, and Plaintiffs' harms can still be redressed by this Court. *Hettinga*, 677 F.3d at 480.

### 2. Plaintiffs' Proposed Supplemental Complaint Substantiates the Continued Harms from Defendants' Conduct at Del Rio.

The proposed Supplemental Complaint is not futile for another, independent reason: it further demonstrates that this Court can afford "concrete, tangible relief" to Plaintiffs and class members. *Zukerman*, 961 F.3d at 444.

At a minimum, Individual Plaintiffs and class members who remain outside the United States would benefit from "[a]n order allowing Individual Plaintiffs and class members ***to return to the United States and requiring Defendants to facilitate return*** . . . so that Individual Plaintiffs may pursue their asylum claims in the United States." Compl. (prayer) 84 ¶ i (emphasis added). Defendants do not dispute this; they instead inaccurately assert that Plaintiffs "have already received access to the procedural protections they sought in the original Complaint." DR 19. That is incorrect, as in reality, three Individual Plaintiffs (not to mention numerous class members) ***remain outside the United States*** in dangerous and potentially life-threatening conditions, and remain unable to seek asylum, as a direct result of Defendants' conduct at Del Rio. Plaintiffs Mirard Joseph and Madeleine Prospere are currently in Chile, where they face anti-Haitian violence and discrimination, and Plaintiff Jacques Doe remains in Haiti, under constant threat from the gang that forced him to flee to Del Rio in the first place. Suppl. Compl. ¶¶ 39–43. Class members' circumstances are similar, and others expelled to Haiti through the Title 42 Process remain in harmful and dangerous conditions, unable to access the asylum system. *See id.* ¶ 48.

Defendants erroneously assert that these Plaintiffs have received all they requested in the Complaint, while noting that Mirard, Madeleine, and Jacques "submitted applications for Haitian Parole in January 2023." DR 9. That is far short of a facilitated return to the United States and access to the asylum process, Compl. (prayer) 84 ¶ i, which requires physical presence in the United States, *see* 8 U.S.C. § 1158(a) (noncitizens who are "physically present in the United States . . . may apply for asylum"). While parole can be a pathway to asylum and may grant these Plaintiffs a temporary stay in the United States, it is drastically different from the opportunity for Plaintiffs to exercise their right to seek asylum and remain in the United States long-term.

Defendants' position *might* have more legitimacy if these Plaintiffs' parole applications had been *granted*, thus allowing Mirard, Madeleine, and Jacques to come to the United States to seek asylum. As things stand, however, these Plaintiffs remain in danger outside of the U.S. while they await a decision on their parole applications. At bottom, the government appears to be asking this Court to ignore the facts on the ground and the plight of Plaintiffs and class members and their claims for relief in service of (incorrectly) dismissing this case as moot.

Plaintiffs and class members remaining outside the United States have experienced other injuries that can also still be "properly recompensed by the relief requested." *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 805 (D.C. Cir. 1985). If the three Individual Plaintiffs and class members had not been expelled by Defendants following the events of Del Rio, these Individual Plaintiffs and class members could have been eligible to obtain TPS when it was redesignated for Haiti. *See* Suppl. Compl. ¶¶ 40, 43. Instead, due to Defendants' unlawful conduct, they remain outside the United States, unable to pursue asylum, ineligible for TPS, and subject to the new Asylum Ban regulations. As such, the Supplemental Complaint properly requests declaratory relief so that Individual Plaintiffs and class members may be deemed eligible for TPS and not subject to the Asylum Ban Regulations. *See id.* (prayer) 23 ¶¶ a, b.

The Supplemental Complaint also substantiates the continued harm to Individual Plaintiffs and class members who have made it to the United States. They have been delayed in their eligibility to seek work authorization due to their removal from Del Rio, and they could have been eligible for TPS if not for Defendants' conduct. *See* Suppl. Compl. ¶¶ 46–47, 49. This lawsuit could remedy these harms by returning Plaintiffs and class members to the position they would be in had they not been denied their right to seek asylum at Del Rio. *See, e.g.*, *Al Otro Lado*, 423 F. Supp. 3d at 872. Under the Supplemental Complaint, Plaintiffs and class members seek the "concrete and tangible relief" of being "immediately eligible to apply for (c)(8) work authorization upon submission of their asylum applications," and declaratory relief that Plaintiffs and class members may be eligible for TPS. Suppl. Compl. (prayer) 23 ¶¶ a, c. Further, Organizational Plaintiff HBA continues to experience the effects of Defendants' unlawful conduct in Del Rio

through the drain on HBA's resources, staff, and finances, which are continuously diverted to deal with the aftermath of Defendants' actions. *See id.* ¶¶ 51–55. Supplementation would allow this Court to address Plaintiffs' continued need for relief from these harms—through declaratory relief that holds Defendants accountable and through appropriate injunctive relief that helps make Plaintiffs whole and prevents Defendants from continuing to harm Plaintiffs.

> **3.    Plaintiffs' Proposed Supplemental Complaint Will Not Prejudice Defendants and Will Promote Judicial Economy.**

The Supplemental Complaint will not cause "undue prejudice" to Defendants. Undue prejudice is "not mere harm to the non-movant but a denial of the opportunity to present facts or evidence which would have been offered had the amendment been timely.'" *Dove v. Washington Metro. Area Transit Auth.*, 221 F.R.D. 246, 248 (D.D.C. 2004) (cleaned up). Prejudice may be found where "the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation," *Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006), adds new parties at a "critical juncture [in] the case," *Thorp*, 325 F.R.D. at 514 (cleaned up), or "alter[s] either the choice of counsel or the nature of the opposing party's strategy," *Dove*, 221 F.R.D. at 248.

Here, the Supplemental Complaint proceeds on the same theory of the Haitian Deterrence Policy, has been proposed early in the litigation (indeed, before any ruling on a Rule 12 motion), and adds no new parties or claims. Because no discovery has yet been ordered by this Court, there is no significant new preparation that Defendants would have to engage in, other than responding to the motion and Supplemental Complaint, which they already have done.

Defendants' argument that the Supplemental Complaint will cause the suit to "morph" into a "new challenge to more recent government policies" fails because Plaintiffs' Supplemental Complaint proposes no new causes of action. DR 19. Defendants also fail to articulate how such a circumstance, even if true, would unduly prejudice them at this early stage in the litigation. Defendants instead cite an inapposite decision where leave to supplement was denied after discovery had already progressed for nineteenth months because the proposed supplemental

complaint added two new defendants "while including no [new] allegations against the current parties" and occurred "at a critical juncture [in] the case." *Thorp*, 325 F.R.D. at 514 (cleaned up). Here, the Supplemental Complaint does not add "events fully distinct from those underlying" the original complaint; does not add any new parties; and has been submitted before discovery has even begun and before a trial date has been set. Defendants' bald assertion that the Supplemental Complaint "does not pertain to the original cause of action in this case," DR 19, ignores the fact that the events alleged in the Supplemental Complaint were committed by the same defendants, against the same plaintiffs, and occurred after the filing of the original complaint—precisely the circumstance in which supplemental complaints are warranted. *See, e.g.*, *Health Ins. Ass'n of Am. v. Goddard Claussen Porter Novelli*, 213 F.R.D. 63, 66 (D.D.C. 2003) ("A supplemental pleading . . . is designed to cover matters subsequently occurring but pertaining to the original cause." (quotation omitted)). Finally, although Defendants take issue with the fact that the Supplemental Complaint "seek[s] entirely new forms of declaratory and equitable relief," DR 9, this is proper in a supplemental complaint, which may be used to seek "additional relief; [and] to put forward new claims or defenses based on events that took place after the original complaint or answer was filed." *BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 24 (D.D.C. 2015) (cleaned up).

## CONCLUSION

This Court should discharge the Order to Show Cause, conclude that this case is not moot, and grant Plaintiffs leave to file the Supplemental Complaint.

DATED: July 28, 2023

Respectfully submitted,

/s/ *Alexander L. Schultz*
Alexander L. Schultz

**Stephen Manning** (OR0024)
stephen@innovationlawlab.org
**Tess Hellgren** (OR0023)
tess@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

**Nicole Phillips** (*pro hac vice*)
nphillips@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4265 Fairmount Avenue, Suite 280
San Diego, CA 92105
Telephone: +1 949 603-5751

**Lauren M. Wilfong** (NJ0014)*
lauren.wilfong@justiceactioncenter.org
**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
**Jane Bentrott** (DC Bar No. 1029681)
jane.bentrott@justiceactioncenter.org
**Karen C. Tumlin** (CA00129)
karen.tumlin@justiceactioncenter.org
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7276

*Not admitted to practice law in California*

**Stanley Young** (CA00146)
syoung@cov.com
mdelgado@cov.com
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: +1 650 632-4704

**Alexander L. Schultz** (DC Bar No. 1618410)
aschultz@cov.com
COVINGTON & BURLING, LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: +1 424 332-4788

**Maura A. Sokol** (DC Bar No. 1672674)
msokol@cov.com
COVINGTON & BURLING, LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: +1 202 662-5528

*Counsel for Plaintiffs*