**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HAITIAN BRIDGE ALLIANCE,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281;

MIRARD JOSEPH and MADELEINE
PROSPERE, citizens of Haiti, c/o
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281;

MAYCO CELON and VERONIQUE
CASSONELL, citizens of Haiti, c/o
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281;

JACQUES DOE, citizen of Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281;

ESTHER and EMMANUEL DOE, citizens of
Haiti
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281;

SAMUEL and SAMENTHA DOE, citizens of
Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042

Civil Action No. 1:21-cv-03317 (JMC)

Facsimile: +1 503-882-0281;

PAUL DOE, citizen of Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

ERIC and FLORENCE DOE, citizens of Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

PIERRE and GINETTE DOE, citizens of Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

JAMES DOE, citizen of Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

DELGADO DOE, citizen of Haiti,
c/o INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503-882-0281

*Plaintiffs*,

v.

JOSEPH R. BIDEN, PRESIDENT OF THE
UNITED STATES, *in his official capacity*; 1600
Pennsylvania Avenue NW Washington, DC
20500;

ALEJANDRO N. MAYORKAS, SECRETARY

OF HOMELAND SECURITY, *in his official capacity*;
Department of Homeland Security
245 Murray Lane SW
Washington, DC 20528;

U.S. DEPARTMENT OF HOMELAND
SECURITY
245 Murray Lane SW
Washington, DC 20528;

TROY A. MILLER, ACTING COMMISSIONER
FOR U.S. CUSTOMS AND BORDER
PROTECTION, *in his official capacity*;
U.S. Customs and Border Protection 1300
Pennsylvania Ave. NW
Washington, DC 20229;

DIANE J. SABATINO, ACTING EXECUTIVE
ASSISTANT COMMISSIONER OF U.S.
CUSTOMS AND BORDER PROTECTION'S
OFFICE OF FIELD OPERATIONS, *in her official capacity*;
CBP Office of Field Operations
1300 Pennsylvania Ave. NW
Washington, DC 20229;

JASON OWENS, CHIEF OF
U.S. BORDER PATROL, *in his official capacity*;
U.S. Border Patrol
1300 Pennsylvania Ave. NW
Washington, DC 20229;

U.S. CUSTOMS AND BORDER
PROTECTION,
Office of Chief Counsel
1300 Pennsylvania Avenue, Suite 4.4-B
Washington, D.C. 20229;

PATRICK LECHLEITNER, DEPUTY
DIRECTOR & SENIOR OFFICIAL
PERFORMING THE DUTIES OF THE
DIRECTOR OF
U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, *in his official capacity*;

U.S. Immigration and Customs Enforcement, 500
12th Street SW
Washington, DC 20536;

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
500 12th Street SW
Washington, DC 20536;

XAVIER BECERRA, SECRETARY OF
HEALTH AND HUMAN SERVICES, *in his
official capacity*;
U.S. Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Ave. SW
Washington, DC 20201;

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
Hubert H. Humphrey Building 200 Independence
Ave. SW
Washington, D.C. 20201;

MANDY COHEN, DIRECTOR OF CENTERS
FOR DISEASE CONTROL AND
PREVENTION, *in her official capacity*; Centers
for Disease Control and Prevention 1600 Clifton
Road
Atlanta, GA 30329;

CENTERS FOR DISEASE CONTROL AND
PREVENTION,
Centers for Disease Control and Prevention 1600
Clifton Road
Atlanta, GA 30329;

*Defendants*.

**SUPPLEMENTAL AND AMENDED CLASS ACTION COMPLAINT FOR
INJUNCTIVE AND DECLARATORY RELIEF**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 3

PARTIES ........................................................................................................................ 3

I.      Plaintiffs ............................................................................................................ 3

II.     Defendants ...................................................................................................... 10

FACTUAL ALLEGATIONS ....................................................................................... 14

I.      The United States' history of anti-Haitian immigration policies. ....................... 14

      A.     The United States has long supported the economic and political subjugation of Haitians. ....................................................................... 15

      B.     The United States used its immigration policy to discriminate against Haitians and deter them from seeking protection in the United States. ............... 16

      C.     Through the Title 42 Process, the United States implemented another racist and exclusionary immigration policy consonant with its long-running strategy of deterring Haitian migration. .................................................... 19

II.     Defendants adopted and implemented the Del Rio Deterrence Decision and violated the rights of thousands of Haitian asylum seekers in Del Rio. .......................... 21

      A.     DHS Defendants took no steps to prepare for the anticipated arrival of thousands of Haitian asylum seekers in Del Rio pursuant to the Del Rio Deterrence Decision. ....................................................................... 23

      B.     Thousands of Haitian asylum seekers arrived in Del Rio in September 2021. ............................................................................................ 26

      C.     CBP personnel abused Haitian asylum seekers in Del Rio. ................................ 27

            1.     CBP personnel deprived thousands of asylum seekers in their custody of basic human needs. ................................................. 28

                 (a)     CBP personnel provide inadequate food and water. .................... 29

                 (b)     CBP personnel denied asylum seekers adequate shelter. .............. 32

            2.     CBP personnel refused to provide effective medical care. ....................... 33

            3.     CBP personnel physically and verbally abused asylum seekers in Del Rio. ................................................................................... 35

Page

D.    DHS Defendants summarily expelled thousands of Haitian asylum seekers from Del Rio in unprecedented fashion. ............................................... 38

    1.    DHS Defendants expelled thousands of asylum seekers from Del Rio to  Haiti. ................................................................. 40

    2.    DHS Defendants expelled thousands of asylum seekers from Del Rio to Mexico. .............................................................. 44

E.    Asylum seekers expelled from Del Rio were returned to danger in Haiti and Mexico. ............................................................................ 45

III.    President Biden and DHS Defendants' Del Rio Deterrence Decision diverged from standard practices and was driven by discriminatory purpose. ............................... 48

A.    The treatment of Haitian migrants in Del Rio diverged from standard practices Defendants applied to other asylum seekers. ........................... 48

B.    Discriminatory intent drove the treatment of Haitian asylum seekers in Del Rio. ................................................................................... 51

IV.    Defendants' Title 42 Process applied in Del Rio was unlawful. ....................................... 52

A.    The federal government's public health powers provide no support for the mass, summary expulsion of asylum seekers. ...................................... 53

B.    Defendants' Title 42 Process deprived asylum seekers of protections guaranteed under U.S. law. ...................................................... 54

C.    Defendants' Title 42 Process did not advance public health................................ 56

D.    Defendants continued to enforce the Title 42 Process following Del Rio. ........... 57

V.    Defendants' actions pursuant to the Del Rio Deterrence Decision, including their summary expulsion of asylum seekers from the CBP Encampment under the Title 42 Process, continue to harm Individual and Organizational Plaintiffs. .................................... 58

A.    Many individuals expelled to Haiti remain trapped there in increasingly dire conditions. ................................................................... 59

B.    Due to Defendants' unlawful expulsions, many Haitian asylum seekers are ineligible for Temporary Protected Status. .......................................... 61

C.    Defendants' unlawful expulsions have subjected many Haitian asylum seekers to new regulations that curtail their future ability to seek asylum. .......... 62

D.    Defendants have continued to evade accountability for the atrocities at Del Rio. .................................................................................... 67

E.     Defendants' actions and policies have harmed and continue to harm Individual Plaintiffs. ................................................................. 69

  1.     Plaintiffs Mirard Joseph and Madeleine Prospere ...................... 70

  2.     Plaintiffs Mayco ("Michael") Celon and Veronique Cassonell ............... 73

  3.     Plaintiff Jacques Doe ....................................................... 74

  4.     Plaintiffs Esther and Emmanuel Doe ................................... 77

  5.     Plaintiffs Samuel and Samentha Doe ................................... 79

  6.     Plaintiff Paul Doe .......................................................... 80

  7.     Plaintiffs Eric and Florence Doe ....................................... 82

  8.     Plaintiffs Pierre and Ginette Doe ...................................... 85

  9.     Plaintiff James Doe ........................................................ 86

  10.    Plaintiff Delgado Doe .................................................... 89

F.     Defendants' actions and policies have harmed and continue to harm Organizational Plaintiff Haitian Bridge. .................................. 91

CLASS ALLEGATIONS ........................................................................ 95

CAUSES OF ACTION ......................................................................... 99

G.     Contrary to the Public Health Service Act, 42 U.S.C. § 265. ........................... 105

H.     Contrary to the Immigration and Nationality Act, 8 U.S.C. § 1158 (Asylum). ............................................................................ 106

I.     Contrary to the Immigration and Nationality Act, 8 U.S.C. § 1231 (Withholding of Removal). ................................................... 106

J.     Contrary to the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 Note (Convention Against Torture). ........................... 107

K.     *Ultra Vires* and Contrary to the Immigration and Nationality Act, 8 U.S.C. §§ 1225, 1229a (Removal of Noncitizens). ................................ 107

A.     Inspection and Asylum Referral Process ................................ 111

B.     Withholding of Removal ................................................... 112

C.     Removal under the INA ..................................................... 112

**Page**

PRAYER FOR RELIEF ............................................................................................................ 116

## INTRODUCTION

1.      In September 2021, approximately 15,000 Haitians arrived at the U.S. border near Del Rio, Texas, seeking to exercise their right to request humanitarian protection under U.S. and international law. This case challenges the federal government's shameful detention of these individuals in deplorable conditions as well as its rapid expulsion of asylum seekers back to the dangers they had fled, in violation of U.S. law. As set forth below, Defendants' actions violated the U.S. Constitution and statutory commands and exceeded Defendants' statutory authority.

2.      In the late summer of 2021, senior White House and Department of Homeland Security ("DHS") officials received intelligence that a significant number of Haitian nationals were traveling to the U.S. border near Del Rio to seek protection in the United States. In response, these officials decided to suppress the growing number of Haitians arriving at the border and to prevent and deter them from lawfully accessing the U.S. asylum system by subjecting them to brutal and inhumane conditions and then summarily expelling them from the United States, as described in this First Amended Complaint (the "Del Rio Deterrence Decision").

3.      Haitians who sought asylum near Del Rio in September 2021 were detained by Defendant U.S. Customs and Border Protection ("CBP") in a makeshift encampment near the Del Rio International Bridge (the "CBP Encampment"). Pursuant to the Del Rio Deterrence Decision, Defendants refused to prepare sufficient infrastructure, personnel, and resources to provide even basic necessities at the CBP Encampment. Defendants then engaged in rapid mass expulsions under an authority popularly known as "Title 42," sending many individuals back to Haiti in shackles and with no understanding of where they were being transported.

4.      As these events unfolded, the personal experience of Plaintiff Mirard Joseph captured the public's attention through a photograph that became emblematic of the widespread human rights abuses in Del Rio. Like so many others, Mirard and his family arrived in Del Rio to seek protection in the United States. After watching his wife Madeleine and their one-year-old daughter endure triple-digit temperatures and suffer from hunger and dehydration in the CBP Encampment, Mirard was one of many migrants who crossed the Rio Grande back into Mexico to

attempt to purchase life-sustaining food for his family. In the photograph, widely circulated by media outlets, Mirard is pictured returning with two bags of food as a U.S. officer on horseback bears down on him, lashing at him with split reins. For several minutes, the officer attempted to drag Mirard back to the river, releasing him only when he was almost trampled by the officer's horse. Two days after the photograph was taken, Defendants took Mirard and his family to a detention facility. From there, Mirard and Madeleine were shackled, placed on a plane with their young daughter, and expelled to Haiti under Title 42. Mirard and his family never had the chance to seek protection in the United States.

5.      Because it was captured on camera, Mirard's experience shocked the national conscience and placed a spotlight on the treatment of Haitians in the CBP Encampment. But Mirard is just one of the thousands of Haitians at Del Rio who had hoped to seek safety in the United States and were instead met with human rights abuses and swift, unlawful expulsion back to the very country they had fled.

6.      Consistent with the United States' long history of anti-Haitian and anti-Black immigration policies, the Biden Administration used the inhumane conditions in the CBP Encampment and the Title 42 Process as a cudgel to deny these individuals the opportunity to access the U.S. asylum process. By the end of September 2021, nearly all of the 15,000 individuals at the CBP Encampment had been expelled to Haiti or forced back to dangerous conditions in Mexico, in violation of their legal right to *non-refoulement*.

7.      To date, there has been no accountability for the unconscionable actions taken by Defendants in 2021, in what is now the single largest expulsion event in recent U.S. history.

8.      Plaintiffs are sixteen Haitian asylum seekers, who were victims of U.S. officials' abusive treatment in the CBP Encampment and expelled without an opportunity to access the U.S. asylum system, and Haitian Bridge Alliance, a community-based organization that led the legal and humanitarian response to that conduct. Plaintiffs assert four constitutional claims based on violations of the equal protection component of the Fifth Amendment's Due Process Clause and their substantive and procedural due process rights. Plaintiffs also assert four claims under the

Administrative Procedure Act, on the grounds that the Title 42 Process and the Del Rio Deterrence Decision as applied to them and to the putative class in Del Rio was contrary to law and arbitrary and capricious, and resulted in required agency action being unlawfully withheld or unreasonably delayed. On behalf of themselves and a class of similarly situated individuals, Plaintiffs seek declaratory and injunctive relief to remedy the ongoing injuries inflicted on them by Defendants' discriminatory and unlawful actions, including relief to prevent Defendants from engaging in similar violations against Haitians in the future.

**JURISDICTION AND VENUE**

9.      This case arises under the Fifth Amendment of the U.S. Constitution; the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. ("INA"), and its implementing regulations; the Convention Against Torture, 8 U.S.C. § 1231 note ("CAT"), *see also* the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681–82 (1998) ("FARRA"); and the Public Health Service Act of 1944, 42 U.S.C. § 201, et seq.

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. The United States has waived sovereign immunity with respect to the claims alleged in this case. *See* 5 U.S.C. § 702. This Court has jurisdiction to enter declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

11.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and I(1) because Defendants are agencies of the United States and federal officers of the United States acting in their official capacities and are headquartered or reside in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

I.      **Plaintiffs**

12.      Plaintiff **Haitian Bridge Alliance** ("Haitian Bridge") is a grassroots and community-based nonprofit organization incorporated in California. Its mission is to advocate for

- 3 -

fair and humane immigration policies and to provide humanitarian, legal, and social services to migrants—particularly Black migrants, the Haitian community, and other vulnerable populations. Since 2015, Haitian Bridge has provided services to asylum seekers and other migrants at the border and throughout their U.S. immigration proceedings. As a Haitian-led, Haitian Creole-speaking organization, Haitian Bridge also provides social and humanitarian assistance to and advocates alongside Black migrant communities at the border, across the United States, and in Mexico, and educates the public about anti-Black racism in the U.S. immigration system. Haitian Bridge provided aid and legal services to asylum seekers in the CBP Encampment in September 2021. Since the encampment was cleared, Haitian Bridge has continued to provide humanitarian assistance and legal services to Haitian asylum seekers expelled from Del Rio.

13.     Plaintiffs **Mirard Joseph and Madeleine Prospere** are citizens of Haiti. They fled to Chile in 2017 because they felt unsafe in Haiti and feared they could be kidnapped every time they left their home. Due to their lack of stability in Chile, the couple decided to travel to the United States with their one-year-old daughter to seek asylum.[1] On or around September 11, 2021, Mirard, Madeleine, and their baby arrived in Del Rio, Texas, and were given a numbered ticket by U.S. officials. While waiting to seek asylum, they experienced extreme hunger because U.S. officials provided insufficient food to meet their basic needs. Mirard was thus forced to cross the Rio Grande into Mexico several times to buy food for his wife and daughter. On September 18, 2021, as Mirard was returning to the CBP Encampment with food, U.S. officials on horseback chased and lashed Mirard, and tried to force him back to Mexico. Two days later, after Mirard and Madeleine had been in the CBP Encampment for approximately nine days, officials called their ticket number and transported the family to a detention center. After being detained there for several days, Mirard and Madeleine were shackled and—without being told where they were

---

[1] As used in this Complaint, references to "asylum" or the "U.S. asylum process" are understood to encompass the statutory and regulatory processes by which any noncitizen may seek all relevant forms of *non-refoulement* relief available under U.S. immigration laws, including asylum, withholding of removal, and relief under the Convention Against Torture. *See* 8 U.S.C. §§ 1158, 1231 & note.

going—expelled with their young child to Haiti. They never received an opportunity to seek asylum or explain why they feared returning to Haiti. Following their expulsion, life in Haiti was incredibly difficult for Mirard and Madeleine. Mirard went into hiding out of fear of being attacked or kidnapped if he ventured outside. Madeleine was forced to separate from their family to take their young daughter to Chile for medical care that was unavailable in Haiti for the illnesses she developed in the CBP Encampment. After very challenging experiences in Haiti and Chile, in October 2023, Mirard, Madeleine and his family were finally able to enter the United States through a Haitian parole program, but remain ineligible for TPS due to their unlawful expulsion in September 2021. Mirard and Madeleine are working on their asylum applications.

14.    Plaintiffs **Mayco ("Michael") Celon and Veronique Cassonell** are citizens of Haiti. Michael fled Haiti after his mother was murdered when he was fifteen years old. Because it was not safe to return to Haiti, his family remained in the Dominican Republic and Chile for over two decades. During that time, he married Veronique, and they had two children. After suffering discrimination in Chile and seeing multiple Haitians murdered there, Michael and Veronique traveled to the United States with their children, intending to seek asylum. In mid-September 2021, Michael, Veronique, and their children crossed into Del Rio and presented themselves at the CBP Encampment. They experienced terrible conditions, received very little food and water, slept on the ground, and saw officers on horseback using reins as whips against people in the river. After approximately ten days, U.S. officials sent Michael and Veronique to a detention center, where they were detained separately, each with one of their children. After approximately nine days separated in detention, Michael, Veronique, and their children were expelled in shackles to Haiti, having never been given an opportunity to seek asylum. Conditions in Haiti were so bad that the family returned to Chile. Although they faced discrimination and threats in Chile because of their race and Haitian nationality, they were marginally safer there than in Haiti. In July 2022, Mayco and Veronique, along with their children and nephew, received temporary, discretionary grants of humanitarian parole into the United States. They have applied for asylum.

15.    Plaintiff **Jacques Doe**, a citizen of Haiti, fled Haiti because a gang had targeted him for death, even following him into the countryside when he tried to escape their reach. He fled to Brazil and then made an arduous journey to the United States to seek asylum. In mid-September 2021, Jacques came to the CBP Encampment, where U.S. officials gave him a numbered ticket. Jacques understood that he would need to identify himself when officials called the number, which they did around eight days later. Instead of receiving the chance to seek asylum, Jacques was taken to two different detention centers for approximately one week, after which time he was expelled to Haiti. On the expulsion flight, Jacques tried to tell officials that he could not return to Haiti because he faced danger there. But the officials responded only that "there were too many Haitians in the United States" and that they had to send Jacques and others back to Haiti. Jacques went into hiding in Haiti, hoping the gang that previously threatened his life would not learn that he was back in the country. After living in constant fear of being recognized and targeted again by the gang for over two years, in October 2023 Jacques was finally able to enter the United States through a parole program for Haitians. He remains ineligible for TPS due to his unlawful expulsion in September 2021. Jacques is preparing his asylum application.

16.    Plaintiffs **Esther and Emmanuel Doe** are citizens of Haiti. They fled Haiti after receiving numerous threats of violence from a gang affiliated with the majority political party. On or around September 18, 2021, Esther, Emmanuel, and their baby son arrived in Del Rio to seek asylum in the United States. In the CBP Encampment, their baby became very sick. When Esther tried to cross the river to find food for him, she was terrorized by officers on horseback. U.S. officials attempted to expel Esther and Emmanuel back to Haiti without giving them an opportunity to seek asylum. Because they were afraid of being expelled to Haiti, Esther and Emmanuel were forced to cross with their son back into Mexico. They lived in precarious conditions in Mexico until April 2022 when they, along with their child, received temporary, discretionary grants of humanitarian parole into the United States. Esther and Emmanuel have applied for asylum.

17.     Plaintiffs **Samuel and Samentha Doe** are Haitian nationals who fled Haiti after Samuel was attacked by a rival political party and threatened at the school where he worked by men armed with machetes. They originally escaped to Chile but, struggling to survive there, eventually decided to seek asylum in the United States. On or around September 16, 2021, Samuel, Samentha, and their two children crossed into the United States near Del Rio, where they were given a numbered ticket and told to wait until their number was called. While in the CBP Encampment, Samuel developed stomach ulcers, their daughter became very sick, and their son contracted an eye infection and a rash after falling on the ground and injuring his eye while running away from U.S. officers on horseback. Everyone in the family went hungry because there was not enough food in the encampment. Eventually, Samuel and Samentha decided they could not keep their children in such conditions and felt compelled to cross back into Mexico. Samuel, Samentha, and their children lived in difficult conditions in Mexico until April 2022 when they received temporary, discretionary grants of humanitarian parole into the United States. They have applied for asylum.

18.     Plaintiff **Paul Doe** is a citizen of Haiti.[2] A gang affiliated with the dominant political party in Haiti killed his uncle after he failed to pay back money he owed, then targeted Paul for recruitment. Paul fled because he had only two options in Haiti: join the gang or die. He first escaped to Chile and then made his way to the United States, hoping he would be granted asylum. On or around September 17, 2021, Paul arrived in Del Rio, Texas. U.S. officials gave him a numbered ticket and told him to wait until his number was called. While waiting in the CBP Encampment, Paul was provided no shelter and very little food or water. He slept on the ground in the dust and went hungry for several days. He knew he could not survive much longer without adequate food and water. Eventually, Paul saw people being taken from the encampment and heard they had been sent back to Haiti. As more and more people were taken away, he realized that he

_____

[2] On December 23, 2021, this Court granted Plaintiffs' motion to proceed under pseudonym for Jacques Doe, Esther and Emmanuel Doe, Samuel and Samentha Doe, and Paul Doe. *See* Dkt. No. 9 at 7–8.

had no option but to cross back to Mexico because he was weak from lack of food and knew that if he were sent back to Haiti, he was a dead man. Paul was never given an opportunity to speak with U.S. officials to seek asylum. Paul lived in precarious conditions in Mexico until May 2022, when he received a temporary, discretionary grant of humanitarian parole into the United States. He has applied for asylum.

19.    Plaintiffs **Eric and Florence Doe** are citizens of Haiti. They fled Haiti in 2016 because members of the dominant political party targeted Eric, a government employee affiliated with an opposing political party. Eric and Florence fled to Chile and Mexico, struggling to survive in both countries due to pervasive discrimination and an inability to find work. Around September 2021, they crossed the river from Mexico into Del Rio, Texas, to seek protection in the United States. In Del Rio, U.S. officials provided no information about what was happening or how to seek asylum. Eric and Florence waited in the CBP Encampment in deplorable conditions, including exposure to the harsh desert climate, insufficient sanitation facilities, and inadequate water and food. After approximately six days, U.S. officials brought them to a detention facility segregated by gender, where they were separated from each other and detained for approximately two weeks. Subsequently, without any explanation and without providing them any opportunity to request asylum, officials shackled them and put them on an expulsion flight to Haiti. They currently live in hiding in Haiti and continue to be threatened by members of the dominant political party. As recently as January 2024, three armed men looking for Eric threatened to burn down his house with his family inside. Eric and Florence continue to fear for their lives and those of their children, and they still want the chance to seek asylum in the United States.

20.    Plaintiffs **Pierre and Ginette Doe** are citizens of Haiti. Pierre fled Haiti in July 2015 after receiving death threats from opponents for his participation in a political party. Pierre fled to the Dominican Republic and then Chile, where he met his wife, Ginette, and had a child together. After being attacked and threatened in Santiago, Chile, and fearing for their lives, Pierre and Ginette traveled to the United States with their younger child intending to seek asylum. In September 2021, the family crossed into Del Rio, Texas. For around three days while they waited

for immigration officers to help them, they were forced to sleep on the ground in the CBP Encampment, and U.S. immigration officials gave them no food or water. Once their family's number was called by an immigration officer, they were taken to a detention center where they continued to suffer through harsh conditions. After seven days of detention, Pierre was abruptly handcuffed and, without warning, he and his family were expelled to Haiti. They were never afforded the chance to ask for asylum or to express their fear of returning to Haiti. Because they feared that Pierre would be killed for his previous political activities in the country, the family left Haiti for Chile in December 2021. While Pierre lives and works in Santiago with his older child, Ginette lives in the south of Chile with their younger child due to her fear of being attacked in Santiago again. They wish to return to the United States to seek asylum.

21.    Plaintiff **James Doe** is a citizen of Haiti. He fled Haiti around December 2017 because he believed his physical safety was at risk when a political party opposed to one he volunteered with gained power in parliament. James fled to Argentina, where he experienced constant discrimination because he is a Black man. Around July 2021, James left Argentina and began traveling to the United States. In September 2021, James crossed the river into Del Rio, Texas, to seek safety in the United States. In Del Rio, U.S. officials gave him a numbered ticket and instructed him to wait until his number was called. He waited for over a week, during which time he was denied sufficient food and water, access to hygiene products and facilities, and protection from the elements. When his number was called, he approached U.S. officials, who detained him in three separate facilities over the course of approximately fifteen days before expelling him to Haiti. James was shocked to be returned to Haiti, as he was never told that might happen to him, and he was never given the opportunity to explain his fear of return to Haiti. Having nowhere else to go, James returned to his hometown in Haiti, where he remains today. He lives in hiding, fearful for his physical safety, and still wants the opportunity to seek protection in the United States.

22.     Plaintiff **Delgado Doe** is a citizen of Haiti.[3] He fled Haiti in both 2016 and 2018 because he was threatened and shot at for working on his cousin's political campaign and because of the powerful and violent gangs in Haiti. Delgado fled to the Dominican Republic, where he lived in hiding, and then to Chile, where he faced consistent discrimination as a Black man. In September 2021, Delgado crossed the river into Del Rio, Texas, to seek asylum in the United States. In Del Rio, U.S. officials gave him a numbered ticket. Delgado was in the CBP Encampment for approximately nine or ten days and experienced horrible conditions, including sleeping on the ground with no protection from the dust or wind, and no food or water from U.S. officials. When Delgado learned from friends that people whose ticket numbers were called were deported to Haiti without the chance to seek asylum, he felt that he had no choice but to cross the river back into Mexico. U.S. immigration officials never gave Delgado the chance to express his fear of return to Haiti. In February 2022, Delgado returned to the United States and tried to ask for protection a second time. He was still not given an opportunity to explain his fear of return to Haiti. Instead, he was detained for approximately one week, asked by a U.S. immigration officer only if he was Haitian, and then when he confirmed that fact, Delgado was deported to Haiti without the chance to express his fear of return or to request asylum. Delgado is currently in Haiti, fearful for his life, and still wants the chance to seek asylum in the United States.

## II.    Defendants

23.     Defendant Joseph R. Biden, Jr., is President of the United States. He is sued in his official capacity. In that capacity, President Biden is the Chair of the National Security Council ("NSC"), a forum of the President's senior advisors, and the Domestic Policy Council ("DPC"), which is tasked with driving and implementing the President's domestic policy agenda in the White House and across the Federal Government. Under President Biden's authority, the NSC and

---

[3] A motion for leave of the Court for Plaintiffs Eric and Florence Doe, Pierre and Ginette Doe, James Doe, and Delgado Doe to proceed under pseudonym will be filed separately. The Court previously granted a separate motion on behalf of Plaintiffs Jacques Doe, Paul Doe, Samuel Doe, Samentha Doe, Esther Doe, and Emmanuel Doe to proceed under pseudonym. (Dkt. 9.)

DPC each contributed to devising, developing, and implementing the Del Rio Deterrence Decision applied to Individual Plaintiffs and others seeking asylum in Del Rio. In his official capacity, President Biden also delegated authority to the Secretary of the U.S. Department of Health and Human Services ("HHS"), the Director of the U.S. Centers for Disease Control and Prevention ("CDC"), and the Secretary of the U.S. Department of Homeland Security ("DHS") to review, determine, and implement the Title 42 Process that was used to expel Individual Plaintiffs and thousands of others from Del Rio. Pursuant to the Del Rio Deterrence Decision and the delegation of authority to implement Title 42, President Biden enabled DHS to prioritize the rapid expulsion of approximately 15,000 Haitian asylum seekers from Del Rio, Texas, to Haiti and Mexico without giving them access to the asylum process or screening them for a fear of return to their home country.

24.     Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet-level department of the U.S. government. DHS is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1). It is responsible for administering U.S. immigration laws, including those relating to the processing, apprehension, detention, and removal of noncitizens present at or between U.S. ports of entry. *See* 8 U.S.C. § 1103. DHS, in coordination with HHS and CDC, is responsible for implementing the Title 42 Process. Its components include U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), which were responsible for implementing and applying the Del Rio Deterrence Decision, including through use of the Title 42 Process.

25.     Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security. He is sued in his official capacity. In that capacity, Secretary Mayorkas is responsible for the administration of U.S. immigration laws. *See* 8 U.S.C. § 1103. Secretary Mayorkas directs each of DHS's components, including the components responsible for the processing, apprehension, detention, and removal of noncitizens present at or between U.S. ports of entry and the components charged with implementing and applying the Del Rio Deterrence Decision, including through use of the Title 42 Process, to Individual Plaintiffs and others seeking asylum in Del Rio.

- 11 -

26.     Defendant U.S. Customs and Border Protection is a sub-agency of DHS and an "agency" within the meaning of the APA. *See* 6 U.S.C. § 271; *see also* 5 U.S.C. § 551(1). It is responsible for the processing, apprehension, and detention of noncitizens present at or between U.S. ports of entry. CBP had responsibility for implementing the Del Rio Deterrence Decision, including through the Title 42 Process, and conducting expulsions of noncitizens who were detained at the CBP Encampment in Del Rio.

27.     Defendant Troy A. Miller is the Acting Commissioner for CBP. He is sued in his official capacity. In that capacity, Mr. Miller is a supervisory official responsible for overseeing the processing, apprehension, and detention of noncitizens arriving at or between U.S. ports of entry. The Commissioner for CBP was responsible for implementing the Del Rio Deterrence Decision and the Title 42 Process and for conducting expulsions of noncitizens who were detained at the CBP Encampment in Del Rio.

28.     Defendant Diane J. Sabatino is the Acting Executive Assistant Commissioner of CBP's Office of Field Operations ("OFO"). She is sued in her official capacity. OFO is responsible for border security, including immigration and facilitating travel through U.S. ports of entry. As Executive Assistant Commissioner, Ms. Sabatino oversees OFO personnel and the operation of major field offices and ports of entry along the U.S. border. The Executive Assistant Commissioner of CBP's OFO is a supervisory official who was responsible for applying the Del Rio Deterrence Decision, including through the application of the Title 42 Process, to Plaintiffs and the proposed class.

29.     Defendant Jason Owens is the Chief of U.S. Border Patrol ("Border Patrol"), which is a sub-office of CBP. He is sued in his official capacity. Border Patrol is the mobile, uniformed law-enforcement arm of CBP and is the primary federal law enforcement agency responsible for border security and enforcement of U.S. immigration laws between U.S. ports of entry. The Chief of Border Patrol oversees all Border Patrol personnel and is a supervisory official responsible for applying the Del Rio Deterrence Decision, including through the implementation of the Title 42 Process between U.S. ports of entry.

30.     Defendant U.S. Immigration and Customs Enforcement is a sub-agency of DHS and an "agency" within the meaning of the APA. *See* 6 U.S.C. § 271; *see also* 5 U.S.C. § 551(1). It is responsible for executing removal orders and overseeing immigration detention, including the detention of noncitizens subject to the Del Rio Deterrence Decision and the Title 42 Process. It also conducts air operations to expel or remove noncitizens from the United States through its Office of Enforcement and Removal Operations. ICE was responsible for implementing the Del Rio Deterrence Decision, including by scheduling and coordinating Title 42 expulsion flights of noncitizens who were detained at the CBP Encampment in Del Rio.[4]

31.     Defendant Patrick Lechleitner is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. He is sued in his official capacity. In that capacity, Mr. Lechleitner oversees all ICE personnel. The Director of ICE is a supervisory official responsible for overseeing immigration detention, including the detention of noncitizens subject to the Del Rio Deterrence Decision and the Title 42 expulsion flights of noncitizens who were detained at the CBP Encampment in Del Rio.

32.     Defendant U.S. Department of Health and Human Services ("HHS") is a federal cabinet-level department of the U.S. government. HHS is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1). It is responsible for administering health and human services aimed at promoting public health. Its components include the Centers for Disease Control and Prevention ("CDC"). HHS, through CDC, was responsible for issuing the public health orders and regulations underlying the Title 42 Process.

33.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity. In that capacity, Secretary Becerra directs each component of HHS, including the CDC.

---

[4] Defendants Miller, Sabatino, Owens, and CBP are referred to collectively as "CBP Defendants." Defendants Lechleitner and ICE are referred to collectively as "ICE Defendants." CBP Defendants, ICE Defendants, and Defendants Mayorkas and DHS are referred to collectively as "DHS Defendants."

34.     Defendant Centers for Disease Control and Prevention is a sub-agency of HHS and an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1). The CDC is charged with fighting public health threats, including communicable diseases. It was responsible for issuing the public health orders and regulations underlying the Title 42 Process.[5]

35.     Defendant Mandy Cohen, M.D., M.P.H., is the Director of the CDC. She is sued in her official capacity. The Director of the CDC issued the public health orders underlying the Title 42 Process in this case.

## FACTUAL ALLEGATIONS

**I.     The United States' history of anti-Haitian immigration policies.**

36.     Anti-Black racism and white supremacy motivated the earliest U.S. immigration policies and have continued to shape immigration laws through the present.[6] Haitians in particular have been one of the most common targets of the United States' racist, exclusionary policies.[7]

37.     Haiti's history as an independent country begins in the early 1800s, when Black Africans liberated themselves from slavery and colonial rule. The Haitian Revolution in 1804 marked not only the end of nearly two centuries of French control, but also the creation of the first free Black nation in the Western Hemisphere, and the only one to gain independence through the uprising of enslaved people. With this revolution, Haiti abolished slavery almost sixty years before President Abraham Lincoln's Emancipation Proclamation. Today, Haiti is at least 95% Black and has one of the highest percentages of Black nationals in the Western Hemisphere. With its

---

[5] Defendants Becerra, HHS, Cohen, and CDC are referred to collectively as "HHS Defendants."

[6] *See, e.g.*, Katy Murdza and Walter Ewing, Ph.D., *The Legacy of Racism within the U.S. Border Patrol, American Immigration Council* (2021), https://www.americanimmigrationcouncil.org/research/legacy-racism-within-us-border-patrol.

[7] *See, e.g.*, Fabiola Cineas, *Why America Keeps Turning Its Back on Haitian Migrants*, Vox (Sept. 24, 2021, 2:40 PM), https://www.vox.com/22689472/haitian-migrants-asylum-history-violence ("[E]very presidential administration since the 1970s has treated Haitians differently than other migrant groups, rejecting asylum claims, holding them longer in detention, and making it harder for them to settle down in safety.").

independence, Haiti inspired enslaved Black people across the world and offered freedom and citizenship to all Black and indigenous people of the Americas.

     **A.**     **The United States has long supported the economic and political subjugation of Haitians.**

     38.     Following the Haitian Revolution, the United States viewed the new nation as an existential threat of Black uprising and liberation and did not diplomatically recognize Haiti for more than half a century. Throughout the subsequent 200 years, the United States has actively oppressed and discriminated against Haitians.

     39.     In 1825, when France demanded that Haiti pay the present-day equivalent of billions of dollars for the so-called loss of enslaved human labor, American banks lent to Haiti the money it needed to avoid French reoccupation at usurious interest rates.[8]

     40.     In part to ensure continued payment of this debt, the United States forcibly occupied Haiti from 1915 to 1934. During that period, U.S. officials engaged in violent and deadly repression of Haitians while restructuring the nation's economy and constitution to benefit American interests.[9] The United States ultimately withdrew following mass, organized resistance by the Haitian people.

     41.     Following this occupation, the United States continued to promote its financial and political interests in Haiti to the detriment of the Haitian people. It supported the brutal dictatorships of Francois and Jean-Claude Duvalier, which, over a thirty-year-period, contributed to inequality, impunity, destabilization, and mass poverty in Haiti and resulted in the deaths of tens of thousands of Haitians and a diaspora of thousands of others fleeing violence.

---

[8] *See* Marlene Daut, *France Pulled Off One of the Greatest Heists Ever. It Left Haiti Perpetually Impoverished*, Miami Herald (July 15, 2021), https://www.miamiherald.com/opinion/op-ed/article252809873.html.

[9] *See* Emmanuela Douyon and Alyssa Sepinwall, *Earthquakes and Storms Are Natural, but Haiti's Disasters Are Man-Made, Too*, Wash. Post (Aug. 20, 2021, 6:00 AM), https://www.washingtonpost.com/outlook/2021/08/20/earthquakes-storms-are-natural-haitis-disasters-are-man-made-too/.

42.     In more recent years, the United States has intervened to prop up corrupt leaders in Haiti, further undermining the rule of law and human rights. The United States was instrumental in the election of Michel Martelly and his hand-picked successor Jovenel Moïse, despite Martelly's increasing slide toward authoritarianism and Moïse's fraudulent election and subsequent dissolution of parliament.

43.     In the face of this long history of political and economic instability, Haitians have remained steadfast in their struggle for autonomy against external and internal forces seeking to exploit them. It was this resolute spirit that U.S. Special Envoy to Haiti Daniel Foote referenced in his September 22, 2021 letter resigning his post in protest of the Biden Administration's actions in Del Rio that month. Citing the United States' long history of intervention and the inhumane treatment of Haitians, Ambassador Foote remarked: "[W]hat our Haitian friends really want, and need, is the opportunity to chart their own course, without international puppeteering and favored candidates."

**B.     The United States used its immigration policy to discriminate against Haitians and deter them from seeking protection in the United States.**

44.     As the United States was interfering with Haitian affairs and contributing to burgeoning political and economic unrest, it was also creating immigration policies that specifically targeted Haitians for disparate treatment to keep them off U.S. soil.[10] For decades, the United States has crafted and utilized immigration policies to further a broader goal of deterring Black, Haitian migrants from seeking protection in the United States.

45.     In 1978, for example, the United States adopted a policy dubbed the "Haitian Program," which jailed arriving Haitians and universally denied their asylum claims despite the known atrocities being committed by the Duvalier regime at the time.[11]

_____

[10] "It is instructive to note that, despite the ideological differences between the Carter, Reagan, Bush I, Clinton, and Bush II administrations, each has persistently discriminated against Haitian entrants . . . ." Roger Daniels, *Guarding the Golden Door: American Immigration Policy and Immigrants Since 1882*, at 213–14 (2004).

[11] *See* Carl Lindskoog, *Violence and Racism Against Haitian Migrants Was Never Limited to Agents on Horseback*, Wash. Post (Sept. 30, 2021, 6:00 AM),

46.     The Haitian Program was struck down in *Haitian Refugee Center v. Civiletti*, which held the government systematically discriminated against Haitian asylum seekers. 503 F. Supp. 442, 450 (S.D. Fla. 1980) ("This case involves thousands of [B]lack Haitian nationals, the brutality of their government, and the prejudice of ours."). The United States quickly implemented a new policy requiring asylum seekers to be detained without an opportunity to post bail. The detention policy appeared neutral on its face, but statistics showed selective application to Haitians, and discovery sought in a legal challenge to the policy in *Jean v. Nelson* showed that the government was using this policy to continue its "Haitian Program." 711 F.2d 1455, 1493 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). U.S. officials adopted this detention policy to deter Haitian asylum seekers, even as the then-Deputy Attorney General acknowledged it could create an appearance of "concentration camps" filled with Black people. An Eleventh Circuit panel in *Jean v. Nelson* held that the selective application of the detention policy to Haitians violated equal protection, particularly in light of the government's history of discriminatory policies against Haitians. *Id.*

47.     During the 1980s and 1990s, consistent with this country's historic goal of preventing and deterring Haitian nationals from seeking asylum here, the United States began an aggressive interdiction policy to intercept Haitians at sea and return them to Haiti.[12] The policy was designed to prevent Haitian migrants from reaching U.S. soil, where they could request access to the U.S. asylum process and to evade its *non-refoulement* obligations under international law not to return asylum seekers to a country in which they would be likely to face persecution. Under this interdiction policy, U.S. authorities intercepted tens of thousands of Haitian asylum seekers at sea and prevented them from seeking relief in the United States. Indeed, from 1981 to 1991, only twenty-eight out of over 25,000 interdicted Haitians were allowed to enter the United States.

---

https://www.washingtonpost.com/outlook/2021/10/02/violence-racism-against-haitian-migrants-was-never-limited-horseback-riders/.

[12] *See Pushing Back Protection: How Offshoring and Externalization Imperil the Right to Asylum*, National Immigrant Justice Center and fwd.us, 6 (Aug. 3., 2021), https://www.fwd.us/news/offshoring-asylum/.

48.     While the Haitian interdiction policy was in place, the United States singled out Haitian migrants for detention at Guantanamo Bay. At the height of this policy, at least 12,000 Haitians were held at the U.S. military prison.

49.     Contemporary immigration schemes have also continued to further the United States' historic goal of deterring Haitian migrants from reaching the United States to seek asylum. Under a policy known as "metering," first implemented under President Barack Obama in 2016 in response to an increase in Haitian migrants seeking asylum, U.S. officials limited the number of migrants permitted to request asylum at ports of entry and turned back most asylum seekers to wait in dangerous Mexican border cities for an opportunity to request protection. The metering policy has since been held unlawful by a federal court, but not before it prevented thousands of Haitians from exercising their rights under U.S. law.

50.     In January 2018, DHS announced the termination of Temporary Protected Status ("TPS") for Haitians, despite dire conditions in Haiti. The policy was enjoined after a district court found that the policy was likely "based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians in particular." *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018); *see also Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) ("Based on the facts on this record, and under the factors prescribed by Arlington Heights, there is both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti.").

51.     The disproportionate use of detention against Haitian migrants also continues. Not only are Black migrants in general more likely to be held in immigration detention, but Haitians are particularly targeted. In 2020, Haitians constituted the largest nationality group in family detention. While accounting for only 1 percent of asylum decisions adjudicated in 2020, Haitians represented more than 44 percent of all families locked in ICE detention during summer 2020. Throughout 2020, the U.S. consistently detained more Haitian families than any other nationality.

**C.** **Through the Title 42 Process, the United States implemented another racist and exclusionary immigration policy consonant with its long-running strategy of deterring Haitian migration.**

52.    The United States' arsenal of discriminatory immigration policies was expanded by the Title 42 Process, a policy that began as a purported public health order under the Public Health Service Act, 42 U.S.C. § 265.

53.    During 2018 and 2019, former Trump Administration official Stephen Miller advocated using the federal government's public health powers to restrict immigration and end migrants' access to asylum. This proposal followed a history of bigoted and xenophobic policies advanced by the Trump Administration to scapegoat immigrants, particularly those from predominantly Black countries like Haiti that then-President Trump referred to as "shithole countries."

54.    In early 2020, the Trump Administration seized upon the global COVID-19 pandemic as an opportunity to execute Miller's proposal. Despite objections from CDC public health experts that "there was no valid public health reason" for an order under Section 265, then-President Trump announced on March 20, 2020, that Defendant CDC would issue an order "to suspend the introduction of all individuals seeking to enter the U.S. without proper travel documentation" along the U.S. border. Any migrant subject to the order would be "immediately return[ed]" "without delay."

55.    To implement this immigration authority consistent with then-President Trump's direction, Defendant CDC issued a regulation, without advance notice and comment, permitting the agency to prohibit the "introduction into the United States of persons" from foreign countries. *See* 42 C.F.R. § 71.40 (the "Title 42 Regulation").

56.    Pursuant to this purported regulatory authority, Defendant CDC issued an order directing the "immediate suspension of the introduction of" certain noncitizens seeking entry at ports of entry or between ports of entry without proper travel documents.[13] Defendant CDC

---

[13] Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed.

subsequently reissued similar orders, most recently in August 2021, that continued to prohibit covered noncitizens from entering the United States purportedly to "protect" the public "during the COVID-19 public health emergency."[14] In December 2021, Defendant CDC announced that it would keep the Title 42 order in place.

57.    Shortly after Defendant CDC's issuance of the Title 42 Regulation and the March 2020 public health order, Defendant CBP began developing standards to implement the order. *Cf.* 42 C.F.R. § 71.40(d)(2). By April 2020, Defendant CBP issued an internal memorandum establishing procedures for applying Defendant CDC's order under "Operation Capio" (the "CBP Capio Memo" or the "Memo").[15] The CBP Capio Memo provided that "all processing [of covered noncitizens] will be done in the field" "[t]o the maximum extent possible." It also directed that covered noncitizens should be "immediately returned to Mexico or Canada" at the nearest port of entry or transported to "a dedicated facility for limited holding prior to expulsion" to their home country. The CBP Capio Memo provides no process for covered noncitizens to seek access to the U.S. asylum process and indicates that U.S. immigration officials are purportedly "not operating pursuant to [their] authorities" under U.S. immigration laws when processing and summarily expelling covered noncitizens.

58.    During the first weeks of the Biden Administration, DHS Defendants effectuated the expulsion of more Haitians under the Title 42 Process than during the entire prior fiscal year under the former Trump Administration. From January 2021 through May 2023, Defendants used the Title 42 Process to conduct over 250 expulsion flights to Haiti.

59.    The weaponization of the Title 42 Process against Haitian migrants intensified in late summer 2021, when Defendants adopted and decided to implement the Del Rio Deterrence

---

Reg. 17,060, 17,061 (Mar. 26, 2020) (eff. Date Mar. 20, 2020), https://www.govinfo.gov/content/pkg/FR-2020-03-26/pdf/2020-06327.pdf.

[14] Public Health Assessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828, 42,828 (Aug. 5, 2021), https://www.govinfo.gov/content/pkg/FR-2021-08-05/pdf/2021-16856.pdf.

[15] https://www.documentcloud.org/documents/6824221-COVID-19-CAPIO.html.

Decision in response to the impending arrival of thousands of Haitian migrants to the U.S. border near Del Rio, Texas.

## II.   Defendants adopted and implemented the Del Rio Deterrence Decision and violated the rights of thousands of Haitian asylum seekers in Del Rio.

60.     In August 2021, President Biden, through the NSC and DPC, and DHS Defendants began receiving intelligence reports indicating that they could soon anticipate an increase in the number of Haitians seeking asylum arriving near the Del Rio Port of Entry in Del Rio, Texas. In response, they adopted and decided to implement the Del Rio Deterrence Decision—a decision to suppress the growing number of Haitians arriving at the border near Del Rio and to prevent and deter these Haitian asylum seekers from accessing protection in the United States by subjecting them to harsh conditions and then summarily expelling them as described in this First Amended Complaint. The Del Rio Deterrence Decision was yet another instantiation of the U.S. government's long-running strategy of deterring Haitian migrants.

61.     The Del Rio Deterrence Decision was made in September 2021 by White House advisors at the highest levels, including senior advisors on the NSC and DPC, under authority delegated by President Biden, and was subsequently adopted and implemented by DHS Defendants.

62.     From approximately September 9 to 24, 2021, at least 15,000 Haitians were detained in the CBP Encampment, a makeshift intake site designated for field processing pursuant to the CBP Capio Memo near the Del Rio International Bridge. As directed by the White House and Defendant Mayorkas pursuant to the Del Rio Deterrence Decision, DHS Defendants and personnel took no steps to prepare to receive thousands of asylum seekers in Del Rio—in contrast to DHS's approach to similar circumstances involving non-Haitians. As a result, CBP officers deprived individuals in the CBP Encampment of basic human necessities like sufficient food and water, ignored their medical needs, and provided no shelter to protect them from the blazing sun, triple-digit heat, and copious dust. Non-governmental organizations ("NGOs") who attempted to provide supplies and other aid were prevented from doing so. When asylum seekers attempted to

procure such basic necessities themselves, they were often physically or verbally assaulted by CBP officers.

63.     Upon information and belief, after allowing Haitian asylum seekers to suffer for days, pursuant to the Del Rio Deterrence Decision, DHS officers did not screen individuals in the CBP Encampment for fear of return to their home country or process them for asylum. Instead, officers either forced individuals to return back over the U.S. border to Mexico or used the Title 42 Process to expel individuals on flights back to Haiti. In the resulting series of expulsion flights to Haiti, ICE officials expelled at least one mother with a days-old-baby born in the United States. Some expelled individuals did not even realize they had been sent to Haiti until they got off the plane, because officers had either refused to provide any information or lied about where the asylum seekers were being taken. Many individuals were expelled on flights in shackles.

64.     Upon information and belief, before they were expelled, none of the individuals detained in the CBP Encampment were given an opportunity to request asylum or were screened for their fear of persecution or risk of torture and death upon return to Haiti or Mexico.

65.     DHS Defendants implemented the Del Rio Deterrence Decision while taking steps to shield their actions from accountability, including by preventing media access to the CBP Encampment, restricting the air space over the encampment, and expelling thousands of individuals before any human rights abuses could be documented, investigated, or pursued.

66.     On information and belief, the adoption and implementation of the Del Rio Deterrence Decision was informed by a perception that Haitian asylum seekers are dangerous, violent, and criminal; a discriminatory purpose toward Black and Haitian migrants; a desire to keep Black and Haitian migrants out of the country; and a plan to send a message to other Haitian asylum seekers not to come to the United States.

67.     In internal discussions around the time of the increase in crossings in Del Rio, top DHS officials repeatedly evinced the belief that arriving Haitian asylum seekers in the CBP Encampment were uncivilized, unclean, and like animals—reflecting language and attitudes that,

upon information and belief, were not used to describe non-Black migrants arriving at the U.S. border.

68.     In a meeting including White House senior advisors to President Biden, Secretary Mayorkas, and DHS leadership, a senior DHS official made a comment implying that the Haitian migrants had engaged in criminal conduct in Mexico, without any evidence. Another senior DHS official told White House and other DHS officials, including Secretary Mayorkas, that the Haitian migrants in Del Rio were more likely to be violent than migrants from other countries—with no facts to support this statement.

69.     As set out in further detail below, the inhumane treatment and brutal and rapid expulsion of asylum seekers in the CBP Encampment was intentional. The Del Rio Deterrence Decision, as devised by White House senior officials, also empowered DHS Defendants to weaponize the Title 42 Process in Del Rio in a manner indifferent to humanitarian concerns, focusing on removing Haitian asylum seekers as quickly as possible to discourage other Haitians from exercising their right to seek asylum.

A.     **DHS Defendants took no steps to prepare for the anticipated arrival of thousands of Haitian asylum seekers in Del Rio pursuant to the Del Rio Deterrence Decision.**

70.     By early 2021, President Biden's staff and DHS Defendants were aware that instability and desperate conditions in Haiti had forced numerous Haitians to flee to various South and Central American countries and that many Haitians were traveling toward the U.S. border to seek asylum.

71.     One month before thousands of Haitians arrived at the CBP Encampment, Defendant Secretary Mayorkas redesignated Haiti for TPS.[16] In the notice redesignating TPS, Secretary Mayorkas concluded that protected status was appropriate because of extraordinary conditions in Haiti, including "a deteriorating political crisis, violence, and a staggering increase

---

[16] *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41,863, 41,863–71 (Aug. 3, 2021), https://www.govinfo.gov/content/pkg/FR-2021-08-03/pdf/2021-16481.pdf.

in human rights abuses," as well as "rising food insecurity and malnutrition, . . . waterborne disease epidemics, and high vulnerability of natural hazards, all of which have been further exacerbated by the [COVID-19] pandemic." 86 Fed. Reg. at 41,864 (citation omitted).

72.    Meanwhile, local officials in Del Rio began alerting the Biden Administration that they expected increasing arrivals of asylum seekers and lacked the resources necessary to manage those arrivals. As early as February 2021, Del Rio Mayor Bruno Lozano publicly warned President Biden and DHS Defendants that Del Rio needed federal support to assist with growing numbers of border crossings; at least President Biden's senior advisors on the NSC and DPC, as well as DHS Defendants, were informed of the mayor's concerns.

73.    In April 2021, President Biden's staff and DHS Defendants received data indicating that Haitian migrants disproportionately arrived and crossed into the United States in the CBP Del Rio Sector. In the following months, they continued to receive intelligence reports that migrant border crossings, particularly of single, male Haitian asylum seekers, continued to increase and that Del Rio lacked resources to meet the needs of arriving Haitians.

74.    President Biden's senior staff and DHS Defendants received regular intelligence in July and August 2021 reflecting the movement of Haitians from South and Central America toward the United States. Western Hemisphere immigration experts warned the Biden Administration of the impending arrival of thousands of Haitians. This information was corroborated by internal intelligence reports and information received from both Latin American and local government officials, including intelligence directly from the Mexican government that was presented to President Biden.

75.    Despite these warnings, pursuant to the Del Rio Deterrence Decision, the White House and DHS Defendants took no action to plan for the arrival of these asylum seekers in a deliberate effort to deter Haitians from coming to the United States to seek asylum. Senior White House officials dismissed reports from immigration experts and foreign and local officials and prevented staff from taking steps to prepare for thousands of arriving Haitians given the known resource shortages in Del Rio. Neither President Biden's senior staff nor DHS Defendants

attempted to arrange appropriate infrastructure, personnel, and resources to support the legal processing of the anticipated Haitian asylum seekers and the provision of necessary and appropriate food, water, shelter, and medical care.

76.    Pursuant to the Del Rio Deterrence Decision, senior White House and DHS officials also blocked internal attempts to prepare humanitarian infrastructure in Del Rio. President Biden's senior staff stopped efforts to prepare public health resources, including COVID-19 testing and vaccinations, for arriving Haitians. And while CBP Defendants had, in months prior, coordinated with local officials to create a respite center at a local Del Rio church for arriving migrants, they refused to leverage this additional resource as thousands of Haitians approached the border.

77.    Pursuant to the Del Rio Deterrence Decision, President Biden, his senior advisors, and DHS Defendants also refused to take steps to ensure appropriate infrastructure and resources to facilitate screenings for asylum or withholding of removal and protection under the INA or the Convention Against Torture ("CAT").[17] Senior White House and DHS officials did not make such preparations despite receiving an August 2021 memorandum from DHS's Office for Civil Rights and Civil Liberties advising against expulsions of migrants to Haiti and emphasizing a "strong risk" that such expulsions would violate DHS Defendants' *non-refoulement* obligations under U.S. and international law. Although senior White House staff and DHS Defendants ordered and implemented the adoption of CAT screenings for Mexicans in San Diego in July 2021, they declined to do the same for Haitians in the CBP Encampment.

78.    Upon information and belief, senior NSC, DPC, and DHS officials believed that refusing to make appropriate preparations for arriving asylum seekers would not only deter approaching Haitians from coming to the border to seek asylum, but also disincentivize asylum seekers already in Del Rio from attempting to return if they were expelled.

---

[17] CAT screenings determine whether there are "substantial grounds for believing that [non-citizens] would be in danger of being subjected to torture" if expelled from the United States, 8 U.S.C. § 1231 note.

**B.      Thousands of Haitian asylum seekers arrived in Del Rio in September 2021.**

79.      As President Biden, his senior staff, and DHS Defendants received reports of large groups of Haitian asylum seekers traveling to the U.S. border through the late summer, border personnel in the Del Rio Sector began to observe an increase in crossings by Haitians. Daily encounters with arriving asylum seekers grew to hundreds and eventually thousands. As they began struggling to process arriving migrants under the Title 42 Policy, in late August 2021 CBP officials set up a "temporary intake site" near the Del Rio International Bridge, the primary port of entry in Del Rio. The site was located under the bridge to facilitate the field processing of migrants under the CBP Capio Memo.

80.      The intake site, however, lacked sufficient resources to meet the basic needs of the arriving Haitian asylum seekers and to provide them adequate screenings for protection under U.S. law. The under-resourced intake site reflected the White House and DHS's steadfast refusal to organize any appropriate infrastructure to address the anticipated arrival of thousands of Haitian migrants, even as Del Rio Sector personnel continued to report a lack of processing capacity.

81.      Beginning in September 2021, thousands of people began crossing the Rio Grande near the Del Rio Port of Entry to seek relief in the United States. Most of the individuals were Haitian and had come to Del Rio to request asylum.

82.      According to DHS Defendants, at least 15,000 individuals crossed near the Del Rio Port of Entry by mid-September 2021. Many of the asylum seekers arriving in Del Rio at this time were part of family units. Public reports estimate that approximately 40 percent of individuals arriving near the Del Rio Port of Entry in September 2021 were children.

83.      As Haitian asylum seekers entered the United States in early to mid-September, the temporary intake site under the Del Rio International Bridge turned into the CBP Encampment as U.S. officials required asylum seekers to remain at the site for longer periods of time to be processed. CBP officers adopted a ticketing system to process arriving migrants, separating them into four groups that were identifiable by a numbered, color-coded ticket: families with children, pregnant women, single men, and single women. When officers called out numbers, the

corresponding ticket holders were expected to identify themselves for processing. Migrants were also directed to different sections of the CBP Encampment based on the color of their tickets.

84.    As the number of asylum seekers in the CBP Encampment grew, CBP increased the number of personnel monitoring and patrolling the encampment to congregate and secure arriving Haitians. These personnel prohibited asylum seekers from moving freely throughout the CBP Encampment and informed Individual Plaintiffs and other asylum seekers that they were to wait until their number was called for processing. Upon information and belief, at no point during the existence of the CBP Encampment were arriving migrants given a reasonable opportunity to present themselves to a U.S. immigration officer and request access to the asylum process. They also were not screened for a fear of return to their home country or vulnerability to persecution or torture upon return, as required under U.S. law.

**C.    CBP personnel abused Haitian asylum seekers in Del Rio.**

85.    Despite knowing for months that thousands of Haitian asylum seekers were approaching Del Rio, however, DHS Defendants made decisions that deprived Haitians held in the CBP Encampment of basic human necessities, including adequate food, water, shelter, sanitation, and medical treatment. These decisions were made to implement the Del Rio Deterrence Decision; the resulting deprivations and abuse of Haitians at the CBP Encampment were the intended or foreseeable results of that decision; and such deprivations and abuse shock the conscience.

86.    Due to DHS Defendants' deliberate lack of preparation, there was insufficient food, water, and shelter in the CBP Encampment for the thousands of Haitians arriving there in mid-September. At the same time, CBP personnel monitoring the encampment generally prevented Individual Plaintiffs and other migrants from leaving to provide for their own needs. Defendants also blocked non-governmental and legal organizations, including Plaintiff Haitian Bridge, from entering the CBP Encampment to assist the Haitian asylum seekers or to hand out know-your-rights materials.

87.     Plaintiff Samuel Doe reflects that "no human being should have been" in the CBP Encampment. Similarly, Plaintiff James Doe "never imagined [he] would have to endure such poor conditions in the United States for so long."

88.     The conditions in the CBP Encampment were a direct result of decisions made pursuant to the Del Rio Deterrence Decision by President Biden's closest advisors and DHS Defendants, with the goal of deterring Haitian and Black migrants from seeking asylum in the United States.

89.     For example, in a September 2021 meeting addressing how to respond to conditions at the CBP Encampment, senior DHS officials described the Haitian migrants in Del Rio as "particularly difficult" to deal with when implying that little could be done for the asylum seekers and discussing the need for swift and universal removal of Haitians in the encampment.

90.     A CBP official in the Del Rio Sector leadership expressed a fear that Haitian asylum seekers would "tear through the walls" if put in detention.

91.     The intended or foreseeable result of President Biden and DHS Defendants' Del Rio Deterrence Decision was rampant abuse in the CBP Encampment that shocks the conscience. As described by one Congressman, the conditions in the CBP Encampment were "unacceptable by any human standard." After images of a white CBP officer on horseback assaulting Plaintiff Mirard Joseph went viral, President Biden said he "takes responsibility" for the "horrible" treatment of Haitians in Del Rio.[18]

**1.     CBP personnel deprived thousands of asylum seekers in their custody of basic human needs.**

92.     As asylum seekers arrived in Del Rio and were given tickets for processing, they lost the ability to provide for their basic needs. They were forced instead to rely on the CBP personnel supervising the CBP Encampment for food, water, shelter, and medical care. Pursuant

[18] Marissa Dellatto, *Biden 'Takes Responsibility' for Mishandling of Haitian Migrant Crisis*, Forbes (Sept. 24, 2021, 11:21 AM), https://www.forbes.com/sites/marisadellatto/2021/09/24/biden-takes-responsibility-for-mishandling-of-haitian-migrant-crisis/?sh=6c0153a9319b.

to the Del Rio Deterrence Decision, however, President Biden and DHS Defendants had decided not to prepare or provide sufficient resources to meet these most basic needs until there was a serious humanitarian crisis in the CBP Encampment.

(a)    <strong>CBP personnel provide inadequate food and water.</strong>

93.    Consistent with the Del Rio Deterrence Decision, the distribution of food and water to migrants in the CBP Encampment was woefully inadequate.

94.    For much of the period between September 9 and 24, CBP personnel denied most individuals in the CBP Encampment basic sustenance beyond limited bread and water each day.

95.    CBP personnel arranged a minimal number of service stations in the CBP Encampment to distribute food and water. Anyone wishing to receive water or food was required to wait in line, often for extended periods of time. Because CBP's service stations were set up in only one section of the CBP Encampment, not all migrants could access the stations while food and water were being distributed. Many individuals who could not receive food or water fainted from lack of nutrition or dehydration.

96.    Plaintiff Paul Doe and others describe receiving only one or two pieces of bread or the equivalent and one or two bottles of water each day in the CBP Encampment. Plaintiff Eric Doe likewise describes that U.S. officials sometimes passed out juice and crackers, "but there wasn't enough to feed all of us." Other Individual Plaintiffs and asylum seekers in the CBP Encampment, including Pierre and Ginette Doe and Delgado Doe, received no food or water from U.S. officials.

97.    Appropriate food was not available in reasonable quantities in the CBP Encampment until the NGO World Central Kitchen was able to negotiate access to the encampment and set up operations to begin providing meals the week of September 19, 2021. But by the time World Central Kitchen had scaled its operations, DHS Defendants had already started clearing out the CBP Encampment.

98.    The bottles of water distributed by CBP personnel were often undrinkable when hydration was most needed. They were left on containers covered in plastic with no protection

from the sun. With daily temperatures hovering near triple digits, the water in the bottles became so hot that it could not be consumed when it was handed out.

99.    Due to the lack of water in the CBP Encampment, some Individual Plaintiffs and other asylum seekers in the CBP Encampment were forced to drink water from the Rio Grande, which is not potable. This lack of clean drinking water caused many Haitians in Del Rio to get sick, including the common development of gastrointestinal illness, particularly among babies and children.

100.    CBP Defendants also failed to provide formula or age-appropriate food to migrants with young children. Plaintiff Esther Doe repeatedly requested age-appropriate food for her one-year-old son but was told there was only the food and water being provided to adults. When Esther pleaded for something that her baby could eat, CBP personnel refused. Esther was only able to feed her son some rice pudding, which was distributed occasionally at the CBP Encampment. Esther's baby went hungry for days because Esther could not find enough food for him.

101.    As starving and dehydrated asylum seekers pleaded without success for additional food and water, many looked to the city across the river in Mexico, Ciudad Acuña, for the resources needed to save themselves, their family members, and other vulnerable people in the CBP Encampment. Consistent with the Del Rio Deterrence Decision, CBP personnel often blocked individuals from leaving the encampment to obtain their own food and water in Ciudad Acuña.

102.    Despite often being hungry and thirsty, Plaintiff Eric Doe was prevented from seeking food across the river by government officials with batons. He felt like he and his wife, Plaintiff Florence Doe, were "trapped" in the CBP Encampment.

103.    Plaintiff Jacques Doe was in the CBP Encampment for approximately one week and suffered from severe hunger and thirst. But he never tried to leave to find food in Mexico because he saw that personnel patrolling the encampment would not allow it. Plaintiff Delgado Doe similarly did not have enough food but never attempted to cross into Mexico to get provisions because other people in the CBP Encampment told him the U.S. government forbade doing so.

104.    Asylum seekers attempting to cross the river into Mexico in search of food and water faced a variety of risks: being stopped by CBP personnel while attempting to leave the CBP Encampment, drowning in the river, and being prevented from returning to the encampment by Mexico or U.S. border officials, which could lead to separation from their families.

105.    Despite these risks, some individuals risked the river crossing to secure basic necessities. Plaintiff Mirard left the encampment to find food for his family after he and his wife, Plaintiff Madeleine, received insufficient food and water and were denied age-appropriate food for their one-year-old daughter. Plaintiff Paul Doe also crossed to Mexico to get food for himself and others in the CBP Encampment after surviving several days on only a bottle of water and a tortilla per day. Plaintiff Esther Doe was in the CBP Encampment with her husband Plaintiff Emmanuel Doe and one-year-old son for at least two days during which CBP personnel provided no baby-appropriate food. Esther's son, in desperate need of nourishment, was sick with a fever and diarrhea. Watching her child suffer from sickness and hunger, Esther decided she had no other choice but to cross the river in search of food for her baby. Plaintiff Pierre Doe heard of a man and child drowning in the river, but risked crossing back into Mexico because his young child was crying from hunger.

106.    Individuals returning to the CBP Encampment often encountered resistance from CBP personnel. U.S. border officials, including some on horseback, regularly patrolled the riverbank and physically tried to prevent asylum seekers from crossing the river. CBP personnel frequently confiscated and deliberately disposed of the food that starving individuals had brought from Mexico.

107.    The wholly inadequate food and water provided by DHS Defendants—who had received months of notice of the impending arrival of a significant number of Haitian asylum seekers in the Del Rio Sector—shocks the conscience. So too does the cruelty of CBP Defendants in requiring individuals to remain at the CBP Encampment for their number to be called but providing no food appropriate for babies and young children, preventing individuals from seeking food and water in Ciudad Acuña or from returning to the CBP Encampment, and taking food and

water away from individuals attempting to return to the CBP Encampment. As Plaintiff Samuel Doe noted, the food that his family received in the CBP Encampment was not enough: "It felt like they did enough so we wouldn't die but no more than that. It felt like a nightmare."

**(b)    CBP personnel denied asylum seekers adequate shelter.**

108.    As part of the Del Rio Deterrence Decision, CBP personnel also failed to meet the basic shelter needs of the migrants in the CBP Encampment. As Haitian asylum seekers first entered the United States and were processed into the encampment, CBP personnel refused to provide beds, cots, blankets, tents, or shelters of any kind.

109.    With no shelter, migrants in Del Rio were left fully exposed to the elements. The CBP Encampment was extremely dusty, and the wind—as well as the arrival and departure of helicopters near the bridge—kicked up dirt that gave many individuals, including children, respiratory problems, eye infections, and rashes. Most migrants in the CBP Encampment were held adjacent to the Del Rio International Bridge rather than under it, meaning they were left with no protection from the sun as daily high temperatures reached from 90 to over 100 degrees Fahrenheit. Plaintiff James Doe and others experienced extreme heat and without any shelter tried to find shade in the bushes or trees. Although some migrants were fortunate to have their own tents, others made makeshift shelters from reeds pulled from the nearby riverbank to offer shade. Plaintiff Samuel Doe recalls seeing pregnant women suffering in the heat and the dirt under the bridge because they had nowhere else to go: "I have never seen anything more horrible in my life."

110.    Asylum seekers with their own tents became targets of CBP searches, with officers regularly opening, or demanding that individuals open, their tents, in the middle of the night. These searches were alarming and disorienting for asylum seekers.

111.    Having been denied bedding, most individuals in the CBP Encampment were forced to sleep directly on the ground, often in the dirt or on cardboard. Plaintiff Delgado Doe, for example, recalls that "the dust was everywhere and the wind was really strong. . . . I slept on the ground with no protection from the dust. I had no tent or blanket." Plaintiff Pierre Doe laid his

shirt on the ground so that his young child would not have to sleep directly on the ground. Plaintiffs Esther and Emmanuel Doe and their sick baby were forced to sleep in the dirt each night.

112.    DHS Defendants' failure to provide migrants with any shelter, especially given the extreme heat and dust and its effects on children and pregnant and ill individuals, shocks the conscience. On information and belief, exposure to the elements resulted in prolonged illness and suffering for many Haitians in the CBP Encampment.

### 2.    CBP personnel refused to provide effective medical care.

113.    CBP personnel also refused to provide effective medical care to the thousands of individuals in the CBP Encampment.

114.    Pursuant to the Del Rio Deterrence Decision, President Biden and DHS Defendants refused to take the steps needed to secure necessary resources and personnel to meet the anticipated and reasonable medical needs of migrants, including the large number of babies, children, and pregnant and otherwise vulnerable people in the CBP Encampment.

115.    For individuals able to seek out medical attention, the care offered to sick and injured Haitians was shamefully inadequate, to the extent any was provided.

116.    In some cases, CBP personnel flatly denied migrants' requests for medical care, telling migrants to go back to Mexico instead. Plaintiff Samuel Doe's one-year-old daughter was severely ill while held in the CBP Encampment. As his daughter experienced severe coughing, diarrhea, and vomiting, Samuel begged officers for help. Each time, CBP personnel denied Samuel's pleas, just telling him he should give his daughter water. It was only after Samuel and his family were forced to return to Mexico that his daughter was able to obtain medical treatment.

117.    At other times, CBP personnel ignored pleas for assistance, often from pregnant people and children, acting only when the condition became an obvious medical emergency. In one situation, a pregnant Haitian asylum seeker went into labor while sitting in the dirt. CBP eventually took the woman out of the CBP Encampment but then returned her there mere hours after delivery. Plaintiff Florence Doe recalls seeing women delivering babies under the bridge. Plaintiff Mirard also observed a pregnant woman complain of pain. On information and belief, she

went into labor in the CBP Encampment, but she was not taken to another facility to deliver her child until she had suffered for hours.

118.    Ms. Jozef, Founder and Executive Director of Plaintiff Haitian Bridge, encountered several infants who had been transported to hospitals after suffering dehydration in the CBP Encampment. One baby nearly died; he survived only after Haitian Bridge intervened and advocated for his admission to a hospital in Del Rio. The newborn's condition had grown so precarious that, after he was finally removed from the CBP Encampment, he had to be airlifted to a hospital in San Antonio where specialists were able to save his life.

119.    The medical care others received often had no effect. Plaintiff Esther Doe's baby developed a fever and diarrhea while they were being held in the CBP Encampment. When Esther took him to the medical tent to seek help, she felt that the medical personnel were more focused on taunting her about being deported and going to jail than on treating her baby. They gave Esther some liquid medication and an ice pack, which did nothing to alleviate her baby's illness.

120.    Similarly, Plaintiff Paul Doe suffered from bloating and diarrhea because of the inadequate food and water provided in the CBP Encampment. When Paul sought treatment, an on-site doctor provided him a single pill without explaining what the pill was. The pill did not improve Paul's symptoms, and he soon learned that others seeking medical treatment were provided the same unidentified pill, regardless of their symptoms.

121.    Many asylum seekers were unaware that medical personnel were even available. After his baby daughter developed a severe cough and diarrhea in the CBP Encampment, Plaintiff Mirard was unaware that any medical treatment was potentially available for her, and CBP personnel in the encampment did not offer any assistance to Mirard as his daughter suffered. His daughter continued to ail from health conditions that developed during their time in Del Rio until the family was expelled to Haiti and Madeleine then fled with their daughter to Chile to seek medical treatment and safety.

122.    CBP Defendants' refusal to provide adequate medical care, especially to pregnant people and others in acute distress, shocks the conscience. Such deprivations of medical care

resulted in prolonged illness and lasting suffering for many Haitians in the CBP Encampment. Months after DHS Defendants unlawfully expelled thousands of asylum seekers from the encampment, Individual Plaintiffs, their families, and others continued to experience persistent illness from their ordeal in Del Rio. On information and belief, at least one Haitian who was in the CBP Encampment died after the encampment was cleared, due in part to the poor conditions and lack of medical care.

### 3. CBP personnel physically and verbally abused asylum seekers in Del Rio.

123.    The Del Rio Deterrence Decision did not merely result in the willful deprivation of life-sustaining necessities in the CBP Encampment. Haitian asylum seekers also became the victims of physical and verbal assaults by CBP personnel who were enabled by the policy.

124.    CBP personnel frequently targeted migrants for abuse when they were returning to the CBP Encampment from Mexico with desperately needed food and water. One of the most well-known consequences of the Del Rio Deterrence Decision occurred on or around September 18, 2021, and involved CBP personnel, supported by mounted Border Patrol officers, driving Haitian asylum seekers back into the river as they returned to the CBP Encampment.

125.    Plaintiff Mirard was one of those asylum seekers. While crossing back to the CBP Encampment with food for his wife and their daughter, Mirard encountered a mounted officer who lashed at him with split reins and attempted to drag Mirard back to the river. All Mirard could think about through the ordeal was his duty to hold onto the food at all costs, and his need to return to the CBP Encampment so he could feed his sick and hungry baby. The officer released him only when his horse was about to trample Mirard. Plaintiff Florence Doe recalls that "[t]he most horrific thing I saw was law enforcement officers on horses dragging people."

126.    Plaintiff Esther Doe was also assaulted by mounted officers after going to Mexico to get food for her sick baby. As Esther attempted to return to the CBP Encampment, she was chased back into the river by mounted officers who attempted to force her back to Mexico. As Esther pleaded in English that she was attempting to return to reach her baby in the encampment,

the officers ignored her. They continued to force her deeper into the river, nearly running her down with their horses. Esther needed to get back to her husband and baby, so she tried to reach the shore in Del Rio again, slightly away from the officers on horses. When the officers turned their horses to chase other people crossing the river, she was able to pass by them and reunite with her family.

127.    Officers did not merely target Haitians returning from Mexico with food. They also chased individuals who even gathered near the river, which was commonly used for bathing, washing clothes, and cooling off. For example, when Plaintiff Samuel Doe brought his eight-year-old son to the river so they could clean themselves, mounted officers appeared and began running after migrants. As his terrified son tried to run away from the horses, he fell and hurt himself.

128.    CBP officers deliberately imperiled the safety of migrants crossing in the river in an attempt to keep them from entering the CBP Encampment. As Plaintiff Paul Doe was attempting to return to the United States with food for himself and others, an officer deliberately cut a rope that had been set up to help migrants maintain balance as they traversed the river. Paul was in the middle of the Rio Grande when the officer threw the cut rope into the water and shouted to the crossing Haitians that they could not return. As the officer cut the rope, Paul watched in terror as numerous other Haitians crossing in front of him who were deeper in the water went under the water and struggled not to drown. He also saw other migrants closer to the Del Rio side of the river, including one of Paul's friends, who were hit and shoved back into the river by CBP personnel. While the CBP personnel were busy knocking Haitians into the water, Paul walked and swam downstream to find a place to cross that was not blocked by officers.

129.    Haitians crossing the river observed that the water level of the river would also change throughout the day. At most times, the water level was below migrants' waists, permitting individuals to safely wade across with the assistance of a guide rope. Sometimes when individuals would cross from Mexico, the water level would inexplicably rise, often to an unsafe shoulder-high level that risked causing drownings. When Plaintiffs Eric and Florence Doe crossed the river the water level was low but rose rapidly as they traversed across it. Florence almost drowned, but

her husband Eric saved her. Eric and Florence witnessed approximately five people get swept away in the river and drown. On information and belief, authorities could and did manipulate the flow of water in the Rio Grande to prevent Haitian asylum seekers from crossing. On information and belief, at least three Black migrants believed to be Haitian asylum seekers drowned while attempting to cross the river and reach the CBP Encampment. Through this ordeal, CBP personnel spewed racist and demeaning invectives at Haitian asylum seekers in the CBP Encampment. One example captured on video includes a mounted officer shouting at a group of migrants: "This is why your country's shit, because you use your women for this." The officer then reared his horse, directing it at a group of children.

130.    CBP personnel also used helicopters, motorcycles, and other official vehicles to stir up dust in areas of the CBP Encampment where Haitians were congregating and sleeping. Plaintiff James Doe recollects that "[h]elicopters would occasionally fly near us, causing strong winds which kicked up a lot of dust." Plaintiff Delgado Doe developed a cough from the dust.

131.    While these abuses occurred, DHS personnel deliberately restricted the press and humanitarian aid and legal service organizations from entering the CBP Encampment or documenting the conduct of DHS personnel therein. For example, when Haitian Bridge attempted to enter the CBP Encampment to provide know-your-rights information and humanitarian assistance, CBP officials told Haitian Bridge staff they were not permitted to enter and denied their entry. The only press DHS personnel permitted to access the encampment was Fox News. DHS personnel also restricted the air space over the CBP Encampment to prevent aircraft from taking aerial footage of the encampment. On information and belief, DHS personnel prevented press and neutral observers from entering the CBP Encampment in an attempt to conceal the consequences of the Del Rio Deterrence Decision, including concerted and deliberate misconduct that occurred against Haitian asylum seekers. Defendants' physical and verbal abuse of individuals in the CBP Encampment shocks the conscience and was the intended or foreseeable result of the Del Rio Deterrence Decision. Plaintiff Samuel Doe reflected that his experience in the CBP Encampment was "humiliating" and that the CBP officials treated the Haitian asylum seekers like animals.

**D.**    **DHS Defendants summarily expelled thousands of Haitian asylum seekers from Del Rio in unprecedented fashion.**

132.    In approximately mid-September 2021, continuing to act in accordance with the Del Rio Deterrence Decision, senior advisors in the White House and DHS Defendants took swift and unprecedented action to expel thousands of Haitian asylum seekers to Haiti and Mexico without providing them access to the U.S. asylum system. Indeed, in the final days of the CBP Encampment, DHS officials rushed to clear the camp as quickly as possible and began to force groups of people onto buses for expulsion, often by tying their hands with plastic zip ties, rather than reading their ticket numbers one by one. Many people did not want to get on the buses as they feared deportation to Haiti but were nevertheless forced on by DHS personnel.

133.    The move to rapidly expel Haitians from the CBP Encampment in furtherance of the Del Rio Deterrence Decision was likely prompted by a district court decision issued on September 16, 2021, finding that the Title 42 Process was likely unlawful and enjoining the process from being enforced against families with minor children, but temporarily staying the injunction until September 30. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146 (D.D.C. 2021), *aff'd in part, rev'd in part and remanded by* 27 F.4th 718, (D.C. Cir. 2022). If the preliminary injunction had gone into effect, it would have taken away DHS Defendants' authority to rapidly expel Haitian families—an authority that senior officials and DHS Defendants viewed as a critical tool to prevent and deter Haitian migrants from accessing the U.S. asylum system.

134.    On September 15, 2021—the day before the district court's decision—Defendant Border Patrol stated that it would take between ten and fourteen days to set up infrastructure necessary to complete the processing of the Haitian migrants in the CBP Encampment. But within days after the day the district court issued its injunction, then-U.S. Border Patrol Chief Ortiz stated that the CBP Encampment would be cleared within seven days. On information and belief, it was around this same time that senior White House and DHS officials met and, in furtherance of the Del Rio Deterrence Decision, directed DHS Defendants to pursue rapid mass expulsions of Haitian asylum seekers in Del Rio. The number of daily expulsion flights to Haiti rose swiftly after

September 16. After a single expulsion flight on September 15, daily flights began on September 19, increasing from three flights per day on September 19 to five flights per day on September 23, and then seven flights per day on September 30. Each flight carried at least 100 people. A former ICE official confirmed that "no one" expelled from the CBP Encampment "got to seek asylum."

135.    The number of Haitian asylum seekers in the CBP Encampment dwindled as migrants were processed and sent to detention centers to be staged for expulsion flights. Other migrants, already suffering from the conditions in the CBP Encampment, learned that fellow asylum seekers were being deported to Haiti without the opportunity to ask for protection in the United States, and felt compelled to flee the CBP Encampment back to Mexico to avoid being returned to Haiti.

136.    In carrying out expulsions pursuant to the Del Rio Deterrence Decision under the authority of the Title 42 Process, President Biden and DHS Defendants ignored the high risk of unlawful *refoulement* that their own attorneys had warned would arise from expulsions of Haitians. Upon information and belief, President Biden or DHS Defendants did not take steps to ensure that migrants were allowed to request asylum or were screened for fear or vulnerability.

137.    President Biden's advisors and DHS Defendants were aware that some of the asylum seekers in the CBP Encampment were not Haitian nationals; were adult nationals of other countries; or otherwise had never resided in Haiti, such as children of Haitian nationals who had been born and grew up in countries other than Haiti. Upon information and belief, President Biden's advisors and DHS Defendants affirmatively decided not to adopt any processes or protections to ensure that such individuals were not expelled to Haiti, a country that these individuals may have never visited in their lives. This decision was consistent with the Del Rio Deterrence Decision and the desire to send a message to future Haitian and Black asylum seekers that they are not welcome in the United States.

138.    When crafting and implementing the rapid mass expulsion strategy under the Del Rio Deterrence Decision, a senior CBP official also stated that personnel should prioritize

expelling single Haitian men because they were likely to be dangerous and violent, despite offering no evidence for the assertion.

139.    In mid-September, DHS personnel expelled nearly 4,000 people to Haiti, including hundreds of families with children. By the end of the month, DHS Defendants had effectuated the expulsion of thousands of asylum seekers of Haitian descent to Haiti and Mexico. ICE had chartered close to 40 expulsion flights to Haiti in one of the largest mass expulsions in recent American history, and some 8,000 Haitian asylum seekers had fled to Mexico to avoid being returned to Haiti. The expulsion flights continued even after the CBP Encampment was empty because the asylum seekers had been moved to other detention facilities: between September 19 and October 19, 2021, DHS personnel expelled approximately 10,831 migrants to Haiti, including nearly 2,500 women and 1,800 children.

### 1.    DHS Defendants expelled thousands of asylum seekers from Del Rio to Haiti.

140.    DHS Defendants carried out the summary expulsion of thousands of migrants from the CBP Encampment with a cruelty and indifference to human suffering that shocks the conscience, separating parents from children and husbands from wives, shackling individuals like criminals or animals, and resorting to physical violence to force migrants onto expulsion flights. As DHS Defendants began implementing their unprecedented expulsion plan, CBP officers were charged with summoning asylum seekers in the CBP Encampment at all hours of the day and night for expulsion. CBP personnel would make loud announcements on speakers throughout the CBP Encampment, broadcasting numbers on the color-coded tickets that they had distributed to migrants arriving in the encampment.

141.    Individuals whose numbers were announced were placed onto buses. Once the buses were full, DHS personnel transported the asylum seekers to formal detention facilities to await expulsion.

142.    At DHS detention facilities, guards continued to harass and abuse migrants. Some guards taunted the migrants, calling them "pigs" and saying they would "trash this place like they

trashed their country." Migrants were denied adequate food, medical care and sanitation, and sleeping provisions. Plaintiff Jacques Doe, for example, was only given two small pieces of bread and two bottles of water per day and was forced to sleep on the floor in a holding cell with approximately 30 other men before he was eventually expelled. Plaintiffs Pierre and Ginette Doe and their young child had to sleep on the floor because there were no beds. Plaintiff Florence Doe had no other choice but to drink water from the faucet next to the toilet.

143.    DHS personnel also separated some family units and prevented family members from communicating with each other. Some individuals were unable to shower, wash their faces, or brush their teeth while in detention.

144.    When Plaintiff Michael and his family arrived at a detention facility, officers told Michael and others that they smelled because they were Haitian. Michael and his wife Veronique were detained separately, with each keeping one of their two children with them. When Michael requested milk for his child, he was handcuffed, told to "shut up," and separated from his child for an hour. The experience brought Michael and his family to tears. No one in Michael's family was provided an opportunity to bathe while detained.

145.    Plaintiffs Eric and Florence Doe were also separated upon arrival at a detention facility. She was not feeling well and started crying. For Florence Doe "[i]t was terrible to be apart from him and to not be able to speak see or speak to him."

146.    After spending at least a few days in more formal detention settings, Haitian asylum seekers subject to expulsion were transported to airports in large groups, forced to board airplanes, and returned to Haiti. Upon information and belief, they were given no opportunity to access the U.S. asylum process, request the assistance of counsel, or receive any legal information. Compounding the trauma and abuse they inflicted, DHS personnel indiscriminately handcuffed and shackled nearly all adults during the long flights to Haiti.

147.    Some migrants were woken in their detention cells in the middle of the night and placed on buses by DHS officers. If asylum seekers asked where they were being transported, DHS

officers not only withheld information but sometimes lied, stating that they were being transferred to another detention facility and were not going to be deported.

148.    When asylum seekers arrived at the airport, many resisted boarding the plane as they understood that it meant they would be deported back to danger in Haiti. Some asylum seekers who attempted to resist expulsion were beaten before being physically forced onto the planes. At least one man was beaten in front of his wife and child so savagely that officers ripped off his clothes. Officers then restrained him and handcuffed him so tightly that the restraints cut into his wrists and bled.

149.    After approximately nine days at a detention facility, Plaintiffs Michael and Veronique's names were called. Michael asked an officer if they were being sent back to Haiti. The officer replied that Michael, Veronique, and the others were being transferred to a different detention facility. U.S. officials then handcuffed the adults on waists, legs, and hands before loading them onto a bus. Seeing Michael being handcuffed made his daughter cry. The bus left the detention facility with a police escort.

150.    On the bus, Michael again asked another officer if they were being returned to Haiti. He told the officer that sending them to Haiti would be the equivalent of a death sentence—"You might as well just kill us." The officer replied that they were not being returned to Haiti, but instead being transferred to another detention facility.

151.    Veronique had the couple's two-year old daughter on her lap during the bus trip. At one point, their daughter fell off her lap and became stuck under the seat. Veronique was unable to pick up her child because she was handcuffed. In tears, Michael and Veronique pleaded with the officers for help, saying: "Our baby is under there, we need to get the baby out. Please help us." The officers did not respond until other migrants also began shouting that there was a baby stuck under the seat. An officer eventually released one of Veronique's hands so she was able to reach down and pull her child back into her lap.

152.    It was not until they arrived at the airport that Michael and Veronique realized they were being expelled to Haiti. They remained handcuffed on the waist, legs, and hands during the

duration of the flight to Haiti. Although Michael asked for his handcuffs to be removed so he could use the restroom, officers refused to remove them for the entire trip from the detention facility to Haiti, preventing him from using the restroom.

153.    Michael saw a woman on the bus who had given birth to a baby a few days earlier while in the CBP Encampment. That woman was also handcuffed, and she and her newborn were expelled to Haiti on the same flight as Michael and Veronique's family.

154.    Similarly, when Plaintiffs Mirard and Madeleine and their two-year-old daughter were expelled, all the adults on their flight were shackled at the waist and legs. Any adult who did not have to hold a small child was also handcuffed, including Mirard. The humiliation alone caused Mirard, a proud father and man of faith, to break down in tears. At no time did Defendants inform Mirard or Madeleine that they were being returned to Haiti. Only when they landed in Port-au-Prince did Mirard realize that they were being sent back to the country that he and Madeleine had fled and his daughter had never known.

155.    Likewise, with no warning, Plaintiffs Pierre and Ginette Doe and their young child were transported to an airport in San Antonio, Texas one evening. The following morning, U.S. officials handcuffed Pierre and placed him and his family on a flight back to Haiti. Pierre believes that his child, who was almost four at the time, understood what was happening as he was being handcuffed and was traumatized as a result. To this day, his child lives in fear of the police.

156.    Upon information and belief, at no time during the entire expulsion process—from processing at the CBP Encampment to holding at the detention facility to being transported to the airport and expelled to Haiti—did U.S. officials ever ask if Individual Plaintiffs or any other asylum seeker had a fear of returning to Haiti or wished to seek asylum.

157.    Officers' refusal to screen for fear or vulnerability to *refoulement* was not a mistake. In authorizing and enabling mass expulsions under the Del Rio Deterrence Decision, President Biden and DHS Defendants understood that asylum seekers would be expelled without access to the statutory or procedural protections required under U.S. law.

158.    DHS Defendants' failure to abide by their statutory obligations resulted in erroneous expulsions. In at least one case, a Black migrant from Angola was expelled to Haiti on the presumption that he was Haitian, despite repeatedly explaining to officers that he was not Haitian and had never been to Haiti. On information and belief, such errors were reported to senior DHS officials and President Biden and DHS Defendants took no action to prevent similar erroneous expulsions from occurring.

159.    Defendants' rapid, cruel, and summary expulsion of Haitian asylum seekers pursuant to the Title 42 Process shocks the conscience. Upon information and belief, DHS Defendants effected the mass expulsion of thousands of Haitian asylum seekers with deliberate disregard for the human dignity of the individuals they were expelling, separating parents from children and husbands from wives; depriving individuals scheduled for expulsion of basic food, hygiene, and sleeping provisions; shackling adults like criminals or animals; refusing to tell individuals, or lying to them, about whether they were being sent; physically abusing multiple individuals to force them onto planes to be expelled; and summarily expelling thousands of Haitians without accommodating their statutory right to seek asylum or the United States' *non-refoulement* obligations.

**2.    DHS Defendants expelled thousands of asylum seekers from Del Rio to Mexico.**

160.    Through their conduct taken pursuant to the Del Rio Deterrence Decision, DHS Defendants also effectuated the expulsion of approximately 8,000 asylum seekers to Mexico. These asylum seekers were compelled to cross back to Mexico because despite the dangerous conditions they would face there, many believed that being summarily expelled to Haiti posed an even graver threat.

161.    For example, Plaintiffs Samuel and Samentha Doe were unwilling to risk being sent back to Haiti because they knew if they went back, they would die there. In addition, their children were sick, their son had been injured after running away from a mounted CBP officer chasing Haitians in the river, and they were starving from lack of food. Samuel describes the CBP

Encampment as "the worst thing in my life that I can describe." Because Samuel feared the family would be returned to Haiti, they took their children back to Mexico.

162.    Similarly, after Plaintiffs Esther and Emmanuel Doe had spent about one week suffering in the CBP Encampment waiting to seek asylum, they were awoken early in the morning by U.S. officials and told to get on the "last" bus. Because they were afraid of being sent back to Haiti if they got on the bus, Esther and Emmanuel crossed into Mexico with their son. Although Esther and her family had come to the CBP Encampment to request asylum, they were never asked if they wanted to seek asylum and were not given the chance to express a fear of return to Mexico or Haiti. Esther explained, "I wasn't able to ask for asylum because the officers didn't allow us to do that. I didn't have a chance to talk to them."

163.    So too for Plaintiff Delgado Doe. Delgado spent about nine or ten days in the CBP Encampment. He became afraid after he started to learn that friends whose numbers had been called were being deported back to Haiti. He felt he had no choice but to cross the river back into Mexico, even though he had never had a chance to ask for asylum.

164.    The actions by DHS Defendants that forced individuals back to Mexico shock the conscience. Upon information and belief, DHS Defendants deliberately made conditions in the CBP Encampment so inhumane, and deliberately began expelling as many individuals from the CBP Encampment as possible, that it became clear to individuals with the simple good fortune not to have their number called right away that DHS Defendants would not provide any opportunity to request asylum or seek protection from the United States, and that it would be safer for them to return to Mexico than to be returned to Haiti and the dangers and persecution they had originally fled.

**E.    Asylum seekers expelled from Del Rio were returned to danger in Haiti and Mexico.**

165.    The common consequence of Defendants' implementation of the Del Rio Deterrence Decision, including their use of the Title 42 Process to effect summary expulsions, is that thousands of Haitian asylum seekers were returned to danger in Haiti and Mexico.

166.     The danger faced by these asylum seekers is the predictable result of the Del Rio Deterrence Decision and deliberate choices by President Biden's senior staff and DHS Defendants to expel Individual Plaintiffs and other vulnerable individuals without first affording them any access to the U.S. asylum process or required *non-refoulement* screenings.

167.     Individuals expelled to Haiti have faced serious threats to their safety due to that country's political instability, violent crime by gangs and cartels, and acute food insecurity. Years of devastating natural disasters have crippled critical infrastructure and local economies, while progressively brutal feuds among cartels and political factions have left the government unable to provide basic services or to prevent violence and kidnappings. Conditions in Haiti had deteriorated significantly following the assassination of President Jovenel Moïse in July 2021 and the 7.2 magnitude earthquake in August 2021 that debilitated the country's south.

168.     President Biden and DHS Defendants were aware of these circumstances and the danger that awaited Individual Plaintiffs and asylum seekers in Haiti when they were expelled. Indeed, one month before thousands of Haitians arrived at the CBP Encampment, DHS's civil rights office confirmed that there would be a strong risk of unlawful *refoulement* if DHS were to expel asylum seekers to Haiti. Around the same time, Defendant Secretary Mayorkas redesignated Haiti for TPS because of the extraordinary conditions there.

169.     President Biden and DHS Defendants nonetheless ignored these warnings and authorized and effectuated the expulsion of thousands to Haiti, where there was no infrastructure in place to receive and provide resources to expelled individuals. Many expelled individuals had not been to Haiti for years and had no network, family members, or place to call home. In fact, the head of Haiti's National Migration Office protested in mid-September 2021 that Haiti was unable to receive expelled migrants.

170.     As DHS personnel were expelling Haitians from the CBP Encampment, U.S. Special Envoy for Haiti Daniel Foote resigned, declaring that he refused "to be associated with the United States['] inhumane, counterproductive decision to deport thousands of Haitian refugees" to a "collapsed state [that] is unable to provide security or basic services" and "simply cannot

support the forced infusion of thousands of returned migrants lacking food, shelter, and money without additional, avoidable human tragedy."

171.    Fearing the escalating violence, many migrants expelled to Haiti went into hiding. Before he was granted humanitarian parole to enter the United States, for example, Plaintiff Jacques Doe was forced to hide from the gangs that forced him to flee Haiti originally. Since being deported back to Haiti, Plaintiff Eric Doe continues to live in hiding from political opponents. As recently as January 2024, three armed men came to his house looking for him. Eric's wife, Plaintiff Florence Doe, who was pregnant at the time, was home with her mother and the other children. When the men discovered that he was not there, they threatened to burn the house down. As a result, Florence is also in hiding, and they both remain fearful for their safety. Other individuals had no choice but to live on the street or sleep in temporary shelters. Most migrants struggle to find food, housing, and jobs in a country they had fled and no longer recognize. They spend their days trying to survive amidst rampant robberies, murders, and kidnappings.

172.    Individual Plaintiffs and other Haitian asylum seekers expelled from Del Rio to Mexico were also returned to conditions where they faced insecurity and experienced harm. Black migrants encounter increased challenges in Mexico due to pervasive anti-Black racism from Mexican immigration authorities, the police, and the local community. For example, after fleeing to Mexico to avoid being expelled to Haiti, Plaintiff Paul Doe had difficulty finding a room to rent and was unable to find a job, despite submitting many applications. He was also stopped multiple times by the police, who questioned him about who he was and where he was going. To avoid being targeted this way, Paul remained inside as much as possible until he received humanitarian parole to enter the United States.

173.    Expelled Haitian asylum seekers have regularly been denied adequate medical care, housing, and employment in Mexico. Vendors frequently refuse to serve Haitians and other Black migrants food or water and Mexican police officials are known to extort these migrants, threatening to deport them to their country of persecution. Scores of Haitian migrants have been

kidnapped and held for ransom as they traveled to the United States after being expelled by U.S. officials.

### III.   President Biden and DHS Defendants' Del Rio Deterrence Decision diverged from standard practices and was driven by discriminatory purpose.

174.   The suffering and harm experienced by Individual Plaintiffs and thousands of others in the CBP Encampment and during their subsequent detention and expulsions are a direct and intended or foreseeable result of President Biden and DHS Defendants' Del Rio Deterrence Decision, which aimed to prevent and deter Haitians arriving near Del Rio from accessing immigration protection in the United States. The Del Rio Deterrence Decision included, but was not limited to, the withholding of humanitarian preparation and aid from the arriving Haitian asylum seekers in Del Rio in September 2021 and the mass rapid expulsions of these asylum seekers using the Title 42 Process.

### A.   The treatment of Haitian migrants in Del Rio diverged from standard practices Defendants applied to other asylum seekers.

175.   The decision to deprive Haitian asylum seekers of necessities like food, water, shelter, and medical care departed from DHS Defendants' typical procedures for processing asylum seekers and for providing humanitarian aid to large groups of arriving migrants in several ways.

176.   First, the high level of involvement by top White House and agency officials in decision-making relating to the treatment of asylum seekers in Del Rio was unusual. On information and belief, senior and Cabinet-level officials do not generally take an active role deciding how aid and necessities are provided at field processing centers like the CBP Encampment.

177.   Second, President Biden, his senior advisors in the NSC and DPC, and DHS Defendants disregarded months of intelligence indicating that thousands of Haitian asylum seekers were traveling to the U.S. border and stopped internal efforts to discuss and organize necessary infrastructure, personnel, and resources to prepare for their arrival. It is uncommon for an agency

to ignore its own intelligence and the recommendations of its experts, particularly where, as here, the intelligence is corroborated by reports from sources and partners with first-hand knowledge.

178.    Third, despite the insufficient resources available at the CBP Encampment to meet the needs of Haitian asylum seekers, which posed a foreseeable risk of a humanitarian crisis, DHS Defendants did not seek out assistance from NGOs. In similar situations, agencies like DHS and CBP generally engage with humanitarian aid organizations when circumstances prevent the agency from meeting reasonably anticipated needs. At Del Rio, however, NGOs were generally prevented from providing supplies and other aid to the asylum seekers in and around the CBP Encampment.

179.    Fourth, Defendants diverged from their typical practice of accounting for people in CBP custody and tracking important information about them, including the existence of fear-based claims. On information and belief, DHS Defendants lacked information regarding the number of fear-based claims Haitians in the CBP Encampment had raised, did not know how many people were in their custody, and lost at least one child for hours. On information and belief, this lack of information represented a marked departure from DHS Defendants' protocols and processing of other large groups of asylum seekers at the border.

180.    Fifth, upon information and belief, the actions that CBP officers took to prevent asylum seekers from providing for their basic needs, including by obstructing passage across the river to and from the CBP Encampment, were made pursuant to the Del Rio Deterrence Decision and represented a departure from the way DHS Defendants had previously operated other open-air intake sites. Consistent with the goal of subjecting the asylum seekers in Del Rio to harsh and inhumane conditions, DHS Defendants obstructed all efforts, including those by the asylum seekers themselves, to ensure even basic humanitarian conditions in the CBP Encampment.

181.    The decision to expel Haitians in the CBP Encampment as quickly as possible was also inconsistent with DHS Defendants' standard practice in similar situations.

182.    First, DHS Defendants departed from how they typically addressed the needs of groups of asylum seekers arriving at the border, including other large and fast-growing groups.

For example, when thousands of people were severely overcrowded without food or other necessities in a temporary outdoor processing site under the Anzalduas International Bridge in Mission, Texas, in spring 2021, DHS personnel relocated individuals to other sites for processing to alleviate the humanitarian crisis near the port of entry. They also engaged local NGOs and provided greater resources to asylum seekers, including food, cots, benches, and water misters. Likewise, when over 20,000 Ukrainians began presenting at the U.S.-Mexico border in April 2022 following the Russian invasion of Ukraine, NGOs and other volunteers rushed to help and were able to provide food, shelter, and medical and logistical support on both sides of the border, as well as to assist in organizing Ukrainian asylum seekers to be called for processing by CBP officials; DHS Defendants had adopted a policy of exempting Ukrainians from automatic expulsion under Title 42 and granting humanitarian parole to Ukrainians presenting at the port of entry.[19]

183.    Second, despite being informed in advance that expulsions of Haitian asylum seekers would create a "high risk of *refoulement*" in violation of U.S. and international law, President Biden and DHS Defendants did not take this risk into account and failed to ensure that any *non-refoulement* screenings or interviews were offered to asylum seekers prior to expulsion. This lack of screenings is a departure from general practice, mandated by law, to ensure adequate safeguards against unlawful *refoulement* of asylum seekers.

184.    Third, DHS Defendants expelled asylum seekers to Haiti despite knowing that there was no infrastructure set up to receive and process them. Only days after the expulsion flights began, on or about September 20, 2021, did White House officials and DHS Defendants discuss the lack of infrastructure and any steps to be taken to remedy it. These actions are inconsistent with standard procedures, which call for reception infrastructure prior to expulsions on the scale that DHS Defendants were conducting.

---

[19] The sudden increase in Ukrainians seeking entry to the United States that spring also prompted President Biden to pledge to accept up to 100,000 Ukrainians into the United States through parole and other legal pathways.

185.    Fourth, DHS Defendants and personnel did not discuss or take any steps to mitigate the health risks of expulsion, including COVID-19, to vulnerable asylum seekers who were sick, tender-aged, or pregnant, even though Defendants generally considered health vulnerabilities of migrants when making expulsion decisions under the Title 42 Process. There were multiple pregnant people who went into labor in the CBP Encampment, and at least one woman went into labor while on the tarmac awaiting expulsion.

186.    Fifth, DHS Defendants had a policy not to subject families from Central America and Mexico to the Title 42 Process. This policy included screening families for vulnerability and providing family units with minor children with humanitarian exemptions to the Title 42 Process. DHS Defendants departed from this policy specifically for Haitian families in Del Rio, expelling large numbers of families, including those with infants, and including at least one family with a days-old U.S.-citizen child born in the CBP Encampment, without screening them for vulnerability or exemptions.

**B.    Discriminatory intent drove the treatment of Haitian asylum seekers in Del Rio.**

187.    The Del Rio Deterrence Decision also arose from discriminatory intent based on race and national origin.

188.    At the direction of the White House and DHS Defendants, CBP personnel treated all asylum seekers in the CBP Encampment as presumed Haitian nationals, regardless of whether they were in fact Haitian. DHS personnel also initially miscounted the number of Haitians in the encampment because they assumed that non-Haitian Black asylum seekers were Haitian. On information and belief, DHS Defendants took no action to prevent errors in reporting the nationality of individuals in Del Rio.

189.    On information and belief, DHS officials tasked with addressing the developing humanitarian crisis in Del Rio viewed Haitian and Black asylum seekers as dangerous, barbaric, and criminal. On one occasion, a CBP official in senior leadership for the Del Rio Sector remarked to DHS officials that Haitians would "tear through the walls" of a detention facility. In a meeting

relating to the CBP Encampment, top DHS officials described Haitians as "particularly difficult," and a senior DHS official reported to Secretary Mayorkas, without evidence, that Haitian asylum seekers had engaged in criminal conduct in Mexico.

190.    On information and belief, DHS Defendants believed that Haitians were more likely to break the law, be embedded with smugglers, or move through irregular channels than other groups. On September 16, 2021, when preparing the mass expulsion strategy, a senior CBP official stated that removing single Haitian men must be a priority because they were likely to be dangerous and violent. DHS personnel also refused to allow the inclusion of toothbrushes or combs in some hygiene kits that were distributed at the CBP Encampment, out of concern that the Haitian asylum seekers might use them as weapons.

191.    On information and belief, perspectives such as these shaped the decisions that senior White House and DHS officials made in adopting and implementing the Del Rio Deterrence Decision. These decisions included, among others, the decision not to prepare adequate food, water, medical care, or shelter for asylum seekers arriving in the CBP Encampment; the decision that DHS personnel effectuating the expulsions of Haitians should lie about where such Haitians were being transported; the decision that DHS personnel should shackle Haitians, including mothers with children, on expulsion flights; and the decision to expel Haitians swiftly, without access to *non-refoulement* screenings, in one of the largest mass expulsions in recent U.S. history.

**IV.    Defendants' Title 42 Process applied in Del Rio was unlawful.**

192.    Beyond the abuses described above, the expulsion procedures applied to Individual Plaintiffs and Haitians in Del Rio in connection with the Del Rio Deterrence Decision—the Title 42 Process—were themselves unlawful. Through the Title 42 Process, Defendants deprived asylum seekers of their statutory and procedural protections under U.S. law despite lacking any authority to do so. Moreover, although Defendants pretextually portrayed the Title 42 Process as a public health measure, it instead undermined public health.

A.    **The federal government's public health powers provide no support for the mass, summary expulsion of asylum seekers.**

193.    The Title 42 Process that was used to expel thousands of Haitian asylum seekers in Del Rio is grounded in the federal government's purported public health authority. In reality, as applied to Haitian asylum seekers in the CBP Encampment in September 2021, the Title 42 Process was an unlawful tool used to brutally effectuate the Biden Administration's Del Rio Deterrence Decision.

194.    Title 42's statutory public health powers have their origins in an 1893 statute authorizing the Executive Branch to undertake certain acts to address the spread of contagious diseases originating outside of the United States. *See* Act of Feb. 15, 1893, ch. 114, § 7, 27 Stat. 449, 452. Now codified at 42 U.S.C. § 265, the statute authorizes the CDC Director to address "a serious danger of the introduction of" a "communicable disease" from a foreign country "into the United States" by "prohibit[ing], in whole or in part, the introduction of persons or property."

195.    Over the 128 years that the statute and its predecessors have been in force, this provision had never been used to expel noncitizens from the United States. Despite numerous infectious disease outbreaks since the statute's enactment, no regulation had ever before been promulgated purporting to authorize the immigration powers asserted through the Title 42 Process.

196.    The framework of the Public Health Service Act further confirms that Title 42's public health powers do not include the broad expulsion power claimed by Defendants. Among other reasons, the statutory language expressly provides the power to prohibit "the introduction of persons and property," but it makes no reference to an authority to expel individuals under the act. That Section 265 applies to U.S. citizens and noncitizens further supports the plain language interpretation that "introduction" does not mean "expulsion." Finally, the act references Section 265 as a "quarantine" provision, and provides specific penalties for its violation, none of which include expulsion. *See* 42 U.S.C. § 271(a) (violation of Section 265 "shall be punished by a fine of not more than $1,000 or by imprisonment for not more than one year, or both").

197.   In short, the sole statutory authority underlying the Title 42 Process and relied on in applying the process to Individual Plaintiffs and Haitian asylum seekers in Del Rio does not authorize the expulsion of noncitizens from the United States.

**B.   Defendants' Title 42 Process deprived asylum seekers of protections guaranteed under U.S. law.**

198.   Defendants' Title 42 Process relied not only on a novel, atextual construction of Section 265, but also on the unprecedented and extraordinary claim that Defendants may ignore clear protections for asylum seekers mandated under U.S. immigration laws.

199.   The United States' modern asylum system has its roots in the aftermath of World War II, when U.S. lawmakers created the nation's first formal asylum protections to prevent a recurrence of the United States closing its borders to individuals seeking safety from Nazi persecution.

200.   Currently, three primary statutory frameworks operate to protect individuals fleeing persecution and torture. Together, they provide individuals coming to the United States with a right to seek immigration relief through the specific procedures set forth in those laws.

201.   First, the INA provides that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States"—regardless of their place of entry, interdiction, or status—"may apply for asylum[.]" 8 U.S.C. § 1158(a)(1).

202.   Second, the INA sets forth the duty of *non-refoulement*, an international law principle providing that a country may not expel or return an individual to a country where they have a well-founded fear of persecution or serious harm. Consistent with the United States' obligations under the 1951 Convention on the Rights of Refugees and the 1967 Protocol, the INA's withholding of removal provision prohibits the United States from removing any individual to a country where it is more likely than not that the individual's "life or freedom would be threatened in that country because of [their] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

203.    Third, FARRA implements the United States' *non-refoulement* duties set forth in Article 3 of the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. In relevant part, FARRA prohibits the United States from expelling an individual to a country where it is more likely than not that they will be tortured. *See* 8 U.S.C. § 1231 note.

204.    DHS Defendants and personnel applied the Title 42 Process to persons in the CBP Encampment in a manner that violated each of these fundamental protections of the U.S. asylum system. DHS personnel, for example, refused to allow Individual Plaintiffs and thousands of others to "apply for asylum" as required under the INA. 8 U.S.C. § 1158(a)(1). Rather than inspect all people in the encampment to determine whether they would "indicate[] either an intention to apply for asylum . . . or a fear of persecution," 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i)–(ii), DHS personnel actively refused to engage with Individual Plaintiffs or other asylum seekers.

205.    DHS Defendants also effectuated the expulsion of Individual Plaintiffs and others to Mexico and Haiti without considering whether they would likely be persecuted or tortured upon their return. DHS Defendants' refusal to provide adequate safeguards against *refoulement*, including screenings for withholding of removal and protection under CAT, was inconsistent with their mandatory duties under the INA and FARRA.

206.    Indeed, in a memorandum dated shortly after DHS cleared the CBP Encampment, entitled "Ending Title 42 return flights to countries of origin, particularly Haiti," senior State Department advisor Harold Koh concluded that Defendants' "current implementation of the Title 42 authority continues to violate our legal obligation not to expel or return ('refouler') individuals who fear persecution, death, or torture, especially migrants fleeing from Haiti." Koh explained that the Title 42 Process, particularly as it was applied to asylum seekers in Del Rio, was inconsistent with DHS Defendants' duties under the INA and FARRA and created "an unacceptably high risk that a great many people deserving of asylum" will be unlawfully returned to countries where they fear persecution, death, or torture.

207.    Finally, DHS Defendants' expulsions of Haitian asylum seekers under the Title 42 Process also conflicted with the INA's provisions governing the removal of noncitizens. With few exceptions, removal proceedings before an immigration judge are the "sole and exclusive procedure" for determining whether an individual may be removed from the United States. 8 U.S.C. §§ 1229a(a)(3), 1225(b)(1). The summary expulsions of individuals from the CBP Encampment under the Title 42 Process offered none of the procedural protections mandated by the INA for noncitizens who fear removal.

**C.    Defendants' Title 42 Process did not advance public health.**

208.    Although Defendants' purported goal in implementing the Title 42 Process was to promote public health, scientific experts and legal scholars have made clear that public health was not a significant driving concern in the formulation and implementation of the process.

209.    It is widely reported, for example, that former Vice President Mike Pence directed former CDC Director Dr. Robert Redfield to issue the Title 42 order and Title 42 Regulation after Redfield expressed that there was no valid public health reason to issue such an order.

210.    Moreover, a principal justification for Defendants' continued extension and application of the Title 42 Process was the "congregate nature" of CBP and Border Patrol stations along the U.S. border, which purportedly risks the introduction, transmission, and spread of COVID-19 from arriving migrants. But although HHS Defendants "recognize[] the availability of testing, vaccines, and other mitigation protocols [that] can minimize risk in this area," and "anticipate[] additional lifting of restrictions" as DHS facilities employed these protocols, DHS Defendants enforced the Title 42 Process for months without taking advantage of any widely available mitigation measures. For example, the CBP Capio Memo provided no policies or procedures related to COVID-19 testing or the provision of COVID-19 vaccinations. Although President Biden and DHS Defendants were aware for months that thousands of Haitian asylum seekers were traveling towards Del Rio, they refused to make any preparations for offering testing or vaccination to asylum seekers as they waited days or weeks in the CBP Encampment.

211.    The public health justifications for the Title 42 Process were no more compelling in September 2021 than they were when the policy was first adopted in March 2020. Indeed, any public health justifications for the policy were significantly weaker in September 2021 due to the wide availability in the U.S. of vaccines that are highly effective in combatting the transmission and spread of COVID-19.

212.    In her testimony to Congress shortly after Defendants' use of the Title 42 Process at the CBP Encampment, Anne Schuchat, the former Deputy Director of CDC, testified that the issuance of the first Title 42 order "wasn't based on a public health assessment at the time." Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases and the Chief Medical Advisor to the President, likewise concurrently stated that "expelling" immigrants "is not the solution to an outbreak." And after observing the expulsion of Individual Plaintiffs and thousands of Haitians "without any assessment of their safety," hundreds of then-CDC Director Walensky's former colleagues signed a letter to oppose Defendants' Title 42 Process, calling it "a political measure to prevent legal immigration under the rhetoric of public health."

**D.    Defendants continued to enforce the Title 42 Process following Del Rio.**

213.    After the CBP encampment was cleared, the Biden Administration continued to enforce the Title 42 Process for more than a year and a half. From September 19, 2021 through May 2023, the Biden Administration used at least 246 flights to return at least 24,879 people to Haiti.

214.    In December 2021, CDC conducted its periodic reassessment of the circumstances underlying CDC's August 2021 order and announced that the Title 42 Process would remain in place for at least another sixty days. In addition, President Biden and DHS Defendants blocked the efforts of internal staff to engage in an after-action review of the events at the encampment and DHS Defendants' treatment of Haitian asylum seekers.

215.    On April 1, 2022, well over a year after the Biden Administration took office, then-CDC Director Rochelle Walensky announced the CDC's intention to end the Title 42 Process,

effective May 23, 2022.[20] The stated reason for the order ("April Termination Order") was the CDC's changing assessment of the COVID-19 risk posed by the arrival of "covered noncitizens" in the United States.[21]

216.    The Termination Order explicitly affirmed the CDC's authority to reimplement the Title 42 Process, noting that if "there is a substantial change in the public health situation with respect to the pandemic, such as due to new and particularly concerning SARS-CoV-2 variants, CDC could determine a new order under 42 U.S.C. §§ 265, 268 and 42 C.F.R. § 71.40 is necessary."

217.    Despite the issuance of the April Termination Order, the Title 42 Process did not lift on May 23, 2022. Two days after the CDC Director's announcement, multiple states filed a lawsuit that successfully enjoined the April Termination Order from taking effect. *Louisiana v. CDC*, 603 F. Supp. 3d 406 (W.D. La. 2022). The Title 42 Process thus remained in place.

218.    On January 30, 2023, the Biden administration announced that it would allow the COVID-19 public health emergency declaration to expire at the end of the day on May 11, 2023. Upon the expiration of the declaration—the purported public health basis for the Title 42 Process—the federal government voluntarily ceased enforcing the Title 42 Process.

**V.    Defendants' actions pursuant to the Del Rio Deterrence Decision, including their summary expulsion of asylum seekers from the CBP Encampment under the Title 42 Process, continue to harm Individual and Organizational Plaintiffs.**

219.    More than two years since the mass expulsion of Haitian asylum seekers from the CBP Encampment in Del Rio, individuals unlawfully expelled from Del Rio continue to be harmed by Defendants' actions. Many expelled individuals remain abroad, in dangerous conditions and facing new barriers to seeking protection in the United States that Defendants have created since

---

[20] CDC, *Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exist* (Apr. 1, 2022).

[21] Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 Fed. Reg. 19941, 19941–956 (Apr. 6, 2022), https://www.govinfo.gov/content/pkg/FR-2022-04-06/pdf/2022-07306.pdf

clearing the CBP Encampment. Had they been given the process they were due in 2021, these individuals would have been able to access forms of relief for which they are now ineligible, or that Defendants have since made even less accessible—particularly for Haitians.

220.    As a result of the unlawful expulsions from the CBP Encampment, individuals like Eric and Florence Doe, Pierre and Ginette Doe, James Doe, and Delgado Doe were returned to dangerous conditions in Haiti and remain stranded outside the United States. Plaintiffs Eric and Florence Doe, James Doe, and Delgado Doe all remain in precarious situations in Haiti where they fear for their safety amid worsening violence and instability.

221.    Because Individual Plaintiffs and others like them were not given lawful access to the U.S. asylum system in 2021, they also continue to face limited and delayed access to forms of immigration relief for which they should have been eligible.

222.    Defendants' apparent intent to continue deterring Haitian asylum seekers from accessing the United States asylum system is further evidenced by the fact that Defendants have continued to evade accountability for the constitutional and human rights abuses perpetrated at Del Rio. No Defendant has taken any appropriate corrective steps to ensure that those abuses and mass expulsions are not repeated. As such, there are no safeguards to ensure that—when another large-scale migration event occurs again—the humanitarian crisis Defendants created in Del Rio is not repeated. As the local sheriff stated shortly after the CBP Encampment was cleared, "I've never seen anything like [the CBP Encampment], but it's going to happen again."

A.    **Many individuals expelled to Haiti remain trapped there in increasingly dire conditions.**

223.    For individuals expelled from Del Rio who are still stranded in Haiti, including Plaintiffs Eric and Florence Doe, James Doe, and Delgado Doe, living conditions are incredibly dangerous.

224.    In July 2023, the State Department issued a "Level 4" Travel Advisory for Haiti, advising U.S. citizens not to travel there because "kidnapping is widespread" and "violent crime, such as armed robbery and carjacking, is common." U.S. government employees were encouraged

not to walk in the capital city of Port-au-Prince at any time and were required receive approval to visit certain parts of the city.

225.    In the first quarter of 2024, the Haitian government announced a state of emergency and imposed a nighttime curfew as gang violence intensified and resulted in organized attacks on two of the country's biggest prisons that freed thousands of inmates. An untold number of people have been killed in the rising violence and more than 15,000 have been displaced from their homes since coordinated gang attacks began on February 9, 2024. On March 10, 2024, U.S. Marines flew helicopters into Port-au-Prince in the middle of the night to evacuate non-essential embassy personnel and bolster embassy security. Gangs also took over Haiti's major airports and seaports, preventing then-de facto Prime Minister Ariel Henry from returning to the country from a trip to Kenya, where he signed an agreement for a Kenyan-led mission to help address the insecurity crisis.

226.    As of March 2024, the United Nations estimates that more than 80 percent of Port-au-Prince is under the control of violent armed gangs. Local Haitians are facing a harrowing reality, as "[g]unfire crackles at all hours" and witnesses say the streets of Port-au-Prince reek with the stench of the dead, as corpses, the casualties of violence, pile up too quickly to bury. The New York Times reported that "Haiti is in the throes of an uprising not seen in decades," with an unstable food supply, severe limits to access to water and healthcare, and a government in disarray as de facto Prime Minister Ariel Henry agreed to resign on March 12, 2024. The intended Kenyan-led mission meant to facilitate stability in Haiti has been halted until the installation of an interim prime minister. Despite the recognized need for urgent stability, agreement on the path forward for Haiti remains a long-term challenge, and local Haitians—including individuals unlawfully expelled from Del Rio in 2021—continue to be trapped in an ongoing state of fear and uncertainty.

**B.**    **Due to Defendants' unlawful expulsions, many Haitian asylum seekers are ineligible for Temporary Protected Status.**

227.    As a consequence of their unlawful expulsions, many Haitian asylum seekers who were detained in the CBP Encampment and expelled to Haiti under the Title 42 Process or forced back into Mexico remain ineligible for TPS.

228.    On December 2, 2022, Defendant Secretary Alejandro Mayorkas announced the redesignation of Haiti for TPS on the basis that "[t]he conditions in Haiti, including socioeconomic challenges, political instability, and gang violence and crime—aggravated by environmental disaster—compelled the humanitarian relief. . . ."[22] Under the redesignation, Haitians who have continuously resided in the United States since November 6, 2022 and have remained continuously physically present in the United States since February 4, 2023 were eligible to apply for TPS and accompanying work authorization in the United States through August 3, 2024.[23]

229.    Thousands of individuals who were unlawfully expelled from the CBP Encampment in September 2021 were outside the United States at the time of redesignation. Accordingly, they could not claim continuous physical residence and presence in the United States at the time Secretary Mayorkas redesignated Haitian TPS and do not and cannot qualify for TPS or any TPS-related benefits, like immediate eligibility for work authorization and independent protection against removal.

230.    Had Defendants not unlawfully expelled individuals from Del Rio, many of these Haitian asylum seekers would have been able to pursue their claims for protection in the United States. As of December 2021, newly filed asylum cases took an average of four and a half years

---

[22] Homeland Security, *Secretary Mayorkas Extends and Redesignates Temporary Protected Status for Haiti for 18 Months* (Dec. 5, 2022), https://www.dhs.gov/news/2022/12/05/secretary-mayorkas-extends-and-redesignates-temporary-protected-status-haiti-18#:~:text=Secretary%20of%20Homeland%20Security%20Alejandro%20N.%20Mayorkas%20today,due%20to%20extraordinary%20and%20temporary%20conditions%20in%20Haiti..

[23] Extension and Redesignation of Haiti for Temporary Protected Status, 88 Fed. Reg. 5022, 5022–32, (Jan. 26, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-26/pdf/2023-01586.pdf.

to be adjudicated. Individuals who sought protection at Del Rio would thus have been met the continuous residence and physical presence requirements to make them eligible for Haitian TPS.

**C.    Defendants' unlawful expulsions have subjected many Haitian asylum seekers to new regulations that curtail their future ability to seek asylum.**

231.    In early 2023, the Biden Administration took additional administrative action to suppress the number of asylum seekers coming to the southern border—directly impacting the ability of thousands of class members who remained outside the United States to return to apply for asylum.

232.    On February 23, 2023, the Biden Administration published a Notice of Proposed Rulemaking that proposed a presumptive bar on asylum eligibility for most people arriving at the southern land border.[24] After a limited 30-day comment period, and despite public outcry from over 40,000 commentators, the final rule "Circumvention of Lawful Pathways" (hereinafter "Asylum Ban") went into effect upon the sunset of the Title 42 Process on May 11, 2023.[25]

233.    The stated aim of the Asylum Ban was to address the "concern about the possibility of a surge in irregular migration upon, or in anticipation of" the end of Title 42 and the potential for increased migration from Haiti, among other countries.[26] Notably, the final version of the Asylum Ban was expanded from the initial proposed rulemaking to also make ineligible for asylum migrants who enter the United States through "adjacent coastal borders"—an expansion that disproportionately affects Haitians who, along with Cubans, constitute the largest population of asylum seekers attempting to reach the United States by sea.

234.    The newly imposed Asylum Ban imposes a "rebuttable presumption of asylum ineligibility" on noncitizens who enter the United States without authorization at the southwest

---

[24] Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704 (Feb. 23, 2023), https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways..

[25] Circumvention of Lawful Pathways, 88 Fed. Reg. 31314, 31314–452 (May 16, 2023), https://www.govinfo.gov/content/pkg/FR-2023-02-23/pdf/2023-03718.pdf.

[26] *See* 88 Fed. Reg. at 11705–06.

border and adjacent coastal borders after the termination of Title 42, subject only to narrow exceptions. The Biden Administration announced that asylum seekers barred by the Asylum Ban "will generally be processed under Title 8 expedited removal authority" and removed "in a matter of days."[27] This practice effectively perpetuates Defendants' practice of "expelling" Haitian and other non-Mexican asylum seekers to Mexico under Title 42, with the additional punitive consequence of the five-year bar to re-entry to the United States that accompanies an expedited removal order.

235.    The Asylum Ban is consistent with Defendants' longstanding practice to prevent and otherwise disincentivize Haitian nationals in particular from seeking protection in the United States. Although Congress allows any individual to apply for asylum if that person is "physically present in the United States" or "arrives in the United States (whether or not at a designated port of arrival . . .)," 8 U.S.C. § 1158(a)(1), the Asylum Ban allows for only three narrow exceptions, none of which provide adequate pathways for asylum seekers—particularly for Haitian asylum seekers.

236.    The Asylum Ban effectively requires automatic denial of an applicant's asylum claim, without consideration, unless the person satisfies one of three burdensome conditions: (1) presenting only at a port of entry after securing one of a very limited number of appointments through CBP One, a complicated mobile application that requires an up-to-date smartphone and stable internet connection; (2) applying for and being denied asylum in a country through which the individual traveled on their way to the United States; or (3) obtaining advance permission to travel to the United States through an approved parole program.

237.    As explained in further detail below, none of these exceptions are meaningfully available to Haitian asylum seekers who were expelled from Del Rio and remain stranded outside the country. The Asylum Ban remains in effect while a challenge to the rule is on appeal.

---

[27] U.S Embassy in Chile, *U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://cl.usembassy.gov/u-s-government-announces-sweeping-new-actions-to-manage-regional-migration/.

238.    First, it is well-documented that the CBP One application suffers from numerous flaws, such as excessively limited daily appointments. Importantly, several of these flaws disproportionately or uniquely affect Haitian asylum seekers, including the use of technology that disproportionately rejects applicants with darker skin tones and the provision of information that is at times incorrect and unintelligible in Haitian Creole, but not in other languages offered by the application.[28]

239.    Second, the Transit Ban requires Haitians to first apply for, and be denied, asylum in a country they traveled through on their way to seek asylum in the United States. As Individual Plaintiffs' stories make amply clear, class members experienced and continue to experience rampant violence and discrimination in the very countries where the Transit Ban would require them to seek asylum, making this exception untenable. For example, when Plaintiff James Doe fled Haiti, he first travelled to Argentina, where he faced constant discrimination because he was a Black foreigner, including not being allowed on public transit and being told "to cut myself so [someone on the street] could see if my blood was red like his." Eric Doe and his wife were unable to seek asylum from the Mexican Commission for Refugee Assistance, and Eric Doe experienced significant discrimination when he fled to Chile for being a Black Haitian man: "Chileans cursed our mothers, called us faggots, made us get off public transportation, and fought us." So too for Ginette and Pierre Doe: when living in Chile, Ginette Doe was physically attacked by Pierre and Ginette's neighbor, and both Pierre and Ginette experienced multiple threats of violence from their neighbor and neighbor's son, but the local police did not assist them despite their multiple entreaties. After being expelled to Haiti, Pierre and his family returned to Chile because Pierre feared they would be targeted for his prior involvement in Haitian politics. Pierre and Ginette have been forced to live separately in Chile because Ginette had previously been physically attacked and is now afraid to live in urban areas. Because of this widespread discrimination against Haitians

---

[28] Raul Pinto, *CBP One Is Riddled With Flaws That Make the App Inaccessible to Many Asylum Seekers*, Immigration Impact, (Feb. 28, 2023), https://immigrationimpact.com/2023/02/28/cbp-one-app-flaws-asylum-seekers/.

as well as language barriers that Haitians face in transit countries, Haitians experience additional barriers to accessing the asylum system in transit countries and are thus disproportionately harmed by the Transit Ban.

240.    Third, the limited and oversubscribed parole program available to Haitians falls far short of providing an adequate pathway for asylum seekers. On January 6, 2023, the U.S. government began offering a new parole pathway to Haitian nationals as part of the Processes for Cubans, Haitians, Nicaraguans, and Venezuelans ("Haitian Parole"), which allows qualifying financial supporters in the United States to apply on behalf of nationals of the four countries who reside abroad. If granted, beneficiaries receive advance authorization to travel to the United States and be considered for a temporary parole period of up to two years.[29] Supporters must pass security and background checks and "demonstrate[] sufficient financial resources to receive, maintain, and support the individual(s) whom they commit to supporting for the duration of their stay in the United States," while beneficiaries must pass a "robust security vetting" and "warrant a favorable exercise of discretion."[30]

241.    Haitians are barred from the parole program if they seek asylum between ports of entry at the U.S. border after the date the process was announced. They are also barred if they attempt to journey to the United States to seek asylum and in so doing enter Mexico or Panama without required travel documents for those countries. The U.S. government later amended the program to also exclude asylum seekers interdicted at sea after April 27, 2023—a policy that disproportionately affects Haitians, who represent the largest population of asylum seekers who attempt to reach the United States by sea.[31]

---

[29]  U.S. Citizenship and Immigration Services, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans*, https://www.uscis.gov/CHNV.

[30] *Id.*

[31] Implementation of a Change to the Parole Process for Haitians, 88 Fed. Reg. 26327, 26327–329 (Apr. 28, 2023), https://www.govinfo.gov/content/pkg/FR-2023-04-28/pdf/2023-09014.pdf.

242.    The U.S. government's explicit purpose in implementing the Haitian Parole program was to "disincentivize Haitians in northern Mexico from seeking to enter along the [Southwest Border] of the United States without authorization,"[32] and it explicitly referenced the events in Del Rio in 2021, stating that "[g]iven the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted."[33]

243.    Actual access to the Haitian Parole program is obstructed for most individuals expelled from Del Rio. Many Haitian asylum seekers do not have a qualifying sponsor in the United States who is not only willing to commit to two years of financial support but also can prove their ability to do so. Individuals who can meet the requirements are added to a burgeoning queue of applications and are likely years away from adjudication. Furthermore, in contrast to similar parole programs for Afghans and Ukrainian nationals that have no numerical limits, the parole programs for the four nationalities issue a combined maximum of only 30,000 travel authorizations per month—although the programs surpassed more than 1.5 million applicants within their first five months.

244.    Among the thousands of individuals who were unlawfully expelled from the CBP Encampment in September 2021, any individuals who were outside the United States at the time the Biden Administration adopted the Asylum Ban are now subject to its draconian requirements if they wish to seek protection again in the United States.[34]

---

[32] Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1243–55 (Jan. 9, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-09/pdf/2023-00255.pdf.

[33] *Id.*

[34] On July 25, 2023, the Northern District of California vacated the Asylum Ban, finding that the rule was contrary to law "because it presumes ineligible for asylum noncitizens who enter between ports of entry, using a manner of entry that Congress expressly intended should not affect access to asylum," and also "because it presumes ineligible for asylum noncitizens who fail to apply for protection in a transit country, despite Congress's clear intent that such a factor should only limit access to asylum where the transit country actually presents a safe option." *E. Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278, at *11 (N.D. Cal. July 25, 2023). The Northern District of California court also found the Asylum Ban to be arbitrary and capricious, recognizing the available "exceptions [to the presumption of ineligibility for asylum] will not be meaningfully available to many noncitizens subject to the Rule." *Id.* at *16. The Biden Administration appealed, however, and without a decision explaining its reasoning, the Ninth

D.   **Defendants have continued to evade accountability for the atrocities at Del Rio.**

245.    Defendants promised a swift, impartial, and thorough investigation "in days, [] not weeks" after photos of Plaintiff Mirard being assaulted by an agent on horseback went viral. Instead, nearly ten months after Defendants cleared the CBP Encampment, expelling putative class members at unprecedented rates, Defendant CBP released findings that there was "no evidence" that migrants were struck or prevented from seeking safety on U.S. soil.[35] CBP did not speak to a single Haitian held in the CBP Encampment before releasing its conclusions, despite engaging with Plaintiffs' counsel (who offered to make Plaintiffs available for interviews), and only considered a single 30-minute period during which the viral photograph of a CBP officer grabbing Plaintiff Mirard Joseph was captured. This one-sided and woefully incomplete investigation provides further support for Plaintiffs' assertion that Defendants will continue their unlawful actions toward Plaintiffs and class members.

246.    In conducting their investigation, Defendant CBP only spoke with law enforcement officials and one reporter who declined to provide a full account of what he saw because "he didn't want to get anyone in trouble." Then-CBP Commissioner Magnus told the press that CBP did not interview migrants because they could not locate them, despite the fact that many were in immigration custody during the pendency of the investigation and Individual Plaintiffs had offered to provide testimony. At the press conference announcing the report's conclusions, Commissioner Magnus lauded the "incredible humanitarian . . . efforts" of CBP agents in Del Rio.

247.    The CBP Report (hereafter, "Report") also provides further evidence of Defendants' animus toward Haitians. In interviews, CBP officers repeatedly invoke their fear of a

---

Circuit stayed the district court order pending appeal. No. 23-16032, Dkt. 21 (9th Cir. August 3, 2023). The appeal is currently in abeyance. No. 23-16032, Dkt. 84, 2024 WL 725502 (9th Cir. Feb. 21, 2024). The Asylum Ban is therefore currently in effect.

[35] The Department of Homeland Security U.S. Customs and Border Protection, Office of Professional Responsibility, Report of Investigation, 202112280, https://www.docdroid.net/WVVPGAy/202112280-cbp-closing-report-public-redacted-final-pdf (hereinafter, "Report").

"riot," despite no evidence of any such danger—indeed, CBP admits in the Report that there was no threat from any of the Haitians at the river. This unfounded and racist fear of riots is also reflected in statements by leadership and motivated CBP's decisions that led to the assault and terrorizing of Plaintiff Mirard and others.[36] CBP likewise whitewashed racist comments by a CBP officer, which were caught on camera and widely circulated, as merely "act[ing] in an unprofessional manner," minimizing and eliding the degrading nature of these comments. Indeed, even in drafting the Report, CBP engaged in further dehumanizing language regarding Haitians in the Encampment.

248.    Despite the significant deficiencies of CBP's investigation and the animus reflected in the Report itself, the Report confirms key allegations from Plaintiffs' Complaint, including that conditions in the CBP Encampment were "dire" and that CBP officers understood class members to be in custody yet did not provide them with adequate food, water, or other basic needs.

249.    The Report also admits that officers were instructed to prevent putative class members from reaching the CBP Encampment and did in fact attempt to turn back people on U.S. soil in contravention of asylum law, "us[ing] force, or threats of force, to coerce or compel individuals to return to Mexico." CBP further states that they did so knowing that individuals were attempting to return to their starving families in the CBP Encampment and were in no way threatening. The Report admits that these attempted turn-backs were an unnecessary and unsafe show of force intended to achieve an unlawful goal of pushing Haitians back to Mexico, acknowledging that officers on horseback almost trampled multiple people, including children, while swinging reins and driving people into the water, and that officers grabbed Plaintiff Mirard Joseph while on horseback.[37] The Report further reveals that CBP Chief Ortiz spoke to involved

---

[36] *See, e.g.*, Report at 28; 42 ("Chief Ortiz was worried the migrants under the Del Rio POE would find out about the flights, causing an uprising.").

[37] Report at 5; Report at 3 (acknowledging that class members have due process rights and that forcing a migrant who has arrived on US soil back to Mexico violates these rights).

officers just before the incident occurred and that he accepted responsibility for officers' actions in the CBP Encampment.

250.    On information and belief, in the nearly two years since the Report was released, Defendants have engaged in no other meaningful review of the events at the CBP Encampment, nor have Defendants or their officers been held accountable for their misconduct.

251.    Defendants' apparent intent to continue deterring Haitian asylum seekers from accessing the United States asylum system is further evidenced by the fact that Defendants have continued to evade accountability for the constitutional and human rights abuses perpetrated at Del Rio. Because no Defendant has taken any appropriate corrective steps to ensure that those abuses and mass expulsions are not repeated, there are no safeguards to ensure that—when another large-scale migration event occurs again—the humanitarian crisis Defendants created in Del Rio is not repeated. As the local sheriff stated shortly after the CBP Encampment was cleared, "I've never seen anything like it [the CBP Encampment], but it's going to happen again." And indeed, due to the rapidly deteriorating conditions in Haiti at the time this Amended Complaint is filed, the U.S. government is considering expanding the notorious Guantanamo Bay detention facility in anticipation of potential large-scale migration from Haiti.

**E.    Defendants' actions and policies have harmed and continue to harm Individual Plaintiffs.**

252.    Defendants' adoption and implementation of the Del Rio Deterrence Decision, including through the application of the Title 42 Process, has caused Individual Plaintiffs and all other similarly situated individuals substantial, concrete, particularized, and irreparable injury.

253.    As detailed below, Individual Plaintiffs suffer ongoing harm from their treatment at the CBP Encampment and their unlawful expulsions to Haiti or Mexico. For example, for Individual Plaintiffs who entered on temporary, discretionary grants of humanitarian parole after November 6, 2022—including Plaintiffs Mirard Joseph, Madeleine Prospere, and Jacques Doe—Defendants' conduct at Del Rio has continued to harm them by making them ineligible to apply for TPS. Moreover, because many individuals unlawfully expelled from the CBP Encampment in

2021 intend to return to the United States to seek asylum—including Plaintiffs James Doe, Delgado Doe, Eric and Florence Doe, and Pierre and Ginette Doe—and because Defendants have taken no steps to remediate the human rights abuses that occurred in Del Rio (and in fact have reserved the right to resurrect the Title 42 Process), the harms detailed herein are likely to continue and recur if another large migration event develops. Even if Plaintiffs are able to come to the United States to seek asylum, they will be ineligible for the current designation of TPS.

254.    More broadly, the mass abuse and expulsion of Haitians from Del Rio in 2021, including the deportations in shackles that began at that time, continue to have a chilling effect on class members and other Haitians who would like to exercise their right to seek asylum in the United States. For example, the number of Haitian asylum seekers apprehended at the border since October 2021 is markedly lower than the number of apprehensions in the months leading up to September 2021. On information and belief, the specter of Del Rio remains for class members and other Haitians who would otherwise exercise their right to seek protection.

**1.    Plaintiffs Mirard Joseph and Madeleine Prospere**

255.    Mirard and Madeleine fled Haiti around 2017 in fear for their lives, escaping to Chile. They had a baby in Chile, but Mirard could not secure residency or work authorization there.[38] After months of instability in Chile, the family decided to travel to the United States to seek asylum. The arduous journey to Mexico took the family almost a month with their young child. While traveling, bandits robbed Mirard and Madeleine and took all their money and belongings.

256.    On or around September 11, 2021, Mirard, Madeleine, and their young daughter finally arrived in Del Rio. U.S. officials gave Mirard a blue ticket. He understood that the blue ticket was being assigned to families and meant he should wait until his number was called.

---

[38] In addition to the claims asserted in this Complaint, some Individual Plaintiffs have filed individual administrative claims based on the Federal Tort Claims Act.

257.    In the CBP Encampment, the family was forced to sleep on cardboard. Temperatures soared during the day and there was no shade. As a result, Mirard was severely sunburnt and dehydrated. The encampment was so dirty and dusty that their daughter developed respiratory and gastrointestinal issues that Mirard and Madeleine could not address until after they were expelled to Haiti and eventually fled to Chile. Mirard never saw or was aware of a doctor in the encampment who might assist his daughter.

258.    Mirard, Madeleine, and their daughter were given only water and bread, plus a single diaper each day. There was so little food available in the CBP Encampment that Mirard and others were forced to cross the river to Mexico to purchase food and water for their families.

259.    On or around September 18, 2021, when crossing back from Mexico with food for his family, Mirard was assaulted by a horse-mounted officer who lashed at him with reins, attempted to drag him back into the water, and nearly trampled him. This abuse has left him traumatized.

260.    Approximately two days after this trauma, officials transported Mirard, Madeleine, and their daughter to a detention facility. After being held there in conditions unfit for human life, U.S. immigration authorities called Mirard and his family, along with other detained Haitians, and handcuffed them and put shackles on their feet and waist. Madeleine, though shackled, was not handcuffed so that she could hold the baby. No authorities informed Mirard and Madeline where they were being taken when they were forced onto a plane and expelled to Haiti. Neither Mirard nor Madeline had ever been given an opportunity to seek asylum or otherwise explain why they feared being sent back to Haiti.

261.    When expelled back to Haiti in September 2021, life for Mirard and Madeleine was incredibly difficult. Their child was very sick from an illness she developed in the CBP Encampment, and they feared she would die, but they could not seek medical treatment for her because there were no hospitals or medical clinics operating in the neighborhood. The couple was forced to ask for money from extended relatives in the United States so that Madeleine and their

daughter could travel to Chile in December 2021, where Madeleine was able to take their daughter to a hospital for treatment.

262.    Mirard remained in hiding in Haiti after Madeleine and their child left for Chile, but he was soon compelled to search for ways to leave Haiti himself. In the spring of 2022, a photojournalist came to Port-au-Prince to interview Mirard and take photographs of him for an article, eventually published in TIME magazine, about Del Rio and the photograph of Mirard that went viral during media coverage of Del Rio. After the photojournalist's visit, members of the gang operating in Mirard's neighborhood visited him multiple times and tried to extort money from him, on the assumption that a white visitor with fancy camera equipment had brought him money. When he said he had no money, they began demanding that he join the gang and threatened violence against him. Because of these threats, Mirard was forced to flee to a different, more remote neighborhood and eventually wrote a friend in Chile begging for help. The friend agreed to buy Mirard a plane ticket to Chile, but only if Mirard promised to pay him back. After flying to Chile in May 2022, Mirard was able to finish repaying his friend after approximately one year.

263.    Life in Chile was challenging for Mirard's family. Mirard did not have legal status in Chile, so he was not able to work legally and secure a regular job to help support the family. Madeleine had permanent residence in Chile and was therefore able to work, but her income was often not enough for the family. Mirard was occasionally able to find night jobs where he could work without papers, but these jobs were risky because he had been accosted multiple times at night on his way home by Chileans who assaulted him and attempted to rob him because he is Haitian. Mirard's experience is not unique; Haitians suffer widespread discrimination in Chile, and many Haitians have been killed or assaulted for the color of their skin, with no legal repercussions for the perpetrators. Mirard constantly tried to avoid encounters with Chileans because if you're Haitian, "you'll always be the one who's wrong." He considered traveling back to the United States to seek asylum, but his first attempt to do so—which led him to Del Rio in September 2021—caused him so much suffering that he decided not to take the risk of traveling to the U.S. Southern Border again.

264.    Instead, Mirard applied for Haitian parole through a U.S.-citizen sponsor in order to seek asylum in the United States. On or around October 2023, Mirard, Madeleine, and their child came to the United States through this parole program. They are working on their Form I-589 Applications for Asylum and Withholding of Removal to seek permanent protection in the United States.

265.    If Mirard and Madeleine had not been expelled back to Haiti in September 2021 pursuant to the Del Rio Deterrence Decision and the Title 42 Process, and instead been allowed to access the U.S. asylum process as the INA allows, they could have sought humanitarian parole into the United States under a Title 42 exemption and filed asylum applications. If they had been paroled into the United States during the pendency of their asylum application, they would have been eligible for TPS. Because they entered in October 2023, they are not eligible for TPS.

### 2.    Plaintiffs Mayco ("Michael") Celon and Veronique Cassonell

266.    Michael's family fled Haiti when he was only fifteen years old after the murder of his mother and lived in the Dominican Republic and then in Chile for over two decades. During that time, Michael and Veronique married and had two children. Michael, Veronique, and their children—now ages two and eight—fled Chile after conditions became extremely difficult for Haitians, who were being targeted there for violence and discrimination.

267.    After crossing the river in mid-September 2021 to seek asylum near Del Rio, Michael and his family experienced deplorable conditions at the CBP Encampment. U.S. officials provided very little food and water to Michael's family. Michael and Veronique often gave what little they received to their children. Michael saw fellow migrants pass out from thirst, heat, and hunger. "After days of being outside like that I realized I couldn't stay there anymore and thought about returning back to Mexico."

268.    In the CBP Encampment, migrants were using their own clothes to shade themselves from the sun and to sleep on the ground. In the morning, officers would yell "wake up, wake up" and kick migrants to awaken them. When people complained about the sun, asked about the availability of food and water, or asked when they would be processed, officers would yell and

tell them to "sit down and shut up." Michael saw U.S. officials handcuff other migrants, seemingly because they had been asking questions. He also saw mounted officers using reins as whips against people in the river. He felt like the officers did not treat the Haitians in the encampment as people.

269.    After about three days in the CBP Encampment, Michael was given a numbered ticket. Other Haitians in the CBP Encampment had explained to Michael that he had to wait to receive a ticket, and then wait for his ticket number to be called in order to be interviewed about his case and either remain in the United States or be deported.

270.    About a week later, Michael, Veronique, and their two children had their number called and they were taken to a detention facility. After being separated and detained for over one week, Michael and Veronique were shackled and expelled to Haiti with their children.

271.    After being expelled to Haiti, Michael and his wife did not have enough money to feed their family. One of their daughters became ill from drinking Haiti's contaminated water, and the family was unable to obtain medical care for her due to the country's instability. While back in Haiti, Michael expressed extreme fear for his and his family's safety. "Ever since I've been here I've been fearing for my life. I'm in hiding. I'm at risk every day."

272.    Michael and his family returned to Chile, where they faced discrimination and threats because of their race and Haitian nationality. On or around July 12, 2022, Michael and Veronique, along with their two children and nephew, were paroled into the United States under INA § 212(d)(5) at Hidalgo, Texas. Michael, Veronique, and their children have filed their Form I-589 Applications for Asylum and Withholding of Removal and continue to seek permanent protection in the United States.

### 3.    Plaintiff Jacques Doe

273.    Jacques is a former trade student and construction worker. He fled Haiti in 2019 after a gang threatened his life when he refused their recruitment efforts and reported them to the police. After initially seeking safety in Brazil, he undertook an arduous journey to seek asylum in the United States, sometimes walking up to 40 miles at a stretch.

274.    When he finally arrived in Del Rio on or about September 17, 2021, U.S. officials gave Jacques a numbered ticket. Other asylum seekers in the CBP Encampment told him that if officials called his number, he would need to identify himself to them. Although Jacques knew that people whose numbers were called were taken to prison, he thought that in prison he would be able to ask for a lawyer and get an interview with an immigration official, who would hear why he left Haiti and decide whether he could stay in the United States. He spent approximately one week in the CBP Encampment, waiting for his number to be called. Because officers called ticket numbers at all hours of the night and day, he often stayed awake at night so that he would not miss his number being called.

275.    While in the CBP Encampment, Jacques and other asylum seekers had no choice but to sleep on the ground. Some resorted to cleaning themselves in the river because there was no other option, but he saw people get sick from the river water. "A lot of people were sick. That's what shocked me the most."

276.    Apart from the riverbank, U.S. officials typically did not allow Jacques or others to go anywhere else. But there was not enough food in the encampment: "People were starving there." During the week Jacques spent in Del Rio, U.S. officials gave him only two small sandwiches and two bottles of water per day. The bottles of water were left out in the hot sun, so whenever he got one, the water was so hot it burned his mouth. When Jacques asked for more food, U.S. officials turned him away.

277.    After approximately one week in the CBP Encampment, U.S. officials called Jacques's ticket number in the middle of the night. He was relieved to have his number called, because he thought his chance to ask for asylum had finally come.

278.    Instead, Jacques was sent to two detention facilities. U.S. officials conducted a short interview and took his biometrics, but at no point did they ask him if he was afraid to return to Haiti or if he intended to seek asylum in the United States. Nor was he allowed to ask questions or say anything other than answer the officials' questions. At the second detention facility, the officials did not provide Jacques with bedding, a change of clothing, or an opportunity to shower

or brush his teeth. Jacques slept on the floor with around thirty other individuals. Generally, he was given only two pieces of bread and two water bottles each day.

279.    After Jacques had been detained for approximately four days at the second facility, U.S. officials woke him up at midnight and placed him on a bus. They refused to tell Jacques where they were being taken. When Jacques asked whether he was being taken back to Haiti, U.S. officials said no. "They lied to us." Jacques did not realize he was being expelled to Haiti until he was shackled with chains across his ankles, thighs, and hands and put on the airplane. "It was absolutely terrible; I couldn't do anything. The situation made me cry. I felt helpless." When he realized that he was being deported, Jacques tried to tell officials on the plane that he could not return to Haiti because he faced danger there. But the officials said there were too many Haitians in the United States, so he had to go back.

280.    When Jacques landed in Haiti, he was terrified that the gang would find out he was back and carry out their death threats. He immediately went into hiding. His expulsion from the United States left him traumatized, and he struggled to resist the urge to engage in self-harm after his experience in Del Rio. He was unable to find consistent work, partly because he had to remain in hiding due to the threats against his life, but also because there are very few job opportunities in Haiti. When Jacques was unable to find or pay for food, he simply did not eat. He could not provide for himself or for his sick mother, which further affected his mental health. He rarely saw any friends because sharing his location could put not only himself but also his friends at risk from the gang. When Jacques became sick with a bad flu he contracted after being expelled, he was unable to seek medical treatment.

281.    Jacques applied for Haitian parole through a U.S. sponsor to seek asylum in the United States and entered the United States in about October 2023 through this program. He is working on his Form I-589 Application for Asylum and Withholding of Removal to seek permanent protection in the United States but remains ineligible for TPS.

282.    If Jacques had not been expelled back to Haiti in September 2021 pursuant to the Del Rio Deterrence Decision and the Title 42 Process, and instead been allowed to access the U.S.

asylum process as the INA allows, he could have sought humanitarian parole under a Title 42 exemption and filed an asylum application. If he had been paroled into the United States during the pendency of his asylum application, he would have been eligible for TPS. Because he entered in October 2023, he is not eligible for TPS.

### 4.    Plaintiffs Esther and Emmanuel Doe

283.    Esther fled Haiti in 2017 due to threats to her life because of her family's political connections. After Esther's family suffered home invasions and threats of violence from a gang supporting a rival political party, Esther's father decided to send her to Chile for her own safety. Emmanuel joined her there in 2018.

284.    Esther and Emmanuel lived in Chile and had a baby there. They struggled to survive in Chile, where they were unable to obtain permanent residence, and also faced repeated threats and extortion from drug dealers who targeted them because they were Haitian. Esther and Emmanuel decided to seek asylum in the United States, where they hoped that they could build a new life with their child.

285.    On or about September 18, 2021, Esther, Emmanuel, and their then-fifteen month-old son crossed the U.S. border near Del Rio. When they arrived at the CBP Encampment, a U.S. immigration official gave them a numbered ticket. They observed that U.S. officials would call out numbers, and people with those numbers on their tickets would identify themselves and be taken away from the camp. Esther and Emmanuel believed that when their number was called, they could request the opportunity to remain in the United States.

286.    In the CBP Encampment, the family slept on the ground and their son became sick with diarrhea and fever. U.S. officials distributed almost no baby-appropriate food, and Esther's son went hungry. Despite her fear of Mexican immigration officials, Esther crossed the river alone because she was desperate to find food for her sick and hungry son.

287.    Esther bought what she could on the Mexico side of the river and tried to hurry back to the encampment. But when she was in the middle of crossing the river, she was charged by CBP officers on horseback yelling, "Go back to Mexico!" Although she shouted in English that

she had a baby who was in the CBP Encampment, they told her "no, go back to Mexico." She had to run backwards towards Mexico to avoid being trampled by the horses. It was only because the officers then turned their horses to chase other migrants in the river that Esther was able to pass by them and reunite with her family.

288.    For several more days in the encampment, Esther, Emmanuel, and her family slept on the ground and went hungry. Her son had constant diarrhea and developed a high fever. Eventually Esther's son was so ill that she twice sought help at a medical tent where there were personnel who appeared to be doctors. Visiting the doctors was an incredibly hurtful experience for Esther, because the medical personnel treated her baby "like he was nothing." Instead of paying attention to and treating her son, they taunted Esther by asking when her number would be called so that she would be put in jail and then deported. Eventually they gave her some liquid drops and some ice gel packs for her son's fever, but they did not appear to help.

289.    Esther and Emmanuel saw the numbers in the encampment dwindle as people's numbers were called and they were taken away. Finally, Esther and Emmanuel were awoken early in the morning by officials calling for people to get on the "last" bus. It was clear that officials were trying to clear the encampment. But they were afraid of being sent back to Haiti because of the threats of violence made against their family, and knew it was safer for them to cross the river back to Mexico than to get on the bus and be expelled.

290.    After crossing the river back into Mexico, Esther, Emmanuel, and their son lived in precarious conditions in Mexico. Emmanuel was attacked at knifepoint, and Esther felt very visible, and vulnerable, as a Haitian in the Mexican town where they were renting a room.

291.    On or around April 24, 2022, Esther and Emmanuel, along with their child, received temporary, discretionary grants of humanitarian parole into the United States under INA § 212(d)(5) at Hidalgo, Texas. Esther and Emmanuel have filed their Form I-589 Applications for Asylum and Withholding of Removal and continue to seek permanent protection in the United States.

### 5.    Plaintiffs Samuel and Samentha Doe

292.    Samuel is a primary school teacher and credit union employee who fled Haiti in 2016 after being attacked by a rival political party and receiving death threats by armed men at his workplace. After seeking safety in Chile, he saved enough money for his wife Samentha and their son to join him. Samuel, Samentha, and their family struggled in Chile, where they faced discrimination. Around July 2021, Samuel, Samentha, their eight-year-old son, and their one-year-old daughter, who was born in Chile, began their journey to the United States to seek asylum.

293.    On or around September 16, 2021, the family arrived at the CBP Encampment. U.S. officials gave Samuel a numbered ticket and told him to go with the officials when his number was called. He believed that would be his opportunity to speak with U.S. immigration officials.

294.    While in the CBP Encampment, Samuel and his family struggled. Because there was no shelter from the extreme sun, wind, and large amounts of dirt in the air, people had to search for branches to create shade for themselves. His family slept on the ground.

295.    The family also suffered from the lack of food at the encampment. When Samuel and his family first arrived, there was no food available for them to eat. As U.S. officials began handing out food and water, Samuel waited in line with hundreds of others to receive a bottle of water and a piece of bread or tortilla. As he waited for food, Samuel observed that the officials distributing the food taunted the asylum seekers by throwing water bottles at them. Samuel recalls, "It was humiliating. It felt like at home how you would throw food for chickens on the floor. That's how they treated us." The food that his family received in the CBP Encampment was not enough to sustain them. "It felt like they did enough so we wouldn't die no more than that. It felt like a nightmare."

296.    Because of the wind and large amounts of dirt in the air, Samuel and Samentha's young daughter became very sick with diarrhea, vomiting, and coughing. She became so ill that Samuel pleaded for help from a U.S. official at the encampment. The official said they could not help them and suggested Samuel give his daughter water.

297.    As Samuel and his family waited longer in the CBP Encampment, they began to fear what would happen when their number was called. Samuel and Samentha had heard that people who had their numbers called went to be processed by immigration officials thinking that they were going to be released, but instead were sent back to Haiti. Samuel knew that if his family was returned to Haiti, they would die there.

298.    Samuel took their eight-year-old son to the river to clean himself. Officers on horseback showed up and chased after the migrants by the river. Terrified, Samuel's son ran from the horses, fell, and injured his eye, which then became painfully inflamed. After seeing mounted officers charge at migrants returning from Mexico with food, Samuel knew that his family had to leave the CBP Encampment as quickly as possible to protect his children.

299.    Given how ill their children were, the lack of food in the CBP Encampment, their encounter with mounted officers, and the possibility of being expelled to danger in Haiti, Samuel and Samentha felt their only choice was to cross the river back into Mexico. At no point while they were in the CBP Encampment did Samuel or Samentha have an opportunity to tell U.S. immigration officials that they were afraid to return to Haiti and wished to seek asylum.

300.    After initially staying at a shelter in Mexico, Samuel, Samentha, and their children were expelled from the shelter. They continued to live in precarious conditions in Mexico. Samuel's son suffered from the painful eye condition he developed in the CBP Encampment. Samuel and Samentha feared that if their family returned to Haiti, they would be killed. "If we were to go back to Haiti, we are 99.9 percent dead. So there was no way I would take that risk."

301.    On or around April 23, 2022, Samuel, Samentha, and their two children received temporary, discretionary grants of humanitarian parole into the United States under INA § 212(d)(5) at Hidalgo, Texas. They have applied for asylum and continue to seek permanent protection in the United States.

### 6.    Plaintiff Paul Doe

302.    Paul was pursuing a degree in economics in Haiti but was forced to flee the country in 2017 after a gang associated with a dominant political party threatened his life because Paul

refused to work for them to pay off an uncle's debt. The gang had killed Paul's uncle when he could not repay money he owed. Opposed to the gang's activities and unwilling to engage in their violence, Paul fled Haiti to seek safety in Chile. "I had to leave Haiti because I either had to be involved with the gang, or die. Those were my only two options."

303.    Paul traveled from Chile to the United States to seek asylum because it remains his hope that he can live without constant fear that he or his family might be attacked or killed. On or around September 17, 2021, Paul arrived at the CBP Encampment and was directed to a tent with officers who gave him a ticket with a number on it. They told him to wait under the bridge until his number was called. Other asylum seekers explained that Paul would be taken on a bus to a detention center when his number was called.

304.    For approximately the next week, Paul waited in the CBP Encampment for his number to be called. The conditions in the encampment were some of the hardest he has ever endured. Paul was forced to sleep on the ground in the dust without even a blanket. For the first several days Paul was at the CBP Encampment, officials gave him no more than a bottle of water and a tortilla each day. Often the water was undrinkable because it had been left sitting out in the sun. Around the fifth day, the officials began giving out a portion of rice and beans with the tortilla, and sometimes a box of juice. The food, however, gave him diarrhea, and when he sought medical treatment, a doctor only gave him a pill that had no effect. Paul soon noticed it appeared to be the same pill that the doctors gave to anyone seeking care. Although he continued to feel ill, Paul did not seek medical care because everyone was given the same pill, regardless of symptoms.

305.    Paul eventually became so hungry that he decided to cross the river to get food in Mexico. He also hoped to get medicine for a friend's sick baby. As Paul reached the river, he observed U.S. officers beating asylum seekers returning to the CBP Encampment and pushing them back into the river. When Paul attempted to cross using a rope that had been set up to aid migrants through the river, officers deliberately cut the rope, threw it back into the river, and told Paul and others that they could not cross. Paul was forced to walk and swim downstream until he could cross safely.

306.    Paul was never asked by U.S. immigration officials if he had a fear of return to Haiti or provided an opportunity to request asylum while in the CBP Encampment. As Paul started seeing people leave the encampment, he understood that they were being deported. A U.S. official told him that "the U.S. is not a money tree – you can't just come here and get money."

307.    Paul knew that if he were to be sent back to Haiti, the gang would kill him. He felt that he had no choice but to go back to Mexico and wait there for another opportunity to seek asylum in the United States. What troubles Paul most about his experience in the CBP Encampment is that a country he has dreamed about since he was child had humiliated him and so many others from his country, rather than providing them refuge.

308.    In Mexico, Paul regularly encountered discrimination. It was incredibly difficult for him to find a room to rent—after being denied by approximately ten people advertising rooms for rent, he finally found someone willing to rent to him. Paul was also unable to find work. He has applied to approximately six workplaces that advertised they were hiring, but when Paul applied, he was told they were no longer hiring. Without a job, Paul worried about how he would survive. He was stopped by the police multiple times and questioned about who he was and where he was going. As a result, he avoided going outside as much as possible.

309.    On or around May 12, 2022, Paul received a temporary, discretionary grant of humanitarian parole into the United States under INA § 212(d)(5) at Eagle Pass, Texas. He has applied for asylum and continues to seek permanent protection in the United States.

**7.    Plaintiffs Eric and Florence Doe**

310.    Eric Doe became involved in Haitian politics beginning in 2006, working for several political figures and parties in various roles over the years. He periodically was forced to flee to the Dominican Republic to escape threats by the political opposition but faced discrimination and violence there and was stabbed in the ribs with a knife. Eric eventually was appointed by the party running the local government to become an ambulance driver for the hospital. Members of PHTK, the rival political party that ran the national government, targeted

Eric, including shooting him in the leg and attempting to burn his house down. He eventually fled Haiti for Chile, where he was joined by his wife Florence Doe.

311.    Life in Chile was very hard for Eric and Florence. They had left their children in the care of relatives in Haiti because Eric had no immigration status in Chile, and, as a result, could not find a job. Moreover, he experienced a lot of discrimination there for being a Black Haitian man: "Chileans cursed our mothers, called us faggots, made us get off public transportation, and fought us." Eric and Florence left Chile for Mexico in 2017 and embarked on a difficult journey that took them through the Darién Gap, where they were attacked by men who raped many of the women and young girls in their group. It was very difficult for Eric to witness this. In Mexico, Eric and Florence's situation was also difficult and they could not get an asylum interview with the Mexican Commission for Refugee Assistance. After several challenging years, they decided to seek protection in the United States.

312.    On or around September 2021, Eric and Florence crossed the river from Mexico to Del Rio, Texas. It was a terrible experience for them. The water level was low when they began to cross, but it rose rapidly and picked up speed as they were crossing, and approximately five people near them were swept away and drowned right in front of them. Florence was almost swept away as well, but Eric was able to rescue her from the strong currents. Their clothes got ripped, and Eric lost the bag carrying their important documents.

313.    On the other side of the river, Eric and Florence didn't understand what was going on. U.S. officials did not explain what was happening or how to apply for asylum. They saw people getting picked up by a little van, which they thought was how they would get processed into the United States and have the opportunity to explain why they could not go back to Haiti.

314.    Eric and Florence waited in the CBP Encampment for approximately six days with many other Haitians. The conditions were very poor. Florence had thought that after so much suffering, they would finally have some relief when they arrived in the United States. But she was shocked at how bad the conditions were in the CBP Encampment. There wasn't adequate drinking water or food. Sometimes U.S. officials passed out juice and crackers, but there was not enough

to feed everyone. Eric and Florence were often hungry and thirsty. There were no facilities that they could see to bathe or go to the bathroom. They could not even brush their teeth. There was also nothing for Eric and Florence to sleep on, and they were exposed to mosquitoes and desert animals.

315.    Eric and Florence could not cross back across the river to find food because government officials with batons prevented them from doing so. Florence witnessed women deliver babies under the bridge and law enforcement officers on horses dragging people. Eric felt like he and his wife were trapped in the CBP Encampment.

316.    After around six miserable days, U.S. officials put Eric, Florence, and many others in a van. U.S. officials never told Eric or Florence where they were going. Eric and Florence arrived at a detention facility, where officials separated them as they were placing women with women and men with men. Florence was not feeling well and started crying. They were at this detention facility, separated and confused about what was happening, for about two weeks.

317.    Eric and Florence expected officials at the detention facility to provide them with a translator so that they could explain why they could not go back to Haiti. Instead, one day without any explanation, officials chained their legs, waist, and arms. U.S. officials placed Eric, Florence, and others in a van and drove them to an airport. U.S. officials never told Eric and Florence where they were going. It was not until the plane landed in Haiti that they realized they had been deported. It was a shock for both of them. Eric and Florence never had an opportunity to express their fear of returning to Haiti or their intention to seek refuge in the United States, or to seek any other form of immigration relief. They still want this opportunity.

318.    Upon being expelled to Haiti, Eric and Florence returned to their hometown of Gonaïves, where they reunited with their children, and went into hiding. However, members of PHTK continued to target Eric and his brothers. In August 2022, PHTK members violently assaulted one of Eric's brothers and broke his leg. In January 2024, armed men came to Eric and Florence's house looking for Eric. Florence, who was pregnant at the time, was home with her mother and the children. When the men discovered Eric was not there, they threatened to burn the

house down and burn Florence alive. After that incident, Florence fled to the countryside to protect herself and the children. Eric cannot join them because there are no job opportunities there. Eric and Florence both continue to live in hiding, constantly fearful for their family's safety.

### 8.     Plaintiffs Pierre and Ginette Doe

319.     Pierre was a plumber who fled Haiti in 2015 after receiving death threats for his role as a regional delegate in a political party. His brother, who had been targeted due to Pierre's political affiliation, went missing and is presumed dead. Pierre initially fled to the Dominican Republic, but he left for Chile after just two weeks because he feared being deported to Haiti when his visitor visa expired. In Chile, Pierre met and married his wife Ginette and had a child. In 2021, after Ginette and their young son were attacked in their home and faced repeated threats from their neighbors without response from local police, Pierre and his family decided to seek asylum in the United States.

320.     On or around September 2021, the family arrived at the CBP Encampment. An immigration officer provided them with a numbered ticket.

321.     During an approximately three-day wait, the family attempted to find shelter under the Del Rio Bridge, but the conditions proved to be harsh. They were forced to sleep on the sandy ground. Pierre laid his shirt on the ground for their child to sleep on. U.S. officials failed to supply them with food or water, prompting Pierre to cross the river back into Mexico to get some food for their starving child.

322.     When their number was finally called, the family was put on a bus and taken to a detention center. At the facility, they slept on the floor with only a tinfoil blanket to shield themselves from a cold and windy fan. Neither Pierre nor Ginette was able to brush their teeth or take a shower. In addition to a meager lunch offering, each of them received only two pieces of bread two times a day for breakfast and dinner. Pierre and Ginette gave their child their lunches, themselves subsisting solely on the pieces of bread. Pierre describes the detention center as "one of the worst things I have ever experienced."

323.    After approximately seven days in the detention center, U.S. officials abruptly and without warning transported the family to an airport in San Antonio, Texas. There, Pierre was handcuffed, and the entire family was placed on a plane bound for Haiti. Pierre believes that the traumatic sight of seeing his parent handcuffed continues to cause his son severe emotional distress. Pierre never had the chance to ask for protection in the United States: "No one asked me any questions; I was just handcuffed and sent to Haiti."

324.    Upon their return to Haiti, on or about September 19, 2021, the family needed to seek medical care because of the adverse health effects they developed from their time at the detention center. Since neither of them were able to tend to their personal hygiene needs, Ginette had to be treated for an infection and Pierre's lips experienced severe peeling, leaving him unable to eat for several days. In addition, their son developed bronchitis due to the harsh detention conditions.

325.    Fearing a resurgence of threats from the political opponents who had previously targeted Pierre, the family fled back to Chile in December 2021. However, they remain in constant fear for their safety and that of their son and baby. Ginette lives in a different part of Chile than Pierre because the attack she previously endured there continues to traumatize her. Pierre is afraid of exposing his family to more threats in Chile because they have been targeted before. The family still wishes to seek protection in the United States.

### 9.    Plaintiff James Doe

326.    James used to be a student who volunteered on the political campaign of a parliamentary candidate. James fled Haiti for Argentina in 2016 because he feared for his safety due to his involvement in politics. In Argentina, James faced constant discrimination for being Black and a foreigner. In 2021, James left Argentina to seek safety in the United States. He made the grueling journey through South and Central America with his cousins and several friends. They were robbed of all their belongings, and James was physically assaulted. Around early August 2021, they arrived to Tapachula, in southern Mexico. The conditions in Mexico were difficult—

James felt unsafe and struggled to meet his basic needs. For about a month, they made the challenging journey through Mexico to Ciudad Acuña, Mexico, at the U.S.-Mexico border.

327.    James arrived at Ciudad Acuña on approximately September 4 or 5, 2021, and crossed the river into Del Rio, Texas. Many other people were gathered under the bridge when James arrived. A U.S. immigration official gave him a numbered ticket and explained that he should wait until his number was called. James expected that when his number was called, he would be able to explain to U.S. officials why he was seeking safety in the United States. He hoped to reunite with his brother-in-law, a U.S. citizen who lived in Orlando, Florida and was willing to take him in.

328.    The conditions under the bridge were dire. James received some water and food, but it was not enough. James observed that some people had tents, while others put together makeshift shelters out of sheets or leaves. It was extremely hot, and James would try to find shade in the bushes or trees. Helicopters would occasionally fly near the CBP Encampment, causing strong winds that kicked up a lot of dust. There were some portable toilets, but not nearly enough for all the people there, so James would relieve himself in the bushes. James feared he would get sick in these unsanitary and exposed conditions.

329.    As James explains, "I never imagined I would have to endure such poor conditions in the United States for so long." At one point, James began to get desperate and started to lose hope of his number being called and considered trying to leave to cross back into Mexico. However, James saw that officers on horses were preventing people from crossing the river back into Mexico, so he did not think he would be able to leave if he tried.

330.    Around September 14 or 15, 2021, James's number was called. James approached the U.S. officials, who put him on a bus with many others. After a few hours, the bus arrived at a detention center, where U.S. officials threw away all of James's belongings, including his clothes and toothbrush. They made James remove his belt and hand over his documents, and he was not allowed a shower or given a toothbrush. While James was stressed to be in these conditions, he

expected that eventually he would have a chance to explain his situation and ultimately would be released from detention and allowed to be safely reunited with his brother-in-law in Florida.

331.    After about eight days, officials put James on a bus to another detention center, where he spent about six days. Then, officials took him by bus to a third detention center for one day. He was surprised to be detained for so long and began to lose hope. When James asked U.S. immigration officials what was happening to him, they told him that he was being detained and to wait and see what happened. James wanted to explain his story, but there was never the opportunity; upon initially detaining James, U.S. officials performed intake procedures, like taking his fingerprints and making him take off his clothes, but there was no chance to tell them about his specific situation or why he was afraid to go back to Haiti. One official in the detention center told James to get a lawyer, so he called his brother-in-law for help, but before his brother-in-law was able to find and connect James with a lawyer, James was deported back to Haiti.

332.    At the third detention center, U.S. officials put chains around James's wrists, waist, and ankles, and put him on a bus along with many others to an airport. He was not told they were going; James assumed he was being transported to another detention facility, perhaps in another state.

333.    When the plane landed, James was shocked to realize that he was in Haiti. He was never told that he would be deported, and he never expected that would happen. Throughout his time in the CBP Encampment and in detention, he wanted to tell U.S. immigration officials his story so they could help him, but he never got the chance. He never had the opportunity to explain to U.S. officials his fear of return to Haiti or ask for asylum. He still wants the opportunity to do so.

334.    Upon landing in Port-au-Prince, officials removed James's shackles and gave him an envelope with some of the documents he had handed over to U.S. officials previously. However, he noticed his passport was missing, so he later emailed the detention facility to ask about his passport. His passport was never returned to him.

335.    Having nowhere else to go, James went back to his hometown to live with his mother. He was very worried about reintegrating after being away for five years. Since his return, he has been unable to find a job. He continues to fear threats from the opposing political party, which initially led him to flee Haiti, so he has not participated in any political activity since being returned. In his hometown, there is a heavy gang presence and lots of kidnappings so he cannot go too far from home. A friend's brother was kidnapped in December 2023, and he has not been heard from since. James worries he could be kidnapped, too: "Every time I leave home, arrive at my destination, and then return home safely, I thank God." Because of these risks, since being expelled to Haiti, James has remained living virtually in hiding.

### 10.    Plaintiff Delgado Doe

336.    Delgado used to run a small barber shop and beauty salon in his hometown in Haiti. Around 2020, Delgado fled Haiti for Chile after he previously was threatened and shot at for working on his cousin's political campaign and because he feared the powerful and violent gangs in Haiti. His life was difficult in Chile because he faced discrimination as a Black man.

337.    Delgado left Chile to seek protection in the United States in approximately August 2021. He crossed the river into Del Rio, Texas, in September 2021. When he crossed the river, he saw that other people were having problems crossing the river and were almost getting swept away in the water. Many of the people attempting to cross the river, including Delgado, would reach out to help the people struggling to get across safely.

338.    U.S. officials at the border gave Delgado a colored card with a number on it. He spent about nine or ten days in the CBP Encampment, but his number was never called. The conditions Delgado experienced under the bridge were horrible. The dust was everywhere, and the wind was really strong. Sometimes Delgado had to bend over to walk because the wind was so strong. He slept on the ground with no protection from the dust, no blanket, and no tent. He only had a small bag to put under his head to use as a pillow. He developed a cough from the dust. There were some bathrooms but not enough for everyone. There were no showers, so Delgado had to wash in the river.

339.    Delgado received no food or water from U.S. officials. U.S. officials provided some food and water, but there were so many people waiting in line that there was not enough for everyone. Delgado had to rely on other people under the bridge for food and sometimes went hungry. He would give money to people who would cross the river back into Mexico and buy him food. Delgado did not attempt to cross the river himself to get food because he had friends tell him that U.S. officials on horseback said they were not supposed to cross back into Mexico. If a U.S. official said not do to something, Delgado would not do it. While Delgado was under the bridge, he saw officers on horseback chasing people, and he believes this is because those people were trying to cross back to Mexico to buy food.

340.    Delgado became afraid under the bridge because he learned from friends whose numbers had been called by the U.S. officials that they were deported back to Haiti. He was really scared to be sent back to Haiti. When he realized that people whose numbers were called were being deported without the chance to ask for asylum, he felt that he had no choice but to cross the river back into Mexico. Delgado never had a chance to explain his fear of return to Haiti or to ask for asylum. He was going to tell the U.S. immigration officials, but there was never an opportunity.

341.    Delgado returned to the United States and tried to ask for protection there a second time in February 2022. He was detained by U.S. officials for approximately one week. An immigration officer only asked Delgado if he was Haitian and did not give him an opportunity to talk about his fear of being returned to Haiti. He wanted to ask for asylum but did not have the chance. The immigration officers did not explain anything or give him any papers. They put him in a vehicle; shackled his wrists, waist, and ankles, making Delgado feel as if he was a criminal; and sent him on a plane back to Haiti.

342.    Since Delgado was deported back to Haiti in February 2022, he has not returned to his hometown because he is afraid that the same people that previously threatened to harm him will do so again. He is living in Port-au-Prince and is still constantly fearful for his safety and the safety of his new wife and their newborn child. Sometimes Delgado has to move around or go into hiding at a friend's house because there are shootings and kidnappings by gangs near where he

lives. Delgado never had the chance to ask for asylum protection or other immigration relief in the United States and still wants this opportunity.

**F.    Defendants' actions and policies have harmed and continue to harm Organizational Plaintiff Haitian Bridge.**

343.    The application of Del Rio Deterrence Decision and the Title 42 Process to Haitian asylum seekers in the CBP Encampment impaired Haitian Bridge's normal programming and resulted in a diversion of organizational and programmatic resources.

344.    The abuse of Haitians in Del Rio put severe strain on Haitian Bridge's ability to carry out its work and mission. Haitian Bridge was and remains one of the primary organizations at the center of the massive humanitarian and legal response to the detention, inhumane treatment, and unlawful expulsion of thousands of Haitian and other Black migrants in the CBP Encampment pursuant to the Title 42 Process and Del Rio Deterrence Decision. At the time of the crisis in Del Rio, Haitian Bridge diverted six of its nine full-time staff and one full-time contractor to respond. HBA and its staff has continued to need to shift its operations and programs as a consequence of the Del Rio Deterrence Decision, and continues to devote staff time and resources to supporting victims of the September 2021 expulsions in Del Rio in an effort to mitigate their ongoing harms.

345.    Following media reporting that thousands of Haitians were coming to Del Rio to seek immigration relief, Haitian Bridge's Executive Director Guerline Jozef arrived in Del Rio on September 18, 2021. She was the first responder to the crisis; no other humanitarian organization was present on the ground at that time.

346.    As the first responder, and as a Haitian Creole-speaking organization with Haitian staff, Haitian Bridge was compelled to devote substantial resources to provide and coordinate assistance to the thousands of migrants in Del Rio. Haitian Bridge quickly sent staff to Del Rio. Although Defendants did not allow any of these staff to enter the CBP Encampment to directly assist asylum seekers, Haitian Bridge's staff worked quickly to organize an on-the-ground emergency response. Haitian Bridge coordinated culturally sensitive humanitarian services and transportation for the few individuals permitted to leave Del Rio and arranged support in Haiti to

receive the thousands of asylum seekers being expelled there. It also coordinated communications inquiries with the media and received members of Congress, Haitian-American elected officials, and members of Haitian consulates seeking to protect the interests of Haitian nationals. Haitian Bridge staff organized and led advocacy efforts with the federal government in an unsuccessful attempt to slow or stop expulsion flights and to develop a more humane response that safeguarded the rights of Haitians in the CBP Encampment and in detention facilities.

347.    On September 24, 2021, Secretary Mayorkas announced that there were no longer any migrants in the CBP Encampment. But DHS Defendants' mass expulsion of thousands of asylum seekers did not end Haitian Bridge's response work. Even after the encampment was cleared, Haitian Bridge staff continued to receive delegations of Haitians and other Black leaders in Del Rio. The numerous human rights violations that Haitian Bridge staff observed at and around the CBP Encampment, including physical assaults and the denial of basic necessities to Haitian asylum seekers, compelled Haitian Bridge staff to travel to Ciudad Acuña and elsewhere in Mexico to interview individuals and gather evidence of these human rights violations.

348.    In the immediate aftermath of the clearing of the CBP Encampment, several Haitian Bridge staff members worked in excess of 80–100 hours a week for several weeks and lost several nights of sleep because of additional work from the crisis in Del Rio. Many of Haitian Bridge's core projects were delayed since the government began detaining and expelling asylum seekers from the CBP Encampment in mid-September 2021. Haitian Bridge staff members responding to the abuses in Del Rio, particularly Black staff members, have suffered and continue to suffer trauma from the brutal anti-Black racist treatment and injustice they witnessed in Del Rio.

349.    The need to respond on an emergency basis to the treatment of Haitian migrants at Del Rio impaired Haitian Bridge's ability to keep up with existing demands for its services. For example, a key program component of Haitian Bridge's work involves assisting Haitians in the United States with their applications for Temporary Protected Status, which protects individuals from deportation and enables them to receive work authorization and permission to travel. But this work largely stalled in September 2021. Because it had to shift staff and other organizational

resources to respond to the crisis in Del Rio, Haitian Bridge was forced to postpone several clinics and could not move forward work in preparing a manual and trainings to enable lawyers and law school clinics to provide this assistance around the country. As a result, Haitian Bridge was unable to serve hundreds of people who would have otherwise benefited from its pro bono assistance with TPS applications, with serious adverse consequences for those individuals, who consequently were forced to secure other legal services, not necessarily pro bono, and were delayed in receiving work authorization.

350.    The events at the CBP Encampment and aftermath also strained Haitian Bridge's legal support and case management capacity. Haitian Bridge was forced to organize a national hotline to coordinate efforts and respond to hundreds of calls from Haitian asylum seekers in detention centers across the country and who had just been released from the CBP Encampment. In order to scale and staff this hotline, Haitian Bridge had to stall several ongoing projects.

351.    Even two and a half years after the events in Del Rio, Haitian Bridge continues to divert resources in response to the government's abusive actions. Haitian Bridge continues to provide legal and humanitarian support to affected individuals and respond to media inquiries and speaking requests related to Del Rio. This response effort continues to take a toll on Haitian Bridge, its staff, and their ability to advance Haitian Bridge's mission.

352.    Haitian Bridge continues to divert resources as a result of Defendants' unlawful conduct at issue in this case, which remains the biggest drain on Haitian Bridge's staff and finances. As a result of Defendants' conduct, the demand on Haitian Bridge's resources has increased in Mexico and along the southern border. If class members had been allowed to exercise their legal right to seek asylum when they first entered the United States in 2021, they would either have (1) remained in the U.S. while pursuing their asylum claims, resulting in many cases in a grant of asylum or a grant of TPS when Haiti was redesignated for TPS on December 2, 2022, or (2) been removed to Haiti after receiving an adjudication of their asylum application. Instead, many thousands of class members were expelled to Haiti and Mexico with no opportunity to access the U.S. asylum system.

353.    Haitian Bridge continues to regularly encounter class members who were expelled to Mexico, or expelled to Haiti and have since returned to Mexico, hoping to finally exercise the right to seek asylum denied to them in September 2021. Haitian Bridge must effectively serve the same population twice—once leading up to, during, and in the immediate aftermath of Del Rio; and again in the ensuing months and years, now that expelled individuals languish in Mexico or have left Haiti again to seek safety and stability elsewhere, including in the United States. Fielding inquiries from, and providing services to, this population takes a substantial amount of Haitian Bridge's resources due to the overall increase in demand for Haitian Bridge's services resulting from the mass expulsion and denial of rights to class members. These cases also require additional resources because class members often have more complicated cases as a result of their prior expulsion and suffer from increased trauma due to their treatment by Defendants in Del Rio. Many of these class members would likely not be once again in Haitian Bridge's service area if their rights had been respected at Del Rio, as they would either have been able to remain in the United States, receiving parole, asylum or TPS, or they would have received their due process and be subject to a five-year bar on entry to the U.S.

354.    Defendants' unlawful conduct has increased demand for services at the border and in Mexico, which has diverted significant resources from HBA's existing work. The core of HBA's funding and staffing for its legal and humanitarian programs center on service provision in California. However, because of the urgency created by Defendants' mass expulsion of Haitians to Mexico and Haiti, HBA has had to focus more time and resources, including of its leadership, on fielding inquiries from class members expelled to Haiti and Mexico and addressing egregious and urgent humanitarian and other conditions created by the unprecedented mass expulsion of Haitians. These efforts have drawn resources away from HBA's normal fundraising and administrative operations and has created delay in several key areas of HBA's existing work. For example, HBA experienced a significant delay in launching a long-planned community center in California for Haitian migrants. Similarly, HBA did not meet its benchmarks for providing legal

services in California while it continued to address the increased and urgent need for humanitarian and legal services of class members and other Haitians in Mexico.

355. HBA also experiences ongoing harm because of the primary and secondary trauma that HBA staff experienced at the CBP Encampment and in its aftermath. As the first NGO to arrive in Del Rio, and with many staff who are themselves Haitian, staff experienced trauma from what they witnessed in the CBP Encampment and its clearing. That trauma was compounded by the urgent demand for HBA's resources in the weeks and months following the CBP Encampment. HBA staff were unable to take the time to address their own direct and vicarious trauma because they were continuing to work around the clock to attempt to prevent unlawful expulsions, locate individuals and connect them with their loved ones, and bear witness to the manifold human rights abuses that Haitians had experienced and continued to experience in detention facilities and upon expulsion to Haiti and Mexico. HBA staff continue to experience the effects of burnout and trauma which in turn undermine their ability to most effectively do their work.

## CLASS ALLEGATIONS

356. Individual Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(1) and (b)(2) on behalf of themselves and a class of all other persons similarly situated. The proposed class is defined as all Haitian, or presumed Haitian, individuals who (1) sought access to the U.S. asylum process in or around the CBP Encampment near the Del Rio Port of Entry between September 9 and 24, 2021, and (2) were denied access to the U.S. asylum process.[39]

357. Individual Plaintiffs seek to represent the class for all claims.

358. This action meets all Rule 23(a) prerequisites for maintaining a class action.

359. The class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1). Between approximately September 9 to 24, 2021, at least 15,000 migrants, the

---

[39] As used in the proposed class definition, "asylum" and "asylum process" are understood to encompass the statutory and regulatory processes by which any noncitizen may seek all relevant forms of *non-refoulement* relief available under U.S. immigration laws, including asylum, withholding of removal, and relief under the Convention Against Torture. *See* 8 U.S.C. §§ 1158, 1231, 1231 note.

vast majority of whom were Haitian or Black and seeking asylum in the United States, arrived at the U.S. border and were detained in the CBP Encampment near the Del Rio Port of Entry. Pursuant to the Del Rio Deterrence Decision, DHS Defendants used the Title 42 Process to expel at least 10,000 asylum seekers in the encampment to Haiti or Mexico. Each of these individuals was deprived of access to the U.S. asylum process by Defendants' Del Rio Deterrence Decision and Title 42 Process. Joinder is made further impracticable because class members expelled to Haiti or Mexico generally do not have stable living conditions.

360.    There are questions of law and fact that are common to the class. *See* Fed. R. Civ. P. 23(a)(2). Class members allege common harms resulting from adoption and application of Defendants' Del Rio Deterrence Decision and from the Title 42 Process: all class members were seeking access to the U.S. asylum process, processed in the field pursuant to the CBP Capio Memo, deprived of basic necessities in the CBP Encampment, expelled to Haiti or Mexico, and denied legal rights, including their right to access the U.S. asylum process.

361.    All class members assert the same legal claims. These claims raise numerous questions of fact and law common to all class members, including but not limited to: whether Defendants engaged in the conduct alleged herein; whether class members were and are treated differently from similarly situated asylum seekers based on class members' race or nationality in violation of the Fifth Amendment; whether the application of the Del Rio Deterrence Decision and the Title 42 Process to class members was motivated by discriminatory intent on the basis of race or national origin, in violation of the Fifth Amendment; whether class members were deprived of their substantive and procedural due process rights under the Fifth Amendment by Defendants' application of the Del Rio Deterrence Decision and use of the Title 42 Process; whether Defendants failed to consider important issues, including the right to *non-refoulement* and the danger to human life and welfare resulting from field processing and expelling asylum seekers, when issuing and implementing the Del Rio Deterrence Decision and the Title 42 Process; whether Defendants failed to consider important issues or considered improper factors when applying the Del Rio Deterrence Decision and/or the Title 42 Process to class members; whether 42 U.S.C. § 265 authorizes the

summary expulsion of asylum seekers; whether application of the Del Rio Deterrence Decision to deny class members the ability to access the asylum system at Del Rio in September 2021 by, among other things, using the Title 42 process that was in place at that time conflicted with the INA; whether application of the Del Rio Deterrence Decision to class members using the Title 42 Process conflicted with FARRA; whether the summary expulsion of class members pursuant to the Del Rio Decision using the Title 42 Process violated the United States' *non-refoulement* obligations under the INA; whether class members suffer harm as a result of Defendants' conduct; and whether class members are entitled to equitable and declaratory relief. These shared common facts will ensure that judicial findings regarding the legality of the challenged practices will be the same for all class members.

362.    Individual Plaintiffs' claims are typical of the class's claims. *See* Fed. R. Civ. P. 23(a)(3). Individual Plaintiffs and class members raise common legal claims and are united in their interest and injury. All Individual Plaintiffs, like class members, are Haitians who crossed the U.S. border at Del Rio to seek asylum and were deprived of access to the U.S. asylum process by Defendants' actions. Like class members, Individual Plaintiffs were subjected to Defendants' Del Rio Deterrence Decision and Title 42 Process: they were processed in the field pursuant to the CBP Capio Memo, subjected to dire conditions and abuse in the CBP Encampment, and expelled to Haiti or Mexico without the opportunity to apply for asylum, as part of the federal government's overarching policy of preventing and disincentivizing Haitians as a group from seeking asylum in the United States.

363.    Individual Plaintiffs are also adequate representatives of the class. *See* Fed. R. Civ. P. 23(a)(4). Individual Plaintiffs and all class members share a common interest in ensuring that they are permitted to seek asylum under U.S. immigration laws without having their constitutional or statutory rights violated by Defendants. They also share a common interest in obtaining relief that would return them to the position they would have been in today had Defendants' unlawful conduct not occurred. Individual Plaintiffs also seek the same relief as the members of the class they represent. Individual Plaintiffs and class members seek, among other things, an order: (1)

declaring that the application of Defendants' Del Rio Deterrence Decision and the Title 42 Process to Individual Plaintiffs and class members was unlawful and violated their constitutional and statutory rights; (2) issuing appropriate declaratory and/or injunctive relief to put Individual Plaintiffs and class members in the same position they would be in had Defendants' unlawful conduct not occurred (such as, *e.g.*, relief ensuring meaningful access to the U.S. asylum system and removing residency-related barriers to Individual Plaintiffs' and class members' eligibility for TPS). Individual Plaintiffs have no interest that is now or may be antagonistic to the interests of the class and they will fairly and adequately protect the interests of class members as they defend their own rights.

364.    Individual Plaintiffs are represented by attorneys from Justice Action Center, Innovation Law Lab, Haitian Bridge Alliance, and Covington & Burling LLP. Counsel have demonstrated a commitment to protecting the rights and interests of noncitizens and, together, have considerable experience representing immigrants in complex and class action litigation in federal court aimed at systemic government misconduct.

365.    The class likewise meets the requirements to be certified under Rule 23(b).

366.    The class may be certified under Rule 23(b)(1) because prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications and would create incompatible standards of conduct for Defendants.

367.    The class may also be certified under Rule 23(b)(2). Defendants have acted, have threatened to act, and will act on grounds generally applicable to the class by subjecting them to the unlawful Del Rio Deterrence Decision and Title 42 Process, including field processing under the CBP Capio Memo; denial of adequate food, water, shelter, and medical treatment during such field processing; and expulsion to Haiti and Mexico. Given Defendants' common treatment of class members, final declaratory and/or injunctive relief is appropriate as to the class as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Violation of the Due Process Clause of the Fifth Amendment (Equal Protection)**
*All Plaintiffs Against President Biden and DHS Defendants*

368.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

369.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from denying to any person equal protection of the laws. U.S. Const. Amend. V.

370.    The Due Process Clause applies to all "persons" on United States soil and thus applied to Individual Plaintiffs and similarly situated individuals during the period they were subjected to the Defendants' Del Rio Deterrence Decision and the Title 42 Process in the United States, including field processing pursuant to the CBP Capio Memo.

371.    Defendants' Del Rio Deterrence Decision and Title 42 Process were implemented against Individual Plaintiffs and similarly situated individuals without regard for their health, welfare, humanitarian needs, or statutory rights. In Del Rio in September 2021, the implementation of each distinct policy resulted in Individual Plaintiffs' deprivation of basic necessities such as food, water, shelter, and medical care; the imposition of physical, verbal, and psychological abuse; and the use of threats, violence, and racial slurs.

372.    The adoption and implementation of the Del Rio Deterrence Decision and Title 42 Process against Individual Plaintiffs and similarly situated individuals by President Biden, his staff, DHS Defendants, and DHS personnel departed from standard procedures and was motivated at least in part by discriminatory purpose based on race and presumed national origin.

373.    "[P]laintiffs may allege [either of] two types of equal protection violations: (1) that the plaintiff was subject to differential treatment because of membership in a protected class, such as one based on race; or (2) that the plaintiff was arbitrarily and intentionally treated differently from others who are similarly situated." *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 158 (D.D.C. 2014) (quotation omitted).

374.    Here, Defendants committed both types of equal protection violations.

375.    First, a "discriminatory purpose" was "a motivating factor" in the government's application of both the Del Rio Deterrence Decision and the Title 42 Process to Individual Plaintiffs in Del Rio in September 2021. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977).

376.    Second, and separately, Individual Plaintiffs were arbitrarily and intentionally treated worse than other significant groups of noncitizens arriving at the border during the time when Defendants were enforcing the Title 42 Process.

377.    Discrimination on the basis of race or presumed national origin in the treatment of migrants in the United States is not necessary to fulfill a compelling government interest.

378.    Individual Plaintiffs suffer ongoing harm as a result of President Biden and DHS Defendants' invidious adoption, implementation, and application of the Del Rio Deterrence Decision and the Title 42 Process to them in Del Rio in September 2021.

379.    There is a substantial risk that Individual Plaintiffs and similarly situated individuals will again be subject to discriminatory treatment based on race and presumed national origin as a result of President Biden and DHS Defendants' adoption and implementation of the Del Rio Deterrence Decision, including in connection with continuing U.S. government efforts to deter Haitians as a group from seeking asylum in the United States.

380.    Defendants' conduct has impaired and continues to impair Haitian Bridge's programming and forced and continues to force Haitian Bridge to divert resources to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct

## SECOND CLAIM FOR RELIEF
### Violation of the Due Process Clause of the Fifth Amendment (Substantive Due Process)
### *All Plaintiffs Against President Biden and DHS Defendants*

381.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

382.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty. *See* U.S. Const. amend. V.

383.    The Due Process Clause applies to all "persons" on United States soil and thus applied to Individual Plaintiffs during the period in which they were subject to Defendants' Del Rio Deterrence Decision, including field processing pursuant to the CBP Capio Memo and expulsion under the Title 42 Process.

384.    The conduct of President Biden, his staff, DHS Defendants, and DHS personnel staff in adopting the Del Rio Deterrence Decision and applying it to Individual Plaintiffs, including enforcing the Title 42 Process in Del Rio in a manner indifferent to humanitarian concerns, expelling thousands of Haitian asylum seekers as quickly as possible, and taking steps to shield such actions from accountability, so as to deter Haitians as a group from attempting to seek asylum in the United States, was gravely unfair and so egregious and outrageous that it may fairly be said to shock the conscience.

385.    DHS Defendants and President Biden therefore have violated Individual Plaintiffs' substantive due process rights.

386.    Additionally, the conduct of President Biden, his staff, DHS Defendants, and DHS personnel staff in adopting the Del Rio Deterrence Decision and applying it against Individual Plaintiffs, including enforcing the Title 42 Process in Del Rio in a manner indifferent to humanitarian concerns, expelling thousands of Haitian asylum seekers as quickly as possible, and taking steps to shield such actions from accountability, so as to deter Haitians as a group from attempting to seek asylum in the United States, violated Individual Plaintiffs' fundamental rights, including their rights to bodily integrity, freedom from bodily restraint, and family integrity. For this reason, too, DHS Defendants and President Biden have violated Individual Plaintiffs' substantive due process rights.

387.    Individual Plaintiffs suffer ongoing harm as a result of President Biden and DHS Defendants' unconstitutional adoption, implementation, and application of the Del Rio Deterrence Decision and Title 42 Process to them in Del Rio in September 2021.

388.    There is a substantial risk that Individual Plaintiffs and similarly situated individuals will again be subject to abusive and unconscionable treatment in violation of their fundamental rights enabled by DHS Defendants and President Biden, including in connection with continuing U.S. government efforts to deter Haitians as a group from seeking asylum in the United States.

389.    Defendants' conduct has impaired Haitian Bridge's programming and forced Haitian Bridge to divert resources to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

### THIRD CLAIM FOR RELIEF
**Violation of the Due Process Clause of the Fifth Amendment (Special Relationship)**
***All Plaintiffs Against DHS Defendants***

390.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

391.    Under the Fifth Amendment to the U.S. Constitution, Defendants have an affirmative duty to provide for an individual's basic human needs when they "take[] that person into [their] custody and hold[] him there against his will," thereby creating a "special relationship" with that individual. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). When the government "so restrains an individual's liberty that it renders him unable to care for himself," it assumes responsibility for that individual's safety and well-being. *Id.* at 200.

392.    When the government has a special relationship with an individual, "governmental deliberate indifference will shock the conscience sufficiently to establish a substantive due process violation." *Harvey v. District of Columbia*, 798 F.3d 1042, 1050 (D.C. Cir. 2015) (internal punctuation omitted).

393.    Through their processing of Individual Plaintiffs at the CBP Encampment pursuant to the CBP Capio Memo and as one manifestation of the overarching Del Rio Deterrence Decision,

DHS Defendants and DHS personnel created a "special relationship" with Individual Plaintiffs by restraining their liberty, keeping them in DHS Defendants' custody, and rendering them unable to care for themselves. DHS Defendants therefore owed Individual Plaintiffs a heightened duty of care and protection.

394.    By depriving Individual Plaintiffs in their custody of basic human needs such as adequate food, water, shelter, and medical care, as well as of the ability to act on their own behalf to meet these needs themselves, DHS Defendants and DHS personnel acted with deliberate indifference to Plaintiffs' basic human needs and engaged in conduct "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). The conditions in the CBP Encampment were not reasonably related to a legitimate government interest and therefore unconstitutional.

395.    DHS Defendants therefore have violated Individual Plaintiffs' substantive due process rights.

396.    Individual Plaintiffs are suffering ongoing harm as a result of DHS Defendants' unconstitutional adoption, implementation, and application of the Del Rio Deterrence Decision and the Title 42 Process to them in Del Rio in September 2021.

397.    There is a substantial risk that Individual Plaintiffs and similarly situated individuals will again be subject to abusive and unconscionable treatment in DHS Defendants' custody, including in connection with continuing U.S. government efforts to deter Haitians as a group from seeking asylum in the United States.

398.    DHS Defendants' conduct has impaired Haitian Bridge's programming and forced Haitian Bridge to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

## FOURTH CLAIM FOR RELIEF
**Violation of the Due Process Clause of the Fifth Amendment (Procedural Due Process)**
***All Plaintiffs Against All Defendants***

399.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

400.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. Amend. V.

401.    Congress has guaranteed asylum seekers, including Individual Plaintiffs, a protected interest in applying for asylum, withholding of removal, and relief under the Convention Against Torture, and in not being removed to countries where they face danger, persecution, and potential loss of life. *See* 8 U.S.C. §§ 1158, 1231.

402.    Individual Plaintiffs are thus entitled under the Due Process Clause of the Fifth Amendment to a meaningful opportunity to establish their potential eligibility for asylum and access other forms of relief from removal.

403.    By denying Individual Plaintiffs access to the U.S. asylum system, Defendants' conduct violates procedural due process.

404.    Further, Defendants adopted and implemented the Del Rio Deterrence Decision and the Title 42 Process without adequate safeguards against expulsions of asylum seekers to countries where it is more likely than not that the asylum seeker will face persecution.

405.    As a result of Defendants' violations of the Due Process Clause, Individual Plaintiffs have been harmed by the denial of their access to the asylum system. Individual Plaintiffs have also been harmed by being expelled to Haiti or Mexico where they faced danger and/or continue to face danger. As a result of Defendants' conduct, Individual Plaintiffs have also been harmed because Defendants' conduct has prevented them from establishing eligibility for Haitian TPS, and may similarly prevent Individual Plaintiffs from obtaining other rights, benefits, or other forms of protection against removal or other immigration benefits that Plaintiffs would have been eligible to apply for and/or received had Defendants' constitutional violations not occurred.

406.    Defendants' conduct has impaired, and continues to impair, Haitian Bridge's programming and has forced, and continues to force, Haitian Bridge to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

## FIFTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### Not in Accordance with Law and in Excess of Statutory Authority 42 U.S.C. § 265, 8 U.S.C. §§ 1158, 1231 (Title 42 Process)
### *All Plaintiffs Against All Defendants Other Than President Biden*

407.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

408.    Under the APA, a court "shall . . . hold unlawful . . . agency action" that is "not in accordance with law;" "contrary to constitutional right;" "in excess of statutory jurisdiction, authority, or limitations;" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

409.    Similarly, courts may order injunctive relief through "non-statutory review" of allegedly ultra vires Execution action. *Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996). Here, Plaintiffs allege, in the alternative, that they have a non-statutory cause of action to bring their ultra vires claim.

410.    The Title 42 Process as applied to Individual Plaintiffs must be  declared unlawful, and appropriate retrospective injunctive relief should issue returning Individual Plaintiffs to the same position they would have been in had Defendants' unlawful application of the Title 42 Process to them not occurred, because Defendants' issuance, administration, and application of the Title 42 Process was and is "not in accordance with law," "contrary to constitutional right," "in excess of statutory . . . authority," and "without observance of procedure required by law" in at least the following ways:

**G.    Contrary to the Public Health Service Act, 42 U.S.C. § 265.**

411.    Defendants have relied on Title 42 of the U.S. Code, specifically Section 265, for the purported authority to issue, administer, and apply the public health orders, regulations, and memoranda underlying the Title 42 Process.

412.    Title 42 of the U.S. Code and Section 265 are public health statutes and do not authorize Defendants to deny asylum seekers an opportunity to access statutory and procedural protections afforded under U.S. law, including the INA. *See* 8 U.S.C. §§ 1158, 1231.

413.    Title 42 of the U.S. Code and Section 265 likewise do not authorize Defendants to expel asylum seekers from the United States or to deny asylum seekers an opportunity to access statutory and procedural protections to *non-refoulement* under U.S. law, including the INA.

414.    Defendants applied the Title 42 Process to expel Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from the United States without affording them an opportunity to access statutory and procedural protections under U.S. law.

**H.    Contrary to the Immigration and Nationality Act, 8 U.S.C. § 1158 (Asylum).**

415.    The INA provides that any noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1).

416.    Defendants applied the Title 42 Process to prevent Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from applying for asylum or otherwise accessing the statutory and procedural protections for asylum seekers under the INA and applicable U.S. law.

**I.    Contrary to the Immigration and Nationality Act, 8 U.S.C. § 1231 (Withholding of Removal).**

417.    The international law principle of *non-refoulement* provides that a country has an obligation to not expel or return an individual to a country where they have a well-founded fear of persecution or serious harm.

418.    The INA's withholding of removal provision codifies the United States' duty of *non-refoulement*. Under the INA, the United States may not remove an individual to a country where it is more likely than not that the individual's "life or freedom would be threatened in that country because of [their] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

419.    Defendants applied the Title 42 Process to prevent Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from accessing their substantive rights and any process for requesting withholding of removal under the INA and applicable U.S. law, and to expel Individual Plaintiffs without access to this mandatory safeguard. Further, Defendants adopted and implemented the Title 42 Process without adequate safeguards against expulsions of asylum seekers to countries where it is more likely than not that they will face persecution.

**J.    Contrary to the Foreign Affairs Reform and Restructuring Act of 1998, 8 U.S.C. § 1231 Note (Convention Against Torture).**

420.    The Foreign Affairs Reform and Restructuring Act of 1998 implements the United States' *non-refoulement* duties set forth in Article 3 of the Convention Against Torture. In relevant part, FARRA prohibits the United States from expelling an individual to a country where it is more likely than not that they will be in danger of being tortured. *See* 8 U.S.C. § 1231 note.

421.    Defendants applied the Title 42 Process to prevent Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from meaningfully accessing withholding of removal under FARRA. Further, Defendants adopted and implemented the Title 42 Process without adequate safeguards against expulsions of asylum seekers to countries where it is more likely than not that the asylum seeker will face torture. Defendants have applied the Title 42 Process to expel asylum seekers, including Individual Plaintiffs, without access to this mandatory safeguard.

**K.    *Ultra Vires* and Contrary to the Immigration and Nationality Act, 8 U.S.C. §§ 1225, 1229a (Removal of Noncitizens).**

422.    Congress created the exclusive means for removing a noncitizen from the United States in the INA.

423.    As a general matter, removal proceedings before an immigration judge are the "sole and exclusive procedure" for determining whether an individual may be removed from the United States. 8 U.S.C. §§ 1229a(a)(3). These proceedings include mandatory safeguards for noncitizens who fear removal. *Id*.

424.    Defendants implemented the Title 42 Process as a means of removing noncitizens that is not set forth in or subject to the INA. Defendants purported to apply the Title 42 Process in

a manner that conflicts with and is outside of existing U.S. immigration laws and the sole Congressionally authorized procedures for removal set forth in the INA.

425.    Defendants applied the Title 42 Process to expel Haitian asylum seekers in Del Rio, including Individual Plaintiffs, from the United States without allowing them to access the statutory and procedural protections relating to the removal of noncitizens under the INA and applicable U.S. law.

426.    For each of these reasons, Defendants' application of the Title 42 Process to Individual Plaintiffs was and is ultra vires and contrary to law.

427.    Defendants' issuance, administration, and application of the Title 42 Process constitute final agency action within the meaning of the APA.

428.    Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs. Among other things, Defendants' application of the Title 42 Process to Individual Plaintiffs has harmed them by denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law and to access procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law. In addition, among other things, Defendants' application of the Title 42 Process to Individual Plaintiffs has harmed by them by preventing them from establishing eligibility for Haitian TPS, and may similarly prevent Individual Plaintiffs from obtaining other rights, benefits, or other forms of protection against removal or other immigration benefits that Plaintiffs would have been eligible to apply for and/or received had Defendants' APA violations not occurred.

429.    Defendants' application of the Title 42 Process to Haitian and presumed Haitian asylum seekers, including Individual Plaintiffs, also harmed and continues to harm Haitian Bridge by impairing its programming and forcing it to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

430.    Plaintiffs, who have no adequate remedy at law, seek immediate review under the APA and declaratory relief declaring that the Title 42 Process as applied against Individual Plaintiffs and similarly situated Haitian asylum seekers was unlawful, and retrospective injunctive

relief returning Individual Plaintiffs to the same position they would have been in had Defendants' unlawful application of the Title 42 Process to them not occurred.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2) Arbitrary and Capricious Agency Action (Title 42 Process)**
***All Plaintiffs Against All Defendants Other than President Biden***

431.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

432.    Under the APA, a court "shall . . . hold unlawful . . . agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

433.    Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

434.    Defendants' application of the Title 42 Process to Individual Plaintiffs and similarly situated asylum seekers was arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), in at least the following ways.

435.    Defendants have not provided a reasoned explanation for their decision to apply the Title 42 Process to Haitian asylum seekers in Del Rio, including Individual Plaintiffs, and to expel such asylum seekers from the United States.

436.    Defendants relied on improper considerations and factors Congress did not intend to be considered, including the use of a purported public health measure to deter immigration and restrict access to statutory and procedural protections guaranteed under U.S. immigration laws.

437.    Defendants entirely failed to consider important aspects of the problem when applying the Title 42 Process to Individual Plaintiffs. Among other factors, Defendants failed to consider asylum seekers' fear of persecution or torture in the country to which they will be expelled; humanitarian exceptions to the Title 42 Process as provided for in the CDC Order; that

- 109 -

their implementation of the Title 42 Process would place asylum seekers in congregate settings, contradicting its stated purpose; and the opinions of scientific experts that the Title 42 Process did not advance public health and in fact actually undermined public health.

438.    Defendants also failed to consider reasonable, less restrictive alternatives to applying the Title 42 Process to Individual Plaintiffs and Haitian asylum seekers in Del Rio. Among other alternatives, Defendants did not consider providing widely available COVID-19 testing or vaccinations to asylum seekers, granting humanitarian parole to asylum seekers, or providing due process to the United States' asylum system.

439.    Defendants also offered an explanation—public health— that ran counter to the evidence before the agency, as Defendants' own experts have warned that the Title 42 Process undermines public health.

440.    Defendants' public health rationale was a pretextual means of restricting immigration and was therefore so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

441.    Defendants' application of the Title 42 Process constituted final agency action within the meaning of the APA.

442.    Defendants' actions caused ongoing harm to Plaintiffs. Among other things, Defendants' application of the Title 42 Process to Individual Plaintiffs harmed them by denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law and by denying them access to procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law. Individual Plaintiffs were also harmed by being expelled to Haiti or Mexico where they faced danger and/or continue to face danger. Individual Plaintiffs were also harmed because Defendants' conduct prevented them from establishing eligibility for Haitian TPS, and may similarly prevent Individual Plaintiffs from obtaining other rights, benefits, or other forms of protection against removal or other immigration benefits that Plaintiffs would have been eligible to apply for and/or received had Defendants' APA violations not occurred.

443.    Defendants' application of the Title 42 Process to Haitian and presumed Haitian asylum seekers, including Individual Plaintiffs, also harmed and continues to harm Haitian Bridge by impairing its programming and forcing it to divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by Defendants' conduct.

444.    Plaintiffs, who have no adequate remedy at law, seek immediate review under the APA and declaratory relief declaring that the Title 42 Process as applied against Individual Plaintiffs and similarly situated Haitian asylum seekers was unlawful, and retrospective injunctive relief returning Individual Plaintiffs to the same position they would have been in had Defendants' unlawful application of the Title 42 Process to them not occurred.

## SEVENTH CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1) Unlawfully Withheld or Unreasonably Delayed Agency Action**
*All Plaintiffs Against Defendants CBP and ICE*

445.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

446.    The APA provides that a court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

447.    CBP officers have failed to take numerous discrete agency actions in connection with Defendant CBP's adoption and implementation of the Del Rio Deterrence Decision and the Title 42 Process. Defendant CBP has unlawfully withheld or unreasonably delayed required agency action in at least the following ways:

### A.    Inspection and Asylum Referral Process

448.    CBP officers have a discrete, mandatory duty to inspect all noncitizens and if "the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer." 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i)-(ii); 8 C.F.R. § 235.3(b)(4).

449.    CBP officers failed to inspect Individual Plaintiffs and similarly situated Haitian and presumed Haitian asylum seekers in Del Rio. CBP and ICE personnel also failed to refer Individual Plaintiffs and similarly situated asylum seekers in Del Rio for asylum interviews.

450.    By refusing to allow asylum seekers, including Individual Plaintiffs, a meaningful opportunity to apply for asylum or to access any statutory and procedural protections afforded under the INA and applicable U.S. law to which they are entitled, Defendant CBP has unlawfully withheld and unreasonably delayed discrete agency actions mandated by statute.

**B.    Withholding of Removal**

451.    The INA and FARRA prohibit the United States from removing an individual to a country where it is more likely than not that they will face persecution or torture. *See* 8 U.S.C. § 1231(b)(3) note.

452.    CBP officers have a discrete, mandatory duty to follow the procedures required by 8 U.S.C. § 1231(b)(3) and FARRA, *see* 8 U.S.C. § 1231 note, to determine whether a noncitizen faces a risk of persecution or torture and is therefore entitled to withholding of removal after full removal proceedings.

453.    By refusing to follow those procedures, and thus refusing to allow asylum seekers, including Individual Plaintiffs, meaningful access to procedural protections mandated under the INA and FARRA withholding of removal provisions to which they are entitled, Defendant CBP has unlawfully withheld and unreasonably delayed discrete agency actions mandated by statute.

**C.    Removal under the INA**

454.    The INA sets forth the only processes established by Congress to remove noncitizens from the United States. *See* 8 U.S.C. §§ 1225(b)(1), 1229a; *see generally* 8 U.S.C. § 1101, *et seq*.

455.    To the extent Defendants seek to remove asylum seekers, including Individual Plaintiffs, from the United States, CBP and ICE officers have a discrete, mandatory obligation to follow the statutory and procedural protections relating to the removal of noncitizens under the INA and applicable U.S. law.

456.    By refusing to follow the removal procedures set forth in the INA, *see* 8 U.S.C. §§ 1225(b)(1), 1229, and therefore refusing to allow asylum seekers, including Individual Plaintiffs, meaningful access to statutory and procedural protections relating to the removal of noncitizens mandated by the INA to which they are entitled, Defendants CBP and ICE have unlawfully withheld and unreasonably delayed discrete agency actions mandated by statute.

457.    CBP and ICE's failure to act as required by law, including the INA, FARRA, and other applicable U.S. law, is final agency action within the meaning of the APA.

458.    CBP and ICE's failure to act as required by law has caused, and will continue to cause, ongoing harm to Plaintiffs. Among other things, Defendants CBP and ICE's failure to act as required by law harmed Individual Plaintiffs by denying them a meaningful opportunity to apply for asylum and other relief as required under U.S. law and an opportunity to access procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law. In addition, among other things, Defendants' inaction in contravention of the APA harmed Individual Plaintiffs by preventing them from establishing eligibility for Haitian TPS, and may similarly prevent Individual Plaintiffs from obtaining other rights, benefits, or other forms of protection against removal or other immigration benefits that Plaintiffs would have been eligible to apply for and/or received had Defendants' APA violations not occurred.

459.    CBP and ICE's failure to act also harmed and continues to harm Haitian Bridge, which must divert resources away from its programs to assist the thousands of Haitian asylum seekers harmed by CBP and ICE's conduct.

460.    Plaintiffs have no adequate alternative to review under the APA and thus seek review and an order compelling Defendants to take actions required by the INA, FARRA, and other applicable U.S. law pursuant to 5 U.S.C. § 706(1). Additionally, Plaintiffs seek retrospective injunctive relief returning Individual Plaintiffs to the same position they would have been in had Defendants' unlawful omissions in contravention of the APA not occurred.

## EIGHTH CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)
### Arbitrary and Capricious, An Abuse of Discretion, Not in Accordance with Law and In Excess of Statutory Authority 8 U.S.C. §§ 1158, 1231 (Del Rio Deterrence Decision)
### *All Plaintiffs Against DHS Defendants*

461.    Plaintiffs reallege and incorporate by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

462.    The Del Rio Deterrence Decision was agency action adopted, administered, enforced, and applied by DHS Defendants (in collaboration with the Biden Administration) taken to deter the Haitians arriving at the border near Del Rio in late summer 2021 from lawfully accessing the United States asylum system by inflicting brutal and inhumane conditions on them and summarily expelling them as described in this First Amended Complaint.

463.    The Del Rio Deterrence Decision subjected Individual Plaintiffs and proposed class members to gross abuses, including denial of access to counsel and to the asylum process, denial of the right to *non-refoulement*, denial of basic human needs, and denial of dignity in government detention—all in an effort to deter these Haitian asylum seekers from coming to the United States.

464.    DHS Defendants' issuance, administration, and application of the Del Rio Deterrence Decision to Individual Plaintiffs was and remains arbitrary and capricious because DHS Defendants failed to consider or factor in Plaintiffs' right to access the U.S. asylum process and to access counsel when seeking asylum in the United States; failed to articulate a reasoned explanation for the decision to deter and deny Individual Plaintiffs and similarly situated individuals these rights; failed to consider or factor in Plaintiffs' humanitarian needs in Del Rio in September 2021; and provided an explanation so implausible that it could not be ascribed to agency expertise.

465.    The Del Rio Deterrence Decision was and remains arbitrary and capricious because in its adoption and implementation, DHS Defendants considered factors that Congress did not intend for them to consider in the course of implementing or enforcing U.S. immigration laws.

466.    Additionally, by adopting and implementing the Del Rio Deterrence Decision, DHS Defendants have acted in a manner not in accordance with law, contrary to constitutional right, in

excess of their statutorily prescribed authority, and without observance of procedure required by law in violation of section 706(2) of the APA. *See* 5 U.S.C. §§ 706(2)(A)–(D).

467.    By adopting and implementing a policy that contravenes the right to apply for asylum and the right to *non-refoulement* enshrined in the INA, DHS Defendants acted not in accordance with law. *See* 8 U.S.C. §§ 1158, 1231.

468.    By adopting and implementing a policy that departs from standard procedures and was motivated at least in part by discriminatory purpose based on race and presumed national origin, DHS Defendants also acted contrary to constitutional right. *See* U.S. Const. Amend. V.

469.    For each of these reasons, Defendants' adoption and implementation of the Del Rio Deterrence Decision to Individual Plaintiffs was and is ultra vires and contrary to law.

470.    Plaintiffs allege, in the alternative, that they have a non-statutory cause of action to bring their ultra vires claim. *See Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).

471.    DHS Defendants' adoption and implementation of the Del Rio Deterrence Decision constitute final agency action within the meaning of the APA.

472.    DHS Defendants' adoption and implementation of the Del Rio Deterrence Decision caused, and will continue to cause, ongoing harm to Plaintiffs. Among other things, it has harmed Plaintiffs by denying them a meaningful opportunity to apply for asylum and other relief as required by U.S. law and to access procedural protections to which they and other asylum seekers are entitled under the INA, FARRA, and other applicable U.S. law. In addition, among other things, it has prevented Plaintiffs from establishing eligibility for Haitian TPS, and may similarly prevent Individual Plaintiffs from obtaining other rights, benefits, or other forms of protection against removal or other immigration benefits that Plaintiffs would have been eligible to apply for and/or received had Defendants' APA violations not occurred.

473.    DHS Defendants' adoption and application of the Del Rio Deterrence Decision to Haitian and presumed Haitian asylum seekers, including Individual Plaintiffs, also harmed and continues to harm Haitian Bridge by impairing its programming and forcing it to divert resources

away from its programs to assist the thousands of Haitian asylum seekers harmed by the application of the unlawful Del Rio Deterrence Decision to them in Del Rio in September 2021.

474.    Plaintiffs, who have no adequate remedy at law, seek immediate review, declaratory relief that DHS Defendants' adoption and application of the Del Rio Deterrence Decision against Individual Plaintiffs and similarly situated Haitian asylum seekers was unlawful, as well as retrospective injunctive relief returning Individual Plaintiffs to the same position they would have been had Defendants' unlawful application of the Del Rio Deterrence Decision to them in Del Rio in September 2021 not occurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.    An order certifying a class, pursuant to Federal Rules of Civil Procedure 23(b)(1) and (b)(2), of all Haitian, or presumed Haitian, individuals who (1) sought access to the U.S. asylum process in or around the CBP Encampment near the Del Rio Port of Entry between September 9 and 24, 2021 and (2) were denied access to the U.S. asylum process;

b.    An order appointing the undersigned as class counsel;

c.    An order declaring unlawful the Del Rio Deterrence Decision, on its face and as applied to Individual Plaintiffs and class members;

d.    An order declaring unlawful the Title 42 Process as applied to Individual Plaintiffs and class members;

e.    An order declaring that Defendants' application of the Del Rio Deterrence Decision and the Title 42 Process alleged herein deprived Individual Plaintiffs and class members of their Fifth Amendment rights;

f.    An injunction prohibiting Defendants from applying the Del Rio Deterrence Decision to Plaintiffs and class members in the event of a subsequent mass-migration event;

g.    An order affording Individual Plaintiffs and class members the statutory and procedural protections to which they would have been eligible and/or would have received under the U.S. asylum process and applicable laws if they had not been expelled from the U.S. in or

around September 2021, including access to asylum and withholding of removal under the INA and CAT withholding of removal under FARRA;

     h.     An order declaring that Individual Plaintiffs and class members, for the purposes of seeking Temporary Protected Status only, were continuously residing and continuously physically present in the U.S. since September 2021;

     i.     An order allowing each of the Individual Plaintiffs and class members outside the United States to return to the United States and requiring Defendants to facilitate their return, so that Individual Plaintiffs may pursue their asylum claims in the United States;

     j.     An order declaring that Individual Plaintiffs and class members are not subject to the Asylum Ban Regulations codified at 8 C.F.R. § 208 (2023), 8 C.F.R. § 1003 (2023), and 8 C.F.R. § 1208 (2023), because their entry to the United States at Del Rio was before May 11, 2023;

     k.     An order declaring that Individual Plaintiffs and class members are immediately eligible to apply for 8 C.F.R. § 274a.12(c)(8) work authorization upon submission of their asylum applications;

     l.     An order declaring that Individual Plaintiffs and class members outside the United States are immediately eligible to be considered for a grant of humanitarian parole, separate from the Haitian Parole program announced on January 6, 2023;

     m.     An order awarding Plaintiffs their costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable statute or regulation; and

     n.     An order granting such further relief as the Court deems just, equitable, and proper.

DATED: March 18, 2024

Respectfully submitted,

*/s/ Karen C. Tumlin*

**Tess Hellgren** (OR0023)
tess@innovationlawlab.org
**Stephen Manning** (OR0024)
stephen@innovationlawlab.org
**Rachel Landry** (*pro hac vice*)
rachel@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503 882-0281

**Nicole Phillips** (*pro hac vice*)
nphillips@haitianbridge.org
**Erik Crew** (*pro hac vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4265 Fairmount Avenue, Suite 280
San Diego, CA 92105
Telephone: +1 949 603-5751

**Karen C. Tumlin** (CA00129*)*
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
**Vanessa Rivas Bernardy** (*pro hac vice*)
vanessa.rivas-
bernardy@justiceactioncenter.org
P.O. Box 27280
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7276

**Stanley Young** (CA00146)
syoung@cov.com
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: +1 650 632-4704

**Alexander L. Schultz** (DC Bar No. 1618410)
aschultz@cov.com
COVINGTON & BURLING, LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: +1 424 332-4788

**Maura A. Sokol** (DC Bar No. 1672674)
msokol@cov.com
COVINGTON & BURLING, LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: +1 202 662-5528

*Counsel for Plaintiffs*