# DECLARATION OF JAMES DOE

I, JAMES DOE, upon my personal knowledge, hereby declare as follows:

1. I am a 27-year-old Haitian national. I was born in Gonaives, Haiti.

2. I am currently in Gonaïves, Haiti.

3. Until 2017, I lived in Gonaïves, where I was a student. Leading up to the 2016 elections in Haiti, I volunteered with the campaign of Francois Rigot, a parliamentary candidate from the political party called Fusion. Rigot lost the election, while candidates from another political party called Haiti in Action (referred to as "AAA" based on its acronym in Haitian Kreyol) won several seats in parliament.

4. As AAA gained power, it began targeting Fusion supporters. During regular Fusion party meetings, people would report to the group about threats AAA supporters had made in their neighborhoods. I heard about many threats during those meetings, including that AAA would "show what people in power do" and jail Fusion supporters as political prisoners. Also, an AAA-affiliated neighbor that I grew up with warned that things could soon get very bad, and that in AAA meetings they were discussing plans to identify and riot the neighborhoods that had cast few votes for their party. The threats became increasingly heated, so I eventually decided to leave Haiti because I had been active with Rigot's campaign and believed my physical safety was at risk.

5. I left Haiti for Argentina in or around December 2017. Upon arriving in Argentina, I did the best I could to build a life for myself there, but still had difficulty meeting my basic needs, and experienced constant discrimination for being Black and a foreigner. For example, sometimes I wouldn't be let onto the bus or allowed to sit, and one time, someone on the street

told me to cut myself so he could see if my blood was red like his. After about three and a half years, I decided I needed to leave Argentina because of how difficult my life was there.

6. In or around July 2021, I left Argentina to seek safety in the United States. I traveled with my cousin and several friends up through South and Central America, which was an extremely grueling journey. We were robbed of all our belongings, and once I was physically assaulted. Around early August 2021, we arrived to Tapachula, in southern Mexico. The conditions in Mexico were difficult—I felt unsafe and struggled to meet my basic needs. For about a month, we made the challenging journey through Mexico to Ciudad Acuna, Mexico, at the U.S.-Mexico border.

7. We arrived at Ciudad Acuna on approximately September 4 or 5, 2021, and crossed the river into Del Rio, Texas. Many other people were gathered under the bridge when we arrived. A U.S. immigration official gave me a numbered ticket and explained that I should wait until my number was called. I expected that when my number was called, I would be able to explain to U.S. officials why I was seeking safety in the United States. I hoped I could reunite with my brother-in-law, a U.S. citizen who lived in Orlando, Florida and was willing to take me in.

8. The conditions under the bridge were dire. We received some water and food, but it wasn't enough. Some people had tents, while others put together makeshift shelter out of sheets or leaves. It was extremely hot, and we would try to find shade in the bushes or trees. Helicopters would occasionally fly near us, causing strong winds which kicked up a lot of dust. There were some portable toilets, but not nearly enough for all the people there, so we would relieve ourselves in the bushes. I feared I would get sick in these unsanitary and exposed conditions.

9. I never imagined I would have to endure such poor conditions in the United States for

so long. At one point, I began to get desperate and started to lose hope of my number being called, and I considered trying to leave to cross back into Mexico. However, I saw that officers on horses were preventing people from crossing the river back into Mexico, so I did not think I would be able to leave if I tried.

10. Around September 14 or 15, 2021, my number was called. I approached the U.S. officials, who put me on a bus with many others. After a few hours, the bus arrived at a detention center, where U.S. officials threw away all my belongings, like my clothes and toothbrush. They made us remove our belts and hand over our documents, and I was not allowed a shower or given a toothbrush. While I was stressed to be in those conditions, I expected that eventually I would have a chance to explain my situation and ultimately would be released from detention and allowed to be safely reunited with my brother-in-law in Florida.

11. After about eight days, officials put me on a bus to another detention center, where I spent about six days. Then, officials took me by bus to a third detention center for one day. I was surprised to be detained for so long and I began to lose hope. When I asked U.S. immigration officials what was happening to me, they told me that we were being detained and to wait and see what happened. I wanted to explain my story, but there was never the opportunity; upon initially detaining us, U.S. officials performed intake procedures, like taking our fingerprints and making us take off our clothes, but there was no chance to tell them about my specific situation or why I was afraid to go back to Haiti. One official in the detention center told us to get a lawyer, so I called my brother-in-law for help, but before he was able to find and connect me with a lawyer, I was deported back to Haiti.

12. At the third detention center, U.S. officials put chains around my wrists, waist, and

ankles, and put me on a bus along with many others to an airport. We were not told where we were going; we assumed we were being transported to another detention facility, perhaps in another state.

13. When the plane landed, I was shocked to realize we were in Haiti. I was never told that I would be deported, and I never expected that would happen. Throughout my time in Del Rio and in detention, I wanted to tell U.S. immigration officials my story so they could help me, but I never got the chance. I never had the opportunity to explain to U.S. officials my fear of return to Haiti or ask for asylum. I still want the opportunity to do so.

14. Upon landing in Port-au-Prince, officials removed my shackles and gave me an envelope with some of the documents I had handed over to U.S. officials previously. However, I noticed my passport was missing, so I later emailed the detention facility to ask about my passport. I was never able to retrieve it, so I had to apply for a new passport.

15. Having nowhere else to go, I went back to Gonaïves to live with my mother. I was very worried about reintegrating after being away for five years. For one, I worried about being able to find work, and to this day I have not been able to find a job. I also worried that the threats that led me to flee Haiti would continue, so I have not participated in any political activity since being returned to Haiti and I continue to fear the AAA party. And in Gonaïves, there is a heavy gang presence and lots of kidnappings so I cannot go too far from home. A friend's brother was kidnapped in December 2023, and he hasn't been heard from since. I worry I could be kidnapped, too. Every time I leave home, arrive at my destination, and then return home safely, I thank God. Because of these risks, upon being returned to Haiti I went under the radar, and to this day I live practically in hiding.

16. If possible, I would like to participate in this lawsuit without publicly revealing my

name. I believe it is necessary for my safety to maintain a low profile in Haiti; I worry I would be at risk if my identity were to be disclosed publicly in this lawsuit. I also worry my participation in this lawsuit against the U.S. government could adversely impact my ability to seek immigration relief in the United States.

17. For these reasons, I respectfully ask the Court to allow me to proceed as a plaintiff in the lawsuit under a pseudonym to protect myself.

I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct. Executed at Gonaïves, Haiti on February 15, 2024.



JAMES DOE

## CERTIFICATION OF INTERPRETATION

I, Daniel Tillias, declare that on February 15, 2024, I caused the foregoing declaration to be interpreted faithfully and accurately from English into Haitian Creole for the declarant through telephonic interpretation facilitated by a professional interpreter fluent in English and Haitian Creole and employed by Haitian Bridge Alliance. Before beginning the interpretation, I confirmed that the declarant was able to understand the interpreter. After I finished reading the foregoing declaration via the interpreter, the declarant verified that the contents of the declaration are true and accurate. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 15th, 2024 at Delray Beach Florida.

*/s/ Daniel Tillias*
_____
Daniel Tillias