UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

HAITIAN BRIDGE ALLIANCE, et al.,

            Plaintiffs,

    v.

JOSEPH R. BIDEN
President of the United States, et al.,

            Defendants.

Civil Action No. 21-3317 (JMC)

---

## MOTION TO DISMISS
## PLAINTIFFS' SUPPLEMENTAL AND AMENDED COMPLAINT

Defendants in the above-captioned action, by and through undersigned counsel, respectfully move, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the above-captioned action for the reasons stated in the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Plaintiffs' Supplemental and Amended Complaint (ECF No. 75).

Dated:  May 17, 2024

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: _____/s/ Sean M. Tepe_____
    SEAN M. TEPE, D.C. Bar #1001323
    DIANA V. VALDIVIA, D.C. Bar #1006628
    Assistant United States Attorneys
    601 D Street, N.W.
    Washington, D.C. 20530
    Phone: (202) 252-2533; (202) 252-2545
    sean.tepe@usdoj.gov; diana.valdivia@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HAITIAN BRIDGE ALLIANCE, et al.,

        Plaintiffs,

    v.

JOSEPH R. BIDEN
President of the United States, et al.,

        Defendants.

Civil Action No. 21-3317 (JMC)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
<u>PLAINTIFFS' SUPPLEMENTAL AND AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

BACKGROUND ................................................................................................................... 2

    I.    Arrival of Individual Plaintiffs and Thousands of Haitian Migrants at Del Rio, Texas ..... 2

    II.   Individual Plaintiffs ................................................................................................ 3

    III.  "Del Rio Deterrence Decision" ............................................................................. 4

    IV.  Public Health Authority Under 42 U.S.C. § 265 ................................................. 5

    V.   Plaintiffs' Class Action Lawsuit .......................................................................... 8

LEGAL STANDARDS ......................................................................................................... 8

ARGUMENT ......................................................................................................................... 9

    I.    Plaintiffs Lack Standing to Bring Their Claims ................................................... 9

       A. Individual Plaintiffs Fail to Allege a Present or Imminent Injury ..................... 11

       B. Individual Plaintiffs' Allegations of "Ongoing Harm" Fail to Establish Standing .......... 14

       C. Haitian Bridge Alliance Cannot Establish Organizational Standing ................ 18

    II.   Plaintiffs' Claims Based on the Due Process Clause Should Be Dismissed .................. 24

       A. Substantive Due Process Claims ..................................................................... 24

       B. Procedural Due Process .................................................................................. 30

       C. Equal Protection .............................................................................................. 32

    III.  The APA Claims Should Be Dismissed .............................................................. 38

       A. Injunctive Relief Is Not Available to Plaintiffs .............................................. 38

       B. Plaintiffs Fail to Allege a Plausible Claim of Withheld or Delayed Agency Action ....... 41

       C. Plaintiffs' Challenge to the "Del Rio Deterrence Decision" Fails ................... 43

    IV.  President Biden is Not a Proper Defendant ......................................................... 47

CONLCUSION ..................................................................................................................... 50

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abdelfattah v. Dep't of Homeland Sec.*,
    787 F.3d 524 (D.C. Cir. 2015) ............................................................................... 26

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ............................................................................................... 32

*Akiachak Native Cmty. v. Dep't of Interior*,
    827 F.3d 100 (D.C. Cir. 2016) ............................................................................... 13

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ............................................................................. 39

*Almaqrami v. Pompeo*,
    933 F.3d 774 (D.C. Cir. 2019) ............................................................................... 12

*Al-Owhali v. Ashcroft*,
    279 F. Supp. 2d 13 (D.D.C. 2003) ........................................................................... 8

*Alshawy v. U.S. Citizenship & Immigr. Servs.*,
    Civ. A. No. 21-2206 (FYP), 2022 WL 970883 (D.D.C. Mar. 30, 2022) ................ 30

*Am. Sports Council v. Dep't of Educ.*,
    850 F. Supp. 2d 288 (D.D.C. 2012) ....................................................................... 23

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ........................................................................... 17, 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 9

*Ass'n v. Duggan*,
    962 F.3d 596 (D.C. Cir. 2020) ............................................................................... 10

*Atherton v. D.C. Off. Of Mayor*,
    567 F.3d 672 (D.C. Cir. 2009) ............................................................................... 30

*Baan Rao Thai Rest. v. Pompeo*,
    985 F.3d 1020 (D.C. Cir. 2021) ............................................................................. 39

*Bark v. Forest Serv.*,
    37 F. Supp. 3d 41 (D.D.C. 2014) ........................................................................... 46

*Beatty v. Wash. Metro. Area Transit Auth.*,
    860 F.2d 1117 (D.C. Cir. 1988) ............................................................................. 48

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................................... 44

*Bolling v. Sharpe*,
    347 U.S. 497 (1954) ............................................................................................... 32

*Buffalo Field Campaign v. Zinke*,
    289 F. Supp. 3d 103 (D.D.C. 2018) ....................................................................... 40

*Butera v. District of Columbia*,
    235 F.3d 637 (D.C. Cir. 2001) ......................................................................... 25, 28

*Carik v. Dep't of Health & Hum. Servs.*,
   4 F. Supp. 3d 41 (D.D.C. 2013) ................................................................................... 16

*Cboe Futures Exch., LLC v. SEC*,
   77 F.4th 971 (D.C. Cir. 2023) ...................................................................................... 39

*Center for Responsible Science v. Gottlieb*,
   346 F. Supp. 3d 29 (D.D.C. 2018) .......................................................................... 21, 37

*Chamber of Commerce of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) .................................................................................. 40, 49

*Citizens for Resp. & Ethics in Wash. ("CREW") v. Off. of Special Counsel*,
   480 F. Supp. 3d 118 (D.D.C. 2020) ............................................................................. 18

*Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Homeland Sec.*,
   387 F. Supp. 3d 33 (D.D.C. 2019) ............................................................................... 46

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ...................................................................................................... 33

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ........................................................................................................ 12

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................................. 10, 15

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006) ...................................................................................... 46

*Colindres v. Dep't of State*,
   Civ. A. No. 21-348 (GMH), 2021 WL 5906041 (D.D.C. Dec. 14, 2021) ..................... 36

*Collins v. City of Harker Heights*,
   503 U.S. 115 (1992) ................................................................................................. 24, 27

*County of Los Angeles v. Shalala*,
   192 F.3d 1005 ................................................................................................................ 40

*Cruzan v. Dir., Mo. Dep't of Health*,
   497 U.S. 261 (1990) ...................................................................................................... 26

*Ctr. for Biological Diversity v. Zinke*,
   260 F. Supp. 3d 11 (D.D.C. 2017) ................................................................................ 42

*Ctr. for Democracy & Tech. v. Trump*,
   507 F. Supp. 3d 213 (D.D.C. 2020) .............................................................................. 22

*Davis v. FEC*,
   554 U.S. 724 (2008) ...................................................................................................... 11

*Day v. Obama*,
   Civ. A. No. 15-0671, 2015 WL 2122289 (D.D.C. May 1, 2015) ................................... 48

*Dearth v. Holder*,
   641 F.3d 499 (D.C. Cir. 2011) ...................................................................................... 12

*Department of Homeland Security v. Thuraissigiam*,
   591 U.S. 103 (2020) ............................................................................................ 25, 30, 33

*Dep't of Educ. v. Brown*,
   600 U.S. 551 (2023) ...................................................................................................... 15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) .................................................................................................. 36

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ................................................................................................. 28, 29

*Doe v. Trump*,
  319 F. Supp. 3d 539 (2018) ........................................................................ 48

*Env't Working Grp. v. FDA*,
  301 F. Supp. 3d 165 (D.D.C. 2018) .......................................................... 19

*Equal Rts. Ctr. v. Post Props., Inc.*,
  633 F.3d 1136 (D.C. Cir. 2011) ................................................................ 19

*Erby v. United States*,
  424 F. Supp. 2d 180 (D.D.C. 2006) ............................................................ 8

*Fernandors v. District of Columbia*,
  382 F. Supp. 2d 63 (D.D.C. 2005) ............................................................ 36

*Firearms Pol'y Coal., Inc. v. Barr*,
  419 F. Supp. 3d 118 (D.D.C. 2019) .......................................................... 20

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) .................................................................. 19

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................ 45, 47, 48, 49

*Fund for Animals, Inc. v. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) .................................................................... 44

*Garcia v. U.S. Citizenship & Immigr. Servs.*,
  168 F. Supp. 3d 50 (D.D.C. 2016) ............................................................ 10

*Garnett v. Zeilinger*,
  323 F. Supp. 3d 58 (D.D.C. 2018) ............................................................ 17

*George Wash. Univ. v. District of Columbia*,
  318 F.3d 203 (D.C. Cir. 2003) .................................................................. 26

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) .......................................................... 33

*Gustave-Schmidt v. Chao*,
  226 F. Supp. 2d 191 (D.D.C. 2002) ............................................................ 9

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ................................................................................ 49

*Harris v. District of Columbia*,
  932 F.2d 10 (D.C. Cir. 1991) .............................................................. 28, 30

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir.) ............................................................................ 48

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022) ...................................................... 31, 41, 42

*Hurd v. District of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017) .................................................................. 27

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004) .................................................................. 44

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
  685 F.3d 1066 (D.C. Cir. 2012) ................................................................ 13

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ................................................................................ 31

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 557 (4th Cir.) ............................................................................ 48

iv

*Jean v. Nelson*,
  727 F.2d 957 (11th Cir. 1984) ................................................................................... 33

*Jerome Stevens Pharmacy, Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005) .................................................................................. 8

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ................................................................................... 35

*Kim v. Brownlee*,
  344 F. Supp. 2d 758 (D.D.C. 2004) ........................................................................... 32

*Kingman Park Civic Ass'n v. Gray*,
  27 F. Supp. 3d 142 (D.D.C. 2014) ............................................................................. 35

*Knife Rts., Inc. v. Vance*,
  802 F.3d 377 (2d Cir. 2015) ...................................................................................... 20

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ................................................................................................... 9

*Larsen v. U.S. Navy*,
  525 F.3d 1 (D.C. Cir. 2008) ....................................................................................... 12

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular, Affs.*,
  104 F.3d 1349 (D.C. Cir. 1997) ................................................................................. 33

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................................... 35

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................ 10, 11, 14, 17

*M.M.V. v. Garland*,
  1 F.4th 1100 (D.C. Cir. 2021) ................................................................................... 30

*Maniar v. Mayorkas*,
  Civ. A. No. 19-3826 (EGS), 2023 WL 2709040 (D.D.C. Mar. 30, 2023) ........................ 10, 14

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) ............................................................................................ 36, 37

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) .............................................................................................. 47, 48

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................................... 40

*Narenji v. Civiletti*,
  617 F.2d 745 (D.C. Cir. 1979) ................................................................................... 35

*Nat'l Ass'n of Home Builders v. EPA*,
  667 F.3d 6 (D.C. Cir. 2011) ....................................................................................... 22

*Nat'l Ass'n of Internal Revenue Emps. v. Nixon*,
  349 F. Supp. 18 (D.D.C. 1972) .................................................................................. 48

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) ................................................................................... 23

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ................................................................................. 49

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ................................................................................ 41, 43, 44, 46

*Nova Oculus Partners, LLC v. FDA*,
  Civ. A. No. 20-1174 (DLF), 2020 WL 7230678 (D.D.C. Dec. 8, 2020) ............................ 40

*O'Shea v. Littleton,*
  414 U.S. 488 (1974)..................................................................................................... 12

*Palisades Gen. Hosp. Inc. v. Leavitt,*
  426 F.3d 400 (D.C. Cir. 2005) ................................................................................... 39

*PETA v. Dep't of Agric.,*
  797 F.3d 1087 (D.C. Cir. 2015)................................................................................. 19

*Planned Parenthood of Wis., Inc. v. Azar,*
  942 F.3d 512 (D.C. Cir. 2019) ................................................................................... 13

*Plyler v. Doe,*
  457 U.S. 202 (1982)..................................................................................................... 33

*Pub. Citizen, Inc. v. Trump,*
  297 F. Supp. 3d 6 (D.D.C. 2018) ............................................................................. 16

*Ramos v. Wolf,*
  975 F.3d 872 (9th Cir. 2020) ..................................................................................... 38

*RCM Techs., Inc. v. Dep't of Homeland Sec.,*
  614 F. Supp. 2d 39 (D.D.C. 2009) ........................................................................... 47

*Rochin v. California,*
  342 U.S. 165 (1952)..................................................................................................... 26

*Rockwell Int'l Corp. v. United States,*
  549 U.S. 457 (2007)..................................................................................................... 10

*Sacramento v. Lewis,*
  523 U.S. 833 (1998)..................................................................................................... 25

*Safari Club Int'l v. Zinke,*
  Civ. A. No. 15-1026 (RCL), 2017 WL 8222114 (D.D.C. May 2, 2017)................ 22

*Scenic Am., Inc. v. Dep't of Transp.,*
  836 F.3d 42 (D.C. Cir. 2016) ............................................................................... 23, 35

*Shaughnessy v. United States ex rel. Mezei,*
  345 U.S. 206 (1953)..................................................................................................... 25

*Simon v. E. Ky. Welfare Rts. Org.,*
  426 U.S. 26 (1976)....................................................................................................... 17

*Sw. Bell Tel. Co. v. FCC,*
  168 F.3d 1344 (D.C. Cir. 1999) ................................................................................. 13

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ............................................................................. 48, 49

*Troxel v. Granville,*
  530 U.S. 57 (2000)....................................................................................................... 27

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990)..................................................................................................... 33

*Vasser v. McDonald,*
  228 F. Supp. 3d 1 (D.D.C. 2016) ............................................................................. 35

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977)..................................................................................................... 37

*Village of Bald Head Island v. Army Corps of Eng'rs,*
  714 F.3d 186 (4th Cir. 2013) ..................................................................................... 46

*Washington v. Davis,*
  426 U.S. 229 (1976)..................................................................................................... 34

*Washington v. Glucksberg*,
  521 U.S. 702 (1997), ........................................................................................ 24
*Wayte v. United States*,
  470 U.S. 598 (1985) ........................................................................................ 34
*Weingarten v. Devos*,
  468 F. Supp. 3d 322 (D.D.C. 2020) ............................................................... 21
*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................................ 14
*Wise v. Glickman*,
  257 F. Supp. 2d 123 (D.D.C. 2003) ............................................................... 40
*Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*,
  93 F.3d 910 (D.C. Cir. 1996) .......................................................................... 33
*Worth v. Jackson*,
  451 F.3d 854 (D.C. Cir. 2006) ........................................................................ 10
*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ........................................................................................ 25

Statutes

5 U.S.C. § 551(13) ......................................................................................... 44, 45
5 U.S.C. § 701(a)(2) ............................................................................................ 35
5 U.S.C. § 704 ..................................................................................................... 44
5 U.S.C. § 706(1) ........................................................................................... 41, 42
5 U.S.C. § 706(2) ........................................................................................... 38, 43
8 U.S.C. § 1158(d)(2) ......................................................................................... 16
8 U.S.C. § 1231(b)(3) ..................................................................................... 32, 42
8 U.S.C. § 1254a(b)(2) ........................................................................................ 16
42 U.S.C. § 247d ................................................................................................... 7
42 U.S.C. § 247d(a) .............................................................................................. 7
42 U.S.C. § 265 ............................................................................................. passim
U.S.C. § 1158 ...................................................................................................... 31

Regulations and Other Authorities

8 C.F.R. § 208.5(a) .............................................................................................. 16
8 C.F.R. § 208.7 .................................................................................................. 16
8 C.F.R. § 274a.12(c)(8) ..................................................................................... 16
31 Fed. Reg. 8,855 ................................................................................................. 5
85 Fed. Reg. 16,559 .......................................................................................... 5, 6
85 Fed. Reg. 17,060 .............................................................................................. 6
85 Fed. Reg. 56,424 .............................................................................................. 6
86 Fed. Reg. 42,828 ......................................................................................... 6, 35
88 Fed. Reg. 1,243 .............................................................................................. 17
88 Fed. Reg. 5,022 ......................................................................................... 15, 16

By and through undersigned counsel, Defendants[1] respectfully submit this memorandum in support of their motion to dismiss Plaintiffs' Supplemental and Amended Class Action Complaint for Injunctive and Declaratory Relief ("Amended Complaint"; ECF No. 75).

Plaintiffs, consisting of individuals and an organization, challenge the expulsion in September 2021 of certain Haitian migrants—who crossed the southern border that month at Del Rio, Texas—under a now-expired public health order issued pursuant to section 265 of Title 42 of the U.S. Code, and challenge the conditions and treatment of those migrants while waiting to be processed by CBP prior to expulsion.  While all other suits regarding such Title 42 orders have long been dismissed as moot, Plaintiffs seek to continue their litigation over these past events and policies.  Although suits about the past have their place, past injuries generally do not provide plaintiffs standing to seek declaratory and injunctive relief, which are what Plaintiffs seek here.  As explained below, neither Individual Plaintiffs nor the organizational plaintiff, Haitian Bridge Alliance ("Bridge Alliance"), satisfy the relevant standards for standing that would support this Court's subject matter jurisdiction.

And even if Plaintiffs have standing to litigate the past, despite the lack of a live controversy over those events, the Amended Complaint fails to allege any plausible claims for relief.  The constitutional claims predicated on Individual Plaintiffs' experience in Del Rio must

---

[1]  Defendants are President Joseph R. Biden, Jr.; Alejandro N. Mayorkas, Secretary of Homeland Security; U.S. Department of Homeland Security ("DHS"); U.S. Customs and Border and Protection ("CBP"); Troy A. Miller, Acting Commissioner for CBP; Diane J. Sabatino, Acting Executive Assistant Commissioner of CBP's Office of Field Operations; Jason Owens, Chief of U.S. Border Patrol; U.S. Immigration and Customs Enforcement ("ICE"); Patrick Lechleitner, Deputy Director & Senior Official Performing the Duties of the Director of ICE; U.S. Department of Health and Human Services ("HHS"); Xavier Becerra, Secretary of HHS; Centers for Disease Control and Prevention ("CDC"); and Mandy Cohen, Director of CDC.  Am. Compl. ¶¶ 23-35. CBP Defendants, ICE Defendants, Defendants Mayorkas, and DHS are referred to collectively as "DHS Defendants." *Id*. ¶ 30 n.4.  Becerra, HHS, Cohen, and CDC are referred to collectively as "HHS Defendants." *Id*. ¶ 34 n.5.

be dismissed because the required circumstances on which to anchor due process protections are not present.  Plaintiffs' administrative challenges under the Administrative Procedure Act ("APA") must also be dismissed because there is no existing final agency action to "set aside" or required non-discretionary withheld agency action to "compel."  Again, the relevant public health orders under section 265 of Title 42 expired over a year ago.

Therefore, Defendants respectfully submit that the Amended Complaint should be dismissed in its entirety.

## BACKGROUND

Although the Amended Complaint is not a "short and plain statement" of claims—running 117 pages and 474 paragraphs (plus prayer for relief) in length—the claims and underlying allegations may be summarized succinctly as follows.

## I.    Arrival of Individual Plaintiffs and Thousands of Haitian Migrants at Del Rio, Texas

"From approximately September 9 to 24, 2021, at least 15,000 Haitians" crossed the Rio Grande River "near the Del Rio International Bridge" and the Del Rio Port of Entry in Del Rio, Texas.  Am. Compl. ¶¶ 1, 62.  Among them were Individual Plaintiffs, comprising single adults and family units.  *See id.* ¶¶ 13-22.  They all allege that they crossed into the United States in order to "seek asylum."  *Id*.

Much of Plaintiffs' Amended Complaint is focused on the conditions Individual Plaintiffs encountered in and around the Del Rio International Bridge, which Plaintiffs refer to as the "CBP Encampment."  *Id.* ¶ 3.  When thousands of Haitian migrants arrived at Del Rio, CBP established a "ticketing system" through which arriving migrants were called by "numbered, color-coded ticket" to be processed by CBP.  *Id.* ¶ 83.  While Haitian migrants waited to be processed, CBP set up "service stations . . . to distribute of food and water" to the migrants, but Plaintiffs allege

the food and water was "inadequate." *Id*. ¶¶ 93-97.  Plaintiffs note that World Central Kitchen was able to set up additional meal distribution and that Individual Plaintiffs were able to procure additional food and water by crossing back into Mexico. *Id*. ¶¶ 97, 105.  Plaintiffs also allege that there was medical care at Del Rio but that it too was inadequate, although Plaintiffs acknowledge that some ill migrants were taken to hospitals in the United States. *Id*. ¶¶ 113-22.  Plaintiffs further allege that many migrants lacked shelter, beds, or cots while they waited to be processed. *Id*. ¶¶ 108-12.  Plaintiffs complain of verbal abuse, and in certain instances, physical assaults by CBP personnel. *Id*. ¶¶ 123-26.  Plaintiffs assert that the DHS Defendants were unprepared for the arrival of the thousands of Haitian migrants despite having advance warning of their movement towards the southwest border. *Id*. ¶¶ 70-75.

Much of Plaintiffs' Amended Complaint is also focused on the now expired CDC Order that authorized the expulsion of migrants during the COVID-19 pandemic under Title 42 of the U.S. Code.  The Amended Complaint alleges that many, but not all, Individual Plaintiffs were expelled in September 2021 from the United States pursuant to the CDC's public health order under 42 U.S.C. § 265 without being able to make claims for asylum or assert other protections like withholding of removal.  Individual Plaintiffs Esther and Emmanuel Doe, Samuel and Samantha Doe, Paul Doe, and Delgado Doe were not expelled in September 2021 because they decided to return to Mexico. *Id*. ¶¶ 16-18, 22.

## II.   Individual Plaintiffs

All Individual Plaintiffs allege to have crossed the border into Del Rio, Texas in September 2021, but they fall into one of two categories.  One group of Individual Plaintiffs that originally sued is presently residing in the United States as a result of these individuals having subsequently returned to the United States and received grants of parole ("Domestic Plaintiffs"): Mirard and Madeleine Prospere (Am. Compl. ¶ 264); Mayco ("Michael") Celon and Veronique Cassonell (*id*.

¶ 272); Jacques Doe (*id*. ¶ 281); Esther and Emmanuel Doe (*id*. ¶ 291); Samuel and Samentha Doe (*id*. ¶ 301); and Paul Doe (*id*. ¶ 309).  Further, all Domestic Plaintiffs have filed or are in the process of filing applications for asylum.  *Id*. ¶¶ 264, 272, 281, 291, 301, 309.  Some of the Domestic Plaintiffs allege that prior to receiving parole they were expelled after crossing the border at Del Rio, Texas, in September 2021.  *Id*. ¶¶ 260, 270, 279.  Other Domestic Plaintiffs had crossed the border back into Mexico and were not expelled in September 2021.  *Id*. ¶¶ 289, 299, 307.

The second group of Individual Plaintiffs are newly added to the Amended Complaint, and all presently reside outside the United States ("Foreign Plaintiffs"): Eric and Florence Doe (*id*. ¶ 318); Pierre and Ginette Doe (*id*. ¶ 325); James Doe (*id*. ¶ 335); Delgado Doe (*id*. ¶ 342).  They too allege that they crossed the border at Del Rio, Texas, in September 2021 (*id*. ¶¶ 312, 320, 327, 337), although Delgado Doe was not expelled as a result of his September 2021 border crossing because he had returned to Mexico (*id*. ¶ 340).

## III.    "Del Rio Deterrence Decision"

The Amended Complaint challenges something Plaintiffs themselves call the "Del Rio Deterrence Decision."  Plaintiffs characterize this as "a decision to suppress the growing number of Haitians arriving at the border near Del Rio and to prevent and deter these Haitian asylum seekers from accessing protection in the United States by subjecting them to harsh conditions and then summarily expelling them."  Am. Compl. ¶ 60.  The Amended Complaint alleges that "the Del Rio Deterrence Decision was made" by unnamed "White House advisors . . . and subsequently adopted and implemented by DHS Defendants."  *Id*. ¶¶ 61, 69.  DHS, and in particular CBP and ICE, were allegedly "responsible for implementing and applying" this so-called policy.  *Id*. ¶ 24.

Importantly, as the Amended Complaint makes clear, the "Del Rio Deterrence Decision" is simply a label for the "application of the Title 42 Process" in Del Rio in September 2021 allegedly "in a manner indifferent to humanitarian concerns."  *Id*. ¶¶ 69, 252, 386.  The Amended

Complaint consistently pairs the Del Rio Deterrence Decision with Title 42, *see id*. ¶¶ 23, 24, 60, 69, 132, 136, 160, 165, because the CDC's public health order pursuant to 42 U.S.C. § 265 is what provided the legal authority to expel migrants.

## IV.   Public Health Authority Under 42 U.S.C. § 265

The Amended Complaint makes a variety of allegations concerning the legal authority granted in Title 42 of the U.S. Code and specifically 42 U.S.C. § 265.  Am. Compl. ¶¶ 52-57; 192-218.  In Section 265, Congress gave the Executive the power to exclude individuals from the United States during public health emergencies.  It states:

> Whenever Surgeon General[2] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

In response to the COVID-19 pandemic that began in 2020, HHS issued an interim final rule to implement the authority granted in Section 265 and "enable the CDC Director to suspend the introduction of persons into the United States."  Control of Communicable Diseases; Foreign Quarantine: Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 16,559, 16,563 (Mar. 24, 2020).  This interim rule defined the "introduction into the United States of persons from a foreign country" as

---

[2]   In 1966, acting pursuant to the Reorganization Act of 1949, President Johnson transferred the Surgeon General's authority to what is now the Department of Health and Human Services. 31 Fed. Reg. 8855 (June 25, 1966).  Today, the Centers for Disease Control and Prevention, which is part of HHS, exercises the authority that § 265 gave the Surgeon General.  85 Fed. Reg. 16,559, 16,560, 16,563 (Mar. 24, 2020).

"the movement of a person from a foreign country . . . so as to bring the person into contact with persons in the United States . . . in a manner that the Director determines to present a risk of transmission of a communicable disease." *Id*. at 16,566.  That definition covered "those who have physically crossed a border of the United States and are in the process of moving into the interior in a manner the Director determines to present a risk of transmission of a communicable disease." *Id*. at 16,563.  The CDC promptly applied that interim final rule by issuing an order prohibiting the introduction into the United States of "covered aliens" traveling from Canada or Mexico.  *See* Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020).  "Covered aliens" were defined as noncitizens "who are traveling from Canada or Mexico (regardless of their country of origin), and who must be held longer in congregate settings in [Ports of Entry] or Border Patrol stations to facilitate immigration processing."  *Id*.  As a general matter, that meant noncitizens who "lack valid travel documents." *Id*.  In September 2020, HHS and the CDC issued a final rule implementing the authority granted in Section 265.  *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 Fed. Reg. 56,424 (Sept. 11, 2020).

As relevant for this case, as of September 2021, the applicable CDC Order was issued on August 5, 2021.  *See* Centers for Disease Control and Prevention, Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021) ("August 2021 Order" or "Title 42 Order").  The August 2021 Order continued the suspension of the right to introduce into the United States "covered noncitizens" who would otherwise be introduced into a congregate setting

in a Port of Entry or U.S. Border Patrol station, such as "noncitizens who are apprehended at or near the border seeking to unlawfully enter the United States[.]" *Id*. at 42,841.  The Order allowed for certain exceptions from its scope, including "[p]ersons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." *Id*. at 42,841.

Significantly, the August 2021 Order stated that it would "remain effective until either the expiration of the Secretary of HHS' declaration that COVID-19 constitutes a public health emergency, or [the CDC Director] determine[s] that the danger of further introduction, transmission, or spread of COVID-19 into the United States has ceased to be a serious danger to public health and continuation of this Order is no longer necessary to protect public health, whichever occurs first." *Id*. at 42,841.  Ultimately, on May 11, 2023, the Secretary of Health and Human Services' declaration of COVID-19 constituting a public health emergency expired, which caused CDC's August 2021 Order to likewise expire by its terms.  That is, the public health emergency declaration by the Secretary of Health and Human Services was authorized under 42 U.S.C. § 247d, and by statute expired after ninety days unless renewed.  42 U.S.C. § 247d(a).  The last public health emergency declaration renewal occurred on February 9, 2023.  *See* Renewal of Determination That a Public Health Emergency Exists (Feb. 9, 2023), *available at* https://aspr. hhs.gov/legal/PHE/Pages/COVID19-9Feb2023.aspx.

Multiple litigations challenging either the use of Title 42 legal authority or the CDC Director's prior attempt on April 1, 2022, to terminate prior Title 42 orders were dismissed as moot after the public health emergency declaration expired on May 11, 2023.  Defendants refer the

Court, as necessary, to a summary of those litigations found in Defendants' response to the Court's Order to Show Cause (ECF No. 58 at 3-5).

## V.      Plaintiffs' Class Action Lawsuit

Plaintiffs bring this suit as a putative class action, with the class defined as "all Haitian, or presumed Haitian, individuals who (1) sought access to the U.S. asylum process in or around the CBP Encampment near the Del Rio Port of Entry between September 9 and 24, 2021, and (2) were denied access to the U.S. asylum process." Am. Compl. ¶ 356. The Amended Complaint asserts four claims arising under the Due Process Clause of the Fifth Amendment, three claims pursuant to the Administrative Procedure Act ("APA") challenging the prior orders under 42 U.S.C. § 265, and one additional claim pursuant to the APA challenging the purported "Del Rio Deterrence Decision." *Id*. at 99-116. Plaintiffs seek declaratory and injunctive relief. *Id*. at 116-17.

## LEGAL STANDARDS

A Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be presented as a facial or a factual challenge. "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotation marks and citations omitted). When a defendant makes a facial challenge, the district court must accept the allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). With respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims. *Jerome Stevens Pharmacy, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The plaintiff bears the responsibility of establishing the factual predicates of jurisdiction by a preponderance of evidence. *Erby*, 424 F. Supp. 2d at 182.

Pursuant to a motion made under Rule 12(b)(6), the Court may dismiss a case or claim for failure to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  However, a district court is not required to accept conclusory allegations or unwarranted factual deductions as true.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice."  *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (cleaned up).

## ARGUMENT[3]

### I.      Plaintiffs Lack Standing to Bring Their Claims

Defendants begin with the principle that "[f]ederal courts are courts of limited jurisdiction" and that "[i]t is to be presumed that a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Central to this limitation is Article III, Section 2, which limits judicial authority to "Cases" or "Controversies."  As the Supreme Court has explained, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or

---

[3]      Although this memorandum details how the Amended Complaint should be dismissed for a lack of standing and failure to state a claim, Defendants respectfully reiterate that the Court lacked subject matter jurisdiction and erred when it permitted Plaintiffs to amend their Complaint. *See* Feb. 22, 2024, Min. Order.  That is, prior to filing of the Amended Complaint, Plaintiffs either did not have standing or their claims were moot as explained in Defendants' then-pending motion to dismiss and response to the Court's Order to Show Cause.  *See* ECF Nos. 28, 48, 58.

controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (internal quotation marks and citations omitted). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id*. The "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us," as Plaintiffs seek to do in Counts One through Four, "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id*.

Standing and mootness are two "inter-related judicial doctrines" that "ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.'" *Worth v. Jackson*, 451 F.3d 854, 855 (D.C. Cir. 2006). While similar in their functions, standing is assessed at the time a complaint is filed and mootness encompasses circumstances that destroy standing or justiciability after the filing of the complaint. *Garcia v. U.S. Citizenship & Immigr. Servs.*, 168 F. Supp. 3d 50, 64-65 (D.D.C. 2016) (citing cases). Although standing is normally determined at the time the suit is initiated, the Supreme Court has instructed that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007) (citation omitted); *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 603 (D.C. Cir. 2020) (following *Rockwell*). Accordingly, standing, rather than mootness, is the proper jurisdictional analysis at this stage of Plaintiffs' suit. *See also Maniar v. Mayorkas*, Civ. A. No. 19-3826 (EGS), 2023 WL 2709040, at *12-13 (D.D.C. Mar. 30, 2023) (following *Rockwell* and citing cases).

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To satisfy Article III's standing requirements, Plaintiffs must show (1) each suffered an "injury in fact" that is (a) concrete

- 10 -

and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of Defendants; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id*. at 560-61 (internal quotation marks and citations omitted). And because "standing is not dispensed in gross, . . . [each] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up).

Considering the foregoing legal standards and principles, one must conclude that Plaintiffs do not possess standing to litigate the claims in the Amended Complaint and that the Amended Complaint must be dismissed for lack of subject matter jurisdiction.

## A.   Individual Plaintiffs Fail to Allege a Present or Imminent Injury

Plaintiffs acknowledge, in the very first paragraph of the Amended Complaint, that this suit challenges past events and Government policies: "This case challenges the federal government's shameful detention of [Haitian migrants] in deplorable conditions [in September 2021] as well as its rapid expulsion of asylum seekers[.]" Am. Compl. ¶ 1. Accordingly, all legal claims target either the alleged treatment of Individual Plaintiffs at Del Rio in September 2021 or the use of Title 42 legal authority during that period to expel those Individual Plaintiffs that crossed the Southwest border and remained in Del Rio. Specifically, claims One through Four allege that certain Defendants violated Individual Plaintiffs' constitutional equal protection and due process rights "[t]hrough their processing of Individual Plaintiffs" at Del Rio in September 2021 and expelling certain Individual Plaintiffs "in a manner indifferent to humanitarian concern" and without access to asylum protections. *Id*. ¶¶ 375-76, 384, 393, 404. Claims Five through Eight allege that the use of Title 42 legal authority, which ended more than a year ago, and that a purported "decision" "made in September 2021 by White House advisors," which Plaintiffs call the "Del Rio Deterrence Decision," violated the APA. *Id*. ¶¶ 61, 407-74. Any injuries arising

from those past events and expired Government policies are necessarily in the past, because Individual Plaintiffs are neither presently subject to the conditions in Del Rio nor subject to any Title 42 order. Thus, the Amended Complaint does not allege a plausible present or imminent future injury necessary to establish standing to seek declaratory and injunctive relief.

Past injuries are generally insufficient to establish standing to seek declaratory and injunctive relief, as Plaintiffs do here. *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). This is hornbook law, as reflected in the Supreme Court's repeated directives that allegations of past injury "do[] nothing to establish a real and immediate threat" justifying injunctive relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."). This requirement that past harms do not establish standing to seek injunctive and declaratory relief "ensures that the lawsuit does not entail the issuance of an advisory opinion without the possibility of any judicial relief." *Lyons*, 461 U.S. at 129.

Ruling on the lawfulness of the expired Title 42 Order would be an impermissible advisory opinion because, as courts have consistently ruled with respect to other inoperative rules and policies, there is no live controversy to adjudicate. A similar situation arose in *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008), where the D.C. Circuit explained that "because the [agency has] already eliminated the [challenged] [p]olicy and plaintiffs never allege that the [agency] will reinstitute it, any injunction or order declaring it illegal would accomplish nothing—amounting to exactly the type of advisory opinion Article III prohibits." Or stated differently, "courts generally cannot declare unlawful or enjoin policies that are no longer in force." *Almaqrami v. Pompeo*, 933 F.3d 774, 783 (D.C. Cir. 2019).

That the CDC orders under Title 42 expired necessarily means that there is no live controversy regarding their lawfulness.  Proceeding nonetheless to litigate the lawfulness of that policy would amount to nothing more than an impermissible advisory opinion, as courts have found time and time again.  *See, e.g.*, *Akiachak Native Cmty. v. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016) ("Because that regulation no longer exists, we can do nothing to affect Akiachak's rights relative to it[.]"); *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019) ("[B]ecause the 2018 [policy] is now inoperative, a declaration that it was unlawful would amount to nothing more than an advisory opinion."); *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1074 (D.C. Cir. 2012) (consistent with authority that a "challenge to a superseded law is rendered moot," ruling that amendment of regulation over use of post office sidewalks mooted challenge to prior regulation); *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1351 (D.C. Cir. 1999) (concluding Southwestern Bell was not suffering ongoing harm from FCC's prescription of interim rates because the "interim prescription [was] no longer in effect"). In accordance with this settled principle, the Supreme Court, the Fifth Circuit, and the D.C. Circuit have all concluded that other cases challenging CDC's orders under Title 42 are moot for lack of a live controversy.  *See supra* 7-8; *see also* ECF No. 58 at 3-5.  Plaintiffs' suit presents no more a live controversy than those suits.

Unsurprisingly, the Amended Complaint fails to provide factual allegations plausibly establishing that any Individual Plaintiff suffers or imminently will suffer injury from the expired Title 42 Order or from the events of September 2021 in Del Rio that are being challenged in this suit.  *See generally* Am. Compl.  Instead, Plaintiffs offer the conclusory and speculative allegation of a "substantial risk" that Individual Plaintiffs "will again be subject to discriminatory treatment based on race and presumed national origin" and "abusive and unconscionable treatment" at the

hands of DHS as allegedly occurred in Del Rio. *See* Am. Compl. ¶¶ 253, 379, 388, 397. But there are no allegations that such events are impending, which would be necessary to plead injury-in-fact. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact.") (citations omitted); *Maniar*, 2023 WL 2709040, at *15-16 (ruling plaintiff's risk of being placed back on No Fly List was speculative). Plaintiffs also allege that the Foreign Plaintiffs "intend to return to the United States to seek asylum," but allege no facts plausibly indicating that such a return is imminent. Am. Compl. ¶¶ 253, 318, 325, 335, 342. "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury[.]" *Lujan*, 504 U.S. at 564 (citations omitted).

## B. Individual Plaintiffs' Allegations of "Ongoing Harm" Fail to Establish Standing

To avoid the logical conclusion that Individual Plaintiffs lack standing to enjoin or declare unlawful past events and expired Government policies, the Amended Complaint alleges that Individual Plaintiffs "suffer ongoing harm" as a result of the past events in Del Rio and their past expulsions under Title 42. Such allegations are often conclusory and unsupported, *see* Am. Compl. ¶¶ 378, 387, 396, but Defendants address the few articulated harms below.

The Amended Complaint alleges an "ongoing harm" in the form of Individual Plaintiffs not being eligible for the December 22, 2022, redesignation of Haiti for Temporary Protected Status because they had not continuously resided in the United States since November 6, 2022, which is one of the requirements for obtaining Temporary Protected Status. *Id.* ¶¶ 253, 428, 442, 458, 472. The Temporary Protected Status designation is a "discretionary decision" of the Secretary of Homeland Security that offers eligible applicants in the United States temporary,

limited protections from removal.  *See* Extension and Redesignation of Haiti for Temporary Protected Status, 88 Fed. Reg. 5,022, 5,024 (Jan. 26, 2023).  Plaintiffs' theory of harm is that if Individual Plaintiffs had not been expelled in or around September 2021 (although not all Individual Plaintiffs were in fact expelled), then they would have resided in the United States as of November 6, 2022.  *Id.* ¶ 229-30.

First, this is a speculative and hypothetical harm insufficient to support standing.  If Individual Plaintiffs had not been expelled under Title 42, they would have been subject to processes under Title 8 (which includes removal), and it is purely speculative as to whether any Individual Plaintiff would have remained in the United States through to November 6, 2022, would have applied for protection under Temporary Protected Status (*see* 8 U.S.C. § 1254a(c)(1)(A)(iv)), and would have met other eligibility criteria under the program (*see id.* § 1254a(c)(1)-(2)).  In other words, Plaintiffs' theory of harm is based on an impermissible "speculative chain of possibilities" that might have or might not have occurred had the Title 42 Order not been in place. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).

Second, this supposed Temporary Protected Status harm is not "fairly traceable"— meaning that there is no "causal connection between the injury and the conduct complained of"— to either the events at Del Rio in September 2021 or the Title 42 authority granting the power to expel covered noncitizens.  *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023).  A judgment finding the use of Title 42 authority to have been unlawful, for example, would not make Individual Plaintiffs eligible for Temporary Protected Status because that is an independent program subject to the discretion of the Secretary of Homeland Security with separate requirements and eligibility criteria.

Third, the Amended Complaint fails to explain how Temporary Protected Status ineligibility is currently or imminently harming any Individual Plaintiff. Indeed, Domestic Plaintiffs are not harmed because their pending or forthcoming asylum applications (Am. Compl. ¶¶ 264, 272, 281, 291, 301, 309) protect them from removal while the application is pending (*see, e.g.*, 8 C.F.R. § 208.5(a)) and make them eligible for work authorization if their application has been pending for 180 days or more (*see* 8 U.S.C. § 1158(d)(2); 8 C.F.R. §§ 208.7, 274a.12(c)(8)). And the time it takes to adjudicate asylum applications, according to Plaintiffs "four and a half years," greatly exceeds the period of protection under a Temporary Protected Status designation. *See* 8 U.S.C. § 1254a(b)(2), (3)(C) (stating a designation or extension can last no more than eighteen months); 88 Fed. Reg. at 5,023 (the current Temporary Protected Status designation ends on August 3, 2024).[4]

According to the Amended Complaint, another purported harm is that the events at Del Rio "continue to have a chilling effect on class members and other Haitians who would like to exercise their right to asylum," speculating that lower apprehensions of Haitian migrants since September 2021 reflects reticence to seek asylum. Am. Compl. ¶ 254. First, harm "based on an alleged chilling effect is merely speculative and conjectural, which the Supreme Court has consistently held is insufficient to constitute an injury in fact for Article III purposes." *Carik v. Dep't of Health & Hum. Servs.*, 4 F. Supp. 3d 41, 58 (D.D.C. 2013) (citing cases in rejecting an alleged "chilling effect" on the willingness of future victims of drug shortages to seek judicial review of their grievances); *see also Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 39 (D.D.C. 2018) (explaining

---

[4]     The Amended Complaint also takes issue with the Circumvention of Lawful Pathways rule, which Plaintiffs label an "Asylum Ban." Am. Compl. ¶¶ 231-44. None of the legal claims challenge this rule, which did not exist at the time of the challenged actions in September 2021. To the extent Plaintiffs contend that this represents an "ongoing harm," it is indisputably not a harm traceable to the events at Del Rio or the expulsions under Title 42 around September 2021.

that plaintiffs cannot establish standing by creating a harm based on "their fears of [a] hypothetical future harm").[5]   Notably, this naked assertion is in tension with the other conclusory allegations that Foreign Plaintiffs intend to return to the U.S. border.  Second, this generalized allegation is not tied to any particular Individual Plaintiff.  Individual Plaintiffs cannot rely on harm to others to satisfy standing.  *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 65 (D.D.C. 2018).  Indeed, this allegation does not apply to Domestic Plaintiffs because they have been able to return to the United States and, once present in the United States, they may apply for asylum, and the same policy would be available to Foreign Plaintiffs.  *See* Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243 (Jan. 9, 2023).[6]

The Amended Complaint also alleges that Foreign Plaintiffs are exposed to dangerous conditions in Haiti.  Am. Compl. ¶¶ 220, 223-26.  But this allegation, taken as true at this early stage, does not establish standing either.  First, this allegation does not plead an injury traceable to the expired Title 42 Order being challenged in this lawsuit or the events at Del Rio.  As explained in *Lujan*, "there must be a causal connection between the injury and the conduct complained of . . . 'and not . . . th[e] result [of] the independent action of some third party not before the court.'"  *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)); *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) ("We have required 'substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt

---

[5]   The "chilling effect" theory is traditionally alleged in First Amendment cases, which this case is not.

[6]   On January 9, 2023, DHS announced a process by which Haitian nationals living abroad could apply for advance authorization to travel to the United States to seek a discretionary grant of parole at the Port of Entry for a period of up to two years.  88 Fed. Reg. at 1,252-53.  "The two-year period will also enable individuals to seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States."  *Id*. at 1,244.  Put simply, paroled Haitians would be able to apply for asylum and work authorization if paroled.

as to causation and the likelihood of redress.").  The alleged violence and instability in Haiti arise from the conduct of third parties in Haiti and not from the exercise of Title 42 authority in September 2021.

Moreover, Foreign Plaintiffs' exposure to continuing instability in Haiti is not harm being caused at present or imminently by the challenged Title 42 Order, which expired over a year ago. As explained above, Plaintiffs obviously cannot allege that the expired Title 42 Order is presently "den[ying] legal rights" under Title 8 "including their right to access the U.S. asylum process." Indeed, the ability of Domestic Plaintiffs to have requested advance authorization to travel to the United States to seek parole and apply for asylum once in the United States wholly undermines any notion that the expired Title 42 Order or events that took place in Del Rio in September 2021 is presently causing Foreign Plaintiffs harm.  The same parole program available to Domestic Plaintiffs (and used by at least some of them, *see* Am. Compl. ¶¶ 264, 281) is currently available to Foreign Plaintiffs.  *See supra* note 6.

In sum, the few nonconclusory "ongoing harms" are speculative, not traceable to the challenged conduct, and not tied to Individual Plaintiffs.  Again, Individual Plaintiffs cannot avoid the inescapable conclusion that they fail to allege plausible standing to challenge admittedly past Government actions and policies.

### C.  Haitian Bridge Alliance Cannot Establish Organizational Standing

An organization seeking to establish standing may "sue either on their own behalf ('organizational standing') or on behalf of their members ('representational standing')." *Citizens for Resp. & Ethics in Wash. ("CREW") v. Off. of Special Counsel*, 480 F. Supp. 3d 118, 126-27 (D.D.C. 2020).  By claiming that Defendants' conduct "impaired [its] normal programming and resulted in a diversion of organizational and programmatic resources[,]" *see e.g.*, Am. Compl. ¶ 343, the Bridge Alliance alleges that it possesses organizational standing.

Establishing organizational standing is both similar to and distinct from establishing individual standing. "[L]ike an individual plaintiff," an organization must "show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)). But to establish organizational standing, an organization must specifically show that it suffers "a concrete and demonstrable injury to [its] activities" as an organization distinct from "a mere setback to [the organization's] abstract social interests." *PETA v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotation marks and citations omitted).

Courts in this Circuit use a "two-part inquiry" for assessing whether an organization has sufficiently alleged injury-in-fact, asking first "whether the agency's action or omission to act 'injured the [organization's] interest'"; then, if satisfied, inquiring whether "the organization 'used its resources to counteract the harm.'" *PETA*, 797 F.3d at 1099 (quoting *Equal Rts. Ctr.*, 633 F.3d at 1140); *accord Food & Water Watch*, 808 F.3d at 919 (employing same test). To satisfy the first prong, an injury to its interest, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services[.]" *Food & Water Watch*, 808 F.3d at 919 (internal quotation marks and citations omitted). This impairment occurs "when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Id.* (quoting *PETA*, 797 F.3d at 1094).

### 1.   Haitian Bridge Alliance Fails to Allege Present or Imminent Injury

The Bridge Alliance, however, does not allege a present or imminent impairment of its ability to provide services or perform daily operations. As with individual plaintiffs, organizational plaintiffs may not rely on past injuries to plead a present or imminent impairment of its services and operations. *Env't Working Grp. v. FDA*, 301 F. Supp. 3d 165, 170 (D.D.C.

2018) ("the standard is the same as the one for individuals"). Yet the Bridge Alliance's factual allegations clearly allege harms it purportedly suffered in the past. For example, it alleges "at the time of the crisis in Del Rio" and in "the immediate aftermath" it sent staff to Del Rio and Mexico to provide assistance to those migrants. Am. Compl. ¶¶ 344-46, 348. The Bridge Alliance alleges its staff experienced "trauma" and "lost several nights of sleep" at that time. *Id.* ¶¶ 348, 355. It alleges that its work helping Haitians apply for Temporary Protected Status "stalled in September 2021" and that it "had to stall" unnamed then "ongoing projects" so that the Bridge Alliance could staff a hotline to address calls from migrants in detention centers after crossing the border at Del Rio in September 2021. *Id.* ¶¶ 349-50. But such alleged past harms to an organization "is not an injury that can be redressed through the prospective declaratory and injunctive relief sought in this action." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 388 (2d Cir. 2015) (ruling organization's past expenditures could not support standing) (citation omitted).

The Bridge Alliance sprinkles the words "continues" and "ongoing harm" throughout its pleading of organizational injury. *See id.* ¶¶ 344, 351, 352, 353, 355. Yet upon inspection these allegations are vague, conclusory, and plainly insufficient to allege an existing or imminent concrete impairment of the Bridge Alliance's activities. *See id.* The Amended Complaint is simply devoid of any specific, factual allegations of a present or imminent impairment of the Bridge Alliance's services and operations caused by events at Del Rio from over two-and-a-half years ago and by a long-expired Government policy. Ultimately, as with Individual Plaintiffs, the Bridge Alliance seeks an "advisory judicial pronouncement that some unlawful action occurred in the past. The standing inquiry demands more*." Firearms Pol'y Coal., Inc. v. Barr*, 419 F. Supp. 3d 118, 127 (D.D.C. 2019) (ruling declaratory judgment would not enable the plaintiff organization to obtain redress for the inability to sell bump stocks during a certain period).

2.      The Bridge Alliance Fails to Allege an Impairment of Its Services and
        <u>Operations</u>

The failure to sufficiently allege a present or imminent impairment to its organizational

activities is dispositive, but the Bridge Alliance's claim to standing fails for other reasons as well.

Most of the Bridge Alliance's allegations detail how it diverted or "used its resources" to respond

to events occurring over two years ago (e.g., diverting staff to Del Rio, setting up a hotline, etc.),

but such allegations are relevant to only the second prong of the organizational injury-in-fact

analysis.  As the Court explained in *Center for Responsible Science v. Gottlieb*, 346 F. Supp. 3d

29 (D.D.C. 2018), *aff'd*, 809 F. App'x 10 (D.C. Cir. 2020), such allegations "come[] into play only

after Plaintiff shows an initial impairment to its programs."  *Id*. at 41.  "Put otherwise, an

organization can only divert resources to counteract 'that harm' once there is a harm to counteract.

The diversion itself cannot alone constitute the harm."  *Id*.  There must be "something about the

challenged action itself—rather than the organization's response to it—[that] makes the

organization's task more difficult."  *Id*.

The only allegations that arguably speak to the first prong of the organizational injury-in-

fact analysis are the allegations that the Bridge Alliance "postpone[d] several clinics" to train

people to provide "pro bono assistance with [Temporary Protected Status] applications" and

"experienced a significant delay in launching a long-planned community center in California."

Am. Compl. ¶¶ 349, 354.  The Amended Complaint, though, does not explain how the challenged

events in Del Rio or the Title 42 legal authority inhibited the ability to provide those clinics or

launch the community center apart from the Bridge Alliance's voluntary decision to divert

resources away from those projects, which as stated is insufficient.  *See Weingarten v. Devos*,

468 F. Supp. 3d 322 (D.D.C. 2020) (finding teacher federation's decision to "redirect resources

from other projects" insufficient to establish organizational impairment).  Further, even if one

assumes that these delayed projects constitute an impairment of the Bridge Alliance's ability to engage in the projects, these are allegations of past harms and not present harms traceable to the past challenged conduct.

While Plaintiffs allege that "the demand on Haitian Bridge's resources has increased in Mexico and along the southern border" in relation to its California-based activities, Am. Compl. ¶ 352, aiding Haitian asylum seekers is, by Plaintiffs' own admission, part of its normal activities. As detailed in the Amended Complaint, "[s]ince 2015, Haitian Bridge has provided services to asylum seekers and other migrants at the border and throughout their U.S. immigration proceedings." *Id*. ¶ 12. The Bridge Alliance is not injured by activities in which it ordinarily engages. *See Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 221 (D.D.C. 2020) (ruling "[plaintiff] cannot assert Article III standing by claiming the activities that it would otherwise engage in now injure it"); *Safari Club Int'l v. Zinke*, Civ. A. No. 15-1026 (RCL), 2017 WL 8222114, at *5 (D.D.C. May 2, 2017) (ruling organization's alleged harm was insufficient because it was "part and parcel" of its mission and "normally expended operational costs"). It is to be expected that the Bridge Alliance would have expended resources in providing services to the unprecedented number of Haitian migrants—over 15,000—that crossed the border from Mexico to the United States in September 2021. The Amended Complaint does not explain how the Bridge Alliance's expenditure of resources to provide aid was any greater than it normally would have been to aid that number of migrants in the absence of the supposedly unlawful government conduct alleged in the Amended Complaint. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) (ruling organization failed to show that its expenditures were beyond those normal to carry out its mission).

Similarly, the Amended Complaint fails to delineate how the Bridge Alliance's alleged diversion of resources are traceable to allegedly unlawful Government conduct rather than caused by conduct of third parties (in this case, the sudden influx of 15,000 migrants).  *See Am. Sports Council v. Dep't of Educ.*, 850 F. Supp. 2d 288 (D.D.C. 2012) (denying standing to organization that failed to connect injury to defendant's conduct as opposed to independent third parties).

Further, to the extent the Bridge Alliance contends that it has redirected some of its resources into litigation of this matter, *see, e.g.*, Am. Compl. ¶ 12 (alleging that since the encampment was cleared, the Bridge Alliance has provided "legal services to Haitian asylum seekers expelled from Del Rio"), ¶ 351, this is considered to be a "self-inflicted" decision and insufficient to support standing.  *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (quoted in parenthetical, quoted citation omitted)).

Finally, the Amended Complaint is silent regarding how any alleged injury of the Bridge Alliance would be "likely" redressed by the relief sought.  Indeed, a court order declaring past Government actions and policies to have been unlawful or ordering that Individual Plaintiffs be eligible for various immigration benefits, *see generally* Prayer for Relief, would not redress the Bridge Alliance's purported injuries, whether they be its past diversion of resources or project delays. *See Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 50-51 (D.C. Cir. 2016) (holding that organizational plaintiff failed redressability prong of standing).

Ultimately, the Bridge Alliance fails to allege a tangible impairment to its operations caused by Defendants' actions, beyond its own diversion of resources, and what the Bridge Alliance does allege are not present or imminent harms traceable to the actions being challenged

or redressable through a favorable judgment.  The Bridge Alliance should be dismissed as an organizational Plaintiff.

## II.   Plaintiffs' Claims Based on the Due Process Clause Should Be Dismissed

The first four claims of the Amended Complaint rely on the Fifth Amendment's Due Process Clause even though due process protections do not extend to noncitizens seeking admission to the United States at the border.  For this reason and a variety of pleading deficiencies detailed below, the Court should dismiss Counts One through Four.

### A.   Substantive Due Process Claims

#### 1.   Count Two

In Count Two, Plaintiffs assert that President Biden and DHS Defendants violated substantive due process under the Fifth Amendment.  Am. Compl. ¶¶ 381-89.  The Fifth Amendment provides that no person shall be "deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Due Process Clause "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty[.]"  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (cleaned up).  Because the scope of substantive due process is limited to recognized fundamental rights, the Supreme Court has cautioned that the substantive due process analysis must begin with a "careful description" of the asserted right, for "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field."  *Id.* at 721; *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("failing to provide a reasonably safe work environment" is not a right protected by the substantive component of the Due Process Clause).  This analysis requires a "focus on the allegations in the complaint to determine how [plaintiff] describes the constitutional right at stake and what the [government] did to deprive [plaintiff]."  *Id.*  In addition to identifying the fundamental liberty or property interest

at stake, a plaintiff must also plausibly allege with respect to that interest that the government's "conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Butera v. District of Columbia*, 235 F.3d 637, 651 (D.C. Cir. 2001) (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). "This stringent requirement exists to differentiate substantive due process . . . from local tort law." *Id*. (citations omitted).

Here, Plaintiffs' due process claim fails at the threshold because the Amended Complaint fails to allege a recognized fundamental liberty or property right or interest to which Individual Plaintiffs were entitled and deprived. To begin, Plaintiffs are patently incorrect in asserting that the "Due Process Clause applies to all 'persons' on United States soil" and thus automatically extended to Individual Plaintiffs as soon as they crossed the southern border. Am. Comp. ¶ 383. The Supreme Court has repeatedly rejected this very same contention, most recently in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), as "contrary to more than a century of precedent." *Id*. at 138. The Court explained that noncitizens attempting to enter the United States "are 'treated' for due process purposes 'as if stopped at the border.'" *Id*. at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). And individuals who are stopped "shortly after unlawful entry cannot be said to have 'effected an entry.'" *Id*. at 140 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). Whether a noncitizen arrives at a port of entry or, like Individual Plaintiffs, crosses the border between ports of entry, the noncitizen "is not considered to have entered the country" for purposes of constitutional due process, and thus is provided only those rights provided to them by Congress. *Id*. at 139. The "century-old rule regarding the due process rights of an alien seeking initial entry. . . . would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil." *Id*.

Plaintiffs' "soil"-based due process contention is insufficient as a matter of law because any claim to substantive due process must be anchored to a cognizable fundamental liberty or property interest.  *See Abdelfattah v. Dep't of Homeland Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015) (affirming dismissal of substantive due process claim because "Abdelfattah has not alleged facts suggesting he has been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest.").  Sufficiently identifying and alleging a liberty or property interest at stake is a necessary predicate for stating a plausible substantive due process claim.  *See George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003) (holding that substantive due process imposes no burden on the government "in the absence of a liberty or property interest").

The Amended Complaint attempts to satisfy this requirement by alleging that President Biden and DHS Defendants "violated Individual Plaintiffs' fundamental rights, including their rights to bodily integrity, freedom from bodily restraint, and family integrity."  Am. Compl. ¶ 386.  Yet the Amended Complaint fails to explain how such rights were violated.  The words "bodily integrity, freedom from bodily restraint, and family integrity" appear nowhere else in the 474 paragraph Amended Complaint and this conclusory assertion in Paragraph 386 does not refer the Court to any specific allegations of Individual Plaintiffs.

Further, to the extent such constitutional liberty interests have been recognized, they plainly do not exist under the circumstances alleged in the Amended Complaint.  The right to "bodily integrity," as construed by the Supreme Court, refers to the right to control one's own body.  *See Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269 (1990) ("This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment."); *Rochin v. California*, 342 U.S. 165, 172 (1952) (finding "[i]llegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove

what was there, the forcible extraction of his stomach's contents" to obtain evidence against petitioner was deemed to shock the conscience). Similarly, one's right to "freedom from bodily restraint" is understood to refer to incarceration, involuntary commitment, and similar government-imposed confinement. *See, e.g.*, *Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017).

And with respect to "family integrity," it refers to the "interest of parents in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). The Amended Complaint does not plausibly allege a violation of family integrity as there are no allegations that children of Individual Plaintiffs were forcibly separated from parental custody. *See generally* Am. Compl.

Because Plaintiffs have not alleged a recognized liberty interest applicable to Individual Plaintiffs, the Court need not consider whether the alleged deprivation was so egregious as to shock the contemporary conscience. Even so, what Plaintiffs challenge—the "manner" in which DHS Defendants enforced CDC's Title 42 authority—does not qualify as conduct that "shocks the conscience" under existing jurisprudence. Even while taking Plaintiffs' allegations as true at this stage, actions taken in the "administration of government programs" are not typically a matter of constitutional due process. In *Collins*, for example, the Court declined to extend constitutional due process to a municipal employee who died from asphyxia in the course of his work in sewer lines because the city customarily failed to train or warn its employees about known hazards. 503 U.S. at 117. The Court explained that "[d]ecisions regarding the allocation of resources" and that involve competing "policy choices" are best left to "elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Id*. at 128-29.

Plaintiffs may find conditions in Del Rio and the expulsion process to have been concerning, but they do not satisfy the constitutional standard for violations of substantive due process.

2.    Count Three

Plaintiffs make a second, but no more successful, attempt at pleading a substantive due process claim in Count Three.  In Count Three, Plaintiffs predicate a substantive due process claim against DHS Defendants on a "special relationship" that they assert was created at the alleged "CBP Encampment" at Del Rio.  Am. Compl. ¶¶ 390-98.  Specifically, Plaintiffs allege "[t]hrough their processing of Individual Plaintiffs at the CBP Encampment pursuant to the CBP Capio Memo and as one manifestation of the overarching Del Rio Deterrence Decision, DHS Defendants and DHS personnel created a 'special relationship' with Individual Plaintiffs by restraining their liberty, keeping them in DHS Defendants' custody, and rendering them unable to care for themselves." *Id.* ¶ 393.  As a result of the "special relationship," DHS Defendants allegedly owed Individual Plaintiffs a "heightened duty of care and protection" that was violated by the conditions at the "CBP encampment."  *Id.* ¶¶ 393-94.

The special relationship or "custody exception is narrowly construed" by courts.  *Butera*, 235 F.3d at 648.  As explained by the Supreme Court, "it is the [government's] affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause[.]"  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).  When the government "by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself," "the Constitution imposes upon the [government] affirmative duties of care and protection with respect to" that individual.  *Id.* at 198, 200.  In other words, when the government "enter[s] into 'certain special relationships' with the person," the government has a "due process obligation."  *Harris v.*

*District of Columbia*, 932 F.2d 10, 13-14 (D.C. Cir. 1991) (quoting *DeShaney*, 489 U.S. at 197). Importantly, "[t]he affirmative duty to protect arises not from the [government's] knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200. Further, "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual." *Id.* at 196.

Here, while Plaintiffs nakedly assert that Individual Plaintiffs were in CBP's custody at Del Rio, *see* Am. Compl. ¶ 394, Plaintiffs have failed to provide factual allegations plausibly establishing that Individual Plaintiffs at the "CBP Encampment" were in any form of government custody.  On the contrary, the Amended Complaint presents numerous, specific allegations demonstrating that Plaintiffs were not in government custody or restrained against their will at the Del Rio bridge.  The Amended Complaint alleges repeatedly that Individual Plaintiffs were able to and did leave Del Rio and "cross[ed] the river back into Mexico," a freedom that - individuals actually in custody would not enjoy.  *See* Am. Compl. ¶¶ 4, 13, 16-18, 22, 105, 135, 139, 161-63, 258, 289, 299, 307, 321, 340.  Similarly, contrary to a restraint on liberty rendering an individual "unable to care for himself," *DeShaney*, 489 U.S. at 200, the Amended Complaint alleges that Plaintiffs crossed back to Mexico "to purchase food and water" and other provisions.  *See id.* ¶ 105. Some Individual Plaintiffs—like 8,000 other Haitian migrants, *see id.* ¶ 139, returned to and remained in Mexico, thereby avoiding expulsion pursuant to Title 42.  *Id.* ¶¶ 289-90, 299, 307, 340. Given these allegations of freedom of movement and ability to seek provisions and care in Mexico, Plaintiffs have not plausibly alleged that a "special relationship" arose at the so-called "CBP

- 29 -

Encampment."  *See Harris*, 932 F.2d at 14 (holding police officers did not enter into a special relationship with victim of drug overdose even when handcuffed and placed in a police van).

Thus, Counts Two and Three should be dismissed because the Amended Complaint fails to state plausible substantive due process claims.

### B.        Procedural Due Process

In Count Four, Plaintiffs allege a claim against all Defendants for a violation of Individual Plaintiffs' procedural due process rights under the Fifth Amendment.  Am. Compl. ¶¶ 399-406. "A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." *Atherton v. D.C. Off. Of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009).  Yet the claim fails because it does not identify a constitutionally protected liberty or property interest that Individual Plaintiffs were deprived without procedural protections.  As established above, Plaintiffs' failure to plead a recognized liberty or property interest is fatal to their claim.  *See, e.g.*, *Alshawy v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 21-2206 (FYP), 2022 WL 970883, at *8 (D.D.C. Mar. 30, 2022) ("Because Alshawy does not assert 'a liberty interest protected by the Constitution,' her procedural due process claim must be dismissed.") (citations omitted).

Again, the Court in *Thuraissigiam* emphasized that a noncitizen "has only those rights regarding admission that Congress has provided by statute" and "the Due Process Clause provides nothing more" with respect to the rights available to noncitizens.  591 U.S. at 140 (noncitizen detained twenty-five yards inside the United States did not have right to judicial review of allegedly flawed credible fear proceeding); *see also M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021) ("Just last term, the Supreme Court confirmed that aliens apprehended while trying to enter the country have no due process rights beyond what Congress has provided by statute[.]").

To the extent that Plaintiffs claim that Individual Plaintiffs had in September 2021 a protected liberty or property interest in "access to the U.S. asylum system" or the "opportunity to establish their potential eligibility for asylum and access other forms of relief from removal" (Am. Compl. ¶¶ 401-03), the D.C. Circuit has already concluded that Plaintiffs are mistaken.   The authority granted by Congress in 42 U.S.C. § 265 gives the Executive the power to "prohibit . . . the introduction of persons" from the United States during periods of serious danger of the introduction of a communicable disease into the United States.   In response to the COVID-19 pandemic, the Executive exercised that statutory authority in the CDC's August 2021 Order through which "covered noncitizens" were prohibited from entering the country.   Individual Plaintiffs, as "covered noncitizens" under the August 2021 Order, "[were] here illegally" and the Executive had the lawful authority to expel them.   *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 729 (D.C. Cir. 2022).   The D.C. Circuit disagreed with Plaintiffs' position here that it is unlawful to expel noncitizens pursuant to Section 265 before allowing them an opportunity to apply for asylum pursuant to 8 U.S.C. § 1158.   *Id*. at 729-31.   Granting asylum is a matter of Executive discretion. *Id*. at 730-31 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (§ 1158 "authorizes the Attorney General, in his discretion, to grant asylum to an alien")).   Yet, "[t]he Executive has shown an intent to exercise that 'discretion' by foreclosing asylum for the specific subset of border crossers covered by its § 265 Order" to protect public health.   *Id*. at 731.   The August 2021 Order under Section 265 foreclosed both the grant of asylum and the "statutorily mandated procedures" for asylum applications provided for in Title 8.   *Id*.   Therefore, under the statutory framework in place in September 2021, no further due process regarding asylum was due Individual Plaintiffs.[7]

---

[7]      Some Plaintiffs returned to Mexico prior to processing by CBP and accordingly would not have been harmed by alleged infirmities in procedural due process, and therefore would not have

While the D.C. Circuit did rule that noncitizens covered by the CDC Order cannot be expelled to countries where they more likely than not would be persecuted on account of a protected ground, as set forth in 8 U.S.C. § 1231(b)(3), the Amended Complaint does not allege that any Individual Plaintiff claimed their "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  Nor does the Amended Complaint allege that any Individual Plaintiff claimed a fear of torture in being expelled to Haiti.  Thus, the Amended Complaint does not plausibly allege that any Individual Plaintiff was denied protections under 8 U.S.C. §§ 1231(b)(3) or 1231 note.  In fact, Plaintiffs allege that CBP personnel were guided by an internal memorandum called the "Capio Memo" that included guidance on identifying and processing noncitizens who claimed a fear of torture.  Am. Compl. ¶ 57.

Thus, Count Four should be dismissed because the Amended Complaint fails to allege a recognized liberty or property interest to which Individual Plaintiffs were entitled in September 2021 and denied without procedural due process.

### C.    Equal Protection

Plaintiffs also rely on the Due Process Clause of the Fifth Amendment to assert a claim in Count One against the President and DHS Defendants for a violation of equal protection.  Am. Compl. ¶¶ 368-80.  Although the Fifth Amendment does not contain an equal protection clause, its due process clause "makes the Fourteenth Amendment's guarantee of equal protection applicable to federal entities." *Kim v. Brownlee*, 344 F. Supp. 2d 758, 760-61 (D.D.C. 2004) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 204 (1995), and *Bolling v. Sharpe*, 347 U.S.

---

standing.  The Amended Complaint alleges that most Haitian migrants who had arrived at Del Rio in September 2021 returned to Mexico.  Am. Compl. ¶ 139.

497 (1954)).  But the equal protection claim fails because "the Fifth Amendment's equal protection clause does not protect any Plaintiff outside the United States, so they have no constitutional claim."  *Gomez v. Trump*, 485 F. Supp. 3d 145, 188 (D.D.C. 2020);  *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs*., 104 F.3d 1349, 1353 (D.C. Cir. 1997) (rejecting equal protection claim because "the migrants, as aliens, may not assert a Fifth Amendment right in challenging the procedures for granting immigrant visas") (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269 (1990)).  And as established above, Individual Plaintiffs, as noncitizens attempting to enter the United States, were "for due process purposes 'as if stopped at the border.'"  *Thuraissigiam*, 591 U.S. at 139 (citations omitted).  Therefore, Count One should be dismissed for one of the same reasons that Plaintiffs' other due process claims fail— the Individual Plaintiffs under the circumstances of noncitizens seeking entry as alleged in the Amended Complaint cannot claim Fifth Amendment equal protection rights regarding the challenged border enforcement actions and policies.  *See supra* at 25-26; *see also, e.g.*, *Jean v. Nelson*, 727 F.2d 957, 969-70 (11th Cir. 1984) (en banc), *aff'd on other grounds*, 472 U.S. 846 (1985).

Yet even if Individual Plaintiffs could claim the protections of the Fifth Amendment, the Amended Complaint does not allege a plausible equal protection violation.  "Equal Protection . . . commands that no [government] shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) (on the other hand, "dissimilar treatment of dissimilarly situated persons does not violate equal protection").  And here, where Plaintiffs are

challenging the facially neutral authority under Title 42 and the manner in which that authority was implemented, proof of racially discriminatory intent or purpose is required to state a violation of the Equal Protection Clause. *Washington v. Davis*, 426 U.S. 229, 238-39 (1976).  In sum, the "ordinary equal protection standards . . . require petitioner to show both . . . a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985).  The Amended Complaint fails to plausibly allege either.

The Amended Complaint fails to identify noncitizens (i) of a different race or national origin (ii) who were "similarly situated" to Individual Plaintiffs (i.e., 15,000 persons crossing the border in a span of days, Am. Compl. ¶ 62) and (iii) that were treated differently under the law (e.g., not subject to the Title 42 Order).  Instead, the Amended Complaint briefly mentions a migrant group of unspecified size and unspecified race and nationality who encamped under the Anzalduas International Bridge in Mission, Texas, in spring 2021.  *Id.* ¶ 182.  The sparse allegations regarding Anzalduas suggest more similarities than differences: the Government established temporary outdoor processing, provided humanitarian support directly (e.g., CBP "service stations" for distribution of food and water and "medical tent") and through non-government organizations (e.g., World Central Kitchen), and relocated processed individuals to other sites prior to expulsion.  *See, e.g.*, Am. Compl. ¶¶ 79, 95, 97, 182, 288.

And Plaintiffs' attempt to allege differences in the application of the Title 42 Order falls short of alleging discriminatory disparate treatment as well.  Plaintiffs allege that DHS Defendants had a "policy not to subject families from Central America and Mexico to the Title 42 Process" and that DHS Defendants "departed from this policy" by "expelling large numbers of [Haitian] families."  Am. Compl. ¶ 186.  Plaintiffs do not and cannot direct the Court to such a policy because Plaintiffs are misconstruing DHS's reporting that "a significant percentage of [family

units] were unable to be expelled pursuant to the order, given a range of factors, including, most notably, restrictions imposed by foreign governments" on receiving expelled families. *See* 86 Fed. Reg. at 42,836.  In addition, the August 2021 Order, as well as previous orders, permitted DHS to exercise its unreviewable discretion to except on a case-by-case basis covered noncitizens from expulsion for humanitarian or other purposes based on the totality of the circumstances. *See id.* at 42,841.  Such decisions under Section 265 are "committed to the agency['s] discretion by law" and therefore are not reviewable under the APA.  5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) ("[W]e held an agency's decision not to institute enforcement proceedings to be presumptively unreviewable under § 701(a)(2).") (citations omitted).  This is the exception relied upon in the memo[8] referenced in the Amended Complaint with respect to Ukrainians fleeing Russia's 2022 invasion. *See* Am. Compl. ¶ 182.  Individual Plaintiffs were subject to the same Title 42 authority as Central Americans and Ukrainians, and notably, "[d]istinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive.  So long as such distinctions are not wholly irrational they must be sustained." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (citations omitted).

The failure to provide factual allegations identifying similarly situated noncitizens who were treated differently dooms Plaintiffs' equal protection claim. *See, e.g.*, *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 159 (D.D.C. 2014) (African-American "Plaintiff fails to identify any   neighborhood,   much   less   one   that   is   a   similarly   situated   non-African-American

---

[8]       *See* https://www.aila.org/library/cbp-issues-memo-on-title-42-exceptions.  The Court may take judicial notice of the memo because it is a document referenced in the Amended Complaint. *See, e.g.*, *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (stating that a court may take judicial notice of documents "referred to in the complaint"); *Vasser v. McDonald*, 228 F. Supp. 3d 1 (D.D.C. 2016) (stating courts may consider on a motion to dismiss documents "incorporated by reference in the complaint).

neighborhood—that has been treated more favorably than Kingman Park"), *aff'd*, 815 F.3d 36 (D.C. Cir. 2016); *Colindres v. Dep't of State*, Civ. A. No. 21-348 (GMH), 2021 WL 5906041, at *10 (D.D.C. Dec. 14, 2021) (dismissing case; "complaint fails to allege that 'similarly situated persons were intentionally treated differently' and contains no facts—let alone specific facts—that would support such an inference"), *aff'd*, 71 F.4th 1018 (D.C. Cir. 2023).

Plaintiffs' allegations of discriminatory intent or purpose fare no better. To state an equal protection claim, Plaintiffs must establish that the "decisionmakers" in Individual Plaintiffs' cases "acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). But the section of the Amended Complaint devoted to alleging discriminatory intent (Am. Compl. ¶¶ 187-91) offers no factual allegations of any identifiable decisionmaker determining Individual Plaintiffs' treatment or responsible for Defendants' actions at Del Rio. For example, the Amended Complaint alleges that the supposed "Del Rio Deterrence Decision"—which the Complaint alleges was "devised by White House senior officials" (*id*. ¶ 69)—"arose from discriminatory intent based on race and national origin" but offers no factual allegations suggesting discriminatory intent of these unidentified White House decisionmakers. *Id*. ¶ 187. Rather, the Complaint attempts to rely on short ambiguous quotes from unnamed DHS officials, *see id*. ¶¶ 189-90, and then alleges "on information and belief" a "cat's paw" theory in which the "perspectives such as these shaped the decisions that senior White House and DHS officials made[.]" *Id*. ¶ 191. Such allegations are insufficient to plausibly allege discriminatory purpose to state an equal protection claim. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal*., 140 S. Ct. 1891, 1916 (2020) (President Trump's "critical statements about Latinos" were "unilluminating" and not probative because they were not "contemporary statements" of the "relevant actors" for the recission of Deferred Action for Childhood Arrivals); *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63, 69 (D.D.C. 2005)

("[P]laintiff has not presented any direct evidence that would support an inference that racial considerations motivated the police officers who searched and arrested him.").

According to the Amended Complaint, Plaintiffs seek to rely on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to allege discriminatory purpose. In *Arlington Heights*, the Court considered (1) as "an important starting point," whether the impact of the official action "bears more heavily on one race than another"; (2) "[t]he historical background of the decision"; (3) "[t]he specific sequence of events leading up to the challenged decision," including whether the defendant departed from the "normal procedural sequence"; (4) "[s]ubstantive departures" from factors normally considered in reaching a decision; and (5) the administrative history of a decision. *Id.* at 266-268.

As demonstrated above, the Amended Complaint fails to plausibly allege a disparate impact or effect. *See supra* at 34-36. The Amended Complaint alleges a "history of anti-Haitian immigration policies" (Am. Compl. ¶¶ 36-51) from previous Administrations (and previous decades) but "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987); *see Arlington Heights*, 429 U.S. at 267 ("historical background *of the decision*" being challenged (emphasis added)). In fact, more contemporary among the "sequence of events" leading up to September 2021 is the Biden Administration Secretary of Homeland Security "redesignat[ing] Haiti for Temporary Protected Status" in August 2021. Am. Compl. ¶ 71. This fact contradicts Plaintiffs' assertion of racially discriminatory purpose.[9]

---

[9]     Although Temporary Protected Status decisions do not directly relate to the challenged September 2021 processing and expulsion of Haitian migrants from Del Rio, obviously Plaintiffs cannot use the previous Administration's termination of Temporary Protected Status for Haitians as evidence of discriminatory animus when Defendant Mayorkas and the Biden Administration "redesignated Haiti for Temporary Protected Status." *Id.* ¶¶ 50, 71.

Plaintiffs also vaguely assert that there were "depart[ures] from DHS Defendants' typical procedures for processing asylum seekers," Am. Compl. ¶¶ 175, but the Amended Complaint does not allege what constitutes "typical procedures" for processing an influx of 15,000 migrants in Del Rio, Texas. *Ramos v. Wolf*, 975 F.3d 872, 899 (9th Cir. 2020) (concluding that the fact that events leading up to temporary protected status determinations were "'irregular and suggestive of a predetermined outcome'" was "[insufficient] support for the conclusion that this overarching goal was motivated by racial animus").

Further, the vague allegations of supposed departures from typical procedures are often contradicted by specific allegations elsewhere in the Amended Complaint. For example, Plaintiffs allege that non-governmental organizations were "prevented from providing supplies and other aid" to address the needs of the noncitizens at Del Rio, *id*. ¶ 178, which is contradicted by the specific allegation that the World Central Kitchen set up operations to provide meals, *id*. ¶ 97. Similarly, Plaintiffs allege CBP "obstruct[ed] passage across the river" from Del Rio to Mexico, *id*. ¶ 180, yet this is contradicted by the allegations that several Individual Plaintiffs crossed back to Mexico for food and medical supplies and some of them, along with 8,000 other Haitian migrants, returned to Mexico, *see id*. ¶¶ 105, 139, 289, 299, 307, 340.

Plaintiffs' equal protection claim should be dismissed because Plaintiffs cannot claim protections under the Fifth Amendment and, even if they could, have failed to allege plausible disparate treatment in the application of the Title 42 Order arising from discriminatory intent of identified decision-makers.

## III. The APA Claims Should Be Dismissed

### A. Injunctive Relief Is Not Available to Plaintiffs

Plaintiffs bring Counts Five, Six, and Eight pursuant to 5 U.S.C. § 706(2) of the APA. Section 706(2) authorizes the reviewing court to "hold unlawful and set aside agency action."

Consistent with that statutory authorization, vacatur of the agency action "is the normal remedy," although courts can remand to the agency without vacatur in certain circumstances. *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  Logically, the normal remedy is not available where the challenged Government policy has expired—there is no policy to vacate or set aside.  For this simple reason, these claims should be dismissed.

Because the Court plainly cannot set aside a policy that has already expired, Plaintiffs attempt to pivot to a request for "retrospective injunctive relief" that would "return Individual Plaintiffs to the same position they would have been in had Defendants' unlawful application of the Title 42 Process to them not occurred."  Am. Compl. ¶¶ 410, 430, 444, 474 (with respect to the "Del Rio Deterrence Decision").  In their Prayer for Relief, Plaintiffs ask for various forms of specific relief for Individual Plaintiffs ranging from facilitating Haitian migrants' return to the U.S. to declaring their eligibility under certain immigration policies.[10]  Yet the "district court ha[s] no jurisdiction to order specific relief.  Unlike a district court managing a garden variety civil suit, a district court reviewing a final agency action does not perform its normal role but instead sits as an appellate tribunal."  *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (internal quotation marks and citations omitted) (ruling district court could only vacate the Secretary's decision rejecting the hospital's revised wage data and remand for further action consistent with its opinion; it could not order specific relief such as an adjusted reimbursement

---

[10]    Plaintiffs' requests for injunctive relief also run afoul of the "longstanding judicial principle recognizing that the power to exclude aliens is 'inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers.'"  *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020 (D.C. Cir. 2021) (citations omitted).  "Accordingly, it is a power to be exercised exclusively by the political branches of government[.]"  *Id.*

payment); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999 ("[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards."); *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 111 (D.D.C. 2018) (denying plaintiff's requested relief and stating "the D.C. Circuit has held that district courts commit error when they impose specific relief").  Therefore, any relief beyond setting aside unlawful agency conduct is not available under 5 U.S.C. § 706(2).

And were injunctive relief beyond vacatur and remand available, the Amended Complaint fails to allege the basic facts that would be necessary to plead permanent injunctive relief, such as irreparable injury, public interest, and balancing of equities.  *See generally* Am. Compl.; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-157 (2010) (listing requirements).

Perhaps recognizing that the relief they seek is not available under the APA, in Counts Five (Am. Compl. ¶ 409) and Eight (*id.* ¶ 470) Plaintiffs plead "in the alternative" that they "have a non-statutory cause of action" to challenge purported *ultra vires* conduct.  But the case cited by Plaintiffs makes clear that a non-statutory cause of action exists only "if a plaintiff is *unable* to bring his case predicated on either a specific or a general statutory review provision[.]" *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (emphasis added).  Such a review action is not a Plan B when a plaintiff fails to state a plausible APA claim.  *See Nova Oculus Partners, LLC v. FDA*, Civ. A. No. 20-1174 (DLF), 2020 WL 7230678 (D.D.C. Dec. 8, 2020) (ruling "the doctrine of nonstatutory review is inapposite" because "Nova Oculus is able and indeed does bring its case based on specific review provisions of the APA"); *Wise v. Glickman*, 257 F. Supp. 2d 123, 127 (D.D.C. 2003) (same).

**B.** **Plaintiffs Fail to Allege a Plausible Claim of Withheld or Delayed Agency Action**

In Count Seven, Plaintiffs bring a claim under 5 U.S.C. § 706(1) against CBP and ICE alleging that these Defendants failed to take a variety of actions. Section 706(1) empowers a court to "compel agency action unlawfully withheld or unreasonably delayed." The Supreme Court in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), explained the contours of Section 706(1). The Court stated that "the only agency action that can be compelled under the APA is action legally required," that is where "an agency failed to take a *discrete* agency action that it is *required to take*." *Id*. at 63-64 (emphasis in original). The limitation that the agency action be "required" means there must be a "ministerial or non-discretionary" duty "demanded by law" or amounting to a "specific, unequivocal command." *Id*. at 63. Plaintiffs, however, have not alleged a plausible failure to take a non-discretionary action that CBP or ICE were required to take in September 2021 with respect to Individual Plaintiffs and have not alleged any mandatory action that CBP or ICE are presently failing to take.

Plaintiffs assert that in September 2021 CBP withheld or unreasonably delayed mandatory action by "refusing to allow . . . a meaningful opportunity to apply for asylum." Am. Compl. ¶¶ 448-50. However, as the D.C. Circuit concluded, the CDC's August 2021 Order under 42 U.S.C. § 265 foreclosed grants of asylum and the statutory "procedures that aliens use to apply for asylum" provided for in Title 8. *Huisha-Huisha*, 27 F.4th at 731. CBP or ICE could not "withhold" something which was not legally available much less legally mandated. In any event, the Amended Complaint does not allege that Plaintiffs who were expelled indicated to CBP an intention to apply for asylum. *See generally* Am. Compl.

Likewise, Plaintiffs complain that CBP and ICE did not use "removal procedures set forth in the INA," *see* Am. Compl. ¶¶ 454-56, but Individual Plaintiffs were not processed under Title

8.  Those Individual Plaintiffs who did not return themselves to Mexico were expelled pursuant to the public health authority granted in Section 265 of Title 42 of the U.S. Code.  And in *Huisha-Huisha*, the D.C. Circuit ruled that expulsions pursuant to that Section 265 authority are likely lawful.  *Huisha-Huisha*, 27 F.4th at 733 ("It is likely that § 265 grants the Executive sweeping authority to prohibit aliens from entering the United States during a public-health emergency; that the Executive may expel aliens who violate such a prohibition[.]").

Plaintiffs also assert that the Government has a "mandatory duty to follow the procedures required by 8 U.S.C. 1231(b)(3) and [1231 note] to determine whether a noncitizen faces a risk of persecution or torture."  Am. Compl. ¶ 452.  Neither provision, however, sets forth any such required "procedures."  For example, Section 1231(b)(3)(A) states that "the [Secretary of Homeland Security] may not remove an alien to a country if the [Secretary] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  It does not establish a "ministerial or non-discretionary" duty "demanded by law" that can be compelled pursuant to 5 U.S.C. § 706(1).  It states what the Government "may not" do "if the Secretary decides" that a "noncitizen's life or freedom would be threatened" but does not mandate any "procedures" that Plaintiffs identify as being withheld.  "The mandatoriness requirement means that courts cannot compel agencies to take action *beyond* what is legally required of them."  *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (emphasis in original).

Further, in contrast to the conclusory allegations that Defendants acted inconsistent with Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, as implemented through the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note), the

Amended Complaint alleges facts establishing the opposite.  Plaintiffs allege that CBP issued an internal memorandum called the "Capio Memo" to provide "procedures for applying Defendant CDC's order" at the border, including at the "CBP Encampment."  Am. Compl. ¶¶ 57 n.15, 62, 79, 362.  The Amended Complaint provides a web link to the Capio Memo, which has a section on processing Convention Against Torture claims. *Id*. ¶ 57 n.15.  The memo states on page four: "Aliens that make an affirmative, spontaneous and reasonably believable claim that they fear being tortured in the country they are being sent back to, will be taken to the designated station and referred to USCIS."  No Individual Plaintiff alleges that they made a claim that they feared torture if expelled to Haiti, much less that a claim under the Convention was asserted and that the Capio Memo procedures were "unlawfully withheld."  *See generally* Am. Compl.  Thus, Count Seven does not state a claim because Plaintiffs fail to identify any mandatory, non-discretionary action that CBP or ICE were required to and failed to take with respect to Individual Plaintiffs under the legal authority existing in September 2021.

Finally, even if there were a non-discretionary action that CBP or ICE was required to take in the past (i.e., September 2021), the APA expressly limits the relief available to compelling the required agency action.  *See Norton*, 542 U.S. at 64 (explaining that § 706(1) "empowers a court only to compel an agency to perform a ministerial or non-discretionary act") (internal quotation marks and citations omitted).  But now, there is no withheld required agency action to be compelled.  Count Seven does not allege that the Title 8 asylum, withholding of removal, and removal procedures identified in that claim are being withheld at present, either generally or with respect to Individual Plaintiffs.

### C.    Plaintiffs' Challenge to the "Del Rio Deterrence Decision" Fails

Count Eight alleges a claim under 5 U.S.C. § 706(2) against the DHS Defendants challenging the so-called "Del Rio Deterrence Decision."  Section 706(2) of the APA authorizes a

court to "hold unlawful and set aside agency action" under certain enumerated circumstances. The APA does not, however, "authorize [courts] to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (citations omitted). The APA permits judicial review of only "final agency action." 5 U.S.C. § 704. Thus, to state a claim, Plaintiffs must allege facts establishing the existence of "agency action" that is "final." *See, e.g.*, *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Whether there has been 'agency action' or 'final agency action' within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable.").

The Supreme Court has stressed that an agency action for APA purposes is limited to the set of "circumscribed, discrete agency actions" delineated in 5 U.S.C. § 551(13), which defines "agency action" as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *See Norton*, 542 U.S. at 62. The agency action must also be "final," and to be considered final the action must "mark the 'consummation' of the agency's decisionmaking process" (not "merely tentative or interlocutory") and be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

With respect to the purported "Del Rio Deterrence Decision," the Amended Complaint clearly fails to allege a discrete final agency action reviewable under the APA. For one, the purported decision is not even alleged to be a decision of any *agency* subject to the APA. Rather, Plaintiffs allege that the "Del Rio Deterrence Decision was made in September 2021 by White House advisors at the highest levels, including senior advisors on the" National Security Council and Domestic Policy Council. Am. Compl. ¶¶ 23, 61, 62. It is well-settled, however, that actions

of the Executive Office of the President are not subject to review under the APA.  *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992).  Therefore, Count Eight should be dismissed.

Plaintiffs seek to avoid this outcome by asserting Count Eight against DHS Defendants only.  Specifically, Plaintiffs contend that DHS Defendants' alleged "adoption and implementation of the Del Rio Deterrence Decision constitute final agency action within the meaning of the APA."  Am. Compl. ¶ 471.  Except that contention is not supported by any factual allegations establishing the existence of a final discrete agency action by DHS Defendants to "adopt" or to "implement" this decision supposedly "made . . . by [the] White House."  Absent from the Amended Complaint are basic factual allegations regarding how this "decision" made by the White House was "adopted" by DHS Defendants (which consists of multiple agencies and scores of officials), when it was adopted, and who at the agencies were involved this adoption.  *See generally* Am. Compl.  As such, the Amended Complaint fails to identify "circumscribed, discrete agency action[]" as delineated in 5 U.S.C. § 551(13) (*i.e.*, "agency rule, order, license, sanction, relief, or the equivalent or denial thereof").  *Id*.  Nor does the Amended Complaint explain how this "adoption and implementation" constituted the "consummation" of an identifiable agency decision-making process or how "legal consequences" flowed from this "decision" separate from an actual, identifiable agency action like the CDC's August 2021 Order.  *See generally id*.  The allegations that DHS Defendants "adopted and implemented" a particular "decision" by the White House are wholly conclusory, as are the allegations that the "adoption and implementation" constitutes a reviewable final agency action.  *See* Am. Compl. ¶¶ 60-61, 471.

It is evident from the pleading that the purported "Del Rio Deterrence Decision" is not an actual reviewable agency action but rather the name Plaintiffs assign to the "manner" in which the CDC Title 42 Order was applied to these Haitian migrants in September 2021.  *Id*. ¶ 69 ("The Del

Rio Deterrence Decision . . . empowered DHS Defendants to weaponize the Title 42 Process in Del Rio in a manner indifferent to humanitarian concerns, focusing on removing Haitian asylum seekers as quickly as possible to discourage other Haitians from exercising their right to seek asylum.").  Thus, based on the pleading in the Amended Complaint, the purported "Del Rio Deterrence Decision," including the "adoption and implementation" thereof, is not a discrete agency action but rather a label created and used by Plaintiffs to describe the application or implementation of an actual final agency action—the CDC's August 2021 Order—to a large group of Haitian migrants.  *See Bark v. Forest Serv.*, 37 F. Supp. 3d 41, 50 (D.D.C. 2014) (finding no final agency action because "Plaintiffs appear to have attached a 'policy' label to their own amorphous description of the Forest Service's practices" under challenge).

Yet challenges to how an agency implements a policy are generally unreviewable under the APA.  As the Supreme Court stated in *Norton*, "[g]eneral deficiencies in compliance" with or implementation of broad statutory or regulatory mandates—like the Section 265 public health authority—"lack the specificity requisite for agency action" review.  542 U.S. at 66-67.  The Court explained that "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA."  *Id.*; *see also Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Because an on-going program or policy is not, in itself, a final agency action under the APA, our jurisdiction does not extend to reviewing generalized complaints about agency behavior."); *Village of Bald Head Island v. Army Corps of Eng'rs*, 714 F.3d 186, 195 (4th Cir. 2013) (an agency's "approval, not [its] subsequent activities in carrying it out, [i]s the final agency action"); *CREW v. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019) ("[A] plaintiff must challenge a 'discrete agency action' and cannot make 'a broad programmatic attack' on an agency's compliance with a statutory

scheme."); *RCM Techs., Inc. v. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 46 (D.D.C. 2009) ("Courts stand ready to entertain appeals from specific, concrete agency adjudications. But absent that, courts have neither the resources nor the expertise to superintend agency policy-making."). Plaintiffs may be concerned with how expulsions pursuant to the August 2021 Order occurred, but as alleged, how DHS assisted with implementing the August 2021 Order at Del Rio in September 2021 is simply not a reviewable final agency action.  Count Eight should be dismissed.

## IV.   President Biden is Not a Proper Defendant

Although Plaintiffs allege claims against the President, he is not a proper defendant in this case.  Plaintiffs may not obtain—and the Court may not order—injunctive or declaratory relief directly against the President for his official conduct.  Therefore, the Court should dismiss all of Plaintiffs' claims against President Biden.

To maintain the constitutional separation of powers, courts have long recognized that the non-ministerial conduct of the President when he acts in his official capacity cannot be enjoined. In *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), the Supreme Court held that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Id*.  In refusing to enjoin President Andrew Johnson from executing the Reconstruction Acts, the Court reasoned that when presidential action requires "the exercise of judgment," "general principles . . . forbid judicial interference with the exercise of Executive discretion."  *Id.* at 499.

A majority of the Justices in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), later reaffirmed these fundamental principles.  In *Franklin*, a district court issued an injunction requiring the President to take certain actions related to the census.  *Id*. at 791.  Writing for a four-Justice plurality, Justice O'Connor explained that "the District Court's grant of injunctive relief against the President himself [was] extraordinary, and should have raised judicial eyebrows."  *Id.* at 802 (citation omitted).  The plurality reiterated that "in general, '[the] court has no jurisdiction of a bill

- 47 -

to enjoin the President in the performance of his official duties.'" *Id.* at 802-03 (quoting *Mississippi*, 71 U.S. at 501).

In line with *Mississippi* and *Franklin*, courts in this and other circuits have rejected demands to enjoin the President in the performance of his official duties, regardless of the claim at issue. *See, e.g.*, *Doe v. Trump*, 319 F. Supp. 3d 539, 542 (2018); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated & remanded on other grounds*, 138 S. Ct. 377 (2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir.), *vacated & remanded on other grounds*, 138 S. Ct. 353 (2017); *Day v. Obama*, Civ. A. No. 15-0671, 2015 WL 2122289, at *1 (D.D.C. May 1, 2015); *Nat'l Ass'n of Internal Revenue Emps. v. Nixon*, 349 F. Supp. 18, 21–22 (D.D.C. 1972). For example, in *Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996), a former member of the National Credit Union Administration Board sued the President and two subordinates after the President removed him from his position. *Id.* at 975. The court recognized that the Supreme Court in *Franklin* had "'left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely ministerial duty.'"[11] *Id.* at 977 (quoting *Franklin*, 505 U.S. at 802). Although the Court found that the President's duty to comply with the removal restrictions in the agency's statute was "ministerial and not discretionary," it nonetheless determined that injunctive relief against the President was not appropriate. *Id.* The Court

---

[11]    A ministerial duty is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion." *Mississippi*, 71 U.S. at 498; *see also Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) ("A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." (citing *Mississippi*, 71 U.S. at 498)). In contrast, "a duty is discretionary if it involves judgment, planning, or policy decisions." *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (citation omitted). There can be no question here that Plaintiffs seek to enjoin the President from performing a discretionary duty—the formation and implementation of immigration and public health policies—that goes to the heart of his authority as Chief Executive overseeing Executive branch agencies.

reiterated the Supreme Court's "stern admonition" from *Franklin* that "injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken." *Id.* at 978.   The rationale behind this doctrine, the Court found, was "painfully obvious":

> the President, like Congress, is a coequal branch of government, and for the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers.

*Id.* (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part & concurring in the judgment)); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (concluding that "[w]ith regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief) (citations omitted).

The foregoing cases underscore that the President is not a proper defendant in this case.   It is undisputed that Plaintiffs sued the President in his official capacity, challenging actions his administration took concerning public health policy at the U.S. borders during a pandemic in his role as Chief Executive overseeing HHS and DHS.   *See* Am. Compl. ¶¶ 23, 368-80 (First Claim), ¶¶ 381-89-99 (Second Claim), ¶¶ 399-406 (Fourth Claim).   It is also undisputed that Plaintiffs effectively seek declaratory and injunctive relief against the President.   *Id.*; *see also id.* at 116-17 (Prayer for Relief).   It is further undisputed that Plaintiffs brought suit against numerous subordinate Executive Branch officials, *id.* ¶¶ 24–35, and Plaintiffs ordinarily could obtain full relief for their alleged injuries through relief against those other Defendants.[12]

---

[12]   "In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials." *Swan*, 100 F.3d at 978–79 (citing *Franklin*, 505 U.S. at 803; *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 811 n.17 (1982)).   Thus, in cases involving the President and other defendants, courts avoid granting relief against the President and instead grant relief only against subordinate officials in the Executive Branch.   *See, e.g.*, *id.* at 976-80.

Further, the Amended Complaint fails to challenge or even identify any action taken by President Biden himself. *See generally* Am. Compl. Indeed, though named as a defendant in the First, Second, and Fourth claims, there are no allegations articulating how the President violated Fifth Amendment due process and continues to cause Plaintiffs harm.

Accordingly, because this Court cannot issue a declaratory judgment or an order enjoining the President for his official, discretionary action, the Amended Complaint is devoid of any allegations stating that the President himself violated at law, and subordinate officials are named Defendants, the Court should dismiss President Biden from the case.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint in its entirety.

Dated: May 17, 2024

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar. #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:      */s/ Sean M. Tepe*
SEAN M. TEPE, D.C. Bar #1001323
DIANA V. VALDIVIA, D.C. Bar #1006628
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-2533; (202) 252-2545
sean.tepe@usdoj.gov; diana.valdivia@usdoj.gov

*Attorneys for the United States of America*