# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HAITIAN BRIDGE ALLIANCE *et al.*,<br><br>           *Plaintiffs*,<br><br>    v.<br><br>JOSEPH R. BIDEN, President of the United States, *et al.*,<br><br>           *Defendants.* | Case No. 1:21-cv-03317 (JMC) |

## <u>PLAINTIFFS' OPPOSITION TO<br>DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 2

      A.    The Del Rio Deterrence Decision ............................................................ 2

      B.    The Abusive Treatment and Mass Expulsion of Haitian Migrants in Del Rio ....... 3

      C.    Continued Restrictions on Plaintiffs' Access to Relief Post-Del Rio .................... 5

III.  LEGAL STANDARDS ....................................................................................... 7

IV.   ARGUMENT ...................................................................................................... 8

      A.    Plaintiffs Have Standing .......................................................................... 8

            1.    Individual Plaintiffs Have Standing to Seek Declaratory and Injunctive Relief ........................................................................ 8

            2.    Haitian Bridge Alliance Alleges Sufficient Facts to Establish Organizational Standing ........................................................... 17

      B.    Plaintiffs Adequately State Constitutional Claims ............................... 23

            1.    Plaintiffs Have Pled Sufficient Facts to Establish a Substantive Due Process Claim Under the Fifth Amendment ............................... 24

            2.    Plaintiffs Have Alleged a "Special Relationship" Between DHS Defendants and Individual Plaintiffs and Class Members .................. 27

            3.    Plaintiffs Have Adequately Alleged a Procedural Due Process Claim ........... 30

            4.    Plaintiffs Have Adequately Stated an Equal Protection Claim ..................... 32

      C.    Plaintiffs Adequately State Administrative Procedure Act Claims ..................... 37

            1.    This Court Can Grant Meaningful Injunctive and Declaratory Relief for Plaintiffs' 5 U.S.C. § 706(2) Claims ................................... 37

            2.    Plaintiffs Adequately State a Claim of Withheld or Delayed Agency Action Under 5 U.S.C. § 706(1) ........................................... 40

            3.    Plaintiffs Adequately State a Claim Under 5 U.S.C. § 706(2) Regarding the Del Rio Deterrence Decision ................................... 44

i

D. President Biden Is a Proper Defendant ........................................................................ 48

V.     CONCLUSION .......................................................................................................... 50

# TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ................................................................20

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
    827 F.3d 100 (D.C. Cir. 2016) ................................................................9

*Al Otro Lado, Inc. v. Mayorkas*,
    2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) .........................................50

*Al Otro Lado, Inc. v. Nielsen*,
    327 F. Supp. 3d 1284 (S.D. Cal. 2018) ..................................................44

*Alshawy v. U.S. Citizenship & Immigr. Servs.*,
    2022 WL 970883 (D.D.C. Mar. 30, 2022) .............................................30

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) .................................................................................39

*Am. Sports Council v. U.S. Dep't of Educ.*,
    850 F. Supp. 2d 288 (D.D.C. 2012) ......................................................21

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
    64 F.4th 1354 (D.C. Cir. 2023) ...................................................9, 22, 39

*Anghel v. N.Y. State Dep't of Health*,
    947 F. Supp. 2d 284 (E.D.N.Y. 2013) ...................................................49

*Anglers Conservation Network v. Pritzker*,
    809 F.3d 664 (D.C. Cir. 2016) ...............................................................43

*Aracely, R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) .................................................43, 46

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................7

*Ass'n of Admin. L. Judges v. U.S. Off. of Pers. Mgmt.*,
    640 F. Supp. 2d 66 (D.D.C. 2009) ........................................................46

*Attias v. Carefirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) .........................................................10, 21

*Sabra ex rel. Baby M v. Pompeo*,
    453 F. Supp. 3d 291 (D.D.C. 2020) ......................................................25

*Bechtel v. FCC,*
    10 F.3d 875 (D.C. Cir. 1993) .................................................................................................38

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .......................................................................................................7, 35

*Bennett v. Spear,*
    520 U.S. 154 (1997) .....................................................................................................45, 46

*Bollat Vasquez v. Mayorkas,*
    520 F. Supp. 3d 94 (D. Mass. 2021) .......................................................................................24

*Bowen v. Mich. Acad. of Fam. Physicians,*
    476 U.S. 667 (1986) .............................................................................................................39

*Buffalo Field Campaign v. Zinke,*
    289 F. Supp. 3d 103 (D.D.C. 2018) .......................................................................................39

*Butera v. District of Columbia,*
    235 F.3d 637 (D.C. Cir. 2001) ...............................................................................................27

*Cal. Cmtys. Against Toxics v. EPA,*
    934 F.3d 627 (D.C. Cir. 2019) ...............................................................................................47

*CASA de Maryland, Inc. v. Trump,*
    355 F. Supp. 3d 307 (D. Md. 2018) .......................................................................................49

*CC Distribs., Inc. v. United States,*
    883 F.2d 146 (D.C. Cir. 1989) ..........................................................................................11, 12

*Centro Presente v. U.S. Dep't of Homeland Sec.,*
    332 F. Supp. 3d 393 (D. Mass. 2018) ...............................................................................49, 50

*Chamber of Com. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) ...............................................................................................40

*Citizens for Resp. & Ethics in Wash. ("CREW") v. U.S. Office of Special Couns.,*
    480 F. Supp. 3d 118 (D.D.C. 2020) .......................................................................................18

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) .........................................................................................................9, 15

*Clinton v. Jones,*
    520 U.S. 681 (1997) .............................................................................................................48

*Collins v. City of Harker Heights,*
    503 U.S. 115 (1992) .....................................................................................................26, 27

*County of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999) ...........................................................................39

*Comcast Corp. v. FCC*,
    579 F.3d 1 (D.C. Cir. 2009) ..................................................................................8

*Cook v. Babbitt*,
    819 F. Supp. 1 (D.D.C. 1993) ...........................................................................33

*Ctr. for Democracy & Tech. v. Trump,*
    507 F. Supp. 3d 213 (D.D.C. 2020) ...................................................................20

*County of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999) ...........................................................................39

*Ctr. for Responsible Sci. v. Gottlieb,*
    346 F. Supp. 3d 29 (D.D.C. 2018) .................................................................19, 20

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) (Cooper, J.) .................................................24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ................................................................................................35

*Dep't of Homeland Sec. v. Thuraissigiam* ,
    591 U.S. 103, 139 (2020) .........................................................................23, 24, 30

*District of Columbia v. Trump*,
    291 F. Supp. 3d 725 (D. Md. 2018) ...................................................................49

*Dearth v. Holder*,
    641 F.3d 499 (D.D.C. 2011) ...............................................................8, 9, 12, 16, 17

*District of Columbia v. Trump*,
    291 F. Supp. 3d 725 (D. Md. 2018) ...................................................................49

*Doe v. Trump*,
    284 F. Supp. 3d 1172 (W.D. Wash. 2018) .........................................................38

*Does v. District of Columbia*,
    374 F. Supp. 2d 107 (D.D.C. 2005) ...................................................................15

*Edwards v. United States*,
    2020 WL 2800605 (D.D.C. May 29, 2020) .....................................................7, 37

*Env't Working Grp. v. FDA*,
    301 F. Supp. 3d 165 (D.D.C. 2018) ...................................................................18

*EpicSys. Corp. v. Lewis*,
    584 U.S. 497 (2018)............................................................................30, 41

*Equal Rts. Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) .........................................................17

*FDA v. All. for Hippocratic Med.*,
    __ S. Ct. __, 2024 WL 2964140 (June 13, 2024) ...........................15, 23

*Fernandors v. District of Columbia*,
    382 F. Supp. 2d 63 (D.D.C. 2005) .....................................................34, 35

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015) ...........................................................18

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992).............................................................................48, 49

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010).............................................................................38

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).............................................................................7

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) .............................................................45

*Garnett v. Zeilinger*,
    323 F.Supp.3d 58 (D.D.C. 2018) .......................................................7

*Gomez v. Biden*,
    2021 WL 3663535 (D.D.C. Aug. 17, 2021) ......................................44

*Gutierrez-Rogue v. INS*,
    954 F.2d 769 (D.C. Cir. 1992) ...........................................................30

*Haaland v. Brackeen*,
    599 U.S. 255 (2023).............................................................................39

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).............................................................................17

*Hill v. U.S. Dep't of the Interior*,
    2023 WL 6927266 (D.D.C. Oct. 19, 2023) .......................................49

*Howard Univ. v. Watkins*,
    857 F. Supp. 2d 67 (D.C. Cir. 2012)..................................................34

*Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives*,
    720 F.3d 939 (D.C. Cir. 2013) ................................................................37

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) .................................................4, 5, 31, 32, 41, 42

*Huisha-Huisha v. Mayorkas*,
    560 F. Supp. 3d 146 (D.D.C. 2021) ........................................................31

*Huisha-Huisha v. Mayorkas*,
    642 F. Supp. 3d 1 (D.D.C. 2022) ...........................................................32

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ...............................................................45

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
    319 F. Supp. 3d 491 (D.D.C. 2018) ........................................................25

*Jean v. Nelson*,
    472 U.S. 846 (1985) ...............................................................................24

*Jones v. NVR Incorporation*,
    2020 WL 2064085 (D.D.C. Apr. 29, 2020) .............................................13

*Jordan ex rel. Jordan v. Jackson*,
    15 F.3d 333 (4th Cir. 1994) ...................................................................26

*Kentucky v. Graham*,
    473 U.S. 159 (1985) ...............................................................................49

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020) .................................................2, 10, 15, 38

*Knife Rts., Inc. v. Vance*,
    802 F.3d 377 (2d Cir. 2015) ..................................................................20

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018) ....................................................47

*Larsen v. U.S. Navy*,
    525 F.3d 1 (D.C. Cir. 2008) .....................................................................9

*Las Americas Immigrant Advoc. Ctr. v. Wolf*,
    507 F. Supp. 3d 1 (D.D.C. 2020) ......................................................10, 30

*Lucas R. v. Azar*,
    2018 WL 7200716 (C.D. Cal. Dec. 27, 2018) .......................................47

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................................7, 8, 10

*M.G.U. v. Nielsen*,
  325 F. Supp. 3d 111 (D.D.C. 2018) ..................................................................25

*Mayor & City Council of Balt. v. Trump*,
  416 F. Supp. 3d 452 (D. Md. 2019) ...................................................................49

*McCleskey v. Kemp*,
  481 U.S. 279 (1987)............................................................................................34

*McCray v. Biden*,
  574 F. Supp.3d 1 (D.D.C. 2021) ...................................................................48, 49

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*,
  785 F.3d 684 (D.C. Cir. 2015) ...........................................................................39

*N.A.A.C.P. v. U.S. Dep't of Homeland Sec.*,
  364 F. Supp. 3d 568 (D. Md. 2019) ...................................................................33

*Nat. Law Party of U.S. v. Fed. Elec. Comm'n*,
  111 F. Supp. 2d 33 (D.D.C. 2000)........................................................................7

*Nat'l Treasury Emps. Union ("NTEU") v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ......................................................................48, 49

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) .........................................................................48

*Nixon v. Sirica*,
  487 F.2d 700 (D.C. Cir. 1973) ...........................................................................48

*Norris v. D.C.*,
  737 F.2d 1148 (D.C. Cir. 1984) .........................................................................26

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)........................................................................................40, 46

*Nw. Immigr. Rights Project* ("*NWIRP*") *v. U.S.C.I.S.*,
  496 F. Supp. 3d 31 (D.D.C. 2020)..........................................................19, 21, 22

*O'Shea v. Littleton*,
  414 U.S. 488 (1974).................................................................................9, 14, 18

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.C. Cir. 2019) ...............................................................19

*Palisades Gen. Hosp. Inc. v. Leavitt*,
    426 F.3d 400 (D.C. Cir. 2005) ..................................................................39

*NB ex rel. Peacock v. District of Columbia*,
    682 F.3d 77 (D.C. Cir. 2012) .........................................................8, 15, 17

*People for the Ethical Treatment of Animals ("PETA") v. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ................................................................18

*Planned Parenthood of Wisc., Inc. v. Azar*,
    942 F.3d 512 (D.C. Cir. 2019) ....................................................................9

*Powell v. District of Columbia*,
    634 A.2d 403 (D.C. 1993) .........................................................................28

*Quizinsight.com P'ship v. Tabak*,
    2019 WL 4194433 (D.D.C. Sept. 4, 2019) ...........................................35, 37

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................45

*Ramirez v. U.S. Immigr. & Customs Enf't*,
    310 F. Supp. 3d 7 (D.D.C. 2018) ...............................................................45

*Safari Club Int'l v. Zinke*,
    2017 WL 8222114 (D.D.C. May 2, 2017) ...................................................20

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................48, 49, 50

*Sanchez v. Keener*,
    2022 WL 16856360 (N.D. Cal. Nov. 10, 2022) ..........................................49

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016) ....................................................................22

*Smith v. District of Columbia*,
    413 F.3d 86 (D.C. Cir. 2005) ...............................................................28, 29

*Sparrow v. United Air Lines, Inc.*,
    216 F.3d 1111 (D.C. Cir. 2000) .............................................................7, 37

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................7

*Stone v. Trump*,
    400 F. Supp. 3d 317 (D. Md. 2019) ...........................................................49

*Sw. Bell Tel. Co. v. FCC*,
  168 F.3d 1344 (D.C. Cir. 1999) .......................................................................... 9

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ...................................................................... 48, 49

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
  402 U.S. 1 (1971) ............................................................................................. 38

*Traynor v. Turnage*,
  485 U.S. 535 (1988) .......................................................................................... 40

*Tri-Cnty. Indus. v. District of Columbia*,
  104 F.3d 455 (D.C. Cir. 1997) .......................................................................... 26

*Troxel v. Granville*,
  530 U.S. 57 (2000) ............................................................................................ 26

*Turlock Irrigation Dist. v. FERC*,
  786 F.3d 18 (D.C. Cir. 2015) ............................................................................ 18

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019) ......................................................................... 7, 19

*United States v. Salerno*,
  481 U.S. 739 (1987) .......................................................................................... 25

*Vanda Pharma, Inc. v. FDA*,
  2023 WL 6035663 (D.D.C. Aug. 2, 2023) ........................................................ 11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................................ 32, 33, 35, 36

*Washington v. Davis*,
  426 U.S. 229 (1976) .......................................................................................... 36

*Weingarten v. Devos*,
  468 F. Supp. 3d 322 (D.D.C. 2020) .................................................................. 20

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) .......................................................................................... 47

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................................ 9

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) .......................................................................................... 24

*Young v. Lozano*,
  2020 WL 4339372 (E.D. Cal. July 28, 2020) ........................................................24

*Youngberg v. Romeo*,
  457 U.S. 307 (1982) ..............................................................................................26

*Zwickler v. Koota*,
  389 U.S. 241 (1967) ..............................................................................................39

**STATUTES**

5 U.S.C. § 551 ............................................................................................................45, 46

5 U.S.C. § 706 ..............................................................................................37, 38, 44, 47

8 U.S.C. § 1158 ................................................................................................................30

8 U.S.C. § 1231 ..........................................................................................................30, 31

8 U.S.C. § 1225 ..............................................................................................12, 40, 41, 42, 43

8 U.S.C. § 1229 ................................................................................................................40

8 U.S.C. § 1252 ..........................................................................................................23, 24

8 U.S.C. § 1254 ..........................................................................................................13, 50

28 U.S.C. § 1331 .............................................................................................................39

42 U.S.C. § 265 .........................................................................................................40, 41

**OTHER AUTHORITIES**

8 C.F.R. § 235.3 ....................................................................................................12, 40, 43

24 Cong. Rec. 290 (1892) ...............................................................................................41

85 Fed. Reg. 65,806 (Oct. 16, 2020) ................................................................................2

86 Fed. Reg. 41,863-01 (Aug. 3, 2021) ..........................................................................36

86 Fed. Reg. 42,828-02 (Aug. 5, 2021) ..........................................................................41

88 Fed. Reg. 1243-01 (Jan. 9, 2023) ..........................................................................6, 16

88 Fed. Reg. 5022-01 (Jan. 26, 2023) ............................................................................13

89 Fed. Reg. 48,487 (June 3, 2004) ..........................................................................14, 16

U.S. Const. Amend. V ..........................................................................................24, 26, 30

Eric Cortellessa, "How Far Trump Would Go," Time Mag. (Apr. 30, 2024),
    https://time.com/6972021/donald-trump-2024-election-interview/........................................16

Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for
    Control of Presidential Information*, 90 Geo. L.J. 737, 758 (2002) ......................................48

## I.  INTRODUCTION

In September 2021, thousands of Black Haitian nationals began arriving at the U.S.-Mexico border to request humanitarian relief (including asylum) near Del Rio, Texas. Despite receiving notice months in advance of the impending arrival of a large number of Haitians seeking protection, Defendants refused to prepare. Instead, Defendants decided to suppress the growing number of Haitians traveling to the border and prevent them from accessing the U.S. asylum system by subjecting them to inhumane conditions and summary expulsion.

In moving to dismiss Plaintiffs' complaint, Defendants seek to avoid accountability for the egregious and ongoing harms they have inflicted on the Individual Plaintiffs, the putative class, and Organizational Plaintiff Haitian Bridge Alliance ("Haitian Bridge"). Defendants cherry-pick self-serving facts from the Amended Complaint to argue that Plaintiffs have no standing, or have failed to adequately plead their claims, while ignoring (or misapprehending) facts that are inconvenient for their arguments. Defendants narrowly focus the Court's attention on the now-expired Title 42 Process, but in so doing ignore the Del Rio Deterrence Decision and the ongoing harms Plaintiffs are suffering. Defendants similarly misstate the case law to present the constitutionally untenable argument that individuals who have not yet been legally admitted to the United States have no constitutional protections against abuse and discriminatory treatment inflicted on them by U.S. officials on U.S. soil.

The redress that Plaintiffs seek from this Court is straightforward: that Individual Plaintiffs and members of the putative class be allowed to seek asylum and other humanitarian protections from the United States, as the INA and its regulations allow and, indeed, command. "[N]othing in the INA prevents this Court from enjoining the [U.S. government] to take certain actions to remedy

prior unlawful agency conduct." *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 58 (D.D.C. 2020) (Jackson, J.). Defendants' Motion to Dismiss should be denied.

## II.    STATEMENT OF FACTS

For years, Haiti has suffered from devastating natural disasters and severe political instability that have left the government unable to provide basic services or to protect its citizens from violence. Am. Compl. (ECF No. 75) ¶ 167. Following the assassination of Haitian president Jovenel Moïse on July 7, 2021 and the 7.2 magnitude earthquake that devasted the country's southern region a month later, conditions in Haiti became even more dire. *Id.* In late summer 2021, thousands of Haitian nationals fleeing this intensified instability and violence began crossing the Rio Grande into the United States near Del Rio, Texas seeking humanitarian protection. *Id.* ¶¶ 79–82. Defendants responded by subjecting these asylum seekers to harsh conditions and summarily expelling them without regard to their humanitarian needs or rights. *Id.* ¶¶ 62–63.

### A.  The Del Rio Deterrence Decision

Over the course of months starting in February 2021, Defendants were notified of the impending arrival to Del Rio of thousands of Haitians and were warned that expelling these asylum seekers would violate *non-refoulement* obligations. *See id.* ¶¶ 70–78. Despite repeated warnings, Defendants decided (in what is referred to herein as the "Del Rio Deterrence Decision") to subject the Haitians arriving at the border near Del Rio to harsh conditions and then to summarily expel them under Title 42[1] to prevent and deter Haitians from seeking humanitarian protection. *Id.* ¶ 60. As part of this decision, Defendants took no steps to muster the resources necessary to legally process the asylum seekers or to provide for their basic needs. *Id.* ¶¶ 74–78. Unlike with previous

---

[1] *See* Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 16, 2020); *see also* Am. Compl. ¶ 57; ¶¶ 215–17.

groups from other countries, Customs and Border Protection ("CBP") did not attempt to coordinate with a local church to create a respite center for arriving migrants, *id.* ¶ 76; nor did Defendants allocate any resources to screen migrants for humanitarian relief, *id.* ¶ 77. This disparate treatment was fueled by discriminatory views that Haitian asylum seekers are dangerous, violent and criminal, and by a desire to keep Black and Haitian migrants out of the country. *Id.* ¶¶ 187–91.

### B.  The Abusive Treatment and Mass Expulsion of Haitian Migrants in Del Rio

Pursuant to the Del Rio Deterrence Decision, senior White House and Department of Homeland Security ("DHS") officials blocked internal efforts to prepare humanitarian infrastructure for the impending arrival of thousands of Haitian asylum seekers, despite having made such efforts in anticipation of previous increases in the numbers of non-Haitian and non-Black asylum seekers arriving along the U.S.-Mexico border. *Id.* ¶¶ 75–76. Senior White House and DHS officials similarly blocked efforts to prepare public health resources, including COVID-19 testing and vaccination, for the thousands of Haitians they knew would be coming to the Del Rio Sector. *Id.* ¶ 76. As a result, the treatment of the primarily Haitian migrants in Del Rio was drastically worse than the treatment of other non-Haitian and non-Black migrants who came in prior large-scale arrivals. *See id.* ¶¶ 175–86.

Rather than prepare appropriate facilities and resources, CBP erected a temporary intake site near the Del Rio International Bridge in late August 2021, which eventually became an encampment (the "CBP Encampment") for U.S. officials to contain and detain the asylum seekers, who were required to wait for days for field processing. *Id.* ¶ 79. At least 15,000 Haitians were detained in the CBP Encampment between approximately September 9 to 24, 2021. *Id.* ¶ 62. CBP adopted a ticket system, *id.* ¶ 83, but that was apparently only to facilitate mass expulsion: when numbers were called, ticket holders were detained for some days and then expelled, with no

process to screen for *non-refoulement* relief and no opportunity to request protection, *see id.* ¶¶ 84, 140–59, 278–79, 306, 323, 331, 340.

Many people were starving and dehydrated as they waited for days outside under a merciless sun. *See id.* ¶¶ 93–107. Some Individual Plaintiffs received no food or water, *see id.* ¶¶ 96, 98, and migrants fainted from lack of nutrition and dehydration, as well as gastrointestinal illness, *id.* ¶¶ 95, 99. Most people were forced to sleep on the ground, exposed to the elements— including dust that caused respiratory problems, eye infections, and rashes. *See id.* ¶¶ 108–12. At best, medical care was inadequate; at worst, nonexistent. *See id.* ¶¶ 113–22.

Individual Plaintiffs reported physical and verbal abuse by the federal officials at the CBP Encampment, including by CBP horse patrol who assaulted and harassed, among others, Plaintiffs Mirard and Esther, *id.* ¶¶ 125–26; CBP officers who threw water bottles at migrants, *id.* ¶ 295; medical personnel who taunted migrants seeking medical assistance, *id.* ¶ 119; CBP officers who used motorcycles and helicopters to kick up dust, *id.* ¶ 130; and CBP officers who used horses to drive migrants into the Rio Grande, and who cut ropes that had been strung across the river to prevent drowning *while migrants were using them*, *id.* ¶ 128.

In addition to creating and exacerbating dangerous conditions for asylum seekers, the Del Rio Deterrence Decision encompassed a deliberate decision to rapidly expel thousands of Haitians. *Id.* ¶ 22. In one of the largest mass expulsions in U.S. history, officials rushed to expel as many Haitians as possible after a district court issued a September 16, 2021 injunction ("*Huisha-Huisha* injunction") that, if it took effect after a two-week stay period, would have prevented the federal government from expelling many of the Haitians in the CBP Encampment. *Id.* ¶¶ 132–34. In the rush, government officials cut corners and failed to ensure that the Haitians in the CBP Encampment were not returned to a place where they would be tortured or persecuted. *Id.* ¶¶ 132–

37. In total, nearly 11,000 people, including thousands with infants and children, were expelled to Haiti between September 19 and October 19, 2021. *Id.* ¶ 139. Others, including some Individual Plaintiffs, fled back to Mexico, which offered marginally safer prospects than being returned to Haiti. *Id.* ¶¶ 160–64. By September 24, 2021—six days before the *Huisha-Huisha* injunction would take effect—CBP had emptied the Encampment. *Id.* ¶ 139.

Defendants' treatment of migrants while they were detained prior to expulsion to Haiti, and during the expulsion flights themselves, was inhumane. Migrants were in many cases denied adequate food, water, medical care, sanitation, and sleeping provisions, *id.* ¶ 142; subjected to verbal abuse and harassment, *id.* ¶ 144; separated from family members, *id.* ¶ 145; and placed on expulsion flights without being told what was happening to them or where they were going, *id.* ¶ 147. Virtually all Haitian adults—even mothers holding babies—were shackled on the expulsion flights. *Id.* ¶ 146. The migrants expelled on flights to Haiti and those forced to flee to Mexico faced further danger. *See id.* ¶¶ 165–73. Despite public outcry, no official or agency in the Biden administration has taken any steps to ensure that these abuses are not repeated. *Id.* ¶ 222.

### C.  Continued Restrictions on Plaintiffs' Access to Relief Post-Del Rio

Since being expelled, Individual Plaintiffs and the other members of the putative class continue to face obstacles to humanitarian relief they should have been permitted to access prior to being expelled or would have benefitted from had they not been expelled. For example, in December 2022 Defendant Secretary of Homeland Security Mayorkas redesignated Haiti for Temporary Protected Status ("TPS") on the basis that "[t]he conditions in Haiti, including socioeconomic challenges, political instability, and gang violence and crime—aggravated by environmental disaster—compelled the humanitarian relief." *Id.* ¶ 228. But TPS eligibility requires that applicants prove that they have continuously resided in the United States since November 6,

2022, generally making those expelled from Del Rio ineligible. *Id.* Prior to the December 2022 redesignation, Haiti had last been redesignated for TPS in August 2021—one month *before* thousands of Haitians arrived at the CBP Encampment. *Id.* ¶ 71.

The United States asylum process has also become even more restrictive since the Del Rio expulsions, in ways that continue to target Haitians seeking humanitarian protection. *See id.* ¶¶ 231–44. Most notably, DHS finalized a regulation entitled "Circumvention of Lawful Pathways" (hereinafter "Asylum Ban") that went into effect on May 11, 2023—when the last Title 42 expulsion order expired—making most asylum seekers arriving at the southern land border presumptively ineligible for asylum. *Id.* ¶ 232. The Asylum Ban's stated purpose was to address "concern about the possibility of a surge in irregular migration upon, or in anticipation of" the end of Title 42 and the potential for increased migration from Haiti, among other countries. *Id.* ¶ 233. The final version of the Asylum Ban was expanded from the initial proposed rule to also make migrants who enter the United States through "adjacent coastal borders" presumptively ineligible for asylum, which disproportionately affects Haitians, *id.* ¶ 233, as does the subsequent decision to also make presumptively ineligible those interdicted at sea, *id.* ¶ 243. The Asylum Ban does have three exceptions, but they are burdensome and not meaningfully available to most Haitian asylum seekers who were expelled from Del Rio and remain stranded outside the United States. *See id.* ¶¶ 236–44. One of those exceptions, the Haitian Parole program, is explicitly intended to "disincentivize Haitians in northern Mexico from seeking to enter along the [Southwest Border] of the United States without authorization," stating that "[g]iven the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted."[2]

---

[2] Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243-01, 1243–55 (Jan. 9, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-09/pdf/2023-00255.pdf.

### III.    LEGAL STANDARDS

When reviewing a motion to dismiss under Rule 12(b)(6), courts evaluate whether the plaintiff's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts must "accept as true all of the plaintiff's allegations of fact, and must also 'grant plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Edwards v. United States*, 2020 WL 2800605, at *5 (D.D.C. May 29, 2020) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)).

To establish Article III standing and defeat a Rule 12(b)(1) motion, a plaintiff must show (1) "an injury in fact" that is "concrete and particularized and actual or imminent"; (2) that the "claimed injury is 'fairly traceable to the challenged conduct of the defendant'"; and (3) that it is "likely, as opposed to merely speculative, that the[] injury will be redressed by a favorable decision." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); and *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court will] presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* at 61 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Plaintiffs "need only state a plausible claim that the requirements of standing are met." *Garnett v. Zeilinger*, 323 F.Supp.3d 58, 65 (D.D.C. 2018) (quotation omitted). Standing (in contrast to mootness) is assessed "upon the facts as they exist at the time the complaint is filed." *Nat. Law Party of U.S. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 41 (D.D.C. 2000).

IV.    ARGUMENT

    A.  Plaintiffs Have Standing

        1.    Individual Plaintiffs Have Standing to Seek Declaratory and
              Injunctive Relief

    Individual Plaintiffs have sufficiently pled both (1) ongoing injuries and (2) a realistic

threat of repetition. *See Lujan*, 504 U.S. at 560–61 (requiring injury in fact fairly traceable to

defendants' actions that can be redressed by this Court). Contrary to Defendants' assertions

otherwise, each ground is sufficient on its own to support Individual Plaintiffs' standing. *See*

*Dearth v. Holder*, 641 F.3d 499, 501 (D.D.C. 2011).

        a.    Individual Plaintiffs Have Standing Due to the Continuing,
              Adverse Effects of Defendants' Conduct at Del Rio

    Individual Plaintiffs both inside and outside the United States have standing to seek

declaratory and injunctive relief because they have shown multiple "ongoing injur[ies]" and suffer

"continuing, adverse effects" due to the Defendants' actions at Del Rio. *See Dearth*, 641 F.3d at

501 (where plaintiffs seek equitable relief, plaintiffs "must show [they] are suffering an ongoing

injury *or* face[] an immediate threat of injury" (emphasis added)); Am. Compl. ¶ 8 ("Plaintiffs

seek declaratory and injunctive relief to remedy the ongoing injuries inflicted on them by

Defendants' discriminatory and unlawful actions").[3]

    As an initial matter, by focusing on the timing of the *acts that caused* Individual Plaintiffs'

harms, Defendants mistakenly obscure the *current continuing effects* of those acts. ECF No. 82

---

[3] While standing must be established for each claim and form of relief, "if one party has standing
in an action, a court need not reach the issue of the standing of other parties when it makes no
difference to the merits of the case." *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009); *see
also NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (same). As
discussed in further detail below, at least one plaintiff has standing for each of the Claims for Relief
pled by Individual Plaintiffs. *See* Am. Compl. at pp. 99–116.

("Mot.") at 11–12. In fact, Individual Plaintiffs' "ongoing injury" and the "continuing, adverse effects" from the events at Del Rio establish Individual Plaintiffs' standing. *Dearth*, 641 F.3d at 501 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)).[4] For example, in *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*, plaintiff sought declaratory and injunctive relief after suffering injuries caused by a U.S. Postal Service program that was later revoked. 64 F.4th 1354, 1363 (D.C. Cir. 2023). The court found that plaintiff "suffered viewpoint discrimination and [that] his *continuing* inability to speak through custom stamps while others can is sufficient to support standing," notwithstanding that the program was revoked. *Id.* at 1359 (emphasis added). Individual Plaintiffs here too are presently suffering from the continuing effects of harms caused by the Defendants in Del Rio in September 2021.[5]

*__First__*, as Plaintiffs state, "individuals unlawfully expelled from Del Rio continue to be harmed by Defendants' actions." Am. Compl. ¶ 219. It is "well established that a plaintiff has

---

[4] The cases cited by the Defendants, which do not involve a showing of continuous, adverse effects, do not establish that Plaintiffs in this case seek redress of only "past injuries." Mot. at 12–13. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (allegations of past harm could establish standing for damages but did not establish "a real and immediate threat" of future harm); *Whitmore v. Arkansas*, 495 U.S. 149, 157 (1990) (alleged injury too speculative where future injury would require federal habeas relief where plaintiff's conviction and death sentence were final). Other cases cited by the government involve *no* allegations that the challenged policy will recur (*see Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (claim moot "because the Navy already eliminated the Thirds Policy and *plaintiffs never allege that the Navy will reinstitute it*") (emphasis added); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016) (same)), or situations where the challenged policy or practice *could not* recur. *See Planned Parenthood of Wisc., Inc. v. Azar*, 942 F.3d 512, 517 (D.C. Cir. 2019) ("the legal controversy teed up by the plaintiffs is not capable of repetition"); *Sw. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1351–52 (D.C. Cir. 1999) (agency policy was put in place for a new service that "will no longer be a 'new' service for these particular petitioners" in the future). As discussed further in Section I.A.1.B, *infra*, that is not the case here.

[5] Defendants' invocation of other actions concerning Title 42 that were dismissed as moot are similarly inapposite. *See* Mot. at 13. As Plaintiffs explained in the Reply to the Defendants' Combined Response at ECF No. 59, the remedy sought in those cases concerned only a forward-looking injunction to block an ongoing policy, and did not include a remedy to fix the continuing adverse consequences of past expulsions, as Plaintiffs seek here. *See* ECF No. 59 at 5–6.

standing to bring a claim concerning a procedural injury if she can show that the agency failed to abide by a procedural requirement that was 'designed to protect some threatened concrete interest' of the plaintiff." *Kiakombua*, 498 F. Supp. 3d at 24 (quoting *Lujan*, 504 U.S. at 573 n.8) (plaintiffs who alleged their asylum requests were evaluated unlawfully and resulting in their expedited removal identified an injury in fact); *see also Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 21 (D.D.C. 2020) (finding "little doubt" that individual plaintiffs, who were removed to their home countries after asylum officers found they lacked credible fear, have standing to sue). "Many expelled individuals remain abroad, in dangerous conditions[.]" Am. Compl. ¶ 219. Four Individual Plaintiffs are stranded and living in dangerous conditions in Haiti because Defendants expelled them. *See id.* ¶¶ 223–26. Their continuing plight includes living "under the control of violent armed gangs" where bodies are left in the street and thousands of people have been displaced or murdered. *Id.* ¶¶ 225–26; *see also id.* ¶¶ 318, 335, 342. Two Individual Plaintiffs are stranded in Chile, living in constant fear for their safety and subject to multiple threats of violence with no help from local authorities. *Id.* ¶¶ 239, 325. These Plaintiffs' situations are the "result of the unlawful expulsions from the CBP Encampment." *Id.* ¶ 220.

These injuries are "fairly traceable" to the challenged actions of Defendants. "Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). It is not the existence of violence and instability in Haiti that Plaintiffs claim as the harm caused by Defendants; rather, it is that Defendants "unlawfully expelled" Individual Plaintiffs back to Haiti under the Title 42 Process and pursuant to the Del Rio Deterrence Decision, a violation of their legal right to *non-refoulement*. *See* Am. Compl. ¶¶ 6, 219; *id.* ¶ 220 ("As a result of the unlawful expulsions from

the CBP Encampment, [certain Individual Plaintiffs] were returned to dangerous conditions in Haiti and remain stranded outside the United States."). These expulsions, in turn, have resulted in ongoing adverse effects as Individual Plaintiffs face dangerous conditions abroad.

*__Second__*, all Individual Plaintiffs suffer "continuing, adverse effects" because Defendants caused them to be ineligible for TPS. "[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity." *CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989). If Defendants' had not expelled Individual Plaintiffs, Individual Plaintiffs and putative class members could have sought humanitarian parole or filed their asylum applications in September 2021. *See* Am. Compl. ¶ 230. Under the redesignation of TPS for Haiti, Haitians who have continuously resided in the United States since November 6, 2022 and remained continuously physically present in the United States since February 4, 2023 were eligible to apply for TPS and work authorization in the United States through August 3, 2024. *Id.* ¶ 228. If Individual Plaintiffs and class members had not been unlawfully expelled, they would have been eligible to apply for TPS, which provides eligibility for work authorization, the ability to seek advance parole to travel outside the United States, and independent protection against removal. *Id.* ¶ 229.

The harm to Individual Plaintiffs from their ineligibility for TPS is actual, notwithstanding Defendants' claim of uncertainty regarding whether Individual Plaintiffs would have been approved for TPS. *See CC Distribs.*, 883 F.2d at 150. "Although standing will not follow from a lost opportunity 'if there is no realistic possibility' of receiving the benefit," standing exists where the plaintiff "is not clearly unqualified" for the benefit on any other basis besides the claimed injury. *Vanda Pharma, Inc. v. FDA*, 2023 WL 6035663, at *6 (D.D.C. Aug. 2, 2023) (finding

injury in fact based on ineligibility for rolling review due to agency's denial of fast-track status). As Plaintiffs allege, "Individuals who sought protection at Del Rio would thus have . . . met the continuous residence and physical presence requirements to make them eligible for Haitian TPS." Am. Compl. ¶ 230. This fact must be taken as true at this stage. *Dearth*, 641 F.3d at 501 (in considering standing, the court "assume[s] the factual 'allegations of the complaint relevant to standing are true.'").

It matters not that, in the absence of Title 42, Individual Plaintiffs should have been subject to process under Title 8. *See* Mot. at 15. If Plaintiffs *had* been subject to Title 8, they would have been afforded their statutory right to apply for asylum. Title 8 requires CBP and Immigration Customs Enforcement ("ICE") to inspect noncitizens arriving in the United States and to refer such individuals for further screening where they indicate "either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C.§§ 1225(a)(3), (b)(1)(A)(i)-(ii); 8 C.F.R. § 235.3(b)(4). Individual Plaintiffs would then have been able to apply for TPS. Am. Compl. ¶ 230.

Individual Plaintiffs' ineligibility for TPS is also "fairly traceable" to Defendants' conduct in Del Rio, Am. Compl. ¶ 253, because it is Defendants' conduct in unlawfully expelling Plaintiffs that caused them to be outside the United States and therefore ineligible for TPS, resulting in the loss of this opportunity to pursue a benefit. *See id*; *CC Distribs.*, 883 F.2d at 150. TPS has benefits independent of and separate from the benefits of having an asylum application pending, so TPS ineligibility does harm even those Plaintiffs who have filed asylum applications. As described in the Amended Complaint, TPS provides *immediate* eligibility for work authorization (as opposed to after 180 days for an asylum application, Mot. at 16) and fully *independent* protection against removal. *See* Am. Compl. ¶ 229. Notwithstanding that TPS must be redesignated every 18 months, that protection can and should extend for the entire time that conditions in an individual's home

country warrant TPS.[6] Therefore, as a practical matter, for a country like Haiti that is experiencing "a deteriorating political crisis, violence, and a staggering increase in human rights abuses,"[7] TPS protections can last for years, longer than the four and a half years it takes on average for an asylum application to be adjudicated. *See id*. ¶ 230. Indeed, Haiti was initially designated for TPS in January 2010, and Haitian TPS has been repeatedly extended (including by court order) or redesignated since then.[8] In addition, during the TPS designation period, TPS beneficiaries "may not be removed," and may also apply for authorization to travel outside the United States for any reason, which would not otherwise be available to an asylum applicant.[9]

   ___***Third***___, Individual Plaintiffs are harmed because they are now subject to the Asylum Ban, a harm that is fairly traceable to Defendants' conduct at Del Rio in September 2021. *See* Am. Compl. ¶ 244. As the Amended Complaint explains, "[a]mong the thousands of individuals who were unlawfully expelled from the CBP Encampment in September 2021, any individuals who were outside the United States at the time the Biden Administration adopted the Asylum Ban are now subject to its draconian requirements." *Id*. ¶ 244. This Asylum Ban "effectively requires automatic

---

[6] *See* 8 U.S.C. § 1254a(b)(3) ("At least 60 days before [the] end of an initial period of [TPS] designation, and any extended period of designation . . . the Attorney General . . . shall determine whether the conditions for such designation under this subsection continue to be met;" if the AG "does not determine" that a foreign state "no longer meets the conditions for [TPS] designation," then "the period of designation of the foreign state is extended for an additional period of 6 months (or, in the discretion of the Attorney General, a period of 12 or 18 months).")

[7] *See* Am. Compl. ¶ 71 (quoting 86 Fed. Reg. at 41,864).

[8] *See* Extension and Redesignation of Haiti for Temporary Protected Status, 88 Fed. Reg. 5022-01, 5024, (Jan. 26, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-26/pdf/2023-01586.pdf (cited at Am. Compl. ¶ 228 n.3). Although the Secretary announced the termination of the TPS designation for Haiti effective July 22, 2019, "court injunctions require[d] DHS to continue TPS for Haiti temporarily pending further court order" through until when Haiti was newly designated effective August 3, 2021. *Id.* The Court may consider documents cited and relied on in a complaint. *Jones v. NVR Incorporation*, 2020 WL 2064085, at *3 (D.D.C. Apr. 29, 2020).

[9] *Id*. at 5024, 5029.

denial of an applicant's asylum claim, without consideration, unless the person satisfies one of three burdensome conditions." *Id.* ¶ 236. None of these exceptions are meaningfully available to Individual Plaintiffs or putative class members. *Id.* ¶ 237. In a footnote, Defendants dismiss this harm on the basis that "it is indisputably not a harm traceable to the events at Del Rio or the expulsions under the Title 42 around September 2021." Mot. at 16 n.4. But, like the other harms pled by Plaintiffs, the fact that Individual Plaintiffs are subject to the Asylum Ban at all is fairly traceable to their unlawful expulsions in September 2021.[10] *See* Am. Compl. ¶ 244. Plaintiffs do not need to plead any legal claims against the Asylum Ban because their harms are not based on whether the Asylum Ban itself is unlawful; they are based on how the unlawful expulsions that occurred in Del Rio in 2021 have caused them to be subject to the Asylum Ban—and this new barrier to asylum is a "continuing, adverse effect[]" of Defendants' unlawful conduct in Del Rio. *O'Shea*, 414 U.S. at 495.

Finally, Defendants do not (and cannot) dispute that Individual Plaintiffs' ongoing harms are redressable. *See* Mot. at 9–18. Plaintiffs' injuries can be redressed by both (1) a favorable decision in this case that would prevent a repeat of the Del Rio Deterrence Decision and Title 42 Process in the future, by declaring both to be unlawful and prohibiting Defendants from applying them in the event of a subsequent mass-migration event; and (2) an order that would put Plaintiffs as close as possible to the position they would have been in had they *not* been unlawfully expelled from Del Rio in 2021 and had instead been permitted to exercise their legal right to apply for asylum at the time of their initial entry in September 2021. *See* Am. Compl., Prayer for Relief at

---

[10] The Biden Administration has also recently announced more hurdles to those seeking asylum at the border, effectively capping the number of asylum applications processed per day. Securing the Border, 89 Fed. Reg. 48,487 (June 3, 2004), https://www.federalregister.gov/documents/2024/06/07/2024-12647/securing-the-border.

pp. 116–17. For example, Plaintiffs seek "[a]n order declaring that Individual Plaintiffs and class members, for the purposes of seeking Temporary Protected Status only, were continuously residing and continuously physically present in the U.S. since September 2021," as well as orders facilitating the return of Individual Plaintiffs outside the U.S., and "declaring that Individual Plaintiffs and class members are not subject to the Asylum Ban Regulations." *Id.*, Prayer for Relief at (h)–(j). These forms of relief would directly eliminate the ongoing injuries that Plaintiffs continue to suffer from their 2021 expulsions. *Kiakombua*, 498 F. Supp. 3d at 26 (injury to noncitizens who sought asylum and were subject to expedited removal would be "redressed" by a court order requiring new credible fear interviews).

**b.    Individual Plaintiffs Have Standing Based on a Realistic Threat of Repeated Injury**

Individual Plaintiffs also have standing to seek injunctive relief because they not only suffer the continuing and remediable effects of their 2021 expulsion, but also show "a sufficient likelihood of future injury," *FDA v. All. for Hippocratic Med.*, __ S. Ct. __, 2024 WL 2964140, at *6 (June 13, 2024), as they are "realistically threatened by a repetition [of the violation].'" *Does v. District of Columbia*, 374 F. Supp. 2d 107, 109 (D.D.C. 2005) (quoting *Lyons*, 461 U.S. at 103) (brackets in original). Under this inquiry, "absolute certainty is not required." *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 85–86 (D.C. Cir. 2012). Plaintiffs state that "because many individuals unlawfully expelled from the CBP Encampment in 2021 intend to return to the United States to seek asylum—[including specific Individual Plaintiffs]—and because Defendants have taken no steps to remediate the human rights abuses that occurred in Del Rio (and in fact have reserved the right to resurrect the Title 42 Process), the harms detailed herein are likely to continue and recur if another large migration event develops." Am. Compl. ¶ 253. The order terminating the Title 42 policy "explicitly affirmed the CDC's authority to reimplement the Title 42 Process,

noting that if 'there is a substantial change in the public health situation …, CDC could determine a new order under [Title 42] is necessary." *Id*. ¶ 216. Former President Trump, running for reelection this fall, has already stated his intent to reinstate the Title 42 Process.[11]

Individual Plaintiffs and putative class members also face the potential recurrence of the Del Rio Deterrence Decision. As Plaintiffs explain, "[t]he disproportionate use of detention against Haitian migrants also continues." Am. Compl. ¶ 20; *see also id.* ("In 2020, Haitians constituted the largest nationality group in family detention (44%) despite comprising just 1 percent of asylum decisions that year; "[t]hroughout 2020, the U.S. consistently detained more Haitian families than any other nationality"). The likelihood of a large migration event developing that would invoke the type of response from Defendants that Plaintiffs experienced in Del Rio is a present threat, with attempted entries at the U.S. border exceeding 2,500 per day, and a recent announcement of new asylum restrictions aimed at border crossings.[12] The U.S. government has stated that "[g]iven the number of Haitian migrants currently residing in Mexico, the prospect of another surge cannot be discounted."[13]

Defendants decline to engage with these allegations, dismissing them as "conclusory and speculative." Mot. at 13. But, as with the plaintiff in the *Dearth* case, cited by Defendants, Individual Plaintiffs outside the United States have stated their intent to return to the United States, to face a set of laws that threaten a repeat of Individual Plaintiffs' injuries (here, the denial of Individual Plaintiffs' right to seek asylum and *non-refoulement* protections). *See* Am. Compl. ¶

---

[11] Eric Cortellessa, "How Far Trump Would Go," Time Mag. (Apr. 30, 2024), https://time.com/6972021/donald-trump-2024-election-interview/.

[12] Securing the Border, 89 Fed. Reg. 48,487 (June 3, 2024), https://www.federalregister.gov/documents/2024/06/07/2024-12647/securing-the-border.

13 Am. Compl. ¶ 242 (quoting 88 Fed. Reg. 1243-01, 1243–55 (Jan. 9, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-09/pdf/2023-00255.pdf).

253. The court in *Dearth* rejected the Government's objection "that it remains speculative whether Dearth will again come up against the statutes and regulations he is challenging," and found that "[i]n light of Dearth's stated intent to return regularly to the United States, only to face a set of laws that undoubtedly prohibit him from purchasing a firearm, we conclude his injury is sufficiently real and immediate to support his standing to challenge those laws." *Dearth*, 641 F.3d at 503; *see also Peacock*, 682 F.3d at 85–86 (plaintiffs must establish a "likelihood of injury that rises above the level of unadorned speculation—that is, a realistic danger that [plaintiff] will suffer future harm"). Here, Individual Plaintiffs have an ongoing need and intent to seek asylum and are likely to face the same harms again due to similar circumstances involving high numbers of migrants seeking protection at the border, and the stated intent and policy of Defendants to restrict asylum at the border, all of which create a "realistic danger that [Plaintiffs] will suffer future harm." *Id*. at 86.

### 2.    Haitian Bridge Alliance Alleges Sufficient Facts to Establish Organizational Standing

Haitian Bridge "provide[s] humanitarian, legal, and social services to migrants—particularly Black migrants, the Haitian community, and other vulnerable populations." Am. Compl. ¶ 12. To establish organizational standing, Haitian Bridge, like Individual Plaintiffs, must show "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Organizations' interests in their own missions and resources are indisputably judicially cognizable. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.20 (1982). Haitian Bridge has Article III standing because Defendants' conduct has impaired its legally protected interests and Haitian Bridge has used its resources to counteract this harm. Haitian Bridge's injuries are also fairly traceable to Defendants' conduct and can be redressed.

a.    **Haitian Bridge Sufficiently Alleges Actual and Threatened Injury in Fact**

Haitian Bridge alleges an "actual or threatened" injury, *People for the Ethical Treatment of Animals ("PETA") v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015), because Defendants' conduct (1) "injured the [Haitian Bridge's] interest" and (2) Haitian Bridge "used its resources to counteract that harm," *Citizens for Resp. & Ethics in Wash.* ("*CREW*") *v. U.S. Office of Special Couns.*, 480 F. Supp. 3d 118, 127 (D.D.C. 2020) (quotations omitted).

*First*, Haitian Bridge can establish "an injury to its interests" because Defendants' unlawful activity "perceptibly impaired the organization's ability to provide services." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)). Defendants' unlawful application of the Title 42 Process and the Del Rio Deterrence Decision to Haitian asylum seekers impaired, and continues to impair, Haitian Bridge's daily operations. On September 18, 2021, Haitian Bridge dropped its regular work and stalled core projects, rapidly deploying its resources and staff to address the emergency facing its community. Am. Compl. ¶¶ 12, 344–46, 348–50. As the only Haitian Creole-speaking, Haitian-led organization working at the U.S.-Mexico border, Haitian Bridge acted as first responder to the emergency Defendants created. *Id.* ¶¶ 12, 118, 345–48, 350.

As with Individual Plaintiffs, Defendants' unlawful conduct provides a basis for standing where, as here, there are "continuing, present adverse effects." *Env't Working Grp. v. FDA*, 301 F. Supp. 3d 165, 174 (D.D.C. 2018) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Defendants' unlawful conduct has resulted in "continu[ing]" harms to Haitian Bridge, including an ongoing need to "continue to provide legal and humanitarian support to" migrants expelled from Del Rio and who would "likely not be once again in Haitian Bridge's service area if their rights had been respected." Am. Compl. ¶ 353. Far from engaging in "activities in which [Haitian

Bridge] ordinarily engages," *see* Mot. at 22, Haitian Bridge is effectively serv[ing] the same population twice," this time contending with "more complicated cases" as a result of Defendants' conduct, Am. Compl. ¶ 353. Haitian Bridge's operations also continue to suffer "because of the primary and secondary trauma that [Haitian Bridge] staff experienced at the CBP Encampment and its aftermath[,]" which "undermine[s] their ability to most effectively do their work." *Id.* These ongoing harms amply represent "a direct conflict between the defendant's conduct and the organization's mission" sufficient to establish injury to the organization's interests.[14] *Nw. Immigr. Rights Project* ("*NWIRP*") *v. U.S.C.I.S.*, 496 F. Supp. 3d 31, 46 (D.D.C. 2020) (internal quotation and citations omitted); *id.* (finding injury where defendant's challenged rule conflicted with organization's mission to provide legal services to immigrants); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 142–43 (D.C. Cir. 2019) (finding injury in fact where Defendants' challenged policy would impair organization's ability to provide legal services to asylum seekers, including by requiring Plaintiff to prepare them for "more onerous" immigration procedures). Put differently, the "challenged action itself"—Defendants' mass expulsion of migrants from Del Rio in September 2021—"makes the organization's task [of providing services to migrants] more difficult." *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018), *aff'd*, 809 F. App'x 10 (D.C. Cir. 2020)).

In arguing otherwise, Defendants rely on inapposite authorities, in which plaintiffs did not allege impairment to services. Mot. at 21–22. In *Center for Democracy & Tech. v. Trump*, the Court held that there was no standing where Plaintiff only alleged impairment to its free speech online

---

[14] Defendants mischaracterize the Amended Complaint as "simply devoid of any specific, factual allegations" of present injury, Mot. at 20, ignoring the detailed allegations of how Haitian Bridge suffers ongoing harm. Am. Compl. ¶¶ 351–55. Plaintiffs need only make "general factual allegations of injury" at the pleadings stage. *In re U.S. Off. of Pers. Mgmt.*, 928 F.3d at 61.

advocacy, not its ability to provide services. 507 F. Supp. 3d 213, 222 (D.D.C. 2020); *see also Safari Club Int'l v. Zinke*, 2017 WL 8222114, at \*4 (D.D.C. May 2, 2017) (similar; finding no standing where Plaintiff's lobbying efforts were "not a perceptible impairment to their daily operations"). So too in *Weingarten v. Devos*, where the organization only claimed resources diversion, not program impairment. 468 F. Supp. 3d 322, 334 (D.D.C. 2020). By contrast, Haitian Bridge's service provision to migrants has been directly impaired because of Defendants' unlawful conduct. Am. Compl. ¶¶ 351–55; *see also Center for Responsible Sci.*, 346 F. Supp. 3d at 42 ("In the bulk of cases satisfying organizational standing, the plaintiff organization engaged in direct services to individuals that were made more difficult by the challenged action.") (collecting cases); *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (finding injury where Defendants' conduct "frustrated Abigail Alliance's efforts to assist its members … in accessing potentially life-saving drugs and its other … services").

**_Second_**, Haitian Bridge diverted, and continues to divert, resources to counteract the harm Defendants caused. *See* Am. Compl. ¶¶ 344–54. Rather than constituting expenditures Haitian Bridge "normally would have" incurred, Mot. at 22, "[e]ven two and a half years after the events in Del Rio, Haitian Bridge *continues* to divert resources in response to the government's abusive actions," "which *remains* the biggest drain on Haitian Bridge's staff and finances[,]"Am. Compl. ¶¶ 351–52 (emphasis added); *cf.* Mot. at 20 (citing *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 388 (2d Cir. 2015) (finding organization's *past* expenditures could not support standing) (citation omitted)). Defendants misconstrue *this litigation* as the supposed cause of Haitian Bridge's harm, but in so doing fundamentally misunderstand the other *direct legal services* Haitian Bridge has been forced by Defendants' conduct to provide. As explained above, Haitian Bridge's operations have been impaired and its resources have consequently been diverted to *directly serve* the

complex immigration needs of Haitian asylum seekers expelled from Del Rio, and those services are distinct from this litigation. *See* Mot. at 23; *cf.* Am. Compl. ¶¶ 12, 351–55 (explaining diversion of resources to provide services concerning affected individuals' immigration cases, not litigation); *see also NWIRP*, 496 F. Supp. 3d at 47 (finding organization had standing where government rule would require organization to "spend more time and resources helping clients").

> **b.    Haitian Bridge's Injuries Are Fairly Traceable to Defendants' Unlawful Conduct**

Defendants suggest that Haitian Bridge's clients themselves caused harm to the organization by seeking protection in the United States. Mot. at 23. Not so. Haitian Bridge's injuries are "fairly traceable" to Defendants' conduct. *See Attias*, 865 F.3d at 429. The decision in *NWIRP* reflects as much. There, the court ruled that an organization's injuries were fairly traceable to Defendant's challenged rule where the rule would make it more costly and difficult for migrants within the organization's service area to seek immigration benefits. *NWIRP*, 496 F. Supp. 3d at 50 (organization's "asserted injuries [were] the product of" the rule's impact on clients). Similar to *NWIRP*, Defendants' unlawful application of the Del Rio Deterrence Decision and Title 42 against Haitian asylum seekers has rendered their immigration case postures more complex and resource-intensive, so Haitian Bridge's injuries to its service provision are the "product of" Defendants' conduct. *See also* Am. Compl. ¶ 12 (but for Defendants' conduct, class members would have been permitted to seek asylum or other appropriate immigration relief in September 2021). Absent the expulsions, class members would have thus either remained in the United States in September 2021 or been removed after adjudication of their asylum applications. *Id.* ¶ 352. Defendants rely on *Am. Sports Council v. U.S. Dep't of Educ.*, 850 F. Supp. 2d 288 (D.D.C. 2012), Mot. at 23, but there the organization could not establish causation where third parties' decisions to file administrative complaints was independent from the agency's denial of the organization's petition

to repeal or clarify a rule—whereas here, class members' need to seek Haitian Bridge's services can be fairly traced to Defendants' unlawful expulsion of class members, Am. Compl. ¶ 353.

### c.    Haitian Bridge's Injuries Are Redressable by This Court

This Court can redress Haitian Bridge's harms. An injunction returning the putative class to the immigration case posture they would have been in but for Defendants' unlawful conduct would mitigate the ongoing harm and diversion of resources affecting Haitian Bridge's programs. Am. Compl., Prayer for Relief at (g)–(l); *see also* Am. Compl. ¶¶ 353, 355. Furthermore, just as Individual Plaintiffs face a realistic threat of repeated injury, *see* Section IV.A.1.B, so too does Haitian Bridge; if Individual Plaintiffs are once again subjected to Defendants' unlawful policies, Haitian Bridge can reasonably anticipate further impairment to its work. Defendants are also wrong that declaratory relief would not meaningfully redress Haitian Bridge's harms. *See* Mot. at 20, 23. "A declaratory judgment may serve as the basis for issuance of a[n] injunction." *Anatol Zukerman & Charles Krause Reporting*, 64 F.4th at 1366. Because Haitian Bridge would benefit from an injunction to remedy ongoing harms, it would likewise benefit from a declaration that can serve as the basis for an injunction.

Only by relying on inapposite authority can Defendants contend that the requested relief would not redress Haitian Bridge's injuries. Mot. at 20, 23. This case is unlike *Scenic Am., Inc. v. U.S. Dep't of Transp.*, where an organization that spent resources to "fight[] digital billboards" could not demonstrate how vacating an agency's guidance document would "eliminate or lessen" the organization's need to spend resources in that "fight." 836 F.3d 42, 50 (D.C. Cir. 2016). Here, Haitian Bridge is not seeking to vacate guidance; it is seeking declaratory and injunctive relief, and that relief would, moreover, *directly reduce* service impairment and the amount of resources that Haitian Bridge must divert to provide direct legal services to individuals in its service area.

### B.  Plaintiffs Adequately State Constitutional Claims

Plaintiffs have adequately pled constitutional claims. Defendants' primary challenge to these claims requires misreading *Department of Homeland Security v. Thuraissigiam*, as if it ruled that newly arrived asylum seekers are "not considered to have entered the country" and therefore have no substantive or procedural rights under the Due Process Clause, including its equal protection component. 591 U.S. 103, 139 (2020); *see* Mot. at 25, 30, 33. Defendants' argument not only misconstrues *Thuraissigiam*, but the text of the Constitution, which commands without condition that "*No person* shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V (emphasis added).

In *Thuraissigiam*, the Supreme Court addressed Congress's decision in 8 U.S.C. § 1252(e) to limit habeas review for individuals who have been put in expedited removal (unlike Individual Plaintiffs here), ultimately deciding that the statute violated neither the Suspension Clause nor *procedural* due process. Defendants' proposed application of *Thuraissigiam*'s limited holding to *all* constitutional claims, including *substantive* due process and equal protection claims, stretches *Thuraissigiam* well beyond these facts. *Accord Thuraissigiam*, 591 U.S. 103, 193 n.12 (Sotomayor, J. dissenting) ("[T]oday's decision can extend no further than these claims for relief."). Defendants seek to apply *Thuraissigiam*'s dicta—that a noncitizen "at the threshold of initial entry cannot claim any greater rights under the Due Process Clause" than what Congress grants—to deny *substantive* due process and equal protection rights to any noncitizen who has yet to be granted admission to the United States. *Thuraissigiam*, which did not even consider such claims, holds no such thing—and Defendants have pointed to no authority applying *Thuraissigiam* in this way.

To the contrary, courts in this district have already held that *Thuraissigiam* does *not* foreclose *substantive* due process rights, even in the context of expedited removal (where, unlike here, 8 U.S.C. § 1252(e) applies). *See D.A.M. v. Barr*, 474 F. Supp. 3d 45, 63 (D.D.C. 2020) (Cooper, J.) ("[P]etitioners are entitled to due process in relation to the conditions attendant to their deportations"). This holding is consistent with the text of the Constitution and the moral precepts embedded in its protection of all *persons* inside the territorial jurisdiction of the United States: "Only the most perverse reading of the Constitution would deny detained [noncitizens] the right to bring constitutional challenges to the most basic conditions of their confinement." *Jean v. Nelson*, 472 U.S. 846, 874 (1985) (Marshall, J., dissenting); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (due process provisions "are universal in their application, to all persons within the territorial jurisdiction"). Other courts have likewise addressed equal protection claims on their merits notwithstanding *Thuraissigiam*'s dicta. *See, e.g.*, *Bollat Vasquez v. Mayorkas*, 520 F. Supp. 3d 94 (D. Mass. 2021); *Young v. Lozano*, 2020 WL 4339372 (E.D. Cal. July 28, 2020). What is more, *Thuraissigiam* does not even apply here to preclude Plaintiffs' procedural due process claim, which is based in part on Defendants *refusing* to provide Plaintiffs the statutory processes that Congress enacted. *See infra* Section II.B.3.

### 1.     Plaintiffs Have Pled Sufficient Facts to Establish a Substantive Due Process Claim Under the Fifth Amendment

In Count Two, Plaintiffs allege that Defendants' actions at Del Rio shock the conscience, in violation of the substantive due process rights of Individual Plaintiffs and the putative class. Without the fig leaf of *Thuraissigiam*, Defendants can only argue that Plaintiffs have not alleged a cognizable fundamental liberty or property interest, and that articulating such an interest is a necessary "threshold" requirement before the Court can consider the egregiousness of Defendants' actions. Mot. at 25, 27. This contention is wrong on both points.

As an initial matter, the Supreme Court has long held that substantive due process "prevents the government from engaging in conduct that 'shocks the conscience' . . . *or* interferes with rights 'implicit in the concept of ordered liberty.'" *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations omitted, emphasis added); *see also Sabra ex rel. Baby M v. Pompeo*, 453 F. Supp. 3d 291, 318 (D.D.C. 2020) ("There are two strands of the substantive due process doctrine. The first strand protects rights that are fundamental, whereas the second protects against the exercise of governmental power that shocks the conscience." (internal punctuation and citations omitted)). Thus, Defendants cannot escape scrutiny of their conscious-shocking behavior by conflating these two independent prongs of substantive due process protection. *See, e.g.*, *Sabra*, 453 F. Supp. 3d at 318; *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 499–502 (D.D.C. 2018); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 118–21 (D.D.C. 2018).

Defendants' claim that Plaintiffs have failed to allege a cognizable fundamental liberty or property interest fares no better. The Amended Complaint alleges numerous instances where Defendants violated Individual Plaintiffs' fundamental "rights to bodily integrity, freedom from bodily restraint, and family integrity," Am. Compl. ¶ 386, including instances in which multiple Individual Plaintiffs and their children **suffered bodily harm because they were denied adequate food, water, shelter, and medical care**, *see id.* ¶¶ 257–58, 267–68, 275–76, 278, 286–88, 294–96, 304–05, 314–15, 321–22, 328–29, 338–39; **were physically assaulted**, *see id.* ¶¶ 125, 259, 126, 128, 148; **were unnecessarily and illegally shackled and detained**, *id.* ¶¶ 260, 279, 323; and **were separated from each other, including parents from children**, *id.* ¶¶ 14, 144.

Each of these allegations describe how Defendants intentionally violated Plaintiffs' fundamental rights, which alone states a substantive due process claim.[15]

Nor can Defendants meaningfully dispute that the government misconduct alleged in the Amended Complaint shocks the contemporary conscience. *See, e.g.*, *Tri-Cnty. Indus. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997) ("a deliberate flouting of the law that trammels significant personal or property rights[] qualifies for relief" under the Fifth Amendment); *Norris v. District of Columbia*, 737 F.2d 1148, 1152 (D.C. Cir. 1984) ("The gratuitous brutalization of prisoners is a proscribed governmental purpose."). Rather than address Defendants' conscience-shocking behavior on its own terms, Defendants cite *Collins v. City of Harker Heights* for the remarkable proposition that actions taken "in the administration of government programs" generally cannot violate substantive due process. Mot. at 27. But the Fifth Amendment's Due Process Clause contains no such general exemption, and *Collins* does not rule to the contrary. Instead, *Collins* addresses only whether a government employer is constitutionally required to act affirmatively to provide employees with a safe working environment. 503 U.S. 115, 125 (1992). *Collins*, which considered the government's *failure* to act, has no relevance to Plaintiffs' substantive due process claim, where the government *affirmatively* acted to cause harm to Individual Plaintiffs and members of the putative class—a population entirely at the mercy of the government's coercive powers as to whether and when they may remain in the country and may

---

[15] *See e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) ("liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action.") (citation and internal punctuation omitted); *Norris v. D.C.*, 737 F.2d 1148, 1151–52 (D.C. Cir. 1984) (collecting cases acknowledging physical assault can support a due process claim); *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (collecting cases recognizing fundamental rights of parents to make decisions concerning the care, custody, and control of their children); *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994) ("forced separation of parent from child, even for a short time, represents a serious impingement on [parental] rights.").

exercise their legal right to request humanitarian protection—by subjecting them to inhumane conditions at the CBP Encampment, physically abusing them, and separating families.

### 2. Plaintiffs Have Alleged a "Special Relationship" Between DHS Defendants and Individual Plaintiffs and Class Members

Plaintiffs have adequately alleged in Count Three that Defendants created a "special relationship" with Individual Plaintiffs and members of the putative class by restraining their liberty and rendering them unable to care for themselves, and thus had "a corresponding duty to assume some responsibility for [their] safety and general well-being." *Butera v. District of Columbia*, 235 F.3d 637, 651–52 (D.C. Cir. 2001) (citation omitted). Defendants' actions in creating and increasing danger to the Haitians at Del Rio—by depriving them of basic necessities like food, shelter, and medical care, and by increasing the risk of drowning by cutting ropes placed across the river as a safety measure—likewise gave rise to "a duty of protection," particularly given that Defendants "had the opportunity to plan [their] operation with care." *Id.* at 652. As a consequence, Plaintiffs can prove that Defendants' actions "'shocked the conscience' by meeting the lower threshold of 'deliberate indifference.'" *Id.* (citations omitted).

Defendants raise one argument for dismissal specific to this claim: that no special relationship existed because individuals in the CBP Encampment could leave to seek food and other necessities in Mexico, and were therefore not sufficiently in Defendants' custody. Mot. at 28–30. This contention mischaracterizes both the factual allegations and the law.

The Amended Complaint alleges that asylum seekers arriving at the CBP Encampment were required to remain there if they wished to be processed by CBP officers, who "adopted a ticketing system to process arriving migrants." Am. Compl. ¶¶ 83, 17, 84, 293, 303, 327, 283. All Individual Plaintiffs allege that they were told or otherwise understood they needed to wait for their ticket number to be called to be processed by CBP officials, which they hoped would allow

them to request asylum—because there was no other opportunity to do so. *See, e.g., id.* ¶ 84 ("[A]t no point during the existence of the CBP Encampment were arriving migrants given a reasonable opportunity to present themselves to a U.S. immigration officer and request access to the asylum process."); ¶¶ 256, 269, 274, 277, 284, 293, 303, 313, 316, 317, 20, 320, 322, 327. Plaintiffs also allege that CBP officers sought to constrain the movement of individuals in the CBP Encampment: if anyone attempted to leave, they might be prevented from doing so or, if they succeeded in leaving, they might be prevented from returning to reunite with their families and to be present when their number was called. *Id.* ¶¶ 62, 83, 84, 86, 92, 106.

These factual allegations suffice to state a claim. The D.C. Circuit has recognized that a special relationship exists when the government constrains an individual's liberty "by limiting, among other things, where he lived and what he could do." *Smith v. District of Columbia*, 413 F.3d 86, 96 (D.C. Cir. 2005). In *Smith*, a youth placed in an "independent living program" had "more freedom than a prisoner" and "could come and go," including by taking weekend home visits. 413 F.3d at 94. "[S]uch flexibility," however, "hardly amounts to freedom from state restraints," and the court accordingly held that the District "held [the youth] subject to its control." *Id.* The youth "had to participate in the program;" if he failed to obey the program's restrictions he risked punishment and greater restrictions on his liberty.[16] *Id.* The court therefore held that the District

---

[16] The *Smith* court distinguished the youth's case from *Powell v. District of Columbia*, 634 A.2d 403 (D.C. 1993), in which the court found that the District had no affirmative duty towards a homeless family housed in a District shelter because the family had no legal obligation to remain in the shelter and were not the District's prisoners. *See Smith,* 413 F.3d at 94–95. Individual Plaintiffs' cases are more akin to the youth's case in *Smith* because, like the youth who was legally bound to participate in the independent living program, they were obligated to remain at the CBP Encampment if they wished to be processed by CBP and, as they hoped, have the opportunity to request asylum. Just as the youth in *Smith* "could not have gone elsewhere even if, for example, he felt threatened by his roommate or his neighbors," individuals in the CBP Encampment could not have gone elsewhere to seek asylum, despite the inhumane living conditions there. *Id.* at 95.

"had sufficient custody" over the youth that it had "a constitutional duty not to act indifferently with respect to his welfare." *Id.*; *see also Harvey*, 798 F.3d at 1042–51 (District owed duty of care to an involuntarily committed mental patient where patient left District institution for less restrictive private group home, because the patient was still being held against his will).

That is precisely what happened here. That some Individual Plaintiffs were able to leave to buy food in Ciudad Acuña—and, indeed, were forced to do so because the food provided in the encampment was wholly insufficient—does not erase the fact that, if they wished to be processed by CBP officers to apply for humanitarian relief, they were required to remain at the CBP Encampment and respond when their ticket number was called. Am. Compl. ¶¶ 83, 256, 274. That the government did not put Individual Plaintiffs in a literal prison does not exempt the government from its constitutional duties: something less than the most restrictive setting imaginable "does not negate the involuntary nature" of Plaintiffs' detention in the CBP Encampment. *Harvey*, 798 F.3d at 1051.

Accordingly, even when an individual has some flexibility of movement and the freedom to come and go from specified premises, a constitutional duty of care can still arise if the government restrains an individual's "freedom of action" by imposing legal consequences if the individual leaves the government's custody. *Smith*, 413 F.3d at 95. DHS Defendants therefore "had sufficient custody over [the individuals in the CBP Encampment] to impose upon [them] a constitutional duty not to act indifferently with respect to [their] welfare." *Id.* at 94. Plaintiffs have sufficiently pled that DHS Defendants created a "special relationship" when they restrained individuals at the CBP Encampment and rendered them unable to care for themselves, and that DHS Defendants were deliberately indifferent to their safety and well-being.

### 3.    Plaintiffs Have Adequately Alleged a Procedural Due Process Claim

Plaintiffs have adequately alleged that Defendants violated Individual Plaintiffs' procedural due process rights by denying them the opportunity to seek asylum and *non-refoulement* relief. Am. Compl. ¶¶ 399–406. Contrary to Defendants' assertions, Mot. at 30, Plaintiffs explicitly identify a protected interest: the right of all noncitizens "physically present in the United States, irrespective of [their] status," to apply for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), and to not be removed to countries where they face danger, persecution, and potential loss of life. Am. Compl. ¶¶ 401–02; 8 U.S.C. §§ 1158(a)(1), 1231. Indeed, it has long been "clearly established in this circuit that although [t]here is no constitutional right to [asylum] itself," even a noncitizen "who has unlawfully entered the United States has a Fifth Amendment procedural due process right to petition the government for [asylum].'" *Gutierrez-Rogue v. INS*, 954 F.2d 769, 773 (D.C. Cir. 1992) (citation omitted); *accord Las Americas*, 507 F. Supp. 3d at 38–39.[17] Because this right is protected by statute, Plaintiffs' procedural due process claim seeks "nothing more" than "those rights regarding admission that Congress has provided," *Thuraissigiam*, 591 U.S. at 140, and thus Defendants' contention that *Thuraissigiam* precludes Claim Four is plainly wrong.

Defendants counter that Title 42 provided the controlling statutory framework and that it displaced the asylum procedures mandated by Title 8. *See* Mot. at 31. But as explained *infra* in Section IV.C.2., Defendants fail to meet their "heavy burden" of showing that the two statutes cannot be harmonized. *See EpicSys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). Even accepting

---

[17] Defendants' reliance on *Alshawy v. U.S. Citizenship & Immigr. Servs.*, 2022 WL 970883 (D.D.C. Mar. 30, 2022), is misguided. *Alshawy* merely concluded that "adult citizen children do not have a constitutionally protected liberty interest in bringing their noncitizen parents into the United States." *Id.* at *8. Plaintiffs make no such allegations.

(*arguendo*) for the moment that Defendants are correct about asylum, their failure to abide by statutory safeguards to ensure Individual Plaintiffs and the putative class were not returned to a place where they were likely to be persecuted or tortured violates the United States' *non-refoulement* obligations, in violation of procedural due process. *See* 8 U.S.C. §§ 1231(b)(3), 1231 note (CAT); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) ("[U]nder 1231(b)(3)(A) and the Convention Against Torture, the Executive cannot expel [noncitizens] to countries where their 'life or freedom would be threatened' on account of their 'race, religion, nationality, membership in a particular social group, or political opinion' or where they will likely face torture."). Defendants do not contest this. *See* Mot. at 32. Instead, they argue Claim Four fails because Plaintiffs did not allege that any Individual Plaintiff claimed a fear of persecution or torture in Haiti. *Id.* This mischaracterizes the relevant allegations and the inferences that can reasonably be drawn therefrom. *See, e.g.*, Am. Compl. ¶¶ 15, 150, 279. It also ignores the fact that Defendants' *non-refoulement* obligations are non-discretionary and cannot be negated by refusing to provide Haitians an opportunity to affirmatively express a fear of return, *see, e.g.*, *id.* ¶¶ 63–64, 156, 183, or by ignoring that little else explains why the Individual Plaintiffs and the other members of the putative class would endure the journey to and conditions in the CBP Encampment.

But even as to Title 42's effect on asylum, Defendants' arguments are disingenuous. When Defendants acted to clear the Encampment, they did so under the gun of a temporarily stayed preliminary injunction holding that the process Defendants would rush to apply to Haitians was "likely unlawful." *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 176–77 (D.D.C. 2021), *aff'd in part, rev'd in part and remanded by* 27 F.4th 718 (D.C. Cir. 2022); *see also* Am. Compl. ¶¶ 132–35. Rather than acknowledge this, Defendants instead point to the subsequent appellate court decision in *Huisha-Huisha*, contending that the "D.C. Circuit already concluded" that the Title 42

31

order "foreclosed both the grant of asylum and the 'statutorily mandated procedures' for asylum applications provided for in Title 8," Mot. at 31, which is likewise misleading. The Court, in fact, stopped short of deciding whether denying noncitizens the opportunity to apply for asylum violates the right to apply for asylum in § 1158. *Huisha-Huisha*, 27 F.4th at 730–31. Instead, the D.C. Circuit remanded the case for further "attention from the District Court when it considers the merits," *id.*, stating explicitly that "[n]o one should read our opinion to bind the District Court or future circuit panels regarding the final answer to the challenging merits questions raised by this case," *id.* at 733. Indeed, the District Court ultimately determined that the Title 42 process was arbitrary and capricious, *Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1, 24 (D.D.C. 2022), *vacated as moot*, 2023 WL 5921335 (D.C. Cir. Sept. 7, 2023), which remains persuasive authority. Even taking the *Huisha-Huisha* Circuit's opinion as binding (which it is not), Individual Plaintiffs and members of the putative class were at minimum entitled to *non-refoulement* relief, and have thus adequately stated a procedural due process claim; this Court therefore need not even decide, at this juncture, whether procedural due process additionally protects their right to apply for the specific humanitarian relief of asylum.

### 4.    Plaintiffs Have Adequately Stated an Equal Protection Claim

The Amended Complaint alleges Defendants violated the equal protection rights of Individual Plaintiffs and the putative class because they subjected individuals in the CBP Encampment to inhumane treatment that violated constitutional and statutory requirements, diverged from Defendants' treatment of similarly situated groups, and were motivated in part by the fact that Plaintiffs and putative class members are Black and Haitian. Am. Compl. ¶¶ 85–131, 174–191, 361, 372, 468. These allegations are more than sufficient to plead an equal protection claim. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

Defendants' primary objections (after first insisting that the Amended Complaint "is not a 'short and plain statement' of claims") to Plaintiffs' now supposedly "sparse" allegations are that Plaintiffs do not sufficiently plead that Individual Plaintiffs and members of the putative class were treated differently than other significant groups of noncitizens arriving at the border while Defendants were enforcing the Title 42 Process, or that such treatment was motivated by a discriminatory purpose. *Compare* Mot. at 2, 34. These arguments both misapprehend the law and misrepresent the factual allegations of the Amended Complaint.

***First***, contrary to Defendants' protestations, it is not necessary for Plaintiffs to identify a comparator to plead an equal protection claim. Mot. at 34–35. As the Supreme Court clarified in in *Arlington Heights*, "[t]his is not to say that a consistent pattern of official racial discrimination is a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act . . . would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions." 429 U.S. at 266 n.14; *see also N.A.A.C.P. v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 577 (D. Md. 2019) ("[U]nder the analysis provided in *Arlington Heights*, no comparator evidence is needed." (citation omitted)); *Cook v. Babbitt*, 819 F. Supp. 1, 19 (D.D.C. 1993) ("A single invidiously discriminatory governmental act is enough." (internal punctuation and citations omitted)).

In any event, Plaintiffs have, in fact, sufficiently identified similarly situated groups who were treated differently, including large migration events in 2021 around the Anzalduas Bridge in Mission, Texas, and in 2022 following the Russian invasion of Ukraine. *See* Am. Compl. ¶ 182. Both these groups—like the Haitians who presented themselves for inspection at Del Rio in 2021—involved large numbers of noncitizens seeking asylum at the border within a relatively short period of time while the Title 42 Process was in effect. *See id.* But for the asylum seekers in

Anzalduas, DHS mobilized to provide resources to "including food, cots, benches, and water misters," and "relocated individuals there to other sites for processing to alleviate the humanitarian crisis near the port of entry." *Id.* For Ukrainians in 2022, non-governmental organizations ("NGOs") and other volunteers were allowed "to provide food, shelter, and medical and logistical support on both sides of the border, as well as to assist in organizing Ukrainian asylum seekers to be called for processing by CBP officials." *Id.* DHS Defendants also had a policy of granting humanitarian parole to Ukrainians and exempting them from expulsion under Title 42.[18] *Id.* Individuals in the CBP Encampment received no comparable opportunity for processing by CBP and did not receive any comparable resources from the government or NGOs.[19] *Id.* ¶¶ 93–112.

**_Second_**, Defendants cannot plausibly contend that the Amended Complaint lacks allegations of discriminatory intent, so instead Defendants argue that these allegations are insufficient because they do not identify specific decisionmakers responsible for the inhumane treatment of Individual Plaintiffs and other asylum seekers in Del Rio. Mot. at 36. But a complaint is not subject to dismissal simply because it does not publicly *name* the specific decisionmakers behind governmental misconduct.[20] *See Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 71 (D.C.

---

[18] To the extent that Defendants argue that such decisions to except Ukrainians from Title 42 expulsion are committed to agency discretion by law, Mot. at 35, Defendants can cite no law nor reason supporting their suggestion that the discretionary nature of that decision (which Plaintiffs do not challenge) somehow makes it off limits as evidence in support of an equal protection claim.

[19] In fact, in Del Rio, NGOs, including organizational Plaintiff Haitian Bridge, were generally prohibited from accessing the CBP Encampment, Am. Compl. ¶¶ 62, 86, 131, 178, and appropriate food support via World Central Kitchen was permitted only in the *final days* of the CBP Encampment. Am. Compl. ¶ 97.

[20] Defendants cite *McCleskey v. Kemp*, 481 U.S. 279 (1987), and *Fernandors v. District of Columbia*, 382 F. Supp. 2d 63 (D.D.C. 2005), to support their argument that Plaintiffs' allegations of discriminatory intent are insufficient. Mot. at 36–37. Neither applies here; *McCleskey* held only that evidence of disparate impact on a systemic level, using a single statistical study, was not sufficient by itself to infer a discriminatory purpose there, *see id.* at 292–93, 297–98, whereas *Fernandors* granted summary judgment to defendant on an equal protection claim where the

Cir. 2012) ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" (quoting *Twombly*, 550 U.S. at 555)); *Quizinsight.com P'ship v. Tabak*, 2019 WL 4194433, at *8 (D.D.C. Sept. 4, 2019) ("[T]he Court will not heighten the notice-pleading standard and demand detailed evidentiary submissions to substantiate these claims for relief before the plaintiffs have had a chance to obtain discovery."). And, unlike President Trump's pre- and post-election statements about Latinos cited in *Department of Homeland Security v. Regents of the University of California*, the statements identified in the Amended Complaint were *not* made "remote[ly] in time and [] in unrelated contexts." 591 U.S. 1, 35 (2020). Quite the opposite: they were made in meetings directly related to how to respond to the arrival of Haitian migrants and Haitian migrants at the CBP Encampment in Del Rio, *see* Am. Compl. ¶¶ 67–68, 89–90, 138, and thus raise a plausible inference that the decisions influencing Defendants' conduct in Del Rio were motivated by racial animus. Also unlike in *Regents*, Plaintiffs do not challenge a "generally applicable immigration policy" that inevitably had a disparate impact on one race (there, Latinos) simply by virtue of the demographics of the immigrant population in the United States, 591 U.S. at 34; the disparate impact of Defendants' actions are thus significantly more probative here. Similarly, unlike here, *Regents* did not involve any procedural irregularities. *Id.* ("[T]here is nothing irregular about the history leading up to the [challenged decision].").

Furthermore, allegations about these discriminatory statements, combined with additional facts alleged in the Amended Complaint, more than satisfy the standard set out by the Supreme Court in *Arlington Heights* for circumstantial evidence demonstrating discriminatory intent. The Amended Complaint **sets out the "historical background" of the Del Rio Deterrence Decision**,

---

plaintiff failed to provide any evidence to create a genuine issue of fact as to "a pattern of activity by [Defendants] that would permit an inference of discriminatory motives." 382 F. Supp. 2d at 70.

*Arlington Heights*, 429 U.S. at 267, by citing earlier immigration policies adopted by the United States to discriminate against Haitians and deter them from seeking protection in the United States, Am. Compl. ¶¶ 44–51; **lays out the "specific sequence of events leading up to the challenged decision,"** *Arlington Heights*, 429 U.S. at 267, by explaining how Defendants took no steps to prepare for the arrival of thousands of Haitians or to ensure that the United States upheld its statutory *non-refoulement* obligations, *see* Am. Compl. ¶¶ 60–67, 74–78, 132, 139, 142–59, 168–69; **identifies "[d]epartures from the normal procedural sequence,"** *Arlington Heights*, 429 U.S. at 267, by contrasting the treatment of asylum seekers in Del Rio with the treatment of other asylum seekers presenting at the border in large numbers, Am. Compl. ¶ 175–86; sets out **"contemporary statements" made by decisionmakers evincing discriminatory intent**, *Arlington Heights*, 429 U.S. at 267, citing specific language demonstrating racial animus, Am. Compl. ¶¶ 67–68, 89–90, 138, 142; and alleges that the "**impact of the official action . . . bears more heavily on one race than another,"** *Arlington Heights*, 429 U.S. at 265 (citation omitted); *see also Washington v. Davis*, 426 U.S. 229, 239–42 (1976) ("[A]n invidious discriminatory purpose may often be inferred from . . . the fact, if it is true, that the law bears more heavily on one race than another.")—here, Black Haitians, *see* Am. Compl. ¶¶ 60, 182, 274.

While Defendants contend that these allegations are in tension with other allegations in the Amended Complaint, Mot. at 38, this boils down to a desire for the Court to weigh the evidence and make inferences in the movant's favor, which is not appropriate at the Rule 12 stage.[21] *See*

---

[21] For example, Defendants suggest that the redesignation of TPS for Haiti in August 2021 negates the racially discriminatory purpose motivating Defendants' conduct in Del Rio. Mot. at 37 n.9. TPS concerns Haitian individuals *already in* the United States, *see* Am. Compl. ¶ 71 n.16; 86 Fed. Reg. 41,863-01, 41,863–71 (Aug. 3, 2021). The Del Rio Deterrence Decision and Title 42 Process concerned Haitians *outside of* the United States and prevented them from accessing the asylum system. Regardless, the weight to give the TPS redesignation is a decision for the factfinder at trial.

*Howard v. Off. of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 950 (D.C. Cir. 2013) (at the motion to dismiss stage, a "court must assess the legal feasibility of the complaint, but may not weigh the evidence that might be offered to support it" (internal punctuation and citation omitted)); *see also Quiznight.com Partnership*, 2019 WL 4194433, at *8 ("A complaint survives a motion to dismiss even where the plaintiffs and the defendant advance plausible alternative explanations because, although the defendant's version may prove to be the true one, . . . that does not relieve [him] of [his] obligation to respond to a complaint that states a plausible claim for relief, and to participate in discovery." (internal punctuation and citations omitted)). Rather, every allegation in the Amended Complaint must be taken as true and courts must "grant plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *See Edwards*, 2020 WL 2800605, at *5 (D.D.C. May 29, 2020) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). Plaintiffs have adequately stated facts supporting their equal protection claim, including its disparate impact on Black Haitians and an impermissible discriminatory intent. Defendants' motion to dismiss Claim One should be denied.

## C. Plaintiffs Adequately State Administrative Procedure Act Claims

### 1. This Court Can Grant Meaningful Injunctive and Declaratory Relief for Plaintiffs' 5 U.S.C. § 706(2) Claims

Defendants do not challenge the sufficiency of Plaintiffs' Fifth and Sixth claims, outside of an unavailing assertion that the injuries Plaintiffs suffered because of the government's Administrative Procedure Act ("APA") violations cannot be *redressed* by this Court. Mot. at 38–40. Defendants argue that injunctive relief is unavailable to Plaintiffs under 5 U.S.C. § 706(2) of the APA because "the challenged Government policy has expired – there is no policy to vacate or

set aside."[22] Mot. at 39. Not so. Plaintiffs' § 706(2) claims challenge the Title 42 Process and the Del Rio Deterrence Decision *as applied to* Plaintiffs. *See, e.g.*, Am. Compl. ¶¶ 425–26, 430, 434–35, 438, 443–44, 469, 474. This Court has the authority to set aside Defendants' unlawful application of the Title 42 Process and Del Rio Deterrence Decision to Individual Plaintiffs by ordering that their claims for protection receive proper consideration under the statutory authorities that should have been applied. *See* Am. Compl., Prayer for Relief at (g); *Bechtel v. FCC*, 10 F.3d 875, 887 (D.C. Cir. 1993) (holding that a plaintiff harmed by "an arbitrary and capricious policy . . . is entitled to a proceeding in which the [government] considers her application. . . under standards free of that policy."). Plaintiffs thus request injunctive relief that is consistent with this Court's authorization pursuant to 5 U.S.C. § 706(2) to "hold unlawful and set aside" unlawful agency actions. *See also Doe v. Trump*, 284 F. Supp. 3d 1172, 1177 (W.D. Wash. 2018) (requiring "Defendants to take actions that are necessary to undo those portions of the Agency Memo that are enjoined"); *Kiakombua*, 498 F. Supp. 3d at 26 (requiring plaintiffs' claims be considered under INA's correct legal framework).

Defendants argue that 5 U.S.C. § 706(2) precludes Plaintiffs' request for injunctive relief. But Plaintiffs do not ask this Court to *grant* asylum or withholding; Plaintiffs request that federal agencies *consider* their asylum claims under the proper statutory authorities, the INA and FARRA. *See Kiakombua*, 498 F. Supp. 3d at 26 (differentiating barred relief that would compel a decision from permissible relief that "the agency afford the procedures and the consideration that [plaintiffs]

---

[22] Plaintiffs' broader requests for injunctive relief are also squarely within this Court's equitable authority to grant. *See* Am. Compl., Prayer for Relief; *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 31 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) ("[E]quitable relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." (internal quotation marks omitted)).

are due under the statute" (internal quotations omitted)). Plaintiffs' request for injunctive relief is thus consistent with the remand authority affirmed by the cases Defendants cite.[23]

Plaintiffs also seek declaratory relief for their APA claims. *See, e.g.*, Am. Compl. ¶¶ 430, 444, 474; Prayer for Relief at (c)–(e). This Court has an obligation to rule on requests for declaratory relief regardless of whether it also finds immediate injunctive relief appropriate, *Zwickler v. Koota*, 389 U.S. 241, 254 (1967) (so holding), particularly as "[a] declaratory judgment may serve as the basis for issuance of a later injunction to give effect to the declaratory judgment and it may have res judicata effect in later actions," including to ensure that a defendant "cannot engage in similar discriminatory conduct towards [a plaintiff] or anyone else in the future." *Anatol Zukerman & Charles Krause Reporting, LLC*, 64 F.4th at 1366–67; *see also Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (affirming the preclusive effect of declaratory judgments).

Finally, even if the Court were to find Plaintiffs' Fifth and Eighth Claims not cognizable under the APA, the Court has authority to remedy Defendants' *ultra vires* conduct under its general federal question jurisdiction, 28 U.S.C. § 1331.[24] *See* Am. Compl. ¶¶ 409, 470. This doctrine authorizes the Court to review and enjoin or declare unlawful *ultra vires* or unconstitutional action. *See, e.g.*, *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 111 (1902); *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986). It properly applies where, as here, the

---

[23] *See* Mot. at 39–40; s*ee Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (district court had jurisdiction "to vacate the Secretary's decision rejecting the hospital's revised wage data and to remand *for further action consistent with its opinion*") (emphasis added); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (district court "should have remanded to the Secretary for further proceedings consistent with its conception of the statute"); *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 111 (D.D.C. 2018) (agreeing that "if the [agency]'s decision is arbitrary and capricious . . . remand is the appropriate remedy").

[24] Defendants' argument that Plaintiffs needed to allege facts necessary to plead permanent injunctive relief, Mot. at 40, is incorrect and misplaced at this stage. *See, e.g.*, *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 695 n.3 (D.C. Cir. 2015) (factors for injunctive relief "come into play when parties dispute relief", not dismissal stage).

Defendant have pointed to no "clear and convincing evidence of a contrary legislative intent" to foreclose such review. *Traynor v. Turnage*, 485 U.S. 535, 542 (1988); *see also, e.g.*, *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

> **2.      Plaintiffs Adequately State a Claim of Withheld or Delayed Agency Action Under 5 U.S.C. § 706(1)**

Under the APA, this Court may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs sufficiently allege that Defendants failed to take "discrete agency action" that they were "required to take," *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004), including by unlawfully failing to provide: (1) inspection and referral of noncitizens to the asylum process; (2) withholding of removal and CAT procedures; and (3) procedures under the INA. Defendants do not dispute that Plaintiffs have identified discrete agency actions, but argue that Defendants were not required to undertake them. Mot. at 41–43. Not so. Because these actions are "compelled by law," *SUWA*, 542 U.S. at 5, they support a cognizable claim under 5 U.S.C. § 706(1). *See* Am. Compl. ¶¶ 448, 451–52, 454–56.

> **a.      Defendants' Statutory Duty Is Not Displaced by any Public Health Authority Granted in 42 U.S.C. § 265**

Defendants CBP and ICE are required by statute to inspect noncitizens found in the United States and to refer them for more screening if they indicate "either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i)-(ii); 8 C.F.R. § 235.3(b)(4).

Defendants argue that these statutory duties and limits under Title 8 were superseded by the CDC's August 2021 Order promulgating the Title 42 Process or eclipsed by Defendants' powers "pursuant to the public health authority granted in Section 265." Mot. at 42. But Defendants' statutory authority to remove noncitizens derives exclusively from 8 U.S.C. §§ 1225(b)(1) and 1229(a), and Section 265 does not create a new source of expulsion authority that

permits the government to ignore its statutory duty to offer asylum screenings. 42 U.S.C. § 265 makes no reference to Title 8. Nor does it reference CBP or ICE's duties delegated under that statute. This omission is not surprising; as the D.C. Circuit has observed, it is the CDC—not any component agency of DHS—that administers Section 265. *See Huisha-Huisha*, 27 F.4th at 730 n.8. It is also clear from the legislative history of Section 265 that the provision was viewed as a public health mechanism to supplement quarantine powers, not as an immigration mechanism to allow sweeping expulsions of noncitizens. Indeed, during the congressional debate of the predecessor to Section 265, a separate bill that would have allowed for sending migrants to their countries of origin was considered, but that bill was not adopted. 24 Cong. Rec. 290 (1892). In other words, Congress deliberately decided not to include the power to expel migrants when crafting the narrower text of Section 265.

A court "must" give effect to *each* of two duly enacted Congressional statutes whenever it is possible to do so, and "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *EpicSys. Corp.*, 584 U.S. at 510; *see also Huisha-Huisha*, 27 F.4th at 730 (similar). Here, DHS's responsibilities under Section 265 must be harmonized with their duties of inspection, withholding of removal, and removal under the INA. *See Huisha-Huisha*, 27 F.4th at 731–33 (concluding that the Executive may not expel noncitizens in violation of their statutory rights to *non-refoulement*).

Nor does the CDC's August 2021 Order make *non-refoulement* screening processes under Title 8 "not legally available." Mot. at 41; *see* 86 Fed. Reg. 42,828-02 (Aug. 5, 2021). The August 2021 Order, which is necessarily limited to the scope of powers delegated by § 265, notably makes no reference to 8 U.S.C. §§ 1225 or 1229, or to *non-refoulement* processes and protections more

generally. It does, however, explicitly direct that the Order "does *not* apply to . . . [p]ersons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant . . . humanitarian . . . interests." 86 Fed. Reg. at 42,841. Fear of persecution or torture constitute significant humanitarian interests. The D.C. Circuit did not rule otherwise in *Huisha-Huisha. Contra* Mot. at 41. Instead, the court's characterization of the Order as foreclosing "procedures that [noncitizens] use to apply for asylum" hinged on the discretionary nature of granting asylum, *Huisha-Huisha*, 27 F.4th at 731, not the mandatory nature of withholding of removal and CAT determinations.[25]

### b.  Defendants' Duty to Inspect Includes Affirmative Screening for Fear of Persecution or Torture

"[U]nder § 1231(b)(3)(A) and [CAT], the Executive cannot expel [noncitizens] to countries where their life or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or political opinion or where they will likely face torture." *Huisha-Huisha*, 27 F.4th at 733 (quotations omitted). To challenge Claim Seven, Defendants wrongly argue there are no mandatory procedures to implement these protections. *See* Mot. at 42.

The *non-refoulement* protections enshrined in § 1231 and the § 1231 note specify a mandatory result: no return of individuals to a country where they are more likely than not to be tortured or killed. This mandatory result requires Defendants to take mandatory action, without which the *non-refoulement* obligation would be meaningless. Such action includes the INA-mandated inspection procedures. *See* 8 U.S.C. § 1225(a)(3) ("All [noncitizens] . . . who are applicants for admissions . . . *shall* be inspected by immigration officers." (emphasis added));

---

[25] The D.C. Circuit's analysis on this point also referenced § 1158, *see Huisha-Huisha*, 27 F.4th at 731, a completely different section of Title 8 at issue in Plaintiffs' Seventh Claim.

*Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) (noting that the word "'shall' indicates a mandatory duty"). It is through this mandatory inspection process that noncitizens have the opportunity to "indicate[ either] an intention to apply for asylum . . . or a fear of persecution," 8 U.S.C. § 1225(b)(1)(A)(i)–(ii), including a non-discretionary duty to provide Individual Plaintiffs with an opportunity to express fear of persecution or torture, 8 C.F.R. § 235.3(b); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 149 (D.D.C. 2018) ("An agency is bound to adhere to its own regulations."). Defendants are required to ask, record, and verify an arriving noncitizen's response to four specific questions contained on Form I-867B designed to actively solicit information about fear of return. *See* 8 C.F.R. § 235.3(b)(2)(i). Because Defendants failed to perform these non-discretionary acts, Individual Plaintiffs were given no opportunity to request protection or to receive a credible fear screening. *See* Am. Compl. ¶¶ 8, 63.

The Capio Memo itself reflects Defendants' failure to take the discrete agency actions required of them. *Contra* Mot. at 26–27. The Capio Memo "provides no process for covered noncitizens to seek access to the U.S. asylum process." Am. Compl. ¶ 57. To the extent the Capio Memo purports to shift the burden to immigrants to make "affirmative" and "spontaneous" claims that they fear torture, *see* Mot. at 43, it reflects Defendants' failure to comply with their statutory and regulatory duties, which squarely place the responsibility for screening for fear of persecution or torture on Defendants. Even if Defendants were right that the process laid out in the Capio Memo is consistent with their responsibilities (it is not), Plaintiffs also adequately allege that Defendants failed to comply with the memo's processes. Defendants *prevented* Individual Plaintiffs from affirmatively communicating their desire to seek protection by "actively refus[ing] to engage" Am. Compl. ¶ 204; foreclosing Individual Plaintiffs' ability to express fear, *id.* at ¶¶ 278; failing to inform them that they were being expelled to Haiti, *id.* at ¶¶ 260, 279, 317, 332–33;

and ignoring them when they did attempt to overcome Defendants' improper barriers, *id.* at ¶ 279 (describing how Jacques told officials he could not return to Haiti because he faced danger).[26]

### c.    This Court Can Grant Meaningful Relief Under the APA Based on Defendants' Past Unlawful Conduct

Defendants incorrectly argue that Claim 7 must be dismissed because "now, there is no withheld required agency action to be compelled." Mot. at 43. Under 5 U.S.C. § 706(1), the Court may compel Defendants to afford Plaintiffs and class members the statutory and procedural protections that they should have received when they sought protection in the United States in September 2021. *See* Am. Compl. ¶¶ 64, 84, 132, 135–37, 156–58, 164; *id.* Prayer for Relief at (g), (i), (j), (l); *see also Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1311 (S.D. Cal. 2018) (noting government's concession that "relief under section 706(1)" is "an appropriate remedy" for the government's alleged failures to act under the INA's statutory provisions pertaining to asylum); *Gomez v. Biden*, 2021 WL 3663535, at *24 (D.D.C. Aug. 17, 2021) (under 5 U.S.C. § 706(1), ordering Defendants to adjudicate withheld visas where mandatory processes had been unlawfully denied). Defendants' motion to dismiss Claim Seven should be denied.

### 3.    Plaintiffs Adequately State a Claim Under 5 U.S.C. § 706(2) Regarding the Del Rio Deterrence Decision

Section 706(2) of the APA authorizes a court to "hold unlawful and set aside agency action" where the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Defendants seek to dismiss Plaintiffs' Eighth Claim, arguing that the Del Rio Deterrence

---

[26] Defendants are wrong that no Individual Plaintiffs expressed fear of torture; the lack of formal channels for Individual Plaintiffs to do so is also evidence that Defendants failed to uphold their duties to screen for fear of return to Haiti. *See* Mot. at 30–32, 41–43.

Decision is not reviewable because it is not a final agency action and because it was planned at the White House level. Mot. at 43–47. Defendants are wrong on both counts. As a "*particularized* agency action" from which legal consequences flow, the Del Rio Deterrence Decision is a final agency action that forms the predicate for an APA claim. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (emphasis in original); *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997).

> ### a.    The Del Rio Deterrence Decision Qualifies as an "Agency Action"

5 U.S.C. § 551(13) defines "agency action" with an "expansive [list that] is meant to cover comprehensively every manner in which an agency may exercise its power." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 (D.C. Cir. 2006) (cleaned up); *see also Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("the term 'agency action' undoubtedly has a broad sweep").

Here, the Del Rio Deterrence Decision undoubtedly involved the "exercise [of] power" by Defendants, and is appropriately challenged under the APA. In particular, it qualifies as a "sanction," which is defined to include "the whole or a part of an agency . . . prohibition, requirement, limitation, or other condition affecting the freedom of a person; . . . withholding of relief; . . . [or] imposition of penalty." 5 U.S.C. § 551(10), (13). As the Amended Complaint describes, the Decision adversely affected "the freedom of . . . persons" (by restricting freedom of movement within the CBP Encampment and in the CBP Encampment and by precluding Haitian migrants from seeking immigration relief that would grant them lawful presence in the United States), and also involved the "withholding of relief" (e.g., proper asylum screening and processing). Am. Compl. ¶¶ 70–131. These exercises of power constitute a "sanction" under the APA. *See, e.g.*, *R.I.L-R,*, 80 F. Supp. 3d at 184 (finding as final agency action "ICE's consideration of an allegedly impermissible factor in making custody determinations"); *Ramirez v. U.S. Immigr.*

*& Customs Enf't*, 310 F. Supp. 3d 7, 20–21 (D.D.C. 2018) (finding as final agency action ICE's consistent failure to apply certain factors in making individual custody decisions). Even if not a sanction, the Decision can be viewed as an "order," a "denial" of "relief," or a "failure to act" to allow Individual Plaintiffs to seek the legal protections to which they are entitled—all "agency actions" under 5 U.S.C. § 551(13). *See SUWA*, 542 U.S. at 62 (broadly defining "order" as "a final disposition . . . in a matter other than rule making" (quotation omitted)).

### b.    The Del Rio Deterrence Decision Is "Final" Agency Action

Defendants also wrongly argue that the agency action is not "final." The Del Rio Deterrence Decision was the specific, ultimate means adopted and implemented by DHS Defendants to suppress the growing number of Haitians arriving in September 2021 and to prevent and deter them from lawfully accessing the U.S. asylum system. Am. Compl. ¶¶ 2, 60.

Though unwritten, the Del Rio Deterrence Decision meets the definition of a final agency action. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138 (D.D.C. 2018) (noting that "agency action need not be in writing to be judicially reviewable as a final action"). To be "final," an action must "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted); *see also Ass'n of Admin. L. Judges v. U.S. Off. of Pers. Mgmt.*, 640 F. Supp. 2d 66, 72 (D.D.C. 2009) (to be "final," agency action "must not be of a merely tentative or interlocutory nature").

Plaintiffs satisfy both prongs of the test. First, as pled, the decision-making process behind the Del Rio Deterrence Decision is complete. *See* Am. Compl. ¶¶ 60–61. That the Decision was applied to Plaintiffs in 2021, and that Plaintiffs are still experiencing ongoing harms from Defendants' unlawful conduct, does not mean that the Decision itself remains in flux or is interlocutory. *See id.* ¶¶ 219–44. Courts have found that that the implementation of a decision that

denied rights to certain immigrants "mark[s] the 'consummation' of an agency's decisionmaking process." *Lucas R. v. Azar*, 2018 WL 7200716, at *8 (C.D. Cal. Dec. 27, 2018). Second, "legal consequences flow[ed]" from Defendants' Del Rio Deterrence Decision. *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612 n.7 (S.D.N.Y. 2018). Plaintiffs suffered those intended consequences when they were subjected to inhumane conditions and hastily expelled from the United States without statutory rights or due process afforded to them. *See supra* Section II; *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (second prong of finality is based on the action's "concrete consequences"); *see also L.V.M.*, 318 F. Supp. 3d at 612 (finding final agency action where challenged conduct caused a delay in the process of releasing unaccompanied children). The Del Rio Deterrence Decision constitutes a "final" agency action and is subject to APA review.

> **c.  The White House's Involvement in Devising the Del Rio Deterrence Decision, Which Agency Defendants Implemented, Does Not Render That Decision Exempt from APA Review**

The fact that the White House was involved in devising the Del Rio Deterrence Decision does not render it exempt from APA review where, as here, the DHS Defendants adopted and implemented that Decision and Plaintiffs' claim names only the DHS Defendants. *Contra* Mot. at 44–45. The case law is clear that a directive from the White House that is later adopted and implemented by an agency may appropriately form the basis for a claim under section 706(2) against the agency. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001) (agency action reviewable where agency adopted rule together with White House directive). To hold otherwise would shield agencies from administrative review merely because some plan, policy, or directive was initially devised by the White House. The motion to dismiss Claim Eight should be denied.

### D. President Biden Is a Proper Defendant

Seeking to dismiss all claims against President Biden from this case, Defendants make the absolutist assertion that courts "may not order[] injunctive or declaratory relief directly against the President for his official conduct." Mot. at 47, 50. Defendants' assertion is contrary to binding precedent: "the doctrine of separation of powers . . . can[not] sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Clinton v. Jones*, 520 U.S. 681, 704 (1997) (quotations omitted); *see also Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) (if "the President himself" violates the law "the court's order must run directly to the President"). Consistent with this precedent, courts in the D.C. Circuit and beyond have issued declarations and injunctions running against the President. *See Nat'l Treasury Emps. Union ("NTEU") v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (declaratory judgment); *Saget v. Trump*, 375 F. Supp. 3d 280, 334–35 (E.D.N.Y. 2019) (preliminary injunction).

Defendants' contrary argument (Mot. at 47–49) relies on an overbroad interpretation of one recent U.S. Supreme Court case and two D.C. Circuit cases: *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (discussing *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866))); *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996); and *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010). But these decisions do not "expressly h[o]ld" that courts may "*never* enjoin the President with regard to his official behavior." Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for Control of Presidential Information*, 90 Geo. L.J. 737, 758 (2002). To the contrary, *Franklin* and *Swan* "leave[] open the possibility that an injunction against the President might be appropriate where a ministerial duty is at issue or as a last resort in situations where relief is not available against any other executive official." *McCray v. Biden*, 574 F. Supp.3d 1, 9 (D.D.C. 2021). Further, "*Newdow*'s passing observations . . . were made in dicta, since the

President was not a defendant." *McCray*, 574 F. Supp. 3d at 11. Further contradicting Defendants'

argument, courts have issued equitable relief against the President in cases that concern the

Office's official duties. *See NTEU*, 492 F.2d at 616; *Saget*, 375 F. Supp. 3d at 334–35.[27]

      Critically, moreover, "none of the authority cited by Defendants requires that the President

be dismissed at this early stage" of the case. *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d

307, 329 (D. Md. 2018) (discussing similar reliance by the government on *Franklin* and *Swan*).

Indeed, numerous "district courts, when faced with this delicate question at the motion to dismiss

stage, have declined the government's invitation to dismiss the President as a party." *Mayor &*

*City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 516 (D. Md. 2019) (collecting cases).[28] That

is the right disposition here. While Plaintiffs *might* receive complete relief through injunctions or

declarations against subordinate officials alone, *see* Mot. at 49 & n.12 (speculating to this effect),

the Court should not address that issue now, as the "record in this case has not been fully developed

---

[27] Defendants contend Plaintiffs must allege "action taken by President Biden himself" to trigger this doctrine. Mot. at 50. Defendants are wrong where, as here, Plaintiffs assert *official* capacity claims. "Official capacity [claims] seek[] to hold the entity of which the officer is an agent liable, rather than the officer himself," *Sanchez v. Keener*, 2022 WL 16856360, at *2 (N.D. Cal. Nov. 10, 2022) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)), which is why only "*individual* capacit[y]" claims require an "allegation of personal involvement," *Anghel v. N.Y. State Dep't of Health*, 947 F. Supp. 2d 284, 299 (E.D.N.Y. 2013) (emphasis added), *aff'd*, 589 F. App'x 28 (2d Cir. 2015). Defendants' related argument that Plaintiffs lack standing to sue the President (Mot. at 50) similarly fails; it is sufficient that the Amended Complaint alleges actions taken by "the White House" and "senior White House advisors" to which Plaintiffs' injuries are fairly traceable. *See, e.g.,* Am. Compl. ¶¶ 2, 61–62, 68–69, 75–77, 80, 132–34, 176, 188, 191; *Hill v. U.S. Dep't of the Interior*, 2023 WL 6927266, at *6 (D.D.C. Oct. 19, 2023) (Article III's "causation standard . . . is not particularly demanding" (quotation omitted)); *supra* Section IV.A.

[28] *See, e.g.*, *Stone v. Trump*, 400 F. Supp. 3d 317, 359–60 (D. Md. 2019) (declining to dismiss President from suit on a motion to dismiss); *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 751–52 (D. Md. 2018) (same), *rev'd on other grounds*, *In re Trump*, 928 F.3d 360 (4th Cir. 2019); *Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 418–19 (D. Mass. 2018) (finding it "premature" to decide this question on a motion to dismiss); *CASA de Maryland*, 355 F. Supp. 3d at 329 (denying motion to dismiss; even if "relief against the President is extraordinarily unlikely" dismissal "at this early stage" would be "premature"); *Saget*, 345 F. Supp. 3d at 297 (similar).

regarding . . . 'whether an injunction against lower officials or declaratory relief would be sufficient.'" *Saget*, 345 F. Supp. 3d at 297 (quoting *Centro Presente*, 332 F. Supp. 3d at 419).

Similarly, the question of whether the relief ultimately afforded Plaintiffs is "non-ministerial," Mot. at 31, is best addressed when the Court undertakes to fashion such relief. While Defendants assert that "enjoin[ing]" the President from "form[ing] and implement[ing] . . . immigration and public health policies" would be improper, Mot. at 48 n.11, the Prayer nowhere requests such a broad-ranging injunction, *see* Am. Compl., Prayer for Relief at (a)–(n); it instead requests specific forms of injunctive relief akin to what courts have previously recognized involve ministerial duties. *See, e.g.*, *Saget*, 375 F. Supp. 3d at 335 ("enjoining the President and other executive officials from violating [8 U.S.C. § 1254a, the Temporary Protected Status] statute is akin to performing a ministerial duty"); *Al Otro Lado, Inc. v. Mayorkas*, 2021 WL 3931890, at *14 (S.D. Cal. Sept. 2, 2021) ("[T]he duties to inspect and refer [arriving asylum applicants] contained in [8 U.S.C.] § 1158(a)(1) and § 1225 are mandatory ministerial duties.").

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

DATED: June 21, 2024

Respectfully submitted,

*/s/ Maura A. Sokol*
    Maura A. Sokol

**Nicole Phillips\***
nphillips@haitianbridge.org
**Erik Crew\***
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4265 Fairmount Avenue, Suite 280
San Diego, CA 92105
Telephone: +1 949 603-5751

**Stanley Young** (CA00146)
syoung@cov.com
COVINGTON & BURLING, LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: +1 650 632-4704

**Alexander L. Schultz** (DC Bar No. 1618410)
aschultz@cov.com
COVINGTON & BURLING, LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: +1 424 332-4788

**Maura A. Sokol** (DC Bar No. 1672674)
msokol@cov.com
COVINGTON & BURLING, LLP
850 Tenth Street, NW
Washington, DC 20001
Telephone: +1 202 662-5528

**Karen C. Tumlin** (CA00129*)*
karen.tumlin@justiceactioncenter.org
**Esther H. Sung** (CA00132)
esther.sung@justiceactioncenter.org
**Vanessa Rivas-Bernardy\***
vanessa.rivas-
bernardy@justiceactioncenter.org
Los Angeles, CA 90027
Telephone: +1 323 316-0944
Facsimile: +1 323 450-7276

**Tess Hellgren** (OR0023)
tess@innovationlawlab.org
**Stephen Manning** (OR0024)
stephen@innovationlawlab.org
**Rachel Landry\***
rachel@innovationlawlab.org
INNOVATION LAW LAB
333 SW Fifth Avenue #200
Portland, OR 97204
Telephone: +1 503 922-3042
Facsimile: +1 503 882-0281

    \*Admitted *Pro Hac Vice*

*Counsel for Plaintiffs*