**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAITIAN BRIDGE ALLIANCE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, *et al.*, <br><br> Defendants. | Case No. 1:21-cv-03317 (JMC) |

## <u>MEMORANDUM OPINION AND ORDER</u>

In the summer of 2021, the assassination of Haiti's President and a massive earthquake compounded years of natural disasters and civil unrest to leave the country in a wildly difficult situation. *See* ECF 75 ¶ 167. So that fall, nearly 15,000 Haitians arrived at the United States' southern border in Texas, hoping to apply for asylum or other forms of humanitarian protection. When they arrived, however, they were not allowed to apply for those forms of protection. That is because, since the onset of the COVID-19 pandemic, the Government had issued a series of orders under a public health statute that required any noncitizen arriving at a land border without travel documents to be immediately removed. With those orders in place, the Government refused to process the arriving Haitians as they would have under normal circumstances. Instead, they held the migrants in an encampment in Texas, just across the border. After a few days at the encampment, the Government put many of the migrants on a plane and returned them to Haiti. Seeing what was happening, other migrants turned around and returned to Mexico.

Some of the Haitian migrants who were turned away, along with an advocacy group, filed this lawsuit to challenge the Government's use of those public health orders to expel Haitians, along with its allegedly inhumane treatment of the migrants at the encampment in Texas. This was

one of several lawsuits filed to challenge these public health orders. After the pandemic subsided in 2023, however, the public health orders expired. When that happened, courts dismissed as moot those other lawsuits. This one, however, presents a live controversy. That is because several of the Plaintiffs are Haitian migrants who were expelled to Haiti pursuant to the public health orders and who remain in Haiti today. Those migrants never had a chance to seek the humanitarian relief they might have applied for had the public health orders not been in place. If they prevail in this lawsuit by proving the orders unlawful, the Court could redress that injury by requiring the Government to ensure the Plaintiffs get that opportunity. Insofar as the Plaintiffs seek that relief, the Court can adjudicate their claims. And while some of their claims fail, others are plausible. The Court therefore **GRANTS in part** and **DENIES in part** the Government's motion to dismiss.[1]

## I.    BACKGROUND

This case involves the interaction between the immigration laws and a provision of the 1944 Public Health Service Act that authorizes the Department of Health and Human Services "to prohibit . . . the introduction of persons" into the United States in the case of an outbreak of "disease in a foreign country." 42 U.S.C. § 265; *see Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 723–24 (D.C. Cir. 2022). The Court therefore begins by describing those statutes and the Government's recent implementation of the public health statute. The Court then turns its attention to what the Plaintiffs have dubbed the "Del Rio Deterrence Policy"—an initiative adopted in 2021 to deter Haitian migrants from seeking asylum in the United States that year. Finally, the Court sketches the procedural history of this case.

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

### A. Statutory and regulatory background

#### 1. The Immigration and Nationality Act

The Immigration and Nationality Act (INA) authorizes the executive to deport "[a]ny alien who is present in the United States in violation of" federal law. 8 U.S.C. § 1227(a)(1)(B). The law does, however, provide noncitizens with certain procedural and substantive rights to resist their expulsion. *See Huisha-Huisha*, 27 F.4th at 724. Those rights include three protections relevant to this case: (1) asylum, (2) withholding of removal, and (3) protections under the U.N. Convention Against Torture (CAT). *See* ECF 75 ¶¶ 198–203.

Any person who is "physically present in the United States"—even one who enters the country illegally—"may apply for asylum." 8 U.S.C. § 1158(a)(1); *see also Huisha-Huisha*, 27 F.4th at 730. Asylum is a discretionary protection that the Attorney General "may grant" to people who "fear . . . persecution" in their home country because of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42). Those granted asylum can lawfully live and work in the United States. *Id.* § 1158(c).

Unlike asylum, neither withholding of removal nor CAT relief entitles a noncitizen to legal status in the United States. Instead, they only bar the Government from removing noncitizens to a particular location. *See Huisha-Huisha*, 27 F.4th at 731. Withholding of removal protects noncitizens from removal to a particular country if it is likely that their "life or freedom would be threatened in that country" based on their "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). CAT relief protects noncitizens from removal to countries where they face a likelihood of torture. *See id.* § 1231 note; 8 C.F.R. § 208.16(c); 28 C.F.R. § 200.1. Both withholding of removal and CAT relief "are mandatory: the Executive must provide them to aliens who qualify for them." *Huisha-Huisha*, 27 F.4th at 725.

### 2.  Title 42

"Congress [has] authorized the Executive to determine that individuals from certain countries should be excluded from the United States during public-health emergencies." *Huisha-Huisha*, 27 F.4th at 723. That power is codified in 42 U.S.C. § 265, which grants the Surgeon General the "power to prohibit . . . the introduction of persons" from a foreign country when she determines that "there is a serious danger of the introduction" of a "communicable disease" from that country. The responsibility for exercising this authority has been delegated to the Centers for Disease Control and Prevention (CDC). *See Huisha-Huisha*, 27 F.4th at 724.

The CDC made use of this power in response to the COVID-19 pandemic. *See id.* at 725. After issuing an interim rule to the same effect in the early days of the pandemic, the CDC eventually issued a final rule banning certain noncitizens from entering the United States from Canada or Mexico. *See* Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right to Introduce and Prohibition of Introduction of Persons into United States from Designated Foreign Countries or Purposes, 85 Fed. Reg. 56424 (Sept. 11, 2020). The CDC later reissued similar orders continuing the same policy, including the order that was in effect when the Plaintiffs arrived in the United States. *See* Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42828, 42829 (Aug. 5, 2021).

These Title 42 orders applied to noncitizens "traveling from Canada or Mexico (regardless of their country of origin) . . . who must be held longer in congregate settings . . . to facilitate immigration processing." Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. 17060, 17061 (Mar. 26, 2020). "As a general matter, that mean[t noncitizens] who 'lack[ed] valid travel documents.'" *Huisha-Huisha*, 27 F.4th at 726 (quoting 85 Fed. Reg. at

17061). The Government "expelled" noncitizens covered by these orders "without allowing them to apply for asylum or seek relief from removal to a place where they will face persecution." *Id.*

Per the terms of the CDC's orders, the Government ended this exercise of its Title 42 power on May 11, 2023. *See* ECF 75 ¶ 218; Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42828, 42830 (Aug. 5, 2021) ("This Order will remain in place until . . . the expiration of the Secretary of [Health and Human Services'] declaration that COVID–19 constitutes a public health emergency."); *see also* Circumvention of Lawful Pathways, 88 Fed. Reg. 11704, 11708 (Feb. 23, 2023) ("The termination of the Secretary of HHS' declaration that COVID-19 constitutes a public health emergency is expected to occur on May 11, 2023.").

## B. The Del Rio Deterrence Decision

In addition to the statutes and regulations described above, Plaintiffs allege the existence of an unwritten policy initiative they refer to as the Del Rio Deterrence Decision. ECF 75 ¶ 60. According to the complaint, in August 2021, President Biden and the Department of Homeland Security (DHS) began receiving reports that the United States would soon see an increase in the number of Haitian migrants seeking asylum. *Id.* ¶¶ 60, 65–67. Those migrants were going to arrive "near the Del Rio Port of Entry in Del Rio, Texas." *Id.* ¶ 60. In response, the President, his advisors, and DHS made "a decision to suppress the growing number of Haitians arriving at the border near Del Rio and to prevent and deter these Haitian asylum seekers from accessing protection in the United States by subjecting them to harsh conditions and then summarily expelling them" "under the authority of [] Title 42." *Id.* ¶¶ 60, 136. This decision is what the Plaintiffs call the Del Rio Deterrence Decision. *See id.* ¶ 193.

The decision, according to the Plaintiffs, was principally implemented at "a makeshift encampment near the Del Rio International Bridge" where the arriving Haitian immigrants were

"detained" by Customs and Border Patrol. *Id.* ¶ 3; *see, e.g.*, ¶¶ 85–91 (introducing allegations about the "implement[ation] of the Del Rio Deterrence Decision" at the encampment). That encampment housed at least 15,000 migrants—mostly Haitian—in the fall of 2021. *Id.* ¶¶ 81–82. At the Biden administration's direction, officials running the Del Rio encampment denied Haitian migrants such "basic human necessities" as sufficient food and water, *id.* ¶¶ 85, 93–107, medical treatment, *id.* ¶¶ 113–22, and shelter from the elements, *id.* ¶¶ 108–12. Migrants were physically and verbally assaulted when they attempted to retrieve provisions for their families from Mexico. *Id.* ¶¶ 123–31. Organizations offering humanitarian and legal assistance were denied entry to the facility. *Id.* ¶ 178. Many migrants housed at Del Rio—more than 10,000 over the course of a single month—were expelled to Haiti without being given an opportunity to apply for asylum or screened for fear of return to their home country. *Id.* ¶¶ 132–39. These people were put on planes chartered by the Government, and some did not know they were being returned to Haiti until they landed there. *See id.* ¶¶ 63, 139, 154, 333. Around 8,000 additional migrants, fearing expulsion to Haiti, felt compelled to retreat to Mexico instead. *Id.* ¶¶ 160.

## C. This case

A group of individuals and a non-profit organization filed this lawsuit to challenge the Government's use of Title 42 and the Del Rio Deterrence Decision. The individual Plaintiffs all arrived at the Del Rio encampment in September 2021. ECF 75 ¶¶ 8, 13–22. The complaint details the reasons each of these people left Haiti and their nightmarish experiences in Del Rio. *See id.* ¶¶ 255–342. The complaint also lays out what happened to each of the individuals after Del Rio. Some—Eric Doe, Florence Doe, James Doe, and Delgado Doe—were expelled to Haiti and have not been able to return to the United States. *See id.* ¶¶ 19, 21, 22. This group all remain in Haiti today. *See id.* Other Plaintiffs were expelled to Haiti but were later allowed to return to the United States. They are Mirard Joseph, Madeline Prospere, Mayco Celon, Veronique Cassonell, Jacques

Doe, Esther Doe, Emmanuel Doe, Samuel Doe, Samantha Doe, and Paul Doe. *See id.* ¶¶ 13–18. Two other Plaintiffs, Pierre and Ginette Doe, have also made it into the United States since the amended complaint was filed. *See* ECF 97.

The organizational Plaintiff is Haitian Bridge Alliance, "a grassroots and community-based nonprofit" whose mission is "to advocate for fair and humane immigration policies and to provide humanitarian, legal, and social services to migrants—particularly Black migrants, the Haitian community, and other vulnerable populations." ECF 75 ¶ 12. Haitian Bridge provides services to asylum seekers and other migrants, both at the border and throughout their U.S. immigration proceedings. *Id.* As part of its mission, Haitian Bridge provided aid and legal services to asylum seekers at Del Rio in September 2021. *Id.*

Near the end of 2021, the Plaintiffs filed this putative class action against President Biden, in his official capacity, as well as several other Government officials and agencies. *See* ECF 1. After the Government filed a motion to dismiss, *see* ECF 28, but before the Court could rule on that motion, the Government announced the expiration of the Title 42 Process. The Court then issued an order requiring the Plaintiffs to show cause as to why the case was not moot. *See* Min. Order, May 12, 2023. The Plaintiffs both responded to that order and filed a separate motion to file a supplemental complaint. *See* ECF 55; ECF 56. After those motions were briefed, the Plaintiffs indicated an intent to amend their complaint once again. *See* ECF 66. In the interest of judicial economy, the Court mooted out the pending motions to dismiss and supplement and granted the Plaintiffs leave to file an amended complaint. *See* ECF 75; Min. Order, Feb. 22, 2024.

The amended complaint presses claims under the Fifth Amendment and the Administrative Procedure Act, challenging the Plaintiffs' treatment at the Del Rio encampment in September 2021, their expulsions from the country, and the policies that authorized those actions. *See generally*

ECF 75 ¶¶ 368–474. The Plaintiffs seek various forms of relief, including declarations that the Title 42 orders and the Del Rio Deterrence Decision were unlawful and an order "allowing each of the Individual Plaintiffs . . . to return to the United States and requiring Defendants to facilitate their return, so that [they] may pursue their asylum claims." *Id.* at 124–25. The Government again moved to dismiss, arguing that the Plaintiffs lack standing to challenge policies that are no longer in effect and that the claims fail on the merits. *See* ECF 82 at 18, 32, 47, 50.

## II.    LEGAL STANDARD

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Id.* Faced with a Rule 12(b)(1) motion to dismiss for lack of standing, a court takes the "factual allegations in the complaint as true." *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021). "[W]hen a plaintiff . . . voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007).

"To survive" a Rule 12(b)(6) "motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court "must treat the complaint's factual allegations as true . . . and must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). That said, a court need not accept "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Nor must a court accept "legal conclusions cast in the form of factual allegations." *Id.*

## III.    ANALYSIS

The Court begins, as it must, with jurisdiction. The expiration of the Title 42 orders since this case was filed unsurprisingly presents a justiciability question. The Government rightly frames the issue as one of standing, rather than mootness, given the Plaintiffs' filing of an amended complaint after the expiration of the Title 42 orders. *See Rockwell Int'l Corp.*, 549 U.S. at 473–74. Because the Government expelled some of the Plaintiffs to Haiti pursuant to the Title 42 orders and those Plaintiffs remain in Haiti today—never having applied for the forms of immigration relief they came to the United States seeking—those Plaintiffs have standing to challenge their expulsion. But because the Plaintiffs are only seeking injunctive and declaratory relief, not damages, the Court cannot redress any injuries related to the conditions in the Del Rio encampment where Haitians were held. The Court therefore lacks jurisdiction over the claims related to those conditions. The Court then turns to the merits of the claims over which it has jurisdiction. Some, but not all, survive the Government's Rule 12(b)(6) motion to dismiss. The Court walks through these claims below. Finally, because the President need not be a defendant for the Court to fashion complete relief, the Court dismisses him from the case.

### A.  The Plaintiffs have established standing insofar as they challenge their expulsion from the United States but have not established standing for their remaining claims.

The Plaintiffs' claims fall into two buckets. First, several relate to their expulsion from the United States. That is the gravamen of each of their claims—counts four, five, six, and seven—related to the Government's use of Title 42. *See* ECF 75 ¶¶ 404, 410, 434, 447. That is also true of the equal protection claim (count one), insofar as that count relates to the "application" of Title 42. *Id.* ¶ 378. Other claims fall into a different bucket. These relate to the Government's allegedly inhumane treatment of the Haitian migrants at the Del Rio encampment in September 2021. That is true of both substantive due process claims, as well as the APA challenge to the Del Rio

Deterrence Decision. *See id.* ¶¶ 384, 386 (discussing "humanitarian concerns" and "fundamental rights" including "bodily integrity, freedom from bodily restraint, and family integrity"); *id.* ¶ 394 (pointing to "depriv[ation]" of "basic human needs such as adequate food, water, shelter, and medical care"); *id.* ¶ 462 (describing the "brutal and inhumane conditions" near the border in "late summer 2021").

The Plaintiffs must "demonstrate standing for each" of these claims. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). And although they filed this case as a putative class action, that "adds nothing to the question of standing" at this stage. *Doe 1 v. Apple Inc.*, 96 F.4th 403, 413 n.2 (D.C. Cir. 2024). The standing inquiry therefore trains on the "named plaintiffs" and the named plaintiffs only. *Id.* That said, only one plaintiff needs to establish standing for each claim "[t]o establish jurisdiction." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). The Court concludes that the individual Plaintiffs who are still in Haiti have standing to press the Title 42 related claims, but that no Plaintiff has standing to challenge the Government's treatment of migrants at the Del Rio encampment.

### 1. The expulsion related claims.

With little trouble, the Court concludes that at least one Plaintiff has established standing to bring the expulsion related claims. The Plaintiffs allege that they were "expelled to Haiti under the Title 42" orders issued by the CDC during the pandemic. ECF 75 ¶ 227. Had they not been expelled under Title 42, they would have had the opportunity to apply for asylum, withholding of removal, or CAT protection. *See id.* ¶¶ 401, 415–21, 437, 442, 448–56. That qualifies as an injury in fact. Plaintiffs are alleging that the Government "failed to abide by . . . procedural requirement[s]"—the requirements allowing noncitizens to seek those forms of immigration relief. *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 24 (D.D.C. 2020). And those

"procedural requirement[s]" are no doubt "designed to protect [a] threatened concrete interest" of the Plaintiffs: not being removed to a country where they face persecution or torture. *Id.*

So too is this procedural injury fairly traceable to the Government's application of Title 42 to the individual Plaintiffs. The complaint is replete with allegations that individuals were expelled pursuant to Title 42, and that in implementing Title 42 the Government did not allow individuals the opportunity to apply for asylum or either form of withholding relief. *See, e.g.*, ECF 75 ¶¶ 63, 192, 198–207. Eric and Florence Doe, for instance, were in the encampment at Del Rio for six days before the Government took them to a detention facility and, "without any explanation," put them on a plane to Haiti. *Id.* ¶¶ 316–17. "It was not until the plane landed in Haiti that they realized they had been deported," and neither "had an opportunity to express their fear of returning to Haiti or their intention to seek refuge in the United States, or to seek any other form of immigration relief." *Id.* The Government, for its part, does not even contest that it denied those expelled under Title 42 the opportunity to apply for asylum or withholding of removal, instead explaining its view that Title 42 "foreclosed" those forms of relief. ECF 82 at 50. And while the Government does point to a memo that suggests there was a process for inquiring about eligibility for CAT relief, *id.* at 52, the allegation that no individual Plaintiff was afforded the opportunity to seek immigration relief raises a factual question as to whether that opportunity existed in practice, *see* ECF 75 ¶¶ 13–22. Because the individual Plaintiffs were denied these procedural protections pursuant to Title 42, and because those "procedural [protections] w[ere] connected to the substantive result" the individuals sought—asylum or withholding or removal—their procedural injury is fairly traceable to the application of Title 42. *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002); *see also Kiakombua*, 498 F. Supp. 3d at 25–26.

As for redressability, the Court is satisfied that a favorable ruling can redress the procedural injuries of the Plaintiffs who remain in Haiti. Unlike the Plaintiffs who are now in the United States and who have been afforded the process previously denied to them, *see, e.g.*, ECF 75 ¶ 309, the Plaintiffs in Haiti have still not had the chance to seek any of the forms of relief to which they say they were entitled, *see, e.g.*, *id.* ¶¶ 317–18. As the Plaintiffs have requested, the Court could redress that ongoing injury by "order[ing] the government to return to the United States the plaintiffs who were unlawfully deported and to provide them with" the processes they were deprived. *Kiakombua*, 498 F. Supp. 3d at 29; *see* ECF 75 at 124–25 (seeking that relief).

To be sure, whether that relief will ultimately be warranted is an open question. But whether that "kind of relief" is "avail[able]" goes to "the merits," not the justiciability of these claims. *Chafin v. Chafin*, 568 U.S. 165, 174 (2013) (holding Article III's "case or controversy" requirement was satisfied where plaintiff was seeking an order requiring return of his child to the United States, despite defendant's argument that the "District Court lack[ed] the authority" to order that relief). The same goes for the Plaintiffs' request that the Court order the Government to apply the immigration rules that would have been applied to them had they been able to seek immigration relief when they first arrived in the United States in 2021, rather than the stricter rules that have been implemented since then. *See* ECF 75 at 124–25. The Court may or may not be able to do that, but the request for "relief to ameliorate past and present harms stemming from the" Plaintiffs' expulsion pursuant to Title 42 maintains a justiciable controversy. *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1112 n.3 (9th Cir. 2025), *cert granted sub nom.*, *Noem v. Al Otro Lado*, No. 25-5, 146 S. Ct. 604 (2025); *see* 138 F.4th at 1109, 1112 (challenged policy was "rescinded" but district court "enjoined the Government from applying" an immigration rule that was adopted after noncitizens were "turned away under the" challenged policy).

The Government's principal objection to this conclusion is that the Title 42 orders have expired. *See, e.g.*, ECF 82 at 21–22 (arguing that Plaintiffs are not "presently subject . . . to any Title 42 order"). True, the Court cannot "provide . . . effectual relief by prohibiting the [Government] from enforcing a policy that is no longer on the books." *Zukerman v. USPS*, 961 F.3d 431, 443 (D.C. Cir. 2020). But some "aspect[s] of [the individual Plaintiffs'] injur[ies] persist[] and can be relieved by an appropriate court order." *Id.* Most obviously, the individuals in Haiti "still [have] not" been afforded the processes they argue Title 42 unlawfully deprived them of. *Id.* Because the Court can remedy that injury, the individual Plaintiffs in Haiti have standing.

Nor, as the Government suggests, do the Plaintiffs lack standing because they could hypothetically travel back to the border and avail themselves of those processes without the help of a court order. *See* ECF 89 at 11. The individual Plaintiffs made long, arduous journeys to get to the southern border in 2021. *See, e.g.*, ECF 75 ¶ 311(describing Eric and Florence Doe's journey "through the Darién Gap, where they were attacked by men who raped many of the women and young girls in their group"). The Government then put them on planes and returned them to Haiti. *See, e.g.*, *id.* ¶ 317 (describing Eric and Florence Doe's return to Haiti). To return to the border to seek immigration relief, the individual Plaintiffs would again have to endure that arduous journey and incur the costs of travel. It strains credulity to argue in these circumstances that the individual Plaintiffs' ongoing injuries are self-inflicted and therefore not cognizable. *See* Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.5 (3d ed. 2025) ("Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury. . . . Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain."); *see also, e.g.*, *Libertarian Nat'l Comm., Inc. v. FEC*, 924 F.3d 533, 538 (D.C. Cir. 2019) (choosing "the lesser of two evils hardly transforms" a plaintiff's injury into a "self-imposed" one).

Finally, the Government's reliance on decisions dismissing as moot other challenges to the COVID-era Title 42 orders is misplaced. *See* ECF 82 at 16–17; ECF 89 at 6. In *Huisha-Huisha*, one of these cases, the plaintiffs were present in the United States and sought to represent a class— of which they assured the court they were a part for class certification purposes—limited to "noncitizens who . . . are or will be in the United States." Second Am. Compl. ¶¶ 74, 77–78, *Huisha-Huisha v. Mayorkas*, No. 21-cv-100 (D.D.C. Feb. 14, 2022), ECF 131; *see also Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 160 (D.D.C. 2021) (describing prior orders staying plaintiffs' removal from the United States), *affirmed in part* 27 F.4th 718. The same goes for *P.J.E.S. v. Wolf*, where the named plaintiff was "currently in . . . custody in McAllen, Texas" and the class consisted of children who "are or will be detained . . . in the United States." Compl. ¶¶ 3, 101, *P.J.E.S. v. Wolf*, No. 20-cv-2245 (D.D.C. Aug. 14, 2020), ECF 1. That the claims brought by people who were present in the United States were mooted in these cases by the expiration of the Title 42 orders has little to say about the claims in this case brought by people who were expelled under the Title 42 orders and who remain in Haiti.

The Fifth Circuit litigation the Government cites is even further afield. That case was brought by states "seeking to enjoin" the termination of the Title 42 orders. *Louisiana v. Ctrs. For Disease Control & Prevention*, 603 F. Supp. 3d 406, 412 (W.D. La. 2022). Whether those states could continue their lawsuit after the policy was repealed on a different basis than the one challenged in that case presents an entirely different set of questions than whether the individuals expelled from the United States under the policy suffer ongoing harms. *See Arizona v. Mayorkas*, 143 S. Ct. 1312, 1313–14 (2023) (Statement of Gorsuch, J.) (explaining the twists and turns that led to mootness of states' challenge). The same goes for the Supreme Court's resolution of a case related to the Title 42 orders. At the Court, that case involved the effort of some states to intervene

in the *Huisha-Huisha* litigation to defend the Title 42 orders. *See Arizona v. Mayorkas*, 143 S. Ct. 478 (2022). As already explained, the *Huisha-Huisha* litigation being moot does not suggest there is no live controversy over some of the claims brought by the out-of-country Plaintiffs in this case. And the Supreme Court's holding that the state's motion to intervene was rendered moot by the mootness of the case they sought to join, *see Arizona*, 143 S. Ct. at 1312, similarly has nothing to say about the justiciability of the out-of-country Plaintiffs' claims.

To sum up: The individual Plaintiffs who were expelled pursuant to Title 42 and who remain in Haiti have standing to press their claims related to the application of Title 42. In each of those claims, the Plaintiffs allege that by subjecting them to Title 42 the Government deprived them of procedural rights designed to protect them from either removal from the United States altogether, or at the very least removal to Haiti. The denial of those procedural opportunities is fairly traceable to the Government's application of Title 42, and the Court could ameliorate the ongoing effects of this injury by ordering the Government to facilitate the Plaintiffs' return to the United States so that they can avail themselves of these procedures and requiring the Government to apply the rules that would have been used in determining these noncitizens' entitlement to immigration relief had they been able to seek it before they were expelled under Title 42. Because nothing more is required to demonstrate standing, and because the Court is satisfied that at least one Plaintiff has standing to press these claims, the Court need not address Haitian Bridge's organizational standing to press the same claims.

### 2. The conditions related claims.

Unlike the claims related to the expulsion of the Plaintiffs under Title 42, no Plaintiff has standing to bring the claims related to the conditions at the Del Rio encampment in September 2021. "[P]ast exposure to illegal conduct, without more, is insufficient to establish standing for prospective relief." *Jones v. U.S. Secret Serv.*, 143 F.4th 489, 495 (D.C. Cir. 2025). The Plaintiffs

therefore cannot seek an order declaring unlawful their treatment at the Del Rio encampment or an injunction barring future similar treatment based on the mere fact that the Government's actions at the Del Rio encampment were allegedly unlawful.

Recognizing as much, the Plaintiffs have attempted to rely on "continuing, adverse effects" of the Government's "conduct at Del Rio." ECF 86 at 21. Those effects, however, are all traceable to the noncitizens' expulsion from the United States, not to the allegedly unlawful conditions at the Del Rio encampment. That is true of the fact that some Plaintiffs are still in Haiti and have not been afforded the "procedural" opportunities to which they are allegedly entitled, *id.* at 22–23, of the fact that some of the Plaintiffs were allegedly rendered ineligible for temporary protective status because they were "unlawfully expelled," *id.* at 24, and of the fact that some of the Plaintiffs are now subject to harsher immigration rules than they would have been had they not been "unlawfully expelled," *id.* at 26. The same goes for the ongoing effects Haitian Bridge claims it is suffering. It is allegedly "serving the same population twice" because migrants who otherwise would have had their chance to seek asylum or withholding of removal were instead "expelled." *Id.* at 31–32; *see also id.* at 34 (discussing the diversion of resources required to serve the "needs of Haitian asylum seekers expelled from Del Rio"). Because none of these ongoing effects are fairly traceable to the conduct challenged in the substantive due process claims and APA challenge to the Del Rio Deterrence Decision, none of these injuries establish the Plaintiffs' standing to seek prospective relief based on those claims.

The Plaintiffs similarly falter in arguing that they have standing to press these claims because there is a "likelihood of a large migration event developing that would invoke the type of response from [the Government] that [the] Plaintiffs experienced at Del Rio." ECF 86 at 29. The Plaintiffs have not plausibly alleged a "real and immediate threat of repeated injury" sufficient to

establish standing based on this theory. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). The Court focuses on Haitian Bridge here, rather than the individual Plaintiffs, because the chain of events leading the organization to suffer this future harm is slightly less attenuated than it is for the individuals (who would have to show a "substantial risk" that they themselves would end up back at the border suffering again from similar treatment, *id.*). Haitian Bridge needs to have plausibly alleged, bare minimum, a substantial risk that (1) another mass migration event will take place, (2) that event will involve the population of migrants Haitian Bridge serves, (3) the migrants will arrive en masse at a single location, like the Haitian migrants did in 2021, and (4) that the Government will respond to that mass migration event by adopting a policy like the Del Rio Deterrence Decision. Compounding the uncertainty, this sequence of events depends both on the "decisions of third parties"—migrants—and of the Government defendants. *Id.* at 72. Because it runs through a "speculative chain of possibilities," this theory of future injury cannot establish standing to seek prospective relief from the possible reimposition of the conditions at the Del Rio encampment. *Clapper*, 568 U.S. at 414. No ongoing or future injury supports the Plaintiffs' claims related to the conditions at the Del Rio encampment, so the Court lacks jurisdiction over them.

**B. Aspects of Plaintiffs' procedural due process and Administrative Procedure Act claims are plausible and therefore survive the motion to dismiss.**

The Plaintiffs have standing to pursue their equal protection claim as it relates to the allegedly discriminatory application of Title 42 (count one), their procedural due process claim (count four), and their APA claims related to Title 42 (counts five through seven). The Government moved to dismiss each of those claims under Rule 12(b)(6). The Court grants that motion as to the equal protection claim and as to the procedural due process claim and APA claims insofar as they relate to the Government's denial of the opportunity to apply for asylum. The remaining aspects of the procedural due process and APA claims, however, survive the Government's motion.

1.  **The equal protection claim.**

The Plaintiffs allege that Title 42 was "implement[ed]" against them and other Haitian migrants differently than it was against other similarly situated migrants, and that the differential treatment was "based on race" and "national origin." ECF 75 ¶¶ 372, 376–77. At the threshold, the Court notes that many of the amended complaint's allegations related to the equal protection claim are centered on the conditions at the Del Rio encampment. *See, e.g.*, *id.* ¶¶ 175–80, 187–91. Because the Plaintiffs lack standing to challenge those conditions, the Court focuses its attention on the allegations related to the decision to expel Haitian migrants under Title 42.

Turning now to those allegations. The Title 42 orders issued during COVID were themselves facially neutral as to race and national origin. Per the terms of the Title 42 orders, they applied to all migrants "traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land Port of Entry . . . or Border Patrol station at or near the United States borders with Canada or Mexico"—in practice, noncitizens "who lack valid travel documents." Notice of Order Under Sections 362 and 365 of the Public Health Service Act Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists, 85 Fed. Reg. at 17061. While the precise contours of the Plaintiffs' equal protection challenge are a little difficult to discern, the argument appears to be that despite the facial neutrality of the Title 42 policy its implementation in Del Rio was either (1) "motivat[ed]" by a desire to discriminate based on race or national origin or (2) arbitrarily treated Haitians worse than similarly situated migrants. ECF 75 ¶¶ 373–76. The Government offers several reasons why this claim fails, but the Court dismisses for the simple reason that the facts alleged by the Plaintiffs do not plausibly support either of these legal conclusions.

As for "discriminatory purpose," the Plaintiffs focus on the United States' long, shameful record of "anti-Haitian immigration policies," statements from a small number of Government

officials in the lead up to the events of September 2021, the sheer disregard for the migrants' human rights at the Del Rio encampment, and a comparison to the Government's response to other mass migration events. ECF 75 ¶¶ 36–59, 175–91. The problem for the Plaintiffs here is much like the problem faced by the plaintiff in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Here, as there, the complaint seeks to challenge a "policy" that was allegedly "adopted" by senior government officials—there, the Attorney General and Director of the FBI, here the President, his senior advisors, and the Director of the CDC—"because of . . . race and national origin." *Id.* at 682; ECF 75 ¶¶ 23, 372. Here, as there, the complaint suggests more "likely explanations" for these senior officials' decision to implement Title 42. The Title 42 order in effect in September 2021—when the events at the Del Rio encampment took place—was issued on August 5 of that year. *See* 86 Fed. Reg. 42828. That is at the very beginning of the month that the Plaintiffs allege the President and his advisors "began receiving intelligence reports indicating that they could soon anticipate an increase in the number of Haitians seeking asylum arriving near the Del Rio Port of Entry." ECF 75 ¶ 60. And it is *before* the complaint alleges the "Del Rio Deterrence Decision was made." *Id.* ¶ 61. In other words, the sequence suggests that the decision to implement the Title 42 order in effect when the Plaintiffs arrived in Del Rio was made before the Government developed concerns about an impending surge of Haitian migrants. That undermines the inference the Plaintiffs are asking the Court to draw from the alleged facts and suggests an "obvious alternative explanation," *Ashcroft*, 556 U.S. at 682, for the implementation of the Title 42 policy: ongoing concerns about the transmission of COVID-19, just as the Title 42 order said. *See* 86 Fed. Reg. at 42838 (summarizing findings).

The Plaintiffs' reliance on historic discrimination against Haitians and the previous Presidential administration's allegedly discriminatory motives for adopting Title 42, *see*

ECF 75 ¶¶ 52–54, do not nudge this claim over the line to plausible. Outdated "historical evidence . . . has little probative value," and the allegations about the prior administration do not support an inference that the Biden administration maintained the policy for the same allegedly discriminatory reasons. *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987).

The allegations about other mass migration events do not salvage the claim, either. One of those allegations relates to the treatment of migrants in Mission, Texas, in the spring of 2021. When faced with a "humanitarian crisis" in Mission, the complaint alleges, the Government took steps to resolve the crisis that it did not take in Del Rio. ECF 75 ¶ 182. But the complaint never alleges that the migrants in Mission were not expelled under Title 42, just as the Haitian migrants were. How the Government "alleviate[d] the humanitarian crisis" at Mission, *id.*, does not indicate that Title 42 was adopted or applied in a discriminatory fashion.

The other mass migration the Plaintiffs point to underpins their second equal protection theory: that they were "arbitrarily and intentionally treated differently from others who [we]re similarly situated." ECF 75 ¶ 373. Ukrainian asylum seekers who arrived in April 2022 were "exempt[ed]" from "automatic expulsion under Title 42." *Id.* ¶ 182. "Distinctions on the basis of nationality," however, "may be drawn in the immigration field . . . [s]o long as such distinctions are not wholly irrational." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979). The complaint alleges no facts from which the Court can draw a reasonable inference that the Executive's determination that the Russian invasion of Ukraine warranted an exception to Title 42 was wholly irrational, *see* ECF 82 at 44 n.8 (citing memorandum offering this justification), so does not plausibly allege an equal protection violation on this basis. Because the Plaintiffs have not plausibly alleged an equal protection claim, the Court dismisses count one.

### 2. The procedural due process claim.

Noncitizens "apprehended while trying to enter the country have no [procedural] due process rights beyond what Congress has provided by statute." *M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021). The same goes for noncitizens who have "set foot on U.S. soil," but who nonetheless have not "effected an entry" to the country. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020); *see also Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *22 (D.C. Cir. Nov. 22, 2025) (outlining contours of this rule). The Haitians expelled from Del Rio pursuant to Title 42 therefore had "only those rights regarding admission that Congress . . . provided by statute." *Thuraissigiam*, 591 U.S. at 140; *see also Guerrier v. Garland*, 18 F.4th 304, 310 (9th Cir. 2021) (describing the "due process rights" of noncitizens detained at or near border as "coextensive with the statutory rights Congress provides").

The Plaintiffs do not resist any of this legal framework. Instead, they claim that the Government's Title 42 orders deprived them of the "rights regarding admission that Congress . . . provided." ECF 86 at 43. In particular, the Plaintiffs claim that the Government deprived them of their statutory right to apply for asylum, withholding of removal, and CAT relief. *See* ECF 75 ¶¶ 401–02. The Plaintiffs' claim fails insofar as it relates to the opportunity to apply for asylum but is plausible as it relates to withholding and CAT relief.

Plaintiffs' asylum-related claim hinges on a provision that "entitles [noncitizens]—even those who enter the country illegally—to apply for asylum before they are expelled." *Huisha-Huisha*, 27 F.4th at 730; *see* 8 U.S.C. § 1158(a)(1). Like in the *Huisha-Huisha* litigation, the Plaintiffs claim that the Government deprived them of that right when it used Title 42 to expel noncitizens without providing any opportunity to apply for asylum. *See Huisha-Huisha*, 27 F.4th at 730 (describing this claim). Although the Circuit did not definitively resolve this question in that case—instead making only a prediction about those plaintiffs' likelihood of success, *see id.* at

21

733—the Court finds its reasoning rejecting this claim persuasive and follows that decision's lead. As the panel explained there, asylum is "discretionary" in nature: "[T]he Executive 'may grant asylum.'" *Id.* at 730 (quoting 8 U.S.C. § 1158(b)(1)(A)). In issuing the Title 42 orders, "the Executive . . . show[ed] an intent to exercise that 'discretion' by foreclosing asylum for the specific subset of border crossers covered" by the Title 42 orders. *Id.* at 731. "It's true that the" Title 42 orders "foreclose[d]" not only that "grant of asylum," but also "the statutorily mandated procedures" used "to apply for asylum." *Id.* "But if the asylum decision ha[d] already been made— by the [Title 42 orders]—then those procedures would [have been] futile." *Id.* Because nothing in the complaint suggests the Government had not "already . . . made" the "asylum decision" as to the Haitians arriving at Del Rio, *id.*—this claim is premised on the fact that the Government did just that, *see, e.g.*, ECF 75 ¶¶ 204, 403—the Title 42 orders did not deprive the Plaintiffs of a procedural right to seek asylum.

The Plaintiffs have plausibly alleged, however, that the Government's application of Title 42 deprived them of their rights to apply for withholding of removal and CAT relief. Here again, the Court follows the Circuit's reasoning from *Huisha-Huisha*. Both "withholding-of removal relief" and CAT relief "are mandatory." *Huisha-Huisha*, 27 F.4th at 731–32. "To expel" a noncitizen to a country where they otherwise cannot be expelled because of withholding of removal or CAT, the "Executive must identify a statute that creates an exception" to those protections. *Id.* Title 42 is not "that statute." *Id.* at 732. While its text does, in combination with another statute, contemplate the removal of noncitizens, Title 42 "says nothing about where the Executive may expel" noncitizens. *Id.* So in exercising its power under Title 42, the Government nonetheless must abide by its obligation not to expel noncitizens to "any place where" they "will be persecuted" or tortured. *Id.* The Plaintiffs were therefore entitled to the processes by which they

could have sought to prevent their removal to those countries. *See* 8 U.S.C. § 1225(b)(1)(A), (B) (describing these processes for noncitizens placed in expedited removal); *id.* §§ 1225(b)(2), 1229a (describing processes for "other" noncitizens); *see also Thuraissigiam*, 591 U.S. at 140 (identifying same statutes as source of "right[s]" "Congress provided"). The Plaintiffs have plausibly alleged that the Government deprived them of these procedural rights.

The Government does not counter this conclusion on the law. Instead, it argues that the complaint "does not plausibly allege that any Individual Plaintiff was denied protections under" the withholding or CAT statutes. ECF 82 at 41; *see also* ECF 89 at 21–22. That argument overlooks many of the complaint's allegations. The complaint details the fears each individual Plaintiff who remains in Haiti—the ones the Court has concluded have standing to press this claim—had about being returned there.

Eric Doe, for instance, was "involved in Haitian politics," was "periodically . . . forced to flee to the Dominican Republic to escape threats by the political opposition," and was the victim of an attempted arson and successful shooting by the members of "the rival political party." ECF 75 ¶ 310. Since the Government returned Eric and his wife Florence Doe to Haiti, they have gone "into hiding," "armed men" have come to their home looking for Eric and "threatened to burn th[eir] house down and burn Florence alive," and members of a rival political party have "violently assaulted one of Eric's brothers and broke[n] his leg." *Id.* ¶ 318. Given these allegations, it is entirely plausibly to infer that Eric and Florence Doe would have attempted to avail themselves of withholding of removal and CAT protections to avoid being expelled to Haiti, precisely as the complaint alleges was their intent. *See id.* ¶¶ 19, 311; 8 U.S.C. § 1231(b)(3)(A) (withholding bars removal to a country where "life . . . would be threatened" because of "political opinion"); 8 C.F.R. § 208.16(c)(4) (providing that noncitizens are eligible for CAT relief if they are "more likely than

not to be tortured in the country of removal"). The complaint includes similar allegations for the other individual Plaintiffs who remain in Haiti. *See* ECF 75 ¶¶ 21–22, 326, 335, 336–37, 341–42. The Plaintiffs who have standing have therefore plausibly alleged that they were deprived of their procedural rights to apply for withholding and CAT protection, and these aspects of the procedural due process claim survive the motion to dismiss.

### 3. The Administrative Procedure Act claims.

In addition to their constitutional claims, Plaintiffs bring four claims under the Administrative Procedure Act (APA). *See* ECF 75 at 113–22.[2] The Court has already concluded that the Plaintiffs lack standing to press the final of those claims, count eight, which challenges the decision to "inflict[] brutal and inhumane conditions" on the Haitian migrants at the Del Rio encampment. *Id.* ¶ 462; *see supra* 9–10. The Government has moved to dismiss the remaining three claims on two grounds, one of which is applicable to the contrary to law and arbitrary and capricious claims in counts five and six, the other of which applies to the agency action unlawfully withheld or unreasonably delayed claim in count seven.

First, the Government argues that because "vacatur of the agency action" is "the normal remedy" for a contrary to law or arbitrary and capricious APA claim, and because the Plaintiffs seek to redress their injury through an injunction rather than vacatur, "these claims should be dismissed." ECF 82 at 48. That cramped view of remedies under the APA misstates the law. While "vacatur" is the "ordinary" remedy in APA cases, a plaintiff can secure an injunction if a court

---

[2] To avoid any potential confusion, the Court notes that although it is calling these claims the APA claims, that shorthand is not meant to suggest anything about the source of the cause of action for the Plaintiffs' constitutional claims. The APA may well provide that cause of action. *See* 5 U.S.C. § 702 (providing for judicial review); *id.* § 706(2)(B) (instructing court to "hold unlawful and set aside agency action" that is "contrary to constitutional right"). But because the Government has not raised any argument related to the Plaintiffs' cause of action, the Court need not address that issue. *See Shapiro v. McManus*, 577 U.S. 39, 45 (2015) ("Absent . . . frivolity, the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.").

"determine[s] that an injunction *should* issue under the traditional four-factor test." *Standing Rock Sioux Tribe v. U.S. Army Corps. of Eng'rs*, 985 F.3d 1032, 1050, 1053 (D.C. Cir. 2021) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010)). And plaintiffs regularly seek— and courts regularly award—precisely that relief. *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021) (collecting cases). It is, of course, far too early in this case to determine whether the Plaintiffs will ultimately be entitled to an injunction. But their claim is not somehow rendered implausible because they are seeking that relief.

The Government's second argument is trained on the Plaintiffs' claim of agency action unlawfully withheld or unreasonably delayed. In that claim, the Plaintiffs allege that the Government (1) failed to "inspect[]" and then refer noncitizens who indicated an intention to apply for asylum "for an interview by an asylum officer," (2) failed to follow the procedures for adjudicating claims for withholding of removal or CAT relief, and (3) generally failed to follow the procedures governing the removal of noncitizens that are laid out in the immigration statutes. 8 U.S.C. § 1225(a)(3), (b)(1)(A)(i)–(ii); *see* ECF 75 ¶¶ 448–49, 452–56 (outlining claims). The Government says those claims fail because none of the actions the Plaintiffs accuse the Government of failing to take were "non-discretionary," "mandatory" duties. ECF 82 at 50.

The Government is right about the first and third aspects of this claim, but not the second. For the reasons already explained, the Government was not obligated to provide an opportunity for the arriving Haitians to "indicate[] . . . an intention to apply for asylum." 8 U.S.C. § 1225(b)(1)(A)(i)–(ii). By relying on Title 42 to expel the arriving noncitizens, the Government foreclosed the pathway to that discretionary relief. *See supra* 21–22.[3] So too do the Plaintiffs fail in arguing that the Government generally failed to follow the processes established

---

[3] This same reasoning also dooms the Plaintiffs' claim that the Title 42 orders were contrary to law because they were contrary to the asylum statute. *See* ECF 75 ¶ 416. The Court therefore dismisses this portion of count five, as well.

by the immigration statutes. The APA requires a plaintiff to identify a "discrete," mandatory action; it does not permit "broad[,] programmatic attack[s]" against a government program. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The only discrete duties the Plaintiffs have identified are those related to asylum, withholding, and CAT. So insofar as the Plaintiffs challenge the Government's compliance with those obligations, this claim is redundant, and to the extent it adds anything to the case, it is impermissibly programmatic.

But, for the same reasons the procedural due process claim can proceed as it relates to withholding and CAT, so too can the unlawfully withheld or delayed claim. A statute requires immigration officers to "inspect[]" arriving noncitizens. 8 U.S.C. § 1225(a)(3). And the immigration statutes detail what must happen vis-à-vis withholding and CAT claims from there, with the precise path dependent on the form of removal proceeding used by the Government to expel the noncitizen. *See id.* § 1225(b)(1)(A)(ii), (b)(1)(B) (describing various steps that "shall" be taken in expedited removal proceedings); *id.* § 1229a(a)(1), (b) (same for section 240 proceedings). Federal regulations provide still more detail about the steps the government must take in adjudicating withholding and CAT claims. *See, e.g.*, 8 C.F.R. § 235.3(b)(2)(i) ("In every case in which the expedited removal provisions will be applied and before removing" a noncitizen, "the examining immigration officer shall create a record of the facts of the case and the statements made" by the noncitizen.); *id.* § 235.3(b)(4) (providing that "examining immigration officer shall record sufficient information in the sworn statement to establish and record that" a noncitizen indicated a "fear[] or concern" about "persecution or torture"). These regulations, like the statutes they implement, impose mandatory duties, as well. *See, e.g.*, *Fort Still Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 120 (D.D.C. 2015) (identifying federal regulations as source of "mandatory, nondiscretionary dut[ies]"); *see also Ctr. for Auto Safety v. Dole*, 846 F.2d

1532, 1534 (D.C. Cir. 1988) ("[R]egulations promulgated by an administrate agency " can "supply the 'law to apply'" in "reviewing administrative agency inaction."). Because the Plaintiffs have plausibly alleged that the Government prevented them from seeking withholding or CAT protection, this claim is plausible insofar as it relates to the Government's failure to perform its duties related to those protections.

### C. The President is not a proper defendant in this case.

The Government urges the Court to dismiss the President from the case, arguing that separation-of-powers principles bar the Court from issuing "injunctive or declaratory relief directly against the President for his official conduct." ECF 82 at 56. There is no doubt that such relief is constitutionally disfavored and—at best—surpassingly rare. *See Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) ("[F]or the President to be ordered to perform particular executive acts at the behest of the Judiciary at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers."). Because the Plaintiffs can obtain complete relief via "injunctive relief against subordinate officials," the Court sees no need to take the unusual step of retaining the President as a defendant here. *Id.* at 978–79.

\*     \*     \*

The Government's motion to dismiss is **GRANTED in part** and **DENIED in part**. Counts one, two, three, four, and eight are **DISMISSED** without prejudice in their entirety. Counts five and seven are **DISMISSED** without prejudice insofar as they relate to the Government's denial of the opportunity to apply for asylum.

**SO ORDERED.**

_____
JIA M. COBB
U.S. District Court Judge

Date: March 6, 2026